Civil Action No. 23-682-CFC

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

Bloomberg L.P., Dow Jones & Company, Inc.,
The New York Times Company, and The Financial Times Ltd.,

Appellants,

v.

FTX Trading Ltd.,
Alameda Research LLC,

Appellees.

On Appeal from the United States Bankruptcy Court for the District of Delaware
Bankruptcy Case No. 22-11068 (JTD)

## BRIEF OF APPELLANTS BLOOMBERG L.P., DOW JONES & COMPANY, INC., THE NEW YORK TIMES COMPANY, AND THE FINANCIAL TIMES LTD.

<div style="text-align: right;">

David L. Finger (ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 N. Orange St., 7th fl.
Wilmington, DE 19801
(302) 573-2525
dfinger@delawgroup.com
*Counsel of Record for Appellants*

Katie Townsend (*pro hac vice*)
Adam A. Marshall (*pro hac vice*)
Reporters Committee for Freedom
    of the Press
*Counsel for Appellants*

</div>

## CORPORATE DISCLOSURE STATEMENTS

Bloomberg L.P., the publisher of Bloomberg News, is a limited partnership. Its general partner is Bloomberg Inc., which is privately held.  No publicly held corporation owns 10% or more of Bloomberg L.P.'s limited partnership interests.

Dow Jones & Company, Inc. ("Dow Jones") is an indirect subsidiary of News Corporation, a publicly held company.  Ruby Newco, LLC, an indirect subsidiary of News Corporation and a non-publicly held company, is the direct parent of Dow Jones.  News Preferred Holdings, Inc., a subsidiary of News Corporation, is the direct parent of Ruby Newco, LLC.  No publicly traded corporation currently owns 10% or more of the stock of Dow Jones.

The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned.  No publicly held company owns 10% or more of its stock.

The Financial Times Limited is a private company, and is a wholly-owned subsidiary of private company Financial Times Group Limited which is wholly owned by private company Nikkei Inc.  No publicly held corporation owns 10% or more of the stock of The Financial Times Limited.

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENTS ...................................................... ii

TABLE OF AUTHORITIES ...................................................................... v

JURISDICTIONAL STATEMENT .......................................................... 1

ISSUES PRESENTED AND STANDARDS OF REVIEW ..................................... 3

STATEMENT OF THE CASE ................................................................. 6

SUMMARY OF ARGUMENT ............................................................... 11

ARGUMENT ........................................................................................ 16

I.   There is a powerful presumption in favor of public access to court filings and to the names of creditors in bankruptcy proceedings that proponents of sealing must meet a heavy burden to overcome .................. 16

II.  The Bankruptcy Court erred as a matter of law by reversing the presumption in favor of public access and by failing to require a specific, particularized showing before authorizing broad redaction. ........ 19

   A.   The Bankruptcy Court improperly shifted the burden to the objecting parties. ................................................................. 20

   B.   The Bankruptcy Court erred by not requiring a particularized showing or undertaking a particularized review of the records or information at issue. ......................................................... 23

III. The Bankruptcy Court erred in authorizing the continued redaction of customer-creditors' names under § 107(b)(1) ......................................... 25

   A.   The Bankruptcy Court erred in concluding that the names of Debtors' customer-creditors are a "trade secret" without making any finding that Debtors took "reasonable measures" to keep that information secret. ......................................................... 27

   B.   The Bankruptcy Court erred in determining that the customer-creditor names have "value" and are therefore a "trade secret." ........ 31

|   | 1. | Debtors did not demonstrate that any of their customer-creditors would remain FTX customers in the event of a reorganization. | 32 |

|   | 2. | Debtors did not prove they could sell their customer-creditors' names and did not offer any evidence of the "value" of those names in any such sale. | 35 |

|   | 3. | The record establishes that a "vast number" of Debtors' customer-creditors already use other cryptocurrency platforms. | 38 |

| IV. | The Bankruptcy Court erred by permanently sealing the names of customer-creditors under § 107(c)(1). | 41 |

|   | A. | The Bankruptcy Court erred by failing to find that disclosure of Debtors' customer-creditors' names, alone, "would" create undue risk of identity theft or unlawful injury. | 42 |

|   | B. | The Bankruptcy Court erred by failing to make factual findings that disclosure of Debtors' customer-creditors' names, alone, would create "undue risk" of identity theft or other unlawful injury | 45 |

| V. | The Bankruptcy Court erred in refusing to consider less-restrictive alternatives to the redaction of all customer-creditor names | 53 |

CONCLUSION ................................................................54

CERTIFICATE OF COMPLIANCE .......................................57

# TABLE OF AUTHORITIES

## Cases

*Anderson v. City of Bessemer City*,
  470 U.S. 564 (1985) ................................................................34

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. Hotel Rittenhouse Assocs.*,
  800 F.2d 339 (3d Cir. 1986) .......................................................4

*Farmers Edge Inc. v. Farmobile, LLC*,
  970 F.3d 1027 (8th Cir. 2020) ..................................................30

*In re Alterra Healthcare Corp.*,
  353 B.R. 66 (Bankr. D. Del. 2006)........................................ 13, 26, 55

*In re AM Int'l, Inc.*,
  203 B.R. 898 (D. Del. 1996) .......................................................4

*In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*,
  924 F.3d 662 (3d Cir. 2019) ............................................ *passim*

*In re Avaya, Inc.*,
  No. 17-10089, 2019 WL 1750908 (Bankr. S.D.N.Y. Mar. 28, 2019) ................46

*In re Bell & Beckwith*,
  44 B.R. 661 (Bankr. N.D. Ohio 1984) ..............................................13

*In re Borders Grp., Inc.*,
  462 B.R. 42 (Bankr. S.D.N.Y. 2011) ...............................................53

*In re Celsius Network LLC*,
  644 B.R. 276 (Bankr. S.D.N.Y. 2022) ...................................... *passim*

*In re Cendant Corp.*,
  260 F.3d 183 (3d Cir. 2001) .......................................... 28, 41, 42, 46

*In re Crawford*,
  194 F.3d 954 (9th Cir. 1999) ........................................... 12, 16

*In re Cred Inc.*,
  No. 20-12836 (JTD), 2020 WL 13577187 (Bankr. D. Del. Dec. 21, 2020) ........25

*In re Creighton*,
   490 B.R. 240 (Bankr. N.D. Ohio 2013) ...............................................18

*In re FiberMark, Inc.*,
   330 B.R. 480 (Bankr. D. Vt. 2005) ............................................ 18, 40

*In re Food Mgmt. Grp., LLC*,
   359 B.R. 543 (Bankr. S.D.N.Y. 2007) ...............................................13

*In re Found. for New Era Philanthropy*,
   No. 95-13729F, 1995 WL 478841 (Bankr. E.D. Pa. May 18, 1995) ..................17

*In re Frontier Grp., LLC*,
   256 B.R. 771 (Bankr. E.D. Tenn. 2000)................................... 27, 35, 39

*In re Int'l Wireless Commc'ns Holdings, Inc.*,
   279 B.R. 463 (D. Del. 2002),
   *aff'd*, 68 F. App'x 275 (3d Cir. 2003) ...............................................4

*In re Itel Corp.*,
   17 B.R. 942 (Bankr. 9th Cir. 1982) ............................................ 18, 26

*In re Leopold to Unseal Certain Elec. Surveillance Applications & Orders*,
   964 F.3d 1121 (D.C. Cir. 2020)................................................................24

*In re MorAmerica Fin. Corp.*,
   158 B.R. 135 (Bankr. N.D. Iowa 1993) ...............................................17

*In re Neal*,
   461 F.3d 1048 (8th Cir. 2006) ...............................................16

*In re Northstar Energy, Inc.*,
   315 B.R. 425 (Bankr. E.D. Tex. 2004)...............................................27

*In re Orion Pictures Corp.*,
   21 F.3d 24 (2d Cir. 1994) .............................................. *passim*

*In re Purdue Pharma L.P.*,
   632 B.R. 34 (Bankr. S.D.N.Y. 2021) ................................... 18, 21, 29

*Leucadia, Inc. v. Applied Extrusion Techs., Inc.*,
   998 F.2d 157 (3d Cir. 1993) .......................................... 18, 53

*Meridian Bank v. Alten,*
    958 F.2d 1226 (3d Cir. 1992) ..................................................................4

*Miller v. Indiana Hosp.,*
    16 F.3d 549 (3d Cir. 1994) ....................................................................17

*Nat'l Archives & Recs. Admin. v. Favish,*
    541 U.S. 157 (2004) ..............................................................................42

*Prusky v. ReliaStar Life Ins. Co.,*
    474 F. Supp. 2d 703 (E.D. Pa. 2007),
    *aff'd,* 532 F.3d 252 (3d Cir. 2008) ......................................................45

*Publicker Indus., Inc. v. Cohen,*
    733 F.2d 1059 (3d Cir. 1984) ..................................................... 15, 16, 17

*U.S. Dep't of Just. v. Reporters Comm. for Freedom of the Press,*
    489 U.S. 749 (1989) ..............................................................................42

*United States v. A.R.,*
    38 F.3d 699 (3d Cir. 1994) ....................................................................28

*United States v. Cianfrani,*
    573 F.2d 835 (3d Cir. 1978) ................................................................1, 2

*United States v. Criden,*
    648 F.2d 814 (3d Cir. 1981) ....................................................................4

*United States v. Smith,*
    123 F.3d 140 (3d Cir. 1997) ....................................................................2

*United States v. Wecht,*
    537 F.3d 222 (3d Cir. 2008) ....................................................................2

*United States v. Wise,*
    515 F.3d 207 (3d Cir. 2008) ..................................................................40

*United States v. Xue,*
    No. 22-2609, 2023 WL 4622816 (3d Cir. July 19, 2023) ............................ 28, 31

*Zolfo, Cooper & Co. v. Sunbeam-Oster Co.,*
    50 F.3d 253 (3d Cir. 1995) ......................................................................5

**Statutes**

11 U.S.C. § 107 ............................................................................. 12, 24

11 U.S.C. § 107(a) ........................................................................ 16, 19

11 U.S.C. § 107(b)(1) ................................................................... *passim*

11 U.S.C. § 107(c)(1) ................................................................... *passim*

11 U.S.C. § 521(a) ...............................................................................17

18 U.S.C. § 1028(d) .............................................................................41

18 U.S.C. § 1839(3) .............................................................................26

18 U.S.C. § 1839(3)(A) ............................................................ 15, 26, 28

18 U.S.C. § 1839(3)(B) ........................................................ 15, 26, 31, 35

28 U.S.C. § 1334 ...................................................................................2

28 U.S.C. § 157 .....................................................................................2

28 U.S.C. § 158 .....................................................................................2

5 U.S.C. § 552 .....................................................................................42

**Other Authorities**

Alexander Gladstone & Soma Biswas, *Celsius Names Fahrenheit as Winning Chapter 11 Bidder*, Wall St. J. (May 25, 2023), https://www.wsj.com/articles/crypto-lender-celsius-names-fahrenheit-as-winning-chapter-11-bidder-40c3c3e5 ..................................................36

*Amended Standing Order of Reference* (D. Del. Feb. 29, 2012) ..............................2

Ava Benny-Morrison et al., *Bankman-Fried's Inner Circle Continues to Crumble With Singh Guilty Plea*, Bloomberg (Feb. 28, 2023), https://www.bloomberg.com/news/articles/2023-02-28/former-ftx-engineering-chief-singh-pleads-guilty-to-us-charges...........................................11

Caitlin McCabe & Rachel Louise Ensign, *FTX Crypto Customers Worry They Will Never See Their Money Again*, Wall St. J. (Nov. 21, 2022),

https://www.wsj.com/articles/ftx-crypto-customers-worry-they-will-never-
see-their-money-again-11668976779 ....................................................................44

Chris Arnold, *FTX investors fear they lost everything, and wonder if there's
anything they can do*, NPR (Nov. 18, 2022),
https://perma.cc/B7WR-9CBF ............................................................... 34, 44

Complaint,
*Rabbitte v. Sequoia Capital Operations, LLC*, No. 3:23-cv-655
(N.D. Cal. Feb. 14, 2023) ...................................................................................44

*Cryptocurrency 'is not the answer' to current monetary system: Jamie
Dimon*, Fox Business (Jan. 10, 2023),
https://www.foxbusiness.com/video/6318453640112 .........................................55

David Yaffe-Bellany & Matthew Goldstein, *Sam Bankman-Fried Pleads Not
Guilty to Additional Set of Charges*, N.Y. Times (Mar. 30, 2023),
https://www.nytimes.com/2023/03/30/business/sam-bankman-fried-
charges.html.......................................................................................................11

Fed. R. Bankr. P. 1007(a) ......................................................................................17

Fed. R. Evid. 201 ................................................................................... 43, 44, 45

*General Bankruptcy/Committee Questions*,
FTX Trading Official Committee of Unsecured Creditors,
https://dm.epiq11.com/case/ftx/info2 (last accessed Aug. 18, 2023)..................43

Joshua Oliver et al., *FTX: inside the crypto exchange that 'accidentally' lost
$8bn*, Financial Times (Nov. 18, 2022),
https://perma.cc/P8PX-U5QY ............................................................................11

Matthew Goldstein, *Ordinary Investors Who Jumped Into Crypto Are
Saying: Now What?*, N.Y. Times (Dec. 5, 2022),
https://www.nytimes.com/2022/12/05/business/cryptocurrency-investors-
ftx-blockfi.html................................................................................................ 44, 45

Notice of Successful Bidder and Backup Bidder,
*In re Celsius Network LLC*, No. 22-10964
(Bankr. S.D.N.Y. May 25, 2023), Doc. No. 2713................................................36

Pls.' Preliminary Report in Advance of Initial Status Conference,
   *In re FTX Cryptocurrency Exchange Collapse Litigation*,
   No. 1:23-md-03076 (S.D. Fla. June 16, 2023), ECF No. 40 ................................ 34

Preliminary Report Exhibit C: Related Cases,
   *In re FTX Cryptocurrency Exchange Collapse Litigation*,
   No. 1:23-md-03076 (S.D. Fla. June 16, 2023), ECF No. 40-3 ........................... 44

Restatement (First) of Torts § 757 cmt. b ................................................................ 26

Sandro Psaila, *Building trust in crypto exchanges*, Deloitte,
   https://perma.cc/5J8E-NTFQ (last accessed Aug. 18, 2023) ............................. 33

*Undue*, American Heritage Dictionary (5th ed. 2022),
   https://perma.cc/3AGJ-2P64 .............................................................................. 45

*Undue*, Black's Law Dictionary (11th ed. 2019) .................................................... 45

## JURISDICTIONAL STATEMENT

Debtors FTX Trading Ltd. *et al*.[1] ("Debtors" or "FTX") initiated this action pursuant to Chapter 11 on November 11, 2022.  D.I. 1.[2]  On December 9, 2022, Bloomberg L.P., Dow Jones & Company, Inc., The New York Times Company, and The Financial Times Ltd. ("Media Intervenors-Appellants") moved to intervene for the limited purpose of objecting to the redaction of the names of Debtors' creditors who were also customers of their cryptocurrency exchange in bankruptcy court filings, A49.  Their motion to intervene was granted on December 19.  A111.

On June 15, 2023 the Bankruptcy Court entered an order authorizing (a) the redaction of the names, addresses and e-mail addresses of Debtors' creditor-customers from any such filings for a period of at least 90 days pursuant to Bankruptcy Code § 107(b)(1); and (b) the permanent redaction of the names of Debtors' customers who are natural persons from all such filings pursuant to Bankruptcy Code § 107(c)(1) (the "Order").  A700.  The Order is a final order, including under the collateral order doctrine.  *See, e.g.*, *United States v. Cianfrani*,

---

[1]    FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively.  Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2]    Citations to "D.I" herein pertain to the docket entries below.

573 F.2d 835 (3d Cir. 1978); *United States v. Smith*, 123 F.3d 140 (3d Cir. 1997);

*United States v. Wecht*, 537 F.3d 222 (3d Cir. 2008).

Media Intervenors-Appellants timely appealed on June 23, 2023.  A705.

The Bankruptcy Court had subject-matter jurisdiction pursuant to 28 U.S.C.

§ 157, 28 U.S.C. § 1334, and the *Amended Standing Order of Reference* from the

United States District Court for the District of Delaware, dated February 29, 2012.

This Court has jurisdiction pursuant to 28 U.S.C. § 158.

2

## ISSUES PRESENTED AND STANDARDS OF REVIEW

**Issues Presented on Appeal:**

1.      Did the Bankruptcy Court, in entering the Order authorizing the redaction of Debtors' customer-creditors' names in all court records filed in these Chapter 11 cases, err as a matter of law by: (i) applying a presumption in favor of secrecy to the names of customer-creditors in cryptocurrency-related bankruptcy proceedings and shifting the burden to objecting parties, including Media Intervenors-Appellants, to overcome that presumption; (ii) concluding that only a showing of potential value was required to qualify Debtors' customer-creditors' names as a trade secret and justify their redaction under Bankruptcy Code § 107(b)(1), and/or (iii) declining to make particularized findings as to the need for specific redactions or to consider less-restrictive alternatives to redacting the names of an estimated 9 million natural persons and entities who are customer-creditors of Debtors from all filings?

2.      Did the Bankruptcy Court abuse its discretion when it entered the Order authorizing the redaction of the names of all Debtors' customer-creditors—both natural persons and entities—from all court records filed in these Chapter 11 cases for a period of 90 days pursuant to Bankruptcy Code § 107(b)(1)?

3.      Did the Bankruptcy Court abuse its discretion when it authorized the permanent redaction of the names of Debtors' customer-creditors who are natural

persons from all court records filed in these Chapter 11 proceedings pursuant to Bankruptcy Code § 107(c)(1)?

**Standards of Review on Appeal:**

Questions of law are "examined on appeal under a *de novo* standard of review." *In re AM Int'l, Inc.*, 203 B.R. 898, 903 (D. Del. 1996). A reviewing court "must break down mixed questions of law and fact, applying the appropriate standard to each component." *Meridian Bank v. Alten*, 958 F.2d 1226, 1229 (3d Cir. 1992) (citation omitted); *see also In re Int'l Wireless Commc'ns Holdings, Inc.*, 279 B.R. 463, 466 (D. Del. 2002), *aff'd*, 68 F. App'x 275 (3d Cir. 2003) (explaining that a reviewing court will accept a lower court's factual findings "unless clearly erroneous," but will exercise "plenary review" of the lower court's "choice and interpretation of legal precepts and its application of those precepts" to the facts (citations omitted)).

A lower court's ultimate decision to seal or restrict access to judicial records is reviewed for abuse of discretion. *See, e.g.*, *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 674 n.8 (3d Cir. 2019). However, such decisions are "not accorded the narrow review reserved for discretionary decisions based on first-hand observations." *United States v. Criden*, 648 F.2d 814, 818 (3d Cir. 1981); *accord Bank of Am. Nat'l Tr. & Sav. Ass'n v. Hotel Rittenhouse Assocs.*, 800 F.2d 339, 344 (3d Cir. 1986). A lower court abuses its discretion occurs if it fails to apply

the proper legal standard, fails to follow proper procedures in making a decision, or bases a decision upon findings of fact that are clearly erroneous. *Zolfo, Cooper & Co. v. Sunbeam-Oster Co.*, 50 F.3d 253, 257 (3d Cir. 1995) (citations omitted).

## STATEMENT OF THE CASE

On November 11, 2022, Debtors petitioned for relief under Chapter 11 of the Bankruptcy Code.  Thereafter, they moved for leave to file a consolidated Creditor Matrix containing the names and addresses of their creditors.  A33–A34, ¶ 6. Simultaneously, Debtors sought leave pursuant to 11 U.S.C. § 107(b)(1) to redact the names and addresses of those creditors who were also customers of FTX in all publicly filed versions of the Creditor Matrix and Consolidated Top 50 Creditors List and Schedules and Statements.  A35–A36, ¶ 12.

On December 9, 2022, Media Intervenors-Appellants moved to intervene for the limited purpose of objecting to the redaction of the names of Debtors' customer-creditors.  A49.  The U.S. Trustee also objected to redaction of the names of Debtors' customer-creditors.  A60.  On December 19, the Bankruptcy Court granted Media Intervenors-Appellants' motion to intervene.  A111.

On January 8, 2023, Debtors filed a response to the objections of Media Intervenors-Appellants and the U.S. Trustee, A112, accompanied by the declaration of Kevin M. Cofsky (the "Cofsky Declaration"), A132.

On January 11, 2023, the Bankruptcy Court held a hearing (the "Second Day Hearing") on, *inter alia*, Debtors' motion to redact the names of their customer-creditors, during which it heard testimony from Mr. Cofsky ("Cofsky").  A139.

On January 20, 2023, the Bankruptcy Court entered an order granting final relief as to some portions of Debtors' sealing request and interim relief as to other portions. A163. That order, in pertinent part, authorized Debtors to permanently "redact the addresses and e-mail addresses of their creditors and equity holders who are natural persons from any filings," and further authorized Debtors, pursuant to 11 U.S.C. § 107(b)(1), to redact the names of "all customers," and the "addresses and e-mail addresses of customers who are not natural persons" for a period of 90 days (the "Redaction Period"). A165 ¶¶ 4–5. The Bankruptcy Court required the Debtors to refile their Consolidated List of Top 50 Creditors "without redacting the name of any creditor who was appointed by the U.S. Trustee to the Official Committee of Unsecured Creditors" (the "Official Committee") and "the address, e-mail address or phone numbers of any creditor who is not natural persons [sic] and was appointed by the U.S. Trustee" to the Official Committee. A166–A167, ¶ 10.

On March 22, 2023, the Ad Hoc Committee of Non-US Customers filed its own motion to seal, seeking to redact the names of its members in certain filings pursuant to, *inter alia*, 11 U.S.C. § 107(b)(1) and § 107(c). A169 (the "Ad Hoc Committee Motion to Seal"). Media Intervenors-Appellants objected to the Ad Hoc Committee Motion to Seal and to any extension of the Redaction Period. A188.

On April 20, 2023, Debtors and the Official Committee filed a joint motion to, in relevant part, (i) extend the Redaction Period for an additional 90 days pursuant

to § 107(b)(1) and (ii) permanently seal the names of Debtors' individual customer-creditors pursuant to § 107(c).  A217 (the "Joint Motion to Seal").  In support of the latter argument, the Debtors and Official Committee submitted the declaration of Jeremy A. Sheridan (the "Sheridan Declaration").  A241, A257–A476.

Media Intervenors-Appellants objected to the Joint Motion to Seal, A477. The U.S. Trustee filed an omnibus objection to both the Ad Hoc Committee Motion to Seal and the Joint Motion to Seal.  A490.

On June 8 and 9, 2023, the Bankruptcy Court held a hearing to address, *inter alia*, the Joint Motion to Seal, the Ad Hoc Committee Motion to Seal, and the objections of Media Intervenors-Appellants and the U.S. Trustee.  A501; A541.  The Court heard further testimony from Cofsky on June 8, 2023 ("June 8 Hearing").  It heard testimony from Mr. Sheridan ("Sheridan") on June 9, 2023 ("June 9 Hearing").

Following argument at the June 9 Hearing, the Bankruptcy Court stated its intention to grant the Joint Motion to Seal and deny the Ad Hoc Committee Motion to Seal.[3]  With respect to the Joint Motion, the Bankruptcy Court concluded that "under [§] 107(b), the customer names constitute a trade secret" and, thus, that the names of FTX's customer-creditors, including businesses and other entities, could

---

[3]     The Bankruptcy Court's ruling on the Ad Hoc Committee Motion to Seal was not appealed.

"continue to be redacted for an additional 90 days while the debtors continue to seek how they're going to come out of these bankruptcies," A693:18–22.    The Bankruptcy Court further stated it would grant the Joint Motion to Seal the names of Debtors' customer-creditors who are natural persons "on a permanent basis" under § 107(c).  A694:22–24.

On June 15, 2023, the Bankruptcy Court entered an order (the "Order") granting in part and denying in part the Joint Motion to Seal "for the reasons set forth on the record at the hearing on the Motion on June 9, 2023."  A700.  The Order authorizes Debtors and the Official Committee:

- Pursuant to § 107(b)(1), to continue to "redact the names, addresses and e-mail addresses of all of the Debtors' customers from all filings with the Court or made publicly available in these Chapter 11 Cases" in "which disclosure would indicate the status of such person or entity as a customer" for an additional 90 days, and allowing any party to seek further extension of that time period; and

- Pursuant to § 107(c)(1), "to permanently redact the names of all customers who are natural persons from all filings with the Court or made publicly available in these Chapter 11 Cases in which disclosure would indicate such person's status as a customer."

A701–A702, ¶¶ 2, 4.  The Order did not alter the Court's January 20, 2023 order, A163, requiring "that the name of any creditor who was appointed by the U.S.

Trustee to the [Official Committee], and the address, e-mail address or phone numbers of any creditor who is not [a] natural person[] and was appointed by the U.S. Trustee to the [Official Committee] not be redacted from the Debtors' refiled Consolidated Lists of Top 50 Creditors."  A704 ¶ 13.

Media Intervenors-Appellants appealed on June 22, 2023.  A705.  The U.S. Trustee appealed on July 6, 2023.  D.I. 1846.

## SUMMARY OF ARGUMENT

Media Intervenors-Appellants appeal from an order of the Bankruptcy Court that—in addition to imposing extraordinary secrecy in a matter of indisputably heightened public interest—calls into question whether longstanding rules and precedent mandating openness in bankruptcy proceedings will be applied in Chapter 11 cases arising out of the emergent cryptocurrency sector in this District.

The spectacular collapse of FTX—one of the world's largest cryptocurrency exchanges—in November 2022 sent shockwaves through the crypto-industry and global financial markets. The implosion exposed billions of dollars in missing funds,[4] and sparked regulatory and criminal investigations. Top executives have pled guilty to federal criminal charges,[5] and FTX's founder and former CEO, Samuel Bankman-Fried, is set to stand trial later this year on charges ranging from securities fraud to violations of the Foreign Corrupt Practices Act.[6]

After FTX's collapse, Debtors quickly sought the protection of United States

---

[4]    Joshua Oliver et al., *FTX: inside the crypto exchange that 'accidentally' lost $8bn*, Financial Times (Nov. 18, 2022), https://perma.cc/P8PX-U5QY.

[5]    Ava Benny-Morrison et al., *Bankman-Fried's Inner Circle Continues to Crumble With Singh Guilty Plea*, Bloomberg (Feb. 28, 2023), https://www.bloomberg.com/news/articles/2023-02-28/former-ftx-engineering-chief-singh-pleads-guilty-to-us-charges.

[6]    David Yaffe-Bellany & Matthew Goldstein, *Sam Bankman-Fried Pleads Not Guilty to Additional Set of Charges*, N.Y. Times (Mar. 30, 2023), https://www.nytimes.com/2023/03/30/business/sam-bankman-fried-charges.html.

11

bankruptcy law, filing these Chapter 11 cases on November 11, 2022. But notwithstanding their counsel's admission that "Chapter 11 is a fish bowl," and their claim to "welcome" such transparency, A143:6–8, Debtors (and the Official Committee) have sought (and obtained) an extraordinary level of secrecy that has kept the press, the public, and creditors in the dark about key—and routinely public—aspects of these consequential bankruptcy proceedings.

Specifically, Debtors obtained—over the objections of Media Intervenors-Appellants and the U.S. Trustee—authorization to redact the names of creditors who were also customers of FTX (both institutional customers and natural persons) in all filings in these Chapter 11 cases. The impact of the Order is staggering; as counsel for the U.S. Trustee explained, it makes "documents that are the core of a bankruptcy proceeding, that any debtor who is seeking bankruptcy protection must file" essentially secret, including:

> the creditor matrix, statements of assets and liabilities, statement of financial affairs, claims register, proofs of claim, disclosures of professionals, such as the professionals' connections with parties in interest . . . and then, of course, the Bankruptcy Rule 2019 statements, as well as affidavits of service[,] and many other documents.

A638:5–14.

The Bankruptcy Code, buttressed by the First Amendment, guarantees the public a presumptive right of access to bankruptcy filings. 11 U.S.C. § 107; *In re Crawford*, 194 F.3d 954, 960 (9th Cir. 1999). Indeed, the public's right to inspect

12

court records is at "its zenith when issues concerning the integrity and transparency of bankruptcy court proceedings are involved." *In re Food Mgmt. Grp., LLC*, 359 B.R. 543, 553 (Bankr. S.D.N.Y. 2007); *see also In re Bell & Beckwith*, 44 B.R. 661, 663–64 (Bankr. N.D. Ohio 1984) (calling openness "fundamental to the operation of the bankruptcy system" and rejecting argument that "privacy" interests of customer-creditors permit withholding their names).

Yet despite the long-recognized rule that "[d]uring a chapter 11 reorganization, a debtor's affairs are an open book," *In re Alterra Healthcare Corp.*, 353 B.R. 66, 73 (Bankr. D. Del. 2006), the Bankruptcy Court concluded, in effect, that cryptocurrency-related bankruptcy cases are different. Relying on two narrow exceptions to the Bankruptcy Code's general mandate of disclosure—11 U.S.C. § 107(b)(1) and § 107(c)(1)—the Bankruptcy Court broadly authorized the redaction of the names of essentially all of Debtors' estimated 9 million customer-creditors in all filings in these Chapter 11 cases.[7]  A700.  The Order conflicts with decisions from other jurisdictions, *see, e.g.*, *In re Celsius Network LLC*, 644 B.R. 276 (Bankr. S.D.N.Y. 2022) ("*Celsius*"), as well as the openness that is "fundamental to the operation of the bankruptcy system[,]" *In re Bell & Beckwith*, 44 B.R. at 664, and should be reversed.

---

[7]     The Bankruptcy Court did not authorize redaction of the names of members of the Official Committee or Ad Hoc Committee.  Order, A704 ¶ 13; Order Denying Ad Hoc Committee Motion to Seal, D.I. 1858.

As an initial matter, the Bankruptcy Court erred as a matter of law by inverting the well-established standards for sealing judicial records, creating a presumption in favor of redaction of customer-creditor names in cryptocurrency-related bankruptcy proceedings.  Instead of determining on a particularized basis that Debtors and the Official Committee had met their heavy burden to prove redaction necessary as to all of the information they sought to seal, the Court instead—at the urging of Debtors' counsel—improperly shifted the burden to Media Intervenors-Appellants and the U.S. Trustee to proffer evidence in support of access.  *See* A626:10–15 (counsel for Debtors arguing U.S. Trustee and Media Intervenors-Appellants "offer[ed] no evidence"); A666:21–24 (Bankruptcy Court inquiring what Media Intervenors-Appellants were "going to do with" the names of FTX's customer-creditors).  As a result, the Bankruptcy Court created and applied what amounts to a presumption of secrecy based on generalized, speculative testimony that—if sufficient—would require the default sealing of the names of all customer-creditors in all cryptocurrency-related bankruptcy proceedings.

Even setting aside those legal errors, the showing made by Debtors and the Official Committee simply does not support the extraordinary—and extremely broad—Order entered by the Bankruptcy Court.  First, the Bankruptcy Court incorrectly concluded that the names of Debtors' customer-creditors (both institutions and individuals) were a "trade secret" under § 107(b)(1).  A693:18–22.

14

But it made no finding—and there was no evidence presented to support a finding—that Debtors took "reasonable measures" to keep such names "secret," as is required. 18 U.S.C. § 1839(3)(A).   Nor did the Bankruptcy Court find that the roughly 9 million names of Debtors' customer-creditors at issue (either in whole or in part) have sufficient "independent economic value," *id.* § 1839(3)(B), or that their disclosure would "cause an unfair advantage to competitors," *In re Orion Pictures Corp.*, 21 F.3d 24, 27 (2d Cir. 1994) (citation and internal quotation marks omitted), to otherwise warrant sealing under § 107(b)(1).   The Court relied on vague conjecture, cut off crucial examination of Debtors' fact witness, and either ignored or dismissed evidence—including from Debtors' own expert—that FTX's customer-creditors are not exclusive and already use (or are likely to move to) other crypto exchanges.   Second, the Bankruptcy Court erred in authorizing the permanent redaction of the names of Debtors' individual customer-creditors under § 107(c)(1). The Court failed to make the requisite factual findings that disclosure of any—let alone all—of those names "would" create "undue risk" of identity theft or other unlawful injury and, again, ignored evidence to the contrary.

Finally, Third Circuit precedent requires a court to conduct a particularized "document-by-document review" before sealing court records in whole or in part, *In re Avandia Mktg.*, 924 F.3d at 677, and to consider less-restrictive alternatives to broad sealing, *see Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1071–73 (3d Cir.

1984).  Here, the Bankruptcy Court authorized the sweeping redaction of the names of an estimated 9 million individuals and entities who are customer-creditors of Debtors from all filings in these Chapter 11 cases without making any particularized findings as to any specific document, or as to any specific customer-creditor, despite Media Intervenors-Appellants' request that the Court consider, in the alternative, the unsealing only of the names of Debtors' top-50 customer-creditors.

For the reasons herein, the Order should be reversed in relevant part.

## ARGUMENT

I.    **There is a powerful presumption in favor of public access to court filings and to the names of creditors in bankruptcy proceedings that proponents of sealing must meet a heavy burden to overcome.**

Section 107(a) of the Bankruptcy Code provides that "a paper filed in a case under this title and the dockets of a bankruptcy court are public records and open to examination by an entity at reasonable times without charge."  This provision "is rooted in . . . the common law and buttressed by the First Amendment," *In re Crawford*, 194 F.3d at 960; its plain language "evinces a clear congressional intent that papers filed in bankruptcy cases be available to the public," *In re Neal*, 461 F.3d 1048, 1053 (8th Cir. 2006) (citation omitted), unless information therein is found to fall within one of the provision's narrow exceptions to disclosure, *In re Orion Pictures Corp.*, 21 F.3d at 26; *see also Celsius*, 644 B.R. at 288 (explaining that

16

"[c]ourts have zealously upheld the public's right to access and narrowly construed" its exceptions (citation omitted)).

The Bankruptcy Code's strong presumption of public access expressly applies to the identities of creditors. *See, e.g.*, 11 U.S.C. § 521(a) ("The debtor shall file a list of creditors[.]"); Fed. R. Bankr. P. 1007(a) ("[T]he debtor shall file with the petition a list containing the name and address of each entity included or to be included on Schedules D, E/F, G, and H[.]").  Indeed, public access to creditors' names is especially important because, *inter alia*, conferral among creditors is an integral part of the Chapter 11 reorganization process, and such conferral is frustrated when creditors' identities are sealed.  *See In re Found. for New Era Philanthropy*, No. 95-13729F, 1995 WL 478841, at *6 (Bankr. E.D. Pa. May 18, 1995); *see also In re MorAmerica Fin. Corp.*, 158 B.R. 135, 137 (Bankr. N.D. Iowa 1993) ("The ability to campaign among one's fellow creditors is an important ability in a bankruptcy case.  Sealing of creditor lists inhibits that ability.").

Under Third Circuit law, the proponent of sealing any judicial record, in whole or in part, bears a "heavy burden" to show that "'the material is the kind of information that courts will protect' and that 'disclosure will work a clearly defined and serious injury to the party seeking closure.'"  *Miller v. Indiana Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994) (quoting *Publicker Indus., Inc.*, 733 F.2d at 1071).  That rule applies fully in bankruptcy proceedings.  *See Celsius*, 644 B.R. at 292 ("The strong

17

public policy of transparency and public disclosure in bankruptcy cases requires very narrow exceptions and only on strong evidentiary showings."); *see also, e.g.*, *In re Purdue Pharma L.P.*, 632 B.R. 34, 39 (Bankr. S.D.N.Y. 2021) ("The party asserting the right to protection under § 107(b) has the burden of proof to show that one of the listed grounds exists."); *In re Creighton*, 490 B.R. 240, 244 (Bankr. N.D. Ohio 2013) (noting a party seeking sealing "must overcome the presumption of public access to all bankruptcy documents. This is not an easy burden."). Conclusory statements that a debtor will be harmed by disclosure of presumptively public information are insufficient to justify sealing. *See, e.g.*, *In re Itel Corp.*, 17 B.R. 942, 943–44 (Bankr. 9th Cir. 1982); *In re Purdue Pharma L.P.*, 632 B.R. at 40 (explaining that a "request under § 107(b)(1) should be supported by specific evidence, not argument or conclusory statements in a declaration"). Particularized evidence of harm that rises above mere speculation is required. *See id.* "That information might 'conceivably' or 'possibly' fall within a protected category is not sufficient to seal documents." *In re FiberMark, Inc.*, 330 B.R. 480, 506 (Bankr. D. Vt. 2005) (citation omitted).

The Third Circuit has repeatedly instructed courts to conduct a "document-by-document review" before sealing records to ensure compliance with the "exacting analysis [its] precedent requires." *In re Avandia Mktg.*, 924 F.3d at 677; *see also Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 167 (3d Cir. 1993) (district court erred by permitting "all of the documents filed to remain under

seal without conducting a document-by-document review of their contents"). While a court need not "provide [a] lengthy, detailed discussion of each individual document," it "must be clear from the record that the district court engaged in a particularized, deliberate assessment of the standard as it applies to each disputed document." *In re Avandia Mktg.*, 924 F.3d at 677 n.11.

## II.   The Bankruptcy Court erred as a matter of law by reversing the presumption in favor of public access and by failing to require a specific, particularized showing before authorizing broad redaction.

The Bankruptcy Court was required to determine whether Debtors and the Official Committee had met their heavy burden to demonstrate (on the basis of specific, non-speculative evidence) that all of the customer-creditor names they sought to redact warranted sealing under § 107(b)(1) or § 107(c)(1). Instead, the Bankruptcy Court—dispensing with the particularized and "exacting analysis" required by Third Circuit precedent, *In re Avandia Mktg.*, 924 F.3d at 677— concluded, given the nature of cryptocurrency-related bankruptcy proceedings generally, that the names of all of FTX's customer-creditors were excepted from § 107(a)'s mandate of openness. The Bankruptcy Court placed the onus on those objecting to sealing—Media Intervenors-Appellants and the U.S. Trustee—to disprove any need for redaction. This was legal error and, if left undisturbed, would sanction the automatic sealing of the names of all customer-creditors in all cryptocurrency-related bankruptcy proceedings.

A.    <u>The Bankruptcy Court improperly shifted the burden to the objecting
parties.</u>

At the June 9 Hearing counsel for Debtors and the Official Committee repeatedly argued that their Joint Motion to Seal should be granted because Media Intervenors-Appellants had not proffered sufficient evidence in support of disclosure, including evidence of their need for access[8] to the names of Debtors' customer-creditors. *See, e.g.*, A626:10–15 (Debtors' counsel arguing that neither the U.S. Trustee nor Media Intervenors-Appellants "offered anything new in opposition to the relief requested under Section 107(b). They offer no evidence . . . ."); A626:21–25 (Debtors' counsel arguing Media Intervenors-Appellants "have not provided evidence of any specific harm being suffered that requires the disclosure of names"); A632:7–11 (Official Committee's counsel arguing that neither the U.S. Trustee nor Media Intervenors-Appellants "presented any evidence" to "contradict" Sheridan's opinions).

Persuaded by those arguments, the Bankruptcy Court not only failed to

---

[8]    At the June 9 Hearing, the Court asked Media Intervenors-Appellants' counsel: "What are your clients going to do with this? If I say the names have to . . . be released, what are you going to do with that information?" A666:21–24. Though it is clear from the record that Media Intervenors-Appellants seek access to the names of FTX's customer-creditors so they can report on these ongoing bankruptcy proceedings and the impact of FTX's collapse, their reasons for seeking access to court records are, as a matter of law, not relevant to the analysis. *See In re Avandia Mktg.*, 924 F.3d at 677 ("[A] person's motive for inspecting or copying judicial records is irrelevant under the common law right of access.").

acknowledge the strong presumption in favor of public access to filings in bankruptcy proceedings, or the heavy burden imposed on Debtors and the Official Committee to overcome that presumption, but also it shifted the burden to the objecting parties to <u>disprove</u> application of § 107(b) and § 107(c).  Put another way, the Bankruptcy Court did not, as required, look to whether the showing made by Debtors and the Official Committee was sufficient to warrant the broad relief they sought under those narrow exceptions (which, as detailed below, it was not).  *See, e.g.*, *In re Purdue Pharma L.P.*, 632 B.R. at 39.  Instead, the Bankruptcy Court determined that the objecting parties had not presented adequate evidence to counter that broad redaction request.  A693:16–17 ("I think the evidence presented was uncontroverted that customer identification has value."); A694:8–9 (referring to "uncontroverted" expert testimony of Sheridan).  That was legal error.

*In re Avandia Marketing* is instructive.  There, the Third Circuit held that a trial court erred as a matter of law when it denied access to court records under the common law without "acknowledge[ing] the presumption of public accessibility":

> [The trial court] reasoned that continued sealing is proper given that "there are no substantial countervailing interests *other than* the public's broad right to review a judicial proceeding."  This analysis gave insufficient weight to the public's interest in openness. Consideration of the public's right of access must be the starting point, not just one of multiple factors.

924 F.3d at 677.

Similarly, here, the Bankruptcy Court's failure to use the public's right of

access as the starting point of its analysis led to an erroneous sealing Order.  Had it not improperly shifted the burden away from the proponents of redaction, the Bankruptcy Court necessarily would have rejected their broad sealing—just as a bankruptcy court in the Southern District of New York did in a closely analogous case: *In re Celsius Network LLC*. The debtors in *Celsius*—a cryptocurrency exchange and affiliated entities—argued that if the names of their customer-creditors were "publicly disclosed," competitors "would gain a 'significant competitive advantage by having access to the complete list of [their] worldwide customer base,' which 'would significantly decrease the value of the customer list as an asset in any future potential asset sale.'"  644 B.R. at 282.  The bankruptcy court rejected those arguments, finding the debtors' showing insufficient to support redaction.    It explained, among other things, that the debtors had failed to carry their burden to justify sealing, including by "fail[ing] to address with evidence whether creditors who deposited crypto assets with the [d]ebtors also maintain accounts with the [d]ebtors' competitors."  *Id.* at 292.

In contrast, here, by shifting the burden to the objecting parties to disprove the generalized grounds for sealing proffered by Debtors and the Official Committee, the Bankruptcy Court authorized the redaction of the names of an estimated 9 million customer-creditors of FTX.  In so doing, the Bankruptcy Court committed reversible legal error.  *In re Avandia Mktg.*, 924 F.3d at 677.

B.     <u>The Bankruptcy Court erred by not requiring a particularized
       showing or undertaking a particularized review of the records or
       information at issue.</u>

The Bankruptcy Court further erred as a matter of law by concluding that no particularized analysis was required before authorizing the redaction of the names of an estimated 9 million customer-creditors of FTX in all filings in these Chapter 11 cases.   For instance, Media Intervenors-Appellants expressly requested that the Bankruptcy Court consider whether the names of Debtors' top-50 customer-creditors, in particular, warranted different treatment.   *See* Media Intervenors' Objections, A207–A208, ¶¶ 46–51; A673:7–11 (argument from Media Intervenors-Appellants' counsel).   The Bankruptcy Court declined to do so, notwithstanding testimony from Debtors' expert that those customer-creditors were unlikely to be cryptocurrency novices susceptible to scams, *see infra* Section V.

The Bankruptcy Court analyzed the redaction of <u>all</u> the names of Debtors' customer-creditors as a whole,  *see, e.g.*, Order, A700, without regard to whether they have tens of millions of dollars or zero dollars at stake in these bankruptcy proceedings.   Indeed, the Bankruptcy Court—in declining to consider evidence proffered by Debtors and the Official Committee that a "vast" number of Debtors' customer-creditors already used other cryptocurrency trading platforms, Sheridan Declaration, A254–A255 ¶ 24—bluntly explained its all-or-nothing approach:

> I mean, we've got nine million customers; that's a lot of people. I have no way to parse that. I don't think anybody has a way to parse that out.

23

> So the best way to deal with the issue is to say that all of the customer names continue to be redacted.

A694:3–7.[9]   The Bankruptcy Court's interpretation of § 107 to permit such generalized analysis contravenes Third Circuit precedent requiring a "particularized, deliberate assessment," *In re Avandia Mktg.*, 924 F.3d at 677 n.11.   That error of law, too, necessitates reversal.

The Bankruptcy Court, in effect, created and applied a *per se* redaction rule for customer-creditor names in cryptocurrency-related bankruptcies—a rule with no limiting principle that, if left undisturbed, will have broad-ranging consequences for the right of access to court filings in bankruptcy proceedings in this District.  If the record in this case were sufficient to support the redaction of all of Debtors' customer-creditor names, it is difficult to see how redaction of the names of all customer-creditors in <u>every</u> cryptocurrency-related bankruptcy would not be routine.  For example, as discussed in more detail below, in authorizing the permanent redaction of the names of all of Debtors' customer-creditors who are

---

[9]   To the extent the Bankruptcy Court concluded that no particularized showing was required because it would be burdensome to make, it was wrong as a matter of law. *See In re Leopold to Unseal Certain Elec. Surveillance Applications & Orders*, 964 F.3d 1121, 1134 (D.C. Cir. 2020) (refusing to consider the "administrative burden" of unsealing, explaining that: "[p]roviding public access to judicial records is the duty and responsibility of the Judicial Branch" and "[p]recluding public access because of the personnel-hours required" to provide such access "is no more warranted than precluding public access to high-profile trials because of the costs of crowd control").

natural persons under § 107(c)(1), the Bankruptcy Court concluded that if "they have a name and they are an FTX customer, they can be targeted[.]"  A694:8–18. Replace "FTX" with the name of any other cryptocurrency exchange platform and the result would be the same.  Similarly, in concluding that redaction was warranted under § 107(b)(1), there is nothing in the Bankruptcy Court's Order that would limit its conclusion to the particular facts of this case.  Indeed, the Bankruptcy Court previously authorized the redaction of customer-creditor names in a cryptocurrency bankruptcy proceeding for the same, generally applicable reasons. *See In re Cred Inc.*, No. 20-12836 (JTD), 2020 WL 13577187, at *1 (Bankr. D. Del. Dec. 21, 2020) (authorizing permanent redaction of customer-creditor names and contact information).  Because the Bankruptcy Court improperly created and applied what amounts to a general presumption in favor of sealing the names of customer-creditors in cryptocurrency-related bankruptcies, its Order was legally erroneous and should be reversed.

**III.   The Bankruptcy Court erred in authorizing the continued redaction of customer-creditors' names under § 107(b)(1).**

Section 107(b)(1) provides a narrow exception to the general mandate of public access in Chapter 11 cases for "a trade secret or confidential research, development, or commercial information."  11 U.S.C. § 107(b)(1).

A "trade secret" is defined under federal law in the Defend Trade Secrets Act ("DTSA") to mean "financial, business, scientific, technical, economic, or

engineering information," 18 U.S.C. § 1839(3), that meets two additional criteria. First, "the owner thereof" must have "taken reasonable measures to keep such information secret." *Id.* § 1839(3)(A); *accord* Restatement (First) of Torts § 757 cmt. b ("The subject matter of a trade secret must be secret."). Second, the information must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Id.* § 1839(3)(B).

Confidential "commercial information" within the meaning of § 107(b)(1) is "information which would cause an unfair advantage to competitors by providing them information as to the commercial operations of the debtor." *In re Orion Pictures Corp.*, 21 F.3d at 27 (citation and internal quotation marks omitted); *accord In re Alterra Healthcare Corp.*, 353 B.R. at 75 (quoting same). Though confidential commercial information need not rise to the level of a trade secret to warrant redaction under § 107(b)(1), it must be "so critical to the operations of the entity" that "its disclosure will unfairly benefit that entity's competitors." *In re Alterra Healthcare Corp.*, 353 B.R. at 76 (citation omitted). Further, its disclosure "[must] reasonably be expected to cause the entity commercial injury." *Id.* at 75 (alteration in original) (citation omitted); *see also Itel Corp.*, 17 B.R. at 944 (explaining that "[w]hile it is conceivable that the identity and addresses of creditors would fall into

26

th[e] category [of commercial information], it is not likely").

Bankruptcy courts have found that overlapping lists of customers and creditors qualify as confidential commercial information under § 107(b)(1) only in rare circumstances—namely, when the identities of the debtor's customers were the debtor's "primary asset." *See, e.g.*, *In re Frontier Grp., LLC*, 256 B.R. 771, 773 (Bankr. E.D. Tenn. 2000) (granting debtor's sealing request where the debtor, a brokerage agency arranging for physicians to serve in various client hospitals, demonstrated that its physician list was its "primary asset" and that disclosure would enable competitors to "identify its contracting physicians, and recruit those physicians away from the [d]ebtor"). In *In re Northstar Energy, Inc.*, for example, a debtor sought to seal its list of investors because "investor procurement functions [were] crucial to its business plan," and "those functions would be severely jeopardized by the unrestricted publication of its investor list." 315 B.R. 425, 427–29 (Bankr. E.D. Tex. 2004). In that case, because disclosure of the debtor's investor list would "expose the heart and soul of [its] commercial operations," the bankruptcy court found it was "confidential commercial information" under § 107(b)(1). *Id.* at 429–30.

A.   <u>The Bankruptcy Court erred in concluding that the names of Debtors' customer-creditors are a "trade secret" without making any finding that Debtors took "reasonable measures" to keep that information secret.</u>

The Bankruptcy Court concluded that the names of Debtors' customer-

27

creditors "constitute a trade secret," A693:18–20,[10] without making a necessary factual finding: namely, that Debtors took "reasonable measures" to keep those names "secret." 18 U.S.C. § 1839(3)(A); *cf. United States v. Xue*, No. 22-2609, 2023 WL 4622816, at *1 (3d Cir. July 19, 2023) (in non-precedential opinion, noting testimony on the company's physical and digital security, nondisclosure agreements, and training on confidentiality). That failure is reversible error. *United States v. A.R.*, 38 F.3d 699, 705 (3d Cir. 1994) (noting that "an abuse of discretion occurs if the court fails to make the factual findings" required by statute); *see also In re Cendant Corp.*, 260 F.3d 183, 198 (3d Cir. 2001) (holding, under common law, that district court abused its discretion in sealing class action bids because, *inter alia*, it failed to make necessary, on-the-record, factual findings).

---

[10]     Debtors' original sealing motion did not specify what portion of § 107(b)(1) they claimed applied to the names of their customer-creditors. *See* A31. And it is not clear from the Second Day Hearing whether the Bankruptcy Court concluded those names were a "trade secret." A160:1–5 (Court discussing "a customer list in any bankruptcy case"). Indeed, as Media Intervenors-Appellants' objections to the Ad Hoc Committee Motion to Seal noted, it would have "ma[de] little sense" for the Bankruptcy Court to have determined, on a temporary basis, that those names were a trade secret. A197 n.3. The Joint Motion to Seal also did not specify what portion of § 107(b)(1) Debtors believed was applicable, and at no point did Debtors expressly argue that the names of their customer-creditors were a "trade secret." *See* A217, A241. Because the case law analyzing requests to seal customer-creditor information in Chapter 11 cases does so under the framework of confidential commercial information, Media Intervenors-Appellants focused their arguments there. A188; A477. At the June 9 Hearing, the Bankruptcy Court concluded that Debtors' customer-creditors' names are a "trade secret," without any briefing from the parties directed to the standard for determining whether something qualifies as a "trade secret." *See* A693:18–20.

To be clear, the Bankruptcy Court could not have found this requirement satisfied because Debtors presented no evidence of any measures taken to keep FTX's customer-creditors' names secret. The Joint Motion to Seal does not address the issue. *See* A217. And the only evidence in support of withholding Debtors' customer-creditors' names under § 107(b)(1) was the testimony of Cofsky, who asserted only that he believed, generally, that "maintaining the confidentiality of customers' identities" is important. A152:2–11. Simply put, nothing in the record even approaches satisfying Debtors' stringent evidentiary burden to establish that those names are in fact a "trade secret" under § 107(b)(1). *See In re Purdue Pharma L.P.*, 632 B.R. at 40 (a sealing "request under § 107(b)(1) should be supported by specific evidence, not argument or conclusory statements").

Moreover, there is evidence indicating that Debtors not only did not take "reasonable" steps to keep the customer-creditor names at issue "secret," but also that they shared those names with third parties. First, FTX's Privacy Policy states that FTX would collect certain "personal information" from customers, including their "[f]irst and last name" and, for institutions, the "institution's legal name." A97. It further states that FTX could disclose such "personal information" with certain "categories of third parties," including business partners, NFT partners, affiliates, and advertising partners. A103–A104. There is no evidence that Debtors required those third parties to keep that information secret, which would be necessary for it

29

to qualify as a trade secret.  *See Farmers Edge Inc. v. Farmobile, LLC*, 970 F.3d 1027, 1033 (8th Cir. 2020) (holding that information shared "with a third-party contractor without a confidentiality agreement and without other policies or practices for safeguarding secrets" could not qualify as a trade secret).  Second, there is ample evidence that Debtors "did not keep appropriate books and records, <u>or security controls</u>, with respect to [FTX's] digital assets."  Declaration of John J. Ray III ("Ray Declaration"), A22–A23, ¶ 65 (emphasis added).  Indeed, current FTX CEO John Ray has averred that the Debtors were "unable to create a list of their top 50 creditors that include[d] customers" at the outset of these Chapter 11 cases because their "attempts to access this property of the estate may create a risk of its loss to unauthorized persons."  A25–A26, ¶ 75.  This strongly suggests that Debtors were not even in control of information about their customer-creditors—a far cry from taking "reasonable measures" to keep it secret.  *See id.*

As noted above, the Bankruptcy Court's Order is based on its conclusion that Debtors' customer-creditor names are a "trade secret"—not confidential commercial information under § 107(b)(1).  To be clear, however, that provision also requires a showing that the information a party seeks to have sealed has been kept "confidential," 11 U.S.C. § 107(b)(1).  For the reasons set forth above, there is no evidence in the record that that requirement is met and, indeed, there is evidence to the contrary.  *Cf. Celsius*, 644 B.R. at 288 ("The moving party bears the burden of

showing that the information is confidential under section 107(b).").

     B.    <u>The Bankruptcy Court erred in determining that the customer-creditor names have "value" and are therefore a "trade secret."</u>

The Bankruptcy Court's determination that the names of Debtors' customer-creditors are a trade secret because they "ha[ve] value . . . to the [D]ebtors' estates," A693:16–18, was erroneous for at least the following two reasons.

First, as a matter of law, the mere determination that information has "value" is not sufficient to qualify it as either a trade secret or confidential commercial information under § 107(b)(1). A trade secret must "derive[] independent economic value" from not being known by others who can obtain economic value "from the disclosure or use" thereof. 18 U.S.C. § 1839(3)(B); *see also Xue*, 2023 WL 4622816, at *1 (explaining that a company's trade secret gave it "a competitive edge"). To qualify as confidential commercial information, disclosure must provide an "unfair advantage to competitors," *In re Orion Pictures Corp.*, 21 F.3d at 27 (citation omitted). The Bankruptcy Court erred as a matter of law in interpreting § 107(b)(1) to require only a showing of "value" to Debtors, A693:16–18.

Second, the Bankruptcy Court made no findings—and there was no evidence proffered to support findings—that the customer-creditor names at issue have <u>actual</u> (rather than merely speculative) "value"; what the <u>specific</u> "value" of those names is; and how Debtors would be placed at a competitive disadvantage by the disclosure

of those names (or any particular subset of them) in filings in these Chapter 11 cases.
Debtors relied solely on the testimony of their fact witness, Cofsky—testimony that
was highly speculative, incomplete, and contradicted by other evidence in the
record—to argue that the customer-creditor names might have value because,
alternatively: (1) if Debtors reorganize they will want to keep those customer-
creditors using their exchange;[11] (2) if they do not reorganize, Debtors might be able
to sell FTX's "customer lists" to a third party; and (3) disclosure of the names, only,
in filings (without any corresponding contact information, and not in the form of a
list) would allow competitors to target those customers and potentially lure them
away from FTX.  *See* A148:10–15 (testimony of Cofsky); A526 (testimony of
Cofsky).  None of these theories supports the Bankruptcy Court's conclusion that
the customer-creditor names at issue are a "trade secret," or that they constitute
confidential commercial information.

> 1.  Debtors did not demonstrate that any of their customer-creditors
> would remain FTX customers in the event of a reorganization.

There is no evidence in the record to even suggest that if Debtors were to re-
open their exchange, any—let alone all—of their customer-creditors would continue
to use Debtors' platform.  On cross-examination, Cofsky admitted that Debtors made

---

[11]   On July 31, 2023, Debtors filed a draft reorganization plan with the
Bankruptcy Court.  D.I. 2100.  Media Intervenors-Appellants respectfully request
the Court take judicial notice of that filing pursuant to Fed. R. Evid. 201.

no effort to survey any customer-creditors to determine whether they would stay, A533:14–A534:11, and his rank speculation—his mere "belie[f]," A523:1—that Debtors' customer-creditors would remain loyal to FTX has no evidentiary value.

Indeed, there is ample support for the contrary (and common-sense) conclusion that Debtors' customer-creditors will not continue to use FTX's exchange in the event of a reorganization. Trust is crucial. *See, e.g.*, Sandro Psaila, *Building trust in crypto exchanges*, Deloitte, https://perma.cc/5J8E-NTFQ (last accessed Aug. 18, 2023) ("It is widely accepted that trust is the most valuable asset required to overturn a generally pessimistic view of crypto assets and exchanges alike."). And FTX's collapse due to mismanagement and malfeasance obliterated such trust. Ray Declaration, A2 ¶ 5 (FTX's current CEO testifying that FTX's "complete failure of corporate controls" was of an "unprecedented" nature). Indeed, Debtors' own expert testified as much:

> FTX was seen as the pillar and strength and shining star of the cryptocurrency industry and I think it generated a lot of trust, safety, and security in its customer base that was quickly changed based on the nature of this – of everything that occurred.

A589:4–11 (testimony of Sheridan). And as a recent report from the MDL consolidating the many lawsuits arising from FTX's collapse states: "Numerous class and non-class actions arose as a result of the calamitous downfall of FTX, principally alleging fraudulent and conspiratorial conduct with regard to the promotion, marketing, auditing, and misappropriation of funds for the FTX

platform." Pls.' Preliminary Report in Advance of Initial Status Conference at 1, *In re FTX Cryptocurrency Exchange Collapse Litigation*, No. 1:23-md-03076 (S.D. Fla. June 16, 2023), ECF No. 40.

Debtors' freezing of their customer-creditors' wallets only further diminishes any likelihood they would use FTX's exchange in the future. Debtors' customer-creditors cannot currently access their cryptocurrency or cash in their accounts, A521:19–25, and may be unable to do so for at least a year, A522:1–8. As in *Celsius*, this undoubtedly "has not won many fans" among their customer-creditors. *See* 644 B.R. at 291 (finding Celsius's decision to freeze "all customer accounts, refusing to permit any withdrawals of crypto assets" undermined the debtors' claim that customer-creditors would continue to use their exchange in the future). Indeed, one FTX customer-creditor, Terri Smith, who had roughly $30,000 in her account, said of the freeze: "It feels like someone stealing your money . . . . It feels like theft." Chris Arnold, *FTX investors fear they lost everything, and wonder if there's anything they can do*, NPR (Nov. 18, 2022), https://perma.cc/B7WR-9CBF.

Simply put, Debtors' claim that redaction of the customer-creditor names at issue will enable Debtors to keep those individuals and entities trading on their platform in the event of a reorganization is not only unsupported, it is implausible. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 577 (1985) (explaining that a finding is clearly erroneous if the "interpretation of the facts is illogical or

34

implausible").

        2.    <u>Debtors did not prove they could sell their customer-creditors'</u> <u>names and did not offer any evidence of the "value" of those</u> <u>names in any such sale.</u>

The evidence also cannot support a conclusion that the names, alone, of Debtors' customer-creditors provide "independent economic value," 18 U.S.C. § 1839(3)(B), or are a "primary asset" of Debtors, *In re Frontier Grp.*, 256 B.R. at 773, or that their disclosure would provide an "unfair advantage to competitors," *In re Orion Pictures Corp.*, 21 F.3d at 27 (citation omitted).

Cofsky, Debtors' fact witness, testified that he "believe[d]" that the identities of Debtors' customers "would be valuable" based on an unspecified number of conversations he had with unspecified third parties. A511:2–15. That "belie[f]" is a far cry from evidence establishing that Debtors are, in fact, able to sell the names of their customer-creditors (without any corresponding contact information) for a specific amount.[12]

Debtors failed to proffer <u>any</u> evidence that <u>any</u> cryptocurrency exchange has ever successfully sold their customer names in connection with a bankruptcy—let alone the amount of "value" generated by such a sale. During the Second Day Hearing, Cofsky testified that he had reviewed "bids" for two other failed

---

[12]    Media Intervenor-Appellants have not contested the redaction of customer-creditors' contact information.

cryptocurrency exchanges (Celsius and Voyager), which he testified recognized "incremental value for each customer that is acquired," A146:25–A147:3; *see also* A151:9–21; A534:12–A535:13.  But Debtors did not introduce those bids into evidence or offer testimony as to what that "incremental value" was; nor did Cofsky testify that disclosure of the names of Celsius's customer-creditors in public filings in its Chapter 11 case had any effect, whatsoever, on that value.  *See* A151:9–15.

Crucially, after Cofsky's testimony at the Second Day Hearing, but before the June 8 Hearing, there was an auction in the *Celsius* bankruptcy proceedings, with the crypto consortium Fahrenheit placing the winning bid.  *See* Alexander Gladstone & Soma Biswas, *Celsius Names Fahrenheit as Winning Chapter 11 Bidder*, Wall St. J.  (May 25, 2023), https://www.wsj.com/articles/crypto-lender-celsius-names-fahrenheit-as-winning-chapter-11-bidder-40c3c3e5; *see also* Notice of Successful Bidder and Backup Bidder, *In re Celsius Network LLC*, No. 22-10964 (Bankr. S.D.N.Y. May 25, 2023), Doc. No. 2713.  Cofsky apparently had personal knowledge of Fahrenheit's successful bid when he testified at the June 8 Hearing, A535:22–24—new, additional information that, presumably, could have affected the views he expressed during the Second Day Hearing and that he reiterated on direct during the June 8 Hearing.  But when Media Intervenors-Appellants' counsel attempted to cross-examine Cofsky at the June 8 Hearing about recent developments in the *Celsius* matter, and whether his views had changed, the Bankruptcy Court

sustained a relevancy objection from Debtors, cutting off a crucial line of questioning as to the independent value—if any—of the names of customer-creditors when the assets of a cryptocurrency exchange are auctioned in connection with bankruptcy proceedings. *See* A535:22–A537:19.[13] For the Bankruptcy Court later to find that "the evidence presented was uncontroverted that customer identification has value," A693:16–18, after declining to permit Media Intervenors-Appellants to pursue this line of questioning, was an abuse of discretion.

In any event, Debtors' claim that disclosure of any of the estimated 9 million customer-creditors' names in filings in these Chapter 11 cases would diminish their "value" is premised on the idea that competing cryptocurrency exchanges would use those names to contact Debtors' customer-creditors and successfully lure them away from Debtors' platform. *See, e.g.*, A514–A519. But the record does not establish that is even possible. As the court in *Celsius* stated, when rejecting this very same argument: "Including the names of over 300,000 individual creditors without home or email addresses does not provide a viable means for solicitation, assuming that alone would be enough to justify protection." 644 B.R. at 293.

The Bankruptcy Court made no factual finding that a competitor could successfully contact even a majority—let alone all—of Debtors' customer-creditors

---

[13]    Cofsky also stated: "I'm not sure if it's proper for me to be speaking anything [sic] further about that in this matter, given the confidentiality agreements I have in that case[.]"  A535:24–A536:1.

with a name alone.  *See* A693:14–25.  It appears to have credited the testimony of

Cofsky, who described an admittedly unscientific experiment whereby he instructed

employees to determine—for the top 200 of Debtors' customer-creditors (by claim

size)—whether they could "identify" them "by looking through Google," LinkedIn,

and "Twitter feeds."  A515–A517.  Cofsky testified he believed it was "highly

likely" they correctly identified 34% of Debtors' top-200 customer-creditors, and

"likely" they correctly identified another 12%.  A517:12–20.  Even taken at face

value, the fact that fewer than 50% of those individuals could be "identif[ied]" only

after significant online research casts serious doubt as to the purported value of such

names alone.  But, in any case, Cofsky's testimony makes clear that no steps were

taken to <u>verify</u> that any of the information his employees gathered was accurate (*i.e.*,

that they had, in fact, identified the right individuals or entities).  In other words,

there was no evidence presented that a competitor who wanted to poach Debtors'

customer-creditors would actually be able to do so using only their names.

        3.    <u>The record establishes that a "vast number" of Debtors' customer-creditors already use other cryptocurrency platforms.</u>

Finally, at bottom, Cofsky's testimony tied the purported value of the names

of Debtors' customer-creditors to <u>where</u> they will trade cryptocurrency in the future.

According to him, whether Debtors' "exchange is reorganized or whether the

exchange is sold," a "significant portion of the value of that enterprise going forward,

I believe, will be the customers" and "the extent to which they're going to trade on

this platform or another platform."  A526:8–14.  Thus, according to Cofsky, "the ability of other competitors to gain knowledge of [Debtors'] customers would be detrimental to [Debtors'] estate."  A508:20–22.

But unlike situations where bankruptcy courts have found that the names of customers warranted protection under § 107(b)(1)—such as when the debtor's customers were exclusive to the debtor so as to be its "primary asset," *In re Frontier Grp., LLC*, 256 B.R. at 773—there is nothing in the record here to show that <u>any</u> of Debtors' customer-creditors ever exclusively used FTX's exchange, or that a customer's use of another exchange, in addition to FTX, diminishes the value of that customer vis-a-vis FTX.  *Cf. Celsius*, 644 B.R. at 292.

Cofsky conceded he does not know whether any of Debtors' customer-creditors already use other cryptocurrency platforms, A527:20–23.  Debtors' expert witness, Sheridan, on the other hand, testified that "<u>a vast number of the Debtors' customers</u> use other online platforms or exchanges to hold digital assets (*e.g.*, Coinbase, Metamask, etc.)."  Sheridan Declaration, A254–A255, ¶ 24 (emphasis added).  In other words, Debtors' competitors already have "knowledge" of a vast number of Debtors' customer-creditors, A508:20–22, because those individuals and entities are their customers too.

The Bankruptcy Court erroneously dismissed Sheridan's testimony that a vast number of Debtors' customer-creditors are already trading crypto assets on

other platforms, and the relevance of that fact to the § 107(b)(1) analysis, stating:

> The fact that the customers <u>might not</u> be exclusive customers, and I don't—some of them <u>might</u> be. Some of them <u>might</u> not. I mean, we've got nine million customers; that's a lot of people. I have no way to parse that. I don't think anybody has a way to parse that out.

A694:1–5 (emphasis added). But it was Debtors' burden to prove that disclosure of the names of their customer-creditors would place them at a competitive disadvantage. The Bankruptcy Court was not permitted to simply presume—in the face of contrary testimony from Debtors' own expert—that if their names were not sealed they would be lured away from trading on Debtors' platform to begin trading on a competitor platform. *See, e.g.*, *United States v. Wise*, 515 F.3d 207, 217 (3d Cir. 2008) ("[A] district court will be held to have abused its discretion if its decision was based on a clearly erroneous factual conclusion[.]").

In any event, as discussed in more detail below, the Bankruptcy Court's all-or-nothing approach to sealing the names of Debtors' roughly 9 million customer-creditors—an approach advocated by the Debtors, A627:13–25—was itself error. The Bankruptcy Court was required not only to "narrowly construe[]" § 107(b)(1), *In re FiberMark*, 330 B.R. at 506, but also to narrowly tailor any sealing or redaction of the records filed in these Chapter 11 cases. Put another way, it was required to "parse" which information—if any—Debtors had met their burden to demonstrate must be redacted from information that Debtors had not—and could not have—shown falls within the scope of § 107(b)(1).

40

## IV.    The Bankruptcy Court erred by permanently sealing the names of customer-creditors under § 107(c)(1).

Under § 107(c)(1), a bankruptcy court may, for cause, permit the redaction of "[a]ny means of identification (as defined in section 1028(d) of title 18)[14] contained in a paper filed, or to be filed," in a Chapter 11 case from the Bankruptcy Code's general mandate of public access in order to "protect an individual . . . to the extent the court finds that disclosure of such information would create undue risk of identity theft or other unlawful injury to the individual or the individual's property."

Relying on this provision, the Bankruptcy Court authorized the permanent redaction of the names of Debtors' customer-creditors who are natural persons from all filings in these Chapter 11 cases.  A702 ¶ 4; A694:8–25.  But, as explained below, it failed to make the factual findings required to support such sealing.  *See In re Cendant Corp.*, 260 F.3d at 197–98 (failure to find necessary facts on the record was abuse of discretion).  Moreover, it could not have made the requisite findings on the basis of the evidence presented, which does not support a determination that merely being a customer-creditor of a cryptocurrency exchange means that disclosure of one's name "<u>would</u> create <u>undue risk</u> of identity theft or other unlawful injury."  11 U.S.C. § 107(c)(1) (emphasis added).

---

[14]    Section 1028(d) defines "means of identification" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual."  18 U.S.C. § 1028(d).

A.    <u>The Bankruptcy Court erred by failing to find that disclosure of Debtors' customer-creditors' names, alone, "would" create undue risk of identity theft or unlawful injury.</u>

Section 107(c)(1) expressly requires a showing that information "would" create an undue risk of identity theft or other unlawful injury. As the Supreme Court has explained, "would" is a "stricter standard" than, for example, "could reasonably be expected to." *U.S. Dep't of Just. v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 756 & n.9 (1989) (discussing exemptions in the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA")); *see also Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 166 (2004) (discussing difference between "would" and "could" in FOIA).

Here, the Bankruptcy Court based its § 107(c)(1) ruling entirely on the expert testimony of Sheridan, who it found:

> introduced very compelling testimony; again, uncontroverted testimony, about how customers can be identified just by a name. It's something that happens all the time in our society today . . . . And he testified, again, very compellingly, that if they have a name and they are an FTX customer, they can be targeted, and that is what we need to protect here.

A694:8–18. The Bankruptcy Court made no factual finding that disclosure of the names of FTX's individual customer-creditors "would" subject them to an undue risk of identity theft or other unlawful injury, as required by § 107(c)(1). Instead, it concluded only that customer-creditors "can be targeted." The failure to make that finding warrants reversal. *See In re Cendant Corp.*, 260 F.3d at 198.

42

This is not mere semantics.  On the contrary, even though names of some customer-creditors of FTX already have been made public, there is no evidence any have been "targeted" by scammers (even assuming, *arguendo*, that merely being "targeted" constitutes an "undue risk of identity theft or other unlawful injury," which it does not, as explained further below).  In January, the Bankruptcy Court ordered Debtors to refile their Consolidated Lists of Top 50 Creditors "without redacting the name of any creditor who was appointed by the U.S. Trustee to the [Official Committee.]"  A166–A167, ¶ 10.  Notwithstanding that almost six months passed between that order and the hearings on June 8 and 9, 2023, neither Debtors nor the Official Committee introduced any evidence that any member of the Official Committee was "targeted."  And, indeed, the Official Committee also lists its members, which include Larry Qian and Zachary Bruch, on its website.  *General Bankruptcy/Committee Questions*, FTX Trading Official Committee of Unsecured Creditors, https://dm.epiq11.com/case/ftx/info2 (last accessed Aug. 18, 2023).[15]

Moreover, if merely being identified, by name, as a customer-creditor of Debtors "would" subject an individual to undue risk of identity theft or other unlawful injury, one would expect reluctance among Debtors' customer-creditors to identify themselves publicly.  But Debtors' customer-creditors have done just that.

---

[15]    Media Intervenors-Appellants respectfully request that the Court take judicial notice of this website pursuant to Fed. R. Evid. 201.

A199.  Individuals have identified themselves, by name, as customer-creditors of FTX to the news media, on "crypto Twitter,"[16] and in lawsuits arising out of FTX's collapse.[17]  Indeed, Media Intervenors-Appellants have interviewed numerous FTX customer-creditors in order to report on the aftermath of FTX's implosion.  *See, e.g.*, Caitlin McCabe & Rachel Louise Ensign, *FTX Crypto Customers Worry They Will Never See Their Money Again*, Wall St. J. (Nov. 21, 2022), https://www.wsj.com/articles/ftx-crypto-customers-worry-they-will-never-see-their-money-again-11668976779 (interviewing FTX customers Matthew Way, Drake Lyle, Joseph DiBella, George Gonzalez); Matthew Goldstein, *Ordinary Investors Who Jumped Into Crypto Are Saying: Now What?*, N.Y. Times (Dec. 5, 2022), https://www.nytimes.com/2022/12/05/business/cryptocurrency-investors-

---

[16]     *See, e.g.*, Chris Arnold, *FTX investors fear they lost everything, and wonder if there's anything they can do*, NPR (Nov. 18, 2022), https://perma.cc/9D2P-5JMN (interviewing FTX customers Terri Smith, Nick Howard, and Jake Thacker); https://twitter.com/Randymarcote/status/1686809042071461888, https://twitter.com/joshuaricho/status/1684166429325815809 (users self-identifying as losing money on FTX).  Media Intervenors-Appellants respectfully request that the Court take judicial notice of this article and Twitter posts pursuant to Fed. R. Evid. 201.

[17]     *See, e.g.*, Compl. ¶ 34, *Rabbitte v. Sequoia Capital Operations, LLC*, No. 3:23-cv-655 (N.D. Cal. Feb. 14, 2023) (stating "Plaintiff Patrick J. Rabbitte purchased, deposited, and transacted assets with FTX"); *see also* Preliminary Report Exhibit C: Related Cases, *In re FTX Cryptocurrency Exchange Collapse Litigation*, No. 1:23-md-03076 (S.D. Fla. June 16, 2023), ECF No. 40-3 (identifying related cases).  Media Intervenors-Appellants respectfully request that the Court take judicial notice of these cases pursuant to Fed. R. Evid. 201.

ftx-blockfi.html (interviewing FTX customers Frank Friemel, Mashood Alam, and Chen Mei-Sha).[18]  Again, there is no evidence in the record that these individuals—or any other of Debtors' customer-creditors—were "targeted."  The absence of any such evidence underlines the Bankruptcy Court's error in failing to make the requisite factual finding that disclosure of their names "would" pose undue risk to customer-creditors under § 107(c)(1).

 B. <u>The Bankruptcy Court erred by failing to make factual findings that disclosure of Debtors' customer-creditors' names, alone, would create "undue risk" of identity theft or other unlawful injury.</u>

Section 107(c)(1) does not apply whenever disclosure would create <u>a</u> risk of identity theft or other unlawful injury; it applies only to prevent "undue risk."  Undue is defined as "[e]xcessive or unwarranted," *Undue*, Black's Law Dictionary (11th ed. 2019); or "[e]xceeding what is appropriate or normal," American Heritage Dictionary (5th ed. 2022), https://perma.cc/3AGJ-2P64.   In other words, to be "undue," the risk must exceed what is normal.  *Id.*; *see also Prusky v. ReliaStar Life Ins. Co.*, 474 F. Supp. 2d 703, 710 (E.D. Pa. 2007), *aff'd*, 532 F.3d 252 (3d Cir. 2008) (noting, in context of the Restatement (Second) of Contracts, that it "does not limit required mitigation to alternate plans without *any* risk; rather, it says 'undue risk'").  As one bankruptcy court noted in rejecting a request to seal information, if

---

[18] Media Intervenors-Appellants respectfully request that the Court take judicial notice of these articles pursuant to Fed. R. Evid. 201.

a "general fear of identity theft constituted cause for redaction, a court would have to seal or redact all personal information in every case." *In re Avaya, Inc.*, No. 17-10089, 2019 WL 1750908, at *6 (Bankr. S.D.N.Y. Mar. 28, 2019).

Here, even assuming, *arguendo*, that disclosure of Debtors' individual customer-creditors' names, alone, "would" create a risk of identity theft or other unlawful injury (which, again, is unsupported and, indeed, contradicted by the record), the Bankruptcy Court failed to make any finding that such risk is "undue," which is reversible error. *See In re Cendant Corp.*, 260 F.3d at 198.

Debtors and the Official Committee argued—and the Bankruptcy Court agreed—that the risk posed by disclosure of the names of customer-creditors in cryptocurrency-related bankruptcy proceedings is different from the risk posed by the disclosure of the names of creditors in other types of bankruptcy proceedings. *See* A694:8–18 (Bankruptcy Court concluding that if "they have a name and they are an FTX customer, they can be targeted"). But this 'crypto is different' standard is not supported by either the law or the facts.

The sole evidence presented by the Debtors and Official Committee in support of sealing under § 107(c)(1) was Sheridan's expert testimony. He posited a two-pronged theory of the "risk" posed by disclosure of the names of Debtors' customer-creditors: that "malefactors typically target (x) consumers they believe to be holders of cryptocurrency and (y) consumers who are in a vulnerable state, including

46

because they have sums of money tied up in bankruptcy proceedings."  A245 ¶ 8. Addressing the second prong first, the fact that a creditor may have "money tied up in bankruptcy proceedings" cannot, alone, justify sealing that creditor's name.  If it could, the name of every creditor in every bankruptcy proceeding would be sealed. And while Sheridan speculated that <u>some</u> of Debtors' customer-creditors "<u>may</u> be vulnerable due to the monetary losses they have experienced," A246 ¶ 10 (emphasis added), he admitted during cross-examination that he does not know the financial or other circumstances of <u>any</u> of the individuals whose names have been redacted from the filings in these Chapter 11 cases.  A591:24–A592:4.

As to the first prong of his theory—that scammers will target known cryptocurrency holders—Sheridan admitted during cross-examination that he "didn't make [any] comparison between cryptocurrency holder[s] and non-cryptocurrency holder[s]."  A594:13–14.  Indeed, he confirmed that he had made no effort to determine whether being involved in a bankruptcy case outside of the cryptocurrency context makes an individual more or less vulnerable to attempted identity and other asset theft crimes.  A592:5–12.  Sheridan's testimony repeatedly failed to draw any meaningful distinction between individuals who use the internet, in general, and cryptocurrency holders, in particular.

For example, while Sheridan testified about the risk of a "business email compromise" scam, he confirmed it is not unique to the cryptocurrency context.

47

A593:23–25. He also conceded he had no data or research showing that known cryptocurrency holders are more frequent targets of such online scams, A594:1–7, and, crucially, could point to no data showing that a known cryptocurrency holder is more likely to be a victim of a business e-mail compromise scam than a non-cryptocurrency holder, A597:9–14. He gave the same testimony with respect to "account spoofing"—a scamming method that can be used to target anyone who uses a computer or cell phone, and also is not unique to the cryptocurrency context, A604:18–23; *see also* A604:24–A605:11 (testifying he did not review data or research comparing how often known cryptocurrency holders are targets or victims of account spoofing scams versus non-cryptocurrency holders)—and "romance scams," A608:14–A609:5 (testifying that romance scams can target anyone, are not unique to the cryptocurrency context, and that he did not review data or research comparing how often known cryptocurrency holders are targets or victims of romance scams versus non-cryptocurrency holders).

Further, as to so-called "pig butchering" (a variation on a romance scam), Sheridan confirmed it too can target both holders and non-holders of cryptocurrency. He testified that a bad actor can convince a non-holder "to set up a cryptocurrency wallet to further facilitate the crime." A610:9–12. And, indeed, in an example of pig butchering attached as an exhibit to Sheridan's declaration (an article published by Media Intervenor-Appellant Dow Jones), the victim was not a cryptocurrency

holder.  A369.  Sheridan also testified that in the pig-butchering cases he had personally investigated, he did not know whether the perpetrators knew in advance whether their victim had cryptocurrency holdings.  A610:16–25.[19]

Sheridan provided essentially the same testimony with respect to phishing— a familiar method commonly used by online scammers.  He confirmed it "is not unique to cryptocurrency," A600:25, and can target anyone who uses e-mail, text messages, or instant messages, A600:21–23.  He also confirmed that he had not seen any data or research comparing how often known cryptocurrency holders are phishing targets compared to non-cryptocurrency holders, A601:5–10, and, again, conceded he had no data about the success of phishing attempts targeting cryptocurrency holders, specifically, *see* A602:5–16.

The Debtors and Official Committee repeatedly pointed to *Celsius* as purported evidence that Debtors' customer-creditors might be the targets of phishing attempts if their names were not redacted.  644 B.R. at 294.  As discussed above, in *Celsius*, the bankruptcy court found cause to redact individual customer-creditor "email and physical addresses," but denied the debtors' request to seal their names. *Id.*  Noting that hundreds had already filed claims with names and addresses, the

---

[19]     Sheridan also testified that "pig butchering" (and SIM swapping) are scams cannot work on customers who cannot access their cryptocurrency funds because they are in a cold wallet.  A573:21–A576:4; A576:20–A577:16. Here, Debtors' customer-creditors' accounts have been frozen; they cannot access cryptocurrency or cash in their FTX accounts.  A521:19–25.

court was "unconvinced, beyond speculation, that the disclosure of names alone (without email or physical addresses) presents an imminent risk of harm." *Id.* at 295. Following that ruling, there were notices of phishing attempts filed on the *Celsius* docket. *See, e.g.*, A376–A389.

But crucially, there is no evidence in the record, at all, to show that <u>any</u> of those phishing attempts were successful. *See also* A606:20–A607:4 (Sheridan testifying he did not know how many Celsius customers received phishing e-mails and did not know how many phishing attempts that reached Celsius customers were successful). Indeed, the record shows that Celsius customer-creditors who received phishing e-mails identified the communications as suspicious and notified the debtors' counsel. *See* A379–A389. Simply put, at most, this evidence shows that some number of customer-creditors in a cryptocurrency bankruptcy proceeding may—like non-cryptocurrency holders—get phishing e-mails, and that they may be in a <u>better</u> position than digital novices to effectively identify them and avoid being scammed. If the possibility of merely receiving a phishing e-mail was sufficient evidence to redact an individual's name, the name of every individual creditor in every bankruptcy proceeding could be redacted.

In sum, all of the types of online scams identified by Sheridan can be targeted at holders and non-holders of cryptocurrency, in or outside of bankruptcy proceedings, and there is no evidence showing comparative rates of targeting or,

more importantly, success of those scams based on those variables.

Finally, Sheridan testified more generally that disclosure of Debtors' customer-creditors' names would allow malefactors to create a "dossier[s]" for each of those individuals by "correlat[ing] additional information," A245–A246, ¶ 9, which then, presumably, could be used for nefarious ends.  But as Sheridan testified, such a dossier can be created for <u>anyone</u> so long as there's "corroborating information," which, he conceded, candidly, "in today's day and age is generally easy to find."  A586:3–5.  Take, for example, the information each of the parties' counsel in this case provides in each filing they make with the Bankruptcy Court: name, e-mail address, business telephone number, and office address.  That information is far more extensive than only a name.  That someone might use it to create "dossier[s]" for those attorneys does not amount to "undue risk" of identity theft or other unlawful injury that would warrant redacting their names under § 107(c)(1).

According to Debtors' own evidence, since 2012 the top 15 data breaches have affected more than <u>9.6 billion</u> accounts around the world.  A467–A476.  The 2021 LinkedIn breach alone affected 700 million users, with the perpetrator(s) collecting "email addresses, phone numbers, geolocation records, genders[,] and other social media details."  A470.  Marriott International's data breach, affecting 500 million customers, permitted the harvesting of "guests' names, mailing

addresses, phone numbers, email addresses, passport numbers . . . dates of birth, gender, arrival and departure information, reservation dates, and communication preferences." A471–A472.  The unfortunate reality of modern life is that everyone who uses online services faces a persistent risk of data breaches, and many (if not most) of us have already experienced at least one.  And, as Sheridan confirmed, a data breach involving an individual's data increases the likelihood that they will be targeted by an online scam, <u>regardless</u> of whether they hold cryptocurrency. A586:17–21.

The Bankruptcy Court seems to have recognized that everyone, regardless of whether they hold cryptocurrency, is a frequent target of online scammers:

> It's something that happens all the time in our society today, given the access to, not just the types of information we all have access to -- Google, Twitter, et cetera -- but the dark web, where there's all kinds of information about individuals that can be found with just a name.

A694:10–15.  But it can't be the case that if something "happens all the time," the disclosure of individuals' names in bankruptcy court filings makes the unproven and uncertain risk of the same thing happening an "undue risk."  To the contrary, as Sheridan acknowledged, being a customer-creditor of FTX could make someone <u>more likely to be cautious</u> and less likely to be the victim of a scam in the future. *See* A620:2–8; *see also* A620:9–12 (testifying that being the victim of cybercrime makes people more wary and cautious of potential future scams).

**V.     The Bankruptcy Court erred in refusing to consider less-restrictive alternatives to the redaction of all customer-creditor names.**

As detailed above, Third Circuit precedent requires courts to conduct "a document-by-document review" before sealing judicial records in whole or in part. *In re Avandia Mktg.*, 924 F.3d at 677; *see also Leucadia*, 998 F.2d at 167.  Narrow tailoring is also supported by the policy favoring public access in bankruptcy proceedings; accordingly, "[r]edacting documents to remove only protectable information is preferable to wholesale sealing."  *In re Borders Grp., Inc.*, 462 B.R. 42, 47 (Bankr. S.D.N.Y. 2011) (citation omitted).

Here, however, the Bankruptcy Court refused to make any distinctions between any of Debtors' approximately 9 million customer-creditors, *see* A702 ¶ 4; A694:8–25, including rejecting Media Intervenors-Appellants' request that the Bankruptcy Court separately evaluate the need to redact the names of Debtors' top-50 creditors. *See, e.g.*, A677:1–9.

Among other things, determining which of Debtors' top-50 creditors are already customers of other exchanges for purposes of determining whether disclosure of their names would give competitors an unfair competitive advantage under § 107(b)(1) would have been trivially easy.  Indeed, in the Second Day Hearing, the Bankruptcy Court engaged in an extended colloquy with Debtors' counsel about delineating between pure creditors and customer-creditors in its top-50 list.   A155:7–A157:19. For the Bankruptcy Court to fail to require any

particularized showing as to those individuals, so that it could consider the less-restrictive option of unsealing those names, was error.

Similarly, under § 107(c)(1), there was no evidence presented that the individuals on Debtors' list of top-50 creditors, in particular, would face undue risk of identity theft or other unlawful injury if their names are unsealed. To the contrary, it is likely those customer-creditors are experienced cryptocurrency users who are the <u>least</u> susceptible to any scams. Indeed, Sheridan testified that in his experience, he had never known an individual with $10 million in cryptocurrency in a single exchange to be new to crypto. A619:16–22. The smallest of Debtors' top-50 creditors has a claim of more than double that amount. *See* A44–A48 (claims ranging from more than $21 million to more than $226 million).

## **CONCLUSION**

The Bankruptcy Court's Order not only deprives members of the press and public (including creditors) of vital information about these bankruptcy proceedings, but also it limits the public's ability to understand the broader effects of FTX's collapse, and the controversial, largely unregulated, multibillion-dollar cryptocurrency industry more generally. As Debtors' expert testified, "malefactors often use cryptocurrency to facilitate financial fraud," A245 ¶ 8—matters of undeniable public concern. And the public interest in cryptocurrency is not limited to its potential to facilitate crime. It is a meaningful, growing segment of the world's

economy, with both adherents and detractors. *See, e.g.*, *Cryptocurrency 'is not the answer' to current monetary system: Jamie Dimon*, Fox Business (Jan. 10, 2023), https://www.foxbusiness.com/video/6318453640112 (CEO of JPMorgan Chase, criticizing cryptocurrency in general and FTX in particular).

For all the foregoing reasons, and contrary to the Bankruptcy Court's ruling, there is no legal or factual basis to—and powerful reason not to—except cryptocurrency-related bankruptcies generally, and FTX's bankruptcy in particular, from the longstanding rule that "[d]uring a chapter 11 reorganization, a debtor's affairs are an open book[,]" *In re Alterra Healthcare Corp.*, 353 B.R. at 73. Media Intervenors-Appellants respectfully request that the Court vacate the portions of the Order below authorizing the redaction of the names of Debtors' customer-creditors.

Date: August 21, 2023

Respectfully submitted,

/s/ David L. Finger
David L. Finger (ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 N. Orange St., 7th fl.
Wilmington, DE 19801
302.573.2525
*Counsel of Record for Appellants*

Katie Townsend (*pro hac vice*)
Adam A. Marshall (*pro hac vice*)
Reporters Committee for Freedom
   of the Press
1156 15th St. NW, Ste. 1020
Washington, DC 20005
(202) 795-9300

ktownsend@rcfp.org
amarshall@rcfp.org
*Counsel for Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that the foregoing brief complies with the type-volume limitations set forth in Federal Bankruptcy Rule 8015(a)(7)(B) and this Court's Standing Order Regarding Briefing in All Cases in that the brief contains 12,763 words as counted by Microsoft Word and was prepared in 14-point Times New Roman font.

<div style="text-align: right;">

/s/ David L. Finger
David L. Finger (ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 N. Orange St., 7th fl.
Wilmington, DE 19801
302.573.2525
*Counsel of Record for Appellants*

</div>