No. 23-cv-00682

---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---

In re FTX TRADING LTD., *et al*., Debtors.

---

BLOOMBERG L.P., DOW JONES & COMPANY, INC., THE NEW YORK TIMES COMPANY, AND THE FINANCIAL TIMES LTD., Appellants,

v.

FTX TRADING LTD., *et al.*, Appellees.

---

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---

**JOINT BRIEF OF APPELLEES
FTX TRADING LTD., ET AL. AND THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS**

---

**LANDIS RATH & COBB LLP**
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
         brown@lrclaw.com
         pierce@lrclaw.com

**SULLIVAN & CROMWELL LLP**
Andrew G. Dietderich (*pro hac vice*)
James L. Bromley (*pro hac vice*)
Brian D. Glueckstein (*pro hac vice*)
Alexa J. Kranzley (*pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
         bromleyj@sullcrom.com
         gluecksteinb@sullcrom.com
         kranzleya@sullcrom.com

**YOUNG CONAWAY
STARGATT & TAYLOR, LLP**
Matthew B. Lunn (No. 4119)
Robert F. Poppiti, Jr. (No. 5052)
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: mlunn@ycst.com
      rpoppiti@ycst.com

**PAUL HASTINGS LLP**
Kristopher M. Hansen (*pro hac vice*)
Kenneth Pasquale (*pro hac vice*)
Isaac S. Sasson (*pro hac vice*)
John F. Iaffaldano (*pro hac vice*)
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
Email: krishansen@paulhastings.com
      kenpasquale@paulhastings.com
      isaacsasson@paulhastings.com
      jackiaffaldano@paulhastings.com

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

CORPORATE DISCLOSURE STATEMENT ........................................................ I

STATEMENT OF THE CASE ........................................................................... 1

I.     Nature of the Case ................................................................................... 1

II.    The FTX Debtors and Their Chapter 11 Cases ............................................ 2

III.   The Original Motion .................................................................................. 3

IV.   The First Extension Motion ........................................................................ 5

V.    The Kroll Hack ....................................................................................... 11

COUNTER-STATEMENT OF ISSUE AND STANDARD OF REVIEW ............ 12

SUMMARY OF THE ARGUMENT ................................................................ 13

ARGUMENT .............................................................................................. 14

I.     The First Extension Order is Not a Final, Appealable Order ...................... 14

    A.   The 107(b)(1) Relief in the First Extension Order is Not "Final" Under Bullard or Ritzen. ................................................................... 15

    B.   The First Extension Order Does Not Resolve All Claims, so the Order as a Whole is Not Subject to Appeal. ........................................... 18

II.    The Bankruptcy Court Correctly Authorized the Sealing of Customer Names Pursuant to Section 107(b)(1) for 90 Days ..................................... 19

    A.   This Court Reviews the Bankruptcy Court's Decision for Clear Error. 19

    B.   The Bankruptcy Court Did Not Commit Clear Error in Determining that Appellees Met Their Burden Under Section 107(b)(1). ......................... 20

    (i)   The customer lists are confidential commercial information. ............... 20

    (ii)  The customer lists are a trade secret. ............................................ 25

III.    The Bankruptcy Court Correctly Held That Cause Exists to Seal
        Information Pursuant to Section 107(c) ........................................................28

IV.     The Bankruptcy Court Did Not Shift the Burden to Appellants or Err by
        Not Considering Less Restrictive Alternatives ...........................................37

        A.    The Bankruptcy Court Did Not Reverse the Presumption in Favor of
              Public Access............................................................................................37

        B.    The Bankruptcy Court Did Not Err by Not Considering Less Restrictive
              Alternatives...............................................................................................38

CONCLUSION .....................................................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Altegrity, Inc.*,
   2015 WL 10963572 (Bankr. D. Del. July 6, 2015) ............................................21

*In re Alterra Healthcare Corporation*,
   353 B.R. 66 (Bankr. D. Del. 2006) ....................................................................20

*American Ice Co.* v. *Royal Petroleum Corp.*,
   261 F.2d 365 (3d Cir.1958) ...............................................................................25

*In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*,
   924 F.3d 662 (3d Cir. 2019) ..............................................................................39

*In re BlockFi, Inc.*,
   No. 22-19361 (MBK) (Bankr. D.N.J. Nov. 30, 2022).......................................30

*In re Borders Grp., Inc.*,
   462 B.R. 42 (Bankr. S.D.N.Y. 2011).............................................................20, 40

*Bullard* v. *Blue Hills Bank*,
   575 U.S. 496 (2015)......................................................................................15, 16

*In re Celsius Network LLC*,
   644 B.R. 276 (Bankr. S.D.N.Y. 2022)................................................................31

*Century Indem. Co.* v. *Boy Scouts of Am.*,
   2021 WL 1174573 (D. Del. Mar. 29, 2021) .......................................................16

*In re Cred Inc.*,
   No. 20-12836 (JTD) (Bankr. D. Del. Dec. 18, 2020)........................................21

*In re Cred Inc.*,
   No. 20-12836 (JTD) (Bankr. D. Del. Dec. 21, 2020)........................................31

*U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgt. LLC* v. *Village at
   Lakeridge, LLC*,
   138 S. Ct. 960 (2018)..........................................................................................12

*In re Decade. S.A.C., LLC*,
   2020 WL 1623632 (Bankr. D. Del. Mar. 18, 2020) ...........................................18

*Doeblers' Pa. Hybrids, Inc.* v. *Doebler*,
   442 F.3d 812 (3d Cir. 2006), *as amended* (May 5, 2006) ............................ 25-26

*In re Energy Future Holdings Corp*,
   949 F.3d 806 (3d Cir. 2020) ...............................................................16

*In re Faucett*,
   438 B.R. 564 (Bankr. W.D. Tex. 2010)...................................................21

*In re Genesis*,
   652 B.R. 618 (Bankr. S.D.N.Y. 2023).......................................21, 22, 23, 24, 30

*Interfaith Cmty. Org.* v. *Honeywell Int'l, Inc.*,
   399 F.3d 248 (3d Cir. 2005) ..........................................................12, 23

*In re Kaiser Aluminum Corp.*,
   456 F.3d 328 (3d Cir. 2006) ..............................................................32

*Liveware Publ'g, Inc.* v. *Best Software, Inc.*,
   252 F. Supp. 2d 74 (D. Del. 2003).........................................................25

*In re LMI Legacy Holdings, Inc.*,
   625 B.R. 268 (D. Del. 2020) (Connolly, J.) ...............................................18

*Mattern & Assoc., L.L.C.* v. *Seidel*,
   678 F. Supp. 2d 256 (D. Del. 2010).......................................................25

*In re Motions Seeking Access to 2019 Statements*,
   585 B.R. 733 (D. Del. 2018)...........................................................30, 32

*In re Neal*,
   461 F.3d 1048 (8th Cir. 2006) ............................................................19

*In re Northwestern Corp.*,
   319 B.R. 68 (D. Del. 2005)...............................................................17

*In re Nunn*,
   49 B.R. 963 (Bankr. E.D. Va. 1985).......................................................21

*In re O'Brien Env't Energy, Inc.*,
    188 F.3d 116 (3d Cir. 1999) ...............................................................12

*Orabi* v. *Attorney Gen. of the United States*,
    738 F.3d 535 (3d Cir. 2013) ...............................................................11

*In re Orion Pictures Corp.*,
    1993 WL 330065 (S.D.N.Y. Aug. 25, 1993).......................................19

*In re Orion Pictures Corp.*,
    21 F.3d at 27 ...................................................................................20, 38

*In re Phar-Mor, Inc.*,
    191 B.R. 675 (Bankr. N.D. Ohio 1995)...............................................38

*In re Roman Catholic Archbishop of Portland in Oregon*,
    661 F.3d 417 (9th Cir. 2011) .......................................................... 37-38

*Ritzen Grp., Inc.* v. *Jackson Masonry, LLC*,
    140 S. Ct. 582 (2020).............................................................15, 16, 17

*In re Trinsum Grp., Inc.*,
    467 B.R. 734 (Bankr. S.D.N.Y. 2012).......................................... 18-19

*United States* v. *Cianfrani*,
    573 F.2d 835 (3d Cir. 1978) ...............................................................18

*United States* v. *Smith*,
    123 F.3d 140 (3d Cir. 1997) ...............................................................18

*United States* v. *Wecht*,
    537 F.3d 222 (3d Cir. 2008) ...............................................................18

*In re Voyager Digital Holdings, Inc.*,
    No. 22-10943 (MEW) (Bankr. S.D.N.Y. July 08, 2022) ....................31

*Werner* v. *Werner*,
    267 F.3d 288 (3d Cir. 2001) ...............................................................11

## Statutes & Rules

11 U.S.C. § 107 ....................................................................................*passim*

11 U.S.C. § 1102 ..........................................................................................3

11 U.S.C. § 1107 .................................................................................2

11 U.S.C. § 1108 .................................................................................2

18 U.S.C. § 1839 ...............................................................................26

28 U.S.C. § 158 .................................................................................14

Fed R. Evid. 301 ...............................................................................28

## Other Authorities

Shaurya Malwa, *FTX Customers Hit by "Withdrawal" Phishing Mails
    after SIM Swap Attack*, COINDESK, Aug. 29, 2023 ...........................................11

Twitter, *Misleading and deceptive identities policy* (April 2023),
    https://help.twitter.com/en/rules-and-policies/twitter-
    impersonation-and-deceptive-identities-policy .................................................34

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 8012 and Rule 8014 of the Federal Rules of Bankruptcy Procedure, FTX Trading Ltd., on behalf of itself and its affiliated debtors and debtors-in-possession (collectively, the "<u>FTX Debtors</u>"), states as follows based on information available to the FTX Debtors at the time of this filing:

1.    100% of the equity of Alameda Aus Pty Ltd. is owned by Alameda Research Ltd.

2.    100% of the equity of Alameda Global Services Ltd. is owned by Alameda Research LLC.

3.    100% of the equity of Alameda Research (Bahamas) Ltd. is owned by Alameda Research Ltd.

4.    100% of the equity of Alameda Research Holdings Inc. is owned by Alameda Research LLC.

5.    100% of the equity of Alameda Research KK is owned by Alameda Research LLC.

6.    There is no parent corporation or publicly held corporation that has been identified owning 10% or more of the equity of Alameda Research LLC.

7.    100% of the equity of Alameda Research Ltd. is owned by Alameda Research LLC.

8.    100% of the equity of Alameda Research Pte Ltd. is owned by Alameda Research Ltd.

9.    99.9% of the equity of Alameda Research Yankari Ltd. is owned by Alameda Research Ltd.

10.   100% of the equity of Alameda TR Ltd. is owned by Alameda Research Ltd.

11.   100% of the equity of Alameda TR Systems S. de R. L. is owned by

Alameda Research Ltd.

12.    100% of the equity of Allston Way Ltd. is owned by FTX Trading Ltd.

13.    100% of the equity of Analisya Pte Ltd. is owned by FTX Trading Ltd.

14.    100% of the equity of Atlantis Technology Ltd. is owned by Alameda Research Holdings Inc. Services Ltd.

15.    100% of the equity of Bancroft Way Ltd. is owned by FTX Trading Ltd.

16.    Approximately 52% of the equity of Blockfolio, Inc. is owned by Blockfolio Holdings, Inc.

17.    100% of the equity of Blue Ridge Ltd. is owned by Alameda Research Ltd.

18.    100% of the equity of Cardinal Ventures Ltd. is owned by Alameda Research Ltd.

19.    100% of the equity of Cedar Bay Ltd. is owned by Alameda Research Ltd.

20.    There is no parent corporation or publicly held corporation that has been identified owning 10% or more of the equity of Cedar Grove Technology Services, Ltd.

21.    There is no parent corporation or publicly held corporation that has been identified owning 10% or more of the equity of Clifton Bay Investments LLC.

22.    100% of the equity of Clifton Bay Investments Ltd. is owned by Clifton Bay Investments LLC.

23.    100% of the equity of Cottonwood Grove Ltd. is owned by Alameda Research Ltd.

24.    100% of the equity of Cottonwood Technologies Ltd. is owned by Alameda Research Ltd.

25.    100% of the equity of Crypto Bahamas LLC is owned by FTX Trading Ltd.

26.    100% of the equity of DAAG Trading, DMCC is owned by FTX Europe AG.

27.    There is no parent corporation or publicly held corporation that has been identified owning 10% or more of the equity of Deck Technologies Holdings

LLC.

28.  100% of the equity of Deck Technologies Inc.is owned by Deck Technologies Holdings LLC.

29.  100% of the equity of Deep Creek Ltd. is owned by FTX Trading Ltd.

30.  100% of the equity of Digital Custody Inc. is owned by West Realm Shires Inc.

31.  100% of the equity of Euclid Way Ltd. is owned by Alameda Research Ltd.

32.  100% of the equity of FTX (Gibraltar) Ltd. is owned by FTX Trading Ltd.

33.  100% of the equity of FTX Canada Inc. is owned by FTX Trading Ltd.

34.  100% of the equity of FTX Certificates GmbH is owned by FTX Europe AG.

35.  100% of the equity of FTX Crypto Services Ltd. is owned by FTX Trading Ltd.

36.  100% of the equity of FTX Digital Assets LLC is owned by West Realm Shires Financial Services Inc.

37.  100% of the equity of FTX Digital Holdings (Singapore) Pte Ltd. is owned by FTX Trading Ltd.

38.  100% of the equity of FTX EMEA Ltd. is owned by FTX Trading Ltd.

39.  100% of the equity of FTX Equity Record Holdings Ltd. is owned by FTX Trading Ltd.

40.  100% of the equity of FTX EU Ltd. (f/k/a K-DNA Financial Services Ltd) is owned by FTX Europe AG.

41.  100% of the equity of FTX Europe AG is owned by FTX Trading Ltd.

42.  100% of the equity of FTX Hong Kong Ltd. is owned by FTX Trading Ltd.

43.  100% of the equity of FTX Japan Holdings K.K. is owned by FTX Trading Ltd.

44.  100% of the equity of FTX Japan K.K. is owned by FTX Japan Holdings K.K.

45.   100% of the equity of FTX Japan Services KK is owned by FTX Japan Holdings K.K.

46.   100% of the equity of FTX Lend Inc. is owned by West Realm Shires Inc.

47.   100% of the equity of FTX Marketplace, Inc. is owned by West Realm Shires Inc.

48.   100% of the equity of FTX Products (Singapore) Pte Ltd. is owned by FTX Trading Ltd.

49.   100% of the equity of FTX Property Holdings Ltd. is owned by FTX Trading Ltd.

50.   100% of the equity of FTX Services Solutions Ltd. is owned by FTX Trading Ltd.

51.   100% of the equity of FTX Structured Products AG is owned by FTX Europe AG.

52.   100% of the equity of FTX Switzerland GmbH is owned by FTX Europe AG.

53.   100% of the equity of FTX Trading GmbH is owned by FTX Trading Ltd.

54.   Approximately 75% of FTX Trading Ltd. is owned by Paper Bird Inc.

55.   100% of the equity of FTX US Services, Inc. is owned by West Realm Shires Services Inc.

56.   100% of the equity of FTX US Trading, Inc. is owned by West Realm Shires Services Inc.

57.   100% of the equity of FTX Ventures Ltd. is owned by Paper Bird Inc.

58.   99.9% of the equity of FTX Zuma Ltd. is owned by FTX Trading Ltd.

59.   100% of the equity of GG Trading Terminal Ltd. is owned by FTX Trading Ltd.

60.   100% of the equity of Global Compass Dynamics Ltd. is owned by FTX Trading Ltd.

61.   100% of the equity of Good Luck Games, LLC. is owned by West Realm

Shires Inc.

62.  100% of the equity of Goodman Investments Ltd. is owned by Alameda Research Holdings Inc.

63.  100% of the equity of Hannam Group Inc. is owned by Alameda Research LLC.

64.  100% of the equity of Hawaii Digital Assets Inc. is owned by West Realm Shires Inc.

65.  There is no parent corporation or publicly held corporation that has been identified owning 10% or more of the equity of Hilltop Technology Services LLC.

66.  100% of the equity of Hive Empire Trading Pty Ltd. is owned by FTX Trading Ltd.

67.  100% of the equity of Innovatia Ltd. is owned by FTX Trading Ltd.

68.  100% of the equity of Island Bay Ventures Inc. is owned by Paper Bird Inc.

69.  100% of the equity of Killarney Lake Investments Ltd. is owned by Alameda Research Holdings Inc.

70.  100% of the equity of Ledger Holdings Inc. is owned by West Realm Shires Inc.

71.  100% of the equity of LedgerPrime Bitcoin Yield Enhancement Fund, LLC is owned by Ledger Prime LLC.

72.  100% of the equity of LedgerPrime Bitcoin Yield Enhancement Master Fund LP is owned by LedgerPrime Bitcoin Yield Enhancement Fund, LLC.

73.  100% of the equity of LedgerPrime Digital Asset Opportunities Fund, LLC is owned by Ledger Prime LLC.

74.  100% of the equity of LedgerPrime Digital Asset Opportunities Master Fund LP is owned by LedgerPrime Digital Asset Opportunities Fund, LLC.

75.  100% of the equity of Ledger Prime LLC is owned by Alameda Research LLC.

76.  100% of the equity of LedgerPrime Ventures, LP is owned by Ledger Prime

LLC.

77.   Approximately 50% of the equity of Liquid Financial USA Inc. is owned by FTX Japan Holdings K.K. and approximately 50% is owned by third party investors.

78.   100% of the equity of LiquidEX LLC is owned by Liquid Financial USA Inc.

79.   100% of the equity of Liquid Securities Singapore Pte Ltd. is owned by FTX Trading Ltd.

80.   100% of the equity of LT Baskets Ltd. is owned by FTX Trading Ltd.

81.   100% of the equity of Maclaurin Investments Ltd. is owned by Alameda Research Ltd.

82.   100% of the equity of Mangrove Cay Ltd. is owned by FTX Trading Ltd.

83.   100% of the equity of North Dimension Inc. is owned by Alameda Research LLC.

84.   100% of the equity of North Dimension Ltd. is owned by Alameda Research Ltd.

85.   100% of the equity of North Wireless Dimension Inc. is owned by Alameda Research LLC.

86.   There is no parent corporation or publicly held corporation that has been identified owning 10% or more of the equity of Paper Bird Inc.

87.   100% of the equity of Pioneer Street Inc. is owned by West Realm Shires Inc.

88.   100% of the equity of Quoine India Pte Ltd. is owned by FTX Japan K.K.

89.   100% of the equity of Quoine Pte Ltd. is owned by FTX Japan Holdings K.K.

90.   100% of the equity of Quoine Vietnam Co. Ltd. is owned by FTX Japan K.K.

91.   100% of the equity of Strategy Ark Collective Ltd.  is owned by Alameda Research Ltd.

92.   100% of the equity of Technology Services Bahamas Limited is owned by FTX Trading Ltd.

93.   100% of the equity of Verdant Canyon Capital LLC is owned by Alameda Research LLC.

94.   100% of the equity of West Innovative Barista Ltd. is owned by FTX Trading Ltd.

95.   100% of the equity of West Realm Shires Financial Services Inc. is owned by West Realm Shires Inc.

96.   There is no parent corporation or publicly held corporation that has been identified owning 10% or more of the equity of West Realm Shires Inc.

97.   100% of the equity of West Realm Shires Services Inc. is owned by West Realm Shires Inc.

98.   100% of the equity of Western Concord Enterprises Ltd. is owned by FTX Trading Ltd.

99.   100% of the equity of Zubr Exchange Ltd. is owned by Innovatia Ltd.

* * *

In accordance with Federal Rule of Bankruptcy Procedure 8012, Appellee, the Official Committee of Unsecured Creditors, is a statutorily designated entity and is not a corporation.

## STATEMENT OF THE CASE

## I.      Nature of the Case

This appeal is the product of disappointed parties—with neither a pecuniary interest in the FTX Debtors' estates nor any of the risks associated with being a publicly named FTX Debtor customer—that, as a result of the Bankruptcy Court's decision below, cannot mine the FTX Debtors' customer lists of more than 9 million names and addresses for the purpose of naming them in news publications. Appellants' interests, contrary to their arguments on appeal, do not eclipse those of Appellees and the creditors of these bankruptcy estates, whose interests Appellees have the fiduciary duty to advance and protect. The mandates of the FTX Debtors and the Committee include maximizing the value of the FTX Debtors' estates and protecting the FTX Debtors' customers from the risk of further harm. The Bankruptcy Court struck the appropriate balance of interests in the First Extension Order.

Section 107 of the Bankruptcy Code authorizes the Bankruptcy Court to protect the FTX Debtors' highly sensitive customer information by permitting the redaction of customer names and addresses both because the customer lists are important assets of the FTX Debtors and potential sources of value, and the circumstances of the FTX Debtors' Chapter 11 Cases dictate that disclosing the

names of the FTX Debtors' non-institutional customers exposes those individuals to a very present and undue risk of financial and physical harm.

After two days of witness testimony, the Bankruptcy Court determined that Appellees had met their burden to show that customer names should be redacted for 90 days pursuant to section 107(b)(1) of the Bankruptcy Code (subject to further extension), and permanently for individual customers pursuant to section 107(c) of the Bankruptcy Code. Appellants prematurely attempt to appeal the Bankruptcy Court's non-final findings of fact and determinations based on the unrefuted evidence, and the appeal should be rejected on that basis alone. In any event, Appellants do not (and cannot) demonstrate that the Bankruptcy Court committed clear error, and the Bankruptcy Court's First Extension Order should be affirmed.[1]

## II.    The FTX Debtors and Their Chapter 11 Cases

On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the FTX Debtors filed with the Bankruptcy Court voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"). The FTX Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and

---

[1]    The Office of the United States Trustee objected to the relief before the Bankruptcy Court but has abandoned any attempt to appeal from the First Extension Order. *See Order Granting the Motion to Dismiss Appeal*, Case No. 23-cv-00737 (CFC) [D.I. 18].

1108 of the Bankruptcy Code.  Joint administration of the FTX Debtors' cases (the "Chapter 11 Cases") was authorized by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") by entry of an order on November 22, 2022.  On December 15, 2022, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors in the FTX Debtors' Chapter 11 Cases (the "Committee") pursuant to section 1102 of the Bankruptcy Code.

## III.    The Original Motion

On November 19, 2022, the FTX Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain a Consolidated List of Creditors in Lieu of Submitting a Separate Matrix for Each Debtor, (II) Authorizing the Debtors to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals and (III) Granting Certain Related Relief* (the "Original Motion").  (A31-A43.)  Among other things, the Original Motion requested authority for the FTX Debtors to redact (a) the names and all associated identifying information of the FTX Debtors' customers pursuant to section 107(b)(1) of the Bankruptcy Code, and (b) the address and email addresses of individual creditors or equity holders of the FTX Debtors pursuant to section 107(c) of the Bankruptcy Code.  (*Id.*)  On November 23, 2022, the Court granted the Original Motion on an interim basis and entered the *Interim*

*Order (I) Authorizing the Debtors to Maintain a Consolidated List of Creditors in Lieu of Submitting a Separate Matrix for Each Debtor, (II) Authorizing the Debtors to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals on an Interim Basis and (III) Granting Certain Related Relief.* (A720-A724.)

Objections to the Original Motion being granted on a final basis were interposed by the U.S. Trustee and Appellants. On January 8, 2023, the FTX Debtors filed a reply (the "Original Reply") (A112-A131) and a declaration from Kevin Cofsky of Perella Weinberg Partners L.P. ("PWP"), the FTX Debtors' investment banker (A132-A138), each in support of the Original Motion. Through the Original Reply, the FTX Debtors modified the relief requested in the Original Motion to seek authority to redact confidential information pursuant to section 107(b) of the Bankruptcy Code only for a limited period, subject to extension, as the FTX Debtors explore a sale or reorganization of their trading exchanges. (A114-A115.) The FTX Debtors at that time deferred their request to redact customer names pursuant to section 107(c). (A115.)

The Bankruptcy Court held an evidentiary hearing on the Original Motion on January 11, 2023 (the "January 11 Hearing"). (A139-A162.) At the January 11 Hearing, the Bankruptcy Court granted the relief requested, except that the Bankruptcy Court authorized the FTX Debtors to redact customer names

pursuant to section 107(b) of the Bankruptcy Code for an initial period of only 90 days, subject to extension (such date, the "Original Redaction Deadline"). (A159:18-A161:25.)   Accordingly, on January 20, 2023, the Bankruptcy Court entered the *Final Order (I) Authorizing the Debtors to Maintain a Consolidated List of Creditors in Lieu of Submitting a Separate Matrix for Each Debtor, (II) Authorizing the Debtors to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals on a Final Basis and (III) Granting Certain Related Relief* (the "Original Order").   (A163-A168.) Pursuant to the Original Order, the Original Redaction Deadline expired on April 20, 2023.  (A165.)

## IV.    The First Extension Motion

On April 20, 2023, Appellees filed the *Joint Motion of the Debtors and the Official Committee of Unsecured Creditors for an Order Authorizing the Movants to Redact or Withhold Certain Confidential Information of Customers and Personal Information of Individuals* (the "First Extension Motion").  (A217-A240.) The First Extension Motion requested, among other things, authority to redact (a) the names, addresses and email addresses of the FTX Debtors' customers for an additional 90 days pursuant to section 107(b)(1) of the Bankruptcy Code, and (b) the names, addresses and email addresses of the FTX Debtors' customers who are natural persons on a permanent basis pursuant to section 107(c) of the Bankruptcy

Code.  (A224-A231.)  In support of the First Extension Motion, Appellees also filed a declaration from Jeremy Sheridan.  (A241-A476.)  On May 3, 2023, Appellants filed an objection to the First Extension Motion (the "Objection").  (A477-A489.)  On June 5, 2023, Appellees filed their reply.  (A725-A738.)

On June 8 and June 9, 2023, the Bankruptcy Court held a hearing on the First Extension Motion (collectively, the "June Hearing").  (A501-A699.)  At the June Hearing, Mr. Cofsky testified in support of the First Extension Motion.  (A507:5-A538:7.)  He testified that, in his experience, including "represent[ing] a number of companies and businesses with respect to 363 sales and plan of reorganization sales, a number of which involved customers," it was his opinion that "the customers have, in this case, material value to the estate."  (A508:13-19.)  He further testified that "the ability of other competitors to gain knowledge of those customers would be detrimental to the estate."  (A508:20-22.)  He also testified that "releasing that information [i.e. the customer lists] would impair the debtors' ability to maximize the value that it currently possesses."  (A511:25-A512:7.)

Mr. Cofsky went on to detail how PWP has "already engaged in a significant outreach process, with respect to solicitation of third-party interests in participating in a process to either acquire, invest into, or reorganize the FTX exchange.  And based on those conversations . . . existing customers are extremely

valuable and valued by folks who would be interested in investing into a reorganized business."  (A509:20-A510:2.)

Mr. Cofsky further explained how he and his team looked at the top 200 customers of the FTX Debtors, representing a sampling of approximately $2.4 billion of claims, to determine whether they could be identified by name alone. (A515:2-A517:25.)  Of the 200 customers, Mr. Cofsky's team was able to identify the exact individual for approximately 46 percent of the names utilizing only basic search tools.  (A517:12-17.)  Of that 46 percent, Mr. Cofsky's team thought it was "highly likely" that they had identified 34 percent, and "likely" that they had identified 12 percent.  (A517:17-20.)  The amount identified represented over one billion dollars of claims against the FTX Debtors.  (A517:21-25.)

At the June Hearing, the Bankruptcy Court also heard testimony from Mr. Sheridan (A550:8-A622:2), who holds an expert certification from the Blockchain Council, a certificate from Carnegie Mellon University for Chief Information Security Officer, two certificates from the Global Information Assurance Corporation in information security governance and leadership and is a certified information security manager through the Information Systems Audit and Control Association.  (A550:22-A551:8.)  He worked at the Secret Service for 24 years, where he spent 14 years investigating financial crimes.  (A552:50-19.)  Prior

to providing his testimony to the Bankruptcy Court, Mr. Sheridan testified as an expert witness three times in front of the United States Congress.  (A553:3-7.)

Mr. Sheridan testified at the June Hearing that simply having an individual's name, but not their home address or email address, would be enough information for a bad actor to identify them and perpetuate a cybercrime.  (A559:4-8.)  He further testified that between a cryptocurrency bankruptcy case and a regular Chapter 11 Case, he perceived a "much higher" risk of cyber schemes and attacks on personally identifiable information.  (A563:15-22.)  Mr. Sheridan also testified that FTX users specifically are an easier target for cyber criminals because they were "specifically marketed to as an easier and less technical customer" and "their focus [is] solely on the return on the investment, as opposed to the security of their investment."  (A558:19-22.)

Appellants did not put on any evidence to rebut the testimony from Appellees' witnesses, who were credited by the Bankruptcy Court.  Following Appellees' witnesses' testimony, the Bankruptcy Court determined that, with respect to section 107(b) of the Bankruptcy Code, "the evidence presented was uncontroverted that customer identification has value.  It has value to the debtors' estates."  (A693:15-18.)  As a result, the Bankruptcy Court ordered that Appellees could continue to redact those names for 90 additional days.  (*Id.* at 20-25.)  With respect to section 107(c), the Bankruptcy Court stated that "Mr. Sheridan introduced

very compelling testimony; again, uncontroverted testimony, about how customers can be identified just by a name." (A694:8-10.) The Bankruptcy Court further found that Mr. Sheridan "testified, again, very compellingly, that if they have a name and they are an FTX customer, they can be targeted, and that is what we need to protect here. . . . I want to make sure that they are protected and they don't fall victim to any types of scams that might be happening out there." (*Id.* at 8-21.)

Mr. Sheridan also provided testimony regarding a recent hack in the chapter 11 cases of *In re Celsius Network LLC, et al.*, No. 22-10964 (MG) (Bankr. S.D.N.Y.). Specifically, Mr. Sheridan described how, after the names of individual Celsius customers were disclosed, those names were "placed into an interactive, searchable Excel spreadsheet that was put online through Celsiusnetworth.com," following which "there were multiple reported incidents of phishing, business email compromise, other types of criminal schemes that targeted the individuals listed in - - that spreadsheet." (A0562:7-24.) Mr. Sheridan further testified that, in his expert opinion, there was a "much higher risk related to [the FTX case than the Celsius case] because of the prominence of the case, the notoriety of the case, and also where the industry is at this particular time in the overall market" (A0563:4-9), and that there was "much higher visibility in this case." (A0563:15-564:4.)

Accordingly, on June 15, 2023, the Court entered the *Order Authorizing the Movants to Redact or Withhold Certain Confidential Information of*

*Customers and Personal Information of Individuals* (the "<u>First Extension Order</u>").

(A700-A704.)  The First Extension Order authorized Appellees, pursuant to section

107(c)(1) of the Bankruptcy Code, "to permanently redact the names of all

customers who are natural persons from all filings with the Bankruptcy Court or

made publicly available in these Chapter 11 Cases in which disclosure would

indicate such person's status as a customer."  (A702.)  The First Extension Order

also authorized Appellees, "pursuant to section 107(b)(1) of the Bankruptcy Code,

to redact the names, addresses and e-mail addresses of all of the [FTX] Debtors'

customers from all filings with the [Bankruptcy] Court or made publicly available

in these Chapter 11 Cases . . . until the date that is 90 days from the date of entry of"

the First Extension Order (such date, the "<u>Extended Redaction Deadline</u>"), with the

rights of Appellees reserved to seek a further extension of the redaction deadline.

(A701-A702.)  The Extended Redaction Deadline was set to expire on September

13, 2023.  (A701.)  On September 13, 2023, Appellees sought an additional 90-day

extension of the Extended Redaction Deadline by filing the *Second Joint Motion of*

*the Debtors and the Official Committee of Unsecured Creditors for an Order*

*Authorizing the Movants to Redact or Withhold Certain Confidential Information of*

*Customers* (the "<u>Second Extension Motion</u>").  (A748-A759.)  The Second Extension

Motion is currently pending before the Bankruptcy Court.

## V.     The Kroll Hack

On August 25, 2023, Kroll Restructuring Administration ("Kroll"), the FTX Debtors' claims agent in the Chapter 11 Cases, experienced a data breach by a third-party malefactor.  (A744-A747.)[2]  Through the hack, an unauthorized third party obtained the names, addresses, email addresses and account balances of approximately 78,459 FTX account holders.  (A744.)  Shortly following this incident, a number of users reported that they had received phishing emails, whereby a third party used names and email addresses to attempt to gain access to users' FTX accounts.  *See* Shaurya Malwa, *FTX Customers Hit by "Withdrawal" Phishing Mails after SIM Swap Attack*, COINDESK, Aug. 29, 2023, *available at* https://www.coindesk.com/business /2023/08/29/ftx-customers-hit-by-withdrawal-phishing-mails-after-sim-swap-attack/ ("[U]sers are getting hit by a new phishing attack on their FTX-registered emails a week after Kroll, the claims agent in the bankruptcy proceedings, was impacted by a SIM swapping attack.").

---

[2]   Appellees respectfully request that the Court take judicial notice of this subsequent development in the bankruptcy cases below.  *See Werner* v. *Werner*, 267 F.3d 288, 295 (3d Cir. 2001) (finding courts of appeal "may take judicial notice of filings or developments in related proceedings which take place after the judgment appealed from"); *Orabi* v. *Attorney Gen. of the United States*, 738 F.3d 535, 537 n.1 (3d Cir. 2013) ("We may take judicial notice of the contents of another Court's docket.").

## COUNTER-STATEMENT OF ISSUE AND STANDARD OF REVIEW

**Issues Presented**:

1.      Did the Bankruptcy Court correctly authorize, pursuant to section 107(b)(1) of the Bankruptcy Code, the sealing of the FTX Debtors' customer names for an additional 90 days, subject to further extension?

2.      Did the Bankruptcy Court correctly authorize, pursuant to section 107(c) of the Bankruptcy Code, the permanent sealing of the FTX Debtors' customer names of natural persons?

**Standard of Review:**

In reviewing the decision of the Bankruptcy Court, the District Court reviews "the Bankruptcy Court's legal determinations de novo, its factual findings for clear error, and its exercise of discretion for abuse thereof." *In re O'Brien Env't Energy, Inc.*, 188 F.3d 116, 122 (3d Cir. 1999). "By well-settled rule, [the bankruptcy court's] factual findings are reviewable only for clear error—in other words, with a serious thumb on the scale for the bankruptcy court." *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgt. LLC* v. *Village at Lakeridge, LLC*, 138 S. Ct. 960, 966 (2018). "Clear error exists 'only if [a finding] is completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data.'" *Interfaith Cmty. Org.* v. *Honeywell Int'l, Inc.*, 399 F.3d 248, 254 (3d Cir. 2005) (quoting *Shire U.S., Inc.* v. *Barr Labs., Inc.*, 329 F.3d 348, 352 (3d Cir. 2003)).

## SUMMARY OF THE ARGUMENT

Appellants' arguments fail for many reasons. *First*, the First Extension Order is not a final, appealable order with respect to the Bankruptcy Court's holding as to section 107(b)(1). The First Extension Order permitted Appellees to redact all customer names and identifying information for 90 days from its entry. (A701.) This relief is temporary and subject to extension, which Appellees have sought pursuant to the Second Extension Motion currently pending before the Bankruptcy Court. Under binding Supreme Court precedent regarding what constitutes a "final" order in bankruptcy cases, the First Extension Order is not appealable because the disputed issue is not yet resolved.

Even if the First Extension Order were appealable, Appellants have failed to show that the Bankruptcy Court committed clear error in its determination that Appellees may independently redact customer names and addresses pursuant to section 107(b)(1) and section 107(c)(1) of the Bankruptcy Code. Under well-established precedent, customer lists such as those of the FTX Debtors are "confidential commercial information" that merit protection under section 107(b)(1). The Bankruptcy Court credited Appellees' witnesses' testimony and determined in its discretion that redacting customer information is appropriate, and Appellants have failed to show that was clear error.

-13-

Similarly, the Bankruptcy Court correctly exercised its discretion in determining, based on the evidentiary record, which was entirely uncontroverted, that the risk of harm to the FTX Debtors' individual customers necessitates protection from public disclosure pursuant to section 107(c) of the Bankruptcy Code.

Lacking any evidence in the record that the entry of the First Extension Order constituted clear error, Appellants attempt to manufacture nonexistent "legal" issues that are easily dismissed through a review of the record. The Bankruptcy Court's decision should be affirmed.

## **ARGUMENT**

## I.   **The First Extension Order is Not a Final, Appealable Order**

As an initial matter, the First Extension Order is not a final, appealable order because the relief granted pursuant to section 107(b)(1) of the Bankruptcy Code was interim and is subject to further proceedings now pending. For an order to be appealable from the bankruptcy court without leave from the reviewing court, it must be a "final order." 28 U.S.C. § 158(a) ("The district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders and decrees; . . . (3) with leave of the court, from other interlocutory orders and decrees; of bankruptcy judges entered in cases and proceedings. . .") Appellants incorrectly assert that "[t]he [First Extension] Order is a final order, including under the

collateral order doctrine" and did not request leave of this Court to appeal.  (D.I. 17 at 1.)

### A.    The 107(b)(1) Relief in the First Extension Order is Not "Final" Under *Bullard* or *Ritzen*.

The Supreme Court recently clarified when a bankruptcy court decision is a "final order" and therefore appealable as of right.  In two cases, *Bullard* v. *Blue Hills Bank*, 575 U.S. 496 (2015) and *Ritzen Grp., Inc.* v. *Jackson Masonry, LLC*, 140 S. Ct. 582  (2020), the Supreme Court considered what constitutes a "final order" in a bankruptcy proceeding, which—unlike ordinary civil litigation—"involves 'an aggregation of individual controversies,' many of which would exist as stand-alone lawsuits but for the bankrupt status of the debtor." *Bullard*, 575 U.S. at 501 (quoting 1 Collier on Bankruptcy ¶ 5.08[1][b], p. 5–42 (16th ed. 2014)).  "By providing for appeals from final decisions in bankruptcy 'proceedings,' as distinguished from bankruptcy 'cases,' Congress made 'orders in bankruptcy cases . . . immediately appeal[able] if they finally dispose of discrete disputes within the larger [bankruptcy] case." *Ritzen*, 140 S. Ct. at 587 (quoting *Bullard*, 575 U.S. at 501) (alterations and omission in original).

In *Bullard*, the Supreme Court held that an order denying plan confirmation with leave to amend was not a final order.  *See* 575 U.S. at 503.  In doing so, it found that, although an "order denying confirmation does rule out the specific arrangement of relief embodied in a particular plan," that alone does not

make the order final because, among other reasons, "[t]he possibility of discharge lives on." *Id.* In rejecting arguments from the Solicitor General that "an order resolving *any* contested matter is final and immediately appealable," the Supreme Court noted that "[t]he concept of finality cannot stretch to cover, for example, an order resolving a disputed request for an extension of time." *Id.* at 505 (emphasis in original). In *Ritzen*, to the contrary, the Supreme Court held that denial of a motion to lift the automatic stay is a final, appealable order. *Ritzen*, 140 S. Ct. at 592. Consistent with these decisions, the First Extension Order is not a final order because its temporary relief pursuant to 107(b)(1) did not finally dispose of the issues underlying that portion of the order.

Courts in the Third Circuit have interpreted *Ritzen* to mean that a bankruptcy court order is final and appealable "when it resolves a proceeding that 'initiates a discrete procedural sequence, including notice and a hearing'; requires application of a 'statutory standard'; and does 'not occur as part of the adversary claims-adjudication process.'" *Century Indem. Co.* v. *Boy Scouts of Am.*, 2021 WL 1174573, at *3 (D. Del. Mar. 29, 2021) (quoting *In re Energy Future Holdings Corp*, 949 F.3d 806, 817 (3d Cir. 2020)). The key word is **resolves**: the First Extension Order does no such thing, as evidenced by the fact that the Second Extension Motion is currently pending before the Bankruptcy Court. Appellants will almost certainly

object, and there will almost certainly be a further evidentiary record developed. As a result, the First Extension Order is not final and not appealable as of right.

Prior to *Ritzen* (and in some cases after it), courts in the Third Circuit have applied a "flexible, pragmatic approach to determining whether an order of the Bankruptcy Court is final." *See, e.g.*, *In re Northwestern Corp.*, 319 B.R. 68, 72 (D. Del. 2005). "Under this approach, the Court may consider a variety of factors including but not limited to (1) whether the order leaves additional work to be done by the Bankruptcy Court; (2) whether the order implicates purely legal issues; (3) the impact of the Bankruptcy Court's order upon the assets of the debtor's estate; (4) the necessity for further fact-finding on remand to the Bankruptcy Court; (5) the preclusive effect of the District Court's decision on the merits of subsequent litigation; and (6) the furtherance of judicial economy." *Id.* (citing *U.S.* v. *Pellulo*, 178 F.3d 196, 200-201 (3d Cir. 1999)). This analysis, too, demonstrates that the First Extension Order is not a final order. Among other things, there is additional work to be done by the Bankruptcy Court, which has a pending motion on the same issue before it now; the First Extension Order does not implicate purely legal issues; and determination of this issue will have a large impact on the value of the FTX Debtors' estates.

None of the cases cited by Appellants compel a contrary result. Each case concerns efforts by media intervenors to access information related to a criminal

proceeding that was sealed for an *indeterminate term*. *See United States* v. *Wecht*, 537 F.3d 222, 230 (3d Cir. 2008) (finding that the relevant order "conclusively determine[d] the disputed question" because "the names of prospective jurors will not be available to the Media-Intervenors *at any time before or after the trial*") (emphasis added); *United States* v. *Smith*, 123 F.3d 140 (3d Cir. 1997) (denying access to court proceedings); *United States* v. *Cianfrani*, 573 F.2d 835, 845 (3d Cir. 1978) (finding an order closing a hearing and sealing the record permanently to be a "final decision" and thus appealable under the "collateral order" doctrine). That is not the case here, where the Bankruptcy Court will soon consider an extension of the limited 90-day relief granted pursuant to section 107(b)(1) under the First Extension Order.

**B.    The First Extension Order Does Not Resolve All Claims, so the Order as a Whole is Not Subject to Appeal.**

An order that only resolves some claims is not final. *In re LMI Legacy Holdings, Inc.*, 625 B.R. 268, 277-78 (D. Del. 2020) (Connolly, J.) (noting that "the Order was not final on issuance because at least one claim remained . . . ."); *In re Decade. S.A.C., LLC*, 2020 WL 1623632 at *4 (Bankr. D. Del. Mar. 18, 2020) ("[B]ankruptcy orders granting summary judgment as to some but not all claims are generally regarded as interlocutory and are not appealable as of right."); *In re Trinsum Grp., Inc.*, 467 B.R. 734, 741 (Bankr. S.D.N.Y. 2012) ("[O]rders granting summary judgment as to some or not all claims are generally regarded as

interlocutory.")  As such, the open issues under section 107(b)(1) of the Bankruptcy Code preclude Appellants from appeal as of right for the First Extension Order as to any part of the First Extension Order, including with respect to the relief granted pursuant to section 107(c).

## II.    The Bankruptcy Court Correctly Authorized the Sealing of Customer Names Pursuant to Section 107(b)(1) for 90 Days

### A.    This Court Reviews the Bankruptcy Court's Decision for Clear Error.

Section 107(b)(1) provides that "[o]n request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may . . . protect an entity with respect to a trade secret or confidential research, development, or commercial information . . . ." 11 U.S.C. 107(b).  To the extent the Court finds that the First Extension Order is a final, appealable order with respect to section 107(b)(1), whether the FTX Debtors' customers lists are confidential commercial information within the meaning Section 107(b)(1) "presents a factual question reviewed for clear error."  *In re Neal*, 461 F.3d 1048, 1052 (8th Cir. 2006) (discussing section 107(b)(2)).  Even where Appellants' arguments are "phrased as legal issues, [they] are really challenges to the Bankruptcy Court's factual findings and to that court's discretionary power."  *In re Orion Pictures Corp.*, 1993 WL 330065, at *1 (S.D.N.Y. Aug. 25, 1993), *aff'd* 21 F.3d 24 (2d Cir. 1994) (discussing section 107(b)(1)).

**B.     The Bankruptcy Court Did Not Commit Clear Error in Determining that Appellees Met Their Burden Under Section 107(b)(1).**

The Bankruptcy Court's determination that the FTX Debtors' customer names must be protected under section 107(b)(1) of the Bankruptcy Code was not clear error.

(i)     The customer lists are confidential commercial information.

To meet the requirements of section 107(b)(1), the moving party must only show "that the information it sought to seal [is] 'confidential' and 'commercial' in nature." *In re Orion Pictures Corp.*, 21 F.3d at 27.  The information need not rise to the level of trade secret to be protected. *Id.* at 28.  "Commercial information [under section 107(b)(1)] has been defined as information which would cause an unfair advantage to competitors by providing them information as to the commercial operations of the debtor." *Id.* (quoting *Ad Hoc Protective Comm. For 10 ½% Debenture Holders* v. *Itel Corp.*, 17 B.R. 942, 944 (9th Cir. 1982)).  It also includes "situations where a bankruptcy court may reasonably determine that allowing such disclosure would have a 'chilling effect on [business] negotiations, ultimately affecting the viability of Debtors,'" *In re Borders Grp., Inc.*, 462 B.R. 42, 47 (Bankr. S.D.N.Y. 2011) (alteration in original), or could "reasonably be expected to cause the entity commercial injury," *In re Alterra Healthcare Corporation*, 353 B.R. 66, 75 (Bankr. D. Del. 2006) (quotations omitted).

-20-

Contrary to Appellants' assertion (D.I. 17 at 27), there is no requirement that a customer list be the "primary asset" of a debtor in order to qualify as confidential commercial information under section 107(b)(1).  Indeed, courts regularly hold that customer lists constitute confidential commercial information, irrespective of whether there are allegations that they are a primary asset.  *See, e.g.*, *In re Genesis*, 652 B.R. 618, 631 (Bankr. S.D.N.Y. 2023) (finding that a customer list of a cryptocurrency firm was confidential commercial information); *see also In re Cred Inc.*, No. 20-12836 (JTD) (Bankr. D. Del. Dec. 18, 2020), Hr'g Tr. 113:20–25; 114:1–16 [D.I. 277] (A779-A780) (same); *In re Faucett*, 438 B.R. 564, 568 (Bankr. W.D. Tex. 2010) (holding that computer screen shots revealing identity of debtor's customers were confidential commercial information); *In re Altegrity, Inc.*, 2015 WL 10963572, at *3-4 (Bankr. D. Del. July 6, 2015) (holding debtor's list of independent contractors was a "primary asset" that debtor had spent "considerable effort and money to develop" and was "highly susceptible to solicitation" and that such information was therefore confidential commercial information); *In re Nunn*, 49 B.R. 963, 965 (Bankr. E.D. Va. 1985) (holding that customer list was creditor's only "real asset" and was subject to protection under section 107(b) because allowing creditor's competitor access to the list would have adverse effect on that creditor).

A recent decision by Judge Lane of the United States Bankruptcy Court for the Southern District of New York in *In re Genesis Global Holdco, LLC* is instructive. 652 B.R. at 631-36. There, Judge Lane decided that the customer list of Genesis, a cryptocurrency firm, was confidential commercial information pursuant to section 107(b)(1). *Id.* at 635. The court determined that the Genesis debtors established that the list "is a valuable asset of the estate that is currently being marketed for sale and that its release would decrease the amount that would be realized from the sale process and have a negative impact on the value of the Debtor's estate." *Id.*

The same is true here. At the June Hearing, Appellees presented evidence that the FTX Debtors' customer lists are a valuable asset of the estates and that disclosure would have a negative impact on the Chapter 11 Cases. Mr. Cofsky, the FTX Debtors' investment banker, testified that "the existing customer base is extraordinarily valuable." (A509:10-19.) He testified that the list of customers has value in both reorganization and sale scenarios. (A510:7-18.) Mr. Cofsky also testified that the customer lists would be "valuable if [the FTX Debtors] were unable to sell or chose not to sell and/or were unable or chose not to reorganize, but to simply sell the customer lists." (A511:10-15.) He further testified that "releasing the [customer lists] would impair the debtors' ability to maximize the value that it currently possesses." (A512:4-7.) Release of the customer names, according to Mr.

-22-

Cofsky, would negatively impact the FTX Debtors' current process to monetize the asset, "potentially significantly." (A514:8-9.) Based on this testimony, the Bankruptcy Court correctly determined that the FTX Debtors' customer lists may be sealed on a temporary basis pursuant to section 107(b)(1).

Appellants' arguments to the contrary fail. Appellants misstate the legal standard by arguing that the Bankruptcy Court committed clear error because it made "no findings" that the customer names have "actual" or "specific" value. (D.I. 17 at 31.) But Appellants cite to no law or case requiring any such findings, because there is none.

Appellants go on to attack Mr. Cofsky's testimony, repeating the same arguments that the Bankruptcy Court previously rejected. This rehash of the record falls far short of showing that the Bankruptcy Court's decision "bears no rational relationship to the supporting data," as Appellants must establish to prevail on their appeal. *Interfaith Cmty. Org.*, 399 F.3d at 254.

Appellants assert that the Bankruptcy Court erred because it determined that the customers lists have value to the Debtors, and insist that "[t]o qualify as confidential commercial information, disclosure must provide an 'unfair advantage to competitors.'" (D.I. 17 31.) But Mr. Cofsky's testimony and the record clearly demonstrate it would because, as in *Genesis*, that "[t]he unrebutted evidence shows that release of this information would allow competitors to determine the identity of

-23-

the Debtors' [customers] and take steps to poach the [customers], undermining the value of the Debtors' ongoing business." *Genesis*, 652 B.R. at 635.

Appellants allege that the record does not "even suggest" that customers would stay on the FTX Debtors' exchange if they reopened. (D.I. 17 at 32.) This is not at all required, but Appellants nonetheless ignore Mr. Cofsky's testimony that customers would in fact be incentivized to utilize the reconstituted exchange because they would likely be *owners of it*. (A523:15-24.)

Appellants attempt to distract with arguments that Appellees "did not prove" the FTX Debtors could sell the customer names or "offer any evidence of the 'value' of those names in any such sale" (D.I. 17 at 35), and posit that the FTX Debtors' customers may also be customers of other cryptocurrency platforms. (D.I. 17 at 38-40.) These assertions are meritless and irrelevant. Mr. Cofsky, who has an MBA from Wharton, a law degree from the University of Pennsylvania and has been an investment banker at PWP for nearly 20 years (A507:12-23), testified repeatedly and unwaveringly to his belief, based on feedback from third parties and his own professional assessment, that the customer lists have value. (A510-A512.) He testified that customer names have value even if those customers use other platforms as well. (A530-A531.) The Bankruptcy Court chose to credit his testimony on these issues and Appellants have not shown, and cannot show, that this was clear error.

(ii)   <u>The customer lists are a trade secret</u>.

Though a customer list need not rise to the level of trade secret to mandate protection pursuant to section 107(b)(1), *see In re Orion*, 21 F.3d at 28, the customer lists here do in fact constitute a trade secret, as the Bankruptcy Court found. (A693 (Bankruptcy Court noting that "under 107(b), the customer names constitute a trade secret").)   The Bankruptcy Code does not define "trade secret," but courts regularly hold that customer lists are "precisely the type of business information which is regularly accorded trade secret status" outside of the bankruptcy context. *Mattern & Assoc., L.L.C.* v. *Seidel*, 678 F. Supp. 2d 256, 269 (D. Del. 2010): *Liveware Publ'g, Inc.* v. *Best Software, Inc*., 252 F. Supp. 2d 74 (D. Del. 2003) (collecting cases); *American Ice Co.* v. *Royal Petroleum Corp.*, 261 F.2d 365, 367 (3d Cir. 1958) (holding that customer lists are trade secrets under Pennsylvania law).

In the Third Circuit, "[f]actors to be considered in determining whether given information is a trade secret are: (1) the extent to which the information is known outside of the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

*Doeblers' Pa. Hybrids, Inc.* v. *Doebler*, 442 F.3d 812, 829 (3d Cir. 2006), *as amended* (May 5, 2006).  Mr. Cofsky's testimony established the customer lists as confidential, valuable, the result of substantial investment by the FTX Debtors and easily acquired if published—all consistent with the FTX Debtors' customer lists being trade secrets under the Third Circuit's non-exclusive set of relevant factors.

Appellants refer the Court, without support, to the definition of "trade secret" contained in the Defend Trade Secrets Act.  (D.I. 17 at 26 (citing 18 U.S.C. § 1839(3)).)  Appellants assert that it was reversible error for the Bankruptcy Court not to make a factual finding that the FTX Debtors took reasonable measures to keep the customer names secret, but there was no requirement for the Bankruptcy Court to do so because this definition of "trade secret" is not applicable to section 107(b)(1).  Section 1839 begins by stating the following definitions are "[a]s used in this chapter."  Nowhere in Section 1839 does it suggest that its definitions should be incorporated into the Bankruptcy Code, and the Bankruptcy Code nowhere incorporates that definition.  Appellants do not cite to a single case applying that definition of trade secret to section 107(b) of the Bankruptcy Code.

Even if Appellees were required to establish that the customer names are a trade secret for section 107(b)(1) protection (they are not), and even if such a factual finding that the FTX Debtors took reasonable measures to keep the customer lists confidential were required (it is not), the record is clear that the FTX Debtors

*have* taken such measures.  It is uncontroverted that the customer names are confidential; if they were not, this entire exercise would be moot.  Moreover, Mr. Cofsky testified that based on conversations with third parties, the customer lists have value and could be sold.  (A511:2-9.)  This would of course not be the case if the customer lists were not confidential.

Appellants' arguments regarding the FTX Trading Ltd. Privacy Policy and the FTX Debtors' prepetition practices do nothing to change this.  The FTX Trading Ltd. Privacy Policy contemplates, in relevant part, only that in the event of a sale, merger or reorganization, "information may be sold or transferred as part of such a transaction."  (A104.)  That language contemplates transfer to a buyer, not public disclosure.  Similarly, the provision permitting disclosure *if required* to comply with law enforcement or legal process plainly contemplates maintaining confidentiality where possible.  (*Id.*)  The record clearly establishes that the customer lists are confidential, and Appellants' speculation that the FTX Debtors may have shared some information prepetition is insufficient to overcome that.

Appellants' further assertion that the FTX Debtors' prepetition practices show that the information is not confidential plainly fails.  The quoted sentence from Mr. Ray's declaration speaks to a lack of security controls "*with respect to [FTX's] digital assets*" (D.I. 17 at 30 (quoting A22-A23, ¶ 65 (emphasis added))), not customer information.  Appellants' assertion that the FTX Debtors

"were not even in control of" their customer lists is also meritless.  (D.I. 17 at 30.) To the contrary, Mr. Ray's declaration shows that the FTX Debtors took affirmative steps to secure all customer data.  (A25-A26, ¶ 75.)

Appellants' attempts to grasp at straws fail, and the record plainly demonstrates the Bankruptcy Court appropriately exercised its discretion with respect to granting relief pursuant to section 107(b)(1) of the Bankruptcy Code, and did not commit clear error in doing so.

## III.   The Bankruptcy Court Correctly Held That Cause Exists to Seal Information Pursuant to Section 107(c)

Appellants fail to present any legitimate basis to reverse the Bankruptcy Court's ruling that individual customer names should be sealed pursuant to section 107(c).  The Bankruptcy Court's decision in that regard was based upon an unrebutted evidentiary record presented by Appellees, the foundation of which was the testimony of Mr. Sheridan.  As further discussed in section IV, *infra*, contrary to Appellants' arguments on appeal, the Bankruptcy Court recognized the presumption in favor of public access – but *not* in favor of secrecy – and placed the burden to overcome that presumption squarely on Appellees.  *See* Fed. R. Evid. 301.  As set forth below, Appellees satisfied their burden with evidence, overcoming the presumption of public access.  Notably, no evidence at all was offered by Appellants. The Bankruptcy Court was entirely correct in finding that the evidence presented by Appellees was "uncontroverted," and its factual findings based upon the evidence

before it were not clearly erroneous.  (A694:8-10.)  Accordingly, that portion of the First Extension Order, which permanently sealed individual customer names pursuant to section 107(c), should be affirmed.

The Bankruptcy Court found based on the record that cause existed to seal customer names and certain other personally identifying information under section 107(c) of the Bankruptcy Code.  The Bankruptcy Court expressly made the following factual findings in its bench ruling:

> The 107(c) issue, Mr. Sheridan introduced very compelling testimony; again, ***uncontroverted testimony***, about how customers can be identified just by a name. It's something that happens all the time in our society today, given the access to, not just the types of information we all have access to -- Google, Twitter, et cetera -- but the dark web, where there's all kinds of information about individuals that can be found with just a name.
>
> And he testified, again, very compellingly, that if they have a name and they are an FTX customer, they can be targeted, and that is what we need to protect here. It's the customers that are the most important issue here. I want to make sure that they are protected and they don't fall victim to any types of scams that might be happening out there.

(A694:8-21 (emphasis added).)  Appellants try to create an issue on appeal by arguing that an order sealing information pursuant to section 107(c) required evidence that disclosing such information "would," rather than could, create harm. (D.I. 17 at 42.)  Appellants are wrong both as a matter of fact and law.

Appellants' contention that certainty of undue risk is required to be proven in order for a court to seal information pursuant to section 107(c) lacks any support in law. This Court held in *In re Motions Seeking Access to 2019 Statements*, 585 B.R. 733 (D. Del. 2018), that "[s]ection 107(c) references 'risk,' and assessment of risk is forward-looking. While a specific potential harm must be identified, *the standard does not require evidence of injury having occurred in the past or under similar circumstances*." *Id.* at 751 (emphasis added; internal citations omitted). The extensive record below conclusively demonstrates that individual customers of the FTX Debtors are subject to undue *future* risk, and the Bankruptcy Court so held. (A246-A255 (declaration of Mr. Sheridan describing the various methods malefactors use to target cryptocurrency holders using their personal information); A554-A565; A585-A621 (testimony of Mr. Sheridan that disclosure of customer names in the FTX bankruptcy cases subjects customers to significant risk of harm); A693-A694 (Bankruptcy Court's bench ruling).)

Indeed, the Bankruptcy Court below is not alone in recognizing the risk to customers and therefore sealing individual customer names in cryptocurrency-related bankruptcy cases. *See In re Genesis*, 652 B.R. at 643-44 (order granting motion to redact personally identifiable customer information for individuals under section 107(c)); *In re BlockFi, Inc.*, No. 22-19361 (MBK) (Bankr. D.N.J. Nov. 30, 2022) [D.I. 53] (A788-A789) (interim order granting motion to redact personally

identifiable information of individual creditors, clients, equity holders, and current and former employees; motion remains *sub judice*); *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. July 08, 2022) [D.I. 54] (A782) (order granting motion to seal names of any natural persons subject to UK GDPR and EU GDPR regulations); *In re Cred Inc*., No. 20-12836 (JTD) (Bankr. D. Del. Dec. 21, 2020) [D.I. 264] (A760-A763) (order granting motion to seal individual customer names).

Appellants rely upon a single out-of-Circuit case in which a bankruptcy court denied a request to seal individual customer names in a cryptocurrency bankruptcy case. *In re Celsius Network LLC*, 644 B.R. 276 (Bankr. S.D.N.Y. 2022). But, as Mr. Sheridan testified below, there were multiple reported incidents of cyberattacks that followed the disclosure of customers' names in Celsius, including phishing scams that went so far as a malefactor criminally falsifying an order of the bankruptcy court, which purported to require Celsius customers to submit personal information, including their cryptocurrency wallet address and contact information, and to pay a "filing fee" and "tax fee."   (A376-378; A390-A392; A432-A435; A562:7-A563:14 (testimony of Mr. Sheridan describing phishing, business email compromise, and other types of criminal schemes that occurred in the Celsius chapter 11 cases).)

Appellants attempt to dismiss the harm resulting from *Celsius*, asserting that "there is no evidence in the record, at all, that any of those phishing attempts were successful." (D.I. 17 at 50.)  Appellants' purported standard is not the law and would improperly require actual harm to have occurred before sealing would be appropriate, contrary to the "undue risk" of harm standard provided by section 107(c).  *See In re Motions Seeking Access to 2019 Statements*, 585 B.R. at 751 ("the standard does not require evidence of injury having occurred in the past or under similar circumstances").  Indeed, it would be an absurd and improper reading of the statute to ignore the word "risk" and require a showing that the particular harm had already occurred.  *See In re Kaiser Aluminum Corp.*, 456 F.3d 328, 338 (3d Cir. 2006) ("A basic tenet of statutory construction is that courts should interpret a law to avoid absurd or bizarre results.").  Particularly as it relates to sealing of information, once the information is publicly available, it cannot later be effectively sealed.  The protection otherwise available pursuant to section 107(c) cannot remedy the harm after the fact.

Unfortunately, the undue risk to the FTX Debtors' customers of which the Bankruptcy Court was concerned has proven to be much more than hypothetical, demonstrating the fallacy in Appellants' arguments.  As discussed herein, following the August 25, 2023 Kroll data breach, whereby an unauthorized party using a SIM swapping attack obtained names, addresses, email addresses and account balances

-32-

of FTX account holders, FTX users have been under attack by a malefactor attempting to gain access to their accounts.   This is precisely the risk of which Mr. Sheridan testified, and that the Bankruptcy Court found justified its order sealing customer names pursuant to section 107(c).  It is frankly callous for Appellants to maintain their positions on appeal that refute the undue risk of harm to the FTX Debtors' customers in the face of the record below and the effect of the breach that occurred after the First Extension Order was granted.

Equally unavailing is Appellants' contention that the FTX Debtors' customers are voluntarily identifying themselves without ramifications. (D.I. 17 at 43.)  But, such disclosures were made by order of the Bankruptcy Court, which held that creditors who *voluntarily* participate in the Chapter 11 Cases should identify themselves.  (A716:17-23.)[3]  Most customers, of course, did not voluntarily decide to participate in the Chapter 11 Cases, but are compelled to participate in order to protect their rights and pursue their respective claims.   The millions of such

---

[3]   According to the Rule 2019 statement recently filed by the Ad Hoc Committee Non-US Customers of FTX.com in the Chapter 11 Cases, after the Bankruptcy Court denied the Ad Hoc Committee's motion to seal its members' personal identifying information because such members had voluntarily determined to participate in the cases, members holding in the aggregate what was alleged to be over $1.7 billion in claims against the FTX Debtors left the Ad Hoc Committee "to protect the confidentiality of personal information." (A740.)

customers (many of whom are likely not actively participating or following the bankruptcy proceedings) would, absent the relief granted by the Bankruptcy Court, have their identities revealed without their consent, and in many cases without their knowledge.  This simple fact would make those individuals far more susceptible to cyberattacks.  Indeed, even after the Celsius debtors took steps to notify customers of such phishing attempts, there was "acknowledgement and admission that they will not reach all customers." (A607:16-19.)   The Bankruptcy Court observed that "it's the customers that are the most important issue here." (A694:18-19.)  And, as set forth above, in response to Appellees' evidence, Appellants offered absolutely no evidence below that customers are not at risk or that those who have had to identify themselves have not been targeted or harmed.[4]  Those customers are the most vulnerable and deserving of the protections afforded by the Bankruptcy Court's First Extension Order.  (A557:8-A559:3 (testimony of Mr. Sheridan that the "very nature

---

[4]   Appellants point to certain individual creditors who have publicly identified themselves as FTX customer-creditors to the news media and on "crypto twitter," as purported support for their contention that there is no undue risk of harm to customers.  Appellants presented no evidence before the Bankruptcy Court to support this proposition and, in any event, the Court can take judicial notice that many participants notably choose to engage in "crypto twitter" anonymously. *See* Twitter, *Misleading and deceptive identities policy* (April 2023), https://help.twitter.com/en/rules-and-policies/twitter-impersonation-and-deceptive-identities-policy ("[Y]ou are not required to display your real name or image on your profile").

of the data shown and the amount . . . demonstrates a lack of sophistication a high . . . volume of users").)

Nor is there any evidence whatsoever to support Appellants' claims that cryptocurrency holders are in a "better position . . . to avoid being scammed," or that the FTX Debtors' list of top-50 creditors are "the least susceptible to any scams." (D.I. 17 at 50, 54.)  To the contrary, unlike in a typical bankruptcy case, the FTX Debtors' customer claims may be viewed as an indication of an individual customer's personal wealth because their claims are for the amount of assets held on the FTX Debtors' exchanges, not the amount owed to a trade creditor, for example, for delivery of specified goods or services—which claim reveals nothing about that trade creditor's assets or wealth.  The FTX Debtors' schedules and top-50 creditor list, if not redacted, would enable malefactors to focus their attention on those who may be the FTX Debtors' wealthiest customers and target their scams accordingly. (A245.)

Appellants propound a highly selective excerpting of Mr. Sheridan's testimony in order to try to discredit the evidence presented to the Bankruptcy Court. For example, Appellants contend, without relevant context, that Mr. Sheridan did not review any data or research about how often known cryptocurrency holders are targets of the various scams, relative to non-cryptocurrency holders.  (D.I. 17 at 47-49.)  To the contrary, he testified that an individual is more likely to be the victim of

a phishing attack if they are a known holder of cryptocurrency: "it's a more effective way to generate criminal proceeds because of the circumstances of and nature of the asset, as I described earlier; it's instantaneous, near-instantaneous, it's global, it's valuable, it's pseudo- anonymous, it's irreversible.  And so it is both the method and the means in which the majority of criminal schemes in an online sense are conducted in our -- in the bulk of our investigations."  (A601:19-A602:4.)  Mr. Sheridan further testified in that regard, that "the schemes are carried out using cryptocurrency in an overwhelming number of cases because that's how the criminals are paid and that's how the proceeds are transferred.  Whether or not the criminal knows the individual is a known holder or not, we don't make that distinction . . . ."  (A602:5-16.)  Although true that phishing and other similar scams can be used to target anyone, the record reflects that the very nature of cryptocurrency places holders at high risk of such scams and attacks.

Accordingly, for the foregoing reasons, the Bankruptcy Court correctly sealed the names and other personal information of customers pursuant to section 107(c)(1) of the Bankruptcy Code.  The First Extension Order should be affirmed.

**IV.  The Bankruptcy Court Did Not Shift the Burden to Appellants or Err by Not Considering Less Restrictive Alternatives**

    **A.  The Bankruptcy Court Did Not Reverse the Presumption in Favor of Public Access.**

Likely because Appellants know they cannot establish that the Bankruptcy Court committed clear error in issuing the First Extension Order under section 107(b)(1) and 107(c) of the Bankruptcy Code, they attempt to manufacture an issue of law that does not exist.  Appellants assert that the "Bankruptcy Court erred as a matter of law by reversing the presumption in favor of public access and by failing to require a specific, particularized showing before authorizing broad redaction."  (D.I. 17 at 19.)  The Bankruptcy Court did no such thing.  In fact, Appellants themselves cite to the Bankruptcy Court's contrary statement that "I think the evidence presented was uncontroverted that customer identification has value."  (D.I. 17 at 21 (citing to A693:16-17).)  That was not burden-shifting by the Bankruptcy Court, but rather a determination that Appellees met their evidentiary burden, *overcoming* that presumption, and Appellants failed to offer any evidence of their own to rebut the dispositive evidence offered by Appellees.

Once Appellees satisfied their burden, section 107(b)(1) of the Bankruptcy Code *mandates* protection for the FTX Debtors' commercial information.  11 U.S.C. § 107(b)(1) ("On request of a party in interest, the bankruptcy court shall . . . protect an entity with respect to a trade secret or . . .

commercial information."); *see also In re Roman Catholic Archbishop of Portland in Oregon*, 661 F.3d 417, 430-31 (9th Cir. 2011) ("[u]nder [section] 107, the strength of the public's interest in a particular judicial record is irrelevant"); *In re Phar-Mor, Inc.*, 191 B.R. 675, 678 (Bankr. N.D. Ohio 1995) (holding that section 107(b) "triggers a mandatory requirement that the bankruptcy court protect" the relevant information); *In re Orion* 21 F.3d at 27 ("[I]f the information fits any of the specified categories [under section 107(b)(1)], the court is required to protect a requesting interested party and has no discretion to deny the application.").   Once the Bankruptcy Court determined that Appellees met their burden with respect to establishing that the FTX Debtors' customer names were protected by section 107(b)(1), the Bankruptcy Court was obligated to authorize protection of such information and did not need to then balance the interests of public access.   Likewise, Appellees offered no evidence whatsoever to rebut the "very compelling . . . uncontroverted testimony" with respect to section 107(c). (A0694:8-9.)  Appellants' arguments fail.

## B.   The Bankruptcy Court Did Not Err by Not Considering Less Restrictive Alternatives.

Appellants' assertion that the Bankruptcy Court erred in refusing to consider less-restrictive alternatives to the redaction of customer names likewise fails.  (D.I. 17 at 52.)

As an initial matter, the cases cited by Appellants arguing that the Bankruptcy Court was required to "conduct 'a document-by-document review'" are inapposite. *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.* involved 65 separate, disputed documents. 924 F.3d 662, 677 (3d Cir. 2019). The Third Circuit found that the lower court's analysis of these documents in a single footnote, "in which a multitude of documents spanning several years were divided into broad categories" was insufficient. *Id.* at 677 n.11. That is not the case here, where the same considerations apply to *all* of the more than 9 million customer names on the FTX Debtors' customer lists. Furthermore, the Third Circuit in *Leucadia, Inc.* v. *Applied Extrusion Techs., Inc.* determined a lower court erred because it "did not discuss the contents of the documents" and only noted that it had approved a broad protective order in overruling a challenge to designated material pursuant to that protective order. 998 F.2d 157, 160 (3d Cir. 1993). This bears no relation to the issues here, where the Bankruptcy Court heard extensive evidence on the specific customer information to be sealed.

According to Appellants, the Bankruptcy Court erred by "refus[ing] to make any distinctions between any of [the FTX] Debtors' approximately 9 million customer-creditors."[5] (D.I. 17 at 53.) Not so. Mr. Cofsky testified that there is

---

[5] Appellants' assertion that it would have been "trivially easy" to identify which of the FTX Debtors' customers are also customers of other exchanges is meaningless (because any such customer name still has value), factually

value to *all* customer names, individual and institutional, and irrespective of whether the customer has an account on another exchange or not.  (A530:9-A533:2.)  There is therefore no reason to distinguish between one customer or another for the purposes of section 107(b)(1).  With respect to section 107(c), the Bankruptcy Court credited Mr. Sheridan's "compelling" testimony that "customers can be identified by just a name."  (A694:8-10.)  This is true regardless of whether or not such customer is one of the FTX Debtors' largest customers, or any other arbitrary distinction Appellants might seek to draw.  Moreover, Appellants' statement that "it is likely those [largest] customer-creditors . . . are the least susceptible to any scams" (D.I. 17 at 54) is completely unsupported by any evidence in the record.

Appellants also assert that "redacting documents to remove only protectable information is preferable to wholesale sealing."  (D.I. 17 at 53 (quoting *In re Borders Grp., Inc.*, 462 B.R. 42, 47 (Bankr. S.D.N.Y. 2011) (citation omitted)).)  But that is exactly what the Bankruptcy Court did:  the First Extension Order authorized the Appellees to *redact* protectable information (customer names), not to "wholesale seal" documents.  (A700.)  The Bankruptcy Court did not commit clear error, and the First Extension Order should be affirmed.

---

unsupported, and untrue.  (D.I. 17 at 53.)  The FTX Debtors do not have access to the customer lists of other cryptocurrency exchanges.  The "colloquy" cited by Appellants is on a different point entirely: whether the FTX Debtors can distinguish between creditors that are and are not customers.  (A155:7-A157:19.)

## **<u>CONCLUSION</u>**

For the foregoing reasons, this Court should affirm the Bankruptcy

Court's First Extension Order.

Dated:  September 21, 2023
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Adam G. Landis*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
       brown@lrclaw.com
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**

Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
       bromleyj@sullcrom.com
       gluecksteinb@sullcrom.com
       kranzleya@sullcrom.com

*Counsel for the Appellee FTX Debtors*
*and Debtors-in-Possession*

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

*/s/ Robert F. Poppiti, Jr.*
Matthew B. Lunn (No. 4119)
Robert F. Poppiti, Jr. (No. 5052)
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: mlunn@ycst.com
          rpoppiti@ycst.com

-and-

PAUL HASTINGS LLP
Kristopher M. Hansen*
Kenneth Pasquale*
Isaac S. Sasson*
John F. Iaffaldano*
200 Park Avenue
New York, NY 10166
Telephone:  (212) 318-6000
Facsimile:  (212) 319-4090
Email: krishansen@paulhastings.com
          kenpasquale@paulhastings.com
          isaacsasson@paulhastings.com
          jackiaffaldano@paulhastings.com

*Admitted pro hac vice*

*Counsel to the Official Committee of Unsecured
Creditors*

## <u>CERTIFICATION OF COMPLIANCE</u>

The foregoing brief complies with Federal Rule of Bankruptcy Procedure 8015 and this Court's Standing Order Regarding Briefing in All Cases because it contains 9,421 words and was prepared in 14-point Times New Roman font.

Dated: September 21, 2023          <u>/s/ *Adam G. Landis*        </u>
                                                  Adam G. Landis